**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **STACIE RAY, BASIL ARGENTO,** | ) | |
| **JANE DOE, and ASHLEY BREDA,** | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | |
| **LANCE HIMES, in his official capacity** | ) | |
| **as Director of the Ohio Department** | ) | |
| **of Health, KAREN SORRELL, in her** | ) | |
| **official capacity as Chief of the Office of** | ) | |
| **Vital Statistics, and JUDITH NAGY, in** | ) | |
| **her official capacity as State Registrar of** | ) | |
| **the Office of Vital Statistics,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>COMPLAINT</u>

### NATURE OF ACTION

1.    This action is brought by transgender people who wish to correct their Ohio birth certificates to accurately reflect their gender identity.  They wish to have access to a birth certificate they can use without being exposed to discrimination and other harm, including a high risk of violence.  Although Stacie Ray, Jane Doe, and Ashley Breda are all women, the Ohio Department of Health and Office of Vital Statistics incorrectly identifies them as male on their birth certificates.  Although Basil Argento is a man, the Ohio Department of Health and Office of Vital Statistics incorrectly identifies him as female on his birth certificate.

2.    Accurate identity documents are essential to every person's ability to navigate through life.  Access to employment, education, housing, health care, banking, travel, and

government services often depend on having documentation that accurately reflects a person's identity. A birth certificate is a basic identity document routinely relied upon for many purposes, including as a prerequisite to obtain other essential identity documents.

3. While the state provides most people born in Ohio with accurate birth certificates—matching their gender identity—the state bars transgender people alone from obtaining accurate birth certificates matching their gender identity. In practical terms, this policy denies transgender people access to birth certificates they can use. Ohio's refusal to issue such birth certificates erects a barrier to the full recognition, participation, and inclusion of transgender people in society and subjects them to discrimination, privacy invasions, harassment, humiliation, stigma, harm to their health, and even violence.

4. The State of Ohio refuses to correct the gender markers on transgender people's birth certificates regardless of what steps a person may have taken in order to obtain recognition of their gender identity.

5. Ohio's categorical bar stands in sharp contrast to the approach of nearly all other states and the District of Columbia, which have established processes by which transgender people can correct the gender marker on their birth certificate. Indeed, this total bar is also inconsistent with Ohio's own practice of permitting transgender people to correct the gender marker on their driver's license or state identification card to match their gender identity.

6. Ohio's practice, which each Defendant enforces, violates federal constitutional guarantees, including the rights to equal protection, due process, and freedom from compelled speech. As confirmed by the practices adopted by other states, as well as Ohio's own practice in changing the gender marker on state-issued driver's licenses and state identification cards, there

is no government justification to support Ohio's refusal to provide transgender people with accurate birth certificates matching their gender identity.

## JURISDICTION AND VENUE

7.     Subject matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1343 because this action seeks to redress the deprivation, under color of state law, of rights secured by the United States Constitution through 42 U.S.C. § 1983.

8.     Venue is proper in the Southern District of Ohio under 28 U.S.C. § 1391(b)(1) and (2) because each of the Defendants resides in the district and because a substantial part of the events or omissions giving rise to the claims occurred in the district.

9.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

10.     This Court has personal jurisdiction over Defendants because they are domiciled in Ohio and because their refusal to provide Plaintiffs with accurate birth certificates matching their gender identity occurred within Ohio.

## PARTIES

**Plaintiffs**

11.     Plaintiff Stacie Ray ("Ms. Ray") is a woman who was born in Ohio and who currently resides in Columbus, Ohio.  Ms. Ray is transgender and wishes to correct her Ohio birth certificate, which currently indicates that her sex is male, to accurately reflect her sex as female.

12.     Plaintiff Basil Argento ("Mr. Argento") is a man who was born in Ohio and who currently resides in Columbus, Ohio.  Mr. Argento is transgender and wishes to correct his Ohio

birth certificate, which currently indicates that his sex is female, to accurately reflect his sex as male.

13. Plaintiff Jane Doe ("Dr. Doe") is a woman who was born in Ohio and who currently resides in New Mexico. Dr. Doe is transgender and wishes to correct her Ohio birth certificate, which currently indicates that her sex is male, to accurately reflect her sex as female.

14. Plaintiff Ashley Breda ("Ms. Breda") is a woman who was born in Ohio and who currently resides in Arizona. Ms. Breda is transgender and wishes to correct her Ohio birth certificate, which currently indicates that her sex is male, to accurately reflect her sex as female.

