## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| STACIE RAY, *et al*., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:18-cv-00272 |
| v. | ) ) | |
| LANCE HIMES, *et al*., | ) ) ) | Judge: Michael Watson |
| Defendants. | ) ) ) | Magistrate Judge: Chelsey Vascura |

---

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

---

### INTRODUCTION

Birth certificates are essential identity documents. People are required to produce birth certificates to verify their identities at critical stages throughout their lives. This includes, for instance, applying for a job, qualifying for professional licenses, obtaining a passport, and procuring or amending other government records. Compl. ¶¶ 53-54, 66-67, 85-97, ECF No. 1.

Accordingly, Defendants typically permit changes to the notations recorded at birth, as, for instance, in the case of a person's name change or adoption, so that birth certificates are *useable* identity documents. Mem. in Supp. of Defs.' Mot. to Dismiss 1,3-4, ECF No. 18; Ohio Rev. Code Ann. §§ 3705.15, 3705.22 (West 2018). Such changes ensure that birth certificates continue to accurately communicate who people are. *Id.* at 4. But, for transgender people, Defendants refuse to correct the gender identification field on birth certificates, depriving them of the contemporaneously accurate birth certificates that they need. This refusal, regardless of

whether it is supposedly dictated by state law,[1] is the policy that Defendants enforce (the "Policy"). The Policy facially discriminates between transgender people and non-transgender people, unconstitutionally depriving only transgender people of documents that accurately communicate who they are, and that they can use without compromising their privacy, dignity, and safety.

In defending the Policy, Defendants make a specious distinction that birth certificates do not convey a person's gender, but rather their "sex" at birth—which Defendants define as a biological characteristic that is independent of gender identity. *Id.* at 4-6. This distinction is ideological, not scientific, and it disregards the function of birth certificates in everyday life.[2] People need a birth certificate that conforms to who they are so that they can *use* it. A transgender woman, who participates in community life as a woman and may have other identity documents confirming that she is a woman, should not be forced to show a prospective employer, for example, a birth certificate saying she is a man. When she is required to reveal a birth certificate that does not match her gender, she involuntarily discloses her status as a transgender person—subjecting her to humiliation, harassment, violence, and barriers to conducting routine business that non-transgender persons never have to face. Defendants' Policy forces Plaintiffs and similarly situated people to experience this invasion of privacy and face these risks, over and over again.

---

[1] Defendants rely on *In Re Declaratory Relief for Ladrach,* 513 N.E.2d 828 (Ohio Ct. Com. Pl 1987) for the proposition that Ohio's statutes prohibit the relief Plaintiffs seek. But *Ladrach,* a case about same-sex marriage, is no longer good law. Moreover, the instant constitutional challenge does not require the Court to interpret Ohio's statutes, but evaluate the constitutionality of the Policy.

[2] Plaintiffs have alleged that gender identity is a critical determinant of sex. Compl. ¶ 21. As explained below, courts have confirmed, as a matter of law, that "sex" is not limited to one's birth-assigned sex. Even to the extent that Defendants seek to characterize this as a matter of scientific dispute rather than ideological viewpoint, it is at most a dispute of fact that must be resolved in Plaintiffs' favor at this stage.

Ohio's discriminatory refusal to provide accurate birth certificates to transgender people makes it an outlier.[3] Defendants' Policy violates Plaintiffs' constitutional rights to equal protection, due process, and freedom of expression, and Defendants fail to articulate any adequate justification for it, much less one that can be credited at the pleading stage. Plaintiffs have more than adequately pled these claims, and this Court must allow them to proceed.

## STANDARD OF REVIEW

When deciding a motion to dismiss under Fed. R. Civ. P 12(b)(6), courts "must construe the complaint in the light most favorable to the plaintiff and must accept all the factual allegations contained in the complaint as true." *Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010). To survive a motion to dismiss, a "complaint need contain only 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quotation omitted). Plaintiffs' claims easily clear this low bar.

## ARGUMENT

Plaintiffs bring this challenge to Defendants' Policy of refusing to provide transgender people with Ohio birth certificates matching their gender identity in violation of equal protection, due process, and freedom of speech and expression. "It is fundamental that the federal forum, as the ultimate guardian of constitutional rights...rectify constitutionally infirm practices, policies or conduct." *Kendrick v. Bland*, 740 F.2d 432, 437 (6th Cir. 1984).

---

[3] Today, 47 states provide procedures for transgender people to obtain accurate birth certificates. Recently, federal district courts in Idaho and Puerto Rico struck down policies similar to Ohio's, leaving Ohio, Tennessee, and Kansas as the only remaining jurisdictions in the country that refuse to provide accurate birth certificates for transgender people.

