## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Stacie Ray, *et al.*,

      Plaintiffs,                      Case No. 2:18-cv-272

      v.                                Judge Michael H.  Watson

Lance Himes, Director,             Magistrate Judge Jolson
Ohio Department Health, *et al.*,

      Defendants.

### OPINION AND ORDER

Stacie Ray ("Ray"), Basil Argento ("Argento"), Jane Doe ("Doe"), and

Ashley Breda ("Breda," collectively "Plaintiffs") sue Lance Himes ("Himes"), in his

capacity as Director of the Ohio Department of Health ("ODH"), Karen Sorrell

("Sorrell"), in her capacity as Chief of the Ohio Office of Vital Statistics, and

Judith Nagy ("Nagy"), in her capacity as State Registrar of the Ohio Office of Vital

Statistics (collectively "Defendants").  ECF No. 1.  Defendants move to dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No. 18.  For the

following reasons, the Court **DENIES** Defendants' motion.

## I.  FACTS

This action is brought by four transgender individuals who wish to change

the sex on their[1] Ohio birth certificates to reflect their gender identity.  Compl. ¶¶

---

[1] This Opinion uses the pronouns "they" and "them" to be consistent with those used in the Complaint.

11–14, ECF No. 1. Plaintiffs Ray, Doe, and Breda all identify as women, but their birth certificates designate their sex as male. *Id.* ¶ 1. Plaintiff Argento identifies as a man, but his birth certificate indicates his sex as female. *Id.*

ODH, through its Office of Vital Statistics, is responsible for issuing and correcting birth certificates in Ohio. *Id.* ¶¶ 16–17, 41. Himes supervises the activities of ODH and enforces Ohio's vital statistics laws. *Id.* ¶ 15. Sorrell and Nagy are the Chief and State Registrar of the Office of Vital Statistics, respectively. *Id.* ¶¶ 16–17. Sorrell oversees enforcement of Ohio's vital statistics laws, while Nagy has authority over the issuance and alteration of Ohio's birth certificates. *Id.*

According to the Complaint, each Plaintiff has unsuccessfully requested to have the sex—which Plaintiffs refer to as the "gender marker"—corrected on their Ohio birth certificate. *Id.* ¶¶ 41, 56, 75. Moreover, Plaintiffs allege that, except for a short time when Defendants exercised their authority to correct birth certificates for transgender people pursuant to a court order, Defendants have categorically refused to change the sex on any transgender person's birth certificate to match their gender identity. *Id.* ¶¶ 41, 43. Plaintiffs refer to this failure to act under the law as Ohio's "Birth Certificate Policy."[2] *Id.* ¶ 41.

---

[2] According to Plaintiffs, this alleged policy has only been reduced to writing in letters sent by Defendants rejecting requests by transgender persons to correct their birth certificate. *Id.* ¶ 42.

As it stands today, Ohio and Tennessee[3] are the only states that do not permit a transgender person to change the sex on their birth certificate. *Id.* ¶ 45. By contrast, the Ohio Bureau of Motor Vehicles ("Ohio BMV") allows transgender people to change the sex on their driver's license and state identification card to reflect an individual's gender identity. *Id.* ¶ 47. Federal agencies, including the U.S. Department of State and the Social Security Administration, also allow changes to an individual's sex in their respective records. *Id.* ¶ 46. Each Plaintiff here has changed their name and sex on their Ohio driver's license or state identification card and in their social security records, as well as taken steps to bring their body and gender expression into conformity with their gender identity. *Id.* ¶¶ 50, 61, 80, 92.

Gender identity refers to "a person's fundamental, internal sense of their gender." *Id.* ¶ 18. For transgender people, gender identity does not match the sex assigned to them at birth based on their external genitalia. *Id.* ¶¶ 19–20. Rather, according to Plaintiffs, there are other "sex-related characteristics" such as chromosomes, hormone levels, and internal reproductive organs that are not

---

[3] At the time this case was filed, Kansas was also included among those states that do not allow changes to birth certificates based on gender identity. However, on June 21, 2019, Kansas became the forty-eighth state to allow transgender individuals to obtain birth certificates that reflect an individual's "true sex" consistent with their gender identity. Notice, 1, ECF No. 40; Consent Judgment, 3–4, *Foster v. Andersen*, No. 18-cv-2552 (D. Kan. June 21, 2019).

in alignment with one another, causing gender identity to be the "critical determinant of sex." *Id.* ¶¶ 20-21.

Plaintiffs allege that "[l]iving in a manner consistent with one's gender identity is critical to the health and well-being of transgender people." *Id.* ¶ 23. "The discordance between one's gender identity and birth-assigned sex can be associated with clinically significant distress, which is known as gender dysphoria." *Id.* ¶ 26. Thus, the process by which transgender people come to live in a manner consistent with their gender identity versus their birth-assigned sex is known as "transition." *Id.* ¶ 23.

The transition process is specific to each transgender individual but may include "social transition, gender confirmation medical treatment, and/or gender confirmation surgical treatment." *Id.* ¶ 24. Social transition includes changing one's name, changing identity documents to reflect gender identity, and/or changing one's outward appearance, including hairstyle and clothing. *Id.* ¶ 25. Plaintiffs allege that while some transgender people undergo medical or surgical treatment, social transition is also part of the necessary medical treatment for many transgender people with gender dysphoria. *Id.* ¶ 27. Ultimately, the goal of social transition is to "bring the person's physical appearance and social presentation into better alignment with their gender." *Id.* ¶ 29.

