CONFIDENTIAL AND ATTORNEYS' EYES ONLY

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4                        - - -

5    STACIE RAY, ET AL.,          :
                                  :
6              Plaintiffs,        :
                                  :
7          vs.                    :   CASE NO. 2:18-CV-00272
                                  :
8    AMY ACTON, ET AL.,           :
                                  :
9              Defendants.        :

10                       - - -

11                   Deposition of

12                   JUDITH NAGY

13

14                    Taken at

15         American Civil Liberties Union
                    Staff Counsel
16          1108 City Park Avenue
                   Suite 203
17          Columbus, Ohio 43206

18

19

20      On Friday, August 2, 2019, at 9:00 a.m.

21

22    Reported by:  Diane L. Schad, Court Reporter.

23                       - - -

24

25

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 2 of 220 PAGEID #: 341

Stacie Ray, et al. vs Amy Acton, et al.                                          Judith Nagy

2

```
 1   APPEARANCES:

 2   ELIZABETH BONHAM, ESQ.
     ACLU OF OHIO
 3   4506 Chester Avenue
     Cleveland, Ohio 44103
 4   614.469.3209
     ebonham@acluohio.org
 5        and
     KARA N. INGELHART, ESQ.
 6   LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
     105 West Adams Street
 7   Chicago, Illinois 60603
     312.663.4307
 8   kingelhart@lambdalegal.org

 9             On behalf of the Plaintiffs.

10   JAKE J. BLAKE, ESQ.
     CALFEE, HALTER & GRISWOLD, LLP
11   1200 Huntington Center
     41 South High Street
12   Columbus, Ohio 43215-3465
     614.621.1500
13   jblake@calfee.com
          And
14   RACHEL L. BELENKER, ESQ.
     STATE OF OHIO, DEPARTMENT OF HEALTH
15   246 North High Street
     Columbus, Ohio 43215
16   614.466.4882

17             On behalf of the Defendants.

18                       - - -

19   ALSO PRESENT:

20   Mr. Ara Mekhjian.

21                       - - -

22

23

24

25
```

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

```
 1                              Friday Morning Session

 2                              August 2, 2019

 3                              9:00 a.m.

 4                  - - -

 5                  STIPULATIONS

 6            It is stipulated by and among counsel

 7   for the respective parties that the deposition of

 8   JUDITH NAGY, a Defendant herein, called by the

 9   Plaintiffs under the Federal Rules of Procedure, may

10   be taken at this time in stenotype by the Notary; that

11   said deposition may thereafter be transcribed by the

12   Notary out of the presence of the witness; that proof

13   of the official character and qualification of the

14   Notary is waived; that the witness may sign the

15   transcript of her deposition before a Notary other than

16   the Notary taking her deposition; said deposition to

17   have the same force and effect as though signed before

18   the Notary taking it.

19                  - - -

20

21

22

23

24

25
```

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

4

1                    INDEX OF EXAMINATION

2                           - - -

3     JUDITH NAGY                                        PAGE

4     EXAMINATION BY MS. BONHAM                            6

5     EXAMINATION BY MR. BLAKE                           186

6     EXAMINATION BY MS. BONHAM                          194

7                           - - -

8            INDEX TO PLAINTIFFS EXHIBITS

9     EXHIBIT   DESCRIPTION                             PAGE

10    1         Notice of Deposition                     11

11    2         Complaint                                27

12    3         Birth Certificate                        38

13    4         Interrogatories                          89

14    5         Summary document from Help Desk          94

15    6         Letter from ODH                         101

16    7         Notes from Midwest Conference           116

17    8         Report of NAPHSIS                       123

18    9         Public records request and response     134

19    10        Mail log                                141

20    11        5/15/12 email from Ms. Lee to Ms. Boler 155

21    12        Email from Rebekah to ODH               158

22    13        Email from Devon to Rena                161

23    14        2016 email between Karen and Rena       165

24    15        Email between Flo and Rena              170

25    16        Multi-paged file                        173

Stacie Ray, et al. vs Amy Acton, et al.                                                    Judith Nagy

5

1                              - - -

2                    P R O C E E D I N G S

3                              - - -

4                    (Witness was sworn.)

5              MS. BONHAM:  This is the 30(b)(6) deposition

6    for the Ohio Department of Health in the matter of

7    Ray versus Acton.

8              My name is Elizabeth Bonham.  I'm Plaintiffs'

9    counsel with the ACLU.  Can you all just go around and

10   introduce yourselves.

11             MS. INGELHART:  Good morning.  My name is

12   Kara Ingelhart.  I am Plaintiffs' counsel with Lambda

13   Legal.

14             MS. BELENKER:  Rachel Belenker, in-house

15   counsel for the Ohio Department of Health.

16             MR. BLAKE:  Jason Blake, outside counsel for

17   the Ohio Department of Health and the other Defendants.

18             MS. NAGY:  Judy Nagy, State Registrar, Office

19   of Vital Statistics.

20             MS. BONHAM:  Thanks.

21                             - - -

22

23

24

25

Stacie Ray, et al. vs Amy Acton, et al.                                  Judith Nagy

6

1                    JUDITH NAGY

2   being by me first duly sworn, as hereinafter certified,

3   deposes and says as follows:

4                    EXAMINATION

5   BY MS. BONHAM:

6        Q    Is it okay if I call you Ms. Nagy?

7        A    Sure.

8        Q    Okay.  Great.

9             So I just want to go over a couple of ground

10  rules before we proceed; you may have been deposed

11  before, just so that we're all on the same page.

12            First, we're obviously here with a court

13  reporter, so if you could just please answer all my

14  questions audibly.  Sometimes it's easy to get into a

15  conversational tone and just nod, but she obviously

16  can't show that on the transcript.

17            For the same reason it's important that we

18  don't talk over each other.  So I just want to make

19  sure I finish every question before you start to answer

20  and I won't interrupt you either.

21            Do you understand that you're under oath

22  today and that means you're required to answer

23  truthfully?

24        A    Yes.

25        Q    If there's any question I ask that you don't

Stacie Ray, et al. vs Amy Acton, et al.                                                    Judith Nagy

7

1   understand, though, please just ask me for a

2   clarification.  It's your deposition and you're

3   entitled to do that.  So we just want the record to be

4   clear.

5        A    Okay.

6        Q    If you don't ask for clarification and you

7   answer, then I'll assume you understood my question

8   then.

9             You are also just a witness not a prisoner,

10  so we can take a break any time you want and get

11  another cup of coffee.  So just let me know.  I'd just

12  ask that we don't take breaks between a question and an

13  answer.

14       A    Sure.

15       Q    Your counsel may object and he's just going

16  to object for the record.  So unless he instructs you

17  not to answer, please still go ahead and answer the

18  question.

19       A    Okay.

20       Q    And I am going to ask you about a series of

21  exhibits and your preparation for this deposition, for

22  example, but I'm never going to ask you a question that

23  requires you to tell me what you talked about with your

24  attorneys.

25       A    Okay.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

8

1    Q    So, you know, stop me and don't worry about

2  stopping me if you feel like it's going there but I'm

3  not going to do that.

4         Is there any reason that you won't be able to

5  testify truthfully and accurately today?

6    A    No.

7         MS. BONHAM:  Okay.  I also wanted to get a

8  couple of housekeeping matters out of the way.

9         Your attorneys said that you would be willing

10 to stipulate to the authenticity of the documents that

11 were produced by the Ohio Health Department.

12        Can we get that on the record?

13        MR. BLAKE:  Yes, we'll stipulate.

14        MS. BONHAM:  Thank you.

15        There's a protective order in this case,

16 meaning some of the records that we have are marked

17 confidential or attorneys' eyes only, and I'm going to

18 be showing you exhibits today and I just wanted to ask

19 that we agree that if there's an exhibit that's already

20 marked attorneys' eyes only or confidential that we

21 see, it also be marked by the court reporter with that

22 designation and we just continue that designation.

23        Is that okay?

24        MR. BLAKE:  That's okay.

25        MS. BONHAM:  And then, additionally, I want

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

9

1    to assume that where a record is marked attorneys' eyes

2    only but you, yourself, produced it and have already

3    seen it we can use that as an exhibit in the

4    deposition.

5            MR. BLAKE:  And to the extent that the

6    protective order doesn't already allow for deposition

7    witnesses to see attorneys' eyes only information we

8    stipulate to that.

9            MS. BONHAM:  Okay.  And I'm sure we'll do the

10   same.  Thank you.

11       Q    So have you ever given a deposition before?

12       A    No, I have not.

13       Q    Have you ever been designated as a 30(b)(6)

14   witness at all?

15       A    No, I have not.

16       Q    Have you ever been involved in litigation in

17   any capacity?

18       A    No.

19       Q    Okay.  Even a personal capacity?

20       A    No.

21       Q    Okay.  Welcome to the party.

22       A    Thank you.

23       Q    So you are aware that a lawsuit has been

24   filed by four Plaintiffs, Stacie Ray, Basil Argento,

25   Ashley Breda and Jane Doe, against the Ohio Health

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

10

1    Department through its Director Amy Acton, yourself,

2    and Karen Sorrell, right?

3         A    Yes.

4         Q    And you have been designated by the Ohio

5    Health Department to be here on behalf of ODH, not

6    yourself as an individual.  Do you understand that?

7         A    Yes.

8         Q    Thanks.

9              MS. BONHAM:  Let me just take a break for one

10   second.

11             (A recess was taken.)

12             MS. BONHAM:  Back on the record.

13             We just had somebody come in.  Sir, could you

14   just state your name and who you are for the record.

15             MR. MEKHJIAN:  Good morning.  My name is

16   Ara Mekhjian.  My name is spelled A-R-A, first name.

17   My last name is spelled M-E-K-H-J-I-A-N.  I'm the

18   Section Chief of the Health and Human Resources

19   Services Section at the Ohio Attorney General's Office,

20   and I will just be observing today.

21             MS. BONHAM:  Thank you.

22        Q    We're going to look at some exhibits

23   throughout the course of the deposition.  It may take

24   some time for me to get them together, and I know that

25   can seem awkward.  It's not going to show up obviously

11

1  on the transcript as an awkward pause.  I apologize for

2  that.

3          MS. BONHAM:  I'd like to ask for this to be

4  marked as Exhibit 1.

5                        - - -

6          (Thereupon, Plaintiff's Exhibit 1 was marked

7  for purposes of identification.)

8                        - - -

9  BY MS. BONHAM:

10     Q    I'm handing you what's been marked as

11 Exhibit 1.  I only have a couple copies.  Have you seen

12 this before?

13     A    Yes, I have.

14     Q    What is this document?

15     A    This document is -- well, I'm not a lawyer

16 but I would imagine it's the deposition notice.

17     Q    That's right, this is the notice of 30(b)(6)

18 deposition for the Ohio Health Department.

19          Where did you see this before?

20          MR. BLAKE:  Yeah, I mean to the extent you

21 can -- she doesn't want to know about communications

22 but it's fine to tell her that you reviewed it with

23 your attorney.

24     A    Oh, okay.  Yes, I reviewed it with my

25 attorney.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

12

```
1        Q     Okay.  Did you review it with anyone else?

2        A     No, I did not.

3        Q     Just with Jake?

4        A     Yes.

5        Q     And when was that?

6        A     Yesterday.

7        Q     Did you review anything else to prepare for

8   the deposition?

9        A     Yes.

10        Q     What was that?

11        A     Some discovery documents.

12        Q     Do you remember what those were exactly?

13        A     Email communications, some general notes

14   regarding the statements of the case.

15        Q     Do you remember what kind of notes in more

16   detail?

17        A     I'm not a lawyer.  It's part of I guess the

18   actual filed paperwork that indicates the people that

19   are filing and their positions on what the case is

20   about and the things that they have brought to the

21   table as far as the allegations.

22        Q     Okay.  That sounds like to me the Complaint.

23   Does that ring a bell?

24        A     Yes, there you go.

25        Q     The Complaint, emails between?
```

Stacie Ray, et al. vs Amy Acton, et al.                          Judith Nagy

13

1        A     Legal counsel and whoever the requestor was.

2        Q     Legal counsel for ODH?

3        A     Yes.

4        Q     And who else?

5        A     Between legal counsel and I think it was the

6     ACLU.

7        Q     Okay.  And do you remember the topic of those

8     emails?

9        A     It was a request for records and what we

10    could or could not give as part of that records

11    request.

12       Q     Did you review anything else?

13       A     Not to my knowledge.

14       Q     Did you bring any of those documents here

15    with you?

16       A     I did not bring anything.

17       Q     I'd like to continue looking at Exhibit 1,

18    the Notice of Deposition.

19             Are you aware that your testimony today is on

20    behalf of the Ohio Health Department?

21       A     Yes, I am.

22       Q     And are you aware that the testimony may be

23    used throughout this case, including at trial?

24       A     Yes.

25       Q     I'd like to look at this topic by topic.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

14

1          If you can look on Page 1 at Topic 1.  Are

2     you the person designated by ODH to speak on its behalf

3     with respect to the factual basis for ODH's arguments

4     and defenses and all claims and defenses presented in

5     this litigation?

6          A    Yes, I am.

7               MR. BLAKE:  And I would just like to

8     interpose an objection there in reference to my email

9     dated July 18th which clarifies, further clarifies the

10    scope of that topic.  Obviously she's not going to be

11    able to testify about any knowledge or allegations

12    which is exclusively or even predominantly in the

13    control of the individual Plaintiffs, but to the extent

14    ODH would have reason to know about any of these

15    allegations she's designated to testify about those

16    allegations contained in the Complaint.

17              MS. BONHAM:  We do have email correspondence

18    clarifying that understanding.

19              MR. BLAKE:  Thank you.

20    BY MS. BONHAM:

21         Q    Also on Page 1 at Topic 2.  Are you the

22    person designated by ODH to speak on its behalf with

23    respect to the organization's responses to

24    interrogatories, requests to admit, and requests for

25    production of documents in this litigation and the

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

15

1  basis for those responses?

2      A    Yes.

3           MR. BLAKE:  And then just similarly, the same

4  email July 18th clarifying that, yes, as to

5  interrogatories and requests to admit to the extent

6  that there are any.  But as to specific documents

7  without reference to have individual Bates numbers,

8  she'll have a general knowledge of the documents that

9  are shown here today that have been produced but not

10 specific detail unless ahead of time there was some

11 Bates range that was identified, which I don't believe

12 there was any particular document which says, hey,

13 we're going to ask you about this.

14           Does that correspond with your understanding?

15           MS. BONHAM:  We have email correspondence

16 reflecting I think our shared understanding on that.

17 We can take it exhibit by exhibit to deal with the

18 documents.

19           MR. BLAKE:  Thank you.

20 BY MS. BONHAM:

21      Q    Again, regarding Exhibit 1 I'd just like you

22 to flip to the next page.  And this is a three-page

23 document.  Under Topic 3, are you the person designated

24 by ODH to speak on its behalf with respect to the Ohio

25 Health Department's current and past policies and

16

1   practices regarding changing birth certificates,

2   including formulation and application of and

3   justification underlying those policies and practices?

4        A    Yes.

5        Q    And can we agree that when I say "ODH," I'm

6   referring to the Ohio Health Department?

7        A    Oh, that's fine.  I understand.

8        Q    It's my own shorthand.  Thank you.

9             Besides reviewing the documents that we

10  discussed and talking to counsel did you do anything

11  else to prepare for the deposition?

12       A    No, I did not.

13       Q    Okay.  Did anyone else from the Health

14  Department help you prepare testimony at all?

15       A    No, they did not.

16       Q    Prior to reviewing the two documents that we

17  discussed with your counsel for the deposition have you

18  ever been asked to gather other documents related to

19  the case?

20       A    Not to my knowledge.

21       Q    Have you ever assisted in the gathering of

22  documents related to this case?

23       A    Yes.

24       Q    And can you tell me about that.

25       A    How we can gather documents?

17

1    Q    Yes.

2    A    Hit the print button.  I mean, a lot of the

3 information is searchable and whatever we can produce

4 we hit print and give to whoever is requesting it.

5    Q    Okay.  So related to this litigation did

6 someone instruct you to gather and print documents like

7 that?

8         MR. BLAKE:  Objection.  Instruct you not to

9 answer.  Attorney-client work product and all those

10 things.

11        The people who instructed her are in-house

12 for those conversations about what was she asked and

13 how to gather documents and things like that.

14        To the extent they came from the attorneys at

15 the ODH, I'm going to instruct you not to answer.

16        To the extent they came from other places,

17 you can go ahead and give your testimony.

18        MS. BONHAM:  Are you instructing her not to

19 answer the question whether she was instructed to

20 gather documents?

21        MR. BLAKE:  I don't believe that was the

22 question.

23 BY MS. BONHAM:

24    Q    Let's start with that.  Were you ever

25 instructed to gather documents in the way you just

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

18

1    described for this litigation?

2        A    Yes.

3        Q    Who instructed you to do that?

4        A    Legal counsel.

5        Q    In-house or Jake?

6        A    In-house.

7        Q    At what time, do you remember?

8        A    I would say approximately a year ago.

9        Q    Okay.  Were there multiple occasions?

10       A    To update any new information, yes.

11       Q    Do you remember when those occasions were?

12       A    No.

13       Q    How many times?

14       A    Those documents don't go to me directly so I

15   don't see them in the course of the day.

16       Q    Which documents don't go to you directly?

17       A    Any documents that come to our mailroom that

18   get disbursed for work product don't come to me so I

19   may not see everything.  But if we needed to review, if

20   there was anything else to produce, there's other

21   people that would have more knowledge as to what has

22   come in and if there's anything that we would need to

23   make additional copies of.

24       Q    Okay.  So what I'm hearing you say is that

25   you were requested by in-house counsel at one time

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

19

1   maybe a year ago to search for and produce documents?

2       A    Correct.

3       Q    And then some number of additional times

4   since then you've been requested to supplement the

5   production or search for new documents?

6       A    Yes.

7       Q    But that you don't directly oversee that,

8   someone else does?

9       A    I directly oversee it but I don't necessarily

10  see all of the documents coming in firsthand.

11      Q    Okay.  Who else is involved in that from the

12  Department?

13      A    Rena Boler.

14      Q    Anyone else?

15      A    Not really.

16      Q    What's Ms. Boler's job title?

17      A    She is -- I knew you would ask me that --

18  administrative officer and she oversees the corrections

19  unit.

20      Q    Do you know how long she's been at the

21  Department?

22      A    Fifteen years, approximately.

23      Q    How long have you been there?

24      A    Almost 19.

25      Q    So when you were requested to gather

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

20

1   documents for the case, can you explain how you would

2   go about gathering those?

3         A    Sure.  It's dependent upon what it is.

4              If the request is for a procedure manual how

5   we actually do our work, that's easy.  That's

6   accessible from almost anyone in the Department to make

7   a copy of.

8              If it's specific to an individual, we do a

9   search on the system which will provide us information

10  as to -- if there's more information connected to that

11  record that may not be on the system that has come

12  through as a legal document, we have a mechanism in

13  place by which we can search for where that legal

14  document is because we do house that via paper.  And we

15  can then review whether or not that that's a document

16  that should be pulled or made copies of.

17        Q    Okay.  Let me ask you a couple of follow-ups

18  on that.

19             When you say the document exists as a paper,

20  do you mean it doesn't exist in electronic form?

21        A    Correct.

22        Q    Okay.  What kinds of documents don't exist in

23  electronic form?

24        A    Anything that is provided to us by a court is

25  always a piece of paper.

Stacie Ray, et al. vs Amy Acton, et al.                                   Judith Nagy

21

1         Any change notice such as an affidavit that
2   may come from an individual that's also -- it's both
3   electronic and paper, but we would have a paper copy
4   because we need it notarized.
5         Attorney affidavits are always paper.  We
6   don't get those in electronic.  And some death
7   certificates are still paper.
8       Q    Do you put any of these into electronic
9   storage or do you keep them all as paper only?
10      A    What do you mean by electronic storage?
11      Q    For example, do you take any of these
12  documents habitually as a practice and scan it in and
13  store it electronically?
14      A    No court paperwork is ever scanned.  We have
15  no electronic trail of a -- it simply is a paper of
16  paper.
17        Paternity affidavits we do not scan.
18        Death certificates we do not scan, but the
19  information on the death certificate resides
20  electronically.
21      Q    How does it reside electronically?
22      A    We data enter the fields.
23      Q    Do you data enter the fields similarly for
24  birth certificates?
25      A    Those are all data entered at the place where

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

22

1   the event occurred.  So the Health Department does not

2   do any of them because none of them occurred at the

3   Health Department.

4       Q    Does the Health Department somehow collect or

5   aggregate that information from the source?

6       A    Collect or aggregate meaning?

7       Q    For instance, if that information is data

8   entered locally, does it get transmitted and then kept

9   by ODH?

10      A    Yes, it does.

11      Q    And how does that work?

12      A    We are all using the same system, so as a

13  user of the system let's say at a hospital you have the

14  accessibility to data enter as a clerk which allows you

15  to put in a new event to go over whatever your process

16  is.

17          There's also a separate user of the system at

18  that same location that can certify that the event

19  occurred and that the facts are true and then that

20  information -- like I said, we can actually see from

21  our user level everything that has been started,

22  everything that is complete and everything that has

23  been certified.  And then we have a different role that

24  allows us to take that information, submit it as needed

25  to other sources, as well as print it for certified

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

23

1   copies for customers.

2       Q    Okay.  So there's a uniform electronic

3   storage system --

4       A    Yes.

5       Q    -- that the Department of Health can use?

6   And what are the local entities that also use that?

7   Hospitals?

8       A    It could be either a hospital -- The system

9   has two components.  There's a birth component and a

10  death component.  So if you want to keep it to birth,

11  it would be hospitals, birthing centers, local health

12  departments, and the state office.

13      Q    So when you were discussing how you would

14  search for and produce records that you were asked to

15  search for and produce for the case, so I think you

16  said if there's a paper document you would have to go

17  and get that?

18      A    Yes.

19      Q    How are the paper documents kept?

20      A    The particular paper documents you're talking

21  about being like a court document?

22      Q    For example, yes.

23      A    A court document that comes in is given a

24  different sequential sequence of numbers that is not

25  associated with the filing system of the birth

24

1   document.  And that's a different sequence, resides

2   apart from the old paper records of the births.  And

3   the only way of getting the link number to know the

4   piece of paper that came in that resides with the birth

5   record is you have to know the individual's name so we

6   can uncover what the link is to get that number to go

7   into an actual vault with an envelope that has that

8   matching number which we then actually unseal and can

9   review the paper documents inside.

10      Q    I noticed the word "vault" in some of your

11  records.  It makes it sound very exciting.

12      A    It's not that exciting.  It's a large room.

13      Q    So you have a set of paper records and then

14  you have sort of a corresponding set of some kind of

15  electronic data that will let you know where the paper

16  records are.  Is that fair?

17      A    Yes.

18      Q    And birth records you said are searchable by

19  name?

20      A    Correct.

21      Q    And is that current name, current legal name?

22      A    Yes.

23      Q    And are these searchable in any other way?

24      A    You can search records by the facility.  You

25  can search by a county.  You can search by a particular

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

25

1   birth date, birth year, and mother's information.

2        Q    So when you were instructed to search for

3   records and produce them related to this case, you

4   searched for and produced both paper and electronic

5   records; is that right?

6        A    Yes.

7        Q    Or records that are kept as paper and kept

8   electronically; is that right?

9        A    Yes.

10       Q    Did you use search terms like key words to

11  perform that search?

12       A    We can only -- For this particular case we

13  could only utilize the name information as we knew it

14  legally to see if there was any corresponding paperwork

15  that would go with that record.

16       Q    So in order to search for the documents you

17  produced you used name information.  Did you use any

18  other search terms?

19       A    No.

20       Q    So what other principles did you use to

21  perform this search?  How else did you perform this

22  search to produce relevant documents?

23       A    That really is it.

24       Q    You made name searches?

25       A    Yeah.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

26

1          MR. BLAKE:  Let's stop for a second.  We can

2     go off the record.

3          (Discussion held off the record.)

4          MS. BONHAM:  Okay.  Back on.

5          We took a break and Jake offered to provide

6     the search terms or any other details about the search

7     for the document production in the case generally, so

8     we're going to handle that later.

9          MR. BLAKE:  The mechanisms that we used to

10    initially collect and then create the production set.

11         MS. BONHAM:  I appreciate that.

12         MR. BLAKE:  And to the extent you have any

13    other questions or you think that there's something

14    missing, I'm more than happy to supplement our document

15    productions.

16         MS. BONHAM:  Okay.  I appreciate that.

17    Q    Let's move on.  We'll re-visit how some of

18    these Department documents are kept and searched for.

19    A    Okay.

20    Q    To return to your preparation for the

21    deposition for a moment.  You said you didn't talk to

22    anyone else in the Department and you didn't review

23    anything except for the Complaint and emails between

24    ODH and my office?

25         MR. BLAKE:  Objection.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

27

1    BY MS. BONHAM:

2         Q    Is that fair?

3         A    Yes.

4         Q    And you didn't prepare in any other way?

5         A    No.

6         Q    Okay.

7                        - - -

8              (Thereupon, Plaintiff's Exhibit 2 was marked

9    for purposes of identification.)

10                        - - -

11   BY MS. BONHAM:

12        Q    I'm handing you what's been marked as

13   Exhibit 2.  We just discussed this.  Can you say

14   whether you recognize that?

15        A    Yes, I recognize it.

16        Q    And what is it?

17        A    It is the Complaint.

18        Q    And you testified previously that you saw

19   this before in preparation for your deposition and that

20   your counsel showed it to you.

21             I want to direct you to the caption of the

22   Complaint right on the first page, page number one,

23   which lists the four Plaintiffs by name.

24             Do you know Stacie Ray?

25        A    I do not.

28

1      Q     Have you heard of her?

2      A     No.

3      Q     In connection with the lawsuit only?

4      A     Yes.

5      Q     Have you ever reviewed her records related to

6   your position at ODH?

7      A     Can you clarify what you mean.

8      Q     Have you ever reviewed any record related to

9   Stacie Ray?

10     A     No.

11     Q     No, or you don't know?

12     A     No.

13     Q     Okay.  Do you know Basil Argento?

14     A     No, I do not.

15     Q     Have you ever reviewed any record related to

16  Basil Argento?

17     A     No.

18     Q     Have you ever spoken to anyone about either

19  of these people?

20     A     Spoken to anyone as in?

21     Q     Have you ever spoken to anyone at all about

22  Stacie Ray?

23     A     I have spoken to the staff once the request

24  was received that we needed additional review but that

25  would be it.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

29

1      Q    Can you tell me about that request.

2      A    Sometimes we receive court paperwork that we

3    need additional guidance in the review process.  So it

4    gets forwarded to me first for discussion and then we

5    usually include other people at ODH to further review

6    the request to make a determination whether or not we

7    can perform the work.

8      Q    Okay.  Let me ask you a few follow-ups about

9    that.

10          Who else at ODH would be involved in that

11   kind of conversation?

12     A    Our legal counsel.  Usually the paperwork

13   goes to our processing unit first, Rena.  And so it

14   would be a person in the processing unit, Rena, myself,

15   and usually legal counsel.

16     Q    Is the person in the processing unit always

17   the same person?

18     A    No.

19     Q    How many people work in the processing unit?

20     A    Two to six.  It depends on where it kind of

21   is.

22     Q    Do you know their names offhand?

23     A    Yeah.

24     Q    Can you tell me?

25     A    Yeah.  Sure.  There's Harold Burces and

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

30

1   Denise Sinkfield would probably be the two.  And then

2   from there there's typists that -- they're actually

3   like the reviewers and that would probably be the

4   people that would have the questions.

5        Q    Okay.  So a request of this kind comes in and

6   it goes to Harold and Denise that review it?

7        A    Correct.

8        Q    And then they push it up to you?

9        A    To Rena.

10       Q    To Rena.

11       A    For assistance if they need some

12   clarification.  And if Rena needs to review it further,

13   she pushes it up to me.  And then if we feel like it

14   still needs to be evaluated further, then we usually

15   ask legal counsel for some assistance.

16       Q    Okay.  So with regard to Stacie Ray what was

17   this request?

18       A    To my knowledge Stacie Ray had a court order

19   which we determined that needed further review because

20   we don't get many court orders with a legal name change

21   attached.  So it was stopped at the review process

22   because it looked different than what most of the

23   paperwork is that we receive, and Rena and I discussed

24   it and we needed to have further review with legal

25   counsel to figure out what we should do with the

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

31

1    paperwork.

2         Q    Do you remember when that was about?

3         A    That I cannot say.

4         Q    Did you produce records related to that in

5    the litigation?

6         A    I'm not too sure I understand.

7         Q    So you said there was a request that came in,

8    then there was some correspondence related to this

9    request getting pushed up the chain, and then there was

10   some determination made.  Were there any records

11   generated at any part of that process?

12        A    If there were you have them because they

13   would have been emails.

14        Q    Okay.  Including the request itself that came

15   through?

16        A    I believe so.

17        Q    So Stacie Ray made a request for a legal name

18   change on a birth certificate and attached a court

19   order for the legal name change, true?

20        A    The court order had two requests in it.  And

21   the legal name change was actually part of the court

22   order, and also there was a request for a different

23   change as well.

24             Usually legal name changes are not a court

25   order like that, so it was confusing.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

32

1      Q      Okay.  And what was the other part of the

2  order that you just referenced?

3      A      The other part of the order was a request to

4  change the gender.

5      Q      So she made a request to change the name and

6  the gender on the birth certificate?

7      A      Correct.

8      Q      And it was all part of one request?

9      A      Yes.

10      Q      And the court order included both the name

11  change and the gender?

12      A      Yes, it did.

13      Q      What court generated that order?

14      A      I do not know offhand.

15      Q      Was it an Ohio Probate Court or out-of-state?

16      A      I honestly do not know.

17      Q      Can you take me through exactly what happened

18  when that request came in and what you all did with it.

19      A      Usually what happens, a legal name change

20  comes in on a different document and court-ordered

21  requests come in as a court-ordered correction.

22             This document kind of combined two things

23  together onto one document.  So it was something that

24  we hadn't really seen so once the review process

25  started and it was reviewed we really weren't too sure

1    how to handle it because legal name changes are usually

2    not a court order, which means they're not sealed,

3    which is why they're usually on different documents.

4    So we didn't know how to handle that.

5           So Rena looked at it, also didn't know

6    exactly what to do.  I looked at it, also had never

7    seen it before and didn't know what to do.  So we

8    reviewed what the request was with legal counsel and it

9    was determined that only one-half of the request could

10   be processed.

11          And we reached out to the individual that had

12   filed it to indicate what we could do.  And whether

13   that individual chose for us to just do the legal name

14   change, we would go ahead and do that, but the rest of

15   the request we could not go ahead and change.  That's

16   pretty much it.

17      Q    And the individual you're referring to is

18   Stacie Ray --

19      A    Yes.

20      Q    -- one of the Plaintiffs in the litigation?

21          So the reason it was unusual is not because

22   there was a request for name change, right, that

23   happens with some kind of regularity?

24      A    Usually name changes are not done as a court

25   order, so that was actually a little bit weird for us.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

34

1    And like I said the reason being, our legal name

2    changes do not get sealed and the court orders do.  So

3    if we were to seal a name change, that seemed kind of

4    weird.  So the whole thing was reviewed to see if we

5    needed to contact the court or if we could process the

6    request or what action we had to take.

7         Q    And you said you processed half of the

8    request.  You processed the name change and not the

9    gender change; is that right?

10        A    Right.  We ask each individual their

11   preference.  And some people choose not to do anything.

12        Q    Okay.  So when someone asks you for both a

13   name change and a gender change at the same time, you

14   ask them their preference whether (A) they want nothing

15   done or (B) they just want the name change done?

16        A    That is correct.

17        Q    And those are the only two options?

18        A    Yes.

19        Q    And why don't you process the gender change?

20        A    Because under Ohio law that's a change that

21   we do not have the ability to do.

22        Q    Okay.  We'll come back to that.

23             So you asked in this instance Stacie Ray

24   whether she wanted to have nothing done or whether she

25   wanted to have only the name change done; is that

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

35

1    right?

2         A    Correct.

3         Q    And then she told you what?

4         A    I believe she requested that we process the

5    name change.  So we held onto the paperwork, processed

6    her name change and updated her record accordingly.

7         Q    Generally speaking, how common are requests

8    just for name change?

9         A    We probably receive 25 per week.

10        Q    Okay.  So that in itself is not unusual, it

11   was just the form that was unusual here as you were

12   discussing?

13        A    The form was not what we expect for a legal

14   name change.

15        Q    About how often do you receive requests for a

16   gender change?

17        A    To my knowledge one a month.

18        Q    One a month for how long?

19        A    The past year.

20        Q    Okay.  What about before that?

21        A    Very infrequently.  I think -- well,

22   specifically what are you -- for what kind of change?

23        Q    Well, are there multiple ways to change the

24   gender marker?

25        A    There are no ways to change a gender marker.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

36

1    Q    Okay.  So when people request that you change

2  it, just generally speaking that happens about once a

3  month over the past year?

4    A    Yes.

5    Q    And previous to the past year it happened

6  less frequently you're saying?

7    A    Yes.

8    Q    About how often?

9    A    It's hard to say.  Maybe a few a year.

10   Q    Okay.  Can you talk about the nature of any

11  of these requests.  What does it look like when such a

12  request comes in?

13   A    Such a request as what?

14   Q    What does it look like when someone makes

15  the request to you to change their gender marker?

16   A    I would imagine it depends upon the court,

17  the state, they could look a little bit different, but

18  we usually ask for a court order.

19        The court orders have all been very different

20  with the types of verbiage that they use, the type of

21  request that is made.  So they're not a standard format

22  necessarily.  It's just different information is

23  provided.

24        As long as the court order is an original

25  copy or certified, we'll go ahead and review it to see

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

37

1    if it can be processed.

2         Q    Okay.  So when you say you ask for a court

3    order, why do you do that?

4         A    For those individuals that have a mistake on

5    their birth record we would request that you go to do a

6    correction.  All corrections that have a mistake are

7    usually done through a court and the court -- whatever

8    evidence you need to provide to that individual through

9    the court system.  They then send us the request to our

10   department ordering us to make the change, and that's

11   what we expect to have in order to do the process.

12        Q    So there are some instances where you'll

13   change the gender marker?

14             MR. BLAKE:  Objection.

15        A    We don't have the ability to change a gender

16   marker.

17        Q    Then why are you requesting a court order

18   from folks that are asking you to change the gender

19   marker?

20        A    If you want to make a correction to your

21   birth record for the sex because it was not entered

22   correctly at the time of birth, then we do ask for a

23   court order, because there's evidence that you would

24   need to produce in order for that correction to be

25   done.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

38

1    Q    So if someone asserts that there was a

2    mistake, you'll process a change for their gender

3    marker?

4         MR. BLAKE:  Objection.  Hypothetical.

5         If you know, go ahead.

6    A    If someone knows a mistake has been done,

7    goes to court and asks that their sex information be

8    changed, we can do that.

9    Q    So it's physically possible to change the

10   gender marker designation?

11        MR. BLAKE:  Objection.

12   A    We don't have a gender marker designation.

13   Q    I see.

14                    - - -

15        (Thereupon, Plaintiff's Exhibit 3 was marked

16   for purposes of identification.)

17                    - - -

18   BY MS. BONHAM:

19   Q    I'm going to hand you what's been marked

20   Exhibit 3.  Do you recognize this document?

21   A    It's a certified birth abstract.

22   Q    And how do you recognize it?

23   A    It's the form that's certified and it tells

24   what health district issued it.

25   Q    And is this commonly referred to as a birth

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

39

1    certificate?

2         A    Yes.

3         Q    Is that your signature near the bottom

4    right-hand corner?

5         A    It is.

6         Q    So did you produce this document?

7         A    No.

8         Q    Who produced it?

9         A    Mahoning County General Health District.

10        Q    And then you signed it?

11        A    That signature is in the system.

12        Q    And what is the effect of attaching your

13   signature to this?

14        A    We have a centralized database so any birth

15   record that is issued out of the database gets the

16   State Registrar's signature.

17        Q    And what does that do for a record to get the

18   State Registrar's signature on it?

19        A    It's one of the components of getting a

20   certified copy.

21        Q    Can I have you read the name on the birth

22   certificate that we're looking at.

23        A    The name on the birth record is

24   Ashley Abigail Breda.

25        Q    And can I have you read where it says "Sex."

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

40

1      A    The sex is listed as male.

2      Q    Where it says "Sex" on this birth record

3  would you agree that's commonly what someone would use

4  to indicate whether they were male or female?

5           MR. BLAKE:  Objection.

6      A    What was the question?

7

8      Q    Where it says "Sex" on this birth certificate

9  next to the word "Male," would you agree that's what

10 someone would commonly use to indicate whether they

11 were male or female?

12          MR. BLAKE:  Objection.

13     A    I don't know how people use a certified copy

14 of a birth record and in what capacity, so I can't say.

15     Q    Do you have a driver's license?

16     A    Yes, I do.

17     Q    Does it designate whether you're male or

18 female?

19     A    I believe it does.

20     Q    Can I ask you how you identify?  Do you

21 identify as male or female?

22     A    Female.

23     Q    Does your driver's license say female?

24     A    I believe it does.

25     Q    And when you take it out and show it to

Stacie Ray, et al. vs Amy Acton, et al.                          Judith Nagy

41

1    somebody, is that congruent with how you look and feel?

2            MR. BLAKE:  Objection.

3            Go ahead.  Obviously at this point she's not

4    testifying on behalf of ODH how her subjective feelings

5    are, but go ahead if you know.

6        A    I don't really put any thought into it.

7        Q    Okay.  But if you were to take out your

8    driver's license right now and show it to me and it

9    says female on it and I'm looking at you, Ms. Nagy, is

10   that an accurate reflection of who you are as a woman?

11           MR. BLAKE:  The same objection.

12       A    I guess so, sure.  It also says I weigh

13   150 pounds too.  I don't think that's accurate, but...

14       Q    So we can agree -- I'm a woman.  I identify

15   as a woman.  I have a driver's license that says female

16   and I take it out to indicate that I'm a woman, that's

17   how I use it, and is that how you use your driver's

18   license, you take it out and show it to me?

19           MR. BLAKE:  The same objection.

20       Q    You feel like it's right?

21       A    I feel like it's right.

22       Q    Okay.  So I'm going to refer to this

23   designation where it says, for example, Sex:  Male on

24   the birth certificate that's Exhibit 3 generally as the

25   gender designation on the birth certificate throughout

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

42

1    the deposition.