**Defendants**

15. Defendant Lance Himes ("Mr. Himes") is the Director of the Ohio Department of Health ("ODH"). Mr. Himes supervises the activities of the Department and enforces Ohio's vital statistics laws. Mr. Himes's administration and enforcement of the vital statistics laws are actions under color of state law. Mr. Himes is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

16. Defendant Karen Sorrell ("Ms. Sorrell") is the Chief of the Office of Vital Statistics within ODH. In this role, Ms. Sorrell is the official custodian of the vital records of the state and oversees the enforcement of Ohio's vital statistics laws. Ms. Sorrell's administration and enforcement of the vital statistics laws are actions under color of state law. Ms. Sorrell is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

17. Defendant Judith Nagy ("Ms. Nagy") is the State Registrar of the Office of Vital Statistics within ODH. In this role, Ms. Nagy exercises direct authority over the issuance and alteration of Ohio birth certificates. Ms. Nagy's administration and enforcement of the vital

4

statistics laws are actions under color of state law.  Ms. Nagy is a person within the meaning of

42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

## FACTS

**Background Information Regarding Transgender People**

18.    Gender identity is a well-established medical and psychological term that refers to

a person's fundamental, internal sense of their gender.  It is a core characteristic of human

identity that everyone possesses.  Gender identity is innate and typically fixed at an early age.

19.    For the majority of people, their gender identity matches their sex assigned at

birth.  That is not the case, however, for transgender people, whose gender identity does not

match their sex assigned at birth.

20.    A person's gender marker on a birth certificate is usually designated at birth based

solely on the appearance of external genitalia.  However, there are numerous other sex-related

characteristics, which can include chromosomes, hormone levels, internal reproductive organs,

and gender identity.

21.    Where a person's sex-related characteristics are not in typical alignment with each

other, gender identity is the critical determinant of sex.

22.    Attempts to change a person's gender identity to bring it into alignment with the

person's birth-assigned sex are not only unsuccessful but also dangerous to the individual,

risking psychological harm and even suicide.

23.    Living in a manner consistent with one's gender identity is critical to the health

and well-being of transgender people.  The process by which transgender people come to live in

a manner consistent with their gender identity, rather than their birth-assigned sex, is known as

transition.  The refusal to treat a person in a manner consistent with their gender identity is

harmful to that person's dignity and wellbeing.

24.     The steps that transgender people take to transition vary with each individual's specific needs, but these steps generally include one or more of social transition, gender confirmation medical treatment, and/or gender confirmation surgical treatment.

25.     Social transition involves shifting one's presentation and social functioning so that it is consistent with one's gender identity.  For example, for a woman who is transgender, social transition can include changing her first name to one typically used by women, changing her identity documents to indicate a female gender, changing her hairstyle and clothing, and otherwise presenting herself publicly as a woman in all aspects of her life.

26.     The discordance between one's gender identity and birth-assigned sex can be associated with clinically significant distress, which is known as gender dysphoria.  Gender dysphoria is a serious medical condition that, if improperly treated, can have serious health consequences.  Treatment for gender dysphoria is governed by internationally recognized standards of care.

27.     Social transition is a part of necessary medical treatment for many transgender people with gender dysphoria.  While social transition is adequate treatment for gender dysphoria for some transgender people, others may need medical or surgical treatments as well.

28.     Whether other treatment is medically necessary or even appropriate, however, depends on the needs and health of the individual.  A person's ability to access treatment—especially gender confirmation surgery—may also be limited by financial resources, insurance coverage, provider availability, and other barriers to health care access.

29.     The various components associated with transition—social transition and gender confirmation medical or surgical treatment—do not change a person's gender, but instead bring

the person's physical appearance and social presentation into better alignment with their gender.

30.     Depriving transgender people of birth certificates that match their gender identity harms their health and well-being.  This deprivation also interferes with medical treatment for gender dysphoria by impeding a transgender person's ability to live in a manner consistent with that person's gender identity, and can aggravate symptoms of gender dysphoria.

**The Need for Accurate Birth Certificates Matching One's Gender Identity**

31.     A birth certificate is more than a piece of paper.  It reflects government recognition of a person's gender—just as a marriage certificate reflects government recognition of a person's relationship.  The government's refusal to provide transgender people with a birth certificate matching their gender identity is a stigmatizing refusal to acknowledge their gender, depriving them of their equal rights and dignity.

32.     A birth certificate is an essential government-issued document that each person uses to establish their identity throughout their lifetime.  That is why the government routinely makes copies of a birth certificate available to the person named on the birth certificate, rather than merely reserving the document solely for the government's use.

33.     Birth certificates are commonly used in a wide variety of contexts, such as determining eligibility for employment, obtaining other identity documents (including driver's licenses, state identification cards, social security cards, passports, and other state and federal identification documents), establishing school records, proving age, and enrolling in government programs.

34.     All people need access to an accurate birth certificate to establish their identity. Transgender people born in Ohio, unlike non-transgender people born in Ohio, do not have access to one.