I.     **The Birth Certificate Policy Violates the Equal Protection Clause.**

   A.     **The Policy Discriminates Against Transgender People By Denying Them Birth Certificates Matching Their Gender Identities.**

Defendants' Policy prohibits transgender people from having birth certificates that accurately reflect their gender identity, while allowing non-transgender people to have accurate birth certificates. This Policy is facially discriminatory in violation of Equal Protection. *See Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 285 (W.D. Pa. 2017). Defendants contend that the Policy is facially neutral because, in refusing to correct gender markers, it supposedly treats all people the same. But the Policy inherently discriminates against transgender people whose birth-assigned sex conflicts with who they are. If the only way that a woman can have a birth certificate with a female gender marker is to have been assigned "female" at birth, then transgender women are forever denied an accurate birth certificate. The same holds true for transgender men. *See Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016) ("*Highland*") *stay denied, Dodds v. United States Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016).

According to Defendants' logic, laws excluding same-sex couples from marriage were also not discriminatory, because gays and lesbians had the same right as heterosexual people to marry different-sex spouses. *Obergefell v. Hodges* concluded differently. *Obergefell v. Hodges* 135 S. Ct. 2584, 2589-90 (2015). Indeed, by Defendants' logic, no state action discriminating against transgender people would ever be unconstitutional, because the state could always argue that it "neutrally" requires everyone to identify and live in a manner consistent with their birth-assigned sex—a requirement no transgender person could ever meet. Refusing to permit transgender people to obtain birth certificates that accurately reflect their gender forecloses meaningful access to a government document every non-transgender person born in Ohio may

obtain and use. Requiring all people to have documents reflecting their birth-assigned sex does not cure this problem—it *is* the problem.

Regardless of the level of judicial scrutiny applied, Plaintiffs have alleged sufficient facts to support their claim. As noted below, however, strict scrutiny is the appropriate standard.

### B. The Policy Requires Strict Scrutiny Because It Discriminates Against a Suspect Class.

Strict scrutiny is required where the government targets a class that (1) has been "historically subjected to discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," (3) has "obvious, immutable, or distinguishing characteristics," and (4) is "a minority or politically powerless." *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd on other grounds*, 133 S. Ct. 2675 (2013) (internal quotation marks omitted). All these indicia are present for transgender people. Compl. ¶ 106. Discrimination against transgender people therefore demands strict scrutiny. *See Karnoski v. Trump*, No. C17-1297-MJP, 2018 WL 1784464, at *14 (W.D. Wash. Apr. 13, 2018).

First, there has been a long and cruel history of discrimination against this group, which remains pervasive. "As a class, transgender individuals have suffered, and continue to suffer, severe persecution and discrimination." *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 208-09 (D.D.C. 2017) ("*Doe*"). Transgender people experience "alarming rates" of harassment and physical violence relative to the general population. *Id.* "There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *see also Highland*, 208 F. Supp. 3d at 874.

Second, this longstanding discrimination is unrelated to transgender people's value to society. *See Karnoski*, 2018 WL 1784464, at *10; *Doe*, 275 F. Supp. 3d at 209; *Highland*, 208

5

F. Supp. 3d at 874; *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015).

Additionally, "[t]ransgender people have 'immutable [and] distinguishing characteristics that

define them as a discrete group.'" *Highland*, 208 F. Supp. 3d 874 (S.D. Ohio 2016)

(quoting *Lyng v. Castillo*, 477 U.S. 635, 638 (1986)); *see also Doe*, 275 F. Supp. at 208;

*Evancho*, 237 F. Supp. 3d at 288.  "Experts agree that gender identity has a 'biological

component,' and there is a 'medical consensus that gender identity is deep-seated, set early in

life, and *impervious to external influences.*'" *Karnoski*, 2018 WL 1784464, at *10 (emphasis in

original).  Finally, transgender people have very little political power. *Karnoski*, 2018 WL

1784464, at *11; *Doe*, 275 F. Supp. 3d at 209; *Highland*, 208 F. Supp. 3d at 874; *Adkins*, 143 F.

Supp. 3d at 140.

Because discrimination against transgender people rings every alarm alerting courts to a

suspect classification, the Policy here is subject to strict scrutiny.

### C.    In the Alternative, the Policy Requires Heightened Scrutiny.

 "[A]ll gender-based classifications…warrant heightened scrutiny." *United States v.