There is no question that "[a] birth certificate is an essential government-issued document that each person uses to establish their identity throughout their

lifetime." *Id.* ¶ 32. According to the Complaint, accurate birth certificates are essential to gaining "[a]ccess to employment, education, housing, health care, banking, travel, and government services." *Id.* ¶ 2. Plaintiffs claim that lack of access to an accurate birth certificate "subjects them to discrimination, privacy invasions, harassment, humiliation, stigma, harm to their health, and even violence." *Id.* ¶ 3. Plaintiffs also allege that depriving transgender people from obtaining birth certificates that match their gender identity denies them access to birth certificates they can comfortably use to participate in public life and interferes with medical treatment for gender dysphoria by preventing a transgender person's ability to live in an outward manner consistent with their gender identity. *Id.* ¶¶ 3, 30.

Plaintiffs contend that in any scenario where they are required to present their current birth certificate, they are forced to disclose their transgender status to other people whether they want to or not. *Id.* ¶ 36. The Complaint provides several specific instances where this is alleged to have occurred to Plaintiffs. According to Ray, when she presented her birth certificate during the orientation process for a new job, she was outed as transgender by the human resources person in front of ten coworkers upon realizing Ray's birth certificate did not match the gender on her other documents. *Id.* ¶ 54. Similarly, when she underwent a background check to obtain a hazmat endorsement for her commercial driver's license, a receptionist loudly disclosed her status as

transgender in a public waiting area after noting the mismatch between her birth certificate and driver's license. *Id.* ¶ 55. Likewise, Doe was outed as transgender to a waiting room of "more than one hundred people" when she presented her birth certificate to the Social Security Administration to correct the "gender marker" in her social security records. *Id.* ¶ 85. Confusion regarding Breda's "gender marker" on her birth certificate and her other Ohio identification documents caused a discussion at an Arizona government agency regarding her being transgender when she attempted to get a new identification card after relocating to Phoenix. *Id.* ¶ 97. She was also outed as transgender after starting a new job when a human resources member disclosed her transgender identity to her colleagues upon inspecting her Ohio birth certificate. *Id.* ¶ 99. Argento alleges similar involuntary disclosure of his transgender status as he went through the process of using his Ohio birth certificate to obtain dual Italian citizenship and, unsuccessfully, an Italian passport. *Id.* ¶¶ 66–77. Plaintiffs describe these experiences as humiliating, stigmatizing, and despairing. *Id.* ¶¶ 55, 87, 94.

Plaintiffs also claim that such forced disclosure "seriously jeopardize[s] a person's safety and subject[s] the person to a risk of bodily harm[,]" noting a high incidence of harassment, discrimination and violence directed at transgender people. *Id.* ¶¶ 37, 52, 63, 83, 95. All Plaintiffs recount experiences where they have been treated with hostility due to their transgender status. Ray alleges that

due to being harassed and menaced in her work as a truck driver, she has ceased using truck stops and only uses highway rest stops also used by the public "because lighting, security cameras, quick accessibility to the highway, and the presence of police is better[.]" *Id.* ¶ 52. She also alleges that after her transgender status was involuntarily disclosed at a new job, her coworkers refused to speak to her, referred to her as "the freak of the company" and a female coworker threatened to "beat [her] ass" if she ever saw her in the women's restroom. *Id.* ¶ 54. As a result, Ray left that job. *Id.* Doe recalls being verbally harassed at work. *Id.* ¶ 83. Breda alleges that she has been the target of online harassment. *Id.* ¶ 95. According to the 2015 U.S. Transgender Survey that Plaintiffs cite in their Complaint, approximately one in three transgender people "who showed an identity document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or services, asked to leave, or assaulted." *Id.* ¶ 38.

Plaintiffs now seek a declaration that Defendants' Birth Certificate Policy is unconstitutional on the basis that it impermissibly interferes with their right to equal protection under the law, substantive due process, and free speech. Plaintiffs also request the Court permanently enjoin Defendants from enforcing the Policy. Defendants move to dismiss Plaintiffs' Complaint in its entirety, maintaining that Plaintiffs have no constitutional right to change their birth certificates in the manner requested.

## II.   STANDARD OF REVIEW

A claim survives a motion to dismiss pursuant to Rule 12(b)(6) if it

"contain[s] sufficient factual matter, accepted as true, to state a claim to relief that

is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal

quotations omitted).  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has

acted unlawfully." *Id.* A complaint's "[f]actual allegations must be enough to

raise a right to relief above the speculative level, on the assumption that all of the

complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (internal citations omitted).

A court must also "construe the complaint in the light most favorable to the

plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).   In doing

so, however, a plaintiff must provide "more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Twombly*,

550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not

suffice."); *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d

545, 548 (6th Cir. 2007). "[A] naked assertion . . . gets the complaint close to

stating a claim, but without some further factual enhancement it stops short of the

line between possibility and plausibility . . . ." *Twombly*, 550 U.S. at 557.

## III.    ANALYSIS

### A. Ohio's "Birth Certificate Policy"

As a preliminary matter, there appears to be disagreement between the

parties regarding whether Plaintiffs are making a facial challenge to Ohio Rev.

Code §§ 3705.15 and 3705.22 or challenging Defendants' application of these

laws.

Pursuant to Ohio Rev. Code § 3705.15,

Whoever claims to have been born in this state, and whose registration of birth  .  .  .  has not been properly and accurately recorded, may file an application for  .  .  .  correction of the birth record in the probate court of the county of the person's birth or residence or the county in which the person's mother resided at the time of the person's birth.  .  .  .  The probate judge, if satisfied that the facts are as stated, shall make an order correcting the birth record  .  .  .  . [W]henever a correction is ordered in a birth record  .  .  .  the court ordering the correction shall forthwith forward to the department of health a certified copy of the order containing such information as will enable the department to prepare a new birth record. Thereupon, the department shall record a new birth record using the correct information supplied by the court  .  .  .  .