2            MR. BLAKE:  Is there a question?

3    BY MS. BONHAM:

4        Q    And we can use this to refer back to indicate

5    what we're talking about if we have a disagreement

6    about that.  Let's put that aside and re-visit the

7    Complaint, which is Exhibit 2.

8            So you said you've never met Stacie Ray, the

9    first Plaintiff listed on the Complaint caption.  You

10   don't know her but you have talked about her as you're

11   previously testifying, and that was in the context of

12   her making this request for a change of name and

13   gender --

14       A    That is correct.

15       Q    -- to ODH?

16           And you were able to process only the name

17   change that was court ordered for her?

18       A    That is correct.

19       Q    And that's because -- Let's just clarify why

20   that is.

21           Why wouldn't you process the half of the

22   court order that directed the gender change?

23       A    The change that was requested is not

24   something that we have statute over in law, so we could

25   not comply with that part of the court order, but we

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

43

1    could do the legal name change.

2        Q    So it's the Department's position that you

3    can't do it or you won't do it in the case of Stacie

4    Ray?

5             MR. BLAKE:  Objection.

6        A    It doesn't matter who requests it, we don't

7    have the capacity through our law to make that

8    particular change on a birth record.

9        Q    And why is that?

10       A    Well, first of all, we don't have a gender

11   field to change and --

12       Q    But we can agree -- I'm sorry to interrupt

13   you.  We can agree what we're talking about here is on

14   Exhibit 3 where it says "Sex:  Male"?

15            MR. BLAKE:  Objection.

16   BY MS. BONHAM:

17       Q    That field someone ordered a change of?

18            MR. BLAKE:  Objection.

19   BY MS. BONHAM:

20       Q    And ODH can't or won't change it in the case

21   of Stacie Ray.  Why is that?

22            MR. BLAKE:  Objection.

23       A    That particular field is designated as sex.

24   There are changes that we do make via law that enable

25   us to do like a legal name change to change parentage,

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

44

1    to do adoptions.  That particular change is not

2    reflected in our law as something that we can legally

3    do, so we did not feel that we could comply with that

4    court order but we could do the legal name change part.

5         Q    But you had changed that field in the past

6    for other people, not Stacie Ray but in other

7    instances?

8         A    Yes.

9         Q    And you can do it?

10        A    Yes.

11        Q    So you do it in other cases but not here in

12   Stacie Ray's case?

13        A    In Stacie Ray's case in reviewing the court

14   order we determined that that was not something that we

15   could legally do under our law.

16        Q    Okay.  Why was that exactly?  How was that

17   court order different than the court orders in other

18   instances where you have changed that field?

19        A    Well, in some instances if there's a mistake

20   documenting the event at the time of birth, those

21   corrections we can do and we have done.

22             In this particular case there was no need for

23   correction because the event information was correct at

24   birth, thereby we could not comply with that component

25   of the court order, but we could go ahead and do her

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

45

1   legal name change.

2        Q    And what does that mean that that was

3   corrected at birth?  What does that mean to ODH?

4        A    Well, for example, and this is my personal

5   example, I had twins, a boy and a girl.  My girl was

6   born first.  When you enter information into the system

7   when you have multiples, a clerk is able to copy over

8   the first birth record in order to produce the second

9   or third.  That clerk did that and brought over all of

10  my daughter's medical information, which included her

11  sex, onto my little boy's birth record.

12            One day when I was using his birth record to

13  put him into preschool I finally found that that sex

14  designation on his birth record actually said female.

15  So I contacted the hospital.  They reviewed the record.

16  They agreed that there was a mistake in putting the

17  health information into his record at the time of

18  birth.  I got medical documentation together through

19  the hospital, went to court and corrected that

20  information.  It was sent over to the Health Department

21  where his document was corrected.  So now his sex

22  information on his birth record now says male.

23            In that particular instance obviously it was

24  recorded wrong at the time of birth so it was corrected

25  through the court and corrected through our office.  So

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

1    we did do it.

2        Q    Okay.

3            MR. BLAKE:  We've been going about an hour.

4    I don't know, do you want to break in the next few

5    minutes?

6            MS. BONHAM:  Oh, sure thing.  Yeah, we can

7    break now if you wish.

8            MR. BLAKE:  Is this a good stopping time?

9            MS. BONHAM:  Yeah.

10            (A recess was taken.)

11            MS. BONHAM:  Let's resume.

12        Q    We were on a break and I think you said you

13    had a point of clarification?

14        A    Yes.  From reviewing with my counsel, I

15    actually have met very briefly Ms. Ray, Stacie Ray, one

16    of the Plaintiffs.

17            She did come into the Vital Statistics Office

18    to inquire about changing her birth record, and I tell

19    everyone pretty much the same pathway to do a

20    correction is taking your information to the court.  We

21    direct them to the proper court and from there we

22    expect them to follow the process and then submit the

23    paperwork for consideration.  So that was kind of our

24    meeting.

25        Q    Okay.  So that's basically what you told

Stacie Ray, et al. vs Amy Acton, et al.                          Judith Nagy

47

1   Stacie Ray?

2        A    Uh-huh.

3        Q    Do you remember how long ago that was?

4        A    I have no idea.

5        Q    The past five years?

6        A    Yes.

7        Q    The past year?

8        A    No, I wouldn't think so.

9        Q    Did she indicate at that time that she wanted

10  to have both a name and a gender change on the birth

11  record?

12       A    My conversation with her -- to be honest I

13  have a lot of conversations with a lot of people, but

14  in particular I do remember her being very distraught,

15  that she needed a correction done in order to take some

16  training.

17            She was trying to get all this done so she

18  could do the training, and I just basically said the

19  way you get a correction done is you have to then apply

20  to the Probate Court where you reside and this, this

21  and this.  And I said when we get the paperwork, we'll

22  review it and see if we can go ahead and do the

23  correction for you.

24            I'm not a lawyer.  I don't give legal advice.

25  That's all I can pretty much tell anyone that needs

48

1 something to look different on their record, that they

2 just have to go to court and do what the court asks

3 them to do and provide whatever documentation.  Because

4 I don't know that, I don't know the cost.  We just kind

5 of send them on the right pathway for them to pursue

6 and send the paperwork.

7      Q    Okay.  So that's what you did in Stacie Ray's

8 case?

9      A    Uh-huh.

10     Q    Sort of a general statement?

11     A    Right.  There's nothing that we could do.

12 She's on-site.  We understand that she had an issue but

13 we can't do things through our office just by her

14 showing up.  So this is what she would have to do.

15     Q    So you do need to get a court order to get a

16 name change?

17     A    Yes, you do.

18     Q    From the Probate Court where you live?

19     A    Usually it's where you reside, yes.

20     Q    And are there other courts you can go to or

21 other options?

22     A    For changes -- like, for example, if the

23 parentage of a child is changing, they lump in changing

24 the child's name at that time.  So if you want to call

25 that a legal name change I guess you could.

49

1          But for individuals who are not changing

2   parentage and they just want to change that particular

3   name information, just a legal name change through the

4   court is what we request.  And then it's optional

5   whether or not you even want to file with us.

6          Q    So just as a point of clarification.  I think

7   you testified before that it's atypical to have a court

8   order when you're requesting just a name change?

9          A    Correct.

10         Q    Can you explain that to me.  You need to get

11  the court order but it's atypical to file it with you

12  or what's the procedure?

13         A    So I can just tell you what we receive on our

14  end, what our forms look like.  I can't tell you what

15  the court does or doesn't do or maybe there's multiple

16  documents but we only get what we get.

17         Usually what happens from many courts is

18  there's a form.  It's actually called court-ordered

19  correction.  When the court sends us that information,

20  the top tells us the information that is currently on

21  the birth record, the incorrect.  And then on the other

22  side it basically says we are asking you that you

23  correct this information that you currently have, it

24  should look like this, be changed to look like that

25  (indicating.)  It could be just one thing, it could be

Stacie Ray, et al. vs Amy Acton, et al.                                  Judith Nagy

50

1   multiple things.

2          But that actually is part of the court order.

3   It's just like our little document.  That's because we

4   are not necessarily staff trained to go through many,

5   many pages of legal paragraphs to try to figure out

6   what is needed, so a lot of times our end result even

7   though let's say we get a packet, we're really just

8   looking for that court-ordered correction document that

9   we can type from to get the right spellings and the

10  right information corrected.

11         That is a totally different document than

12  when someone is asking for a legal name change.  It

13  actually has a different title.  It looks different.

14  You can change multiple names, just your last name.

15  It's not a correction, it's a legal name change.

16         The corrections are sealed so the documents

17  look different.

18         A legal name change form if you chose to file

19  a certified copy with us to update your record, those

20  remain public.  And those are attachments, and they're

21  also footnoted at the bottom of the certificate so

22  anyone knows that you have a legal name change on file.

23  Whereas, a correction those documents no one would be

24  any wiser that something had been produced at one time

25  that was incorrect.  We corrected it, now the document

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

51

1  looks the way it should have looked from like day one

2  let's say.

3       Q    I see.  That's very helpful.

4            So in Stacie Ray's case the reason that this

5  was confusing is because it was a court-ordered

6  correction for both the name and gender change

7  together?

8       A    So if she would have put both of hers on the

9  same document, for us processing it's confusing.  A

10 legal name change is public and goes one direction.  A

11 court-ordered correction means that we're going to seal

12 paperwork in our vault correcting our information.  The

13 two travel different paths but they were on the same

14 document.  So when multiple requests come in like that,

15 it's challenging for us and we get assistance to figure

16 out what we should do.

17      Q    So then in her case when you did process the

18 name change, even though it was on this unusual form

19 you processed it as a public record so there is a

20 record of her name having been changed?

21      A    Right.  It's also recorded.  Anyone who would

22 come through as a court-ordered correction with their

23 legal name change, yeah.

24      Q    But other types of information on a

25 court-ordered correction would be sealed in the vault?

52

1       A    Right.

2       Q    And so the way you handle the correction is

3   that there's just a new record and nobody knows?

4       A    (Nodding head in the affirmative.)

5       Q    Can you give an audible.

6       A    Oh.  Yes.  I'm sorry.  Sorry.

7       Q    So in instances that you've mentioned where

8   you have done a change to the gender marker -- or we

9   can call this designation we've been discussing on

10  Exhibit 3 gender or sex marker interchangeably so we

11  have the shared understanding.

12           In instances where you have changed like that

13  for your son, is that information sealed in the vault?

14      A    Yes, it is.

15      Q    So the fact of that change as you said no one

16  would be the wiser?

17      A    Right.

18      Q    Because it's a correction?

19      A    It's a correction so now his birth record

20  looks the way it should have looked from day one.

21      Q    So regarding Stacie Ray we've been through

22  her interactions with you totally; is that right?  You

23  haven't had further interactions with her that we

24  haven't discussed?

25      A    Correct.

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 53 of 220 PAGEID #: 392
Stacie Ray, et al. vs Amy Acton, et al.                                   Judith Nagy

53

1          MR. BLAKE:  Is that a court-ordered

2     correction or just a --

3          A    Listen --

4               (Laughter.)

5     BY MS. BONHAM:

6          Q    So let me direct you back to the Complaint

7     caption on Exhibit 2 and we'll go through and talk

8     about Basil Argento.

9          A    Okay.

10         Q    You said you have never met him in person; is

11    that right?

12         A    Yes, that is correct.

13         Q    But have you reviewed any kind of records

14    related to him?

15         A    If Basil had a similar product sent to us,

16    which would be a legal name change embedded in a court

17    order asking for additional changes to be done to the

18    record, that would have been reviewed.

19         Q    But you don't know whether that occurred?

20         A    It probably did because it wasn't a form that

21    we were familiar with and we always make sure that we

22    get further review and okay to go ahead and process

23    something.  And that if we need to reach out to the

24    customer that everyone is aware that this is what we're

25    going to do.

Stacie Ray, et al. vs Amy Acton, et al.                                      Judith Nagy

54

1    Q    Okay.  And how do you know that that would

2    have been an unusual form, do you recall?

3    A    Again, if the legal name change is embedded

4    in a court order, then we do a review process and we

5    usually get legal counsel advice as far as should we

6    send a letter, do we make a phone call, are there any

7    other problems with the paperwork, and then we go from

8    there.

9    Q    Do you recall specifically whether that was

10   the case as to Basil Argento?

11   A    Specifically, no.

12   Q    Do you recall having any conversation with

13   anyone related to Basil Argento?

14   A    I do not make the phone calls.  If a phone

15   call is made back to an individual that submitted a

16   court order, usually Rena would do a phone call, if

17   necessary.

18   Q    Do you know if she did one in this instance?

19   A    I do not know offhand, no.

20   Q    Did you ever talk to anyone else about

21   Basil Argento?

22   A    No, just the people who process.  Rena, maybe

23   legal counsel, but that would be it.

24   Q    Do you remember specifically whether you had

25   conversations about him or not?

Stacie Ray, et al. vs Amy Acton, et al.                                          Judith Nagy

55

1    A    No.

2    Q    Then let's turn to the fourth Plaintiff

3  listed on the caption of the Complaint that's

4  Exhibit 2, Ashley Breda.

5         Do you know her personally?

6    A    No, I do not.

7    Q    Have you ever met her in person?

8    A    No, I have not.

9    Q    Have you ever spoken to her?

10   A    No, I have not.

11   Q    Have you corresponded with her?

12   A    No.

13   Q    Have you ever spoken to anyone about her?

14   A    No.

15   Q    Did you ever see any records related to her

16  or mentioning her?

17   A    Not to my knowledge, no.

18   Q    Do you have any knowledge of her at all?

19   A    No.

20   Q    To prepare for the deposition did you review

21  anything or ask anyone about anything related to her?

22   A    No.

23        MS. BONHAM:  And I'm going to ask about our

24  fourth Plaintiff who's a Jane Doe Plaintiff, and I'm

25  going to just ask that any mention of Jane Doe on the

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

56

1    transcript be designated as attorneys' eyes only.

2         Can we agree to that?

3         MR. BLAKE:  Absolutely.

4         MS. BONHAM:  Thanks.

5    Q    Do you know the identity of the Jane Doe

6    Plaintiff in this case?

7    A    I do not.

8    Q    Have you ever reviewed any records related to

9    the Jane Doe in this case?

10   A    Not knowing that individual's name, no.

11   Q    Okay.  So are you aware that these four

12   people, Stacie Ray, Basil Argento, Ashley Breda and

13   Jane Doe are alleging in this Complaint that the Ohio

14   Health Department's policy of not changing the gender

15   or sex designation on their birth record

16   unconstitutionally discriminates against transgender

17   people born in the state of Ohio?

18   A    I'm aware that's their complaint, yes.

19   Q    Do you have an understanding of the basis of

20   their claims?

21   A    I've read through the Complaint.

22   Q    Can you describe your general understanding

23   of the claims.

24   A    From the processing standpoint that my office

25   does it is my understanding that they wished that the

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

57

1    court orders be evaluated differently so we can correct

2    their birth record sex, which we currently do not do.

3         Q    And do you have a general understanding of

4    the Health Department's defenses against those claims?

5         A    Yes, I do.

6         Q    Can you describe that to me.

7         A    We do corrections to the birth record right

8    now.  We currently do not have the basis in law to

9    correct gender.  It's something we don't collect.  It's

10   something that was not a mistake at the time of birth.

11   So at this point we have reviewed our statute to

12   determine that this is something that we cannot correct

13   for an individual because it was a snapshot that was

14   correct at the time of birth.

15        Q    I want to ask you a little bit about that.

16             First, I think you just testified that gender

17   is something that you don't correct?

18        A    Correct.

19        Q    So it's your contention that the sex marker

20   on the birth record is not related to gender?

21        A    The sex marker is information that's provided

22   to us by the healthcare professional that assists in

23   the delivery and that medical information is provided

24   to us based on the biological genitalia of the infant

25   that's born.

Stacie Ray, et al. vs Amy Acton, et al.                                Judith Nagy

58

1          So that's not something that's provided by

2    the parents, nor the child.  That's something that the

3    hospital, physician, nurse, midwife provides to us

4    regarding the event.

5          Q    So what the attending physician at birth

6    understands about the genitalia is what the Health

7    Department believes to be the sex that's accurate to

8    record?

9               MR. BLAKE:  Objection.

10              Go ahead if you understand what belief means.

11   That's just vague.  I don't know what you mean by

12   belief, that's all.

13         A    I would presume that a medical professional

14   that is helping or assisting the delivery of a birth

15   knows how to identify a male or a female newborn.  So

16   we think that that would be correct information that we

17   were receiving from that individual.

18         Q    And as you testified that's collected based

19   on the doctor's understanding of the child's genitals?

20         A    Yes.

21         Q    Do you understand that the Plaintiffs in this

22   case and others requesting a change to their gender or

23   sex designation on the birth record are asking for the

24   Department to change where it says sex and then it's

25   followed by male or female?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

59

1      A    I understand the Plaintiffs are asking for a

2   change in information that we don't collect.

3           I believe that when I reviewed these

4   particular court orders with other individuals that not

5   once did it end up indicating that the sex information

6   was incorrect.  We don't collect gender.  There's

7   nothing to correct.  It wasn't a mistake.

8           This is a historical document that gives us

9   statistical information about the event surrounding the

10  birth and it was recorded correctly at that time.

11     Q    So when you use the word "snapshot," that's

12  come up in a couple of the documents that the

13  Department produced in the litigation, what do you mean

14  by snapshot?

15     A    Well, things can change.  Obviously when a

16  child is born there are certain statistical things that

17  happen.  I mean, you know, you're a certain length,

18  you're a certain weight, you're a certain sex.  You may

19  have certain parents at the time of your birth.  Of

20  course we all grow and maybe some people get adopted or

21  they're parentage change or you change your name,

22  whatever, but at the time we certify that the facts

23  surrounding the birth were correct and this information

24  was attested by a physician or whoever was helping the

25  parents through the birth process and it was correct.

Stacie Ray, et al. vs Amy Acton, et al.                          Judith Nagy

60

1     Q    So when you use the word "snapshot" you're

2   referring to as we've seen in Exhibit 3 the sex or

3   gender marker which lists male or female after it, that

4   is a snapshot in time at the moment of birth from the

5   physician's understanding of the child's genitals?

6     A    Yes.

7     Q    Do you consider every field on the birth

8   record to represent a snapshot?

9     A    Some.  Your date of birth is probably

10  something that would not change, hopefully.  Unless

11  there is a mistake and the information is wrong such as

12  your mom's birthplace.  Maybe you get adopted or you

13  get different legal guardians, that information could

14  change.

15         Again, you can change your name but when the

16  record is filed, your birth date, things like that

17  usually there's a couple of fields that would probably

18  never ever, ever, ever change but other ones could.

19    Q    So this document which is we agreed commonly

20  referred to as a birth certificate, Exhibit 3 that

21  we're looking at it, this is one piece of paper; is

22  that right?

23    A    That is correct.

24    Q    If I requested this I get one piece of paper?

25    A    Yes.

Stacie Ray, et al. vs Amy Acton, et al.                                   Judith Nagy

61

1      Q    That shows all your fields and your

2   signature?

3      A    Yes.

4      Q    And the State of Ohio.

5           And some fields on here it's ODH's contention

6   are snapshots in time that never change and other

7   fields change?

8      A    They could possibly change, sure.

9      Q    As we discussed, for example, parentage and

10  name?

11     A    Uh-huh.

12     Q    So the whole document can't be a snapshot in

13  time because some fields on it change; is that right?

14          MR. BLAKE:  Objection.

15     A    Statistically we take the facts of birth as

16  being true and consistent as far as the birth event.

17          Now, this particular certificate of birth are

18  just basic fields that we get from that event.  If

19  they're are incorrect, we can correct them.  If not,

20  they don't just change.  It's just what it is.

21          I mean, again, you don't have to necessarily

22  go by this name that's on your birth certificate.

23  Maybe you got married or divorced or taken on another

24  name.  You don't have to notify us.  It doesn't mean

25  that the information on the birth certificate is wrong.

62

1   It just means when you were born these were the facts.

2   We certify that these are the facts that we have and we

3   give them to you to do what you want to do with them.

4        Q    But if I do submit to you that my name has

5   changed, you'll change it on the birth record?

6        A    Correct.  But more often than not someone has

7   changed their name and we have no knowledge of that.

8             So, I mean, I can't tell you how many people

9   have processed a legal name change and out of those how

10  many we actually end up receiving, but I can tell you a

11  lot of people get married and divorced and we have no

12  knowledge of what's happening there, which doesn't mean

13  that this is any more inaccurate.  This is exactly what

14  happened the day you were born.

15       Q    So let's talk about accuracy a little bit.

16            If I have had a legal name change and I

17  haven't changed my birth record, then the name on

18  another identity document that I have changed or my

19  legal name change that I got would be incongruent with

20  this birth record; is that right?

21       A    The two of them together bridge how you were

22  born, what you currently want to legally go by, and the

23  two of them together make that assumption.

24       Q    In other words, these two documents wouldn't

25  match?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

63

1        A    Correct.

2        Q    And if I went and got a legal name change and

3   then I submitted it to you and you changed the birth

4   record, then I would have two documents that matched?

5        A    Theoretically.

6        Q    And in that instance the name field on those

7   documents if the change was processed correctly would

8   match?

9        A    Yes.

10       Q    But in the name context there would be a

11  record of that having changed?

12       A    If you submitted the legal name change to us,

13  sure.

14       Q    Because as you testified previously, in the

15  name change context you don't consider that to be a

16  correction and doesn't go in the vault?

17       A    No, correct.  And it's also footnoted so

18  people know that the name that is currently on your

19  birth certificate was not the name as it was originally

20  filed.

21       Q    But that's not so with parentage in the case

22  of an adoption?

23       A    Correct.

24       Q    Okay.  Can you take me through what happens

25  with parentage in the case of an adoption if someone

64

1    needs that to be corrected?

2         A    Sure.  In the case of a child going through

3    an adoption it can be one of two things.  Either one

4    parent has gotten married so we're going to just add a

5    father to step-parent adoption, or a child will be

6    getting one or two brand new parents.

7              We have a particular statute that allows us

8    the ability to recreate the birth record by sealing

9    down whatever facts were recorded at the time of birth

10   and bringing back that record with a new name if

11   applicable, new parent information.  The date of birth

12   would stay the same, the file date still stays the

13   same, and the state file number does change.  But we do

14   take the information that the court provides us from

15   the adoption information so we can complete out just

16   the minimum information regarding the parentage and the

17   child.

18             The original record facts still remain but

19   the legal paperwork that you could purchase would

20   change.

21             So the original court information and if

22   there is a paper record are sealed up in the vault and

23   they're only able to be made copies or given back to a

24   parent if the proper adoption procedure laws.  But as

25   far as everyone is concerned that paperwork is not to

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

65

1  be disclosed and the new legal information remains on

2  file.

3      Q    Is there any limit to when in time after the

4  birth you can go and change that?

5          MR. BLAKE:  Objection.

6      A    Specifically an adoption?

7      Q    Yes.

8      A    Not to my knowledge.  You can be adopted up

9  until your mid-twenties pretty much.

10     Q    And that same process would take place?

11     A    Yes.

12     Q    And as you testified previously a similar

13 correction in sealing of records in the vault occurs

14 when there's a mistake as to the gender or sex marker?

15     A    If there is a mistake recording the facts at

16 the time of birth, you can get a court-ordered

17 correction which allows us the ability to seal down

18 your original record and bring it back updating

19 whatever fact was wrong.  And then that would be the

20 only copy that you would have, right.  So we do seal it

21 down.

22     Q    You gave me one example of an instance where

23 the Department would consider the sex or gender

24 designation to have been mistaken, which was your twin

25 son.  Can you give me examples of other instances that

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

66

1    you would consider to be a mistake and then changed?

2        A    A mistake anywhere in the record or --

3        Q    As to the sex or gender marker.

4        A    The only other would be there are very few

5    infants born that because of their gestation they were

6    born alive but only lived for a few minutes and the

7    baby died.  Many of those children if they're under 18,

8    19 weeks they are undetermined, so their sex

9    designation on their birth record would be

10   undetermined.

11          If for some reason -- there's very few, but

12   if the child did survive, usually the parent or the

13   parents would work with the hospital or their physician

14   to determine later on that they would want to update

15   the record to male to female once the child is of age

16   and they can actually tell what the sex designation is

17   and then they could go to court to update the record.

18   But we do have quite a few records that would remain

19   undetermined just because the baby died and it's never

20   updated.

21       Q    Okay.  So far it appears to me based on your

22   testimony that there are three possible fields that

23   could be listed after that sex or gender designation:

24   Male, female, or undetermined?

25       A    Yes.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

67

1       Q     Are there any others?

2       A     We do have one certificate that does list a

3   different sex -- and why am I drawing a blank?  I'll

4   come back to that.  I can't -- I'm sorry.

5       Q     That's no problem.  Is it --

6       A     It's like intersex.  I forget the word

7   offhand.

8       Q     Is it an old-fashioned word for --

9       A     I'm thinking about every word except I know

10  what it is.  Oh, hermaphrodite.  It's hermaphrodite.

11  Sorry.

12      Q     Thank you.

13            So you have one certificate --

14      A     One.

15      Q     -- that says hermaphrodite.  Okay.

16            Did you produce that in the litigation?

17      A     I honestly don't know.

18      Q     Okay.  And you only have that one?

19      A     Yes.

20      Q     Do you know when it's from?

21      A     When as in when we --

22      Q     Or when it was --

23      A     Updated?

24      Q     Created.

25      A     Within the past two to three years we

Stacie Ray, et al. vs Amy Acton, et al.                              Judith Nagy

68

1   received a court order asking us to update the sex

2   field to hermaphrodite.  We reviewed it and we did it.

3        Q    How do you distinguish that from the

4   undetermined designation that you use?

5        A    My recollection from reviewing the paperwork

6   was that this individual went to court, successfully

7   proved that -- I'm sorry, I don't know if this

8   individual goes by he or she but felt that they had

9   both sex organs.  They had a doctor that verified it.

10  They submitted the court documentation.  The court

11  agreed.  And this individual felt very strongly that

12  they were both, and we reviewed the court information

13  and so we did update to indicate that this individual

14  was a hermaphrodite.  But that is the only record that

15  has that other distinction.

16       Q    To your knowledge has anyone else made a

17  similar request for their sex or gender marker to

18  change to reflect that they consider themselves to be

19  both genders?

20       A    No.  That was the only -- first and only I've

21  ever had in my 20 years.

22       Q    With that particular request?

23       A    Yes.

24       Q    Have you received other requests from people

25  who identify as intersex?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

69

1       A     Not to my knowledge, no.

2       Q     Just to be clear.  Have you received any

3    request for any change to the sex or gender marker from

4    an individual who identified as intersex?

5       A     I have never read a court order indicating

6    intersex, no.

7       Q     Have you ever, court order or not, received a

8    request from a person who is intersex identified to

9    change their sex or gender marker on their birth record

10   in any way?

11      A     Those don't come directly to me so I can't

12   say for certainty.  But it depends on how it would come

13   through.  A request could be a phone call.  It could be

14   just a piece of paper.

15            We basically direct people if they need a

16   correction done to their birth record to please visit a

17   court, and we can help them find a proper pathway to

18   get there and then from there I really don't know.

19      Q     So you don't know or you don't remember is

20   your testimony?

21      A     Yeah.

22      Q     Who would know that information?

23      A     Well, can you specify what you mean by a

24   request?  Is it just like any request --

25      Q     Like you said verbal, written; isn't that

Stacie Ray, et al. vs Amy Acton, et al.                                      Judith Nagy

70

1    correct?

2         A    It could have come through a number of -- we

3    have eight phone people.  We have a few phone people

4    that review the mail that puts standardized letters in

5    there.

6              I guess a conglomeration of people could

7    probably say if they've ever had contact with someone

8    inquiring about changes, but if it's not specifically

9    getting through the process where it's being reviewed

10   it's hard to say how many times interactions may have

11   occurred at different stations around the Department.

12        Q    If the request had occurred in writing, would

13   the Department have records of the correspondence?

14        A    No.

15        Q    Why not?

16        A    We only keep them for two years.  So many

17   times if a request comes in, there is no application,

18   there is no court paperwork, there is no money, it's

19   just something handwritten, we usually send back the

20   original correspondence with a standardized letter

21   saying that we weren't able to assist you because

22   there's nothing here that we can process.  So we think

23   this is what you want so you need to send back the

24   following information so we can try to do your request.

25        Q    And you only retain that kind of

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

1   correspondence for two years?

2        A    Yes.

3        Q    If you do take further action, for instance

4   processing the request, do you retain records of that

5   for longer?

6        A    No, two years.

7        Q    Everything is two years?

8        A    Yeah.

9        Q    Do you record those requests in any other

10  way?

11       A    No.  If it has no money, we don't record them

12  in our system.

13       Q    And can you tell me what you mean by "has no

14  money"?

15       A    If you put a request through our office to

16  purchase a certificate and there is money attached, we

17  have a cash system that would have how much you sent

18  us, a check or money order, whatever, cash, the

19  request, and so we can go ahead and process those first

20  in and first out, understand what we did.

21            So if you get a product from us that doesn't

22  match your expectation we can go back in and make sure

23  that you paid for it, it was our office that processed

24  it and we can go ahead and do an exchange or, you know,

25  review the paperwork again to make sure we typed it

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

72

1    correctly.  So we do have record of all of that.

2            But if you send something more of an inquiry

3    or something that really needs our processing, we're

4    not changing anything, we're not going to produce a

5    certificate, we usually have a standardized letter that

6    we can usually send back to the customer within 24

7    hours kind of indicating that we need more something

8    from you and this is how you would go ahead and send it

9    back to us.

10       Q    So if I were to request a change to my birth

11   certificate without sending money and actually

12   requesting a new copy also, that would be the sort of

13   request that you don't keep a record of after two

14   years?

15       A    Correct.

16       Q    But if I were to make the request and also

17   send you the requisite check and say can you also issue

18   me a new record, you keep that type of request for

19   longer?

20       A    Yes, because one is actually tied to our

21   electronic application and one is not.

22       Q    And the latter category of request, how

23   exactly do you record that?

24       A    The latter category being?

25       Q    The one that comes with the money.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

73

1     A    So a couple of things.  Most things that come

2   in with money are just wanting a certificate so the

3   application is kept for two years.  We generate the

4   certificate.

5          As long as we keep this application, we have

6   probably a good five years that we can review and say,

7   yeah, at one time you requested a certificate, this is

8   what we sent out to you.

9          If it doesn't have money, if you just sent

10  like your legal name change, you don't want anything

11  from us, we have a different document that we do

12  record.  It's a Word document.  So we can find your

13  legal paperwork.

14          In case you call and say I sent you

15  something, it doesn't look like you processed it, we

16  have the ability to look at a different like it's in a

17  Word document that we can correspond like old and new

18  names so we can search for it and verify when we

19  received it, who processed it, and where it should be

20  in the Department.

21     Q    And how long do you keep that certified

22  record?

23     A    That list -- we have a good five or six years

24  of that list.

25     Q    In cases that you mentioned where the sex or

74

1   gender field is initially marked undetermined and then

2   is later corrected to male or female, about how often

3   does that occur would you say?

4        A    We actually did a review of what records were

5   remaining in the system that still had a sex

6   designation as U.

7             I can tell you that most of the Us are

8   deceased infants, and I would say out of the list --

9   it's a very short list, there's probably under 30 --

10  maybe four or five eventually got corrected to a gender

11  or sex designation through the court process.  But,

12  again, most of them will remain as U.

13       Q    And in cases where those folks who did

14  survive and request a change, in cases where you made

15  that change do you require any evidence besides the

16  court order?

17       A    We don't see any of the evidence.  We just

18  receive the court order.

19       Q    Okay.  So whatever they need to produce to

20  prove that, they do it at the court?

21       A    Yes.

22       Q    I want to re-visit Exhibit 3, which is the

23  birth record we've been referring to, and go through

24  that a little bit.

25             Can a birth certificate be used to verify

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

75

1    someone's identity as required by their employer?

2            MR. BLAKE:  Objection.

3            To the extent you know, go ahead and answer.

4    A    I don't know the specifics of what other

5    entities require as far as verifying your identity.

6    Q    Do you know whether generally people use

7    these birth records that you create to verify their

8    identity to their employer?

9            MR. BLAKE:  Objection.

10   A    We don't ask why you need a copy of your

11   certified birth record, so I don't know how many times

12   or what people are doing with their birth record.  I

13   have no knowledge of that.

14   Q    When we were discussing one of the Plaintiffs

15   in this case, Stacie Ray, I believe you testified that

16   she told you she needed a birth record in order to

17   update some licensure.  Is that generally right?

18   A    Yes.

19   Q    And she was distraught because she couldn't

20   do it?

21   A    Yeah.  Yes.

22   Q    So that's one reason that someone might need

23   a birth certificate to identify themselves?

24           MR. BLAKE:  Objection.

25   BY MS. BONHAM:

76

1      Q    That you have personal knowledge of in your

2    capacity at ODH?

3           MR. BLAKE:  Well, is it in her personal

4    knowledge or are we talking about what ODH knows about?

5           MS. BONHAM:  It's obviously both because she

6    testified about her personal conversation, yeah.

7           MR. BLAKE:  So let me just interpose the

8    objection.  To the extent that you or ODH has reached

9    any conclusion about what the Plaintiffs' believe these

10   can be used for, you can go ahead and answer.

11          MS. BONHAM:  Well, she can answer my

12   question.

13          MR. BLAKE:  Yes, you can answer her question.

14     A    She felt strongly she needed to correct her

15   birth record.

16     Q    And she told you it was because she needed to

17   take this step in her life, she needed to update her

18   licensure?

19     A    All I know is that she gave me information

20   about needing to have this updated so she could go

21   ahead and I guess take a driving course or some type of

22   training and she felt strongly that it needed to be

23   corrected.  I don't know if she needed it for the

24   course, how she was utilizing it, but she wanted the

25   correction done.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

77

1      Q    So Stacie Ray needed the correct identity

2   document to identify herself for that purpose --

3           MR. BLAKE:  Objection.

4   BY MS. BONHAM:

5      Q    -- and have other people like her in making

6   these sorts of requests told you why they needed the

7   request to be honored?

8      A    As part of the application process we don't

9   ask anyone who you are, why you need it when you make

10  an application for a certified copy of birth because

11  we're an open records state.  I wouldn't know why you

12  need a certified copy of a birth record or what your

13  reasons or purposes are.  We don't ask it and we don't

14  verify who you are, so I wouldn't know any of that

15  information.

16     Q    So just to be clear.  It's your testimony

17  that you don't know whether people need to produce

18  their birth certificates to their employers sometimes

19  or ever?

20     A    If you request a certified copy of a birth

21  record, we don't ask why you're requesting it.  So I

22  wouldn't know you're going to take it to an employer.

23  I wouldn't know you're enrolling your child.  I

24  wouldn't know you're getting a driver's license.  I

25  don't have any knowledge.  We don't ask you.

Stacie Ray, et al. vs Amy Acton, et al.                                          Judith Nagy

78

1     Q    So those three things you listed, enrolling

2   your child in school, getting a new job or interacting

3   with your employer and getting a driver's license are

4   obviously three instances where you may need to

5   disclose a birth certificate; is that right?

6     A    If that is the opinion of the entity, I

7   suppose so.

8     Q    So those could be three reasons why someone

9   requests a copy of their birth certificate from you?

10         MR. BLAKE:  Objection.

11    A    Sure.

12    Q    Can a birth certificate be used to verify an

13  individual's identity as required to obtain other

14  identify documents?

15         You mentioned driver's licenses.  What about

16  passports?

17         MR. BLAKE:  Objection.  Speculation.

18    A    I honestly don't know what the passport

19  process is for verifying identity.

20    Q    And you mentioned enrolling your child in

21  school.  What about other educational opportunities?

22         MR. BLAKE:  Objection.  Speculation.

23    A    I really don't know what other educational --

24  I don't know what the institutions are requiring.

25    Q    So looking at Exhibit 3, you did testify that

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

79

1   this is a record that establishes information, right?

2       A    Right.

3       Q    And that includes information about the

4   subject's identity; is that right?

5       A    It includes the facts that you are a United

6   States citizen, your legal name, your legal parent's

7   name, and how old you are because of your date of

8   birth.

9       Q    Let's take it field by field.  Can you just

10  identify every field for me and what that means.

11           Let's start at the top left where it says

12  state file number.

13      A    So the state file number is two numbers put

14  together.  The first four characters is the year that

15  you're born and then sequentially as birth certificates

16  are filed throughout the year you get the next

17  sequential number, and it's a six-digit number.

18      Q    And are those numbers related to how you

19  store these records?

20      A    It used to be when they were paper but not

21  anymore.

22      Q    So why is the number still there?

23      A    Because that's how we account for how many

24  births happen.

25      Q    Do you record the number anywhere besides on

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

80
1   the birth certificate?

2       A    It's in the electronic file as well.  But

3   that's how we report event information to other

4   entities because that's a unique number.  Only you have

5   that number.  Of course, there's going to be that

6   number in every other year, but what makes it unique is

7   your year of birth.  So that's your unique identifier

8   for the state.

9       Q    Okay.  And so the information on these fields

10  and this document in general is unique to each person;

11  is that right?

12      A    For us for every -- you could have a person

13  with the same name born on the same day, but we would

14  know that you have a different line item, that this is

15  your unique number that goes with your facts of the

16  event.

17      Q    So this birth record contains unique

18  information that is used to identify every unique

19  person?

20           MR. BLAKE:  Objection.

21      A    It depends what you mean by unique.  Is

22  everyone's birth date unique?  No.  You share it with

23  thousands of other people.

24      Q    Sure.  But as you said this, for example,

25  what we're looking at is Exhibit 3 is Plaintiff Ashley

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

81

1    Breda's birth certificate and you're talking about the

2    state file number on the top line.

3         A    The state file number helps us organize the

4    facts of every birth that we receive from all the

5    different hospitals.  So that's how we keep an event

6    record from, you know, not crossing over -- and like I

7    said, those are specific to identifying the facts of

8    the event as they occurred so we don't get them

9    confused with other events.

10        Q    So you can tell looking at this that even if

11   there's another Ashley Abigail Breda that was born in

12   1990, that this information is unique to this Ashley

13   Abigail Breda?

14        A    This information is unique to that state file

15   number.