7

35.     Many transgender people are typically perceived by others accurately and consistent with their gender identity.  A transgender woman born in Ohio who has a birth certificate designating her as male is burdened with an identity document that conflicts not only with her gender, but also with how others perceive her.  A transgender man born in Ohio who has a birth certificate designating him as female is burdened with an identity document that conflicts not only with his gender, but also with how others perceive him.

36.     Denying transgender people birth certificates that match their gender identity reveals private information in contexts where this information would otherwise remain undisclosed (e.g., at a new job), regardless of whether a person's transgender identity may otherwise be known by others (e.g., to friends or family), and regardless of a person's desire not to disclose that personal information.  Transgender people denied accurate birth certificates are deprived of significant control over the circumstances surrounding disclosure of their transgender identity, including when, where, how, and to whom their transgender identity is disclosed.

37.     A perceived mismatch between someone's gender and the information on their birth certificate subjects that person to harm, including an invasion of privacy.  Such a mismatch discloses the fact that a person is transgender.  This is profoundly personal information in which a transgender person has a reasonable expectation of privacy.  Disclosure of that information can seriously jeopardize a person's safety, and subject the person to a risk of bodily harm.

38.     According to the 2015 U.S. Transgender Survey, nearly one in three (over one in three in Ohio) transgender people who showed an identity document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or services, asked to leave, or assaulted.

39.    More generally, transgender people experience substantial discrimination and harassment in a wide variety of settings, including in employment, public accommodations, health care, and interactions with government employees and officials, including those in law enforcement.  Transgender people are also disproportionately targeted for hate crimes.  These realities make the involuntary disclosure of a person's transgender identity particularly harmful and dangerous.

40.    A mismatch between the gender information on a person's birth certificate and the information on the person's other identify documents subjects that person to harms including interference with the person's ability to pass background checks and obtain benefits that persons without such a mismatch routinely enjoy.  In some circumstances the mismatch constitutes a total impediment to obtaining such benefits.

**Ohio's Birth Certificate Policy**

41.    ODH and the Ohio Office of Vital Statistics exercise responsibility for issuing and correcting Ohio birth certificates.  Based on Plaintiffs' experiences, each of the Defendants enforces a policy and practice that categorically refuses to correct the gender marker on transgender people's birth certificate to match their gender identity (the "Birth Certificate Policy").

42.    On information and belief, the Birth Certificate Policy has only been reduced to writing in letters ODH and the Office of Vital Statistics have sent to transgender people rejecting their requests that the state correct the gender marker on their birth certificate.

43.    On information and belief, during one period of time ODH and the Office of Vital Statistics exercised its authority to correct the gender marker on birth certificates of transgender people pursuant to a court order.

44.     On information and belief, ODH and the Office of Vital Statistics since discontinued this practice and will no longer correct the gender marker on transgender people's birth certificate for any reason.  The decision to discontinue the practice was both arbitrary and irrational, especially given that neither ODH nor the Office of Vital Statistics identified any harm resulting from permitting the corrections.

45.     The Birth Certificate Policy stands in sharp contrast to the approach taken by at least forty-six (46) states that permit transgender people to correct the gender marker on their birth certificate to match their gender identity.  A forty-seventh (47th) state, Idaho, will implement a process no later than April 6, 2018 to permit transgender people to correct their birth certificate gender marker.

46.     Similarly, the U.S. Department of State permits corrections to the gender marker on a person's passport when a doctor certifies that the person has had appropriate clinical treatment for gender transition.  Other federal agencies, including the Social Security Administration, have similar standards for changing a person's gender marker in their records.

47.     Ohio's categorical bar to changing gender markers on the birth certificates of transgender people is contrary to even its own practice with other critical identification documents.  The Ohio Bureau of Motor Vehicles (Ohio BMV) allows transgender people to correct the gender marker on their driver's license and state identification card to reflect their gender identity.  Like the federal government, the Ohio BMV also does not require transgender people to have any particular medical procedure, such as surgery, to do so.  That practice is consistent with mainstream medical organizations, which support corrections of gender designations for transgender people, and oppose requiring surgery in order for transgender people to make such corrections on birth certificates.

10

**Plaintiff Stacie Ray**

48.     Plaintiff Stacie Ray is a 44-year-old woman who was born in Franklin County, Ohio and currently resides in Columbus, Ohio.  For the last seventeen years, Ms. Ray has worked on and off as a Class A semi-truck driver.

49.     Ms. Ray is transgender.  She was assigned the sex of male at birth and her birth certificate marks her as male.  However, she is female.

50.     Since beginning her transition to live openly as female approximately two and one half years ago, Ms. Ray has taken steps to bring her body and her gender expression into conformity with her female gender identity.  These steps include clinically appropriate treatment undertaken in consultation with health care professionals.  She also changed her name from a traditionally male one to a traditionally female one, and changed her name on her driver's license and with the Social Security Administration.