Virginia*, 518 U.S. 515, 555 (1996) (quotations omitted).  Defendants' Policy warrants *at least*

heightened scrutiny because "discrimination on the basis of transgender and transitioning status

is necessarily discrimination on the basis of sex." *EEOC v. R.G. &. G.R. Harris Funeral Homes,

Inc.*, 884 F.3d 560, 571 (6th Cir. 2018) ("*R.G.*"), *cert. pet. filed*; *see also, e.g.*, *Barnes v. City of

Cincinnati*, 401 F.3d 729, 739 (6th Cir. 2005); *Smith v. City of Salem*, 378 F.3d 566, 573-75 (6th

Cir. 2004); *Highland*, 208 F. Supp. 3d at 868-71; *Schwenk v. Hartford*, 204 F.3d 1187, 1201-02

(9th Cir. 2000); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *Glenn v.

Brumby*, 663 F.3d 1312, 1319-20 (11th Cir. 2011).  As the Sixth Circuit explained in *R.G.*,

refusing to treat a transgender woman like other women is necessarily based on "notions of how

sexual organs and gender identity ought to align," which is impermissible sex stereotyping. *Id.*

6

at 576. Defendants' Policy discriminates against transgender people based on that exact same stereotyping, which is equally impermissible under the Equal Protection Clause as under Title VII. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 139 n.11 (1994). *R.G.* also held that existing precedent "preclude[s]" a reading of "'sex' to mean only individuals' 'chromosomally driven physiology and reproductive function.'" *Id.* at 575. Defendants urge the same "preclude[d]" understanding of "sex" in defense of the Policy.[4]

Under intermediate scrutiny, Defendants must demonstrate that their "classification [] substantially serve[s] an important governmental interest ***today***, for 'in interpreting the equal protection guarantee, we have recognized that new insights and societal understandings can reveal unjustified inequality…that once passed unnoticed and unchallenged.'" *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) (internal citations omitted).

### D. Defendants' Policy Lacks Even a Rational Basis.

Defendants have not identified and cannot identify *any* legitimate government interest supporting their Policy, let alone an important or compelling one. *See Romer v. Evans*, 517 U.S. 620, 632-33 (1996). Courts in Alaska, Idaho, Michigan, and Puerto Rico have all held that policies barring transgender people from obtaining identity documents matching their gender identity lack any adequate government justification. *See Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1142 (D. Idaho 2018); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015); *K.L. v. State, Dept. of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183, at *6-8 (Alaska Super. Mar. 12, 2012).

---

[4] Contrary to Defendants' assertion, case law interpreting statutory prohibitions on sex discrimination also informs case law interpreting the Equal Protection Clause, and vice versa. *See, e.g.*, *Smith*, 378 F.3d at 577 (same elements are required under equal protection claims and Title VII claims).

Defendants has asserted an interest in the accuracy of birth certificates or prevention of fraud, but then essentially asks this Court to ignore the fact that its Policy, which forces transgender people to have *inaccurate* documents, actually undermines both these goals.  The Eastern District of Michigan recognized that the state's refusal to correct the gender markers on transgender plaintiffs' drivers licenses "[bore] little, if any, connection to Defendant's purported interests" in maintaining accurate identity documents.  *Love*, 146 F. Supp. 3d at 856.  Alaska's Superior Court held that the state's refusal to correct a transgender woman's driver's license not only failed to "further[]…the state's interest in accurate document[s] and identification" but, in fact, created a risk of "inaccurate and inconsistent identification documents."  *K.L.*, 2012 WL 2685183, at *7.  Identity documents bearing a transgender person's birth-assigned sex "inaccurately describe the discernable appearance of the [document] holder by not reflecting the holder's lived gender expression of identity," *id.,* creating problems for the document's owner and all those who need to see it.  *See also F.V.*, 286 F. Supp. 3d at 1142 (birth certificate policy similar to Ohio's lacked rational basis); *Arroyo Gonzalez*, 305 F. Supp. 3d at 333 (birth certificate policy similar to Ohio's was "not justified by any legitimate government interest").

The Policy also creates inconsistency across transgender persons' identity documents because "the Ohio Bureau of Motor Vehicles already allows transgender people to change the sex designation on their driver's license or state identification card to match their gender identity." Mem. Supp. Defs.' Mot. Dismiss 20.  Indeed, Defendants' Policy also creates inconsistencies between Plaintiffs' licenses and their federal identification documents, such as passports and Social Security records.  Compl. ¶¶ 5-6, 46-47.

Defendants also assert that the Policy somehow aids in proving "the fact of death" for vital records purposes, but fail to explain how the Policy accomplishes this goal; how depriving

themselves of gender information that may be reflected on a death certificate makes it easier to match those records with birth certificates; or why permitted changes, such as name and parentage, do not interfere with "fact of death" findings.