ODH can also amend birth records without a court order. Section 3705.22 states

that "[w]henever it is alleged that the facts stated in any birth  .  .  .  record filed in

the department of health are not true, the director may require satisfactory

evidence to be presented in the form of affidavits, amended records, or

certificates to establish the alleged facts."  Moreover, "[t]he director of health shall

have charge of the system of vital statistics, enforce sections 3705.01 to 3705.29

of the Revised Code, and prepare and issue instructions necessary to secure the

uniform observance of such sections[]" and "adopt rules as necessary to insure that [Ohio] shall have a complete and accurate registration of vital statistics." *Id.* § 3705.02.

Defendants characterize Plaintiffs' claims as a facial challenge to the constitutionality of Ohio Rev. Code §§ 3705.15 and 3705.22. Mot. Dismiss 3, ECF No. 18 ("Plaintiffs do not challenge any discretionary policy or practice; rather, they attack Defendants' adherence to Ohio's birth-record laws, which do not allow the relief sought by Plaintiffs."). Based on their interpretation of these statutory sections, Defendants contend they are required to deny applications made by transgender individuals for the purpose of changing the listed sex on their birth certificates to reflect their gender identity. *Id.* at 4. In support, Defendants cite an Ohio probate court's finding that Ohio's birth record laws only allow modification to the sex designation on a person's birth certificate where the sex was inaccurately reported or recorded *at birth*. *In re Declaratory Relief for Ladrach*, 513 N.E.2d 828 (Ohio P.C. 1987). Further, Defendants argue that because birth certificates record sex and not gender identity, "Ohio law does not permit the birth certificate change that Plaintiffs seek." Mot. Dismiss 6, ECF No. 18.

In the Complaint, Plaintiffs explicitly challenge Defendants' "Birth Certificate Policy," requesting the court "declar[e] [it] unconstitutional on its face and as applied." Compl. ¶ A, ECF. No. 1. Plaintiffs argue that Defendants

refusal to correct the "gender identification field" on birth certificates for transgender people, "regardless of whether it is supposedly dictated by state law," facially discriminates between transgender people and non-transgender people. Resp.1–2, ECF No. 23. Plaintiffs state "[i]t is precisely the Defendants' choice not to alter and seal birth records that divulge record holders' transgender identity that Plaintiffs challenge." *Id.* at 13 n.6. They go on to argue that "the instant constitutional challenge does not require the Court to interpret Ohio's statutes, but evaluate the constitutionality of the Policy." *Id.* at 2 n.2.

The plain language of the Ohio Revised Code sections at issue do not explicitly contemplate a transgender individual's ability to change the sex on their birth certificate to reflect their gender identity nor do they explicitly limit changes to sex as to only those inaccurately or improperly recorded "at birth." *Cf.* Tenn. Code Ann. § 68-3-203(d) ("The sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery."). Rather, according to Defendants' motion, Ohio's decision not to allow transgender people to change the sex on their birth certificate—which Defendants do not dispute is the practice of ODH—was adopted by Defendants based on ODH's interpretation of sections 3705.15 and 3705.22 (supported by one probate court case) and the notion that birth certificates record an individual's sex, not their gender identity. Assuming the allegations in the Complaint are true, particularly Plaintiffs' assertion that "gender identity is the critical determinant of sex[,]" Compl. ¶ 21, ECF No. 1, the

Court is not convinced that Ohio law prohibits Plaintiffs' request.[4] *See* Ohio Rev. Code § 3705.02. Plaintiffs allege that ODH has allowed transgender individuals to change the sex on their birth certificate with a court order in the past. Compl. ¶ 43, ECF No. 1.

Ultimately, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, *not what must be pleaded in a complaint*." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331 (2010) (emphasis added). A constitutional claim under the Due Process Clause, for example, "remains a single 'claim' even where a plaintiff challenges an enactment both on its face and 'as applied' to the specific facts at issue." *Ass'n of Cmty. Orgs. for Reform Now v. Corbett*, No. 09-951, 2010 WL 3885373, at *6 (W.D. Pa. Sep. 28, 2010) (citing *Citizens United*, 558 U.S. at 331). Thus, in reviewing the sufficiency of the Complaint, the Court need not explicitly decide at this stage whether

---

[4] In *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1136 (D. Idaho 2018), the Idaho Department of Health and Welfare interpreted its vital statistics laws to prohibit changes to the listed sex unless there was an error in the recording at birth, resulting in a policy of automatically and categorically denying applications made by plaintiffs and all transgender individuals for the purpose of changing the listed sex to reflect their gender identity. In finding the policy unconstitutional as applied, the court noted that "under an alternative, constitutionally-sound reading of Idaho's vital statistics laws, amendments to the listed sex are not only possible, but procedures are already in place to facilitate such amendments[.]" *Id.* at 1142.

Plaintiffs' claims constitute a facial challenge, an "as applied" challenge, or something in between. For ease, and pursuant to the allegations in the Complaint, the Court will refer to Defendants' claimed "adherence to Ohio's birth-record laws," Mot. Dismiss 3, ECF No. 18, as Defendants' "Birth Certificate Policy" moving forward.