16        Q    So this document, a birth record, can only

17   convey information about this one person that has this

18   state file number?

19        A    Correct.

20        Q    We went through and talked about a couple of

21   these fields that you could change or correct and I

22   just want to go over each field to make sure we have it

23   nailed down.

24             So the state file number does not ever

25   change; is that right?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

82

1      A    No, it can change.

2      Q    It can change.  And, I'm sorry, how can that

3  change?

4      A    It can change because when we seal down your

5  information, you will get the next sequential number

6  for that birth year.

7      Q    And can you explain seal down your

8  information.

9      A    So let's say you're doing a change process to

10  put a father on the record, you're going to do a

11  paternity change.  In those cases the original

12  information when we have a paternity document or court

13  order asking us to maybe update the name of the child,

14  add a father, we can do that.  The state file number

15  that goes with this information is sealed

16  electronically.  And we also if there's a paper copy we

17  would remove that from our vault and that's sealed up

18  and it is typed back up with the information from the

19  court.  There's a new state file number given and the

20  1990 sequencing, the next one available, and it comes

21  back with a new state file number with the new

22  information as the court has directed us.

23      Q    Okay.  I understand.

24           So just to be clear.  When someone has a U

25  designation where the sex or gender field is and they

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

83

1   later have that corrected to, for instance, a male

2   designation, at that time they also receive a new state

3   file number and their old record is sealed in the

4   vault?

5        A    Yes.  Correct.

6        Q    So that new record that they have with the

7   new sex or gender designation and the new state file

8   number is now the only one that they would request to

9   be contemporaneously true to convey that this is me?

10       A    Correct.

11       Q    So just going down the list.  As we

12  discussed, the name can change but that's a little

13  different.  That happens and it remains a public

14  record.  It doesn't go into the vault?

15       A    Correct.  Any correction to your name or a

16  legal name change is not a sealed document.  You would

17  keep your state file number and we just do the

18  correction to that document.

19       Q    And you testified earlier that there's a

20  footnote, but that doesn't go on the birth record

21  itself, right?

22            It's here where it says "Note" on Exhibit 3,

23  for example?

24       A    Correct.

25       Q    Are there any other fields that would change

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

84

1   and produce a note like the one we're looking at?

2       A    There would be.  So let's say an example is

3   this is your certificate and you say my first name

4   Ashley is spelled incorrectly.  I spell it A-S-H-L-Y

5   but my birth record is reflecting L-E-Y, you can do an

6   affidavit, which is a notarized document that you do

7   for free at the Health Department or the State.  We

8   will go ahead and correct that field.  A note is put at

9   the bottom of your certificate indicating that a

10  correction affidavit is on file correcting the spelling

11  of your first name, and that's produced for you as a

12  certified copy.

13          So any changes via an affidavit for spelling

14  mistakes to a name, your mom's name, your father's name

15  and in some cases your date of birth will reflect as a

16  note at the bottom and let people know that there is a

17  change on file that they're not seeing.

18      Q    Okay.  And besides the instances you just

19  listed are there any other instances that would produce

20  such a note?

21      A    Any affidavit would produce that note.  But

22  court-ordered corrections would not produce a note

23  because the certificate is reproduced.

24      Q    How long have you been doing things that way

25  at the Department of Health?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

85

1        A    As far back as when I started 18 years ago.

2        Q    And forgive me for all the questions about

3    your own records system.

4        A    That's okay.

5        Q    If someone were to ask me about mine, I

6    would --

7             The state file number in instances where you

8    do get a new one and the old one is sealed away, does

9    the Department retain a link between these two numbers

10   so that you could retrieve the sealed version?

11       A    We do have a link.  It's important because

12   even though the number goes away, the medical

13   information and the statistical information that

14   produce that child's record still remains and we still

15   kind of have information that goes with that number.

16   But our legal document that we produce no longer goes

17   to that number.  It's reflected as a different state

18   file number.

19            So we do have a link.  Your new number has

20   the new demographic birth information attached.  Your

21   old one has all the medical and all the event

22   information as it occurred, which we don't carry over

23   to your new information.

24       Q    Okay.  Including in instances where that

25   information was corrected because it was an error?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

86

1      A     None of the medical carries over because

2    obviously for paternity corrections, adoptions that

3    medical is not the new parent information.

4            In our system we don't differentiate a lot of

5    times between the different corrections that we do.

6            A correction means something changed legally.

7    We have the power to recreate your certificate but we

8    don't try to figure out if all the medical is still

9    adequate for how it was produced, because a lot of the

10   medical is also the birth parents and we don't know if

11   the new information is relevant to the new parent

12   information that may be created.  If that makes sense?

13     Q     When you're talking about that medical

14   information are you referring to additional demographic

15   data that's not reflected on this birth record?

16     A     Right.  Oh, sorry.  Deep dive.

17     Q     No, that's fine.

18           What I want to ask is, in instances like you

19   mentioned for your son -- and just to be clear.  I'm

20   using this example that we're talking about to discuss

21   your knowledge in your capacity at the Ohio Health

22   Department, because you also obviously are also

23   responsible not just as his mother but more managing

24   his records.

25     A     Right.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

87

1      Q    So in this example we discussed about your

2  son who just had an incorrect gender sex marker when he

3  was born, in that case there's an old incorrect record

4  kept in the vault with an old state file number that's

5  linked to the new state file number with the new

6  correct record that is a legal document that he would

7  get when he requests his birth certificate; is that

8  right?

9      A    You are on -- Yes.

10     Q    Thank you.

11     A    That's absolutely correct.

12     Q    Okay.  Thank you.

13          This may seem silly but I want to ask you

14  sort of mechanically when someone is requesting that

15  their sex or gender marker be changed pursuant to a

16  court order when there's an error like the certain

17  instance we just discussed, how mechanically is that

18  changed?  Like how does somebody enter it and produce

19  the new record?  Can you take me through that.

20     A    It's very exciting.

21     Q    Briefly if possible.

22     A    The first thing we do when we get a court

23  order is verify that there is a child that matches the

24  court order.  Sometimes we get court orders for kids

25  that weren't born in Ohio so we can't do anything for

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

88

1    those.

2              So once we're able to identify the correct

3    record there is a series of key strokes.  I think you

4    may have a manual we may have provided that actually

5    walks you through how to use our system.  But basically

6    we ask for -- there's two types of correction

7    processes.  One where we do an update where it doesn't

8    seal and one where we can do an update that will seal

9    the record, which brings up the demographic top half of

10   the record with the new state file number.  We're able

11   to verify or pull over fields from the old record if

12   necessary.  And basically we have to touch each field

13   of the new record to ensure that that information will

14   or will not be changed.

15             Once it's done we can certify it back down

16   and it comes up in our new system as being a legally

17   viable record that someone can purchase.

18             The first record gets electronically sealed

19   but linked in the background, but that link is not

20   exposed to anyone that uses the system.  So as a clerk

21   you can't bring up a legal record and then do some type

22   of key strokes to see iterations of it.  You can only

23   see legally.  If you were to search by let's say my

24   son's name, you don't find two records, you only find

25   the current legal record that's available to purchase.

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 89 of 220 PAGEID #: 428

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

89

1      Q    It sounds like you have explained that

2   before.

3      A    I try to be as succinct as I can.

4      Q    Thank you.

5           MR. BLAKE:  I don't know if you're going to

6   jump into another topic, but a short break?

7           MS. BONHAM:  Yeah, I think we're going to

8   change.  We can take a little break, yes.

9           (A recess was taken.)

10                          - - -

11          (Thereupon, Plaintiff's Exhibit 4 was marked

12   for purposes of identification.)

13                          - - -

14   BY MS. BONHAM:

15     Q    All right.  I'm going to hand you what's been

16   marked as Exhibit 4.  Do you recognize that?

17     A    Oh, yes.  It's the interrogatories that were

18   answered, sure.

19     Q    Okay.  And these were answered by the Ohio

20   Health Department?

21     A    Yes.

22     Q    And you?

23     A    Yes, they were.

24     Q    And where did you see this before?

25     A    I helped answer the questions.  Saw it then.

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 90 of 220 PAGEID #: 429
Stacie Ray, et al. vs Amy Acton, et al.                                        Judith Nagy

90

1    And then we reviewed this a little bit.  Just went

2    through it yesterday.

3        Q    Okay.  I think previously you testified that

4    the only documents you went through to prepare for the

5    deposition were the Complaint and a little bit of

6    correspondence, and I just wanted to be clear about it.

7        A    Can I make a correction and say that this was

8    the other document that we reviewed at the end.

9        Q    The interrogatories?

10       A    Yes.

11       Q    These interrogatory responses which were the

12   responses to Plaintiffs' first interrogatories and

13   requests for production.  And then do you remember any

14   other documents, including court documents that might

15   look similar like this?

16       A    No.

17       Q    I appreciate that.

18            So you helped answer these.  Did you work

19   with anyone else besides your attorneys to help answer

20   them?

21       A    Rena Boler and Karen Sorrell.

22            Oh, sorry.  Do you want me to spell that?

23            THE COURT REPORTER:  Yes, please.

24       A    Rena Boler, R-E-N-A B-O-L-E-R.  Karen

25   Sorrell, K-A-R-E-N S-O-R-R-E-L-L.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

91

1      Q    Let me direct you to Page 4 of this document

2   and your answer to Interrogatory No. 1 near the bottom

3   of Page 4 where it says 1 and then date of response.

4   Can you review that momentarily.

5      A    Okay.

6      Q    Do you remember answering that interrogatory?

7      A    I helped in the response.

8      Q    And is that still a true response?

9      A    Yes, it is.

10     Q    I'm going to refer to these again if we could

11  keep them out.  That's Exhibit 4.

12     A    Okay.

13     Q    So based on that interrogatory response and

14  your testimony today is it the Department's position

15  that Ohio law does not permit changes to the sex or

16  gender designation on a birth certificate?

17          MR. BLAKE:  I'm just going to object.  I kind

18  of let this go a few times, but the ACLU's fully aware

19  as Defendants made clear in various filings that it's

20  our position that the birth certificate reflects sex,

21  sex identifier, which is distinct from gender.  You can

22  go ahead and refer to it whatever you want, but our

23  position is the information recorded is the sex and sex

24  identifier.

25          And I'm just asking for a standing objection

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 92 of 220 PAGEID #: 431
Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

92

1  on that particular thing, so you can go ahead and ask
2  your questions.
3        MS. BONHAM:  That's fine.  The standing
4  objection is noted.
5        MR. BLAKE:  Thank you.
6  BY MS. BONHAM:
7     Q    I'll restate the question.
8     A    Please.
9        MR. BLAKE:  Yeah, sorry about that.
10  BY MS. BONHAM:
11     Q    Is it the Department's position that Ohio law
12  does not permit changes to the sex or gender
13  designation on the birth certificate?
14     A    We permit a correction to the item which is
15  indicated as sex on a birth record through a
16  court-ordered correction process if it was not properly
17  recorded at the time of birth.
18     Q    And it's the Department's position that in
19  any other instance Ohio statute does not permit changes
20  to that designation?
21        MR. BLAKE:  Objection.
22     A    If it is an accurate reflection of what
23  happened at the time of birth there is no reason to
24  change it.
25     Q    So is it the Department's position that

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

93

1    Ohio's statute does not permit changes to the sex or

2    gender designation on a birth certificate when the

3    basis for a request to change that designation is that

4    the individual requesting it is transgender?

5            MR. BLAKE:  Objection.  I'm not sure what the

6    question is.

7            MS. BONHAM:  Your is objection noted.

8            MR. BLAKE:  If you can maybe rephrase it to

9    clarify it, unless you understand the question?

10       A    She can restate it, please.  That would be

11   great.

12       Q    Is it the Ohio Health Department's position

13   that Ohio statute does not permit changes to the sex or

14   gender designation on a birth certificate when the

15   basis for the request for that change is that the

16   requesting individual is transgender?

17       A    It is my understanding that you can correct

18   your sex marker on your birth certificate if it was

19   incorrect at the time that it was recorded.

20            I have no idea about the journey someone is

21   taking.  If it's incorrect it's incorrect whoever you

22   are.  So, I mean, I wouldn't know someone is requesting

23   it for any reason other than it was wrong at the time

24   it was recorded.

25                            - - -

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

94

1          (Thereupon, Plaintiff's Exhibit 5 was marked

2     for purposes of identification.)

3                          - - -

4     BY MS. BONHAM:

5          Q    I'm handing you what's been marked Exhibit 5.

6     This was produced by the Department.  And it's also

7     marked Bates No. 698.  Do you recognize this document?

8          A    Yes, I do.

9          Q    What is it?

10         A    When there was a change to the law regarding

11    married same sex couples who are having children, we

12    had some information that we wanted to share regarding

13    the update to parents' titles.

14              We also had a couple other concerns that had

15    come up that hospitals or local health departments may

16    run into.  One was the processing of longer children's

17    names into the system, and the other one was regarding

18    not having the statute in place to change a sex

19    designation on a record if there was not a mistake at

20    the recording at the time of birth.

21         Q    I want to -- well, I'll ask you first, who

22    created this document, do you know?

23         A    I don't know offhand.  It could have been a

24    couple of authors.

25         Q    Do you have any idea who those couple of

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

95

1    people might be?

2        A    Well, because it is indicated that there's

3    Help Desk, it was probably a summary document that was

4    started with Dan Burleson, D-A-N B-U-R-L-E-S-O-N, who

5    manages the Help Desk.

6              He gets phone calls from stakeholders

7    regarding how to enter information into the system and

8    so his document was probably reviewed by other staff

9    members as well as probably some of legal counsel.

10       Q    Okay.  And you referred to this as a summary

11   document that he or someone similar would have made

12   discussing how the Department was going to respond to

13   these concerns?

14       A    Correct.

15       Q    And can I direct you towards the third

16   subtitle on this page that's bolded and underlined.

17   Can you read what that says.

18       A    "Gender changes."

19       Q    Okay.  And can you read the first sentence of

20   that paragraph.

21       A    "Below is our stance on changing the gender

22   on a birth record in regards to someone that has a

23   gender reassignment surgery or transitioned."

24       Q    Okay.  So one of your staff made this as you

25   testified to discuss how you were going to communicate

96

1  the Department's position to others who were concerned

2  about this; is that right?

3      A    Correct.

4      Q    And so this would you agree reflects what

5  this document called the organization's stance on

6  changing the gender on a birth record for transgender

7  people?

8      A    As it indicates here, we don't have the legal

9  authority to do this so when talking to customers we

10  put it in the language that they may receive when

11  they're on the phone when speaking to individuals.

12      Q    Okay.  And the way this document puts it,

13  this is the Department's stance on changing the gender

14  on a birth record -- that's a quote -- for someone who

15  is transgender; is that right?

16      A    I would say yes.

17      Q    Okay.  So previously you testified that

18  you're not aware of what someone's journey is or why a

19  particular individual may be requesting their birth

20  record?

21      A    Correct.

22      Q    But the Department is aware that people in

23  the transgender community are requesting changes on

24  their birth record for this reason and you're

25  responding to that; is that right?

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 97 of 220 PAGEID #: 436

Stacie Ray, et al. vs Amy Acton, et al.                          Judith Nagy

97

1            MR. BLAKE:  Objection.

2       A    We get many inquiries via the phone, to be

3    honest.  I don't know if it may be that individual, a

4    family member.  It could be anyone.  But we try to be

5    as helpful as possible to direct people where they

6    would need to go to do a correction to their record.

7       Q    So there were enough requests or, you know,

8    there was enough concern from transgender people

9    wanting to change the gender designation on the birth

10   record to reflect their identity that someone at ODH

11   put together this document to be helpful; is that

12   right?

13           MR. BLAKE:  Objection.  Vague.  Compound.

14      A    It's nice to give information to the phone

15   staff regarding how to direct a phone call of a query

16   that you may not get very many times.

17           To say that we get a lot -- We have 150,000

18   births a year.  I don't really know in conjunction with

19   that how many a lot of them phone calls would be on

20   this particular subject, but we want information out to

21   the phone staff to be able to take a name, refer it to

22   the proper person so we can direct them where they

23   would need to go or how they would make a correction to

24   a birth record.

25      Q    So the Department formulated this to be

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

98

1   helpful in the particular instance of transgender

2   people calling or writing to get help with this

3   problem; is that right?

4            MR. BLAKE:  Objection.

5       A    We were trying to be helpful for anyone who

6   had questions regarding how to change their sex marker

7   on their certificate, especially for individuals that

8   were going to the legal trouble to get a legal name

9   change together with this so there was a better

10  understanding and our message could be a little bit

11  clearer.

12       Q    Okay.  And that was for folks -- I'll just

13  read it again.  I know you read it. "When someone that

14  has had gender reassignment surgery or transitioned."

15            And most of these gender change requests come

16  to your office with a legal name change together?

17       A    Yes.

18       Q    This is your stance on how you help the

19  customer in that case; is that right?

20       A    Yes.

21       Q    And this paragraph, I know you said that --

22  you identified the person who may have written this or

23  a couple of people who may have written this, but the

24  paragraph uses "I" language.  You know, if you receive

25  a call from a customer, if they want to speak to

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

1  someone, you can take their name and send it to me.

2  Who is "me" in that paragraph, do you know?

3       A    In that paragraph it's most likely

4  Rena Boler.

5       Q    Okay.  So in that instance she will either

6  call them directly or have legal contact them; is that

7  right?

8       A    Correct.

9       Q    Okay.  And in the bold here below where it

10  says what your stance is on gender changes can you just

11  read the bold.

12       A    "The Ohio Department of Health, Bureau of

13  Vital Statistics can process a name change but has no

14  legal authority to process a gender change.  The Ohio

15  Revised Code Section 3705.15 specifies the procedure

16  for updating a birth certificate after a legal name

17  change and for correcting mistakes on a birth

18  certificate that were made shortly after the birth.  It

19  does not authorize changing a gender marker on a birth

20  certificate to reflect gender transition.

21            Ohio Revised Code Section 3705.22, which

22  allows for amendments of a birth certificate to correct

23  errors, also does not authorize changing the gender

24  marker on a birth certificate to reflect gender

25  transition.

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

1          Sorry for any inconvenience this may cause."

2      Q    So is this text, is this what the Department

3  always tells people who are requesting a change to the

4  gender marker on the birth certificate to reflect a

5  gender transition?

6          MR. BLAKE:  Objection.  Vague.

7      A    I don't know if this is specifically stated

8  over a phone.  But it was given to the staff.  I doubt

9  that they're giving this information directly to a

10  customer.

11     Q    Okay.  But this is reflective of the

12  organization's position?

13     A    It's the information given to the staff

14  regarding what to do when they have a customer that may

15  fall into a category and they need more information

16  regarding what they can do.

17     Q    Okay.  And that category is as this document

18  puts it someone requesting a gender marker change on

19  their birth certificate to reflect gender transition.

20  That's what this is for; is that right?

21     A    Correct.

22     Q    I want to look at another document alongside

23  this.

24          MS. BONHAM:  If I could ask you to mark that.

25               - - -

Stacie Ray, et al. vs Amy Acton, et al.                                        Judith Nagy

101

1          (Thereupon, Plaintiff's Exhibit 6 was marked

2     for purposes of identification.)

3                          - - -

4     BY MS. BONHAM:

5          Q    I'm going to hand you Exhibit 6.  Do you

6     recognize this document?

7          A    This is the letter that we send some

8     individuals regarding when they give us a court order

9     with a legal name change and the request to change a

10    gender marker on a birth certificate.

11         Q    Is the text of this document what you always

12    send in that instance?

13              MR. BLAKE:  Objection.  Vague.

14    BY MS. BONHAM:

15         Q    Is it the same text?

16         A    Unless our legal department needs to put a

17    specific information for a particular request, this is

18    pretty much what would go out.

19         Q    Who created this document?

20         A    Legal counsel in conjunction with our

21    department.

22         Q    And how long have you been sending these out?

23         A    Probably approximately two to three years.

24         Q    Looking back at Exhibit 5.  About when was

25    that document created that we were just discussing

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

102

1    previously?

2        A    Oh, gosh.  Well, probably about the same

3    timeframe.

4        Q    And you can take a minute to look at these

5    again if you need to, but the bolded text here on

6    Exhibit 5 that you had read out into the record and

7    then the text in Exhibit 6 that you commonly send out

8    now, would you say these reflect the same position on

9    behalf of the organization?

10       A    Yes.

11       Q    So based on your testimony today the Health

12   Department does sometimes permit changes on the sex or

13   designation on a birth certificate?

14       A    That is true.

15       Q    But based on these documents, Exhibit 5 and 6

16   and your testimony about them, the Department does not

17   permit such a change if the basis for the request for

18   the change is a gender transition; is that right?

19            MR. BLAKE:  Objection.  Asked and answered.

20       A    If the basis is not to correct something that

21   was incorrect at the time of birth, then we do not

22   change it.  We don't have the legal authority to do so.

23       Q    And specifically if I'm requesting that my

24   sex or gender marker on my birth record be changed

25   because I am transgender and I have gone through a

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

103

1  gender transition, it's the Department's position that

2  you will never make that change?

3          MR. BLAKE:  Objection.  Asked and answered.

4  Hypothetical and compound.

5     A    We'll make the correction to a birth record

6  if at the time of birth the sex designation was

7  incorrectly, you know, given to us.  It doesn't matter

8  who requests it.

9     Q    Since she hasn't really answered I'm going to

10 ask you to answer.

11         MR. BLAKE:  She's answered.

12 BY MS. BONHAM:

13    Q    The question on the table is, if I'm a

14 transgender individual and I make a request to ODH I

15 want to change the sex or gender marker on my birth

16 record on the basis of my gender transition, what will

17 ODH do?

18         MR. BLAKE:  Objection.  Asked and answered.

19 She's answered this now twice.

20         MS. BONHAM:  I'm going to ask the witness to

21 answer.  And speaking objections are getting to be a

22 bit much as well.

23         MS. BELENKER:  It's been asked and answered

24 now three times.

25    A    If the request to change your birth record is

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

104

1   anything other than a mistake we do not have the legal

2   authority to do that change for you.

3        Q    Does the Department consider it to be a

4   mistake when someone is identified as one gender at

5   birth by a physician and that's not their true gender?

6             MR. BLAKE:  Objection.  Vague.  Assumes facts

7   not in evidence.

8        A    We rely on medical professionals to give us

9   the information as they certify it to be true.

10            If a medical professional indicates that the

11  newborn is a male or a female, we basically record that

12  based on their medical expertise.

13            This is given to us from a medical provider.

14  It's not given to us from a parent or from the child.

15  So if it's recorded wrong and the documents in the

16  medical record show that it was incorrectly recorded,

17  we will correct it.

18       Q    And what you need is a court order?

19       A    To correct that field, yes.  You will have to

20  go to court, prove that was incorrectly submitted to us

21  upon birth and we will go ahead and make that

22  correction once we get the court order.

23       Q    So if I present ODH with a court order saying

24  that my gender was originally marked on my birth

25  certificate as male and actually it should be female

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

1   and I submit it along with a request to change that

2   field to ODH, ODH will honor that court order?

3              MR. BLAKE:  Objection.  Vague.  Compound.

4   Assumes facts not in evidence.

5              Go ahead and answer if you can.

6      A    If the court order indicates that there was

7   an error in recording the sex at the time of birth, we

8   will make the correction to the child's birth record.

9      Q    Okay.  So ODH looks at the court order and

10  determines whether ODH believes that the underlying

11  reasoning is error or something else?

12     A    This is correct.

13     Q    Okay.  And in cases where you determine it's

14  error or mistake you will make the change.  And in

15  cases where you don't believe it was an error or

16  mistake you won't make the change?

17             MR. BLAKE:  Objection.  Compound.

18     A    Correct.

19     Q    Other than the instance we've talked about

20  with your son being misdesignated, what do you consider

21  to be a mistake?

22     A    A typographical error is basically a mistake.

23             In some instances way back when we had only

24  paper records very infrequently a doctor who was hand

25  filling it out could have missed a variety of fields.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

106

1   In those cases those individuals also had to go to

2   court.

3           Regardless of how the child was named or what

4   you presumed may be the answer they would still need to

5   go to court and give us a court order to update

6   something that was filed without that information in

7   play.  But other than that it truly is data entry or

8   information not known which can go to court and be

9   corrected.

10      Q    Okay.  How did the Department make that

11  determination?  How did you decide what is a mistake?

12          MR. BLAKE:  Objection.  Vague.

13      A    A mistake is when you basically know what the

14  answer is but it's not reflected correctly in the

15  record.

16          So if there's a true mistake the first thing

17  that we tell people is you can easily correct it but

18  you need to first verify it with the hospital that they

19  have the documentation that you need because you'll

20  probably need that for your court.  And usually the

21  hospital's really good, as I know, preparing a packet

22  for you to take to court so you can go ahead and

23  request the correction be done.

24      Q    So how did the Department determine what it

25  will consider to be a mistake?

107

1              MR. BLAKE:  Objection.

2      A    So in our statute of law we have very

3   specific statutes that allow us the ability to change a

4   record and correct a record.  We've gone through a

5   couple of them just as paternity actions, adding a dad

6   or an adoption, a court-ordered correction and we will

7   make a change.

8              So reviewing the law determined whether or

9   not we had legal authority to update or change the sex

10   designation.  Outside of that we do not.

11              So a correction to the sex information if it

12   was incorrectly recorded we can do upon a court order,

13   but if it was properly recorded at the time of birth

14   then we do not update it.

15      Q    Who was involved in making that

16   determination?

17              MR. BLAKE:  Objection.  Vague.

18      A    ODH.

19      Q    Who from ODH?

20      A    Legal counsel.  I would imagine they reached

21   out to the governor's office.

22              We discussed the paperwork that we were

23   receiving and they reviewed the law and recognized that

24   there was no legal authority for us to make those

25   particular changes.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

108

1    Q    When you say paperwork you were receiving,

2    what does that mean?

3    A    So to give examples of questions that we had

4    and whether and how we should pursue the request we

5    gave examples of court orders with the legal names

6    attached.  They could review the court order which was

7    the legal language that people were describing what

8    they wanted to have done and we gave that all to legal

9    to review and help us determine whether or not we had

10   the authority to make the correction via the court

11   order.

12   Q    Was some of what you reviewed requests from

13   transgender individuals to change their gender marker

14   to reflect their gender transition?

15   A    I assume so.  I didn't really get down into

16   the nitty gritty of their particular cases, so I'm

17   going to say yes.

18   Q    Do you remember any other individuals who

19   played a major role in making the determination?

20   A    No.

21   Q    Do you remember when that was?

22   A    I'd say probably in the about two or three

23   year timeframe, approximately.

24   Q    And what triggered that?

25   A    So we did get some court orders from

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

109

1  out-of-state courts requesting a correction to the

2  birth record, but we also received ones from the state

3  of Ohio courts which was a little bit different.  And,

4  again, because we're kind of form sensitive it looked

5  very different from anything we usually get from any

6  Ohio Probate Court.

7            So it went up the chain.  Someone had the

8  paperwork.  They didn't really understand it.  Went to

9  Rena, went to myself.  We contacted legal counsel.

10  They reviewed the paperwork as we had received it and

11  determined that there was no legal statute available

12  for that person to change their sex designation, so we

13  determined that you could do the legal name change if

14  you wish.

15            So then we would reach out to those

16  individuals to explain we had received their paperwork,

17  this is what we could do.  We could do nothing and send

18  it back.  We could do the legal name change, but we

19  couldn't do the sex designation correction for them

20  because it was correct and we didn't have the

21  authority.

22     Q    Okay.  So about two or three years ago the

23  Department you're saying received these two requests.

24  One was from an out-of-state court order, one was from

25  an Ohio Probate Court order, and this triggered an

Stacie Ray, et al. vs Amy Acton, et al.                                      Judith Nagy

1    agency review of what you were going to do in these

2    instances; is that right?

3         A    Yes.

4              MR. BLAKE:  Objection.  Misstates.

5              Go ahead.

6         A    This is correct.

7         Q    Thank you.

8              And as a result of that review the Department

9    made a determination and the Department's stance as a

10   result is reflected in the documents that we went

11   through, Exhibits 5 and 6; is that right?

12             MR. BLAKE:  Objection.

13             Go ahead.

14        A    Legal counsel verified that we did not have

15   the legal authority to process the court-ordered

16   correction as it was coming through our office.  So

17   that determination was made upon re-review of the law

18   and that's the way that we were to handle the documents

19   from now on.

20        Q    Okay.  And the two court orders that

21   triggered this were they both court orders requesting

22   that the gender marker designation be changed on the

23   basis of gender transition?

24             MR. BLAKE:  Objection.  Misstates.

25        A    I'm not exactly aware of the transition

Stacie Ray, et al. vs Amy Acton, et al.                                Judith Nagy

111

1    process or the specific journey of that individual, but

2    it probably had something to do with I would say

3    something medical but I don't know.  I really don't

4    have that.

5        Q    That's fine.

6             In other words, it was a person saying I'm

7    transgender, this designation is wrong and I would like

8    the other one?

9        A    It was the court indicating what they had

10   received and what the request was.  So what that

11   individual explained to the court I don't know.

12       Q    Okay.  So in those two instances that

13   triggered you to review your practices and come up with

14   this stance two or three years ago those were both

15   instances, one in an Ohio court, one in an out-of-state

16   court, where it was a transgender individual who had

17   obtained a court order saying that the gender marker

18   needs to be changed on the basis of that person's

19   transgender identity.  ODH decided that that wasn't

20   considered to be a mistake and that it wasn't going to

21   process that type of change.  Is that right?

22            MR. BLAKE:  Object and misstates.

23            I also just want to instruct you not to

24   disclose any attorney-client privileged information.

25   So go ahead and answer.  To the extent you can do that

Stacie Ray, et al. vs Amy Acton, et al.                     Judith Nagy

112

1    go ahead and answer.

2        A    Yes.

3            MR. BLAKE:  Fair enough.

4    BY MS. BONHAM:

5        Q    When ODH made that determination of how you

6    were going to handle these requests going forward,

7    besides this summary document that we looked at in

8    Exhibit 5, was there any other internal guidance

9    provided in how to handle this for staff?

10           MR. BLAKE:  Objection.

11           If you can do so without revealing

12   attorney-client privileged information, go ahead and

13   answer.

14       A    Any time we need guidance it goes through the

15   exact same pathway.

16           If you receive a document you're not

17   comfortable through your review process, you get

18   assistance from your manager, get assistance from me.

19   If we don't know how to pursue we would get guidance

20   from legal.

21           So it doesn't matter in what arena.  If it

22   doesn't look like something we're comfortable with

23   because the form looks different, maybe the wording is

24   something we've never read before, then we would go

25   ahead and submit that to legal to make sure we would be

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

113

1    processing the court order correctly.

2         Q    So there was no, for example, written

3    guidance or verbal instruction provided to ODH staff on

4    how to handle this policy other than what we talked

5    about in Exhibit 5?

6              MR. BLAKE:  Objection.

7              To the extent you can answer without

8    disclosing attorney-client privileged information, go

9    ahead.

10        A    The guidance that we give the reviewers of

11   paperwork is if it's indicating that a gender needs to

12   be changed, because that's information we don't

13   collect, that they were to go ahead and get guidance as

14   to what we're going to do.  And usually that paperwork

15   is handled because we don't do the change because we

16   don't collect the information.

17        Q    Okay.  And what you're saying -- so Exhibit

18   No. 5 refers to gender changes and discusses gender

19   changes.  And I've been to make things simple referring

20   to this designation on the birth record, Exhibit 3, as

21   sex or gender.  But I hear you saying that it's

22   currently your position that you don't collect gender

23   information and that you only collect sex information;

24   is that right?

25             MR. BLAKE:  Objection.  Misstates.

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

114

1          A    That is correct.

2          Q    So why do some of the internal documents that

3    you produced refer to gender markers or gender changes

4    then?

5          A    I think it's ease of understanding.  If you

6    were on the phone talking to a variety of people you're

7    trying to use the same verbiage as you may be hearing a

8    customer calling to say how do I do this.  So we do

9    refer to the words that a customer would use such as

10   gender reassignment, gender change, to help the phone

11   staff understand this request probably needs to be

12   routed in this direction.

13          So we want to use the words that other people

14   use to describe their issue.  And so, like I said, this

15   is for phone staff so they would know how to handle a

16   customer and how to route them directly.

17         Q    Right.  That makes sense, right?  If I'm

18   requesting my birth certificate it's because it's a

19   document that I want to use for some purpose; is that

20   right?

21          MR. BLAKE:  Objection. Speculation.

22          Answer if you know.

23         A    If you request your birth record, I don't

24   know why you're using it.  It could be your dead

25   grandmother for all I know.  I mean I don't know why

Stacie Ray, et al. vs Amy Acton, et al.                                      Judith Nagy

1   you're using it.  I don't even know what you're

2   requesting is your own to be honest with you.  So it's

3   hard to identify the purposes of who you are because we

4   don't ask or what you need it for because we don't ask.

5        Q    But as a practical matter, if someone needs

6   to have their birth certificate to identify the subject

7   of the birth certificate, right?

8        A    We send out a lot of birth records to people

9   that are not on the record.

10        Q    And the record identifies the person that is

11   the subject of the record, obviously?

12        A    Right.  But sending something out I don't

13   know who that person is or what you're using it for.

14        Q    All right.  Okay.  So when ODH two or three

15   years ago as we discussed was making this determination

16   about how to handle the requests of transgender people

17   to change the gender marker on their birth certificate,

18   did the Department specifically consider how to

19   interact with transgender customers?

20        A    Interact with transgender customers via the

21   phone?

22        Q    In any way.  How to help them, how to talk

23   with them about requests for gender marker changes, for

24   example?

25        A    I don't believe we did any outreach to a

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

116

1    specific subsect of the community, no.

2        Q    Did the Department internally consider how to

3    treat the topic of transgender individuals requesting

4    new birth records with changed gender markers?

5        A    No.

6             MS. BONHAM:  Okay.  I am going to ask for

7    this to be marked Exhibit 7.

8                         - - -

9             (Thereupon, Plaintiff's Exhibit 7 was marked

10   for purposes of identification.)

11                        - - -

12   BY MS. BONHAM:

13       Q    Okay.  I'm handing you Exhibit 7.

14       A    Thank you.

15       Q    Do you recognize that?

16       A    I actually saw it the first time yesterday,

17   yes.

18       Q    Okay.  You saw this yesterday?

19       A    Uh-huh.

20       Q    In what context?

21       A    Preparing for the deposition today.

22       Q    I just want to ask if you can remember any

23   other documents that you reviewed in preparation for

24   the deposition?

25       A    No.  I swear this is the last one.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

117

1      Q    Okay.  And so you recognize it from reviewing

2   it yesterday.  Do you recognize it in any other way?

3      A    These look like notes that were taken from a

4   Midwest conference.

5      Q    And what's a Midwest conference?

6      A    There's an organization that helps vital

7   statistics offices throughout the states trying to give

8   advice.

9           Basically, it's a good meeting ground for

10  states to talk to one another about changes that

11  they're experiencing, law changes, how they record

12  their birth and death information, et cetera and the

13  Midwest conference are just kind of the Midwest states

14  getting together and trying to determine if there's

15  different laws or changes that each one of us are

16  experiencing and how we dealt with it, what the law

17  looks like, things like that.

18          So it is a -- it's not a -- NAPHSIS is

19  basically like a body of individuals that -- it's just

20  like a -- it's not a government group.  It's just an

21  entity that kind of helps state vital statistics

22  offices.

23     Q    Okay.  So this is -- is it an annual

24  conference?

25     A    It used to be.  Not anymore.  But, yeah, so

Stacie Ray, et al. vs Amy Acton, et al.                              Judith Nagy

1   just a handful of states were invited to come to

2   Columbus and you can basically just say these certain

3   things have happened, does anyone else have any

4   experience, tell me a little bit about what you did.

5   Maybe things that would be helpful.  It could be a

6   variety of different topics.

7       Q    That's nice.  That's a good vital statistics

8   meeting of the minds for our region.

9       A    Exactly.  There you go.

10      Q    These notes that we're looking at in

11  Exhibit 7, do you remember what year this conference

12  was?

13      A    I'm going to say it's 2017.

14      Q    Okay.  And so do you know who generated these

15  notes?

16      A    That I do not know.

17      Q    So do you see on this -- and this is a

18  two-sided document.  It's all the same exhibit.  It's

19  also Bates numbered 709 and 10.

20           Where it says Judy - OH on this document, is

21  that you?

22      A    That is me.

23      Q    Okay.  So does this group -- you said they

24  discuss experiences they've had, how they've handled

25  them.  Does it include social issues or new vital

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

119

1  statistics problems to solve that come up?

2       A    It literally can be anything.  It could be

3  your response to updating your whole electronic system.

4  It could be training.  It could be recruiting people

5  for your office.  I mean it could be anything that

6  impacts how you run and operate the vital statistics

7  system.

8       Q    What does these notes appear to reflect?

9       A    So at the end of the conference there is

10  an informal topic called Hot Topics and it's when you

11  can just say, hey, I have a situation that has come up,

12  I'm not aware if anyone else has had the same thing.

13          So you can see some of the content in here

14  such as three parents on a birth certificate, that's

15  something that I don't have exposure to yet but other

16  people already did.  So it's a way of getting out these

17  things may be happening, this is how we're trying to

18  handle it.  Lessons learned.  Maybe a best practice so

19  you will know maybe who you can contact to try to get a

20  better feel for the road that you've already been down

21  so we can kind of help other states navigate that as

22  well.

23          So it can be a variety of different things or

24  even how to do you pick a vendor to scan your records.

25  It could be anything.  It doesn't necessarily have to

120

1  be law or specific ways about how you actually record

2  an event.

3        Q    Okay.  So things come up that people need and

4  they have some kind of impact on the vital statistics

5  world and you can talk about them together as

6  practitioners?

7        A    Yes.

8        Q    Are most of the folks that come to this,

9  though, a government --

10        A    They're all state offices from their state,

11  so yeah, they're all government.

12        Q    And so the hot topics that were discussed

13  here that are reflected in these notes what are those?

14        A    So these were some of the topics that came

15  up.  A little blurb about what that is, so if for some

16  reason in the future you get let's say a court order

17  requesting three parents and we've never seen that

18  before and we start to gather legal opinion about

19  whether or not we can do something we would have notes

20  to say, oh, I can also tell you other states that may

21  be of interest to us to call so we can kind of see how

22  it is that, you know, they're reviewing the paperwork

23  and what they're accepting and not and why.