51.     As a result of the Birth Certificate Policy, however, the gender marker on Ms. Ray's birth certificate conflicts with her gender identity, which is female.  Defendants' refusal to issue a birth certificate accurately reflecting that Ms. Ray is female is a persistent and stigmatizing reminder that the State of Ohio does not recognize her as a woman.  That refusal impedes her ability to function successfully as a woman in all aspects of her life, including any time when she presents her birth certificate to others.  Further, presenting an identity document that identifies her as male is not only humiliating but also dangerous, putting her at risk of violence.

52.     Ms. Ray is aware of the high incidence of harassment, discrimination, and violence directed at transgender people.  In her work as a truck driver, she has been harassed and menaced at truck stops and rest stops.  As a result, she must take precautions for her personal

11

safety.  For example, Ms. Ray uses highway rest stops designed for use by the general population rather than designated truck stops.  This is because lighting, security cameras, quick accessibility to the highway, and the presence of police is better at rest stops than truck stops.

53.     Possessing a birth certificate that is incongruent with Ms. Ray's gender identity increases her exposure to harassment, discrimination, and violence.  Ms. Ray has experienced first-hand the hostility that transgender people often experience when presenting identification that conflicts with their lived gender.

54.     The incorrect gender marker on Ms. Ray's birth certificate has exposed her to hostility in the workplace.  Upon beginning a new job, Ms. Ray and 10 other new employees were required to present documents including their birth certificates.  The orientation process took place in a small conference room, with all the new hires present.  When her name was called, Ms. Ray walked to a small desk to present her documents to a human resources person. Upon examining her documents, the human resources person asked in a voice loud enough for everyone in the room to hear: "Why doesn't your gender match?"  After this disclosure of Ms. Ray's transgender identity, many of her coworkers refused to speak to her.  A workplace acquaintance explained to Ms. Ray that she had been labeled by her hostile coworkers as "the freak of the company."  Another female coworker told Ms. Ray that if she ever encountered Ms. Ray in the women's restroom, the woman would "beat [her] ass."  Ms. Ray reported the incident to the human resources department, which informed Ms. Ray that the coworker would be spoken to, but the woman's demeanor did not change.  Due to the continuing shunning and harassment, Ms. Ray left that job two weeks later.

55.     At another time, Ms. Ray was employed as a truck driver and sought a higher-paying driving job with better benefits.  She sought a Hazardous Materials (hazmat)

Endorsement for her commercial driver's license because it was a requirement for the new position. Ms. Ray had to pass a Transportation Security Administration ("TSA") background check to obtain the hazmat endorsement. At the first appointment for her background check, Ms. Ray presented her corrected driver's license and her incorrect birth certificate to the receptionist in the TSA waiting room. The receptionist loudly informed Ms. Ray that the mismatch between these two Ohio identity documents prevented TSA from commencing the background check. The receptionist's statement also revealed Ms. Ray's transgender identity to two strangers in the waiting area. The staff member then loudly (and incorrectly) advised Ms. Ray that "You need to change your driver's license back to 'male,'" before TSA could complete the background check. The experience humiliated Ms. Ray and she left in tears.

56.     Ms. Ray drove directly from the TSA facility to the Ohio Board of Health, Office of Vital Statistics, arriving 30 minutes later. Ms. Ray explained what she had just been through to an ODH staff member, and requested a corrected birth certificate. The staff member informed her that ODH would not correct her gender marker, stating, "We will never change it."

57.     Ms. Ray has also been required to present, and has presented, her birth certificate in other contexts, and she will continue to be required to do so. Because people typically perceive Ms. Ray as female, those who see her birth certificate will learn from that document that she is transgender regardless of whether she wishes to share that information with them.

58.     Ms. Ray objects to the state's ideological message that gender is determined solely by the appearance of external genitals at the time of birth.

**Plaintiff Basil Argento**

59.     Plaintiff Basil Argento is a 42-year-old man who was born in Tuscarawas County, Ohio and currently resides in Columbus, Ohio.  Mr. Argento is self-employed as a website designer and eBay entrepreneur.

60.     Mr. Argento is transgender.  He was assigned the sex of female at birth and his Ohio birth certificate identifies him as female.  However, he is male.

61.     Since beginning his transition to live openly as male almost twenty years ago, Mr. Argento has taken steps to bring his body and gender expression into conformity with his male gender identity, including through clinically appropriate treatment undertaken in consultation with health care professionals.  He also changed his name from a traditionally female name to a traditionally male one, and changed his name on his driver's license and with the Social Security Administration.

62.     As a result of the Birth Certificate Policy, however, the gender marker on Mr. Argento's birth certificate conflicts with his gender identity, which is male.  Defendants' refusal to issue a birth certificate accurately identifying Mr. Argento as male is a persistent and stigmatizing reminder that the State of Ohio does not recognize him as a man.  That refusal impedes his ability to function successfully as a man in all aspects of his life, including any time he presents his birth certificate to others.  Further, presenting an identity document that incorrectly identifies him as female is not only humiliating but also dangerous, putting him at risk of violence.