Finally, Ohio cannot justify its Policy as necessary to capture and reflect to the public some purportedly objective, briefly observed "fact" of a person's sex. The gender marker on an uncorrected birth certificate does not account for any sex-related characteristics other than a perception of a person's external genitalia at the time of birth. Defendants have not offered any reason why the government has any legitimate interest in disclosing the appearance of transgender people's external genitalia at the time of birth.

Because the Policy makes accurate and consistent identification *more* difficult, it undermines, rather than supports, Defendants' stated interests. Moreover, to the extent Defendants seek to prove any interest in maintaining the Policy, they cannot do so at the pleading stage. Plaintiffs have adequately pled facts for their Equal Protection claim to survive any level of scrutiny.

## II.    **Defendants' Policy Violates Plaintiffs' Due Process Right to Privacy.**

Plaintiffs have alleged sufficient facts to show that the Policy violates their right to privacy. As set forth in Plaintiffs' complaint, the policy forces transgender people to disclose that their assigned sex at birth is different from their gender identity—that is, it forces them to disclose that they are transgender—every time they must produce a birth certificate. The uncorrected birth certificate reveals highly intimate information and puts Plaintiffs at risk of bodily harm. Defendants argue that Plaintiffs' claim fails because, on the one hand, Defendants may have already disclosed their birth record, making it public, and, on the other, that it is *not*

the Defendants who have disclosed or would disclose this information, but others.  These arguments are inconsistent and unsound.

The "constitutionally protected 'zone of privacy'" includes an "individual interest in avoiding disclosure of personal matters."  *Whalen v. Roe*, 429 U.S. 589, 598-99 (1977).  The Sixth Circuit has described this due process interest as the right to "informational privacy," *Bloch v. Ribar*, 156 F.3d 673, 684 (6th Cir.1998), and recognized two protected categories: highly intimate information, *id.* at 685, and information kept private to preserve a person's "personal security and bodily integrity," *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062 (6th Cir. 1998).  Defendants' Policy violates Plaintiffs' privacy in both categories. *See Arroyo Gonzalez*, 305 F. Supp. 3d at 333.

Informational privacy includes "interests of an intimate nature which define significant portions of our personhood."  *Bloch*, 156 F.3d at 685; *cf. Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992) ("[M]atters[] involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment").  Every federal court to consider the question has agreed that information about a person's gender identity, genitalia, and gender transition could hardly be more intimate or involve more core aspects of personhood.  *See Arroyo Gonzalez,* 305 F. Supp. 3d. at 334; *Love*, 146 F. Supp. 3d at 855; *Darnell v. Lloyd*, 395 F. Supp. 1210, 1214 (D. Conn. 1975).

Just being transgender "is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others," meaning that "[t]he excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate."  *Powell v. Schriver*, 175 F.3d 107, 111-12 (2d

10

Cir. 1999). "Much like matters relating to marriage, procreation, contraception, family relationships, and child rearing, there are few areas which more closely intimate facts of a personal nature than one's transgender status." *Arroyo Gonzalez,* 305 F. Supp. 3d at 333 (citations omitted).

Forced disclosure of this information places the personal safety and bodily integrity of transgender people in jeopardy. *See Whitaker*, 858 F.3d at 1051; *In re E.P.L.*, 891 N.Y.S.2d 619, 621 (Sup. Ct. 2009). As this Court noted in granting Jane Doe's motion to proceed under a pseudonym in this case, transgender people often face social stigma and harassment based on their gender identity. Order, Apr. 5, 2018, ECF No. 9.

According to a 2015 study, more than a third of transgender people in Ohio who presented identification showing a name or gender different from their outward appearance were verbally harassed, denied benefits or services, asked to leave an establishment, or assaulted. Compl. ¶ 38. At least fourteen transgender people have been murdered so far in 2018, two of them in Ohio. *Violence Against the Transgender Community in 2018*, Human Rights Campaign, https://www.hrc.org/resources/violence-against-the-transgender-community-in-2018 (last visited July 26, 2018). In Cleveland alone, four transgender women have been violently attacked this year. Adam Ferrise, *Stabbing of transgender woman in Cleveland is fourth known violent attack on a transgender woman in 2018*, Cleveland.com, July 13, 2018, https://www.cleveland.com/metro/index.ssf/2018/07/man_accused_of_stabbing_transg.html.

This case involves the same type of risk—serious bodily harm—present in *Kallstrom*. *See Love*, 146 F. Supp. 3d at 856 ("Similar to *Kallstrom*, the Court finds no reason to doubt that where disclosure of this highly intimate information may fall into the hands of persons harboring such negative feelings, the Policy creates a very real threat to Plaintiffs' personal security and

11

bodily integrity."). Forbidding alteration of a birth certificate to match the certificate holder's gender identity "exposes transgender individuals to a substantial risk of stigma, discrimination, intimidation, violence, and danger." *Arroyo Gonzalez*, 305 F. Supp. 3d at 333.