## B. Due Process

Pursuant to the Fourteenth Amendment of the United State Constitution, no State may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In addition to requiring fair procedures upon taking certain actions, the Due Process Clause also "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). This doctrine is known as substantive due process, and includes "heightened protection against government interference with certain fundamental rights and liberty interests," including the right to privacy. *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007) (internal quotations omitted).

The Supreme Court has identified two types of interests "protected by the right to privacy that [are] rooted in the substantive due process protections of the Fourteenth Amendment." *Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008). The first is an interest in "'independence in making certain kinds of important decisions.'" *Id.* (quoting *Whalen v. Roe*, 429 U.S. 589, 599–600 & n.26

(1977)). The second is an "'interest in avoiding disclosure of personal matters.'" *Id.* (quoting *Whalen,* 429 U.S. at 599, 603–04). The latter is referred to as one's informational right to privacy and is the right challenged by Plaintiffs in this case. Compl. ¶¶ 116–17, ECF No. 1.

In analyzing an informational right-to-privacy claim, the Sixth Circuit uses a two-step process: "(1) the interest at stake must implicate either a fundamental right or one implicit in the concept of ordered liberty; and (2) the government's interest in disseminating the information must be balanced against the individual's interest in keeping the information private." *Bloch v. Ribar,* 156 F.3d 673, 684 (6th Cir. 1998).

### 1. Implication of a Fundamental Right

The Sixth Circuit has "recognized an informational-privacy interest of constitutional dimension in only two instances: (1) where the release of personal information could lead to bodily harm (*Kallstrom*), and (2) where the information released was of a sexual, personal, and humiliating nature (*Bloch*)." *Lambert,* 517 F.3d at 440.

### a. *Kallstrom*

In *Kallstrom v. City of Columbus,* 136 F.3d 1055 (6th Cir. 1998), personnel records of several undercover officers involved in a drug-conspiracy trial against violent gang members were released to defense counsel. *Id.* at 1059. The personnel records contained the names and addresses of the officers, their

immediate family, and personal references, among other information. *Id.* Noting the gang's "propensity for violence and intimidation," *Id.* at 1063, the Sixth Circuit held that the officers' privacy interests were violated when "the city's disclosure . . . created a risk that the officers' personal information might 'fall into the hands of persons likely to seek revenge upon the officers' and had created a 'very real threat' to the officers' and their family members' bodily integrity and possibly even their lives." *Lambert,* 517 F.3d at 441 (quoting *Kallstrom,* 136 F.3d at 1063).

Plaintiffs contend that Defendants' Birth Certificate Policy "forces them to disclose that they are transgender—every time they must produce a birth certificate" putting Plaintiffs "at risk of bodily harm." Resp. 9, ECF No. 23. Defendants argue that because the Complaint does not "identify a situation where [Plaintiffs'] birth certificate information was released to a dangerous individual likely to expose Plaintiffs to violence" the allegations fall short of what is required under *Kallstrom.* Mot. Dismiss 12, ECF No. 18.

Courts across the United States have explicitly acknowledged the general hostility and violence affecting the transgender population for at least the last decade. *See, e.g., Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034, 1051 (7th Cir. 2017) ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity."); *Powell v. Schriver,* 175 F.3d 107, 111–12 (2d Cir. 1999) ("It is similarly obvious that an individual who reveals that she is transsexual

potentially exposes herself . . . to discrimination and intolerance." (internal

quotations omitted)); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704,

720 (D. Md. 2018) (noting that transgender individuals suffer "very high rates of

violence" due to their status; "at least 25% of transgender persons in the United

States were homicide victims in 2017"); *Adams by and through Kasper v. Sch.*

*Bd. of St. Johns Cnty., Florida*, 318 F. Supp. 3d 1293, 1299 n.15 (M.D. Fla.

2018) (pointing to several sources that support that there is a documented history

of discrimination and violence against transgender individuals); *Adkins v. City of*

*New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) ("[T]ransgender people

have suffered a history of persecution and discrimination."); *Phillips v. Cane*, No.

C13-596 RSM, 2013 WL 4049047, at *6 (W.D. Wash. Aug. 9, 2013) (finding that

putting a transgender lawyer's personal information in the pleadings, including

her name prior to gender reassignment, subjected her to an increased risk of

physical danger and harassment); *In re E.P.L.*, 891 N.Y.S.2d 619, 621 (N.Y. Sup.

Ct. 2009) (finding numerous documented instances of transgender individuals

being targets of violence).

Moreover, three federal courts have recently addressed the specific threat

transgender persons face due to the government's refusal to allow modification

of certain essential identity documents to match a transgender individual's

gender identity. In *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327

(D. P.R. 2018), the District of Puerto Rico was confronted with the same

constitutional challenges to Puerto Rico's birth certificate policy as Plaintiffs raise in this case. Like Ohio, Puerto Rico's policy categorically prohibited transgender persons from correcting their birth certificates to accurately reflect the person's sex based on their gender identity as opposed to their sex assigned at birth. *Id.* at 329. Finding a Due Process violation, the court held that in forcing plaintiffs to disclose their transgender status, Puerto Rico's policy "expose[d] transgender individuals to a substantial risk of stigma, discrimination, intimidation, violence, and danger." *Id.* at 333.