24        Q    And do these particular notes from this

25  particular conference that we're looking at discuss

Stacie Ray, et al. vs Amy Acton, et al.                          Judith Nagy

121

1    changing gender markers on the birth records?

2         A     It kind of goes all over the place.  It talks

3    about parents who don't want sex listed, as well as

4    individuals who want gender listed or removed.

5              Every record for every state is not

6    necessarily the same in style or format.  So their

7    certified copy of a birth record may have different

8    information and reflected differently, so this is

9    specific to how their state is.

10        Q     And from your knowledge, for instance, based

11   on groups like these do most states have some kind of

12   sex or gender designation on the birth record?

13        A     To my knowledge most states would have a sex

14   designation on their birth record.

15        Q     Can I ask you to read the bolded sentence

16   that begins "Judy - Ohio."

17        A     "Ohio does not change gender on birth

18   certificates.  Our view of snapshot birth certificates

19   versus gender changes.  How do other states make people

20   request that change?"

21        Q     And so is that -- can we agree that's a

22   summary of a question that you asked?

23        A     Yes.

24        Q     Why were you asking that question?

25        A     It's always good to have knowledge regarding

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

122

1   the practices of other states because it runs the gamut

2   of -- it's very eye-opening what states allow and the

3   types of forms and it's just nice information.

4        Q    And so can we agree that this document

5   reflects some further discussion of how other states do

6   this?

7        A    It reflects how other states need paperwork

8   regarding their law about changing their information on

9   their birth certificates.

10       Q    Including the gender marker?

11            MR. BLAKE:  Can we take a quick break?  I

12  know there's a question pending.

13            Can you answer the question?

14       A    I don't know that for a fact because I don't

15  know if the other states have gender.  I can only speak

16  to what our state collects and what we have on our

17  certificate, because they're not standard.

18       Q    I'm going to give you a minute to just review

19  this document and we can go off the record.

20            (A recess was taken.)

21  BY MS. BONHAM:

22       Q    So now that you've had another chance to

23  review this does it reflect there were some discussion

24  of changing the gender and sex markers on the birth

25  records and what the different states' practices are

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

1   for that?

2       A   It was different states' practices regarding

3   updating the records.

4       Q   I also want to look at another document.

5                        - - -

6           (Thereupon, Plaintiff's Exhibit 8 was marked

7   for purposes of identification.)

8                        - - -

9   BY MS. BONHAM:

10      Q   Do you recognize this document?

11      A   I have never seen this document before.

12      Q   Okay.  Can you see what it says on the cover?

13      A   Yes.

14      Q   A report of the N-A-P-H-S-I-S.  How would you

15  pronounce that?

16      A   Oh, that's NAPHSIS.

17      Q   NAPHSIS.  What is NAPHSIS again?

18      A   National Association of --

19          MS. BELENKER:  Public Health.

20      A   -- Public Health Systems or Information

21  Systems.

22      Q   That's okay.  It's a group you were referring

23  to previously, right?

24          MR. BLAKE:  With assist from co-counsel.

25      A   Yes, that meets.

124

1      Q    And so do you see this says on the cover that

2    it's a review of social issues affecting registration

3    of vital statistics with recommendations of best

4    practices?

5      A    Yes.

6      Q    But you've never seen this before?

7      A    No.

8      Q    Is there anyone at ODH since ODH produced

9    this that would have reviewed this document?

10     A    No.  If you are a NAPHSIS member you have

11   access to their website which has a variety of

12   committees that produce reports on security, on

13   registration, on different topics regarding collection,

14   so someone must have had it in their email.

15     Q    Okay.

16     A    I probably got it at one time too but I

17   didn't open it up.

18     Q    Are you on any of these committees or active

19   with the group?

20     A    I'm a member of NAPHSIS but not on any of

21   their committees.

22     Q    Is anyone on the ODH staff, do you know?

23     A    Yes.  A member of NAPHSIS but not on the

24   committees, yes.

25     Q    Is anybody on the committees?

Stacie Ray, et al. vs Amy Acton, et al.                                      Judith Nagy

1        A    No.

2        Q    But you go to these conferences that we're

3   discussing?

4        A    Yes.

5        Q    So if you look on Page 5 of 7 of this

6   document also Bates numbered 716.  Can you see what it

7   says at number one in bold?

8        A    "Gender neutral label."

9        Q    And can you see what it says at A?

10       A    "Recommended the use of one gender neutral

11  label."

12       Q    And can you see that the rest of this page of

13  the document talks about, for example, same sex

14  marriages.  Do you see that?

15       A    Let's see.

16       Q    At No. 5.

17       A    'female same sex marriages," yes.

18       Q    And on the previous page 4 of 7 otherwise

19  Bates 715 that it discusses gender identity?

20       A    Yes.

21       Q    Did ODH ever review or discuss anything

22  similar to this document or its contents?

23       A    No.

24       Q    Did ODH ever review or discuss any kind of

25  best practices for dealing with transgender clients?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

126

1     A    No.

2     Q    Customers.  You call them customers, folks

3   who request changes.

4     A    No.

5     Q    Did ODH or anyone there ever discuss

6   generally how to deal with requests from transgender

7   customers?

8     A    Through like NAPHSIS?

9     Q    No, just in general at all.

10    A    No.  Once the paperwork is reviewed on a

11  case-by-case basis, then -- I mean no, no overarching.

12    Q    So no one at ODH has ever had a conversation

13  about how to address the needs of a transgender

14  customer in any way?

15         MR. BLAKE:  Objection.

16    A    I'm going to answer it stating that we did

17  have a discussion with -- sorry, Rachel --

18  TransEquality and some other individuals that came in

19  to give us some insight, but other than that forum,

20  roundtable with a variety of ODH people I don't recall

21  any other discussions happening at ODH.

22    Q    Okay.  When about was that?

23    A    I'm going to say in the three-year time

24  period.

25    Q    Two or three years ago?

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 127 of 220 PAGEID #: 466
Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

127

1      A    Yeah.

2      Q    And what was the topic of those

3  conversations?

4      A    A variety of individuals came in to kind of

5  talk about Ohio law and what they perceived to be

6  something that needed to be changed.  They talked about

7  their own unique experiences.  They talked about other

8  states and what they have been able to enact.  And we

9  listened and at the end of that the discussion turned

10  to, it would be nice if some of those individuals could

11  turn to their legislative representatives to see if

12  they could get a law in place that was designed to do

13  what they wanted to do.

14      Q    And I know obviously ODH had those meetings.

15  Were you personally involved in those meetings?

16      A    I was involved in one and this was that

17  roundtable of individuals.

18      Q    Did they present ODH with any kind of

19  educational materials about how to serve transgender

20  customers?

21      A    I don't believe the materials that I received

22  were on that level.  It was basically ideas about what

23  other states had done and kind of reflective of the

24  information that they had available.  But not

25  necessarily customers, no.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

128

1      Q     Okay.  Do you know how many of those meetings

2  occurred, do you remember?

3      A     I was only party to one so that's all I know.

4      Q     Did you ask anyone before the deposition

5  about those meetings or try to find that out?

6      A     No.

7      Q     And those were basically meetings with

8  advocates for the transgender community; is that right?

9      A     That would be correct.

10     Q     Okay.  And in your understanding what exactly

11  were those folks asking ODH to do?

12     A     I'm not really actually too sure.  It was

13  basically more of a discussion, a one-way discussion,

14  if you will, of like individuals just giving their

15  background as to what their life was like, what would

16  be helpful, some recommendations that they brought to

17  the table that they thought that would help them.

18           And, like I said, legal counsel was also

19  present at those roundtables and indicated that we

20  heard the stories and we thought it would be best

21  served if they would contact someone like a legislative

22  representative to try to talk about a law change.

23     Q     When you indicated to this group that they

24  should seek remedy with the legislature, was that

25  before or after you determined that you were going to

129

1   construe the statute in a way that wouldn't allow you

2   to change these people's gender marker on their birth

3   certificate?

4       A    I recall it being after because they knew

5   exactly the procedures that other states already used,

6   what they had heard that Ohio currently does legally,

7   and so they wanted to comment on what they thought we

8   could also do.

9            Legal did tell them that they reviewed the

10  law and legally we did not have to correct something

11  that was not a mistake and that they really needed to

12  go and get some type of help legislatively to make a

13  correction to the law.

14      Q    And that specific determination of what is or

15  is not a mistake is there an individual at ODH that

16  made that determination?

17           MR. BLAKE:  Objection.

18           If you can answer without revealing

19  attorney-client information, go ahead and do so.

20      A    If you feel there was a mistake on your birth

21  record you're going to the court and asking a judge

22  with I would imagine documentation to indicate why it's

23  a mistake.  That's information we don't get at the

24  Health Department.  So I can't really speak to what

25  someone determines to be a mistake or not.  I just get

1  the court order with the summary judgment of what

2  should occur.

3      Q    Okay.

4      A    So I don't know how you presented your case

5  of being a mistake.

6      Q    But as you testified previously, if the court

7  order reflects that the gender marker change was

8  ordered on the basis that the person is transgender,

9  ODH will not consider that to be a mistake and so will

10 not make the correction on the record; is that right?

11     A    If the transgendered individual does not

12 indicate that a mistake has been done on their record,

13 then we can't make a change because he's indicating the

14 record was correct upon being filed.

15     Q    What if the applicant says and the

16 corresponding court order says this person is

17 transgender therefore their sex that was designated at

18 birth is a mistake, make the correction?

19         MR. BLAKE:  Objection.

20 BY MS. BONHAM:

21     Q    What does ODH do in that instance?

22         MR. BLAKE:  Objection.  Hypothetical.

23     A    We would still route the paperwork because

24 chances are great there's a legal name change with that

25 request as well and we route it for review and respond

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

131

1    accordingly.

2         Q     And how do you respond?

3         A     It depends what the court order says.

4         Q     So if the court order says that there has

5    been a mistake and the mistake is that the person's sex

6    recorded at birth is wrong because this is a

7    transgender person, what does ODH do then?

8              MR. BLAKE:  Objection.  Hypothetical.

9         A     I've never seen that court order.  I can tell

10   you what my court order said for my child, and it just

11   basically says it was recorded in error at the time of

12   birth, it should be corrected for the following.  They

13   don't have to give any evidence as to how it was

14   recorded incorrectly or what the consequence -- we

15   don't really get all this detail and --

16        Q     But you do make some distinction?

17        A     Well, sure.  I think that it's -- you can

18   review things.  You can call the court and review with

19   them what it is if you have a problem.  But obviously

20   in some cases where the child is six months old, eight

21   months old and the court says an error was done of the

22   recording of this child's birth, okay.

23              If you get someone who's maybe in their

24   thirties or forties who has a complete name change

25   indicating that there is a correction to be done on

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

132

1  their birth certificate, we can follow-up with a phone

2  call to say is that a correction or is that something

3  that is a -- and a lot of times it doesn't say gender

4  to the sex information.  They want a gender change,

5  which is something we don't correct because we don't

6  ever collect it.  So there's really not a lot we can

7  do.

8       Q    And if you do have a court order and it

9  doesn't say error or mistake but it does order that

10  that their sex or gender field be changed?

11      A    I'm trying to think if I've ever seen one

12  like that.

13      Q    What if the court order just says without

14  saying anything about error or mistake, this person is

15  transgender therefore their gender marker must be

16  changed?

17           MR. BLAKE:  Objection.  Hypothetical.

18      A    I don't know if I've ever, honestly, seen

19  anything like that.

20           But a court-ordered correction like I said

21  it's on a form to be corrected and a lot of times if

22  there is not a mistake that form is not filed so we

23  can't do what the court order is asking us because

24  (A) we don't collect it and (B) it's not on the right

25  form and we just don't really know how to handle it.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

133

1      Q     What about in those two instances that you

2   said triggered this review of how you were going to

3   handle this, the court order from the Ohio Probate

4   Court and the court order from out-of-state, what did

5   those court orders indicate?

6           MR. BLAKE:  Objection.

7           Go ahead.

8      A     The court orders indicated that there was a

9   legal name change inside the court order, which again

10  is confusing because a court order is sealed up with

11  the original birth record, but the legal name change

12  needs to stand outside of that as a public record, so

13  we didn't know how to handle that.

14     Q     But did it also indicate a gender change?

15     A     It indicated a gender change, correct.

16     Q     Okay.  And it didn't discuss error or

17  mistake?

18     A     Not to my knowledge, no.

19     Q     So there have been two instances where you

20  have seen this and had to decide what to do, and as a

21  result your team reviewed this policy and came up with

22  the stance that we discussed; is that right?

23          MR. BLAKE:  Objection.

24     A     We reviewed the law, we looked at the

25  paperwork and determined that the law did not

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

134

1   substantiate the change because there was not a mistake

2   at the time that the record was recorded.  So we could

3   do the legal name change.

4        Q    Only?

5        A    Yes.

6             MS. BONHAM:  Okay.  I think we're going to

7   move on to another set here in a second and we

8   shouldn't be too much longer if folks want to take a

9   little break or work through lunch.  I just want to see

10  where people are at.  I don't want to exhaust you

11  either.  You're out of Snapple.

12            (A luncheon recess was taken.)

13  BY MS. BONHAM:

14       Q    So we're back from lunch.  At this point I

15  want to go over a couple sets of records with you and

16  ask you some questions about these.

17                      - - -

18            (Thereupon, Plaintiff's Exhibit 9 was marked

19  for purposes of identification.)

20                      - - -

21  BY MS. BONHAM:

22       Q    I'm handing you Exhibit 9.  Can you review

23  that briefly for me.  And this is a four-page exhibit

24  that I handed you.  It's also Bates Nos. 650 through

25  653.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

135

1          So it's the public records request and our
2     response.  Have you seen this before?
3          A     Yes.
4          Q     When was that?
5          A     When Rachel shared it with me when we helped
6     her get the records request like about two years ago.
7          Q     Okay.  Can you see the date on there?
8          A     Let's see.  Our response was May 31st -- Oh,
9     no.  Our response was June 22nd, 2017.
10         Q     Okay.  And are these -- is this the
11    correspondence that you reviewed also in preparation
12    for the deposition?
13         A     I saw it but I did not read it, so ...
14         Q     And when you say "Rachel" you're referring
15    to?
16         A     Oh, I'm sorry.  Rachel Belenker from legal
17    counsel.
18         Q     Okay.  Do you pronounce it Belenker?
19         A     Belenker.  Sorry, Rachel.
20               MS. BELENKER:  Either one.  It doesn't
21    matter.  It really doesn't.
22    BY MS. BONHAM:
23         Q     Can you tell me when Ms. Belenker gave this
24    to you originally, reviewed it with you originally,
25    what was the purpose of you looking at this?

Stacie Ray, et al. vs Amy Acton, et al.                                Judith Nagy

136

1      A    So when Rachel received this email from

2   Freda, she contacted our office and asked for us to

3   review it and see if we could comply with this

4   certificate request.

5           We basically told her that the way that our

6   information is organized that we do not have the

7   capacity to find all the certificates that meet this

8   records request, so she responded back with her answer.

9      Q    Okay.  And their request is from

10  Freda Levenston from my office; is that right?

11     A    Yes.

12     Q    And what exactly is it requesting, can you

13  see?

14     A    So Freda was requesting every birth

15  certificate where we changed or corrected the gender

16  marker, and all other records referring to any

17  instances where we have changed or corrected the gender

18  marker on the birth certificate.

19     Q    Okay.  And can you just summarize again your

20  response.  I don't want you to have to repeat yourself.

21     A    So our recordkeeping is organized by event

22  name.  It's not by the process that we perform.  So

23  there was no way for us to get a listing of records

24  that met her criteria.

25     Q    Okay.  And so what did you do in response to

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

137

1   the request?

2        A    We worked with Rachel to craft a response

3   back to Freda.

4        Q    Okay.  And did you have any further

5   correspondence with my office on that issue after that?

6        A    There may have been another one or two

7   requests after that to maybe pare down this request and

8   scope to see if records could be obtained underneath

9   that new request.

10       Q    Did you ever end up producing responsive

11  records?

12       A    I think we did end up producing some.  I'd

13  have to review what we sent out.  I did not review this

14  prior to today so I'm not absolutely sure how many

15  times this may have popped back and forth.

16       Q    Did you talk to my office on the phone about

17  the request?

18       A    I don't recall ever contacting anyone via

19  phone for this request.

20       Q    Do you remember a time in about July of 2017

21  after this request was made where you and Ms. Belenker

22  talked to my office on the phone about it?

23       A    May, but I don't have any recollection.

24       Q    Okay.  Before the deposition did you ask

25  anyone about it or try to find out about a conversation

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

138

1    like that?

2         A    No.

3         Q    Okay.  You mentioned that you had already

4    reviewed other correspondence between your office and

5    the ACLU.  Can you tell me what that other

6    correspondence was about.

7         A    You mean in preparation for today?

8         Q    Today.

9         A    Like I said, we didn't review anything.  This

10   came up as information that was received but I didn't

11   review it, I didn't read it, and I didn't follow-up

12   with anything.  So I just knew that we had taken part

13   in trying to satisfy the records request.

14        Q    We've been talking about determination made

15   by ODH over the past two or three years that when you

16   receive requests for gender or sex marker changes on

17   the birth certificate that you don't believe there is

18   birth certificate error that you won't change those.

19   Before that determination was made were there ever

20   instances where you would make that change?

21        A    Yes.

22        Q    Okay.  Can you tell me about every such

23   instance.

24        A    I can't tell you about every such incident

25   but I can tell you that there was a time period when we

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

139

1    did receive a couple of out-of-state court orders

2    probably about 10 over about a five-year period or so

3    that we followed the court order and did process the

4    change in sex.  However, when we received the court

5    order from Ohio asking us to do that on a different

6    form and we went ahead and re-evaluated the law, ODH

7    found out that we were not correcting the certificates

8    to the letter of the law and that we should not go

9    ahead and follow that practice further, that we should

10   only do the legal name change.

11        Q    Okay.  So there was a time, maybe a five-year

12   period.  And how long ago was that time?

13        A    Approximately like 2011 to about 2015-ish.

14        Q    What did you do before 2011?

15        A    Honestly, I don't recall getting anything

16   except -- definitely not out-of-state.  But we would

17   have received a correction document from the court of

18   Ohio if a child's record had an error upon being filed.

19   So we didn't get court order requests with legal name

20   changes in them like we did around 2011.

21        Q    Okay.  So if you got a request before 2011

22   that didn't also have a legal name change but didn't

23   explicitedly say it was an error or mistake, what would

24   you do?

25        A    Prior to 2011 we don't have any recollection

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

140

1  of getting anything except for Ohio-based court orders

2  asking for a correction to be done to the birth record.

3      Q    Okay.

4      A    So the form is standard for any correction to

5  the birth record and we would have gone ahead and

6  performed that change.

7      Q    Okay.  Regardless of the basis if there was a

8  court order?

9      A    Right.

10     Q    Okay.  Got it.

11          And obviously this timeframe here is

12  approximate you're saying?

13     A    Yes.

14     Q    And has there been a time any time since you

15  made this determination about how to handle this where

16  you have made an exception?

17     A    I don't think we've made an exception to my

18  knowledge.

19     Q    And the instance that you indicated where you

20  marked a third or neither M, F nor U but a

21  hermaphrodite marker, when did that occur?

22     A    I'd have to actually have to look it up.  It

23  was within the past five years.

24     Q    Okay.  But you don't know if it was before or

25  after this determination?

141

1      A     Yeah, that I do not know.  Sorry.

2      Q     That's okay.

3            I'd like to draw your attention back to the

4   interrogatories, which I think are Exhibit 3, and can

5   you turn for me to Page 4.  Or, I'm sorry, Page 6.

6            MS. BONHAM:  And let me make a correction for

7   the record.  This is not Exhibit 3.

8      Q     Would you mind just turning to page and

9   showing me.  It's Exhibit 4.

10           So we're looking at Exhibit 4, the ODH's

11  responses to Plaintiffs' first set of interrogatories

12  and requests for production.

13           MS. BONHAM:  And I'd also like to ask the

14  court reporter to mark this.

15                          - - -

16           (Thereupon, Plaintiff's Exhibit 10 was marked

17  for purposes of identification.)

18                          - - -

19  BY MS. BONHAM:

20     Q     And this is Exhibit 10 that I'm handing you

21  that we can look alongside of Page 6 of Exhibit 4.

22           So you've already testified that you are

23  familiar with and have reviewed the interrogatory

24  responses.  Can I ask you to review what's now marked

25  as Exhibit 10.

Stacie Ray, et al. vs Amy Acton, et al.                          Judith Nagy

142

1      A      Sure.

2      Q      That's also Bates numbered 156 through 158.

3      A      Okay.

4      Q      Do you recognize that document?

5      A      It's our mail log that we keep at work.

6      Q      Okay.  And did you review it in preparation

7   for your deposition?

8      A      Nope.

9      Q      Can you explain to me in a little bit more

10  detail what that is, the mail log that you keep at

11  work.

12     A      So when we do process corrections since many

13  of them pertain to the changing of a child's name, if a

14  customer called us wanting to know if we processed a

15  request that they have sent in or the court has sent

16  in, you may know the child by the new name but we can't

17  search by the new name because it's still listed as the

18  old name.  So we actually have a mail log that we keep

19  that we record documents that we receive from the

20  court, the date that we receive it, and the information

21  off the paperwork which would reflect their current

22  name in the system and the new name that they're going

23  to be known as once the court paperwork is processed.

24          So we can keep that and help our customers

25  and also verify that we received something, first of

143

1   all, and where it is in being processed and whether or

2   not we've done it.

3        Q    Okay.  So the purpose of keeping the log is?

4        A    Different people may know the same child by

5   different names dependent upon what the situation is.

6        Q    Okay.

7        A    So if you call as a parent that is adopting a

8   child, you know the child as the name that you have

9   gone to court to provide the child, but in the system

10  because that paperwork hasn't been processed it's still

11  legally listed as whatever the child was born with,

12  whatever name.  So I can't help you if I can't do that

13  connector.  This way I can search by the new name not

14  in the system because it's not there yet and kind of

15  ensure that we've received the paperwork and kind of

16  where it is in order to be processed.

17       Q    Okay.  So this would reflect documents that

18  are in the process of being changed only?

19       A    Right.

20       Q    Okay.  And how far back do you keep this log?

21       A    I would have to check for sure but I think it

22  goes back quite a few years, like four or five.

23       Q    Does what you're looking at appear to you to

24  be a complete log, a complete version of this log?

25            MR. BLAKE:  Object to form.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

144

1      A    It's hard for me to say because it runs many,

2   many, many, many, months.  So this is a -- it may have

3   been sorted by date.

4           I mean it's a Word document so it's

5   (gesturing.)

6      Q    And we can see on here that it appears to

7   list a processing date between September of 2014 all

8   the way through December 2017, if that help you

9   remember whether this is complete or not.

10     A    So complete meaning every single entry

11  between '14 and '17?

12     Q    Well, first of all, yes, would it have every

13  entry between '14 and '17?

14          MR. BLAKE:  Objection.

15     A    It doesn't have every entry on this exhibit,

16  no.

17     Q    Okay.

18     A    We usually get 40-some thousand a year.

19     Q    I see.

20     A    Yeah, this is not --

21     Q    Then do you know how this subset was

22  generated?

23     A    I do not.  I did not generate it.

24     Q    Do you know who would have generated it?

25     A    I'm going to assume that it's Rena Boler.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

145

1     Q    And then this shows '14 to '17.  Would the

2  log that you keep, the full log that you keep also go

3  back further in time than '14?

4     A    I would honestly have to check to tell you.

5     Q    Would you keep it up through the present day?

6     A    It's definitely up to the present day at

7  least for the past couple years.  I don't know if

8  previous information has been archived or available.

9     Q    So I want to ask you to just from left to

10  right read the top row so that we can see what every

11  column says.

12     A    Okay.  So New SFN is the new state file

13  number.

14          AFS is the service -- is what it's called our

15  service request.

16          Old Name is the current name that's in our

17  system for the child.

18          New Name is the new name as requested by the

19  court.

20          The date of birth of that child.

21          The gender of the child.

22          The date we received the court paperwork into

23  our office.

24          Whether or not that court paperwork also

25  included money.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

146

1           The state that sent us the court paperwork.

2           The date that we processed the court change

3      on.

4           And whether or not a letter has been sent.

5           And finally there's a comment section.

6      Q    And whether or not a letter has been sent,

7      does that mean to the requestor?

8      A    It could have been a variety of things.

9      Usually there's like a standard letter that sometimes

10     is mailed.  But it could have been a specific letter

11     back to the parent, but usually it's just a standard

12     letter saying something has been completed.

13     Q    And what's the comment section for?

14     A    The comment section is if we have to return

15     something for processing or it couldn't be completed as

16     requested we can put a comment there.  So if a parent

17     calls and doesn't get what they expect we can look up

18     the information in the system and try to help them

19     navigate why that request may not have been processed.

20     Q    And you're using the words "parent" and

21     "child" but could this refer to anyone who requested a

22     change?

23     A    It depends the age of the child.  So if

24     you're under 18 your parents have to request it.  And

25     if you're over 18 you can do it yourself.

Stacie Ray, et al. vs Amy Acton, et al.                          Judith Nagy

147

1    Q    And both cases are listed in this document?

2    A    Yes.

3    Q    And under "Processed On," if there's a date

4   does that mean that the request was processed?

5    A    It means that we're done doing whatever we

6   can do so you can pretty much assume that we processed

7   as much as we could.  That could have been we sent it

8   back, we actually did the correction, but it's done,

9   it's completed as far as we can complete it.

10    Q    And under "Processed" when it says "No," what

11   does that mean?

12    A    No means it wasn't processed, that there was

13   something sent out.  It could have been not a complete.

14   Maybe it wasn't processed because we actually don't

15   have that child in our system, they sent it to the

16   wrong state.  It's a handful of things that caused us

17   to say this is not something we can complete.

18    Q    And on this subset in the Gender column

19   there's always either an M or an F and then a little

20   arrow and then the opposite.  So in the first row it

21   says M arrow F.  Do you see that in every row in the

22   gender column?

23    A    Uh-huh.

24    Q    What does that indicate?

25    A    To be honest, I don't know.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

148

1      Q    Let's look, for example, at the row on the

2   first page here that begins with the New SFN number

3   19591.  Do you see that?  It's about five from the

4   bottom.

5      A    Yep.

6      Q    And all the way over to the right in the

7   Comment Section can you read that out.

8      A    Sure.  "Name changed previously done

9   1/28/16.  Customer sent letter from doctor for gender

10  change request."

11     Q    And then what does that say on the Processed

12  On column?

13     A    It says "No."

14     Q    And then in the state?

15     A    Where is my state?  Oh.  "Ohio."

16     Q    And then in the Gender column what does it

17  say?

18     A    It says, "Male greater than female."

19     Q    Okay.  And the greater than sign is like a

20  little arrow towards the right?

21     A    Right.

22     Q    So does that indicate to you that this person

23  who sent a doctor for gender change request was

24  requesting a change of the gender marker from male to

25  female?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

149

1        A    Yes.

2        Q    And so can we assume that when that's

3   indicated on this chart the customer is requesting a

4   gender change from male to female?

5        A    Yes.

6        Q    So the document will show that all of these

7   instances after the first five from the top have a No

8   in the Processed On column.  In other words, none of

9   these appear to have been processed.  Do you agree?

10       A    I would agree.

11       Q    But the first five listed do have a processed

12  on date?

13       A    Yes.

14       Q    And in the Comment Section can you see what

15  they all say?

16       A    Yes.

17       Q    What is that?

18       A    The ones from the top or the ones from the

19  bottom?

20       Q    The top five.

21       A    In the Comment Section it says, "Processed as

22  court-ordered correction."

23       Q    In all five instances?

24       A    Yes.

25       Q    Do you remember specifically any of these

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

150

1   instances?

2        A    No.

3        Q    Who would have that information?

4        A    I'm going to say Rena Boler.

5        Q    Do these appear to be past instances where

6   ODH did make or process a change of the gender

7   designation on the birth record?

8        A    We processed a change in the sex information

9   on the child's birth certificate.

10       Q    Okay.  And it indicates that there was a

11  court order from these different states listed under

12  State; is that right?

13       A    Correct.

14       Q    The last one of which is Ohio; is that right?

15       A    Yes.

16       Q    Did you talk to Rena Boler before the

17  deposition to find out about these instances?

18       A    No.

19       Q    Did you talk to her to find out anything

20  about what the Department has done in the past with

21  regard to changing these markers?

22       A    No.

23       Q    Now, I want to go back and look at the

24  interrogatory responses that you made, Exhibit 4.

25            In the middle of the page on Page 6 there's a

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

151

1    chart.  Can you read the final sentence of your answer

2    right before the chart.

3          A    Starting with "Subject"?

4          Q    Yes.

5          A    "Subject to the foregoing Defendants state

6    that the sex identifier has been changed for reason

7    other than set forth in Ohio Revised Code 3705.15 and

8    3705.22 for the following individuals:"

9          Q    And then how many individuals are listed

10   here?

11         A    Ten.

12         Q    Do you know if there is any overlap between

13   this list of instances where the Department changed the

14   gender marker and the list of instances that we just

15   discussed from Exhibit 10?

16         A    The only way of verifying that is by name.  I

17   wouldn't know just by looking at the list.

18         MS. BONHAM:  Okay.  And I just want to make a

19   note that because of the redactions on the documents

20   that are still in dispute we don't have any way of

21   cross-referencing that either and so we have names and

22   other information redacted on every single document we

23   have.

24         Q    Can you tell me from this chart in the

25   interrogatory responses what the first date is?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

152

1      A     Sure.  It's January 8th, 2004.

2      Q     Okay.  And these go all the way up through

3   2011, '12, '13, '14 and '15; is that right?

4      A     Correct.

5      Q     And do these still represent the only

6   instances that you are aware of where the Department

7   has made a change to the sex or gender marker on the

8   birth record for reasons other than set forth in these

9   two code provisions that you mentioned?

10      A     To the best of our ability doing the search

11   these are the only ones that we could find.

12      Q     And what was the reason underlying these

13   instances?

14      A     Unless I looked at the court order I wouldn't

15   know what the reason is.

16      Q     Do you remember any reason for any of these

17   instances?

18      A     No.

19      Q     Is there anyone that would know that

20   information?

21      A     Anyone would have to look at the court order

22   and tell you because it's sealed.

23      Q     In preparing this response how did you put

24   this list together?

25      A     These individuals as we were saying before,

153

1    although they have a court order, there was a legal

2    name change most likely associated with it which made

3    these documents public so it's not in the vault.  So we

4    would have to go to our legal name changes to find that

5    there was also an additional change requested at the

6    time of the legal name change.

7            If something is sealed unless I literally

8    opened up 400,000 envelopes I wouldn't know the ones

9    that were sealed.

10       Q    Okay.

11       A    So that's why I said electronically we can't

12   search for the reason but these -- I'm going to call

13   them children -- these individuals had a process by

14   which the court order was not sealed because of their

15   legal name change, so that's why we were able to find

16   them.

17       Q    Okay.  And just to clarify a couple of

18   things.

19            First of all, we don't know whether they're

20   children or adults?

21       A    Right.  We call everyone children because

22   they have a birth certificate.  Sorry.

23       Q    Okay.  All right.  So we can understand that

24   when you say that you're not talking about children?

25       A    No.  A child's birth certificate you could be

Stacie Ray, et al. vs Amy Acton, et al.                        Judith Nagy

154

1    85.

2       Q    I see.  I see.

3       A    Sorry.

4       Q    Oh, no.  That's great.  It's kind of sweet.

5            So then this doesn't reflect every instance

6    that ODH is aware of where a change was made, rather it

7    reflects every instance where this change was made

8    along with a name change request?

9            MR. BLAKE:  Objection.

10           Go ahead.

11      A    Correct.

12      Q    That you were able to find?

13      A    Right, because these documents were not

14   sealed in the vault.

15      Q    And when someone's requested a name change

16   and a gender change and as here the gender change is

17   also performed, that part doesn't get sealed?

18           MR. BLAKE:  Objection.

19      A    No, because by law the statute indicates very

20   specifically what we should and how we should process

21   the legal name change.

22           A legal name change is never ever, ever

23   sealed.  We have to process it a certain way where it's

24   noted on the certificate and that document remains

25   public.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

155

1      Q    So because the gender change is also on that

2    document it also becomes public in these instances?

3      A    Yes.

4      Q    Even though typically a gender change as an

5    ordered correction independent from a name change would

6    be sealed in the vault?

7            MR. BLAKE:  Objection.

8      A    Correct.

9                        - - -

10           (Thereupon, Plaintiff's Exhibit 11 was marked

11   for purposes of identification.)

12                       - - -

13   BY MS. BONHAM:

14     Q    I'm handing you Exhibit 11.  Do you recognize

15   this?  You can take a look at it, obviously.

16     A    Okay.  Yeah.

17     Q    Do you recognize this?

18     A    This is the first time I've seen this email.

19     Q    Okay.  Can you tell who it's from?

20     A    It was originally from a local registrar

21   Carma Lee, C-A-R-M-A L-E-E, from Stark County to Rena

22   Boler.

23     Q    It's the same Rena we've been talking about

24   with your office?

25     A    Yes.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

156

1       Q    And can you tell the date on this?

2       A    It is May 15, 2012.

3       Q    And can you read the title of that email.

4       A    May I?  Yeah.  Oh.  Well, I think that's a

5    response.  It's not the title.

6       Q    Okay.  We can skip that.

7       A    Okay.

8       Q    So this is, as you said, an email from a

9    local registrar.  It looks like Stark County?

10      A    Yes.

11      Q    To your office --

12      A    Yes.

13      Q    -- asking a question.  And does your office

14   function as a resource for local offices to determine

15   what the policies and practices are for recordkeeping?

16           MR. BLAKE:  Objection.

17      A    When this email was done in 2012 we didn't

18   have a centralized system.  This would have been a

19   paper process.  So changes to all birth records only

20   occurred at the State, and we would make two copies.

21   One stayed with us and one was to be mailed back to the

22   local who initially had filed that birth record.

23           So this email I'm going to assume the local

24   registrar at Stark County received a brand new birth

25   certificate with a change on it, the process by which

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

157

1    they are to take whatever the current document is and

2    switch it out with a new piece of paper, and she had a

3    question regarding why she was receiving a new piece of

4    paper for a child's certificate.

5         Q    Okay.  So she received a new corrected

6    document in the mail from ODH?

7         A    Yes, she did.

8         Q    Because it's 2012?

9         A    Yes, exactly.

10        Q    And it was unusual for her so she had this

11   question about it?

12        A    Yes.

13        Q    She wrote to you?

14        A    Yes.  And she wanted to make certain that she

15   understood maybe a little bit more of the circumstances

16   regarding the change of this record because now she

17   could see the old record and the new one that was sent.

18        Q    Okay.  So would you mind just reading out

19   what exactly she asked of your office.

20        A    Sure.  She asked, "Just wanted to make

21   certain that this new change is correct.  Is this due

22   to an error or part of the filing physician back in

23   1933 or is this due to a change in sex status?"

24        Q    And can you just continue.

25        A    Oh, sure.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

158

1           "Previously local offices were told that the

2      sex doesn't change on birth certificates even if the

3      individual has actually undergone a sex change.  I want

4      to make certain that I know the rules as they stand

5      now."

6           Q    And then can you just read out what your

7      office said in response.

8           A    Sure.  Rena responded back, "A court-ordered

9      correction was performed changing the name and sex of

10     the child."

11          Q    So your office in 2012 told this local office

12     in Stark County that that was the correct record that

13     you sent?

14          A    Correct.

15          Q    And was this about during the time that you

16     had mentioned where your office was doing gender marker

17     changes if there was a court order?

18          A    This was the time period that if we received

19     a request as a court order we would have done the

20     change through the sex marker on the certificate.

21          Q    Okay.

22                         - - -

23          (Thereupon, Plaintiff's Exhibit 12 was marked

24     for purposes of identification.)

25                         - - -

Stacie Ray, et al. vs Amy Acton, et al.                              Judith Nagy

                                                                            159

1   BY MS. BONHAM:

2        Q    I'm going to hand you Exhibit 12.  Have you

3   seen this before?

4        A    I have not.

5        Q    Can you tell what this appears to be?

6        A    This is an email correspondence between a

7   local registrar, Rebekah, R-E-B-E-K-A-H, from Hamilton

8   County to our offices to our staff regarding a court

9   order with a name and gender change.

10       Q    Okay.  And so this is also correspondence

11  from a local office, Hamilton County, at this time; is

12  that right?

13       A    Correct.

14       Q    And so this would be, though, after the

15  electronic system came into place in 2015, or no?

16       A    I'm trying to think when my kids were born.

17  Yeah, this would have been the electronic system.

18       Q    Okay.  And so this person is just asking

19  about something a customer has asked her; is that

20  right?

21       A    Yes.

22       Q    Can you see down at the bottom there -- can

23  you summarize from the bottom what she's asking your

24  office?

25       A    The Hamilton County Registrar received a

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

160

1  phone call from a customer asking about the procedure

2  to change the sex of the child on the birth record as

3  well as changing the name and she wanted assistance

4  regarding what the procedure was and what she should

5  tell the customer.

6       Q    And can you just read the second sentence of

7  her email on the bottom there.

8       A    Sure.

9            "I was always told for years that you have to

10 and can change a name by going through the court but

11 the sex of the child will never change on the birth

12 certificate no matter what.  Is that still true now?"

13      Q    And then this gets obviously pushed up to

14 Rena the person we've been discussing, and can you read

15 out what she says in response when this gets kicked up

16 to her.

17      A    Sure.  Rena responds back to Rebekah, "Thank

18 you.  And, yes, I did tell them to forward to ODH."

19 Oh, that's Rebekah.

20           "Anyone who states that they have a court

21 order with the name and gender change can send the

22 documents to our office.  We will then send it on to

23 legal so it can be reviewed for acceptance.  If

24 approved by legal, we will amend the birth record."

25      Q    So at this time you were in the space where

Stacie Ray, et al. vs Amy Acton, et al.                        Judith Nagy

161

1   if your legal department approved a gender marker

2   change then you would do it pursuant to a court order;

3   is that right?

4           MR. BLAKE:  Objection.

5       A   We review all of the court orders ourselves

6   not based on what hearsay is between the customer and

7   the Hamilton County Registrar, not knowing if the

8   registrar may have told us the right situation or the

9   right problem.  So, basically, regardless of what was

10  sent we review all court-ordered paperwork.  And not

11  knowing whatever was sent I don't even know if it met

12  this criteria.