63.     Mr. Argento is aware of the high incidence of harassment, discrimination, and violence directed at transgender people.

14

64.     Possessing a birth certificate that is incongruent with Mr. Argento's gender identity increases his exposure to harassment, discrimination, and violence.  Mr. Argento has experienced first-hand the hostility that transgender people often experience when presenting identification that conflicts with their lived gender.

65.     The incorrect gender marker on Mr. Argento's birth certificate has also subjected him to inconvenience and expense, and has prevented him from obtaining benefits that he would have received if his gender marker on his birth certificate were correct.

66.     Mr. Argento is of direct, unbroken Italian descent.  According to Italy's *Jus Sanguinis* ("Law of the Blood"), he is eligible for dual citizenship in the United States and Italy, and all of the attendant privileges, including an Italian passport.  To obtain dual citizenship, he needed first to apply for an Italian birth certificate.  Obtaining an Italian birth certificate under the Law of the Blood requires the applicant to meticulously document, translate, and authenticate his ancestors' lineage and his own birth information.

67.     After painstakingly assembling all these necessary forms, information, and documentation, Mr. Argento made an appointment with the Italian Consulate that has jurisdiction over Ohio, which is in Detroit, Michigan.  He then drove there from his home in Columbus to present his portfolio.  The staff at the Italian Consulate refused to allow him to submit his portfolio for processing due to the incongruity between the gender on his Ohio birth certificate (female) and the gender on his other identity documents (male) including his Ohio driver's license.  Consular officials claimed to not know how to proceed, and said they needed to contact Rome for guidance.

68.     Mr. Argento drove back to Columbus and spent a year exploring various avenues, including consulting with legal counsel, to overcome the barrier to dual citizenship created by

15

his Ohio birth certificate.

69.    Mr. Argento then made a second trip to the Consulate in Detroit without an

appointment, because consular officials had been ignoring his calls and emails for months.  This

time, he insisted that officials accept his document portfolio for review.  However, they still

refused to accept the $339 processing fee that he proffered. Again, he had to return home

without completing the application process.

70.    A few months later, consular officials told Mr. Argento that Rome had advised

them that his birth was to be registered under his birth name and gender—his legal name change

would be ignored because the gender of his legal name did not match the gender on his Ohio

birth certificate.

71.    Even after this guidance from Rome, consular officials refused to believe it was

impossible for Mr. Argento to have the gender on his Ohio birth certificate corrected, because

the state where the Consulate is located (Michigan) does so, and because transgender people in

Italy have been able to correct the gender on their birth certificates since 1982.

72.    After another year of exchanging emails, documents, and phone calls with

Consulate staff, Mr. Argento returned to Detroit a third time for a scheduled appointment. He

finally persuaded the Consulate staff to process his application, using the same documentation

he had presented during his first visit.

73.    After three inter-state trips and almost three years, Mr. Argento's birth is now

registered in Italy, and he is an Italian citizen.  However, because his Ohio birth certificate

identifies him as female, Mr. Argento's Italian birth certificate carries the same incorrect gender

designation and also incorrectly identifies Mr. Argento by the female name he was given at

birth.  This makes it impossible for Mr. Argento to obtain an Italian passport without

16

undertaking legal proceedings in Italy.

74.     In his continuing efforts to obtain an Italian passport, Mr. Argento was advised by an Italian lawyer to first obtain a California court order confirming a legal gender change.  He flew to California and obtained this on December 7, 2017.  Mr. Argento is currently attempting to retain an Italian law firm.  The law firm will charge him between 2,000 euros ($2,490.00) and 6,000 euros ($7,471.00) to obtain the name and gender change on his Italian birth record.  These additional legal proceedings will also likely require him to travel to Italy.  All of this extra time, cost, and inconvenience would have been avoided if his Ohio birth certificate was correct.

75.     On December 18, 2017, Mr. Argento wrote to the Ohio Department of Health to inquire if he could correct the gender marker on his birth certificate.  That request was denied.

76.     Mr. Argento objects to Ohio' ideological message that gender is determined solely by the appearance of external genitals at the time of birth.

77.     Mr. Argento has been required to present, and has presented, his birth certificate in other contexts, and he will continue to be required to do so.  Because people typically perceive Mr. Argento as male, those who see his birth certificate will learn that he is transgender regardless of whether he wishes to share that information with them.

**Plaintiff Jane Doe**

78.     Plaintiff Jane Doe is a 67-year-old woman who was born in Dayton, Ohio, and who currently resides in New Mexico.  Dr. Doe is a physician.