As explained in the Complaint, Defendants' actions have already instigated hostility and threats of violence against Plaintiffs in the workplace, Compl. ¶ 54, in federal government offices, *id.* at ¶ 85, and in interactions with the governments of other states, *id.* at ¶ 97. After Plaintiff Stacie Ray's birth certificate disclosed her identity at work, her coworker threatened to "beat [her] ass." *Id.* at ¶ 54. All Plaintiffs fear future violence if they cannot control whether and when to disclose their transgender identity. Due to the recognized "hostility and intolerance" towards transgender people, "the Constitution does indeed protect the right to maintain the confidentiality of one's transsexualism."[5] *Powell,* 175 F.3d at 111.

Defendants claim that because they do not always directly disclose the protected information, they bear no responsibility for its disclosure. Courts have rejected this approach. In *Kallstrom*, the city did not make an unconstitutional disclosure directly to the gang members who might have inflicted violence, but to defense attorneys. 136 F.3d. at 1065. It was enough that the information disclosed "may fall into the hands" of those likely to inflict violence. *Id.* at 1063; *see also K.L.*, 2012 WL 2685183, at *6 ("[W]hile the DMV is not the entity…actually disclosing this information, the threat of disclosure is nonetheless real").

Defendants give transgender people no choice but to produce a birth certificate that discloses their transgender status in circumstances where that information would never otherwise have come to light. Compl. ¶¶ 54, 85, 97. A person may not be forced to choose between a valuable government benefit and a constitutionally protected right. See *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1077

---

[5] Plaintiffs note the term "transsexualism" is outdated and that, modernized, *Powell* addresses transgender people.

(6th Cir. 1994). Under Defendants' Policy, disclosure is not a "choice" for transgender people in any meaningful sense. People must produce birth certificates to participate in public life. *See, e.g.,* Ohio Admin. Code §§ 5160-1-2-11 (proving eligibility for Medicaid); 145-1-62 (for the public employees' retirement system); 4501-1-1-21(e)(1) (for a driver's license or learner's permit). Defendants have chosen to record the appearance of people's external genitalia at birth as a person's "sex" on birth certificates and never permit transgender people to correct that field, with full knowledge that their Policy forces unwanted disclosure of transgender identity. Those facts are enough to support Plaintiffs' privacy claim. *See Love*, 146 F. Supp. 3d at 856 ("[B]y requiring Plaintiffs to disclose their transgender status, the Policy directly implicates their fundamental right of privacy").

Defendants also argue that because Ohio refers to birth certificates as public records, they are insulated from an informational privacy claim. The cases Defendants cite do not support their position. This Court observed in an unpublished decision that a plaintiff had no privacy right in public records, but the court was referring to unsealed court documents, specifically records of criminal conviction. *G.B. v. Rogers*, No. 1:08-CV-437, 2009 WL 1322451, at *11 (S.D. Ohio May 11, 2009). While federal courts have long acknowledged public interest in records of judicial proceedings, no parallel exists for birth certificates. *See Sheppard v. Maxwell,* 384 U.S. 333, 349(1966). Most states do not permit one to obtain a copy of another person's birth certificate absent some legal relationship, and Ohio is actually much more selective about releasing information on birth certificates than the term "public record" may imply.[6]

---

[6] To obtain someone's birth certificate, an applicant must pay a fee and supply significant personal information about the person, including date and place of birth and the names of the person's parents before marriage. *See* Ohio Department of Health, HEA 2709 3.07 Application for Certified Copies, https://www.odh.ohio.gov/-/media/ODH/ASSETS/Files/vs/general/applicationform.pdf?la=en. Some information in birth records Ohio does not disclose publicly, Ohio Rev. Code Ann. § 3705.23(4) (West 2015), and some birth records become sealed after

The other precedent Defendants cite also does not apply.  In *Cox,* the Court held that imposing civil liability against a broadcaster for publicizing accurate information contained in a public record of a judicial proceeding would violate freedom of the press.  *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495 (1975).  *Lambert* is even further afield: there the court ruled against the plaintiff because she alleged only risk of financial harm, not physical harm.  *Lambert v. Hartman*, 517 F.3d 433, 442 (6th Cir. 2008).  And in *Does*, the court simply noted that while state statute created a privacy interest in certain criminal records, it had not created a privacy interest in the records about which the plaintiffs complained.  *Does v. Munoz*, 507 F.3d 961, 965 (6th Cir. 2007).  No court has held that government entities may force disclosure of *any* private information so long as the information is contained in a document they label as a "public record."