Likewise, when faced with constitutional challenges to a similar birth certificate policy in *F.V. v. Barron*, the District of Idaho noted:

> Statistics regarding the ongoing discrimination transgender individuals face highlight why involuntary disclosure of transgender status creates these risks. For instance, nearly twenty-five percent of surveyed college students, when perceived as a transgender person, were verbally, physically, or sexually assaulted in 2015. This figure tracks the percentage of workers reporting mistreatment in the workplace due to gender identity. More than seventy-five percent of transgender workers take steps to avoid such mistreatment at work by hiding or delaying their gender transition, or by quitting their job.
>
> Across all environments, almost fifty percent of transgender people surveyed for the 2015 report responded that they had been verbally harassed due to their gender identity. Nearly one in ten reported being physically assaulted because of their gender identity. Notably, the reported lifetime suicide attempt rate for transgender people is nearly nine times the rate of the United States population on average.

286 F. Supp. 3d 1131, 1138 (D. Idaho 2018) (internal citations omitted).[5]

In *Love v. Johnson*, 146 F. Supp. 3d 848 (E.D. Mich. 2015), a group of transgender individuals challenged the constitutionality of a Michigan policy that required an individual to provide a birth certificate showing their corrected sex in order to change their gender marker on a state identification card. *Id.* at 850–51. Noting the varying degrees of difficulty (or impossibility in some cases) of getting a corrected birth certificate, plaintiffs alleged that the Michigan policy indirectly required them to reveal their transgender status to anyone who saw their driver's license. *Id.* at 851–52. Finding a violation of the plaintiffs' due process right to privacy, the Eastern District of Michigan stated:

> Plaintiffs relying on their own experiences and the findings of several well-documented studies, maintain that there is a great deal of animosity towards the transgender community. Similar to *Kallstrom*, the Court finds "no reason to doubt that where disclosure of this [highly intimate] information may fall into the hands of persons" harboring such negative feelings, the Policy creates a very real threat to Plaintiffs' personal security and bodily integrity.

*Id.* at 856 (quoting *Kallstrom*, 136 F.3d at 1063).

The Court recognizes that *Kallstrom*'s holding "created a narrowly tailored right, limited to circumstances where the information disclosed was particularly sensitive and the persons to whom it was disclosed were particularly dangerous *vis-à-vis the plaintiffs*." *Barber v. Overton*, 496 F.3d 449, 456 (6th Cir. 2007).

---

[5] The District of Idaho ultimately struck down Idaho's birth certificate policy as unconstitutional based on the State's concession that it violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 1134–35.

However, *Kallstrom* does not require courts to wait until plaintiffs are actually assaulted, or worse, to recognize "a very real threat to [transgender individuals'] personal security and bodily integrity" upon disclosure of their status. *See Kallstrom*, 136 F.3d at 1063. Rather, "'hypothetical risk' plays an important role in determining whether Plaintiffs' privacy claim implicates a fundamental liberty interest." *Love*, 146 F. Supp. 3d at 855. In *Kallstrom*, there was no evidence presented that the gang members used the released personal information to threaten or harm the officers. Nonetheless, the Sixth Circuit held that "where the release of private information places an individual at substantial risk of serious bodily harm, possibly even death, from *a perceived likely threat,* the 'magnitude of the liberty deprivation . . . strips the very essence of personhood.'" *Kallstrom*, 136 F.3d at 1064 (emphasis added) (quoting *Doe v. Claiborne*, 103 F.3d 495, 506–07 (6th Cir. 1996)). Here, like in *Kallstrom*, Plaintiffs have alleged facts which, accepted as true, suggest that the forced disclosure of Plaintiffs' transgender status upon presentation of their birth certificates place their "personal safety and bodily integrity in jeopardy." Compl. ¶ 118, ECF No. 1.

In addition to citing statistical data to support the allegation that transgender people are disproportionately targets of violence—"nearly one in three . . . transgender people who showed an identity document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or services, asked to leave, or assaulted" (Compl. ¶ 38, ECF No.

1)—the Complaint alleges several instances where Plaintiffs were personally subject to hostility and harassment when forced to produce a birth certificate that did not match their gender identity.  *See* Compl. ¶ 54, ECF No. 1 (After a human resources person disclosed Ray's transgender identity upon presentation of her birth certificate, a female coworker threatened to "beat [her] ass" if she ever saw her in the women's restroom.); *Id.* ¶ 85 (Doe was met with "overt hostility" upon presenting her birth certificate at the Social Security office, when a staff person loudly told her she could not "just change [her] from male to female based on [her] say-so."); *Id.* ¶ 97 (Breda was exposed to hostility when a clerk at the Arizona Department of Transportation erroneously denied her request for a state identification card with a female gender marker upon presenting her birth certificate).  As a result of their transgender status, Plaintiffs also recount instances of having to use specific restrooms based on their proximity to security, verbal harassment at work, and online harassment.  *Id.* ¶¶ 52, 83, 95.  As the court in *Love* concluded, "[t]hese allegations cut at the very essence of personhood protected under the substantive component of the Due Process Clause."  146 F.3d at 855 (internal quotations omitted).

### b. *Bloch*

In addition to putting them at risk of bodily harm, Plaintiffs also contend that Defendants' Birth Certificate Policy forces them to reveal "highly personal and intimate" information, i.e. their transgender status, each time they are

required to produce their birth certificates. Compl. ¶ 116, ECF No. 1; Resp. 9, ECF No. 23. Defendants argue that Plaintiffs do not have a fundamental right to "keep secret how their sex was reported and recorded at birth." Mot. Dismiss 11, ECF No. 18.

In *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998), a sheriff released "highly personal and extremely humiliating details" of the rape of the plaintiff during a press conference, some of which were "so embarrassing [the plaintiff] had not even told her husband." *Id.* at 676. The Sixth Circuit held that such disclosure violated the plaintiff's right to privacy because "sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood. Publically revealing information regarding these interests exposes an aspect of our lives that we regard as highly personal and private." *Id.* at 685.