13      Q   Sure.  Sure.  But Rena's statement that you

14  read off was that accurate at the time?  "When there's

15  a gender change request, if approved by legal we will

16  amend the birth record"?

17      A   Yes.

18                      - - -

19          (Thereupon, Plaintiff's Exhibit 13 was marked

20  for purposes of identification.)

21                      - - -

22  BY MS. BONHAM:

23      Q   I'm going to hand you Exhibit 13.  Have you

24  seen this before?

25      A   No.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

162

1    Q    Can you identify it?

2    A    This is from a staff member, Devon,

3  D-E-V-O-N.  She is the -- at that time she was the

4  phone manager and one of her phone people received a

5  request that he didn't know how to handle so was

6  getting some assistance through Rena.

7    Q    And at the bottom there Devon's email can you

8  tell me what that says.

9    A    Basically, Devon sent to Rena that Jon,

10  J-O-N, our phone call customer service rep had a phone

11  call from a gentleman who sent in a legal name change

12  with a gender change and he wanted assistance regarding

13  what to tell the customer if there was a gender change

14  along with a legal name change because the customer was

15  questioning that the name was changed but not the

16  gender.

17    Q    Okay.  And can you see that he says, quote,

18  "Maybe legal is still reviewing those or holding those

19  as pending requests"?

20    A    Yes.

21    Q    Does that indicate that at that time when the

22  Department received a request for a gender change the

23  practice was for the legal department to review that?

24    A    The practice was for any legal paperwork that

25  we needed assistance with that we would get ODH's

Stacie Ray, et al. vs Amy Acton, et al.                           Judith Nagy

163

1    advice as far as whether or not we could accept and

2    process it.

3          Q    Okay.  And when he says, "Still reviewing or

4    holding those as pending," does that indicate there was

5    a period of time when the Department was just holding

6    these requests?

7               MR. BLAKE:  Objection.

8          A    Through the mail log you could tell if a

9    request was received but maybe not completed.  So if he

10   searched on the mail log he would see that date-wise it

11   wasn't being processed timely, so he was assuming that

12   it was pending or holding or there was an issue with

13   the record.

14         Q    Was there a period of time when the

15   Department was determining what to do with requests for

16   gender marker change and holding such requests during

17   that determination?

18         A    There are periods of time that we submit

19   court orders or court documents for review and it may

20   take a while before we get an answer, but we don't

21   purposely hold anything for any other reason other than

22   it's still under review.

23         Q    Okay.  So there was no period of time where

24   the Department was considering what to do about this

25   category of requests and holding the requests while it

Stacie Ray, et al. vs Amy Acton, et al.                                   Judith Nagy

1   considered what to do?

2       A    If something is still under review it's under

3   review for more consideration.  So if you don't know

4   how to proceed you still have it to review until you

5   get a direction.  So if you want to state that that's a

6   hold, it's still under review.

7       Q    Okay.  So specifically as to this policy the

8   determination that we discussed that the Health

9   Department won't change the gender marker on the basis

10  of gender change --

11          MR. BLAKE:  Objection.

12      Q    -- was there a time period specific to that

13  policy where changes were coming in and being held

14  while you made a determination about what to do?

15          MR. BLAKE:  Objection.

16          Go ahead.

17      A    When we received the court order from Ohio

18  indicating a correction that someone wanted to do and

19  also the legal name change, when we received similar

20  documents because that one hadn't been processed, all

21  of those ended up being reviewed together because it

22  looked and appeared to be a similar request.  So we

23  wanted to ensure that we processed them all in a way

24  that was consistent.

25      Q    Okay.  And that was that period about two or

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

165

1    three years ago when you were making this determination

2    about what your stance is as a department?

3        A    Yes.

4                        - - -

5            (Thereupon, Plaintiff's Exhibit 14 was marked

6    for purposes of identification.)

7                        - - -

8    BY MS. BONHAM:

9        Q    I'm handing you Exhibit 14.  Do you recognize

10   this document?

11       A    Yes.

12       Q    How do you recognize it?

13       A    They're internal discussions.  When certain

14   things from our mail log are not being done within 30

15   days that's how we like to close out a request that we

16   receive that things that are not.  We try to follow up

17   and ensure that we are going to get assistance in

18   closing out the request and processing that as fast as

19   possible.

20           So we had some that were falling outside of

21   the date range and Karen, K-A-R-E-N, the chief wanted

22   to know if there were stuff outside of that processing

23   range that weren't being done.

24       Q    So this is an email between her and Rena in

25   2016, and can you read what Karen had asked first which

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

166

1    is on the bottom.

2         A    So Karen asked Rena to send her a summary of

3    where we are on the gender change.  She's compiling an

4    email to Lance, L-A-N-C-E, who at the time was legal

5    counsel.

6         Q    And that's Lance Himes --

7         A    Correct.

8         Q    -- in 2016 who was legal counsel?

9         A    Yes.

10        Q    Do you know what the chief means by "Where we

11   are on the gender change"?

12        A    We noticed in our mail log that the requests

13   that we had received had the same kind of category and

14   that those were in a review process, that we were

15   awaiting guidance as to how to process.  So those that

16   started to fall outside of 30 days we don't want to

17   keep someone's money, we don't want to not get back

18   with them, so we wanted to reach out and get some

19   assistance to ensure that we could contact the

20   customers and get ahold of them to make sure that they

21   understood we received the request and that we were

22   going to go ahead and whatever the answer was, do

23   something.  So Karen wanted to escalate that being the

24   chief of the Department to other people in her level.

25        Q    Sure.

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 167 of 220 PAGEID #: 506
Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

167

1           So Karen as Department Chief is she the one
2    that was developing that guidance?
3        A    We were as ODH developing guidance, but we
4    were also asking other individuals from other areas to
5    review and give their input as well.
6        Q    And who were those people, do you remember?
7        A    Well, mostly they would be legal counsel.
8    And I'm sure we worked with the governor's office to
9    keep them apprised of what we were working on and get
10   some direction from them as well.
11       Q    Do you remember specific communications you
12   had with the governor's office on this issue?
13           MR. BLAKE:  Objection.
14           To the extent you can -- and I'm not sure you
15   can.  But there is an executive privilege to assert
16   here between communications between the governor's
17   office and the ODH.  So to the extent you can disclose
18   any of the specific discussions, go ahead.
19   BY MS. BONHAM:
20       Q    I'm first asking whether you communicated
21   with the governor's office?
22       A    I did not.
23       Q    Did anyone in ODH?
24           MR. BLAKE:  She's already testified to that.
25       A    I don't have that information.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

168

1       Q    It seems to me you indicated a moment ago

2   that ODH did work with the governor's office on

3   developing those guidance on this topic?

4       A    I know that we reach out to the governor's

5   office because we routinely send updates on issues that

6   we have to keep them apprised of what we're reviewing

7   in case someone reaches out at a different level to say

8   I don't really believe that I'm getting good customer

9   service, I think there is an issue.  So the office

10  would have been apprised that we were reviewing

11  documents and that there was a category.

12      Q    So it's actually your testimony that you on

13  behalf of ODH know that the governor's office was

14  apprised of this but you know nothing more about

15  whether or how you communicated?

16      A    I communicate upwards and how it's circulated

17  and communicated above me I don't have any direct

18  knowledge.

19      Q    Did you ask anyone else about that to prepare

20  for the deposition?

21      A    No.

22      Q    Besides the governor's office and other

23  people in ODH, including legal counsel, was there

24  anyone else involved in creating that guidance or

25  making that determination about the gender markers?

169

1      A     Not to my knowledge.

2      Q     So the person to ask would be Karen Sorrell;

3  is that right?

4            MR. BLAKE:  Objection.

5      A     Karen may have additional information but I

6  don't know.

7      Q     Okay.  Are the people who made this guidance

8  and this determination all in your legal department?

9            MR. BLAKE:  Objection.

10     A     ODH made the determination through a review

11 from a variety of people and their input.  So it wasn't

12 necessarily one person.

13     Q     Okay.  And then can I ask you to just read

14 out what Rena said back to the chief about where you

15 were on the gender marker change at that time.

16     A     Do you want the whole paragraph read?

17     Q     Yes, please.

18     A     "From October 2015 to now we have 11 gender

19 change requests pending with some of them ordering name

20 changes as well.  They have all come from outside of

21 Ohio.  At least eight came with money and those

22 applicants are awaiting for a changed birth record.  A

23 few years ago we had the same issue come up and it was

24 determined that we could process the three that had

25 been sent as court-ordered corrections.  I am not sure

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

170

1    what has changed since then."

2        Q    Okay.  Thank you.

3            So does this summary from Rena to the chief

4    appear to reflect the same timeline that you told me

5    about where at one time in the past the Department

6    wouldn't make changes to gender markers, then for about

7    a five-year period it would, and then about two to

8    three years ago you changed back?

9            MR. BLAKE:  Objection.

10       A    That seems to match the time period, yes.

11       Q    And in this communication Rena is seeking to

12   understand what has changed because you had some

13   pending requests sort of in a group?

14       A    Yes.

15                        - - -

16           (Thereupon, Plaintiff's Exhibit 15 was marked

17   for purposes of identification.)

18                        - - -

19   BY MS. BONHAM:

20       Q    Okay.  I'm handing you Exhibit 15.  Do you

21   recognize this?

22       A    This is the first time I've seen this email.

23       Q    Okay.  Can you tell me what it appears to be?

24       A    Yeah.  Flo, F-L-O, is a phone staff and she

25   is emailing Rena regarding help with a customer that

Stacie Ray, et al. vs Amy Acton, et al.                          Judith Nagy

171

1  emailed us for a response.

2       Q    And it looks like Flo has forwarded the

3  customer request and it's on this document.  Does that

4  seem right?

5       A    Yes.

6       Q    And this person is making this request in

7  2015 and they say, "I was born intersex with mixed

8  genitalia."

9            What does Rena direct Flo to do with that at

10 the top?

11      A    Rena directs Flo to send back a response that

12 the individual who contacted us should contact the

13 Probate Court in the county in which they were born and

14 explain the situation and see if they can have a

15 correction of birth record ordered.

16      Q    Okay.  So was that at the time the correct

17 way to process a request to change the gender marker

18 from someone who identified as intersex?

19           MR. BLAKE:  Objection.

20      A    According to the email the customer indicates

21 that there's a genuine error.  Errors can be corrected

22 and the way to do that is through Probate to get a

23 correction of birth record.  So we're going to assume

24 that there is an error and this would be the procedure

25 to get that corrected.

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 172 of 220 PAGEID #: 511
Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

172

1    Q    Is it the Department's position that if

2    someone says they're intersex and that's the reason

3    that their gender marker isn't accurate that counts as

4    an error and should be changed if there's a court

5    order?

6         MR. BLAKE:  Objection.  Hypothetical.

7    A    If someone states that there's an error on

8    their certificate it's up to them to go to the court

9    and respond to what the error is so a court-ordered

10   correction can be issued for us to change the record.

11   I can't respond to what that error is based on

12   anything.  If there's an error, then we can fix it for

13   that person.

14   Q    Okay.  Are you aware of any instances like

15   this one where someone has requested after obtaining a

16   court order that ODH change their gender marker because

17   they were intersex?

18   A    Just the one hermaphrodite.

19   Q    Are you aware of any instances where ODH has

20   made such a change and changed the designation to

21   either male or female rather than hermaphrodite?

22   A    If it was deemed to be a mistake and the

23   correction had to occur, we make the change.  It

24   doesn't matter who's requesting it.

25                          - - -

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

173

1          (Thereupon, Plaintiff's Exhibit 16 was marked

2     for purposes of identification.)

3                        - - -

4     BY MS. BONHAM:

5          Q    I'm handing you Exhibit 16.

6          A    Okay.

7          Q    And this is Bates 259 through 263.

8               Do you recognize this document?

9          A    I have not seen this document before.

10              MS. BONHAM:  This is a document you produced

11    as one document, this multiple-paged file.  It contains

12    for the record a letter from someone who had an

13    indeterminate gender indicated by the doctor at birth.

14    It has a court order requiring a gender change from

15    Arizona.  Had sent previously gender changed other

16    identity documents including a Social Security card and

17    Arizona driver's license.  And then the last page of

18    the document is an Ohio birth certificate.

19         Q    Can you tell based on this document whether

20    the Department actually made the change ordered by the

21    court here?

22         A    The only way of knowing what is currently in

23    the system is for me to search the system today to see

24    if this record exists or it's been changed.

25         Q    Okay.  When it was produced, though --

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

1   obviously this document was accurate when you produced

2   it, which was less than a year ago, right?

3       A    It's accurate the day that we produced it.

4       Q    Right.  So can you tell from the face of this

5   document whether the requested change was made?

6       A    No.

7       Q    You can't tell from what I just handed you?

8       A    No.

9       Q    So you don't know if you look at this

10  together with either of the charts that you produced

11  indicating when the changes were made if this person

12  was one of the people on that chart?

13      A    Not without researching it, no.

14      Q    How would you go about researching it?

15      A    A court order would seal down this record and

16  it would be brought back with a new state file number.

17  So if this record cannot be found we know it's been

18  reproduced with a new state file number and a

19  correction has been done.

20      Q    Okay.  So it's possible for you to do that?

21      A    Uh-huh.

22      Q    And what exact information would you need to

23  find that out?

24      A    We need to know the name of the individual of

25  this record, their date of birth and the state file

Stacie Ray, et al. vs Amy Acton, et al.                                  Judith Nagy

1   number that's listed, and then we can verify if

2   anything has been corrected on the record.

3        Q    So for any person whose records you produced

4   you can also go back and determine whether that change

5   was made but only if you have these three items?

6        A    Yes.

7        Q    And we obviously don't have those items

8   because they've all been redacted?

9        A    Correct.

10       Q    But since ODH established this policy like

11  two or three years ago, you haven't done any gender

12  marker corrections unless there was what you consider

13  to be an error; is that right?

14            MR. BLAKE:  Objection to the use of the word

15  "policy."

16       A    If a correction was court ordered because a

17  mistake was made, we did process those.  If it was not

18  an error upon recording the birth, those were not

19  processed.

20       Q    All right.  We are going to do just a few

21  more records.  I'll try to get you out of here.  I'm

22  trying to determine what else we need to do.

23       A    That's fine.

24            MS. BONHAM:  You know, to be honest, we're

25  going to have to figure out how to deal with the

1 redaction issue. We might have to reopen the

2 deposition. So I'd like to take a five-minute break

3 and talk about it and see what's going to be beneficial

4 to all parties today. Okay?

5         THE WITNESS: Okay. Sounds good.

6             (A recess was taken.)

7         MR. BLAKE: Back on the record.

8         So we've just spent the last few minutes

9 discussing a dispute regarding various redactions to

10 some of the records that have been produced in this

11 case.

12        For now the parties have decided to table --

13 while reserving their rights regarding the redaction

14 table the dispute and have come up with a plan that

15 perhaps will resolve the need to have the documents

16 unredacted. And the plan as counsel for Defendants

17 understands it is that Plaintiffs will identify by

18 Bates number various requests that have been produced

19 in this case and the requests are requests by customers

20 of ODH requesting various changes to their birth

21 certificate, including changes to the sex and/or gender

22 identifier on the birth record.

23        Defendants once they receive those Bates

24 ranges, those Bates-numbered requests will look at the

25 requests and provide information related to three

1    topics.  First, whether or not the request was denied

2    or approved.  If so, what date was the denial or

3    approval processed.  And, three, the reason for that

4    denial or approval.  A short reason such as, you know,

5    no court order or court-ordered correction or court

6    order that did not include a correction.  Something to

7    that effect.

8              The second aspect as Defense counsel

9    understands it that will help to perhaps mitigate this

10   redaction issue relates to Interrogatory No. 3 and

11   Plaintiffs' counsel is in particular interested in

12   verifying whether or not the documents or requests or

13   records reflected with the approvals reflected in

14   Interrogatory No. 3 were produced in this litigation.

15             Defense counsel has agreed to look at the

16   records produced, the unredacted versions, to determine

17   whether or not those requests were produced.  If so,

18   identify the Bates range for each entry.  And if the

19   documents were not produced, we'll attempt to locate

20   them and produce them if they're available.

21             Is that a fair reflection of what the parties

22   agreed, Plaintiffs' counsel?  Elizabeth?

23             MS. BONHAM:  That's right.  Pending doing

24   that we're going to reserve the right to reopen the

25   deposition because we're not able to ask about the

178

1   documents that we have now.  We need to be able to

2   cross-reference these documents with the interrogatory

3   responses and with the other documents so that we can

4   understand when and for whom these changes were made

5   and why, and we've learned through testimony that we

6   can't do that without some help here.

7              So we can work on that between the parties

8   and possibly have to reopen the deposition.

9              We're also going to reserve the possibility

10  of reopening the deposition on the grounds that the

11  30(b)(6) deponent wasn't adequately prepared on all the

12  topics.  I know everybody is going to disagree on that.

13             MR. BLAKE:  Defense counsel reserves their

14  rights to oppose any reopening the 30(b)(6).

15             MS. BONHAM:  So I think pursuant to that

16  we're going to scrap the rest of the exhibits and we

17  have a few questions for you and I understand you guys

18  are going to have Cross.

19             MR. BLAKE:  Very good.

20  BY MS. BONHAM:

21       Q    When you and others, including I know you

22  said legal counsel and possibly the governor's office,

23  were discussing how to treat requests for change on

24  gender markers and you ultimately determined that

25  you're not going to do that unless there was a mistake,

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

179

1    did you ever consider a policy like the one in Illinois

2    which permits people to change that designation using

3    documentation that they've received gender transition

4    treatment?

5        A    I am not aware of Illinois' policy and I

6    didn't reach out and research what they did.  So no.

7        Q    Did you or anybody else discuss whether you

8    should or could implement policies like the ones in any

9    other states or like a model policy?

10       A    We don't form policy.  We review the law

11   reflected as to whether or not this change could be

12   processed and that was the decision.

13       Q    And you testified that you don't know whose

14   decision that was?

15       A    ODH's decision.

16       Q    It is ODH's official stance but you can't

17   tell me the person or people that made that

18   determination?

19       A    (Shaking head in the negative.)

20            MR. BLAKE:  Objection.

21   BY MS. BONHAM:

22       Q    And you didn't attempt to find out before the

23   deposition?

24            MR. BLAKE:  Objection.

25       A    No.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

180

1    Q    I hear you saying that that determination was

2    made after reviewing the laws and after reviewing what

3    you were doing in the past.  What other considerations

4    went into making that determination?

5    A    That's about it.

6    Q    Other than the documents that we've reviewed

7    was that determination promulgated in writing in any

8    way?

9    A    No.

10   Q    Was there ever any kind of training for ODH

11   staff other than what we've already discussed about

12   that?

13   A    Training regarding how to process a document?

14   Q    Training regarding that this is now how ODH

15   is going to interpret this law, for example?

16   A    There's a multi-process for review, so if the

17   reviewer feels that it needs additional assistance,

18   then there may be multiple people reviewing it to

19   ensure that we're following the law correctly.

20   Q    So there was never any kind of policy memo,

21   legal memo, departmental memo, any kind of written

22   documentation other than what we've already looked at

23   indicating that after review this was ODH's

24   determination about how to treat requests for gender

25   marker change?

Stacie Ray, et al. vs Amy Acton, et al.                              Judith Nagy

181

1          MR. BLAKE:  Objection.

2     A    I don't believe there was anything formally

3   circulated to like the local health departments or

4   anything.  We tried to provide a standard response

5   regarding who to contact, what to ask for, and then

6   from there we just await a reply from the court.

7     Q    What interest does this policy serve?  What

8   ODH or Vital Statistics interest does this policy

9   serve?

10         MR. BLAKE:  Objection.

11    A    Can you define what "policy" means.

12    Q    The current Department's stance as we've

13  called it that you will not change the gender marker on

14  a birth certificate for any reason other than what you

15  consider to be error.

16    A    From a statistics standpoint we collect

17  information on vital events because of the public

18  health need and something that we do because the CDC

19  has given us direction and a form to collect specific

20  information that we then send to them every year

21  regarding the health of the mom, the health of the

22  child, statistics about the birth.

23         One of the statistics that they ask us to

24  collect is the sex marker of the child that is live

25  born.  So we go ahead and collect that information.  We

182

1    get it certified by the hospital, the medical

2    professional.

3         If there is errors in the certificate we try

4    to have those corrected and resubmitted from a

5    statistical standpoint so you know things like average

6    birth weight of a child, most common name, how many

7    boys and girls were born in Ohio.

8         So it is a statistical piece of information

9    that we get paid to give to other people, as well as a

10   piece of information that we provide to Social Security

11   to enumerate a newborn, which is a requested field that

12   they ask for.

13        We also can give that information to other

14   parties like voter registration, banks, pension funds,

15   et cetera, so they can do a roster match of their

16   individuals that they're trying to eliminate.  So it's

17   an important field for us to collect.

18   Q    Is it in similar vital statistics interest to

19   count the incidence of transgender people in the

20   population?

21   A    If that is part of the birth event that

22   happens when you're born.  I would say that that's not

23   information that is known at the time of birth and it's

24   not something that the CDC has asked us to collect.

25   Q    What about the incidence of intersex people?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

183

1       A    We all have an ability as a state to put

2    undetermined as to gender -- or, excuse me, the sex

3    marker of an individual and send in that information.

4    If and when it's ever updated we could resend that

5    information for statistical purposes so they would

6    know.

7       Q    In instances where you make corrections for

8    what you consider to be error you update that

9    statistical information, right?

10      A    Yes.

11      Q    Does ODH have any other interest in

12   maintaining this policy besides the one that you've

13   already discussed?

14      A    Not to my knowledge.

15      Q    Are you aware of Ohio's policy, practices or

16   procedures for verifying the fact of an individual's

17   death?

18      A    Yes.

19      Q    Can you briefly explain whether birth

20   certificates play a role in that process?

21      A    Birth certificates do not play a role when an

22   informant goes to a funeral home or crematory and works

23   with that individual.  It's actually the funeral

24   director who will start a death certificate.

25           We have an online verification to submit to

184

1   Social Security that this individual has been -- we're

2   informing them that individual is deceased.  They do

3   their logarithm to try to match someone in their

4   roster.  We get back a verification code within

5   seconds.  The funeral director does.  He has a couple

6   of attempts to change the information to secure a

7   verification.

8           If it doesn't verify, that's fine, we will

9   have that person complete out the record.  We then

10  transmit a full file back to Social Security with

11  additional information.  And if they determine that

12  they have found that person in their file, they will go

13  ahead a mark their record accordingly.

14      Q    Could there ever be an instance where

15  someone's birth certificate and their death certificate

16  didn't match?

17      A    Absolutely.

18      Q    Can you give me an example of such an

19  instance.

20      A    A very good instance is usually a single

21  parent who is not married has a child.  The child ends

22  up dying.  There are paternity issues or other things

23  that never established the father on the birth record,

24  but when that mother goes to the funeral home to do the

25  death certificate with the funeral home she can name a

Stacie Ray, et al. vs Amy Acton, et al.                              Judith Nagy

185

1   father.  She can also change the name of the child at

2   that time.

3           So there are many instances where especially

4   a younger adult will not have a matching birth and

5   death record even though there are other critical

6   fields that we can use to match that child to know that

7   that's the same person.

8       Q    Can you at that time change the birth record

9   or does it remain incongruent with the death record?

10      A    Changes can still be made to a death record

11  even though it's been matched to -- or a birth record

12  even though it's been matched to a death.  It's the

13  same procedure.

14          If there are two parents listed, a person

15  under 18 both persons would have to go with their proof

16  to Probate Court.  And we can still do the correction,

17  absolutely.

18      Q    Okay.  So the same statutes, the same ODH

19  procedures?

20      A    Yes.

21      Q    Do you agree that a birth certificate

22  communicates information about the subject of the birth

23  certificate?

24          MR. BLAKE:  Objection.

25      A    It communicates a vital event for public

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

186

 1   health.

 2        Q    Does it communicate anything else?

 3        A    It could.

 4        Q    Like what?

 5        A    It depends on how you want to use it.  And I

 6   don't know how everyone tries to use their birth record

 7   but the reason that we create it is for a public event.

 8             MS. BONHAM:  I think that's all we have.

 9   Your first deposition.  You deserve a beer.

10             THE WITNESS:  Oh, my Lord.

11             MS. BELENKER:  It's not over yet.

12             MR. BLAKE:  I'll try to do this quickly.  You

13   would be surprised.

14                       - - -

15                    EXAMINATION

16   BY MR. BLAKE:

17        Q    Real quickly.

18             Do you recall Plaintiffs' counsel's questions

19   to you regarding ODH's knowledge of customers with

20   intersex conditions?

21        A    Pretty much.

22        Q    Okay.  Just because someone's sending in a

23   request would ODH know or anyone else in the Department

24   know whether the requestor was someone with intersex

25   conditions?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

1      A    No.  Not for correction, no.

2      Q    Other than that person's birth certificate

3   containing a U designation in the sex identifier, would

4   ODH have any other way to determine the customer had

5   intersex conditions?

6      A    No.

7      Q    And just because someone has M or F as a sex

8   identifier on their birth certificate, does that mean

9   that they do not have intersex conditions?

10     A    No, it does not mean that.

11     Q    It is possible that someone with an M or an F

12  on their birth certificate would be intersex?

13     A    It's possible.

14     Q    And is it also possible that someone with a U

15  on their birth certificate might not have intersex

16  conditions?

17     A    That's possible.

18     Q    It's possible that the U was just entered

19  incorrectly or as a mistake?

20     A    It's possible.

21     Q    Do you recall Plaintiffs' counsel's questions

22  regarding what she referred to as snapshot questions

23  talking about what the birth record reflects?

24     A    Yes.

25     Q    And if I recall she asked you about which

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

188

1   fields could be changed on a birth record.  Do you

2   remember that line of questioning?

3        A    Yes.

4        Q    Do you recall that you identified that the

5   name could be changed and the parentage could be

6   changed on the birth record?

7        A    Yes.

8        Q    And that was as you just indicated

9   Plaintiff's Exhibit 3 when you were looking at that

10  document.  Do you recall looking at that exhibit?

11       A    Yes.

12       Q    So when you talked about name changes and

13  parentage changes, are those corrections?

14       A    There are specific statutes in the law that

15  allows us to correct the birth record regarding the

16  legal name of the child, the legal names of the

17  parents, as well as other incorrectly data-entered

18  information at the time of birth.

19       Q    Do those specific statutes for name change or

20  for the name allow you to change the name without a

21  correction?

22       A    We cannot change a name without a legal name

23  change.

24       Q    Right.  But I guess my question is, does the

25  name have to be an error before you change it on the

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

1  birth record?

2      A    No.

3      Q    And does the statute dealing with the name

4  change explicitly deal with correction only type

5  incidents?

6      A    Yes.

7      Q    Let me back up because maybe that question

8  was bad.

9          When a customer seeks to change their name on

10 the birth record there's a specific statute involved?

11     A    Yes, there's a legal name change statute for

12 changing your full name.

13     Q    And you can change your name for reasons

14 other than just correcting it if I understand the

15 statute right.  Is that your understanding?

16     A    Yes, you can change your name to anything.

17     Q    Okay.  And is it also -- is that same thing

18 true for parentage?  It doesn't have to be a

19 correction.  Can you also change your parentage for

20 other reasons besides a correction?

21     A    You can only change your parents if you're

22 going through a paternity process or an adoption.

23     Q    Okay.  Is that different than a correction?

24     A    We consider that to be a correction.

25     Q    Okay.  How is that different than the

Stacie Ray, et al. vs Amy Acton, et al.                                   Judith Nagy

190

1    correction statutes under ORC 3707.15.22?

2        A    There are specific correction statutes which

3    allows us the ability to seal the original record and

4    reproduce it in such a form that it looks like it

5    should have been that way from day one.

6            So we have the ability to put a signature on

7    it, we have the ability to give it a new state file

8    number, and we have the ability to seal the original

9    document as it was filed.

10           Those correction statutes are very specific

11   to parentage, adoptions, and court-ordered corrections.

12       Q    So those are the ones we talked about that

13   relate to name changes and parenting changes?

14       A    Right.

15       Q    Okay.  Is there a similar statute that deals

16   with changes to the sex identifier on a birth record?

17       A    There are no specific laws regarding changing

18   a sex identifier.

19           MS. BONHAM:  Objection to this line of

20   questioning as it calls for legal conclusions.

21   BY MR. BLAKE:

22       Q    Is it ODH's understanding that Ohio law does

23   not provide for a sex identifier change in the same way

24   that Ohio law provides for name changes of the

25   parentage?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

191

1           MS. BONHAM:  The same objection.

2      A    Yes.

3      Q    In applying those statutes, the name change

4  statutes, the parentage statutes, the correction only

5  type statutes that we've discussed at length today,

6  does ODH treat transgendered individuals any

7  differently than any other customer?

8      A    We wouldn't know a customer's sexual

9  orientation when helping them through our system.

10     Q    Or gender or any other category?

11     A    No.

12     Q    You don't know.  Okay.

13          Okay.  Does ODH collect information about a

14  person's gender?

15     A    We do not collect any field labeled gender.

16     Q    Is that information available to your

17  knowledge, the Department's knowledge at the time of

18  birth?

19          MS. BONHAM:  Objection.  And I want to put on

20  the record that we appear to have a continuing dispute

21  over the difference between sex and gender.  It will

22  probably be better addressed in expert testimony.

23          MR. BLAKE:  Noted.

24     Q    Please answer the question.

25     A    What was the question one more time?

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

192

1        Q    The question was whether or ODH -- whether

2   information regarding an individual's gender is

3   available at the time of birth?

4            MS. BONHAM:  Objection.

5            MR. BLAKE:  Noted.  And I'll grant you a

6   standing objection.

7        A    It is medically not available at the time of

8   birth.

9        Q    Do you know what an open records state is

10  regarding birth records?

11       A    I do, yes.

12       Q    What is an open records state?

13       A    An open records state allows the ability for

14  anyone to request a certified copy of a document when

15  they are not listed on the record.

16       Q    Is Ohio an open records state?

17       A    Yes, we are.

18       Q    Does the fact that Ohio is an open records

19  state play any role in concerns over fraud or

20  fraudulent birth records being used for illegal

21  purposes?

22       A    There's a higher potential that certified

23  copies of birth records could be used because we do not

24  request identifying information from the applicant, nor

25  do we request how the certificate will be used.  So

193

1  we're not aware of exactly how these are being used in

2  however capacity that someone obtains a certified copy.

3      Q    What is your understanding regarding the, I

4  guess, prevalence of this open records policy among

5  states in the United States?

6      A    From what I have read and the information

7  provided through a couple of organizations regarding

8  our records we have triple the amount of requests for

9  birth certificates than the average size state of this

10  size.  We also have more copies in different variations

11  than any other state.  We also have more verifications

12  from the certificate because they're so easily

13  obtainable and can be altered.

14      Q    Is ODH ever contacted by any law enforcement

15  agencies regarding the accuracy or the veracity of

16  birth certificates?

17      A    On occasion there are some entities that may

18  contact us to verify that the state file number and the

19  name information seem to be correct with our database.

20      Q    So Plaintiffs' counsel was asking you about

21  interest that ODH has in maintaining the accuracy or

22  maintaining these records.  Would you also consider law

23  enforcement as one of those potential interest?

24      A    Yes.

25           MR. BLAKE:  No further questions.

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

194

1                        - - -

2                     EXAMINATION

3    BY MS. BONHAM:

4         Q    Your counsel was just asking you about the

5    information that you learn about people, that ODH

6    learns about people when they make requests to change

7    their birth record.  We've looked at several records

8    and you produced many more that are compiled requests

9    from people to change something on their birth record,

10   relevant here the gender marker.

11             When we were looking at the exhibit examples

12   of those did you see that those contained, for example,

13   letters informing ODH of who these people were and why

14   they needed this change to be made?

15        A    I reviewed the letters, however, honestly,

16   when we review the court paperwork we really just

17   review the court paperwork.

18             Too many times people give us extraneous

19   information:  Social Security cards, driver's license.

20   We don't review them.  We don't want them and we don't

21   review them.

22        Q    And in the instance of Stacie Ray that you

23   testified about, for example, you remember a

24   conversation with her where she told you why she needed

25   this, who she was, and you remember seeing that she was

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 195 of 220 PAGEID #: 534
Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

195

1  distraught over it; is that right?

2      A    I do remember that, yes.

3      Q    So, in fact, ODH has and has produced records

4  indicating why these people are making these requests,

5  for example, if they're people with intersex conditions

6  or if they're people who are transgender; isn't that

7  right?

8      A    I really don't have any personal knowledge of

9  any of the requests other than the conversation I had

10 with Ms. Ray.

11     Q    But testifying on behalf of the Department as

12 we've seen examples of the records that you produced

13 the Department has this information?

14     A    Yes, we do.

15     Q    We've used a number of terms today including

16 gender identify, transgender, sexual orientation,

17 intersex.  Was there any term that's been used in this

18 deposition that you don't understand the meaning of?

19     A    I don't believe so.

20     Q    Okay.  Were you comfortable with the meaning

21 of these terms the whole time we were using them?

22          MR. BLAKE:  Objection.

23     A    I think I was, yeah.

24     Q    Enough to speak about them with a

25 colloquial knowledge at least?

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 196 of 220 PAGEID #: 535
Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

196

1          MR. BLAKE:  Objection.

2     A    Yes.

3     Q    Can you just explain for me what your

4  understanding of the definition of sexual orientation

5  is.

6          MR. BLAKE:  Objection.

7     A    Well, in my viewpoint sexual orientation

8  would be an individual's preference for their lifestyle

9  as far as what they prefer a spouse or a partner, how

10  they would prefer that person to be.

11     Q    Thank you.

12          Can you explain your general understanding of

13  what being transgender means.

14     A    I mean, not firsthand, but I can say that

15  it's someone who is trying to live their life in a

16  different sexual orientation whether it's by surgery or

17  by other means that they feel comfortable with.

18     Q    Okay.  So when you received -- when we've

19  been using the word "transgender," can we accept that

20  generally this is someone who was designated to be a

21  certain sex or gender at birth and is actually and is

22  living as some other sex or gender?

23          In other words, if I'm designated to be male

24  at birth but I'm actually a woman, I'm living as a

25  woman, I may have undergone gender reassignment

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

197

1   surgery.  We've been discussing transgender people as,

2   for example, people in a situation such as this?

3           MR. BLAKE:  Objection.

4   BY MS. BONHAM:

5       Q    Is that right?

6           MR. BLAKE:  Objection.

7       A    Right.

8       Q    Okay.  Thank you.

9           And then finally.  Your counsel has been

10  asking you about intersex conditions.  Can you briefly

11  describe what you understand people with intersex

12  conditions to mean.

13      A    We receive very few questions regarding

14  intersex because that condition upon birth is something

15  that is identified by a medical professional.

16          If there is a question about how to document

17  that condition on the birth record as part of the vital

18  event, we may get that question from the hospital.  But

19  generally speaking I think in 19 years I've received

20  that question twice.  So it isn't -- it's a very

21  exceptional case.

22          So as far as I know we don't have a lot of

23  prevalence of intersex children being born in Ohio that

24  may or may not be documented correctly as their sex

25  marker on their birth record at the time of birth.

Stacie Ray, et al. vs Amy Acton, et al.                        Judith Nagy

198

1      Q    Can you just give me your general

2   understanding of what that means.

3      A    It should be an individual that shows

4   biologically two sets of genitalia.

5      Q    Your counsel also asked you about the Ohio

6   Health Department applying the statutes that we've been

7   discussing.  Is that what the Ohio Health Department

8   does?

9      A    Can you specify?

10     Q    It applies the statutes of the State of Ohio

11  regarding vital statistics?

12     A    Well, we execute the law as how it's been

13  defined, yes.

14     Q    And you determine how the Department is going

15  to go about construing and doing that?

16          MR. BLAKE:  Objection.

17     A    Well, the law hopefully defines what we can

18  and cannot do once an event has been filed.  So we look

19  to the law to help maintain that process and to make

20  sure that we do it consistently.

21     Q    And as we've discussed, based on a number of

22  people in the community, transgender customers that you

23  have as well as advocates that you've talked to asking

24  the Health Department to change the gender markers on

25  birth certificates for these folks, you made a review

199

1  of this law and determined that the Ohio Health

2  Department was not going to do this anymore; is that

3  right?

4          MR. BLAKE:  Objection.

5     A    We determined that the correction that was

6  requested was not a mistake and thereby did not fall

7  underneath the correction guidelines and the law.

8     Q    In those circumstances?

9     A    If it's a mistake we will correct it for

10 anyone.

11    Q    And since making that determination you

12 haven't done it for anyone since?

13         MR. BLAKE:  Objection.

14    A    To my knowledge if it's a correction we have

15 done the correction.  And if it's not a correction we

16 don't do it.

17         MS. BONHAM:  Okay.  I think that's all we

18 have.

19         MR. BLAKE:  Okay.

20         MS. INGELHART:  We just want to make sure

21 that this transcript is confidential and remind you the

22 parts that should be marked as attorneys' eyes only.

23         MR. BLAKE:  And we'll read.

24             (Signature not waived.)

25                 - - -

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

200

1          (Thereupon, at 3:51 p.m. on Friday,

2    August 2, 2019, the deposition was concluded.)

3                       - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stacie Ray, et al. vs Amy Acton, et al.                    Judith Nagy

1                        A F F I D A V I T

2    STATE OF _____ :

3                                SS:
     COUNTY OF _____ :
4                                     - - -

5              I, JUDITH NAGY, do hereby certify

6    that I have read the deposition given on Friday,

7    August 2, 2019; that together with the correction page

8    attached hereto noting changes in form or substance, if

9    any, it is true and correct.

10

11                       _____
                         JUDITH NAGY

12

13

14             I do hereby certify that the foregoing

15   deposition of JUDITH NAGY was submitted to the witness

16   for reading and signing; that after she had stated to

17   the undersigned Notary Public that she had read and

18   examined her deposition, she signed the same in my

19   presence on the _____ day of _____, 2019.

20

21                       _____
                         NOTARY PUBLIC - STATE OF OHIO
22   My Commission Expires:

23   _____, _____.