79.     Dr. Doe is transgender.  She was assigned the male sex at birth.  However, she is female.

80.     Since beginning her transition to live openly as female around five years ago, Dr. Doe has taken steps to bring her body and her gender expression into conformity with her female

gender identity, including through clinically appropriate treatment undertaken in consultation with health care professionals. She also changed her name from a traditionally male one to a traditionally female one and changed her name on her driver's license, passport, and academic and professional certifications and with the Social Security Administration.

81. Dr. Doe has also corrected the gender marker on her driver's license and passport, and in her social security records.

82. As a result of the Birth Certificate Policy, however, Dr. Doe's birth certificate fails to reflect her gender, which is female. Defendants' refusal to issue a birth certificate accurately reflecting that Dr. Doe is female operates as a persistent and stigmatizing reminder that the State of Ohio does not recognize her as a woman. That refusal also impedes her ability to function successfully as the woman that she is in all aspects of her life, including any time she needs to present her birth certificate to others. Further, presenting an identity document that identifies her as male is not only humiliating but also dangerous, putting her at risk of violence.

83. Dr. Doe is aware of the high incidence of harassment, discrimination, and violence directed at transgender people. She has been harassed and discriminated against as a transgender person herself in the past, including verbal harassment in her workplace.

84. Possessing a birth certificate that is incongruent with Dr. Doe's gender identity increases her exposure to harassment, discrimination, and violence. Dr. Doe has experienced first-hand the hostility that transgender people often experience when presenting identification that conflicts with their lived gender.

85. For example, the incorrect gender marker on Dr. Doe's birth certificate exposed her to overt hostility when she first visited a social security office to correct the gender marker on her social security records. Upon seeing her birth certificate, a staff person loudly told her

that the Social Security Administration could not "just change you from male to female based on your say-so." A waiting room of more than one hundred people overheard the exchange, causing Dr. Doe's transgender identity to be involuntarily disclosed.

86.     Despite Dr. Doe's protests and citations to the Social Security Administration's written policy that she had printed and brought with her, the staff person insisted that unless Dr. Doe could produce a birth certificate possessing a female gender marker, they could not correct her social security records.

87.     After leaving the Social Security office, Dr. Doe sat in her car in the parking lot and cried for an hour before managing to drive home. She felt humiliated and despairing. The knowledge that the Ohio government would deliberately deprive her of the basic document she needs to validate her identity – possibly for the rest of her life – overwhelmed her. She felt the government had deemed her unworthy of equal treatment and respect as a woman, and her gender dysphoria worsened.

88.     Dr. Doe objects to the state's ideological message that gender is determined solely by the appearance of external genitals at the time of birth.

89.     Dr. Doe has also been required to present, and has presented, her birth certificate in other contexts and she will continue to be required to do so. Because people typically perceive Doe as female, those who see her birth certificate will learn from that document that she is transgender regardless of whether she wishes to share that information with them.

**Plaintiff Ashley Breda**

90.     Plaintiff Ashley Breda is a 27-year-old woman who was born and raised in Youngstown, Ohio, and who currently resides in Phoenix, Arizona. Ms. Breda is currently seeking employment.

91.     Ms. Breda is transgender.  She was assigned the sex of male at birth.  However, she knows herself to be female.

92.     Since beginning her transition to live openly as female around two years ago, Ms. Breda has taken steps to bring her body and her gender expression into conformity with her female gender identity, including through clinically appropriate treatment undertaken in consultation with health care professionals.  She also changed her name from a traditionally male one to a traditionally female one and changed her name on her state identification card and with the Social Security Administration.

93.     Ms. Breda has also corrected the gender marker on her state identification card with the Arizona Department of Transportation and in her social security records.

94.     As a result of the Birth Certificate Policy, however, Ms. Breda's birth certificate fails to reflect her gender identity, which is female.  Defendants' refusal to issue a birth certificate accurately reflecting that Ms. Breda is female is a persistent and stigmatizing reminder that the State of Ohio does not recognize her as a woman.  That refusal also impedes her ability to function successfully as the woman that she is in all aspects of her life, including any time when she presents her birth certificate to others.  Further, presenting an identity document that identifies her as male is not only humiliating but also dangerous, putting her at risk of violence.

95.     Ms. Breda is aware of the high incidence of harassment, discrimination, and violence directed at transgender people.  She has personally been a target of on-line harassment.

96.     Possessing a birth certificate that is incongruent with Ms. Breda's gender identity increases her exposure to harassment, discrimination, and violence.  Ms. Breda has experienced first-hand the hostility that transgender people often experience when presenting identification that conflicts with their lived gender.