Limited availability of information to the public does not foreclose a privacy claim.  In *Kallstrom*, at least some of the information disclosed, such as the names of the officers and their immediate family members, was no doubt available to the public in some form.  But disclosing their names in a context that revealed them to be undercover officers nonetheless violated their right to privacy.  Similarly, disclosing the Plaintiffs' assigned sex at birth in a context that reveals them to be transgender violates their right to privacy.  *Cf. U.S. Dep't of Defense v. Fed. Labor Relations Auth.,* 510 U.S. 487, 500 (1994) ("an individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may [already] be available to the public in some form"); *C.N. v. Wolf*, 410 F. Supp. 2d 894, 903 (C.D. Cal. 2005) (recognizing a lesbian student's privacy interest against disclosure

---

alterations have been made, Ohio Rev. Code Ann. § 3705.23(1) (West 2015).  It is precisely the Defendants' choice not to alter and seal birth records that divulge record holders' transgender identity that Plaintiffs challenge.

of her sexual orientation to her parent, even though she was open about her sexual orientation with other students).

Adopting Defendants' argument would permit an end run around constitutional protections: a government entity could designate anything it wished to disclose a "public record" and escape its constitutional obligations to avoid infringing on privacy rights. Characterizing birth certificates as public records in state law does not determine the scope of federal constitutional rights. In addition, Defendants' speculation that other people may have already obtained the Plaintiffs' birth certificates from online databases cannot be given any weight at the motion to dismiss stage. *See Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005).

Because Plaintiffs pled facts showing that Defendants' Policy discloses their intimate information, exposing them to harm, their due process claim should proceed.

## III.   Defendants' Policy Unconstitutionally Compels Speech and Expression.

Defendants ask this Court to dismiss Plaintiffs' First Amendment claim because the speech at issue belongs to the government, not to Plaintiffs. But the Supreme Court has repeatedly limited the application of the government speech doctrine, and that doctrine is inapposite here. *E.g., Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361 (2018) ("*NIFLA*"). By forcing transgender Ohioans to maintain and produce birth certificates containing the state's ideological message about their gender, rather than their own truthful message, Ohio unconstitutionally compels their speech. *E.g., Wooley v. Maynard,* 430 U.S. 705, 714 (1977); *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.,* 487 U.S. 781, 797 (1988).

### A.     The Government Speech Doctrine Does Not Control Plaintiffs' Challenge.

Defendants oppose Plaintiffs' First Amendment claim using two sleights of hand. First, Defendants *factually* mischaracterize what a birth certificate is. It is not an immutable record of a single point in time, but rather a contemporaneous identity document that people must

15

routinely show to others. Second, Defendants *legally* mischaracterize how the claim should be analyzed.  In issuing an identity document containing a private fact and a message with which a person deeply disagrees, the state is compelling the person's speech, not speaking.

The Supreme Court has explicitly limited the government speech doctrine subsequent to the only decision that Defendants cite, *Walker v. Texas Div. Sons of Confederate Veterans,* 135 S. Ct. 2239 (2015).  *Walker* itself recognized that the First Amendment "may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech."  *Id.* at 2246.  *Walker* "marks the outer bounds of the government speech doctrine."  *Matal v. Tam,* 137 S. Ct. 1744, 1760 (2017).  Courts must "exercise great caution before extending…government-speech precedents," since the "doctrine…is susceptible to dangerous misuse."  *Id.*  Since *Walker,* Courts have declined to extend the state speech doctrine under *Matal*'s warning.  *E.g., Wandering Dago, Inc. v. Desito,* 879 F.3d 20, 35-6 (2d Cir. 2018); *Higher Society of Indiana v. Tippecanoe Cty, Indiana,* 858 F.3d 1113, 1117-18 (7th Cir. 2017); *Knight First Am. Inst. at Columbia University v. Trump,* 302 F. Supp. 3d 541, 572 (S.D.N.Y. 2018).  Here, Defendants force Plaintiffs to utilize birth certificates that express deeply personal information about themselves in a way that is inaccurate, and in a way they dispute, because the State's viewpoint about gender conflicts with their own and with modern science and medicine.  This is manifestly a content-based compulsion of private expression.

It is disingenuous for Defendants to claim that for purposes of gender identity, this document is a "historical reflection" belonging to the state, Mem. Supp. Defs.' Mot. Dismiss 2, but for purposes of other identification fields, this is an identity document that Ohioans are entitled to have updated for practical use.  As Defendants admit, Ohio (not to mention Plaintiffs) has an interest in a birth record matching a death record; this is presumably one reason why

Defendants amend birth certificates after court-ordered name changes.  Def. Br. at 18.  The same goes for information about gender.  A birth certificate's primary purpose is for the bearer to convey identifying information on it to others.