The Second Circuit has long held that the Constitution protects the right to maintain the confidentiality of one's transsexualism.[6] *Powell v. Schriver*, 175 F.3d 107, 112 (1999); *see also Matson v. Bd. of Educ. of City School Dist. of New York,* 631 F.3d 57, 64–65 (2d Cir. 2011). Finding it analogous to the right to maintain privacy over certain medical conditions, the court explained its reasoning in reaching this conclusion:

> Individuals who have chosen to abandon one gender in favor of another understandably might desire to conduct their affairs as if such a transition was never necessary. That interest in privacy . . . is particularly compelling. . . . [T]ranssexualism is the unusual condition

---

[6] The Court recognizes that "transsexualism" is an outdated term.

Case No. 2. 18-cv-272                                   Page 21 of 33

that is likely to provoke both an intense desire to preserve one's
medical confidentiality, as well as hostility and intolerance from others.

*Id.* at 111. Similarly, upon holding that Puerto Rico's birth certificate policy

violated the plaintiffs' right to privacy in *Arroyo Gonzalez*, the court concluded

that "there are few areas which more closely intimate facts of a personal nature

than one's transgender status." 305 F. Supp. 3d at 333 (internal quotations

omitted); *see also Doe v. City of Detroit*, No. 18CV11295, 2018 WL 3434345, at

*2 (E.D. Mich. July 17, 2018) (permitting a transgender individual to proceed by

pseudonym upon finding that the individual's transgender status "certainly

qualifies as information of the utmost intimacy" (internal quotations omitted)).

This Court recently held that patients had a fundamental right to keep

private medical records surrounding their abortion procedures because such

records included details regarding the patients' sexuality and sexual choices,

which the Court concluded was information of a "sexual, personal, and

humiliating nature." *Planned Parenthood Sw. Ohio Region v. Hodges*, No.

15CV568, 2019 WL 1439669, at *5 (S.D. Ohio Mar. 31, 2019); *see also*

*Eastwood v. Dep't. of Corr. of State. of Okl.*, 846 F.2d 627, 631 (10th Cir. 1988)

(explaining that the right to privacy is "implicated when an individual is forced to

disclose information regarding personal sexual matters"). As the District of

Rhode Island explained, "[u]nquestionably, one's sexual practices are among the

most intimate parts of one's life. When those sexual practices fall outside the

realm of 'conventional' practices which are generally accepted without controversy, ridicule, or derision, that interest is enhanced exponentially. As a transsexual, [a] plaintiff's privacy interest is both precious and fragile . . . ." *Doe v. Blue Cross & Blue Shield of Rhode Island*, 794 F. Supp. 72, 74 (D. R.I. 1992).

According to Plaintiffs, "[d]enying transgender people birth certificates that match their gender identity reveals private information in contexts where this information would otherwise remain undisclosed . . . regardless of whether a person's transgender identity may otherwise be known by others . . . and regardless of a person's desire not to disclose that personal information." Compl. ¶ 36, ECF No. 1. Plaintiffs describe such involuntary disclosure of this "highly personal and intimate information" about their transgender status as humiliating, stigmatizing, and despairing. *Id.* ¶¶ 55, 87, 94. As opposed to "[m]aintaining secrecy over basic vital statistics" as Defendants categorize it, Mot. Dismiss 11, ECF No. 18, the Court agrees with the Second Circuit that "[t]he excru[c]iatingly private and intimate nature of [being transgender], for persons who wish to preserve privacy in the matter, is really beyond debate." *Powell,* 75 F.3d at 111; *see also Love,* 146 F. Supp. 3d at 855.

The Court finds that under both *Kallstrom* and *Bloch,* Plaintiffs have adequately alleged that Defendants' Policy of refusing to change birth certificates to reflect gender identity implicates a release of personal information that is of a

"sexual, personal, and humiliating nature" and "could lead to bodily harm,"

resulting in a violation of Plaintiffs' informational right to privacy.[7]  *Lambert*, 517

F.3d at 440; *see Arroyo Gonzalez,* 305 F. Supp. 3d at 333; *Love*, 146 F. Supp.

3d at 856.

### c. Public Record

Defendants also argue that since a birth certificate is a public record,

Plaintiffs cannot claim a privacy interest in information within that record. Mot.

Dismiss 10, ECF No. 18.  Plaintiffs maintain that "[l]imited availability of

information to the public does not foreclose a privacy claim" because it is the

disclosure of "Plaintiffs' assigned sex at birth *in a context that reveals them to be*

*transgender*" that violates their right to privacy.  Resp. 14, ECF No. 23 (emphasis

added).  While the Court agrees with Defendants that birth certificates in Ohio

are public record,[8] the Court also agrees with Plaintiffs' framing of the privacy

interest at issue.

---

[7] The Court would also note that pursuant to a consent judgment between three
transgender persons and the Kansas Statewide Transgender Education Project
(plaintiffs) and officials representing the Kansas Department of Health and Environment
(defendants), the District of Kansas very recently held that Kansas' birth certificate
policy, which prohibited transgender people born in Kanas from obtaining birth
certificates consistent with their gender identity, violated the Equal Protection Clause
and the Due Process Clause of the Fourteenth Amendment.  Consent Judgment, 2–3,
*Foster v. Andersen*, No. 18-cv-2552 (D. Kan. June 21, 2019).

[8] *State ex rel. Hammons v. Chisholm*, 792 N.E.2d 1120 (Ohio 2003).