24

25

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

202

1                    C E R T I F I C A T E

2                           - - -

3    THE STATE OF OHIO:
                              SS:
4    COUNTY OF FRANKLIN:

5              I, Diane L. Schad, a Professional Reporter
     and Notary Public in and for the State of Ohio, do
6    hereby certify that before the taking of her said
     deposition, the said JUDITH NAGY was first duly sworn
7    by me to tell the truth, the whole truth, and nothing
     but the truth;
8              That said deposition was taken in all
     respects pursuant to the stipulations of counsel
9    heretofore set forth;
               That the foregoing is the deposition given
10   at the said time and place by the said JUDITH NAGY;
               That I am not an attorney for or relative of
11   either party and have no interest whatsoever in the
     event of this litigation.
12             IN WITNESS WHEREOF, I have hereunto set my
     hand and official seal of office at Columbus, Ohio,
13   this 14th day of August, 2019.

14

15

16

17

18

19

20

21                       *Diane L. Schad*
                         /S/ Diane L. Schad,
22                       Notary Public, State of Ohio

23

24   My Commission Expires: June 1, 2020.

25

**(**

**(A)** 34:14 132:24
**(B)** 34:15 132:24

**1**

**1** 4:10 11:4,6,11 13:17 14:1,21 15:21 91:2,3
**1/28/16** 148:9
**10** 4:19 118:19 139:2 141:16,20,25 151:15
**101** 4:15
**11** 4:10,20 155:10,14 169:18
**116** 4:16
**12** 4:21 152:3 158:23 159:2
**123** 4:17
**13** 4:22 152:3 161:19,23
**134** 4:18
**14** 4:23 144:11,13 145:1,3 152:3 165:5,9
**141** 4:19
**15** 4:24 152:3 156:2 170:16,20
**150** 41:13
**150,000** 97:17
**155** 4:20
**156** 142:2
**158** 4:21 142:2
**16** 4:25 173:1,5
**161** 4:22
**165** 4:23
**17** 144:11,13 145:1
**170** 4:24
**173** 4:25
**18** 66:7 85:1 146:24,25 185:15
**186** 4:5
**18th** 14:9 15:4
**19** 19:24 66:8 197:19
**1933** 157:23
**194** 4:6
**19591** 148:3
**1990** 81:12 82:20

**2**

**2** 3:2 4:11 14:21 27:8,13
42:7 53:7 55:4
**20** 68:21
**2004** 152:1
**2011** 139:13,14,20,21,25 152:3
**2012** 156:2,17 157:8 158:11
**2014** 144:7
**2015** 159:15 169:18 171:7
**2015-ish** 139:13
**2016** 4:23 165:25 166:8
**2017** 118:13 135:9 137:20 144:8
**2019** 3:2
**22nd** 135:9
**24** 72:6
**25** 35:9
**259** 173:7
**263** 173:7
**27** 4:11

**3**

**3** 4:12 15:23 38:15,20 41:24 43:14 52:10 60:2,20 74:22 78:25 80:25 83:22 113:20 141:4,7 177:10,14 188:9
**30** 74:9 165:14 166:16
**30(b)(6)** 5:5 9:13 11:17 178:11,14
**31st** 135:8
**3705.15** 99:15 151:7
**3705.22** 99:21 151:8
**3707.15.22** 190:1
**38** 4:12

**4**

**4** 4:13 89:11,16 91:1,3,11 125:18 141:5,9,10,21 150:24
**40-some** 144:18
**400,000** 153:8

**5**

**5** 4:14 94:1,5 101:24 102:6, 15 110:11 112:8 113:5,18 125:5,16
**5/15/12** 4:20

**6**

**6** 4:4,15 101:1,5 102:7,15 110:11 141:5,21 150:25
**650** 134:24
**653** 134:25
**698** 94:7

**7**

**7** 4:16 116:7,9,13 118:11 125:5,18
**709** 118:19
**715** 125:19
**716** 125:6

**8**

**8** 4:17 123:6
**85** 154:1
**89** 4:13
**8th** 152:1

**9**

**9** 4:18 134:18,22
**94** 4:14
**9:00** 3:3

**A**

**A-R-A** 10:16
**A-S-H-L-Y** 84:4
**a.m.** 3:3
**Abigail** 39:24 81:11,13
**ability** 34:21 37:15 64:8 65:17 73:16 107:3 152:10 183:1 190:3,6,7,8 192:13
**absolutely** 56:3 87:11 137:14 184:17 185:17
**abstract** 38:21
**accept** 163:1 196:19
**acceptance** 160:23
**accepting** 120:23
**access** 124:11
**accessibility** 22:14
**accessible** 20:6
**account** 79:23
**accuracy** 62:15 193:15,21

**accurate** 41:10,13 58:7 92:22 161:14 172:3 174:1, 3
**accurately** 8:5
**ACLU** 5:9 13:6 138:5
**ACLU's** 91:18
**action** 34:6 71:3
**actions** 107:5
**active** 124:18
**Acton** 5:7 10:1
**actual** 12:18 24:7
**add** 64:4 82:14
**adding** 107:5
**additional** 18:23 19:3 28:24 29:3 53:17 86:14 153:5 169:5 180:17 184:11
**additionally** 8:25
**address** 126:13
**addressed** 191:22
**adequate** 86:9
**adequately** 178:11
**administrative** 19:18
**admit** 14:24 15:5
**adopted** 59:20 60:12 65:8
**adopting** 143:7
**adoption** 63:22,25 64:3,5, 15,24 65:6 107:6 189:22
**adoptions** 44:1 86:2 190:11
**adult** 185:4
**adults** 153:20
**advice** 47:24 54:5 117:8 163:1
**advocates** 128:8 198:23
**affecting** 124:2
**affidavit** 21:1 84:6,10,13, 21
**affidavits** 21:5,17
**affirmative** 52:4
**AFS** 145:14
**age** 66:15 146:23
**agencies** 193:15
**agency** 110:1
**aggregate** 22:5,6
**agree** 8:19 16:5 40:3,9 41:14 43:12,13 56:2 96:4 121:21 122:4 149:9,10 185:21
**agreed** 45:16 60:19 68:11

177:15,22

**ahead** 7:17 15:10 17:17
33:14,15 36:25 38:5 41:3,5
44:25 47:22 53:22 58:10
71:19,24 72:8 75:3 76:10,
21 84:8 91:22 92:1 104:21
105:5 106:22 110:5,13
111:25 112:1,12,25 113:9,
13 129:19 133:7 139:6,9
140:5 154:10 164:16
166:22 167:18 181:25
184:13

**ahold** 166:20

**alive** 66:6

**allegations** 12:21 14:11,
15,16

**alleging** 56:13

**alongside** 100:22 141:21

**altered** 193:13

**amend** 160:24 161:16

**amendments** 99:22

**amount** 193:8

**Amy** 10:1

**and/or** 176:21

**annual** 117:23

**answering** 91:6

**anymore** 79:21 117:25

**apologize** 11:1

**appeared** 164:22

**appears** 66:21 144:6
159:5 170:23

**applicable** 64:11

**applicant** 130:15 192:24

**applicants** 169:22

**application** 16:2 70:17
72:21 73:3,5 77:8,10

**applies** 198:10

**apply** 47:19

**applying** 191:3 198:6

**apprised** 167:9 168:6,10,
14

**approval** 177:3,4

**approvals** 177:13

**approved** 160:24 161:1,
15 177:2

**approximate** 140:12

**approximately** 18:8
19:22 101:23 108:23
139:13

**Ara** 10:16

**archived** 145:8

**areas** 167:4

**arena** 112:21

**Argento** 9:24 28:13,16
53:8 54:10,13,21 56:12

**arguments** 14:3

**Arizona** 173:15,17

**arrow** 147:20,21 148:20

**Ashley** 9:25 39:24 55:4
56:12 80:25 81:11,12 84:4

**asks** 34:12 38:7 48:2

**aspect** 177:8

**assert** 167:15

**asserts** 38:1

**assist** 70:21 123:24

**assistance** 30:11,15
51:15 112:18 160:3 162:6,
12,25 165:17 166:19
180:17

**assisted** 16:21

**assisting** 58:14

**assists** 57:22

**Association** 123:18

**assume** 7:7 9:1 108:15
144:25 147:6 149:2 156:23
171:23

**Assumes** 104:6 105:4

**assuming** 163:11

**assumption** 62:23

**attached** 30:21 31:18
71:16 85:20 108:6

**attaching** 39:12

**attachments** 50:20

**attempt** 177:19 179:22

**attempts** 184:6

**attending** 58:5

**attention** 141:3

**attested** 59:24

**attorney** 10:19 11:23,25
21:5

**attorney-client** 17:9
111:24 112:12 113:8
129:19

**attorneys** 7:24 8:9 17:14
90:19

**attorneys'** 8:17,20 9:1,7
56:1

**atypical** 49:7,11

**audible** 52:5

**audibly** 6:14

**August** 3:2

**authenticity** 8:10

**authority** 96:9 99:14
102:22 104:2 107:9,24
108:10 109:21 110:15

**authorize** 99:19,23

**authors** 94:24

**average** 182:5 193:9

**await** 181:6

**awaiting** 166:15 169:22

**aware** 9:23 13:19,22 53:24
56:11,18 91:18 96:18,22
110:25 119:12 152:6 154:6
172:14,19 179:5 183:15
193:1

**awkward** 10:25 11:1

---

**B**

**B-O-L-E-R** 90:24

**B-U-R-L-E-S-O-N** 95:4

**baby** 66:7,19

**back** 10:12 26:4 34:22
42:4 53:6 54:15 64:10,23
65:18 67:4 70:19,23 71:22
72:6,9 82:18,21 85:1 88:15
101:24 105:23 109:18
134:14 136:8 137:3,15
141:3 143:20,22 145:3
146:11 147:8 150:23
156:21 157:22 158:8
160:17 166:17 169:14
170:8 171:11 174:16 175:4
176:7 184:4,10 189:7

**background** 88:19
128:15

**bad** 189:8

**banks** 182:14

**based** 57:24 58:18 66:21
91:13 102:11,15 104:12
121:10 161:6 172:11
173:19 198:21

**basic** 61:18

**basically** 46:25 47:18
49:22 69:15 88:5,12
104:11 105:22 106:13
117:9,19 118:2 127:22
128:7,13 131:11 136:5
161:9 162:9

**Basil** 9:24 28:13,16 53:8,
15 54:10,13,21 56:12

**basis** 14:3 15:1 56:19 57:8
93:3,15 102:17,20 103:16
110:23 111:18 126:11
130:8 140:7 164:9

**Bates** 15:7,11 94:7 118:19
125:6,19 134:24 142:2

173:7 176:18,23 177:18

**Bates-numbered** 176:24

**beer** 186:9

**begins** 121:16 148:2

**behalf** 10:5 13:20 14:2,22
15:24 41:4 102:9 168:13
195:11

**Belenker** 5:14 103:23
123:19 135:16,18,19,20,23
137:21 186:11

**belief** 58:10,12

**believes** 58:7 105:10

**bell** 12:23

**beneficial** 176:3

**biological** 57:24

**biologically** 198:4

**birth** 4:12 16:1 21:24 23:9,
10,25 24:4,18 25:1 31:18
32:6 37:5,21,22 38:21,25
39:14,21,23 40:2,8,14
41:24,25 43:8 44:20,24
45:3,8,11,12,14,18,22,24
46:18 47:10 49:21 52:19
56:15 57:2,7,10,14,20
58:5,14,23 59:10,19,23,25
60:4,7,9,16,20 61:15,16,
17,22,25 62:5,17,20 63:3,
19 64:8,9,11 65:4,16 66:9
69:9,16 72:10 74:23,25
75:7,11,12,16,23 76:15
77:10,12,18,20 78:5,9,12
79:8,15 80:1,7,17,22 81:1,
4,16 82:6 83:20 84:5,15
85:20 86:10,15 87:7 91:16,
20 92:13,15,17,23 93:2,14,
18 94:20 95:22 96:6,14,19,
24 97:9,24 99:16,17,18,19,
22,24 100:4,19 101:10
102:13,21,24 103:5,6,15,
25 104:5,21,24 105:7,8
107:13 109:2 113:20
114:18,23 115:6,7,8,17
116:4 117:12 119:14
121:1,7,12,14,17,18 122:9,
24 129:2,20 130:18 131:6,
12,22 132:1 133:11
136:14,18 138:17,18
140:2,5 145:20 150:7,9
152:8 153:22,25 156:19,
22,24 158:2 160:2,11,24
161:16 169:22 171:15,23
173:13,18 174:25 175:18
176:20,22 181:14,22
182:6,21,23 183:19,21
184:15,23 185:4,8,11,21,
22 186:6 187:2,8,12,15,23
188:1,6,15,18 189:1,10
190:16 191:18 192:3,8,10,
20,23 193:9,16 194:7,9
196:21,24 197:14,17,25
198:25

**birthing** 23:11

**birthplace** 60:12

**births** 24:2 79:24 97:18

**bit** 33:25 36:17 57:15 62:15 74:24 90:1,5 98:10 103:22 109:3 118:4 142:9 157:15

**Blake** 4:5 5:16 8:13,24 9:5 11:20 14:7,19 15:3,19 17:8,21 26:1,9,12,25 37:14 38:4,11 40:5,12 41:2,11,19 42:2 43:5,15,18,22 46:3,8 53:1 56:3 58:9 61:14 65:5 75:2,9,24 76:3,7,13 77:3 78:10,17,22 80:20 89:5 91:17 92:5,9,21 93:5,8 97:1,13 98:4 100:6 101:13 102:19 103:3,11,18 104:6 105:3,17 106:12 107:1,17 110:4,12,24 111:22 112:3, 10 113:6,25 114:21 122:11 123:24 126:15 129:17 130:19,22 131:8 132:17 133:6,23 143:25 144:14 154:9,18 155:7 156:16 161:4 163:7 164:11,15 167:13,24 169:4,9 170:9 171:19 172:6 175:14 176:7 178:13,19 179:20,24 181:1,10 185:24 186:12,16 190:21 191:23 192:5 193:25 195:22 196:1,6 197:3,6 198:16

**blank** 67:3

**blurb** 120:15

**body** 117:19

**bold** 99:9,11 125:7

**bolded** 95:16 102:5 121:15

**Boler** 4:20 19:13 90:21,24 99:4 144:25 150:4,16 155:22

**Boler's** 19:16

**Bonham** 4:4,6 5:5,8,20 6:5 8:7,14,25 9:9 10:9,12, 21 11:3,9 14:17,20 15:15, 20 17:18,23 26:4,11,16 27:1,11 38:18 42:3 43:16, 19 46:6,9,11 53:5 55:23 56:4 75:25 76:5,11 77:4 89:7,14 92:3,6,10 93:7 94:4 100:24 101:4,14 103:12,20 112:4 116:6,12 122:21 123:9 130:20 134:6,13,21 135:22 141:6, 13,19 151:18 155:13 159:1 161:22 165:8 167:19 170:19 173:4,10 175:24 177:23 178:15,20 179:21 186:8 190:19 191:1,19 192:4 194:3 197:4

**born** 45:6 56:17 57:25 59:16 62:1,14,22 66:5,6 79:15 80:13 81:11 87:3,25

143:11 159:16 171:7,13 181:25 182:7,22 197:23

**bottom** 39:3 50:21 84:9, 16 91:2 148:4 149:19 159:22,23 160:7 162:7 166:1

**boy** 45:5

**boy's** 45:11

**boys** 182:7

**brand** 64:6 156:24

**break** 7:10 10:9 26:5 46:4, 7,12 89:6,8 122:11 134:9 176:2

**breaks** 7:12

**Breda** 9:25 39:24 55:4 56:12 81:11,13

**Breda's** 81:1

**bridge** 62:21

**briefly** 46:15 87:21 134:23 183:19 197:10

**bring** 13:14,16 65:18 88:21

**bringing** 64:10

**brings** 88:9

**brought** 12:20 45:9 128:16 174:16

**Burces** 29:25

**Bureau** 99:12

**Burleson** 95:4

**button** 17:2

---

## C

**C-A-R-M-A** 155:21

**call** 6:6 48:24 52:9 54:6, 15,16 69:13 73:14 97:15 98:25 99:6 120:21 126:2 131:18 132:2 143:7 153:12,21 160:1 162:10,11

**called** 3:8 49:18 96:5 119:10 142:14 145:14 181:13

**calling** 98:2 114:8

**calls** 54:14 95:6 97:19 146:17 190:20

**capacity** 9:17,19 40:14 43:7 76:2 86:21 136:7 193:2

**caption** 27:21 42:9 53:7 55:3

**card** 173:16

**cards** 194:19

**Carma** 155:21

**carries** 86:1

**carry** 85:22

**case** 8:15 12:14,19 13:23 16:19,22 20:1 23:15 25:3, 12 26:7 43:3,20 44:12,13, 22 48:8 51:4,17 54:10 56:6,9 58:22 63:21,25 64:2 73:14 75:15 87:3 98:19 130:4 168:7 176:11,19 197:21

**case-by-case** 126:11

**cases** 44:11 73:25 74:13, 14 82:11 84:15 105:13,15 106:1 108:16 131:20 147:1

**cash** 71:17,18

**category** 72:22,24 100:15,17 163:25 166:13 168:11 191:10

**caused** 147:16

**CDC** 181:18 182:24

**centers** 23:11

**centralized** 39:14 156:18

**certainty** 69:12

**certificate** 4:12 21:19 31:18 32:6 39:1,22 40:8 41:24,25 50:21 60:20 61:17,22,25 63:19 67:2,13 71:16 72:5,11 73:2,4,7 74:25 75:23 78:5,9,12 80:1 81:1 84:3,9,23 86:7 87:7 91:16,20 92:13 93:2,14,18 98:7 99:16,18,20,22,24 100:4,19 101:10 102:13 104:25 114:18 115:6,7,17 119:14 122:17 129:3 132:1 136:4,15,18 138:17,18 150:9 153:22,25 154:24 156:25 157:4 158:20 160:12 172:8 173:18 176:21 181:14 182:3 183:24 184:15,25 185:21, 23 187:2,8,12,15 192:25 193:12

**certificates** 16:1 21:7,18, 24 77:18 79:15 121:18 122:9 136:7 139:7 158:2 183:20,21 193:9,16 198:25

**certified** 6:2 22:23,25 36:25 38:21,23 39:20 40:13 50:19 73:21 75:11 77:10,12,20 84:12 121:7 182:1 192:14,22 193:2

**certify** 22:18 59:22 62:2 88:15 104:9

**cetera** 117:12 182:15

**chain** 31:9 109:7

**challenging** 51:15

**chance** 122:22

**chances** 130:24

**change** 21:1 30:20 31:18, 19,21,23 32:4,5,11,19 33:14,15,22 34:3,8,9,13, 15,19,20,25 35:5,6,8,14, 16,22,23,25 36:1,15 37:10, 13,15,18 38:2,9 42:12,17, 22,23 43:1,8,11,17,20,25 44:1,4 45:1 47:10 48:16,25 49:2,3,8 50:12,14,15,18,22 51:6,10,18,23 52:8,15 53:16 54:3 58:22,24 59:2, 15,21 60:10,14,15,18 61:6, 7,8,13,20 62:5,9,16,19 63:2,7,12,15 64:13,20 65:4 68:18 69:3,9 72:10 73:10 74:14,15 81:21,25 82:1,2, 3,4,9,11 83:12,16,25 84:17 89:8 92:24 93:3,15 94:10, 18 97:9 98:6,9,15,16 99:13,14,17 100:3,18 101:9 102:17,18,22 103:2, 15,25 104:2 105:1,14,16 107:3,7,9 108:13 109:12, 13,18 111:21 113:15 114:10 115:17 121:17,20 128:22 129:2 130:7,13,24 131:24 132:4 133:9,11,14, 15 134:1,3 138:18,20 139:4,10,22 140:6 146:2, 22 148:10,23,24 149:4 150:6,8 152:7 153:2,5,6,15 154:6,7,8,15,16,21,22 155:1,4,5 156:25 157:16, 21,23 158:2,3,20 159:9 160:2,10,11,21 161:2,15 162:11,12,13,14,22 163:16 164:9,10,19 166:3,11 169:15,19 171:17 172:10, 16,20,23 173:14,20 174:5 175:4 178:23 179:2,11 180:25 181:13 184:6 185:1,8 188:19,20,22,23, 25 189:4,9,11,13,16,19,21 190:23 191:3 194:6,9,14 198:24

**changed** 38:8 44:5,18 49:24 51:20 52:12 62:5,7, 17,18 63:3,11 66:1 86:6 87:15,18 88:14 102:24 110:22 111:18 113:12 116:4 127:6 132:10,16 136:15,17 143:18 148:8 151:6,13 162:15 169:22 170:1,8,12 172:4,20 173:15,24 188:1,5,6

**changing** 16:1 46:18 48:23 49:1 56:14 72:4 95:21 96:6,13 99:19,23 121:1 122:8,24 142:13 150:21 158:9 160:3 189:12 190:17

**character** 3:13

**characters** 79:14

**chart** 149:3 151:1,2,24 174:12

**charts** 174:10

**check** 71:18 72:17 143:21 145:4

**chief** 10:18 165:21 166:10, 24 167:1 169:14 170:3

**child** 48:23 58:2 59:16 64:2,5,17 66:12,15 77:23 78:2,20 82:13 87:23 104:14 106:3 131:10,20 142:16 143:4,8,9,11 145:17,20,21 146:21,23 147:15 158:10 160:2,11 181:22,24 182:6 184:21 185:1,6 188:16

**child's** 48:24 58:19 60:5 85:14 105:8 131:22 139:18 142:13 150:9 153:25 157:4

**children** 66:7 94:11 153:13,20,21,24 197:23

**children's** 94:16

**choose** 34:11

**chose** 33:13 50:18

**circulated** 168:16 181:3

**circumstances** 157:15

**citizen** 79:6

**claims** 14:4 56:20,23 57:4

**clarification** 7:2,6 30:12 46:13 49:6

**clarifies** 14:9

**clarify** 28:7 42:19 93:9 153:17

**clarifying** 14:18 15:4

**clear** 7:4 69:2 77:16 82:24 86:19 90:6 91:19

**clearer** 98:11

**clerk** 22:14 45:7,9 88:20

**clients** 125:25

**close** 165:15

**closing** 165:18

**co-counsel** 123:24

**code** 99:15,21 151:7 152:9 184:4

**coffee** 7:11

**collect** 22:4,6 26:10 57:9 59:2,6 113:13,16,22,23 132:6,24 181:16,19,24,25 182:17,24 191:13,15

**collected** 58:18

**collection** 124:13

**collects** 122:16

**colloquial** 195:25

**Columbus** 118:2

**column** 145:11 147:18,22 148:12,16 149:8

**combined** 32:22

**comfortable** 112:17,22 195:20 196:17

**comment** 129:7 146:5,13, 14,16 148:7 149:14,21

**committees** 124:12,18, 21,24,25

**common** 35:7 182:6

**commonly** 38:25 40:3,10 60:19 102:7

**communicate** 95:25 168:16 186:2

**communicated** 167:20 168:15,17

**communicates** 185:22, 25

**communication** 170:11

**communications** 11:21 12:13 167:11,16

**community** 96:23 116:1 128:8 198:22

**compiled** 194:8

**compiling** 166:3

**complaint** 4:11 12:22,25 14:16 26:23 27:17,22 42:7, 9 53:6 55:3 56:13,18,21 90:5

**complete** 22:22 64:15 131:24 143:24 144:9,10 147:9,13,17 184:9

**completed** 146:12,15 147:9 163:9

**comply** 42:25 44:3,24 136:3

**component** 23:9,10 44:24

**components** 23:9 39:19

**compound** 97:13 103:4 105:3,17

**concern** 97:8

**concerned** 64:25 96:1

**concerns** 94:14 95:13 192:19

**conclusion** 76:9

**conclusions** 190:20

**condition** 197:14,17

**conditions** 186:20,25 187:5,9,16 195:5 197:10, 12

**conference** 4:16 117:4,5, 13,24 118:11 119:9 120:25

**conferences** 125:2

**confidential** 8:17,20

**confused** 81:9

**confusing** 31:25 51:5,9 133:10

**conglomeration** 70:6

**congruent** 41:1

**conjunction** 97:18 101:20

**connected** 20:10

**connection** 28:3

**connector** 143:13

**consequence** 131:14

**consideration** 46:23 164:3

**considerations** 180:3

**considered** 111:20 164:1

**consistent** 61:16 164:24

**consistently** 198:20

**construe** 129:1

**construing** 198:15

**contact** 34:5 70:7 99:6 119:19 128:21 166:19 171:12 181:5 193:18

**contacted** 45:15 109:9 136:2 171:12 193:14

**contacting** 137:18

**contained** 14:16 194:12

**contemporaneously** 83:9

**content** 119:13

**contention** 57:19 61:5

**contents** 125:22

**context** 42:11 63:10,15 116:20

**continue** 8:22 13:17 157:24

**continuing** 191:20

**control** 14:13

**conversation** 29:11 47:12 54:12 76:6 126:12 137:25 194:24 195:9

**conversational** 6:15

**conversations** 17:12 47:13 54:25 127:3

**convey** 81:17 83:9

**copies** 11:11 18:23 20:16 23:1 64:23 156:20 192:23 193:10

**copy** 20:7 21:3 36:25

39:20 40:13 45:7 50:19 65:20 72:12 75:10 77:10, 12,20 78:9 82:16 84:12 121:7 192:14 193:2

**corner** 39:4

**correct** 19:2 20:21 24:20 30:7 32:7 34:16 35:2 42:14,18 44:23 49:9,23 52:25 53:12 57:1,9,12,14, 17,18 58:16 59:7,23,25 60:23 61:19 62:6 63:1,17, 23 70:1 72:15 76:14 77:1 81:19,21 83:5,10,15,24 84:8 87:6,11 88:2 93:17 95:14 96:3,21 99:8,22 100:21 102:20 104:17,19 105:12,18 106:17 107:4 109:20 110:6 114:1 128:9 129:10 130:14 132:5 133:15 150:13 152:4 154:11 155:8 157:21 158:12,14 159:13 166:7 171:16 175:9 188:15 193:19

**corrected** 45:3,19,21,24, 25 50:10,25 64:1 74:2,10 76:23 83:1 85:25 106:9 131:12 132:21 136:15,17 157:5 171:21,25 175:2 182:4

**correcting** 51:12 84:10 99:17 139:7 189:14

**correction** 32:21 37:6,20, 24 44:23 46:20 47:15,19, 23 49:19 50:8,15,23 51:6, 11,22,25 52:2,18,19 53:2 63:16 65:13,17 69:16 76:25 83:15,18 84:10 86:6 88:6 90:7 92:14,16 97:6,23 103:5 104:22 105:8 106:23 107:6,11 108:10 109:1,19 110:16 129:13 130:10,18 131:25 132:2,20 139:17 140:2,4 141:6 147:8 149:22 155:5 158:9 164:18 171:15,23 172:10,23 174:19 175:16 177:5,6 185:16 187:1 188:21 189:4,19,20,23,24 190:1,2, 10 191:4

**corrections** 19:18 37:6 44:21 50:16 57:7 84:22 86:2,5 142:12 169:25 175:12 183:7 188:13 190:11

**correctly** 37:22 59:10 63:7 72:1 106:14 113:1 180:19 197:24

**correspond** 15:14 73:17

**corresponded** 55:11

**correspondence** 14:17 15:15 31:8 70:13,20 71:1 90:6 135:11 137:5 138:4,6 159:6,10

Stacie Ray, et al. vs Amy Acton, et al.                                                                Judith Nagy

**cost** 48:4

**counsel** 3:6 5:9,12,15,16
7:15 13:1,2,5 16:10,17
18:4,25 27:20 29:12,15
30:15,25 33:8 46:14 54:5,
23 95:9 101:20 107:20
109:9 110:14 128:18
135:17 166:5,8 167:7
168:23 176:16 177:8,11,
15,22 178:13,22 193:20
194:4 197:9 198:5

**counsel's** 186:18 187:21

**count** 182:19

**counts** 172:3

**county** 24:25 39:9 155:21
156:9,24 158:12 159:8,11,
25 161:7 171:13

**couple** 6:9 8:8 11:11
20:17 59:12 60:17 73:1
81:20 94:14,24,25 98:23
107:5 134:15 139:1 145:7
153:17 184:5 193:7

**couples** 94:11

**court** 6:12 8:21 20:24
21:14 23:21,23 29:2 30:18,
20 31:18,20,21,24 32:10,
13,15 33:2,24 34:2,5
36:16,18,19,24 37:2,7,9,
17,23 38:7 42:17,22,25
44:4,13,17,25 45:19,25
46:20,21 47:20 48:2,15,18
49:4,7,11,15,19 50:2 53:16
54:4,16 57:1 59:4 64:14,21
66:17 68:1,6,10,12 69:5,7,
17 70:18 74:11,16,18,20
82:12,19,22 87:16,22,24
90:14,23 101:8 104:18,20,
22,23 105:2,6,9 106:2,5,8,
20,22 107:12 108:5,6,10,
25 109:6,24,25 110:20,21
111:9,11,15,16,17 113:1
120:16 129:21 130:1,6,16
131:3,4,9,10,18,21 132:8,
13,23 133:3,4,5,8,9,10
139:1,3,4,17,19 140:1,8
141:14 142:15,20,23 143:9
145:19,22,24 146:1,2
150:11 152:14,21 153:1,14
158:17,19 159:8 160:10,20
161:2,5 163:19 164:17
171:13 172:4,8,16 173:14,
21 174:15 175:16 177:5
181:6 185:16 194:16,17

**court-ordered** 32:20,21
49:18 50:8 51:5,11,22,25
53:1 65:16 84:22 92:16
107:6 110:15 132:20
149:22 158:8 161:10
169:25 172:9 177:5 190:11

**courts** 48:20 49:17 109:1,
3

**cover** 123:12 124:1

**craft** 137:2

**create** 26:10 75:7 186:7

**created** 67:24 86:12 94:22
101:19,25

**creating** 168:24

**crematory** 183:22

**criteria** 136:24 161:12

**critical** 185:5

**Cross** 178:18

**cross-reference** 178:2

**cross-referencing**
151:21

**crossing** 81:6

**cup** 7:11

**current** 15:25 24:21 88:25
142:21 145:16 157:1
181:12

**customer** 53:24 72:6
98:19,25 100:10,14 114:8,
9,16 126:14 142:14 148:9
149:3 159:19 160:1,5
161:6 162:10,13,14 168:8
170:25 171:3,20 187:4
189:9 191:7

**customer's** 191:8

**customers** 23:1 96:9
115:19,20 126:2,7 127:20,
25 142:24 166:20 176:19
186:19 198:22

---

**D**

**D-A-N** 95:4

**D-E-V-O-N** 162:3

**dad** 107:5

**Dan** 95:4

**data** 21:22,23,25 22:7,14
24:15 86:15 106:7

**data-entered** 188:17

**database** 39:14,15 193:19

**date** 25:1 60:9,16 64:11,12
79:7 80:22 84:15 91:3
135:7 142:20 144:3,7
145:20,22 146:2 147:3
149:12 151:25 156:1
165:21 174:25 177:2

**date-wise** 163:10

**dated** 14:9

**daughter's** 45:10

**day** 18:15 45:12 51:1
52:20 62:14 80:13 145:5,6
174:3 190:5

**days** 165:15 166:16

**dead** 114:24

**deal** 15:17 126:6 175:25
189:4

**dealing** 125:25 189:3

**deals** 190:15

**dealt** 117:16

**death** 21:6,18,19 23:10
117:12 183:17,24 184:15,
25 185:5,9,10,12

**deceased** 74:8 184:2

**December** 144:8

**decide** 106:11 133:20

**decided** 111:19 176:12

**decision** 179:12,14,15

**deemed** 172:22

**Deep** 86:16

**Defendant** 3:8

**Defendants** 5:17 91:19
151:5 176:16,23

**Defense** 177:8,15 178:13

**defenses** 14:4 57:4

**define** 181:11

**defined** 198:13

**defines** 198:17

**definition** 196:4

**delivery** 57:23 58:14

**demographic** 85:20
86:14 88:9

**denial** 177:2,4

**denied** 177:1

**Denise** 30:1,6

**department** 5:6,15,17
8:11 10:1,5 11:18 13:20
16:6,14 19:12,21 20:6
22:1,3,4 23:5 26:18,22
37:10 45:20 58:7,24 59:13
65:23 70:11,13 73:20 84:7,
25 85:9 86:22 89:20 94:6
95:12 96:22 97:25 99:12
100:2 101:16,21 102:12,16
104:3 106:10,24 109:23
110:8 115:18 116:2 129:24
150:20 151:13 152:6 161:1
162:22,23 163:5,15,24
164:9 165:2 166:24 167:1
169:8 170:5 173:20 186:23
195:11,13 198:6,7,14,24

**Department's** 15:25 43:2
56:14 57:4 91:14 92:11,18,
25 93:12 96:1,13 103:1
110:9 172:1 181:12 191:17

**departmental** 180:21

**departments** 23:12 94:15
181:3

**dependent** 20:3 143:5

**depends** 29:20 36:16
69:12 80:21 131:3 146:23
186:5

**deponent** 178:11

**deposed** 6:10

**deposes** 6:3

**deposition** 3:7,11,15,16
4:10 5:5 7:2,21 9:4,6,11
10:23 11:16,18 12:8 13:18
16:11,17 26:21 27:19 42:1
55:20 90:5 116:21,24
128:4 135:12 137:24 142:7
150:17 168:20 176:2
177:25 178:8,10 179:23
186:9 195:18

**describe** 56:22 57:6
114:14 197:11

**describing** 108:7

**DESCRIPTION** 4:9

**deserve** 186:9

**designate** 40:17

**designated** 9:13 10:4
14:2,15,22 15:23 43:23
56:1 130:17 196:20,23

**designation** 8:22 38:10,
12 41:23,25 45:14 52:9
56:15 58:23 65:24 66:9,16,
23 68:4 74:6,11 82:25
83:2,7 91:16 92:13,20
93:2,3,14 94:19 97:9
102:13 103:6 107:10
109:12,19 110:22 111:7
113:20 121:12,14 150:7
172:20 179:2 187:3

**designed** 127:12

**Desk** 4:14 95:3,5

**detail** 12:16 15:10 131:15
142:10

**details** 26:6

**determination** 29:6
31:10 106:11 107:16
108:19 110:9,17 112:5
115:15 129:14,16 138:14,
19 140:15,25 163:17
164:8,14 165:1 168:25
169:8,10 179:18 180:1,4,7,
24

**determine** 57:12 66:14
105:13 106:24 108:9
117:14 156:14 175:4,22
177:16 184:11 187:4
198:14

**determined** 30:19 33:9
44:14 107:8 109:11,13
128:25 133:25 169:24
178:24

**determines** 105:10
129:25

Stacie Ray, et al. vs Amy Acton, et al. — Judith Nagy

**determining** 163:15

**developing** 167:2,3 168:3

**Devon** 4:22 162:2,9

**Devon's** 162:7

**died** 66:7,19

**difference** 191:21

**differentiate** 86:4

**differently** 57:1 121:8 191:7

**direct** 27:21 46:21 53:6 69:15 91:1 95:15 97:5,15, 22 168:17 171:9

**directed** 42:22 82:22

**direction** 51:10 114:12 164:5 167:10 181:19

**directly** 18:14,16 19:7,9 69:11 99:6 100:9 114:16

**director** 10:1 183:24 184:5

**directs** 171:11

**disagree** 178:12

**disagreement** 42:5

**disbursed** 18:18

**disclose** 78:5 111:24 167:17

**disclosed** 65:1

**disclosing** 113:8

**discovery** 12:11

**discriminates** 56:16

**discuss** 86:20 95:25 118:24 120:25 125:21,24 126:5 133:16 179:7

**discussed** 16:10,17 27:13 30:23 52:24 61:9 83:12 87:1,17 107:22 115:15 120:12 133:22 151:15 164:8 180:11 183:13 191:5 198:21

**discusses** 113:18 125:19

**discussing** 23:13 35:12 52:9 75:14 95:12 101:25 125:3 160:14 176:9 178:23 197:1 198:7

**discussion** 26:3 29:4 122:5,23 126:17 127:9 128:13

**discussions** 126:21 165:13 167:18

**dispute** 151:20 176:9,14 191:20

**distinct** 91:21

**distinction** 68:15 131:16

**distinguish** 68:3

**distraught** 47:14 75:19 195:1

**district** 38:24 39:9

**dive** 86:16

**divorced** 61:23 62:11

**doctor** 68:9 105:24 148:9, 23 173:13

**doctor's** 58:19

**document** 4:14 11:14,15 15:12,23 20:12,14,15,19 23:16,21,23 24:1 26:7,14 32:20,22,23 38:20 39:6 45:21 50:3,8,11,25 51:9,14 59:8 60:19 61:12 62:18 73:11,12,17 77:2 80:10 81:16 82:12 83:16,18 84:6 85:16 87:6 90:8 91:1 94:7, 22 95:3,8,11 96:5,12 97:11 100:17,22 101:6,11,19,25 112:7,16 114:19 118:18,20 122:4,19 123:4,10,11 124:9 125:6,13,22 139:17 142:4 144:4 147:1 149:6 151:22 154:24 155:2 157:1,6 165:10 171:3 173:8,9,10,11,18,19 174:1, 5 180:13 188:10 190:9 192:14 197:16

**documentation** 45:18 48:3 68:10 106:19 129:22 179:3 180:22

**documented** 197:24

**documenting** 44:20

**documents** 8:10 12:11 13:14 14:25 15:6,8,18 16:9,16,18,22,25 17:6,13, 20,25 18:14,16,17 19:1,5, 10 20:1,22 21:12 23:19,20 24:9 25:16,22 26:18 33:3 49:16 50:16,23 59:12 62:24 63:4,7 78:14 90:4,14 102:15 104:15 110:10,18 114:2 116:23 142:19 143:17 151:19 153:3 154:13 160:22 163:19 164:20 168:11 173:16 176:15 177:12,19 178:1,2, 3 180:6

**Doe** 9:25 55:24,25 56:5,9, 13

**doubt** 100:8

**draw** 141:3

**drawing** 67:3

**driver's** 40:15,23 41:8,15, 17 77:24 78:3,15 173:17 194:19

**driving** 76:21

**due** 157:21,23

**duly** 6:2

**dying** 184:22

———

**E**

**earlier** 83:19

**ease** 114:5

**easily** 106:17 193:12

**easy** 6:14 20:5

**educational** 78:21,23 127:19

**effect** 3:17 39:12 177:7

**electronic** 20:20,23 21:3, 6,8,10,15 23:2 24:15 25:4 72:21 80:2 119:3 159:15, 17

**electronically** 21:13,20, 21 25:8 82:16 88:18 153:11

**eliminate** 182:16

**Elizabeth** 5:8 177:22

**email** 4:20,21,22,23,24 12:13 14:8,17 15:4,15 124:14 136:1 155:18 156:3,8,17,23 159:6 160:7 162:7 165:24 166:4 170:22 171:20