97.     The incorrect gender marker on Ms. Breda's birth certificate exposed her to hostility when she visited the Arizona Department of Transportation Motor Vehicle Division ("MVD"), for example.  Shortly after Ms. Breda relocated to Phoenix, she went to the MVD to obtain an Arizona state identification card.  When Ms. Breda requested state identification with a female gender marker, the clerk insisted that Ms. Breda would need to present her birth certificate for inspection, despite the fact that Ms. Breda had already produced her Ohio state identification card with a female gender marker.  The clerk erroneously indicated that the gender marker on one's state identification card would need to match the gender marker on one's birth certificate.  This refusal required the intervention of two supervisors, resulting in a discussion of Ms. Breda's transgender identity in a public place.

98.     Although the supervisor ultimately instructed the clerk to process the request, it was humiliating for Ms. Breda to have to defend that she was a woman and her entitlement to treatment as such, against a government official's insistence to the contrary, based on the fact that her birth certificate did not reflect that she is female.

99.     On another occasion, when she began a new job, she presented her birth certificate to a human resources staff member, who, in turn, disclosed her transgender identity to Ms. Breda's colleagues.

100.     Ms. Breda objects to the state's ideological message that gender is determined solely by the appearance of external genitals at the time of birth.

101.     Ms. Breda has also been required to present, and has presented, her birth certificate in other contexts and will continue to be required to do so.  Because people typically perceive Ms. Breda as female, those who see her birth certificate will learn from that document that she is transgender regardless of whether she wishes to share that information with them.

21

## CAUSES OF ACTION PURSUANT TO 42 U.S.C. § 1983

### FIRST CAUSE OF ACTION
### Equal Protection Violation

102.    Plaintiffs incorporate paragraphs 1 through 101 as though fully set forth herein.

103.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

104.    The Birth Certificate Policy facially and intentionally discriminates against transgender people based on sex.  When the government lists a person's sex on their birth certificate, the government literally creates a classification based on sex.  In the case of transgender people, this classification reflects a sex contrary to their gender identity, causing harm as a result.  Discrimination based on sex-related considerations also includes, but is not limited to, discrimination based on gender nonconformity, gender identity, transgender status, and gender transition.

105.    Discrimination because a person is transgender is both discrimination based on a sex-related consideration, which requires courts to apply intermediate scrutiny at minimum when evaluating the constitutionality of the government's discrimination, and discrimination based on transgender status, which requires courts to apply strict scrutiny to such discrimination.

106.    Government discrimination against transgender people because of their transgender identity bears the indicia of a suspect classification requiring strict scrutiny by the courts.

    a.    Transgender people have suffered a long history of extreme discrimination and continue to suffer such discrimination to this day.

    b.    Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process.  Transgender people are a

relatively small minority, and have had limited success securing express federal, state, and local protections specifically protecting them against discrimination, and have been and continue to be regularly targeted by anti-transgender legislation, regulations, bills, and other government action.

c.  A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

d.  Gender identity is a core, defining trait that is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment. Gender identity is also generally fixed at an early age and highly resistant to change.

107.  The Birth Certificate Policy facially and intentionally discriminates on the basis of sex and transgender status by depriving transgender people who were born in Ohio—and them alone—of birth certificates that accurately reflect their gender identity. Non-transgender people are not deprived of birth certificates that accurately reflect their gender identity.

108.  The Birth Certificate Policy facially and intentionally discriminates on the basis of sex and transgender status by depriving all transgender people, and only transgender people, who were born in Ohio of access to an accurate birth certificate that they can use without sacrificing their privacy, health, safety, dignity, and autonomy. Non-transgender people born in Ohio are not deprived of birth certificates they can use without sacrificing their privacy, health, safety, dignity, and autonomy.

109.  The Birth Certificate Policy deprives transgender people born in Ohio, including Plaintiffs, of their right to equal dignity and stigmatizes them as second-class citizens in violation of the Equal Protection Clause.

110.    The Birth Certificate Policy deprives transgender people born in Ohio, including Plaintiffs, of the ability to secure certain benefits to which they would otherwise be entitled.

111.    The Birth Certificate Policy is not narrowly tailored to further a compelling state interest, substantially related to an important government interest, or even rationally related to a legitimate government interest.

112.    The Birth Certificate Policy is maintained and motivated by animus towards transgender people.

113.    Accordingly, Defendants are liable for their violation of the Fourteenth Amendment rights of the Individual Plaintiffs under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Ohio's Birth Certificate Policy unconstitutional and enjoining its enforcement.

## SECOND CAUSE OF ACTION
### Due Process Violation

114.    Plaintiffs incorporate paragraphs 1 through 101 as though fully set forth herein.

115.    The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

116.    The substantive protections of the Due Process Clause, as well as other constitutional provisions giving rise to a right to privacy, protect information that is highly personal and intimate as well as information that could lead to bodily harm upon disclosure. Government infringement of these protections requires the courts to apply strict scrutiny to such government action.