**B.**     **Ohio's Policy Compels Plaintiffs to Endorse the State's Message About Their Gender Identity, and Prohibits Them From Conveying Their Own Protected Message.**

The Supreme Court has repeatedly struck down laws forcing individuals to express a viewpoint that they disagree with, including through the forced disclosure of information.  *See Janus v. Am. Fed'n of State, Cty., and Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018) (U.S. June 27, 2018) ("Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning."); *see also Bartnicki v. Vopper,* 532 U.S. 514, 527 (2001).  Here, Defendants compel transgender individuals born in Ohio to use birth certificates that convey Defendants' viewpoint about their gender.  For example, Defendants' Policy forces Plaintiff Stacie Ray to maintain and produce a birth certificate that says she is male when she is actually female. Compl. ¶ 51.  This Policy represents a particular ideology that Defendants hold: that a person's gender should only be evaluated based on the sex associated with their external genitalia at birth. Defendants' insistence that a "sex" indicator on the birth certificate is meaningfully different from a "gender identity" indicator exposes the state's position as an ideological one.  Mem. Supp. Defs.' Mot. Dismiss 9.  While the State may choose to embrace that position, at least as a First Amendment matter, Plaintiffs cannot be made to endorse the state's message by repeatedly communicating it to others through their identity documents.  As the Supreme Court has just affirmed, "the people lose when the government is the one deciding which ideas should prevail." *NIFLA*, 138 S. Ct. at 2375.

Even as the Policy forces Plaintiffs and others to endorse Defendants' viewpoint concerning the meaning of sex, it simultaneously prohibits Plaintiffs from conveying their own

17

constitutionally-protected message about their identity and gender. Forcing Mr. Argento to repeatedly communicate through his birth certificate that he is female prevents him from exercising his right to express his true male identity. *See, e.g., Doe v. Bell,* 754 N.Y.S.2d 846, 851 (Sup. Ct. 2003) (expression of gender was protected message); *see also Karnoski*, 2018 WL 1784464, at \*19. And it forces him and other transgender individuals to repeatedly and publicly contradict something at the very core of their personal identity and their beliefs.

The unconstitutionality of forcing this speech is underscored because only Plaintiffs and similarly-situated transgender individuals are targeted by this content-based restriction on their speech. Non-transgender people are not similarly compelled, because their birth certificates match who they are, and do not convey a message with which they disagree. It is a clear sign of content-based compelled speech when "'the State has left unburdened those speakers whose messages *are* in accord with its own views.'" *NIFLA*, 138 S. Ct. at 2378 (citing *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 580 (2011)) (emphasis added).

### C. Defendants' Policy Compels Plaintiffs to Involuntarily Disclose Sensitive Facts About Themselves, Putting Them at Risk of Harm.

In addition to forcing Plaintiffs to endorse the state's viewpoint at the expense of their own, Defendants' Policy forces unwanted disclosure of Plaintiffs' transgender status, in violation of their First Amendment rights. A transgender person faces a severe risk of harm when his or her identity is involuntarily disclosed. *See supra* section II; Compl. ¶ 38. For this reason and others, transgender individuals may need or wish to keep this status private. As detailed in the complaint, Plaintiffs have each faced discrimination and risk of harm when Defendants' Policy forced them to out themselves. Compl. ¶¶ 54, 73-76, 85-87, 97-99.

The First Amendment entitles Plaintiffs to keep their transgender status private, because under compelled speech jurisprudence, "the right to eschew association for expressive purposes

is likewise protected." *Janus*, 138 S. Ct. at 2463 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984)); *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 12 (1986). Defendants may not force Plaintiffs to disclose unwanted facts any more than unwanted viewpoints, *see Riley* 487 U.S. at 797, especially when the fact at issue puts Plaintiffs at risk of harm upon disclosure. The First Amendment has long protected the need for people to keep their memberships in unpopular or at-risk groups anonymous because of fear of bodily harm. *NAACP v. State of Ala. ex rel. Patterson,* 357 U.S. 449, 462 (1958). Further, the harm caused by compelled speech "takes on an added dimension" where the privacy of intimate information is at stake, as here—"[f]or also fundamental is the right to be free…from unwanted governmental intrusions into one's privacy." *Stanley v. Georgia,* 394 U.S. 557, 564 (1969).