In *Cox Broadcasting Corp. v. Cohn*, the Supreme Court held that the defendants were not liable for a violation of privacy for publishing the name of a deceased rape victim where the information was taken from a court record open to public inspection. 420 U.S. 469, 494–97(1975); s*ee also Munoz*, 507 F.3d at 965–66 (finding that, because plaintiffs' convictions were public and remained public, there was no right to privacy implicated in their publication). The Court stated that "the prevailing law of invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record." *Cohn*, 420 U.S. at 494–95.

As Defendants suggest, members of the public can request certified copies of vital records, including birth certificates, pursuant to Ohio Rev. Code § 3705.23(A)(1). Mot. Dismiss 10, ECF No. 18. In this scenario, disclosure of a Plaintiff's birth certificate to a third party may only constitute a *de minimis* invasion of privacy when the gender identities of the Plaintiffs are otherwise unknown. *See U.S. Dep't. of State v. Ray*, 502 U.S. 164, 176 (1991). However, Plaintiffs are not claiming an invasion of privacy due solely to the disclosure of their birth certificates or the sex listed on their birth certificates. Plaintiffs are claiming that "disclosing the Plaintiffs' assigned sex at birth in a context that reveals them to be transgender violates their right to privacy." Resp. 14, ECF No 23. In other words, in any situation where Plaintiffs must present their birth certificate, including those alleged in the Complaint, they are forced to

involuntarily disclose their transgender status due to a mismatch with other identity documents, their outward appearance, or both. *Cf. Carcano v. McCrory*, 203 F. Supp. 3d 615, 648 (M.D.N.C. 2016) (explaining that as opposed to laws that govern the modification of birth certificates, where the law required transgender persons use the bathroom that matched the sex on their birth certificate but a person could change the sex on their birth certificate, "an individual's choice of bathroom does not directly or necessarily disclose whether that person is transgender; it merely discloses the sex listed on the person's birth certificate"). Thus, the invasion of privacy becomes different and significant when that information is linked to particular Plaintiffs upon presentation of their birth certificates. *See Ray*, 502 U.S. at 176.

Unlike the victim's name in *Cohn*, Plaintiffs' transgender status does not appear in a public record. Accordingly, Plaintiffs' privacy interest in their transgender status does not fade away because their birth certificates are public record. *See U.S. Dep't. of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 500 (1994) ("An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form."); *U.S. Dept. of Justice v. Reports Comm. for Freedom of Press*, 489 U.S. 749, 770 (1989) ("[T]he fact that an event is not wholly 'private' does not mean that an individual has no interest in limiting disclosure or dissemination of the information." (internal quotations omitted));

*Abraham & Rose, P.L.C. v. U.S.*, 138 F.3d 1075, 1083 (6th Cir. 1998) ("[A] clear privacy interest exists with respect to such information as names, addresses, and other identifying information even if such information is already available on publicly recorded filings.").

### 2. State Action

Under 42 U.S.C. § 1983, Plaintiffs must prove that Defendants are acting under the color of state law to deprive them of rights secured by federal law. *Bloch,* 156 F.3d at 677. It is not contested that, in denying Plaintiffs corrected birth certificates, Defendants were acting in their capacities as state government employees of ODH. Compl. ¶¶ 15-17, ECF No. 1. However, Defendants contend that because the Sixth Circuit only recognizes a right to informational privacy when the government is responsible for releasing protected information, Plaintiffs' Due Process claim fails. Mot. Dismiss 11, ECF No. 18. Defendants argue that it is Plaintiffs, not Defendants, that are disclosing the information in their birth certificates to third parties. *Id.* at 12.

Unlike *Kallstrom*, this Court need not address whether the actions or potential actions of private actors can be attributed to Defendants. 136 F.3d at 1066. Here, there is no dispute that a birth certificate is a government document. According to Defendants, because a birth certificate is a government document, "the state maintains absolute control over what information can be displayed on birth certificates." Mot. Dismiss 7–9, ECF No. 18. While ODH is not the entity

requiring disclosure or the entity actually disclosing the information, the threat of disclosure is imposed indirectly by the government through its birth certificates. *K.L. v. State, Dep't. of Admin., Div. of Motor Vehicles*, 2012 WL 2685183, at *6 (Sup. Ct. Alaska Mar. 12, 2012); *see also Arroyo Gonzalez,* 305 F. Supp. 3d at 333 *(*finding a violation of constitutional right to privacy where the Commonwealth forced plaintiffs to reveal their transgender status by permitting plaintiffs to change their name on their birth certificate but not their gender marker); *Love*, 146 F. Supp. 3d at 856 (finding that state action infringed upon a fundamental right by requiring plaintiffs to carry an identification card with a sex that conflicts with their lived sex, thereby forcing them to reveal their transgender status).

It is without question that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "Just as the State may not directly order someone to stop exercising his rights, it may not coerce him into 'giving them up' by denying [] benefits if he exercises those rights[,]" even if he is not entitled to that benefit. *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911–12 (6th Cir. 2019). When Plaintiffs present their birth certificates, the discrepancy between their physical appearance, other identity documents, and their birth certificates force disclosure of Plaintiffs' transgendered status. Plaintiffs cannot avoid such disclosure unless Defendants change their Policy or Plaintiffs forego participating in public life—"determining eligibility for

employment, obtaining other identity documents (including driver's licenses, state identification cards, social security cards, passports . . . ), establishing school records, proving age, and enrolling in government programs." Compl. ¶ 33, ECF No. 1. The Court is not persuaded at this stage of the litigation that Defendants, through the "absolute control" over the information contained in Plaintiffs' birth certificates, have no part in the forced disclosure of Plaintiffs' transgender status.