**emailed** 171:1

**emailing** 170:25

**emails** 12:25 13:8 26:23 31:13

**embedded** 53:16 54:3

**employer** 75:1,8 77:22 78:3

**employers** 77:18

**enable** 43:24

**enact** 127:8

**end** 49:14 50:6 59:5 62:10 90:8 119:9 127:9 137:10, 12

**ended** 164:21

**ends** 184:21

**enforcement** 193:14,23

**enrolling** 77:23 78:1,20

**ensure** 88:13 143:15 164:23 165:17 166:19 180:19

**enter** 21:22,23 22:14 45:6 87:18 95:7

**entered** 21:25 22:8 37:21 187:18

**entities** 23:6 75:5 80:4 193:17

**entitled** 7:3

**entity** 78:6 117:21

**entry** 106:7 144:10,13,15 177:18

**enumerate** 182:11

**envelope** 24:7

**envelopes** 153:8

**error** 85:25 87:16 105:7, 11,14,15,22 131:11,21 132:9,14 133:16 138:18 139:18,23 157:22 171:21, 24 172:4,7,9,11,12 175:13, 18 181:15 183:8 188:25

**errors** 99:23 171:21 182:3

**escalate** 166:23

**established** 175:10 184:23

**establishes** 79:1

**evaluated** 30:14 57:1

**event** 22:1,15,18 44:20,23 58:4 59:9 61:16,18 80:3,16 81:5,8 85:21 120:2 136:21 182:21 185:25 186:7 197:18 198:18

**events** 81:9 181:17

**eventually** 74:10

**everyone's** 80:22

**evidence** 37:8,23 74:15, 17 104:7 105:4 131:13

**exact** 112:15 174:22

**EXAMINATION** 4:1,4,5,6 6:4 186:15 194:2

**examples** 65:25 108:3,5 194:11 195:12

**exception** 140:16,17

**exceptional** 197:21

**exchange** 71:24

**exciting** 24:11,12 87:20

**exclusively** 14:12

**excuse** 183:2

**execute** 198:12

**executive** 167:15

**exhaust** 134:10

**exhibit** 4:9 8:19 9:3 11:4, 6,11 13:17 15:17,21 27:8, 13 38:15,20 41:24 42:7 43:14 52:10 53:7 55:4 60:2,20 74:22 78:25 80:25 83:22 89:11,16 91:11 94:1, 5 101:1,5,24 102:6,7,15 112:8 113:5,17,20 116:7,9, 13 118:11,18 123:6 134:18,22,23 141:4,7,9,10, 16,20,21,25 144:15 150:24

Stacie Ray, et al. vs Amy Acton, et al.                                        Judith Nagy

151:15 155:10,14 158:23
159:2 161:19,23 165:5,9
170:16,20 173:1,5 188:9,
10 194:11

**exhibits** 4:8 7:21 8:18
10:22 110:11 178:16

**exist** 20:20,22

**exists** 20:19 173:24

**expect** 35:13 37:11 46:22
146:17

**expectation** 71:22

**experience** 118:4

**experiences** 118:24
127:7

**experiencing** 117:11,16

**expert** 191:22

**expertise** 104:12

**explain** 20:1 49:10 82:7
109:16 142:9 171:14
183:19 196:3,12

**explained** 89:1 111:11

**explicitedly** 139:23

**explicitly** 189:4

**exposed** 88:20

**exposure** 119:15

**extent** 9:5 11:20 14:13
15:5 17:14,16 26:12 75:3
76:8 111:25 113:7 167:14,
17

**extraneous** 194:18

**eye-opening** 122:2

**eyes** 8:17,20 9:1,7 56:1

___

F

**F-L-O** 170:24

**face** 174:4

**facility** 24:24

**fact** 52:15 65:19 122:14
183:16 192:18 195:3

**facts** 22:19 59:22 61:15
62:1,2 64:9,18 65:15 79:5
80:15 81:4,7 104:6 105:4

**factual** 14:3

**fair** 24:16 27:2 112:3
177:21

**fall** 100:15 166:16

**falling** 165:20

**familiar** 53:21 141:23

**family** 97:4

**fast** 165:18

**father** 64:5 82:10,14
184:23 185:1

**father's** 84:14

**Federal** 3:9

**feel** 8:2 30:13 41:1,20,21
44:3 119:20 129:20 196:17

**feelings** 41:4

**feels** 180:17

**felt** 68:8,11 76:14,22

**female** 40:4,11,18,21,22,
23 41:9,15 45:14 58:15,25
60:3 66:15,24 74:2 104:11,
25 125:17 148:18,25 149:4
172:21

**field** 43:11,17,23 44:5,18
60:7 63:6 68:2 74:1 79:9,
10 81:22 82:25 84:8 88:12
104:19 105:2 132:10
182:11,17 191:15

**fields** 21:22,23 60:17 61:1,
5,7,13,18 66:22 80:9 81:21
83:25 88:11 105:25 185:6
188:1

**Fifteen** 19:22

**figure** 30:25 50:5 51:15
86:8 175:25

**file** 4:25 49:5,11 50:18,22
64:12,13 65:2 79:12,13
80:2 81:2,3,14,18,24
82:14,19,21 83:3,7,17
84:10,17 85:7,18 87:4,5
88:10 145:12 173:11
174:16,18,25 184:10,12
190:7 193:18

**filed** 9:24 12:18 33:12
60:16 63:20 79:16 106:6
130:14 132:22 139:18
156:22 190:9 198:18

**filing** 12:19 23:25 157:22

**filings** 91:19

**filling** 105:25

**final** 151:1

**finally** 45:13 146:5 197:9

**find** 69:17 73:12 88:24
128:5 136:7 137:25
150:17,19 152:11 153:4,15
154:12 174:23 179:22

**fine** 11:22 16:7 86:17 92:3
111:5 175:23 184:8

**finish** 6:19

**firsthand** 19:10 196:14

**five-minute** 176:2

**five-year** 139:2,11 170:7

**fix** 172:12

**flip** 15:22

**Flo** 4:24 170:24 171:2,9,11

**folks** 37:18 74:13 98:12
120:8 126:2 128:11 134:8
198:25

**follow** 46:22 139:9 165:16

**follow-up** 132:1 138:11

**follow-ups** 20:17 29:8

**footnote** 83:20

**footnoted** 50:21 63:17

**force** 3:17

**foregoing** 151:5

**forget** 67:6

**forgive** 85:2

**form** 20:20,23 35:11,13
38:23 49:18 50:18 51:18
53:20 54:2 109:4 112:23
132:21,22,25 139:6 140:4
143:25 179:10 181:19
190:4

**formally** 181:2

**format** 36:21 121:6

**forms** 49:14 122:3

**formulated** 97:25

**formulation** 16:2

**forties** 131:24

**forum** 126:19

**forward** 112:6 160:18

**forwarded** 29:4 171:2

**found** 45:13 139:7 174:17
184:12

**four-page** 134:23

**fourth** 55:2,24

**fraud** 192:19

**fraudulent** 192:20

**Freda** 136:2,10,14 137:3

**free** 84:7

**frequently** 36:6

**Friday** 3:1

**full** 145:2 184:10 189:12

**fully** 91:18

**function** 156:14

**funds** 182:14

**funeral** 183:22,23 184:5,
24,25

**future** 120:16

___

G

**gamut** 122:1

**gather** 16:18,25 17:6,13,
20,25 19:25 120:18

**gathering** 16:21 20:2

**gave** 65:22 76:19 108:5,8
135:23

**gender** 32:4,6,11 34:9,13,
19 35:16,24,25 36:15
37:13,15,18 38:2,10,12
41:25 42:13,22 43:10
47:10 51:6 52:8,10 56:14
57:9,16,20 58:22 59:6 60:3
65:14,23 66:3,23 68:17
69:3,9 74:1,10 82:25 83:7
87:2,15 91:16,21 92:12
93:2,14 95:18,21,23 96:6,
13 97:9 98:14,15 99:10,14,
19,20,23,24 100:4,5,18,19
101:10 102:18,24 103:1,
15,16 104:4,5,24 108:13,
14 110:22,23 111:17
113:11,18,21,22 114:3,10
115:17,23 116:4 121:1,4,
12,17,19 122:10,15,24
125:8,10,19 129:2 130:7
132:3,4,10,15 133:14,15
136:15,17 138:16 145:21
147:18,22 148:9,16,23,24
149:4 150:6 151:14 152:7
154:16 155:1,4 158:16
159:9 160:21 161:1,15
162:12,13,16,22 163:16
164:9,10 166:3,11 168:25
169:15,18 170:6 171:17
172:3,16 173:13,14,15
175:11 176:21 178:24
179:3 180:24 181:13 183:2
191:10,14,15,21 192:2
194:10 195:16 196:21,22,
25 198:24

**genders** 68:19

**general** 12:13 15:8 39:9
48:10 56:22 57:3 80:10
126:9 196:12 198:1

**General's** 10:19

**generally** 26:7 35:7 36:2
41:24 75:6,17 126:6
196:20 197:19

**generate** 73:3 144:23

**generated** 31:11 32:13
118:14 144:22,24

**genitalia** 57:24 58:6 171:8
198:4

**genitals** 58:19 60:5

**gentleman** 162:11

**genuine** 171:21

**gestation** 66:5

**gesturing** 144:5

**get all** 47:17 131:15

**girl** 45:5

girls 182:7

give 13:10 17:4,17 47:24
52:5 62:3 65:25 97:14
101:8 104:8 106:5 108:3
113:10 117:7 122:18
126:19 131:13 167:5
182:9,13 184:18 190:7
194:18 198:1

giving 100:9 128:14

good 5:11 10:15 46:8
73:6,23 106:21 117:9
118:7 121:25 168:8 176:5
178:19 184:20

gosh 102:2

government 117:20
120:9,11

governor's 107:21 167:8,
12,16,21 168:2,4,13,22
178:22

grandmother 114:25

grant 192:5

great 6:8 93:11 130:24
154:4

greater 148:18,19

gritty 108:16

ground 6:9 117:9

grounds 178:10

group 117:20 118:23
123:22 124:19 128:23
170:13

groups 121:11

grow 59:20

guardians 60:13

guess 12:17 41:12 48:25
70:6 76:21 188:24 193:4

guidance 29:3 112:8,14,
19 113:3,10,13 166:15
167:2,3 168:3,24 169:7

guys 178:17

---

**H**

habitually 21:12

half 34:7 42:21 88:9

Hamilton 159:7,11,25
161:7

hand 38:19 89:15 101:5
105:24 159:2 161:23

handed 134:24 174:7

handful 118:1 147:16

handing 11:10 27:12 94:5
116:13 134:22 141:20
155:14 165:9 170:20 173:5

handle 26:8 33:1,4 52:2
110:18 112:6,9 113:4
114:15 115:16 119:18
132:25 133:3,13 140:15
162:5

handled 113:15 118:24

handwritten 70:19

happen 59:17 79:24

happened 32:17 36:5
62:14 92:23 118:3

happening 62:12 119:17
126:21

happy 26:14

hard 36:9 70:10 115:3
144:1

Harold 29:25 30:6

head 52:4 179:19

health 5:6,15,17 8:11 9:25
10:5,18 11:18 13:20 15:25
16:6,13 22:1,3,4 23:5,11
38:24 39:9 45:17,20 56:14
57:4 58:6 84:7,25 86:21
89:20 93:12 94:15 99:12
102:11 123:19,20 129:24
164:8 181:3,18,21 186:1
198:6,7,24

healthcare 57:22

hear 113:21 180:1

heard 28:1 128:20 129:6

hearing 18:24 114:7

hearsay 161:6

held 26:3 35:5 164:13

helped 89:25 90:18 91:7
135:5

helpful 51:3 97:5,11 98:1,
5 118:5 128:16

helping 58:14 59:24 191:9

helps 81:3 117:6,21

hereinafter 6:2

hermaphrodite 67:10,15
68:2,14 140:21 172:18,21

hey 15:12 119:11

higher 192:22

Himes 166:6

historical 59:8

hit 17:2,4

hold 163:21 164:6

holding 162:18 163:4,5,
12,16,25

home 183:22 184:24,25

honest 47:12 97:3 115:2
147:25 175:24

honestly 32:16 67:17
78:18 132:18 139:15 145:4
194:15

honor 105:2

honored 77:7

hospital 22:13 23:8 45:15,
19 58:3 66:13 106:18
182:1 197:18

hospital's 106:21

hospitals 23:7,11 81:5
94:15

hot 119:10 120:12

hour 46:3

hours 72:7

house 20:14

housekeeping 8:8

Human 10:18

Hypothetical 38:4 103:4
130:22 131:8 132:17 172:6

---

**I**

idea 47:4 93:20 94:25

ideas 127:22

identification 11:7 27:9
38:16 89:12 94:2 101:2
116:10 123:7 134:19
141:17 155:11 158:24
161:20 165:6 170:17 173:2

identified 15:11 69:4,8
98:22 104:4 171:18 188:4
197:15

identifier 80:7 91:21,24
151:6 176:22 187:3,8
190:16,18,23

identifies 115:10

identify 40:20,21 41:14
58:15 68:25 75:23 77:2
78:14 79:10 80:18 88:2
115:3,6 162:1 176:17
177:18 195:16

identifying 81:7 192:24

identity 56:5 62:18 75:1,5,
8 77:1 78:13,19 79:4 97:10
111:19 125:19 173:16

illegal 192:20

Illinois 179:1

Illinois' 179:1

imagine 11:16 36:16
107:20 129:22

impact 120:4

impacts 119:6

implement 179:8

important 6:17 85:11
182:17

in-house 5:14 17:11 18:5,
6,25

inaccurate 62:13

incidence 182:19,25

incident 138:24

incidents 189:5

include 29:5 118:25 177:6

included 32:10 45:10
145:25

includes 79:3,5

including 13:23 16:2
31:14 85:24 90:14 122:10
168:23 173:16 176:21
178:21 195:15

incongruent 62:19 185:9

inconvenience 100:1

incorrect 49:21 50:25
59:6 61:19 87:2,3 93:19,21
102:21

incorrectly 84:4 103:7
104:16,20 107:12 131:14
187:19 188:17

independent 155:5

indeterminate 173:13

INDEX 4:1,8

indicating 49:25 59:5
69:5 72:7 84:9 111:9
113:11 130:13 131:25
164:18 174:11 180:23
195:4

individual 10:6 14:13
15:7 20:8 21:2 33:11,13,17
34:10 37:8 54:15 57:13
58:17 68:6,8,11,13 69:4
93:4,16 96:19 97:3 103:14
111:1,11,16 129:15 130:11
158:3 171:12 174:24
183:3,23 184:1,2 198:3

individual's 24:5 56:10
78:13 183:16 192:2 196:8

individuals 37:4 49:1
59:4 96:11 98:7 101:8
106:1 108:13,18 109:16
116:3 117:19 121:4 126:18
127:4,10,17 128:14 151:8,
9 152:25 153:13 167:4
182:16 191:6

infant 57:24

infants 66:5 74:8

informal 119:10

informant 183:22

information 9:7 17:3
18:10 20:9,10 21:19 22:5,
7,20,24 25:1,13,17 36:22

---

38:7 44:23 45:6,10,17,20,
22 46:20 49:3,19,20,23
50:10 51:12,24 52:13
57:21,23 58:16 59:2,5,9,23
60:11,13 61:25 64:11,14,
15,16,21 65:1 68:12 69:22
70:24 76:19 77:15 79:1,3
80:3,9,18 81:12,14,17
82:5,8,12,15,18,22 85:13,
15,20,22,23,25 86:3,11,12,
14 88:13 91:23 94:12 95:7
97:14,20 100:9,13,15
101:17 104:9 106:6,8
107:11 111:24 112:12
113:8,12,16,23 117:12
121:8 122:3,8 123:20
127:24 129:19,23 132:4
136:6 138:10 142:20 145:8
146:18 150:3,8 151:22
152:20 167:25 169:5
174:22 176:25 181:17,20,
25 182:8,10,13,23 183:3,5,
9 184:6,11 185:22 188:18
191:13,16 192:2,24 193:6,
19 194:5,19 195:13

**informing** 184:2 194:13

**infrequently** 35:21
105:24

**Ingelhart** 5:11,12

**initially** 26:10 74:1 156:22

**input** 167:5 169:11

**inquire** 46:18

**inquiries** 97:2

**inquiring** 70:8

**inquiry** 72:2

**inside** 24:9 133:9

**insight** 126:19

**instance** 22:7 34:23 45:23
54:18 63:6 65:22 71:3 83:1
87:17 92:19 98:1 99:5
101:12 105:19 121:10
130:21 138:23 140:19
154:5,7 184:14,19,20
194:22

**instances** 37:12 44:7,18,
19 52:7,12 65:25 78:4
84:18,19 85:7,24 86:18
105:23 110:2 111:12,15
133:1,19 136:17 138:20
149:7,23 150:1,5,17
151:13,14 152:6,13,17
155:2 172:14,19 183:7
185:3

**institutions** 78:24

**instruct** 17:6,8,15 111:23

**instructed** 17:11,19,25
18:3 25:2

**instructing** 17:18

**instruction** 113:3

**instructs** 7:16

**interact** 115:19,20

**interacting** 78:2

**interactions** 52:22,23
70:10

**interchangeably** 52:10

**interest** 120:21 181:7,8
182:18 183:11 193:21,23

**interested** 177:11

**internal** 112:8 114:2
165:13

**internally** 116:2

**interpose** 14:8 76:7

**interpret** 180:15

**interrogatories** 4:13
14:24 15:5 89:17 90:9,12
141:4,11

**interrogatory** 90:11 91:2,
6,13 141:23 150:24 151:25
177:10,14 178:2

**interrupt** 6:20 43:12

**intersex** 67:6 68:25 69:4,
6,8 171:7,18 172:2,17
182:25 186:20,24 187:5,9,
12,15 195:5,17 197:10,11,
14,23

**introduce** 5:10

**invited** 118:1

**involved** 9:16 19:11 29:10
107:15 127:15,16 168:24
189:10

**issue** 48:12 72:17 114:14
137:5 163:12 167:12 168:9
169:23 176:1 177:10

**issued** 38:24 39:15
172:10

**issues** 118:25 124:2 168:5
184:22

**item** 80:14 92:14

**items** 175:5,7

**iterations** 88:22

---

**J**

**J-O-N** 162:10

**Jake** 12:3 18:5 26:5

**Jane** 9:25 55:24,25 56:5,9,
13

**January** 152:1

**Jason** 5:16

**job** 19:16 78:2

**Jon** 162:9

**journey** 93:20 96:18
111:1

**judge** 129:21

**judgment** 130:1

**JUDITH** 3:8 4:3 6:1

**Judy** 5:18 118:20 121:16

**July** 14:9 15:4 137:20

**jump** 89:6

**June** 135:9

**justification** 16:3

---

**K**

**K-A-R-E-N** 90:25 165:21

**Kara** 5:12

**Karen** 4:23 10:2 90:21,24
165:21,25 166:2,23 167:1
169:2,5

**keeping** 143:3

**key** 25:10 88:3,22

**kicked** 160:15

**kids** 87:24 159:16

**kind** 12:15 24:14 29:11,20
30:5 32:22 33:23 34:3
35:22 46:23 48:4 53:13
70:25 72:7 85:15 91:17
109:4 117:13,21 119:21
120:4,21 121:2,11 125:24
127:4,18,23 143:14,15
154:4 166:13 180:10,20,21

**kinds** 20:22

**knew** 19:17 25:13 129:4
138:12

**knowing** 56:10 161:7,11
173:22

**knowledge** 13:13 14:11
15:8 16:20 18:21 30:18
35:17 55:17,18 62:7,12
65:8 68:16 69:1 75:13
76:1,4 77:25 86:21 121:10,
13,25 133:18 140:18
168:18 169:1 183:14
186:19 191:17 195:8,25

---

**L**

**L-A-N-C-E** 166:4

**L-E-E** 155:21

**L-E-Y** 84:5

**label** 125:8,11

**labeled** 191:15

**Lambda** 5:12

**Lance** 166:4,6

**language** 96:10 98:24
108:7

**large** 24:12

**Laughter** 53:4

**law** 34:20 42:24 43:7,24
44:2,15 57:8 91:15 92:11
94:10 107:2,8,23 110:17
117:11,16 120:1 122:8
127:5,12 128:22 129:10,13
133:24,25 139:6,8 154:19
179:10 180:15,19 188:14
190:22,24 193:14,22
198:12,17,19

**laws** 64:24 117:15 180:2
190:17

**lawsuit** 9:23 28:3

**lawyer** 11:15 12:17 47:24

**learn** 194:5

**learned** 119:18 178:5

**learns** 194:6

**Lee** 4:20 155:21

**left** 79:11 145:9

**legal** 5:13 13:1,2,5 18:4
20:12,13 24:21 29:12,15
30:15,20,24 31:17,19,21,
24 32:19 33:1,8,13 34:1
35:13 43:1,25 44:4 45:1
47:24 48:25 49:3 50:5,12,
15,18,22 51:10,23 53:16
54:3,5,23 60:13 62:9,16,19
63:2,12 64:19 65:1 73:10,
13 79:6 83:16 85:16 87:6
88:21,25 95:9 96:8 98:8,16
99:6,14,16 101:9,16,20
102:22 104:1 107:9,20,24
108:5,7,8 109:9,11,13,18
110:14,15 112:20,25
120:18 128:18 129:9
130:24 133:9,11 134:3
135:16 139:10,19,22
153:1,4,6,15 154:21,22
160:23,24 161:1,15
162:11,14,18,23,24 164:19
166:4,8 167:7 168:23
169:8 178:22 180:21
188:16,22 189:11 190:20

**legally** 25:14 44:2,15
62:22 86:6 88:16,23 129:6,
10 143:11

**legislative** 127:11 128:21

**legislatively** 129:12

**legislature** 128:24

**length** 59:17 191:5

**Lessons** 119:18

**letter** 4:15 54:6 70:20 72:5
101:7 139:8 146:4,6,9,10,
12 148:9 173:12

**letters** 70:4 194:13,15

---

level 22:21 127:22 166:24 168:7

Levenston 136:10

license 40:15,23 41:8,15, 18 77:24 78:3 173:17 194:19

licenses 78:15

licensure 75:17 76:18

life 76:17 128:15 196:15

lifestyle 196:8

limit 65:3

link 24:3,6 85:9,11,19 88:19

linked 87:5 88:19

list 67:2 73:23,24 74:8,9 83:11 144:7 151:13,14,17 152:24

listed 40:1 42:9 55:3 66:23 78:1 84:19 121:3,4 142:17 143:11 147:1 149:11 150:11 151:9 175:1 185:14 192:15

Listen 53:3

listened 127:9

listing 136:23

lists 27:23 60:3

literally 119:2 153:7

litigation 9:16 14:5,25 17:5 18:1 31:5 33:20 59:13 67:16 177:14

live 48:18 181:24 196:15

lived 66:6

living 196:22,24

local 23:6,11 94:15 155:20 156:9,14,22,23 158:1,11 159:7,11 181:3

locally 22:8

locate 177:19

location 22:18

log 4:19 142:5,10,18 143:3,20,24 145:2 163:8, 10 165:14 166:12

logarithm 184:3

long 19:20,23 35:18 36:24 47:3 73:5,21 84:24 101:22 139:12

longer 71:5 72:19 85:16 94:16 134:8

looked 30:22 33:5,6 51:1 52:20 109:4 112:7 133:24 152:14 164:22 180:22 194:7

Lord 186:10

lot 17:2 47:13 50:6 62:11 86:4,9 97:17,19 115:8 132:3,6,21 197:22

lump 48:23

lunch 134:9,14

luncheon 134:12

**M**

M-E-K-H-J-I-A-N 10:17

made 20:16 25:24 31:10, 17 32:5 36:21 54:15 64:23 68:16 74:14 91:19 95:11, 24 99:18 110:9,17 112:5 129:16 137:21 138:14,19 140:15,16,17 150:24 152:7 153:2 154:6,7 164:14 169:7,10 172:20 173:20 174:5,11 175:5,17 178:4 179:17 180:2 185:10 194:14 198:25

Mahoning 39:9

mail 4:19 70:4 142:5,10,18 157:6 163:8,10 165:14 166:12

mailed 146:10 156:21

mailroom 18:17

maintain 198:19

maintaining 183:12 193:21,22

major 108:19

make 6:18 18:23 20:6 29:6 37:10,20 43:7,24 53:21 54:6,14 62:23 71:22,25 72:16 77:9 81:22 90:7 97:23 103:2,5,14 104:21 105:8,14,16 106:10 107:7, 24 108:10 112:25 113:19 121:19 129:12 130:10,13, 18 131:16 138:20 141:6 150:6 151:18 156:20 157:14,20 158:4 166:20 170:6 172:23 183:7 194:6 198:19

makes 24:11 36:14 80:6 86:12 114:17

making 42:12 77:5 107:15 108:19 115:15 165:1 168:25 171:6 180:4 195:4

male 40:1,4,9,11,17,21 41:23 43:14 45:22 58:15, 25 60:3 66:15,24 74:2 83:1 104:11,25 148:18,24 149:4 172:21 196:23

manager 112:18 162:4

manages 95:5

managing 86:23

manual 20:4 88:4

mark 100:24 141:14 184:13

marked 8:16,20,21 9:1 11:4,6,10 27:8,12 38:15,19 74:1 89:11,16 94:1,5,7 101:1 104:24 116:7,9 123:6 134:18 140:20 141:16,24 155:10 158:23 161:19 165:5 170:16 173:1

marker 35:24,25 36:15 37:13,16,19 38:3,10,12 52:8,10 57:19,21 60:3 65:14 66:3 68:17 69:3,9 87:2,15 93:18 98:6 99:19, 24 100:4,18 101:10 102:24 103:15 108:13 110:22 111:17 115:17,23 122:10 129:2 130:7 132:15 136:16,18 138:16 140:21 148:24 151:14 152:7 158:16,20 161:1 163:16 164:9 169:15 171:17 172:3,16 175:12 180:25 181:13,24 183:3 194:10 197:25

markers 114:3 116:4 121:1 122:24 150:21 168:25 170:6 178:24 198:24

marriages 125:14,17

married 61:23 62:11 64:4 94:11 184:21

match 62:25 63:8 71:22 170:10 182:15 184:3,16 185:6

matched 63:4 185:11,12

matches 87:23

matching 24:8 185:4

materials 127:19,21

matter 5:6 43:6 103:7 112:21 115:5 135:21 160:12 172:24

matters 8:8

meaning 8:16 22:6 144:10 195:18,20

means 6:22 33:2 51:11 58:10 62:1 79:10 86:6 147:5,12 166:10 181:11 196:13,17 198:2

mechanically 87:14,17

mechanism 20:12

mechanisms 26:9

medical 45:10,18 57:23 58:13 85:12,21 86:1,3,8, 10,13 104:8,10,12,13,16 111:3 182:1 197:15

medically 192:7

meet 136:7

meeting 46:24 117:9 118:8

meetings 127:14,15 128:1,5,7

meets 123:25

Mekhjian 10:15,16

member 97:4 124:10,20, 23 162:2

members 95:9

memo 180:20,21

mention 55:25

mentioned 52:7 73:25 78:15,20 86:19 138:3 152:9 158:16

mentioning 55:16

message 98:10

met 42:8 46:15 53:10 55:7 136:24 161:11

mid-twenties 65:9

middle 150:25

Midwest 4:16 117:4,5,13

midwife 58:3

mind 141:8 157:18

minds 118:8

mine 85:5

minimum 64:16

minute 102:4 122:18

minutes 46:5 66:6 176:8

misdesignated 105:20

missed 105:25

missing 26:14

misstates 110:4,24 111:22 113:25

mistake 37:4,6 38:2,6 44:19 45:16 57:10 59:7 60:11 65:14,15 66:1,2 94:19 104:1,4 105:14,16, 21,22 106:11,13,16,25 111:20 129:11,15,20,23,25 130:5,9,12,18 131:5 132:9, 14,22 133:17 134:1 139:23 172:22 175:17 178:25 187:19

mistaken 65:24

mistakes 84:14 99:17

mitigate 177:9

mixed 171:7

model 179:9

mom 181:21

mom's 60:12 84:14

**moment** 26:21 60:4 168:1

**momentarily** 91:4

**money** 70:18 71:11,14,16, 18 72:11,25 73:2,9 145:25 166:17 169:21

**month** 35:17,18 36:3

**months** 131:20,21 144:2

**morning** 3:1 5:11 10:15

**mother** 86:23 184:24

**mother's** 25:1

**move** 26:17 134:7

**Multi-paged** 4:25

**multi-process** 180:16

**multiple** 18:9 35:23 49:15 50:1,14 51:14 180:18

**multiple-paged** 173:11

**multiples** 45:7

---

**N**

**N-A-P-H-S-I-S** 123:14

**Nagy** 3:8 4:3 5:18 6:1,6 41:9

**nailed** 81:23

**named** 106:3

**names** 29:22 50:14 73:18 94:17 108:5 143:5 151:21 188:16

**NAPHSIS** 4:17 117:18 123:16,17 124:10,20,23 126:8

**National** 123:18

**nature** 36:10

**navigate** 119:21 146:19

**necessarily** 19:9 36:22 50:4 61:21 119:25 121:6 127:25 169:12

**needed** 18:19 22:24 28:24 30:19,24 34:5 47:15 50:6 75:16 76:14,16,17,22,23 77:1,6 127:6 129:11 162:25 194:14,24

**needing** 76:20

**negative** 179:19

**neutral** 125:8,10

**newborn** 58:15 104:11 182:11

**nice** 97:14 118:7 122:3 127:10

**nitty** 108:16

**nod** 6:15

**nodding** 52:4

**Nos** 134:24

**notarized** 21:4 84:6

**Notary** 3:10,12,14,15,16, 18

**note** 83:22 84:1,8,16,20, 21,22 151:19

**noted** 92:4 93:7 154:24 191:23 192:5

**notes** 4:16 12:13,15 117:3 118:10,15 119:8 120:13, 19,24

**notice** 4:10 11:16,17 13:18 21:1

**noticed** 24:10 166:12

**notify** 61:24

**number** 19:3 24:3,6,8 27:22 64:13 70:2 79:12,13, 17,22,25 80:4,5,6,15 81:2, 3,15,18,24 82:5,14,19,21 83:3,8,17 85:7,12,15,17, 18,19 87:4,5 88:10 125:7 145:13 148:2 174:16,18 175:1 176:18 190:8 193:18 195:15 198:21

**numbered** 118:19 125:6 142:2

**numbers** 15:7 23:24 79:13,18 85:9

**nurse** 58:3

---

**O**

**oath** 6:21

**object** 7:15,16 91:17 111:22 143:25

**objection** 14:8 17:8 26:25 37:14 38:4,11 40:5,12 41:2,11,19 43:5,15,18,22 58:9 61:14 65:5 75:2,9,24 76:8 77:3 78:10,17,22 80:20 91:25 92:4,21 93:5,7 97:1,13 98:4 100:6 101:13 102:19 103:3,18 104:6 105:3,17 106:12 107:1,17 110:4,12,24 112:10 113:6, 25 114:21 126:15 129:17 130:19,22 131:8 132:17 133:6,23 144:14 154:9,18 155:7 156:16 161:4 163:7 164:11,15 167:13 169:4,9 170:9 171:19 172:6 175:14 179:20,24 181:1,10 185:24 190:19 191:1,19 192:4,6 195:22 196:1,6 197:3,6 198:16

**objections** 103:21

**observing** 10:20

**obtain** 78:13

**obtainable** 193:13

**obtained** 111:17 137:8

**obtaining** 172:15

**obtains** 193:2

**occasion** 193:17

**occasions** 18:9,11

**occur** 74:3 130:2 140:21 172:23

**occurred** 22:1,2,19 53:19 70:11,12 81:8 85:22 128:2 156:20

**occurs** 65:13

**October** 169:18

**ODH** 4:15,21 10:5 13:2 14:2,14,22 15:24 16:5 17:15 22:9 26:24 28:6 29:5,10 41:4 42:15 43:20 45:3 76:2,4,8 97:10 103:14,17 104:23 105:2,9, 10 107:18,19 111:19 112:5 113:3 115:14 124:8,22 125:21,24 126:5,12,20,21 127:14,18 128:11 129:15 130:9,21 131:7 138:15 139:6 150:6 154:6 157:6 160:18 167:3,17,23 168:2, 13,23 169:10 172:16,19 175:10 176:20 180:10,14 181:8 183:11 185:18 186:23 187:4 191:6,13 192:1 193:14,21 194:5,13 195:3

**ODH's** 14:3 61:5 141:10 162:25 179:15,16 180:23 186:19 190:22

**offered** 26:5

**offhand** 29:22 32:14 54:19 67:7 94:23

**office** 5:18 10:19 23:12 26:24 45:25 46:17 48:13 56:24 71:15,23 98:16 107:21 110:16 119:5 136:2,10 137:5,16,22 138:4 145:23 155:24 156:11,13 157:19 158:7, 11,16 159:11,24 160:22 167:8,12,17,21 168:2,5,9, 13,22 178:22

**officer** 19:18

**offices** 117:7,22 120:10 156:14 158:1 159:8

**official** 3:13 179:16

**Ohio** 5:6,15,17 8:11 9:25 10:4,19 11:18 13:20 15:24 16:6 32:15 34:20 56:13,17 61:4 86:21 87:25 89:19 91:15 92:11,19 93:12,13 99:12,14,21 109:3,6,25

**111:15 121:16,17 127:5 129:6 133:3 139:5,18 148:15 150:14 151:7 164:17 169:21 173:18 182:7 190:22,24 192:16,18 197:23 198:5,7,10**

**Ohio's** 93:1 183:15

**Ohio-based** 140:1

**old-fashioned** 67:8

**on-site** 48:12

**one-half** 33:9

**one-way** 128:13

**online** 183:25

**open** 77:11 124:17 192:9, 12,13,16,18 193:4

**opened** 153:8

**operate** 119:6

**opinion** 78:6 120:18

**opportunities** 78:21

**oppose** 178:14

**opposite** 147:20

**optional** 49:4

**options** 34:17 48:21

**ORC** 190:1

**order** 8:15 9:6 25:16 30:18 31:19,20,22,25 32:2,3,10, 13 33:2,25 36:18,24 37:3, 11,17,23,24 42:22,25 44:4, 14,17,25 45:8 47:15 48:15 49:8,11 50:2 53:17 54:4,16 68:1 69:5,7 71:18 74:16,18 75:16 82:13 87:16,23,24 101:8 104:18,22,23 105:2, 6,9 106:5 107:12 108:6,11 109:24,25 111:17 113:1 120:16 130:1,7,16 131:3,4, 9,10 132:8,9,13,23 133:3, 4,9,10 139:3,5,19 140:8 143:16 150:11 152:14,21 153:1,14 158:17,19 159:9 160:21 161:2 164:17 172:5,16 173:14 174:15 177:5,6

**ordered** 42:17 43:17 130:8 155:5 171:15 173:20 175:16

**ordering** 37:10 169:19

**orders** 30:20 34:2 36:19 44:17 57:1 59:4 87:24 108:5,25 110:20,21 133:5, 8 139:1 140:1 161:5 163:19

**organization** 102:9 117:6

**organization's** 14:23 96:5 100:12

**organizations** 193:7

---

Stacie Ray, et al. vs Amy Acton, et al.                                                      Judith Nagy

**organize** 81:3

**organized** 136:6,21

**organs** 68:9

**orientation** 191:9 195:16
196:4,7,16

**original** 36:24 64:18,21
65:18 70:20 82:11 133:11
190:3,8

**originally** 63:19 104:24
135:24 155:20

**out-of-state** 32:15 109:1,
24 111:15 133:4 139:1,16

**outreach** 115:25

**overarching** 126:11

**overlap** 151:12

**oversee** 19:7,9

**oversees** 19:18

---

**P**

**packet** 50:7 106:21

**pages** 50:5

**paid** 71:23 182:9

**paper** 20:14,19,25 21:3,5,
7,9,15,16 23:16,19,20
24:2,4,9,13,15 25:4,7
60:21,24 64:22 69:14
79:20 82:16 105:24 156:19
157:2,4

**paperwork** 12:18 21:14
25:14 29:2,12 30:23 31:1
35:5 46:23 47:21 48:6
51:12 54:7 64:19,25 68:5
70:18 71:25 73:13 107:22
108:1 109:8,10,16 113:11,
14 120:22 122:7 126:10
130:23 133:25 142:21,23
143:10,15 145:22,24 146:1
161:10 162:24 194:16,17

**paragraph** 95:20 98:21,
24 99:2,3 169:16

**paragraphs** 50:5

**pare** 137:7

**parent** 64:4,11,24 66:12
86:3,11 104:14 143:7
146:11,16,20 184:21

**parent's** 79:6

**parentage** 43:25 48:23
49:2 59:21 61:9 63:21,25
64:16 188:5,13 189:18,19
190:11,25 191:4

**parenting** 190:13

**parents** 58:2 59:19,25
64:6 66:13 86:10 119:14
120:17 121:3 146:24
185:14 188:17 189:21

**parents'** 94:13

**part** 12:17 13:10 31:11,21
32:1,3,8 42:25 44:4 50:2
77:8 138:12 154:17 157:22
182:21 197:17

**parties** 3:7 176:4,12
177:21 178:7 182:14

**partner** 196:9

**party** 9:21 128:3

**passport** 78:18

**passports** 78:18

**past** 15:25 35:19 36:3,5
44:5 47:5,7 67:25 138:15
140:23 145:7 150:5,20
170:5 180:3

**paternity** 21:17 82:11,12
86:2 107:5 184:22 189:22

**paths** 51:13

**pathway** 46:19 48:5 69:17
112:15

**pause** 11:1

**pending** 122:12 162:19
163:4,12 169:19 170:13
177:23

**pension** 182:14

**people** 12:18 17:11 18:21
28:19 29:5,19 30:4 34:11
36:1 40:13 44:6 47:13
54:22 56:12,17 59:20 62:8,
11 63:18 68:24 69:15 70:3,
6 75:6,12 77:5,17 80:23
84:16 95:1 96:7,22 97:5,8
98:2,23 100:3 106:17
108:7 114:6,13 115:8,16
119:4,16 120:3 121:19
126:20 134:10 143:4 162:4
166:24 167:6 168:23
169:7,11 174:12 179:2,17
180:18 182:9,19,25 194:5,
6,9,13,18 195:4,5,6 197:1,
2,11 198:22