117.    The fact that a person is transgender constitutes highly personal and intimate information.  A reasonable person would find the involuntary disclosure of one's transgender identity to be deeply intrusive.

24

118.    The involuntary disclosure of one's transgender identity can also cause significant harm, including placing one's personal safety and bodily integrity in jeopardy.  This harm burdens and interferes with the ability of transgender people to live in a manner consistent with their gender identity in all aspects of life, including where doing so is medically necessary.

119.    The Birth Certificate Policy violates transgender people's right to privacy by causing disclosures of their transgender identity and depriving them of significant control over the circumstances around such disclosure.

120.    There is no compelling or even legitimate interest in the government causing transgender people to involuntarily disclose their transgender identity any time third parties see their birth certificates.

121.    There is no recognizable public interest in causing transgender people to disclose their transgender identity to third parties where they would not otherwise do so.

122.    The Birth Certificate Policy also burdens the right to define and express one's gender identity, including a right not to be treated in a manner contrary to one's gender by the government.  Where the government identifies individuals by their sex in official documents, the constitutional protections that shelter individual and bodily autonomy, dignity, and personhood prohibit the government from interfering with the right to live in accordance with one's gender identity.

123.    Accordingly, Defendants are liable for their violation of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Ohio's Birth Certificate Policy unconstitutional and enjoining its enforcement.

## THIRD CAUSE OF ACTION
### First Amendment Violation

124.    Plaintiffs incorporate paragraphs 1 through 101 as though fully set forth herein.

125.    The First Amendment to the United States Constitution provides that a state "shall make no law . . . abridging the freedom of speech."

126.    The First Amendment protects both the right to speak and the right to refrain from speaking.

127.    The Birth Certificate Policy violates the First Amendment rights of transgender people to refrain from speaking by forcing them to disclose their transgender status and to identify with a gender that conflicts with who they are.  It also prevents transgender people from accurately expressing their gender.

128.    The Birth Certificate Policy further violates the First Amendment rights of the Plaintiffs to refrain from speaking, forcing them instead to endorse the government's position as to their own gender, as well as on the meaning of gender generally, through the birth certificate they must show to others.  The gender marker listed on the Plaintiffs' birth certificates conveys the state's ideological message that gender is determined solely by the appearance of external genitals at the time of birth and never deviates from that – a message to which each of the Plaintiffs strongly objects.

129.    The Birth Certificate Policy is not narrowly tailored to serve any compelling government interest.

130.    Accordingly, Defendants are liable for their violation of the First Amendment rights of the Individual Plaintiffs under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Ohio's Birth Certificate Policy unconstitutional and enjoining its enforcement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.       Issue a judgment, pursuant to 28 U.S.C. §§ 2201-02, declaring the Birth Certificate Policy unconstitutional on its face and as applied for the reasons set forth above;

B.       Permanently enjoin Defendants, their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them from enforcing the Birth Certificate Policy, including from refusing to provide birth certificates to transgender people, such as Plaintiffs, that accurately reflect their sex consistent with their gender identity, and without the inclusion of information that would, directly or indirectly, disclose any person's transgender identity on the face of the birth certificate;

C.       Award Plaintiffs costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

D.       Grant any injunctive or other relief that this Court deems just, equitable, and proper.

Dated: March 29, 2018                          Respectfully submitted,


By:     /s/ Freda Levenson

Freda Levenson, Trial Attorney (0045916)
Susan Becker (0010205)
Elizabeth Bonham (0093733)
ACLU of Ohio
4506 Chester Ave.
Cleveland, OH 44103
Phone: 216-472-2220
Facsimile: 216-472-2210
Email: flevenson@acluohio.org
Email: sbecker@acluohio.org
Email: ebonham@acluohio.org

Kara Ingelhart* (Illinois Bar No. 6321949)
Lambda Legal Defense and Education Fund, Inc.
105 W. Adams St., 26th Fl.
Chicago, IL 60603
Telephone: (312) 663-4413
Facsimile: (312) 663-4307
Email: kingelhart@lambdalegal.org

Peter C. Renn* (California Bar No. 247633)
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
Telephone: (213) 382-7600
Facsimile: (213) 351-6050
Email: prenn@lambdalegal.org

John Knight* (Illinois Bar No. 6201433)
American Civil Liberties Union Foundation
180 N. Michigan Ave., Suite 2300
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
Email: jknight@aclu-il.org

Gabriel Arkles* (New York Bar No. 4391918)
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
Telephone: (212) 549-2569
Facsimile: (212) 549-2650

28

Email: garkles@aclu.org

David J. Carey (0088787)
Thompson Hine LLP
41 S. High St., Ste. 1700
Columbus, OH 43215
Telephone: (614) 469-3200
Facsimile: (614) 469-3361
Email: David.Carey@thompsonhine.com

*Attorneys for Plaintiffs*
*Pro hac vice* motion pending