Defendants' refusal to provide transgender individuals with birth certificates matching their gender identity forces them to disclose the most private information about themselves— their transgender status—to absolute strangers in order to access a host of necessary public and private resources. This compelled disclosure of Plaintiffs' identity is exactly what the Court's enduring First Amendment precedent proscribes.

Plaintiffs allege specific facts demonstrating the harm Defendants cause them by forcing them to produce an identity document that conveys the state's message about their gender, rather than their own identity. *E.g.*, Compl. at ¶¶ 58, 76, 88, 100. The First Amendment does not require the government to be viewpoint-neutral in its own speech, *Walker,* 135 S. Ct. 2239*,* but neither does it permit the government to compel peoples' endorsement of its positions or serve as "walking billboards" for the government's message. *Wooley*, 430 U.S. at 715; *see also Walker,* 135 S. Ct. at 2246; *NIFLA,* 138 S. Ct. 2361. Plaintiffs have amply alleged that Ohio has crossed

this line, and taking their allegations as true, *Paige,* 614 F.3d at 277, this Court should allow their First Amendment claim to proceed.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.

Dated this 27th day of July, 2018.

Respectfully submitted,

Kara Ingelhart* (Illinois Bar No. 6321949)
Lambda Legal Defense and Education Fund, Inc.
105 W. Adams St., 26th Fl.
Chicago, IL 60603
Telephone:     (312) 663-4413
Facsimile:     (312) 663-4307
Email: kingelhart@lambdalegal.org

Peter C. Renn* (California Bar No. 247633)
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
Telephone:     (213) 382-7600
Facsimile:     (213) 351-6050
Email: prenn@lambdalegal.org

David J. Carey (0088787)
Thompson Hine LLP
41 S. High St., Ste. 1700
Columbus, OH 43215
Telephone:     (614) 469-3200
Facsimile:     (614) 469-3361
Email: David.Carey@thompsonhine.com

*/s/ Freda Levenson*
Freda Levenson, Trial Attorney (0045916)
Susan Becker (0010205)
Elizabeth Bonham (0093733)
ACLU of Ohio
4506 Chester Ave.
Cleveland, OH 44103
Phone: 216-472-2220
Facsimile: 216-472-2210
Email: flevenson@acluohio.org
Email: sbecker@acluohio.org
Email: ebonham@acluohio.org

John Knight* (Illinois Bar No. 6201433)
American Civil Liberties Union of Illinois
180 N. Michigan Ave., Suite 2300
Chicago, IL 60601
Telephone:     (312) 201-9740
Facsimile:     (312) 288-5225
Email: jknight@aclu-il.org

Gabriel Arkles* (New York Bar No. 4391918)
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
Telephone:     (212) 549-2569
Facsimile:     (212) 549-2650
Email: garkles@aclu.org

*Attorneys for Plaintiffs*

* Admitted *pro hac vice*

20

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2018, I electronically filed the foregoing with the Clerk of the Court for the for the U.S. District Court for the Southern District of Ohio using the CM/ECF system and a copy was made available electronically to all electronic filing participants.

Dated this 27th day of July, 2018.

Respectfully submitted,

Kara Ingelhart* (Illinois Bar No. 6321949)
Lambda Legal Defense and Education Fund, Inc.
105 W. Adams St., 26th Fl.
Chicago, IL 60603
Telephone:      (312) 663-4413
Facsimile:      (312) 663-4307
Email: kingelhart@lambdalegal.org

Peter C. Renn* (California Bar No. 247633)
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
Telephone:      (213) 382-7600
Facsimile:      (213) 351-6050
Email: prenn@lambdalegal.org

David J. Carey (0088787)
Thompson Hine LLP
41 S. High St., Ste. 1700
Columbus, OH 43215
Telephone:      (614) 469-3200
Facsimile:      (614) 469-3361
Email: David.Carey@thompsonhine.com

*/s/ Freda Levenson*_____
Freda Levenson, Trial Attorney (0045916)
Susan Becker (0010205)
Elizabeth Bonham (0093733)
ACLU of Ohio
4506 Chester Ave.
Cleveland, OH 44103
Phone: 216-472-2220
Facsimile: 216-472-2210
Email: flevenson@acluohio.org
Email: sbecker@acluohio.org
Email: ebonham@acluohio.org

John Knight* (Illinois Bar No. 6201433)
American Civil Liberties Union of Illinois
180 N. Michigan Ave., Suite 2300
Chicago, IL 60601
Telephone:      (312) 201-9740
Facsimile:      (312) 288-5225
Email: jknight@aclu-il.org

Gabriel Arkles* (New York Bar No. 4391918)
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
Telephone:      (212) 549-2569
Facsimile:      (212) 549-2650
Email: garkles@aclu.org