### 3. Potential State Interests

When a law infringes on a fundamental right, it is subject to strict scrutiny and cannot be upheld absent a showing by the State that the law is narrowly tailored to further a compelling interest. *United States v. Brandon*, 158 F.3d 947, 959–60 (6th Cir. 1998). Whether a law is narrowly tailored "will turn on whether it is the least restrictive and least harmful means of satisfying the government's goal . . . ." *Id.* at 960.

### a. Accurate Records and Prevention of Fraud

In their motion, Defendants do not assert any compelling interests that specifically support the Birth Certificate Policy in addressing Plaintiffs' Due Process argument. Rather, Defendants rest on the argument that because Ohio's birth certificates are public record and Defendants' refusal to change the sex designation on their birth certificates does not implicate a fundamental liberty interest, Plaintiffs' claim fails as a matter of law. Mot. Dismiss 10, ECF No. 18. However, Defendants do raise two government interests in support of the Birth

Certificate Policy in the context of an intermediate scrutiny or rational basis equal protection analysis: "the well-ordered operation of the state's vital recordkeeping and the prevention of fraud." *Id.* at 17. Even if the Court were to find that these are compelling interests, Defendants' Birth Certificate Policy is not narrowly tailored or "least restrictive" to satisfy either.

There is no dispute that Ohio allows transgender individuals to change their sex to reflect their gender identity on their driver's licenses and state identification cards. Compl. ¶ 47, ECF No. 1; Mot. Dismiss 20, ECF No. 18. In attempting to distinguish birth records from these other state identity documents, Defendants argue that "[b]irth certificates are historical records." Mot. Dismiss 19, ECF No. 18. The Court assumes that Ohio has a compelling interest in maintaining the historical accuracy of all information in its birth records. Yet, Ohio law does provide procedures to amend a birth certificate to change one's name and the names of one's parents in the case of an adoption. Ohio Rev. Code §§ 3705.12, 3705.13. Moreover, forty-eight other states provide procedures for transgender individuals to change the sex on their birth certificates. Compl. ¶ 45, ECF No. 1. As the District Court noted in *Love*, "[t]he Court seriously doubts that these states have any less interest in ensuring an accurate record-keeping system." 146 F. Supp. 3d at 857.

Similarly, Defendants fail to articulate how the State's interest in preventing fraud provides for laws that allow amendments to some parts of the birth

certificate but not others, or permits changes to driver's licenses and state identification cards and not birth certificates. Under Defendants' Policy, Plaintiffs all currently possess government-issued identity documents that provide they are *both* male and female. *See* Compl. ¶¶ 50, 51, 61, 62, 80–82, 92, 93, ECF No. 1. The Court cannot conceive how this helps prevent fraud rather than perpetuate it.

### b. Other Compelling Reasons

Defendants also identify several other "compelling reasons" they believe support the request to dismiss the Complaint. Defendants claim that invalidating Ohio's Policy would "violate traditional judicial-restraint principles," "upend a comprehensive legislative scheme," and "implicate[] core federalism concerns." Mot. Dismiss 18, ECF No. 18.

In the strict scrutiny context, "these vague, speculative, and unsubstantiated state interests do not rise anywhere near the level necessary to counterbalance the specific, quantifiable, and particularized injuries" alleged by Plaintiffs and suffered by transgender people as a whole when they miss out on basic government benefits or face being outed as transgender upon presentation of their birth certificates. *Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 981 (S.D. Ohio Dec. 23, 2013)*, rev'd sub nom. DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014), *rev'd sub nom. Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). Further, the Court is not persuaded that "[f]ederalism principles dictate that this Court leave this task to the reasoned consideration of Ohio's legislature[,]" simply

because no national consensus exists on what is required to allow an individual to change the sex on their birth certificate. Mot. Dismiss 19, ECF No. 19.

"The dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right." *Obergefell,* 135 S. Ct. at 2605. "An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act." *Id.* State laws and policies are still subject to guarantees afforded by the Constitution. *Obergefell,* 962 F. Supp. 2d at 981. Additionally, it is not compelling that a change to Defendants' Policy might be challenging to implement. Forty-eight other states have figured it out. *See In re A.L.,* 81 N.E.3d 283, 288 (Ind. Ct. App. 2017) ("[T]he amendment of a birth certificate with respect to gender is not novel. The vast majority of states . . . have allowed it in practice for some time." (internal quotations omitted)). Therefore, none of these other asserted interests are compelling enough to counteract the alleged infringement on Plaintiffs' right to privacy on a motion to dismiss.

## C. Remaining Claims

In light of the Court's finding that Plaintiffs have raised a cognizable claim under the Due Process Clause, the principle of judicial restraint cautions against deciding the sufficiency of Plaintiffs' remaining constitutional claims. *Love,* 146 F. Supp. 3d at 857; *see Camreta v. Greene,* 563 U.S. 692, 705 (2011) ("[A] longstanding principle of judicial restraint requires that courts avoid reaching

constitutional questions in advance of the necessity of deciding them." (internal quotations omitted)); *Harmon v. Brucker*, 355 U.S. 579, 581 (1958) (explaining that courts have a "duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case"). Therefore, the remainder of Defendants' motion to dismiss is denied without prejudice. Defendants may seek leave to renew the motion should future developments require the Court to rule on either of the remaining claims.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion, ECF No. 18, is **DENIED.**

**IT IS SO ORDERED.**

**MICHAEL H.  WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**