**people's** 129:2

**perceived** 127:5

**perform** 25:11,21 29:7
136:22

**performed** 140:6 154:17
158:9

**period** 126:24 138:25
139:2,12 158:18 163:5,14,
23 164:12,25 170:7,10

**periods** 163:18

**permit** 91:15 92:12,14,19
93:1,13 102:12,17

**permits** 179:2

**person** 14:2,22 15:23
29:14,16,17 53:10 55:7
69:8 80:10,12,19 81:17

97:22 98:22 109:12 111:6
115:10,13 130:8,16 131:7
132:14 148:22 159:18
160:14 169:2,12 171:6
172:13 174:11 175:3
179:17 184:9,12 185:7,14
196:10

**person's** 111:18 131:5
187:2 191:14

**personal** 9:19 45:4 76:1,
3,6 195:8

**personally** 55:5 127:15

**persons** 185:15

**pertain** 142:13

**phone** 54:6,14,16 69:13
70:3 95:6 96:11 97:2,14,
15,19,21 100:8 114:6,10,
15 115:21 132:1 137:16,
19,22 160:1 162:4,10
170:24

**physically** 38:9

**physician** 58:3,5 59:24
66:13 104:5 157:22

**physician's** 60:5

**pick** 119:24

**piece** 20:25 24:4 60:21,24
69:14 157:2,3 182:8,10

**place** 20:13 21:25 65:10
94:18 121:2 127:12 159:15

**places** 17:16

**Plaintiff** 42:9 55:2,24 56:6
80:25

**Plaintiff's** 11:6 27:8 38:15
89:11 94:1 101:1 116:9
123:6 134:18 141:16
155:10 158:23 161:19
165:5 170:16 173:1 188:9

**Plaintiffs** 3:9 4:8 9:24
14:13 27:23 33:20 46:16
58:21 59:1 75:14 176:17

**Plaintiffs'** 5:8,12 76:9
90:12 141:11 177:11,22
186:18 187:21 193:20

**plan** 176:14,16

**play** 106:7 183:20,21
192:19

**played** 108:19

**point** 41:3 46:13 49:6
57:11 134:14

**policies** 15:25 16:3
156:15 179:8

**policy** 56:14 113:4 133:21
164:7,13 175:10,15 179:1,
5,9,10 180:20 181:7,8,11
183:12,15 193:4

**popped** 137:15

**population** 182:20

**position** 28:6 43:2 91:14,
20,23 92:11,18,25 93:12
96:1 100:12 102:8 103:1
113:22 172:1

**positions** 12:19

**possibility** 178:9

**possibly** 61:8 178:8,22

**potential** 192:22 193:23

**pounds** 41:13

**power** 86:7

**practical** 115:5

**practice** 21:12 119:18
139:9 162:23,24

**practices** 16:1,3 111:13
122:1,25 123:2 124:4
125:25 156:15 183:15

**practitioners** 120:6

**predominantly** 14:12

**prefer** 196:9,10

**preference** 34:11,14
196:8

**preparation** 7:21 26:20
27:19 116:23 135:11 138:7
142:6

**prepare** 12:7 16:11,14
27:4 55:20 90:4 168:19

**prepared** 178:11

**preparing** 106:21 116:21
152:23

**preschool** 45:13

**presence** 3:12

**present** 104:23 127:18
128:19 145:5,6

**presented** 14:4 130:4

**presume** 58:13

**presumed** 106:4

**pretty** 33:16 46:19 47:25
65:9 101:18 147:6 186:21

**prevalence** 193:4 197:23

**previous** 36:5 125:18
145:8

**previously** 27:18 42:11
63:14 65:12 90:3 96:17
102:1 123:23 130:6 148:8
158:1 173:15

**principles** 25:20

**print** 17:2,4,6 22:25

**prior** 16:16 137:14 139:25

**prisoner** 7:9

**privilege** 167:15

**privileged** 111:24 112:12 113:8

**Probate** 32:15 47:20 48:18 109:6,25 133:3 171:13,22 185:16

**problem** 67:5 98:3 131:19 161:9

**problems** 54:7 119:1

**procedure** 3:9 20:4 49:12 64:24 99:15 160:1,4 171:24 185:13

**procedures** 129:5 183:16 185:19

**proceed** 6:10 164:4

**process** 22:15 29:3 30:21 31:11 32:24 34:5,19 35:4 37:11 38:2 42:16,21 46:22 51:17 53:22 54:4,22 59:25 65:10 70:9,22 71:19 74:11 77:8 78:19 82:9 92:16 99:13,14 110:15 111:1,21 112:17 136:22 139:3 142:12 143:18 150:6 153:13 154:20,23 156:19, 25 163:2 166:14,15 169:24 171:17 175:17 180:13 183:20 189:22 198:19

**processed** 33:10 34:7,8 35:5 37:1 51:19 62:9 63:7 71:23 73:15,19 142:14,23 143:1,10,16 146:2,19 147:3,4,6,10,12,14 148:11 149:8,9,11,21 150:8 163:11 164:20,23 175:19 177:3 179:12

**processes** 88:7

**processing** 29:13,14,16, 19 51:9 56:24 71:4 72:3 94:16 113:1 144:7 146:15 165:18,22

**produce** 17:3 18:20 19:1 23:14,15 25:3,22 31:4 37:24 39:6 45:8 67:16 72:4 74:19 77:17 84:1,19,21,22 85:14,16 87:18 124:12 177:20

**produced** 8:11 9:2 15:9 25:4,17 39:8 50:24 59:13 84:11 86:9 94:6 114:3 124:8 173:10,25 174:1,3, 10 175:3 176:10,18 177:14,16,17,19 194:8 195:3,12

**producing** 137:10,12

**product** 17:9 18:18 53:15 71:21

**production** 14:25 19:5 26:7,10 90:13 141:12

**productions** 26:15

**professional** 57:22 58:13

104:10 182:2 197:15

**professionals** 104:8

**promulgated** 180:7

**pronounce** 123:15 135:18

**proof** 3:12 185:15

**proper** 46:21 64:24 69:17 97:22

**properly** 92:16 107:13

**protective** 8:15 9:6

**prove** 74:20 104:20

**proved** 68:7

**provide** 20:9 26:5 37:8 48:3 143:9 176:25 181:4 182:10 190:23

**provided** 20:24 36:23 57:21,23 58:1 88:4 112:9 113:3 193:7

**provider** 104:13

**provisions** 152:9

**public** 4:18 50:20 51:10, 19 83:13 123:19,20 133:12 135:1 153:3 154:25 155:2 181:17 185:25 186:7

**pull** 88:11

**pulled** 20:16

**purchase** 64:19 71:16 88:17,25

**purpose** 77:2 114:19 135:25 143:3

**purposely** 163:21

**purposes** 11:7 27:9 38:16 77:13 89:12 94:2 101:2 115:3 116:10 123:7 134:19 141:17 155:11 158:24 161:20 165:6 170:17 173:2 183:5 192:21

**pursuant** 87:15 161:2 178:15

**pursue** 48:5 108:4 112:19

**push** 30:8

**pushed** 31:9 160:13

**pushes** 30:13

**put** 21:8 22:15 41:6 42:6 45:13 51:8 71:15 79:13 82:10 84:8 96:10 97:11 101:16 146:16 152:23 183:1 190:6 191:19

**puts** 70:4 96:12 100:18

**putting** 45:16

## Q

**qualification** 3:13

**query** 97:15

**question** 6:19,25 7:7,12, 18,22 17:19,22 40:6 42:2 76:12,13 92:7 93:6,9 103:13 121:22,24 122:12, 13 156:13 157:3,11 188:24 189:7 191:24,25 192:1 197:16,18,20

**questioning** 162:15 188:2 190:20

**questions** 6:14 26:13 30:4 85:2 89:25 92:2 98:6 108:3 134:16 178:17 186:18 187:21,22 193:25 197:13

**quick** 122:11

**quickly** 186:12,17

**quote** 96:14 162:17

## R

**R-E-B-E-K-A-H** 159:7

**R-E-N-A** 90:24

**Rachel** 5:14 126:17 135:5, 14,16,19 136:1 137:2

**range** 15:11 165:21,23 177:18

**ranges** 176:24

**Ray** 5:7 9:24 27:24 28:9,22 30:16,18 31:17 33:18 34:23 42:8 43:4,21 44:6 46:15 47:1 52:21 56:12 75:15 77:1 194:22 195:10

**Ray's** 44:12,13 48:7 51:4

**re-evaluated** 139:6

**re-review** 110:17

**re-visit** 26:17 42:6 74:22

**reach** 53:23 109:15 166:18 168:4 179:6

**reached** 33:11 76:8 107:20

**reaches** 168:7

**read** 39:21,25 56:21 69:5 95:17,19 98:13 99:11 102:6 112:24 121:15 135:13 138:11 145:10 148:7 151:1 156:3 158:6 160:6,14 161:14 165:25 169:13,16 193:6

**reading** 157:18

**Real** 186:17

**reason** 6:17 8:4 14:14 33:21 34:1 51:4 66:11 75:22 92:23 93:23 96:24 120:16 151:6 152:12,15,16 153:12 163:21 172:2 177:3,4 181:14 186:7

**reasoning** 105:11

**reasons** 77:13 78:8 152:8 189:13,20

**reassignment** 95:23 98:14 114:10 196:25

**Rebekah** 4:21 159:7 160:17,19

**recall** 54:2,9,12 126:20 129:4 137:18 139:15 186:18 187:21,25 188:4,10

**receive** 29:2 30:23 35:9, 15 49:13 74:18 81:4 83:2 96:10 98:24 112:16 138:16 139:1 142:19,20 165:16 176:23 197:13

**received** 28:24 68:1,24 69:2,7 73:19 109:2,10,16, 23 111:10 127:21 136:1 138:10 139:4,17 142:25 143:15 145:22 156:24 157:5 158:18 159:25 162:4,22 163:9 164:17,19 166:13,21 179:3 196:18 197:19

**receiving** 58:17 62:10 107:23 108:1 157:3

**recess** 10:11 46:10 89:9 122:20 134:12 176:6

**recognize** 27:14,15 38:20,22 89:16 94:7 101:6 116:15 117:1,2 123:10 142:4 155:14,17 165:9,12 170:21 173:8

**recognized** 107:23

**recollection** 68:5 137:23 139:25

**recommendations** 124:3 128:16

**Recommended** 125:10

**record** 7:3,16 8:12 9:1 10:12,14 20:11 24:5 25:15 26:2,3 28:8,15 35:6 37:5, 21 39:15,17,23 40:2,14 43:8 45:8,11,12,14,15,17, 22 46:18 47:11 48:1 49:21 50:19 51:19,20 52:3,19 53:18 56:15 57:2,7,20 58:8,23 60:8,16 62:5,17,20 63:4,11 64:8,10,18,22 65:18 66:2,9,15,17 68:14 69:9,16 71:9,11 72:1,13, 18,23 73:12,22 74:23 75:11,12,16 76:15 77:12, 21 79:1,25 80:17 81:6,16 82:10 83:3,6,14,20 84:5

85:14 86:15 87:3,6,19
88:3,9,10,11,13,17,18,21,
25 92:15 94:19 95:22 96:6,
14,20,24 97:6,10,24 102:6,
24 103:5,16,25 104:11,16
105:8 106:15 107:4 109:2
113:20 114:23 115:9,10,11
117:11 120:1 121:5,7,12,
14 122:19 129:21 130:10,
12,14 133:11,12 134:2
139:18 140:2,5 141:7
142:19 150:7 152:8 156:22
157:16,17 158:12 160:2,24
161:16 163:13 169:22
171:15,23 172:10 173:12,
24 174:15,17,25 175:2
176:7,22 184:9,13,23
185:5,8,9,10,11 186:6
187:23 188:1,6,15 189:1,
10 190:3,16 191:20 192:15
194:7,9 197:17,25

**recorded** 45:24 51:21
59:10 64:9 91:23 92:17
93:19,24 104:15,16
107:12,13 131:6,11,14
134:2

**recording** 65:15 94:20
105:7 131:22 175:18

**recordkeeping** 136:21
156:15

**records** 4:18 8:16 13:9,10
23:14 24:2,11,13,16,18,24
25:3,5,7 28:5 31:4,10
53:13 55:15 56:8 65:13
66:18 70:13 71:4 74:4 75:7
77:11 79:19 85:3 86:24
88:24 105:24 115:8 116:4
119:24 121:1 122:25 123:3
134:15 135:1,6 136:8,16,
23 137:8,11 138:13 156:19
175:3,21 176:10 177:13,16
192:9,10,12,13,16,18,20,
23 193:4,8,22 194:7 195:3,
12

**recreate** 64:8 86:7

**recruiting** 119:4

**redacted** 151:22 175:8

**redaction** 176:1,13
177:10

**redactions** 151:19 176:9

**refer** 41:22 42:4 91:10,22
97:21 114:3,9 146:21

**reference** 14:8 15:7

**referenced** 32:2

**referred** 38:25 60:20
95:10 187:22

**referring** 16:6 33:17 60:2
74:23 86:14 113:19 123:22
135:14 136:16

**refers** 113:18

**reflect** 68:18 84:15 97:10
99:20,24 100:4,19 102:8
108:14 119:8 122:23
142:21 143:17 154:5 170:4

**reflected** 44:2 85:17
86:15 106:14 110:10
120:13 121:8 177:13
179:11

**reflecting** 15:16 84:5

**reflection** 41:10 92:22
177:21

**reflective** 100:11 127:23

**reflects** 91:20 96:4 122:5,
7 130:7 154:7 187:23

**regard** 30:16 150:21

**region** 118:8

**registrar** 5:18 155:20
156:9,24 159:7,25 161:7,8

**Registrar's** 39:16,18

**registration** 124:2,13
182:14

**regularity** 33:23

**relate** 190:13

**related** 16:18,22 17:5 25:3
28:5,8,15 31:4,8 53:14
54:13 55:15,21 56:8 57:20
79:18 176:25

**relates** 177:10

**relevant** 25:22 86:11
194:10

**rely** 104:8

**remain** 50:20 64:18 66:18
74:12 185:9

**remaining** 74:5

**remains** 65:1 83:13 85:14
154:24

**remedy** 128:24

**remember** 12:12,15 13:7
18:7,11 31:2 47:3,14 54:24
69:19 90:13 91:6 108:18,
21 116:22 118:11 128:2
137:20 144:9 149:25
152:16 167:6,11 188:2
194:23,25 195:2

**remove** 82:17

**removed** 121:4

**Rena** 4:22,23,24 19:13
29:13,14 30:9,10,12,23
33:5 54:16,22 90:21,24
99:4 109:9 144:25 150:4,
16 155:21,23 158:8
160:14,17 162:6,9 165:24
166:2 169:14 170:3,11,25
171:9,11

**Rena's** 161:13

**reopen** 176:1 177:24
178:8

**reopening** 178:10,14

**rep** 162:10

**repeat** 136:20

**rephrase** 93:8

**reply** 181:6

**report** 4:17 80:3 123:14

**reporter** 6:13 8:21 90:23
141:14

**reports** 124:12

**represent** 60:8 152:5

**representative** 128:22

**representatives** 127:11

**reproduce** 190:4

**reproduced** 84:23 174:18

**request** 4:18 13:9,11 20:4
28:23 29:1,6 30:5,17 31:7,
9,14,17,22 32:3,5,8,18
33:8,9,15,22 34:6,8 36:1,
12,13,15,21 37:5,9 42:12
49:4 68:17,22 69:3,8,13,24
70:12,17,24 71:4,15,19
72:10,13,16,18,22 74:14
77:7,20 83:8 93:3,15
101:9,17 102:17 103:14,25
105:1 106:23 108:4 111:10
114:11,23 121:20 126:3
130:25 135:1,6 136:4,8,9
137:1,7,9,17,19,21 138:13
139:21 142:15 145:15
146:19,24 147:4 148:10,23
154:8 158:19 161:15
162:5,22 163:9 164:22
165:15,18 166:21 171:3,6,
17 177:1 186:23 192:14,
24,25

**requested** 18:25 19:4,25
35:4 42:23 60:24 73:7
145:18 146:16,21 153:5
154:15 172:15 174:5
182:11

**requesting** 17:4 37:17
49:8 58:22 72:12 77:21
87:14 93:4,16,22 96:19,23
100:3,18 102:23 109:1
110:21 114:18 115:2 116:3
120:17 136:12,14 148:24
149:3 172:24 176:20

**requestor** 13:1 146:7
186:24

**requests** 14:24 15:5
31:20 32:21 35:7,15 36:11
43:6 51:14 68:24 71:9 77:6
78:9 87:7 90:13 97:7 98:15
103:8 108:12 109:23 112:6
115:16,23 126:6 137:7
138:16 139:19 141:12
162:19 163:6,15,16,25
166:12 169:19 170:13

176:18,19,24,25 177:12,17
178:23 180:24 193:8
194:6,8 195:4,9

**require** 74:15 75:5

**required** 6:22 75:1 78:13

**requires** 7:23

**requiring** 78:24 173:14

**requisite** 72:17

**research** 179:6

**researching** 174:13,14

**resend** 183:4

**reserve** 177:24 178:9

**reserves** 178:13

**reserving** 176:13

**reside** 21:21 47:20 48:19

**resides** 21:19 24:1,4

**resolve** 176:15

**resource** 156:14

**Resources** 10:18

**respect** 14:3,23 15:24

**respective** 3:7

**respond** 95:12 130:25
131:2 172:9,11

**responded** 136:8 158:8

**responding** 96:25

**responds** 160:17

**response** 4:18 91:3,7,8,
13 119:3 135:2,8,9 136:20,
25 137:2 152:23 156:5
158:7 160:15 171:1,11
181:4

**responses** 14:23 15:1
90:11,12 141:11,24 150:24
151:25 178:3

**responsible** 86:23

**responsive** 137:10

**rest** 33:14 125:12 178:16

**restate** 92:7 93:10

**resubmitted** 182:4

**result** 50:6 110:8,10
133:21

**resume** 46:11

**retain** 70:25 71:4 85:9

**retrieve** 85:10

**return** 26:20 146:14

**revealing** 112:11 129:18

**review** 12:1,7 13:12 18:19
20:15 24:9 26:22 28:24
29:3,5 30:6,12,19,21,24
32:24 36:25 47:22 53:22

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

54:4 55:20 70:4 71:25 73:6
74:4 91:4 108:6,9 110:1,8
111:13 112:17 122:18,23
124:2 125:21,24 130:25
131:18 133:2 134:22 136:3
137:13 138:9,11 141:24
142:6 161:5,10 162:23
163:19,22 164:2,3,4,6
166:14 167:5 169:10
179:10 180:16,23 194:16,
17,20,21 198:25

**reviewed** 11:22,24 28:5,8,
15 32:25 33:8 34:4 45:15
53:13,18 56:8 57:11 59:3
68:2,12 70:9 90:1,8 95:8
107:23 108:12 109:10
116:23 124:9 126:10 129:9
133:21,24 135:11,24 138:4
141:23 160:23 164:21
180:6 194:15

**reviewer** 180:17

**reviewers** 30:3 113:10

**reviewing** 16:9,16 44:13
46:14 68:5 107:8 117:1
120:22 162:18 163:3
168:6,10 180:2,18

**Revised** 99:15,21 151:7

**right-hand** 39:4

**rights** 176:13 178:14

**ring** 12:23

**road** 119:20

**role** 22:23 108:19 183:20,
21 192:19

**room** 24:12

**roster** 182:15 184:4

**roundtable** 126:20
127:17

**roundtables** 128:19

**route** 114:16 130:23,25

**routed** 114:12

**routinely** 168:5

**row** 145:10 147:20,21
148:1

**rules** 3:9 6:10 158:4

**run** 94:16 119:6

**runs** 122:1 144:1

---

**S**

**S-O-R-R-E-L-L** 90:25

**satisfy** 138:13

**scan** 21:12,17,18 119:24

**scanned** 21:14

**school** 78:2,21

**scope** 14:10 137:8

**scrap** 178:16

**seal** 34:3 51:11 65:17,20
82:4,7 88:8 174:15 190:3,8

**sealed** 33:2 34:2 50:16
51:25 52:13 64:22 82:15,
17 83:3,16 85:8,10 88:18
133:10 152:22 153:7,9,14
154:14,17,23 155:6

**sealing** 64:8 65:13

**search** 19:1,5 20:9,13
23:14,15 24:24,25 25:2,10,
11,16,18,21,22 26:6 73:18
88:23 142:17 143:13
152:10 153:12 173:23

**searchable** 17:3 24:18,23

**searched** 25:4 26:18
163:10

**searches** 25:24

**seconds** 184:5

**section** 10:18,19 99:15,21
146:5,13,14 148:7 149:14,
21

**secure** 184:6

**security** 124:12 173:16
182:10 184:1,10 194:19

**seek** 128:24

**seeking** 170:11

**seeks** 189:9

**send** 37:9 48:5,6 54:6
70:19,23 72:2,6,8,17 99:1
101:7,12 102:7 109:17
115:8 160:21,22 166:2
168:5 171:11 181:20 183:3

**sending** 72:11 101:22
115:12 186:22

**sends** 49:19

**sense** 86:12 114:17

**sensitive** 109:4

**sentence** 95:19 121:15
151:1 160:6

**separate** 22:17

**September** 144:7

**sequence** 23:24 24:1

**sequencing** 82:20

**sequential** 23:24 79:17
82:5

**sequentially** 79:15

**series** 7:20 88:3

**serve** 127:19 181:7,9

**served** 128:21

**service** 145:14,15 162:10
168:9

**Services** 10:19

**Session** 3:1

**set** 24:13,14 26:10 134:7
141:11 151:7 152:8

**sets** 134:15 198:4

**sex** 37:21 38:7 39:25 40:1,
2,8 41:23 43:14,23 45:11,
13,21 52:10 56:15 57:2,19,
21 58:7,23,24 59:5,18 60:2
65:14,23 66:3,8,16,23 67:3
68:1,9,17 69:3,9 73:25
74:5,11 82:25 83:7 87:2,15
91:15,20,21,23 92:12,15
93:1,13,18 94:11,18 98:6
102:12,24 103:6,15 105:7
107:9,11 109:12,19
113:21,23 121:3,12,13
122:24 125:13,17 130:17
131:5 132:4,10 138:16
139:4 150:8 151:6 152:7
157:23 158:2,3,9,20 160:2,
11 176:21 181:24 183:2
187:3,7 190:16,18,23
191:21 196:21,22 197:24

**sexual** 191:8 195:16
196:4,7,16

**SFN** 145:12 148:2

**shaking** 179:19

**share** 80:22 94:12

**shared** 15:16 52:11 135:5

**she'll** 15:8

**short** 74:9 89:6 177:4

**shorthand** 16:8

**shortly** 99:18

**show** 6:16 10:25 40:25
41:8,18 104:16 149:6

**showed** 27:20

**showing** 8:18 48:14 141:9

**shown** 15:9

**shows** 61:1 145:1 198:3

**side** 49:22

**sign** 3:14 148:19

**signature** 39:3,11,13,16,
18 61:2 190:6

**signed** 3:17 39:10

**silly** 87:13

**similar** 53:15 65:12 68:17
90:15 95:11 125:22
164:19,22 182:18 190:15

**similarly** 15:3 21:23

**simple** 113:19

**simply** 21:15

**single** 144:10 151:22
184:20

**Sinkfield** 30:1

**Sir** 10:13

**situation** 119:11 143:5
161:8 171:14 197:2

**six-digit** 79:17

**size** 193:9,10

**skip** 156:6

**Snapple** 134:11

**snapshot** 57:13 59:11,14
60:1,4,8 61:12 121:18
187:22

**snapshots** 61:6

**social** 118:25 124:2
173:16 182:10 184:1,10
194:19

**solve** 119:1

**someone's** 75:1 96:18
154:15 166:17 184:15
186:22

**son** 52:13 65:25 86:19
87:2 105:20

**son's** 88:24

**Sorrell** 10:2 90:21,25
169:2

**sort** 24:14 48:10 72:12
87:14 170:13

**sorted** 144:3

**sorts** 77:6

**sound** 24:11

**sounds** 12:22 89:1 176:5

**source** 22:5

**sources** 22:25

**space** 160:25

**speak** 14:2,22 15:24 98:25
122:15 129:24 195:24

**speaking** 35:7 36:2 96:11
103:21 197:19

**specific** 15:6,10 20:8 81:7
101:17 107:3 111:1 116:1
120:1 121:9 129:14 146:10
164:12 167:11,18 181:9
188:14,19 189:10 190:2,
10,17

**specifically** 35:22 54:9,
11,24 65:6 70:8 100:7
102:23 115:18 149:25
154:20 164:7

**specifics** 75:4

**specifies** 99:15

**Speculation** 78:17,22
114:21

**spell** 84:4 90:22

---

Stacie Ray, et al. vs Amy Acton, et al.                                                                    Judith Nagy

spelled 10:16,17 84:4

spelling 84:10,13

spellings 50:9

spent 176:8

spoken 28:18,20,21,23 55:9,13

spouse 196:9

Stacie 9:24 27:24 28:9,22 30:16,18 31:17 33:18 34:23 42:8 43:3,21 44:6, 12,13 46:15 47:1 48:7 51:4 52:21 56:12 75:15 77:1 194:22

staff 28:23 50:4 95:8,24 97:15,21 100:8,13 112:9 113:3 114:11,15 124:22 159:8 162:2 170:24 180:11

stakeholders 95:6

stance 95:21 96:5,13 98:18 99:10 110:9 111:14 133:22 165:2 179:16 181:12

stand 133:12 158:4

standard 36:21 122:17 140:4 146:9,11 181:4

standardized 70:4,20 72:5

standing 91:25 92:3 192:6

standpoint 56:24 181:16 182:5

Stark 155:21 156:9,24 158:12

start 6:19 17:24 79:11 120:18 183:24

started 22:21 32:25 85:1 95:4 166:16

Starting 151:3

state 5:18 10:14 23:12 36:17 39:16,18 56:17 61:4 64:13 77:11 79:12,13 80:8 81:2,3,14,18,24 82:14,19, 21 83:2,7,17 84:7 85:7,17 87:4,5 88:10 109:2 117:21 120:10 121:5,9 122:16 145:12 146:1 147:16 148:14,15 150:12 151:5 156:20 164:5 174:16,18,25 183:1 190:7 192:9,12,13, 16,19 193:9,11,18 198:10

stated 100:7

statement 48:10 161:13

statements 12:14

states 79:6 117:7,10,13 118:1 119:21 120:20 121:11,13,19 122:1,2,5,7, 15 127:8,23 129:5 150:11

160:20 172:7 179:9 193:5

states' 122:25 123:2

stating 126:16

stations 70:11

statistical 59:9,16 85:13 182:5,8 183:5,9

Statistically 61:15

statistics 5:19 46:17 99:13 117:7,21 118:7 119:1,6 120:4 124:3 181:8, 16,22,23 182:18 198:11

status 157:23

statute 42:24 57:11 64:7 92:19 93:1,13 94:18 107:2 109:11 129:1 154:19 189:3,10,11,15 190:15

statutes 107:3 185:18 188:14,19 190:1,2,10 191:3,4,5 198:6,10

stay 64:12

stayed 156:21

stays 64:12

stenotype 3:10

step 76:17

step-parent 64:5

stipulate 8:10,13 9:8

stipulated 3:6

STIPULATIONS 3:5

stop 8:1 26:1

stopped 30:21

stopping 8:2 46:8

storage 21:9,10 23:3

store 21:13 79:19

stories 128:20

strokes 88:3,22

strongly 68:11 76:14,22

stuff 165:22

style 121:6

subject 97:20 115:6,11 151:3,5 185:22

subject's 79:4

subjective 41:4

submit 22:24 46:22 62:4 105:1 112:25 163:18 183:25

submitted 54:15 63:3,12 68:10 104:20

subsect 116:1

subset 144:21 147:18

substantiate 134:1

subtitle 95:16

successfully 68:6

succinct 89:3

summarize 136:19 159:23

summary 4:14 95:3,10 112:7 121:22 130:1 166:2 170:3

supplement 19:4 26:14

suppose 78:7

surgery 95:23 98:14 196:16 197:1

surprised 186:13

surrounding 59:9,23

survive 66:12 74:14

swear 116:25

sweet 154:4

switch 157:2

sworn 5:4 6:2

system 20:9,11 22:12,13, 17 23:3,8,25 37:9 39:11 45:6 71:12,17 74:5 85:3 86:4 88:5,16,20 94:17 95:7 119:3,7 142:22 143:9,14 145:17 146:18 147:15 156:18 159:15,17 173:23 191:9

Systems 123:20,21

_____

T

_____

table 12:21 103:13 128:17 176:12,14

taking 3:16,18 46:20 93:21

talk 6:18 26:21 36:10 53:7 54:20 62:15 115:22 117:10 120:5 127:5 128:22 137:16 150:16,19 176:3

talked 7:23 42:10 81:20 105:19 113:4 127:6,7 137:22 188:12 190:12 198:23

talking 16:10 23:20 42:5 43:13 76:4 81:1 86:13,20 96:9 114:6 138:14 153:24 155:23 187:23

talks 121:2 125:13

team 133:21

tells 38:23 49:20 100:3

Ten 151:11

term 195:17

terms 25:10,18 26:6 195:15,21

testified 27:18 49:7 57:16 58:18 63:14 65:12 75:15 76:6 83:19 90:3 95:25 96:17 130:6 141:22 167:24 179:13 194:23

testify 8:5 14:11,15 78:25

testifying 41:4 42:11 195:11

testimony 13:19,22 16:14 17:17 66:22 69:20 77:16 91:14 102:11,16 168:12 178:5 191:22

text 100:2 101:11,15 102:5,7

Theoretically 63:5

thing 34:4 46:6 49:25 87:22 92:1 106:16 119:12 189:17

things 12:20 17:10,13 32:22 48:13 50:1 59:15,16 60:16 64:3 73:1 78:1 84:24 113:19 117:17 118:3,5 119:17,23 120:3 131:18 146:8 147:16 153:18 165:14,16 182:5 184:22

thinking 67:9

thirties 131:24

thought 41:6 128:17,20 129:7

thousand 144:18

thousands 80:23

three-page 15:22

three-year 126:23

tied 72:20

time 3:10 7:10 10:24 15:10 18:7,25 34:13 37:22 44:20 45:17,24 46:8 47:9 48:24 50:24 57:10,14 59:10,19, 22 60:4 61:6,13 64:9 65:3, 16 73:7 83:2 92:17,23 93:19,23 94:20 102:21 103:6 105:7 107:13 112:14 116:16 124:16 126:23 131:11 134:2 137:20 138:25 139:11,12 140:14 145:3 153:6 155:18 158:15,18 159:11 160:25 161:14 162:3,21 163:5,14, 18,23 164:12 166:4 169:15 170:5,10,22 171:16 182:23 185:2,8 188:18 191:17,25 192:3,7 195:21 197:25

timeframe 102:3 108:23 140:11

timeline 170:4

timely 163:11

Stacie Ray, et al. vs Amy Acton, et al.                                                    Judith Nagy

**times** 18:13 19:3 50:6 70:10,17 75:11 86:5 91:18 97:16 103:24 132:3,21 137:15 194:18

**title** 19:16 50:13 156:3,5

**titles** 94:13

**today** 6:22 8:5,18 10:20 13:19 15:9 91:14 102:11 116:21 137:14 138:7,8 173:23 176:4 191:5 195:15

**told** 35:3 46:25 75:16 76:16 77:6 136:5 158:1,11 160:9 161:8 170:4 194:24

**tone** 6:15

**top** 49:20 79:11 81:2 88:9 145:10 149:7,18,20 171:10

**topic** 13:7,25 14:1,10,21 15:23 89:6 116:3 119:10 127:2 168:3

**topics** 118:6 119:10 120:12,14 124:13 177:1 178:12

**totally** 50:11 52:22

**touch** 88:12

**trail** 21:15

**trained** 50:4

**training** 47:16,18 76:22 119:4 180:10,13,14

**transcribed** 3:11

**transcript** 3:15 6:16 11:1 56:1

**Transequality** 126:18

**transgender** 56:16 93:4, 16 96:6,15,23 97:8 98:1 102:25 103:14 108:13 111:7,16,19 115:16,19,20 116:3 125:25 126:6,13 127:19 128:8 130:8,17 131:7 132:15 182:19 195:6,16 196:13,19 197:1 198:22

**transgendered** 130:11 191:6

**transition** 99:20,25 100:5, 19 102:18 103:1,16 108:14 110:23,25 179:3

**transitioned** 95:23 98:14

**transmit** 184:10

**transmitted** 22:8

**travel** 51:13

**treat** 116:3 178:23 180:24 191:6

**treatment** 179:4

**trial** 13:23

**triggered** 108:24 109:25 110:21 111:13 133:2

**triple** 193:8

**trouble** 98:8

**true** 22:19 31:19 61:16 83:9 91:8 102:14 104:5,9 106:16 160:12 189:18

**truthfully** 6:23 8:5

**turn** 55:2 127:11 141:5

**turned** 127:9

**turning** 141:8

**twin** 65:24

**twins** 45:5

**two-sided** 118:18

**type** 36:20 50:9 72:18 76:21 88:21 111:21 129:12 189:4 191:5

**typed** 71:25 82:18

**types** 36:20 51:24 88:6 122:3

**typically** 155:4

**typists** 30:2

**typographical** 105:22

---

**U**

**Uh-huh** 47:2 48:9 61:11 116:19 147:23 174:21

**ultimately** 178:24

**unconstitutionally** 56:16

**uncover** 24:6

**undergone** 158:3 196:25

**underlined** 95:16

**underlying** 16:3 105:10 152:12

**underneath** 137:8

**understand** 6:21 7:1 10:6 16:7 31:6 48:12 58:10,21 59:1 71:20 82:23 93:9 109:8 114:11 153:23 170:12 178:4,17 189:14 195:18 197:11

**understanding** 14:18 15:14,16 52:11 56:19,22, 25 57:3 58:19 60:5 93:17 98:10 114:5 128:10 189:15 190:22 193:3 196:4,12 198:2

**understands** 58:6 176:17 177:9

**understood** 7:7 157:15 166:21

**undetermined** 66:8,10, 19,24 68:4 74:1 183:2

**uniform** 23:2

**unique** 80:4,6,7,10,15,17, 18,21,22 81:12,14 127:7

**unit** 19:19 29:13,14,16,19

**United** 79:5 193:5

**unredacted** 176:16 177:16

**unseal** 24:8

**unusual** 33:21 35:10,11 51:18 54:2 157:10

**update** 18:10 50:19 66:14, 17 68:1,13 75:17 76:17 82:13 88:7,8 94:13 106:5 107:9,14 183:8

**updated** 35:6 66:20 67:23 76:20 183:4

**updates** 168:5

**updating** 65:18 99:16 119:3 123:3

**upwards** 168:16

**user** 22:13,17,21

**utilize** 25:13

**utilizing** 76:24

---

**V**

**vague** 58:11 97:13 100:6 101:13 104:6 105:3 106:12 107:17

**variations** 193:10

**variety** 105:25 114:6 118:6 119:23 124:11 126:20 127:4 146:8 169:11

**vault** 24:7,10 51:12,25 52:13 63:16 64:22 65:13 82:17 83:4,14 87:4 153:3 154:14 155:6

**vendor** 119:24

**veracity** 193:15

**verbal** 69:25 113:3

**verbiage** 36:20 114:7

**verification** 183:25 184:4, 7

**verifications** 193:11

**verified** 68:9 110:14

**verify** 73:18 74:25 75:7 77:14 78:12 87:23 88:11 106:18 142:25 175:1 184:8 193:18

**verifying** 75:5 78:19 151:16 177:12 183:16

**version** 85:10 143:24

**versions** 177:16

**versus** 5:7 121:19

**viable** 88:17

**view** 121:18

**viewpoint** 196:7

**visit** 69:16

**vital** 5:19 46:17 99:13 117:6,21 118:7,25 119:6 120:4 124:3 181:8,17 182:18 185:25 197:17 198:11

**voter** 182:14

---

**W**

**waived** 3:14

**walks** 88:5

**wanted** 8:7,18 34:24,25 47:9 76:24 90:6 94:12 108:8 127:13 129:7 157:14,20 160:3 162:12 164:18,23 165:21 166:18, 23

**wanting** 73:2 97:9 142:14

**ways** 35:23,25 120:1

**website** 124:11

**week** 35:9

**weeks** 66:8

**weigh** 41:12

**weight** 59:18 182:6

**weird** 33:25 34:4

**wiser** 50:24 52:16

**wished** 56:25

**witnesses** 9:7

**woman** 41:10,14,15,16 196:24,25

**word** 24:10 40:9 59:11 60:1 67:6,8,9 73:12,17 144:4 175:14 196:19

**wording** 112:23

**words** 25:10 62:24 111:6 114:9,13 146:20 149:8 196:23

**work** 17:9 18:18 20:5 22:11 29:7,19 66:13 90:18 134:9 142:5,11 168:2 178:7

**worked** 137:2 167:8

**working** 167:9

**works** 183:22

**world** 120:5

Case: 2:18-cv-00272-MHW-CMV Doc #: 55 Filed: 01/10/20 Page: 220 of 220 PAGEID #: 559

Stacie Ray, et al. vs Amy Acton, et al.                                    Judith Nagy

**worry**  8:1

**writing**  70:12 98:2 180:7

**written**  69:25 98:22,23
113:2 180:21

**wrong**  45:24 60:11 61:25
65:19 93:23 104:15 111:7
131:6 147:16

**wrote**  157:13

─────────────────

Y

─────────────────

**year**  18:8 19:1 25:1 35:19
36:3,5,9 47:7 79:14,16
80:6,7 82:6 97:18 108:23
118:11 144:18 174:2
181:20

**years**  19:22 47:5 67:25
68:21 70:16 71:1,6,7 72:14
73:3,6,23 85:1 101:23
109:22 111:14 115:15
126:25 135:6 138:15
140:23 143:22 145:7 160:9
165:1 169:23 170:8 175:11
197:19

**yesterday**  12:6 90:2
116:16,18 117:2

**younger**  185:4