1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF OHIO

3                        *   *   *

4   STACIE RAY, et al.,

5          Plaintiffs,

6       VS                              Case No.
                                     2:18-CV-00272
7   AMY ACTON, et al.,

8          Defendants.

9                        *   *   *

10          Deposition of QUENTIN L. VAN METER,

11  M.D., Witness herein, called by the Plaintiffs

12  for examination pursuant to the Rules of Civil

13  Procedure, taken before me, Donald Correll, a

14  Notary Public in and for the State of Ohio, at

15  the ACLU of Ohio offices, 1108 City Park

16  Avenue, Suite 203, Columbus, Ohio, Suite 203,

17  Columbus, Ohio, on Friday, the 27th day of

18  September 2019, at 9:00 a.m.

19

20

21

22

23

24

25

```
 1        EXAMINATION CONDUCTED              PAGE

 2    BY MS. INGELHART:     ...............     7

 3    BY MR. BLAKE:         ...............    297

 4

 5               EXHIBITS MARKED

 6    (Thereupon, Plaintiffs' Exhibit 1, Ensuring

 7    Comprehensive Care and Support for

 8    Transgender and Gender-Diverse Children and

 9    Adolescents, was marked for purposes of

10    identification.) ....................    67

11    (Thereupon, Plaintiffs' Exhibit 2,

12    Statement on gender-affirmative approach to

13    care from the pediatric endocrine society

14    special interest group on transgender

15    health, was marked for purposes of

16    identification.) ...................    144

17    (Thereupon, Plaintiffs' Exhibit 3, a

18    developmental, biopsychosocial model for

19    the Treatment of Children with Gender

20    Identity Disorder, was marked

21    for purposes of identification.)  ....   162

22    (Thereupon, Plaintiffs' Exhibit 4,

23    transgender health, was marked

24    for purposes of identification.)  ....   168

25
```

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 3 of 332 PAGEID #: 844
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

3

1  (Thereupon, Plaintiffs' Exhibit 5, Pro-Life

2  Pediatric Group Stands Contrary to

3  Established American Academy of Pediatrics,

4  was marked for purposes of

5  identification.) ................... 178

6  (Thereupon, Plaintiffs' Exhibit 6, About

7  Us, American College of Pediatrics, was

8  marked for purposes of

9  identification.) ................... 182

10  (Thereupon, Plaintiffs' Exhibit 7, Gender

11  Ideology Harms Children, was marked

12  for purposes of identification.) .... 189

13  (Thereupon, Plaintiffs' Exhibit 8, On the

14  Promotion of Homosexuality in the Schools,

15  was marked for purposes of

16  identification.) ................... 197

17  (Thereupon, Plaintiffs' Exhibit 9, American

18  College of Pediatricians, The Best for

19  Children, was marked for purposes of

20  identification.) ................... 201

21  (Thereupon, Plaintiffs' Exhibit 10, letter,

22  CV, and rebuttal expert report from Dr.

23  Van Meter, was marked for purposes of

24  identification.) ................... 209

25

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 4 of 332 PAGEID #: 845
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

4

```
1   (Thereupon, Plaintiffs' Exhibit 11,

2   Certification of Birth of Stacie Marie Ray,

3   was marked for purposes of

4   identification.) ...................  213

5   (Thereupon, Plaintiffs' Exhibit 12,

6   Transgender, a state of mind in search of

7   biology by Dr. Van Meter, PowerPoint

8   photos, was marked for purposes of

9   identification.) ...................  220

10  (Thereupon, Plaintiffs' Exhibit 13,

11  Long-Term Follow-Up of Transsexual Persons

12  Undergoing Sex Reassignment Surgery:

13  Cohort Study in Sweden, was marked for

14  purposes of identification.) ........  232

15  (Thereupon, Plaintiffs' Exhibit 14,

16  Consensus statement on management of

17  intersex disorders, was marked for purposes

18  of identification.) ................  248

19  (Thereupon, Plaintiffs' Exhibit 15, Global

20  Disorders of Sex Development Update since

21  2006:  Perceptions, Approach and Care, was

22  marked for purposes of

23  identification.) ...................  248

24

25
```

STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

5

```
 1   (Thereupon, Plaintiffs' Exhibit 16, Dear
 2   ISNA Friends and Supporters, was marked
 3   for purposes of identification.)  ....  250
 4   (Thereupon, Plaintiffs' Exhibit 17,
 5   Breitbart, Doctors' Political Group Places
 6   Gender Ideology Above Biology, was marked
 7   for purposes of identification.)  ....  263
 8   (Thereupon, Plaintiffs' Exhibit 18, Gender
 9   Identity Issues in Children and
10   Adolescents, was marked for purposes of
11   identification.)  ...................  265
12   (Thereupon, Plaintiffs' Exhibit 19,
13   Breitbart, Judge Finds Father Guilty of
14   Family Violence For Not Using Transgender
15   Teen's Preferred Pronouns, was marked for
16   purposes of identification.)  ........  281
17   (Thereupon, Plaintiffs' Exhibit 20,
18   Breitbart, $5.7 Million In TaxPayer Funds
19   For Study To Justify Sterilizing Children
20   Who Are Gender Confused, was marked for
21   purposes of identification.)  ........  283
22   (Thereupon, Plaintiffs' Exhibit 21,
23   Emergency Petition For Writ of Mandamus,
24   was marked for purposes of
25   identification.)  ...................  285
```

6

```
 1   APPEARANCES:

 2      On behalf of Plaintiffs:

 3          Lambda Legal Defense and Education
            Fund, Inc.
 4
        By:  Kara Ingelhart
 5           Attorney at Law
             105 West Adams Street
 6           26th Floor
             Chicago, Illinois 60603
 7           (312)663-4413
             kingelhart@lambdalegal.org
 8
             And
 9
             ACLU of Ohio
10
        By:  Elizabeth Bonham
11           Attorney at Law
             4506 Chester Avenue
12           Cleveland, Ohio 44103
             (614)469-3200
13           flevenson@acluohio.com

14      On behalf of Defendants:

15          Calfee, Halter & Griswold, LLP

16      By:  Jason J. Blake
             Attorney at Law
17           1200 Huntington Center
             41 South High Street
18           Columbus, Ohio 43215
             (614)621-7789
19           jblake@calfee.com

20

21

22

23

24

25
```

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 7 of 332 PAGEID #: 848
STACIE RAY vs AMY ACTON                          Quentin L. Van Meter, M.D.

7

1              QUENTIN L. VAN METER, M.D.

2    of lawful age, Witness herein, having been

3    first duly cautioned and sworn, as hereinafter

4    certified, was examined and said as follows:

5                    EXAMINATION

6    BY MS. INGELHART:

7         Q.   Good morning.

8         A.   Good morning.

9         Q.   My name is Kara Ingelhart.  I'm a

10   staff attorney at Lambda Legal, and I represent

11   the plaintiffs.

12        A.   Okay.

13             MS. INGELHART:  If we could go

14   around the table.

15             MS. BONHAM:  Elizabeth Bonham,

16   ACLU of Ohio, for the plaintiffs.

17             THE WITNESS:  Okay.

18             MR. BLAKE:  Jason Blake, counsel

19   for defendant -- well, ODH and others.

20             THE WITNESS:  Quentin Van Meter,

21   pediatric endocrinologist in private practice

22   in Atlanta, Georgia.

23   BY MS. INGELHART:

24        Q.   So you've given expert testimony

25   before, right?

8

1       A.   I have.

2       Q.   Okay.  But I'm still going to go

3   over some basic rules, just as a refresher.  We

4   need to speak audibly for Don here, so that he

5   can get a clear record.  Inevitably, one of us

6   will nod our head or shake our head to indicate

7   yes or no, but we'll need to then follow up

8   with the actual words.

9            I'm going to try very hard not to

10  talk over you to allow you all the time you

11  need to answer a question, and I'm also going

12  to try very hard to make sure that when I ask a

13  question it's clear that I'm done when I'm

14  done.  If you do answer a question, I'll assume

15  that you understood it.

16           Today's just a regular

17  conversation, though you're sworn to testify

18  honestly under oath.  Is there any reason that

19  you think you couldn't testify truthfully

20  today?

21      A.   No.

22      Q.   Okay.  And lastly, we can take

23  breaks at your leisure anytime you need to.

24      A.   Okay.  Let me silence my phone, if

25  you don't mind.

1        Q.   Sure.  And the breaks, just so

2    long as there's not a pending question.  So if

3    you need to take a break, let me know, then you

4    can answer the question, and we'll do that.  I

5    drink a lot of liquids, so we'll take some

6    breaks.  Efficient breaks.

7            Okay.  What areas of expertise are

8    you qualified, in your opinion, to give expert

9    testimony?

10       A.   General pediatric medicine and

11   pediatric endocrinology.

12       Q.   Okay.  How many depositions have

13   you given?

14       A.   This would be a guess.  About 15.

15       Q.   Okay.  And for all 15 was the

16   subject matter pediatrics or pediatric

17   endocrinology?

18       A.   Yes.

19       Q.   So have you ever given deposition

20   testimony where you were not serving as an

21   expert witness?

22       A.   Yes.

23       Q.   And what was that?

24       A.   That was a malpractice case.

25       Q.   Okay.  You've never been involved

10

1    in litigation as a party; is that correct?

2          A.   I was.

3          Q.   Okay.  Okay.  And that was for the

4    malpractice?

5          A.   Yes.  That was a malpractice case,

6    yes.

7          Q.   Okay.  So for those 14 other

8    depositions, were they related to challenges to

9    laws, like actual statutory law?

10         A.   No.

11         Q.   Okay.  Regulations or policies?

12         A.   A few of them were, but most of

13   them had to do with medical expert issues

14   related to endocrinology and the practice

15   thereof.

16         Q.   Okay.  So in those cases about

17   pediatric endocrinology, was one party a

18   government entity in all of those cases?

19         A.   No.

20         Q.   Okay.  In some of those cases was

21   the government a party?

22         A.   I do not believe so.

23         Q.   Okay.  So all of the parties in

24   all these cases were private, both plaintiffs

25   and defendants?

11

1        A.    For the medical malpractice cases,

2    but the cases where I've done depositions

3    regarding the subject of transgender health,

4    there were not governed entities involved.

5        Q.    And were you in all those cases an

6    expert for the defense or for the plaintiffs?

7        A.    For the defense.  And I want to

8    restate my prior.  This was one case in

9    Hamilton County, Ohio involving the DEFAS, or

10   the equivalent to Child Protective Services.

11       Q.    Okay.

12       A.    So that's one case.  And there

13   were multiple plaintiffs in that case.  One of

14   which was a government entity.

15       Q.    Okay.  So can you recall what

16   these cases were specifically?

17       A.    The ones dealing with transgender

18   health specifically?

19       Q.    Sure.

20       A.    Okay.  There were school systems

21   it British, Columbia.  There was the DEFAS in

22   Ohio, in Hamilton County, Ohio.  Okay.  There

23   also was in North Carolina the famous Bathroom

24   Bill.  I had to do an affidavit for that.

25       Q.    Okay.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 12 of 332 PAGEID #: 853
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

12

1          A.   So that's three.  Okay.  Just to

2    clarify, now that I go through each one of

3    them, those were the ones that had to do with

4    government entities.

5          Q.   And those were government

6    entities, all three of those?

7          A.   Yes.

8          Q.   Okay.  But those are not the

9    extent of your deposition testimony in the

10   space of transgender issues?

11         A.   No.

12         Q.   What other cases have you given

13   deposition testimony in related to transgender

14   issues?

15         A.   Issues of patient care.

16         Q.   Okay.  But what were those cases

17   specifically?  Can you recall?

18         A.   Let me think.  I'm having

19   difficulty recalling each specific case.  Given

20   some time I probably can come back and revisit

21   that question.

22         Q.   Okay.

23         A.   But I don't want to give an

24   improper answer.

25         Q.   Okay.  Perhaps we'll revisit these

13

```
 1   questions when we pull out your CV later on.
 2           A.    Okay.
 3           Q.    About how many times -- oh.
 4   Actually, how did you come to be involved, just
 5   generally or specifically, if that's more
 6   helpful for you to explain, the transgender
 7   issues cases?  How did you come to be an expert
 8   in those cases?
 9           A.    From my fellowship training at
10   Johns Hopkins back in 1978 through 1980.
11   Transsexual, as it was called then, was part of
12   our curriculum in the fellowship.
13           Q.    Okay.
14           A.    And we had children with disorders
15   of sexual differentiation who presented at
16   Johns Hopkins, because it was sort of an
17   epicenter, if you will, for referral of those
18   patients from around the world and clearly from
19   the United States.
20               So we had a lot of patients who
21   had issues with ambiguity of genitalia or
22   medical conditions where hormones were produced
23   early or were overproduced by tumors, and they
24   looked at the behavioral aspects of the effects
25   of that and issues of their psychological
```

14

1    wellness.  And so that was part of our

2    fellowship.

3              Q.   Okay.

4              A.   So it began then, and it laid

5    quiet for a number of years until the

6    transgender issue sort of began to surface in

7    the United States in the early 1990s.  I had a

8    case, but that was a rarity.  And then in the

9    early 2000s to mid 2000s, the number of

10   transgender clinics began to expand

11   exponentially, and so there was a lot more.

12   There were guidelines produced, and that

13   brought everything to the attention and sort of

14   woke up the concept.  So then everyone began

15   paying attention to it, and those of us who had

16   experience prior to that began to speak out.

17             Q.   Okay.  So perhaps I wasn't super

18   clear.  That's all helpful, and we will

19   continue to explore your expertise and

20   training.  How did you come to be involved in

21   the litigation matters?

22             A.   I was asked by people who were

23   involved in legal battles to be an expert

24   witness.

25             Q.   Okay.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 15 of 332 PAGEID #: 856
STACIE RAY vs AMY ACTON                          Quentin L. Van Meter, M.D.

15

1      A.   And I had actually given a

2  presentation on the subject of transgender

3  medicine and its history, and that sparked

4  people's interest in my world view on the

5  subject.

6      Q.   Okay.  So when people searched for

7  experts, your presence in the community was

8  easily accessible?

9      A.   Yes.

10      Q.   Got it.  Okay.  All right.  How

11  many times have you given trial testimony?

12      A.   I can think of two.

13      Q.   Okay.

14      A.   One was a case in Springfield,

15  Illinois about a malpractice case involving

16  maltreatment of a patient.  It had nothing to

17  do with transgender.  The other was a murder

18  case in California when I was a resident.

19      Q.   And was that murder case related

20  to transgender issues at all?

21      A.   No.

22      Q.   Okay.  And how long ago did you

23  say those were?

24      A.   The murder case was in -- it's an

25  approximation -- 1975.  And the malpractice

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 16 of 332 PAGEID #: 857
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

16

1   case in Springfield, Illinois was I believe two

2   years ago.

3           Q.   Okay.  You just stated previously

4   right here that you had given a presentation on

5   transgender issues, and that's how people came

6   to know your position in the community as

7   holding yourself out as an expert of sorts.

8   Can you talk a little bit about what that

9   presentation was?

10          A.   It was a presentation in -- I

11  believe it was Fort Worth, Texas.  It was a

12  presentation for teenagers and their families,

13  and it was one of a number of subjects

14  presented at that particular forum, and I was

15  asked to speak on the history of transgender

16  medicine.

17          Q.   Okay.  And about when was that?

18          A.   And time goes by very fast.  I'm

19  going to state, about four years ago.

20          Q.   Okay.  And so you said it was a

21  conference for teens and families.  Was it a

22  kind of a multi-disciplinary conference?  Did

23  they invite speakers besides medical doctors to

24  come and educate, or was it strictly about

25  medicine?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 17 of 332 PAGEID #: 858
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

17

```
 1              A.    It was not just medicine alone.

 2   It was individuals who had undergone issues in

 3   their lives that they would wish to speak to

 4   the teenagers about to give them personal

 5   experience.

 6              Q.    Okay.

 7              A.    And then there were behavioral

 8   health specialists that talked.  There were

 9   authors there who spoke on things that they had

10   written.  Books that they had written.

11              Q.    Okay.  And this was in Fort Worth.

12   Do you know who invited you to speak?

13              A.    The name of the conference was

14   Teens 4 Truth.

15              Q.    Okay.  And so Teens 4 Truth, is

16   that an organization?

17              A.    I don't know.  I think it was just

18   the organization of the conference.  I don't

19   know that it exists as an entity.

20              Q.    Okay.  Teens 4 Truth.  So you know

21   the name of the conference, and just an

22   individual who held themselves out as a staff

23   member for Teens 4 Truth reached out to you?

24              A.    Called and said they had heard --

25   I can't remember how they heard specifically.
```

18

1          Q.    Okay.

2          A.    But they said, could you speak to

3    us on this subject?

4          Q.    Okay.  Did you attend any of the

5    other panels or presentations?

6          A.    I did.

7          Q.    Okay.  So the behavioral health

8    specialists, what were the themes or primary

9    messages that were being conveyed by those

10   experts?

11         A.    That teens have a lot of things

12   that basically weigh on them as they grow up,

13   and that the teens and the families need to

14   essentially communicate effectively and deal

15   with deep-seeded emotional problems and

16   depression and anxiety mostly.

17         Q.    Okay.

18         A.    And that to bury those things or

19   not talk about them or have families not

20   recognize them brings harm to those

21   individuals, and therefore there should be an

22   avenue of communication where the families

23   recognize the teens feel comfortable enough to

24   talk to their parents about these issues.  And

25   so that instead of hiding them or burying them,

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 19 of 332  PAGEID #: 860
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

19

1   that they should deal with those, because

2   there's a great deal of suffering and agony

3   that happens as a result of that.

4           Q.   Okay.  Were those behavioral

5   specialists also providing information or

6   speaking on the issues of transgender issues?

7           A.   I think I was the -- I think there

8   was a mention of transgender health by one of

9   the presenters, but most of them were on the

10  subjects of anxiety and depression dealing with

11  sexuality.

12          Q.   Okay.  So what again was the name

13  of the conference?  I'm sorry.

14          A.   Teens -- No. 4 -- Truth.

15          Q.   Oh, okay.  Perhaps if I remind

16  you, you may recall.  That's a Baptist

17  anti-LGBT conference.  Does that characterize

18  it accurately?

19          A.   No.

20               MR. BLAKE:  Objection.

21  BY MS. INGELHART:

22          Q.   Okay.  But is it a Baptist

23  affiliated organization?

24               MR. BLAKE:  Objection.

25               THE WITNESS:  I was unaware that

20

1    it had any religious affiliation to it.

2    BY MS. INGELHART:

3         Q.   Okay.  Were the topics -- you

4    said, primarily, though, they were about sexual

5    orientation and gender identity, correct?

6              MR. BLAKE:  Objection.

7              THE WITNESS:  Primarily about

8    depression and anxiety and how it manifests as

9    someone's developing their sexuality.

10   BY MS. INGELHART:

11        Q.   Okay.  And do you use the term

12   developing their sexuality to include the terms

13   like sexual orientation and gender identity or

14   specifically --

15        A.   All of it.  It's all inclusive.

16        Q.   Okay.  Were you paid to attend

17   that conference?

18        A.   My air fare and my lodging was

19   taken care of, and the meals were provided.  So

20   that was all.

21        Q.   Okay.  So there's like no

22   honorarium?

23        A.   I did not receive an honorarium.

24        Q.   And were you reimbursed for those

25   payments?

 1          A.   I was reimbursed for the air fare.

 2    The lodging was paid for.  It was a conference

 3    site, and it was taken care of.

 4          Q.   Sure.  Okay.  So there was like an

 5    exchange of repayment to you like via a check

 6    or something?

 7          A.   I can't remember specifically.

 8          Q.   Okay.  Okay.  All right.  Have you

 9    ever given testimony at a legislative hearing,

10    for instance?

11          A.   I do not believe I have.

12          Q.   Okay.  Have you ever given

13    testimony at all in a legislative setting?

14          A.   Again, I don't believe I have.  I

15    mean, in regard to transgender specifically.  I

16    have given testimony in the Georgia State

17    Legislative Committees in hearings for issues

18    of general pediatric health.

19          Q.   Got it.  I was speaking generally.

20          A.   Yeah.  Okay.

21          Q.   Thank you.  Thank you for clearing

22    that up.

23          A.   Yeah.

24          Q.   Okay.  And how did you come to

25    testify?  Were you a public participant?  Did

22

1    you seek to speak at these events?

2         A.   I did.  I was the Chairman of the

3    Legislative Committee of the George Chapter of

4    the American Academy of Pediatrics at the time.

5         Q.   Okay.  So you weren't invited to

6    speak.  You affirmatively decided to go speak

7    at those?

8         A.   Yes.

9         Q.   Got it.  Any other like government

10   related speaking engagement type events that

11   you can recall you participated in?

12        A.   No.

13        Q.   Okay.  What about government

14   education?  Perhaps an agency, like a health

15   agency, asks you to come meet with them to

16   discuss your expertise.  Anything ever like

17   that?

18        A.   I have been asked but unable to

19   attend because of time constraints.

20        Q.   Okay.  And so none of this sort of

21   government related testimony that you provided

22   has been about issues related to transgender

23   people; is that correct?

24        A.   In hearings, yes.  That's correct.

25        Q.   Okay.  Okay.  Sorry.  Thank you

STACIE RAY vs AMY ACTON                    Quentin L. Van Meter, M.D.

23

1   for the clarification.  Okay.  How many times

2   have you been disclosed as an expert in

3   litigation?  Do you know?

4           A.   I'd have to guess.

5           Q.   That's fine.

6           A.   Did you say deposed?

7           Q.   Disclosed?

8           A.   Disclosed.  Okay.

9           Q.   Yeah.  Thank you.

10          A.   25 times.

11          Q.   Okay.  And in all of those, was

12  your subject matter expertise related to

13  pediatrics or pediatric endocrinology

14  specifically?

15          A.   Yes.

16          Q.   Did any of those cases involve

17  trans issues?

18          A.   Some of them did.

19          Q.   Okay.

20          A.   More recently.  The ones more

21  recently.

22          Q.   Okay.  You said --

23               MS. INGELHART:  Can you repeat

24  back?  How many times has he been disclosed?

25  Apologies.

24

1          THE COURT REPORTER:  25.

2              MS. INGELHART:  Thank you.

3  BY MS. INGELHART:

4          Q.  Okay.  So 25 times, but you've

5  only been deposed about 14 times.  Were you

6  deposed in each of the cases related to trans

7  issues?

8          A.  No.

9          Q.  Okay.  Do you happen to know what

10  the underlying issues were in all of those

11  matters in which you were disclosed as an

12  expert?

13              MR. BLAKE:  Objection.

14              THE WITNESS:  I can't remember.

15  BY MS. INGELHART:

16          Q.  Okay.  Do you recall whether you

17  were a witness for plaintiffs or defense across

18  those cases?

19          A.  Most often, it was for the

20  plaintiffs.

21          Q.  Okay.

22          A.  In the malpractice cases, most

23  often those were the plaintiffs.  I think I did

24  two malpractice cases where I was for the

25  defense.

25

1      Q.   Okay.  Have you been on the

2   plaintiff side in the cases where you've been

3   disclosed as an expert where transgender issues

4   are at issue?

5      A.   In one case.

6      Q.   What was that case?

7      A.   That was the Hamilton, Ohio case.

8      Q.   Got it.  Okay.  And then in all of

9   the other cases where you've been disclosed as

10   an expert, were you counsel for the defense in

11   all but the Hamilton case?

12           MR. BLAKE:  Objection.

13   BY MS. INGELHART:

14      Q.   Or not counsel.  I'm sorry.

15   Expert for the defense.

16      A.   I believe so.

17      Q.   Okay.  Thank you.  How many times

18   have you executed an expert report?

19      A.   Again, this is sheerly a guess,

20   because I was not prepared to have all the

21   specifics at hand.  So it's coming through

22   memory.  I would say a dozen times.

23      Q.   Okay.  So you've given expert

24   deposition testimony about 14 times but only

25   produced reports about a dozen times; is that

26

1   right?

2           A.   That doesn't match.  So it would

3   have to be at least 14 times.

4           Q.   Okay.  Okay.  And those reports,

5   were they majority related to trans issues?

6           A.   No.

7           Q.   Okay.  About how many of those

8   were related to trans issues?

9           A.   I'm going to guess about five or

10  six.

11          Q.   Okay.  And the others were related

12  to what?

13          A.   Just malpractice.

14          Q.   Okay.  All right.  And in the

15  cases in which you have executed an expert

16  report that was related to trans issues, were

17  you an expert for the defense exclusively?

18          A.   No.  I was an expert for the

19  plaintiff in the Hamilton County case.

20          Q.   Okay.  And there was a report in

21  that case?

22          A.   Yeah.

23          Q.   Do you recall what cases you

24  executed expert reports for related to trans

25  issues?

27

1          A.    Okay.  So again I think I've

2     written this down, and I'm going to do this

3     without any papers in front of me.

4          Q.    That's okay.

5          A.    Hamilton County, Ohio case, the

6     North Carolina Bathroom Bill case, two cases in

7     Canada, the case Grimm Versus Gloucester County

8     in Virginia.  I'm blocking on any others at the

9     moment.

10         Q.    Okay.  And do you know the

11    difference between an expert report and an

12    expert declaration, correct?

13         A.    I'm sure I do.

14         Q.    Okay.  So if I were to ask you

15    whether you know how many cases you've executed

16    an expert declaration, would you be able to

17    speak to that?

18         A.    No.

19         Q.    Okay.  So down the line we've

20    talked about trans issues related to government

21    testimony, as well as in litigation.  Have you

22    ever in litigation testified or written a

23    report regarding intersex or sexuality issues?

24         A.    No, I have not.

25         Q.    So your expert testimony that has

1    resulted in deposition testimony or in a report

2    or a declaration has been pretty much

3    exclusively trans related as --

4         A.   To clarify that.  It's impossible

5    to discuss trans issues without bringing in

6    some background knowledge about disorders of

7    sexual differentiation.  So DSTs.  Am I -- is

8    that how you...

9         Q.   That's helpful.

10        A.   Okay.  So they are distinct, in

11   general.  So in terms of not confusing one with

12   the other, it's important, and my reports have

13   mentioned specifically disorders of sexual

14   differentiation, I believe, in almost every

15   trans case.

16        Q.   Okay.  And so is the only reason

17   intersex issues are included in those reports

18   in trans specific type cases about the

19   distinction, or is there another reason you --

20        A.   It's about the distinction.  It's

21   also about clarification of actually what is a

22   disorder of sexual differentiation, because it

23   tends to be a matter of opinion in some cases

24   in terms of the science of DSDs as they are

25   recognized by the organization.  The

29

1   professional organization.  It's one specific

2   thing, but it has been expanded quite broadly

3   by proponents who say the incidence is as high

4   as maybe one percent or .3 percent of patients

5   across the country -- or humans across the

6   country.  So that's a difference of opinion.

7          Q.    Okay.  But I think that was about

8   intersex issues, and I think you said it's

9   impossible to do testimony about trans issues

10  without talking about intersex issues.  Why is

11  it impossible?

12         A.    Because it's an educational

13  process.

14         Q.    Okay.

15         A.    I mean the purpose of what I'm

16  trying to do is provide background in science

17  and education, so that people can make a

18  reasonable decision.

19         Q.    Okay.  But are they related, trans

20  issues and intersex issues?

21         A.    Very rarely.

22         Q.    Okay.  In the case of Schneider V.

23  Lujan, you testified in deposition in that

24  case, right?

25         A.    Remind me specifically where

1    that -- the name is not --

2           Q.   In Okaloosa County.

3           A.   In Florida.  Yes, I actually -- I

4    was able to write a report.

5           Q.   Okay.  So you didn't give a

6    deposition?

7           A.   I did not.

8           Q.   Okay.  And then about what did you

9    provide testimony in that case?

10          A.   Just background information about

11   transgender.

12          Q.   You provided testimony in the case

13   of Kimora Gilmer, correct?

14          A.   Correct.

15          Q.   What court was that?  Do you

16   recall?

17          A.   I do not.

18          Q.   Okay.  And what did you provide

19   testimony about there?

20          A.   Again, basic information

21   background about transgender issues.

22          Q.   Okay.  And in the Grimm case that

23   you mentioned, your testimony was about trans

24   issues, right?

25          A.   It was specifically about the fact

1  that there was -- it was related to documented

2  science that showed either benefit or lack of

3  benefit or harm based on use of rest rooms.

4          Q.   Okay.

5          A.   That's very specifically focused.

6          Q.   Okay.  Was that similar testimony

7  to what you provided in the Carncano case?

8          A.   Yes.

9          Q.   In North Carolina?

10         A.   Yes.

11         Q.   Okay.  And did you provide

12 deposition testimony in either of those two

13 cases?

14         A.   No.  Wait a minute.  Let me just

15 think back on that.

16         Q.   Sure.

17         A.   North Carolina, and what was the

18 other one?

19         Q.   The Gavin Grimm case in the

20 Eastern District of Virginia.

21         A.   Yeah.  I was deposed for that,

22 yes.

23         Q.   Okay.  Do you recall the Cooley V

24 Paul case?

25         A.   The name is not registering.  I'm

32

1    sorry.

2         Q.   Okay.  What about Jessica

3    Siefert's case?

4         A.   Yes.

5         Q.   Where was that?

6         A.   Let me think for a minute.  I'm

7    forgetting exactly specifically the

8    jurisdiction.

9         Q.   Do you recall what your testimony

10   was about?

11        A.   It was about parents -- oh,

12   Siefert is Ohio.  That's Hamilton County, Ohio.

13   Yes.  Is that -- I'm remembering correctly?

14        Q.   It wasn't In Re:  JNS, in Hamilton

15   County, Ohio?

16        A.   I don't think so.

17        Q.   Okay.  All right.  Go ahead.

18        A.   I think Siefert is Ohio.

19        Q.   Okay.  Can you tell me about what

20   your testimony was there?

21        A.   It was giving information about

22   trans health and the concepts of affirmation

23   therapy versus counseling therapy.

24        Q.   Okay.  And what do you mean,

25   affirmation?

 1          A.   Affirmation is a term that's used

 2     to do social transition, medical transition and

 3     surgical transition.

 4          Q.   Okay.  And then counseling?

 5          A.   Counseling was the pathway that

 6     Dr. Kenneth Zucker proposed and used for about

 7     30 plus years.

 8          Q.   Okay.  And what was that?

 9          A.   That is basically an in-depth

10     psychological evaluation of the patient,

11     family, and ongoing counseling of the patient

12     to basically discover what's going on in terms

13     of their psychological background.

14          Q.   Okay.  And so in that case, where

15     you discussed the benefits and the science of

16     affirmation versus counseling, did you have

17     professional conclusions about which was the

18     better course of treatment?

19          A.   Yes.

20          Q.   And what was that?

21          A.   Is that the counseling, which is

22     referred to as watch and wait, which there's

23     nothing just watching and waiting.  It's very

24     intense and consistent.  It is that there is

25     clear benefit there that those patients that go

34

1    through that -- this was a minor, okay, at the

2    time -- have a very high likelihood of

3    resolving their gender incongruence with the

4    benefit of counseling, appropriate counseling,

5    in-depth counseling.  And that if that is the

6    case, affirmation with hormones and social

7    circumstances and then, if chosen, surgery,

8    provide far more complications for that

9    patient's life, and their quality of life that

10   is diminished significantly compared to those

11   who went through counseling alone.

12         Q.   Okay.  And just so I'm clear, is

13   the counseling course of treatment ever

14   colloquially referred to as conversion therapy?

15         A.   It is often mislabeled as

16   conversion therapy.  It is, in truth, affirming

17   one's sex, if possible.  Most often it's

18   focused on the issues of depression and anxiety

19   and the childhood adverse events that created

20   the background for which set this patient up to

21   have a world view that they were born into the

22   wrong body.

23         Q.   Okay.  And I'm sorry.  In the

24   Hamilton County case, that's juvenile court.

25   That was an issue of custody?

35

1        A.    Custody.

2        Q.    Okay.  And the subject matter you

3   discussed was trans related.  What specifically

4   were your conclusions in that case?

5        A.    That intervention with medical

6   therapy at the time would be inappropriate

7   until the patient was of the age of consent.

8        Q.    Okay.  Okay.  Okay.  In the cases

9   where you say you simply provided background on

10  trans issues, what party hired you?

11       A.    It was either the family of the

12  patient -- most often it was representing the

13  family of the patient.  I can't recall

14  specifically other entities which, you know,

15  compensated me for my time.  It was usually the

16  attorneys for the person who was involved.  Or

17  if they were being sued, the families and the

18  entities asked me for expert opinion.

19       Q.    What were the parties' position?

20  Why did they need you?

21       A.    Because they needed somebody to

22  give an opinion that essentially stated that

23  the possibility of social affirmation, medical

24  affirmation and surgical affirmation was more

25  harmful than beneficial.

36

1        Q.   Okay.  So just to be clear, they

2   needed somebody to testify that affirmative

3   care treatment for trans folks to affirm the

4   trans identity of somebody was not the correct,

5   in your opinion --

6        A.   That's correct.

7             MR. BLAKE:   Objection.

8   BY MS. INGELHART:

9        Q.   Okay.  Thank you for that.

10  Without sharing any attorney work product or

11  privileged conversations what did you do to

12  prepare for today?

13       A.   I read the statements that I had

14  made.  I read Dr. Ettner's statement, and I

15  read Dr. Gordon's rebuttal in my statement.

16       Q.   Okay.  So you -- oh, sorry.  Go

17  ahead.

18       A.   And also there was a judgment I

19  think that was recently handed down on the

20  order regarding dismissal, and I read through

21  that.

22       Q.   Okay.  So you read the three

23  experts' reports in this case and the recent

24  order and opinion?

25       A.   Three expert reports.  It was

37

1    Gordon and Ettner, the two that I had.

2          Q.    And didn't you say yours?

3          A.    And mine.  Okay.  Yes.

4          Q.    Okay.  You didn't review anything

5    else?

6          A.    There was a mention in Dr.

7    Gordon's rebuttal that one of the references

8    that I used did not support what I had said,

9    and I went back to look at that, and I had to

10   agree that the specific statistic that I had

11   quoted from that was not in that article.  So I

12   must have missed references unwittingly.

13         Q.    Okay  So you went out and reviewed

14   that publication?

15         A.    Yes.

16         Q.    Got it.  Okay.  Who first

17   contacted you about being an expert in this

18   matter?

19         A.    Mr. Blake did.

20         Q.    Okay.  Okay.  Did you have any

21   prior interaction with Mr. Blake?

22         A.    No.

23         Q.    What about with the State of Ohio?

24         A.    No.  Well, excuse me.  Hamilton

25   County, Ohio.

1        Q.   Okay.  So any interaction with the

2   Ohio Department of Health?

3        A.   No.

4        Q.   Okay.

5        A.   Unless Child and Protective

6   Services is under that umbrella.  I don't know

7   the spectrum.

8        Q.   I also don't know.

9        A.   Okay.

10        Q.   Any prior relationship with the

11   law firm of Mr. Jake Blake -- Mr. Jason Blake,

12   Calfee?

13        A.   No.

14        Q.   Okay.  When did counsel reach out

15   to you?

16        A.   It was late May of this year.

17        Q.   Okay.  Are you being compensated

18   for rendering your opinion in this matter?

19        A.   I am.

20        Q.   Okay.  How are you being

21   compensated?

22        A.   A retainer fee of $1,500, and then

23   review of records in preparation of records at

24   $350 per hour.  Deposition $450 per hour,

25   unless it's out of state, where I'm out of the

39

1  office.  So today the payment for my day's work

2  here is $3,500.

3          Q.   Got it.  Okay.  So you're not

4  separately being paid like by the hour for

5  deposition testimony?  It's a lump sum for

6  payment?

7          A.   It is a lump sum for this, yes,

8  for the deposition day.

9          Q.   Thank you.  Okay.  Do you know

10  roughly what you've billed to date for this

11  matter?

12          A.   I think it's been -- It might be

13  upwards of $2,800.  Something around that

14  amount.

15          Q.   Okay.

16          A.   I can look up, specifically.

17          Q.   Not including today?

18          A.   Not including today.

19          Q.   Okay.  Got it.  You're being

20  offered as an expert in pediatric endocrinology

21  in this matter, correct?

22          A.   That's correct.

23          Q.   Do you consider yourself to be an

24  expert in gender dysphoria?

25          A.   In that it is part of

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 40 of 332 PAGEID #: 881
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

40

 1   transgenderism, and transgenderism falls on the
 2   shoulders of endocrinology to provide medical
 3   treatment.  So we have to have a background and
 4   expertise in the foundation of what is
 5   transgenderism.  And so for that reason,
 6   literature when I research writing has been --
 7   and so in that case, I would say yes.
 8          Q.   Okay.  So you consider yourself an
 9   expert in gender dysphoria.  I heard you
10   mention transgender issues.  So you consider
11   yourself an expert in transgender issues as
12   well?
13          A.   Yes.
14          Q.   And what about intersex
15   conditions?
16          A.   Yes.
17          Q.   Okay.  What makes you an expert in
18   those issues?
19          A.   Training, clinical experience and
20   active interest in research and review of
21   literature.
22          Q.   Okay.  So is any pediatric
23   endocrinologist who consumes literature and
24   digests it on gender dysphoria an expert in it?
25          A.   Not necessarily.

 1          Q.   Okay.  What do you consider

 2   yourself to be a expert in?  Anything besides

 3   these things?

 4               MR. BLAKE:  Objection.

 5               THE WITNESS:  Pediatric

 6   endocrinology, in general, and pediatrics as

 7   well.

 8   BY MS. INGELHART:

 9          Q.   Okay.  How long have you practiced

10   as a medical physician?

11          A.   I graduated from medical school in

12   1973.  I finished my residency in 1976.  And so

13   actually actively practicing as a licensed

14   physician from 1976 to the present.

15          Q.   Okay.  Have you always been

16   affiliated with like a hospital institution, or

17   have you ever been in private practice?

18          A.   I was in the Navy for 20 years.

19   During which time I was affiliated with

20   academic institutions and the Navy Medical

21   Corp.  Upon retirement, after a 20-year career

22   in the Navy, I went into private practice but

23   maintained academic and clinical teaching

24   positions, adjunct positions, at Emory

25   University and Morehouse College of Medicine.

                                                              42

1          Q.   So you're currently adjunct.  Is
2     that accurate?
3          A.   Yes.
4          Q.   And then you're in private
5     practice also now?
6          A.   Yes.
7          Q.   Thank you.  And what areas of
8     practice have you specifically held yourself
9     out as?
10         A.   Pediatric endocrinology and
11    pediatrics.
12         Q.   Where did you go to school?
13         A.   Medical College of Virginia, in
14    Richmond, Virginia.
15         Q.   When did you graduate?
16         A.   1973.
17         Q.   Did you do a residency after that
18    then?
19         A.   I did.
20         Q.   And where was that?
21         A.   And that was at Oakland Naval
22    Hospital, internship and residency in
23    pediatrics.  And then my fellowship at Johns
24    Hopkins in pediatric endocrinology from 1978 to
25    1980.

43

1      Q.   Okay.  And do you hold any other

2    certifications or -- forgive me if I'm not

3    using the accurate, you know, medical term for

4    certifications or kind of specialization --

5    official recognition?

6          A.   Basically, pediatrics and

7    pediatric endocrinology certification.

8          Q.   Okay.  Can you please describe

9    your education or training related to gender

10   dysphoria?

11         A.   So it began in the fellowship

12   years, and then the issue remained very quiet,

13   because it was not a common issue in pediatrics

14   at all.  My first transgender case in 1993 or

15   '94 was a patient that came to my office.  A

16   military dependent child.  The sex was male.

17   He had been advised to transition to female --

18   he was 13 at the time -- by a psychiatrist in

19   Los Angeles.  The family moved often, and there

20   was an opportunity for sort of a clean break in

21   friendships and what all.  So the family was

22   advised to go ahead and raise this child

23   subsequently as a female, and that patient came

24   to me for hormone therapy.

25              It was sort of out of the blue.  I

1   called all of the people that I knew that were

2   my mentors in pediatric endocrinology across

3   the country, in San Francisco, in Baltimore,

4   in St. Louis, and said, what is your

5   experience?  What do we do with this?  This is

6   not an issue that we have seen, literally,

7   since fellowship days, and we were really not

8   dealing with transgender children at that point

9   in time.  The experience was with the

10  transgendered adults at Hopkins.  And not

11  practicing adult endocrinology, I had

12  essentially no clinical experience in the

13  interim period.

14            Nobody could tell me what to do.

15  No one had any guidelines.  Nobody had any idea

16  of what was appropriate.  I was advised that I

17  needed to have an attorney devise an informed

18  consent, an assent, to cover myself for any

19  potential damage that might be done that I was

20  unaware of by doing cross-sex hormones in this

21  child.  And so I launched on that with the

22  assent and consent for the parents and began

23  treating that male with estrogens.

24            Within six months, the family

25  moved again, and I referred that family to a

1    pediatric endocrinologist at the Naval and

2    Medical Center in Bethesda, Maryland, since

3    they were moving to the Washington, D.C. area,

4    and I never heard.  I'm not sure the patient

5    actually ever made it there.  I called the

6    person that I had referred to, and he indicated

7    he'd never seen the family.  So I don't know

8    what happened.

9          Q.   Okay.

10         A.   But that's how rare it was to deal

11   with transgendered issues in children at that

12   time.

13         Q.   And what was that time again?

14         A.   1993, 1994.

15         Q.   Okay.  So that's when you first

16   were reintroduced to the issue and first time

17   you had seen that since your time at Johns

18   Hopkins?

19         A.   Since my fellowship.  Right.

20         Q.   okay.  And that's a pretty long

21   span.

22         A.   That's correct.

23         Q.   Do you have an opinion about why

24   it was such a long span between those

25   incidents?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 46 of 332 PAGEID #: 887
STACIE RAY vs AMY ACTON                          Quentin L. Van Meter, M.D.

46

1        A.    Because it was a very uncommon

2   condition.  It was exceedingly rare.

3        Q.    Okay.

4        A.     In terms of reported cases and

5   people who professed to have clinical

6   experience that were available in published

7   literature.

8        Q.    Okay.

9        A.    And recognized by academic

10  institutions.

11       Q.    And it's no longer rare?

12       A.    No.

13       Q.    Do you have an opinion about why

14  the incidence of transgender patients

15  presenting themselves to physicians like

16  yourself is less rare?

17       A.     It is clearly my opinion.  I have

18  some indirect statistics that do not show

19  causality, but the advent of the internet and

20  available information to children and the

21  advocacy of the transgender movement has made

22  it a forefront issue.  The combination of those

23  two things has exponentially increased people's

24  sense that it exists and that it is a real

25  entity that is biologically based.

1          Q.    And so people's awareness makes --

2     how does that awareness affect the rate of

3     incidence?

4          A.    The study that was published by

5     Lisa Littman showed there was sort of a social

6     contagion among adolescent females

7     particularly.  The ratio of incidence from

8     twice as many males as females in the

9     background for any number of years, from

10    published studies back in the 1970s, '80s, and

11    '90s and even in the early 2000s, to the point

12    where it is now twice as many females as males,

13    and the age of onset in these females is mid

14    adolescence.

15         Q.    Okay.  So what I heard you say was

16    that there's a social contagion.  What is the

17    social contagion?

18              MR. BLAKE:  Objection.

19              THE WITNESS:  The presence on the

20    internet of YouTube videos, suggestions of what

21    to say to your physician, helpful guidelines --

22    hopefully helpful -- to guide patients who have

23    issues toward the idea that they are

24    transgender.

25    BY MS. INGELHART:

48

1          Q.   Okay.  How is that a contagion?  I

2     don't think I understand your use of that term.

3               MR. BLAKE:  Objection.

4               THE WITNESS:  It is the increase

5     cannot be explained by purely social

6     acceptance.  Okay?  The sociologists who have

7     reviewed this in the UK, particularly in the

8     Scandinavian, can't explain a hundred fold

9     increase in the incidence of transgenderism

10    since 2010.

11    BY MS. INGELHART:

12          Q.   Okay.  So you're saying that the

13    cultural acceptance of trans folks does not

14    explain?

15          A.   It does not explain that.

16          Q.   Okay.

17          A.   I'm not a sociologist, but the

18    sociologists who are trying to figure this out

19    have explained that they are quite alarmed by

20    this and in their world view as sociologists

21    can't explain that it is purely acceptance that

22    brought this about.

23          Q.   And who are those sociologists?

24          A.   People who publish.  I don't know

25    the names specifically.

49

1              Q.   Okay.  And so for the cause and

2    effect, if the effect is that there's a higher

3    rate now, what are you saying is the cause

4    then?

5                   MR. BLAKE:  Objection.

6                   Answer if you know.

7                   THE WITNESS:  It's sort of a

8    recruiting of patients online.

9    BY MS. INGELHART:

10             Q.   Okay.  And who's recruiting?

11                  MR. BLAKE:  Objection.

12                  Answer if you know.

13                  THE WITNESS:  The nature of what

14   is online when you Google transgender is

15   explaining that transgenderism is a biologic

16   entity, that if you are concerned and upset

17   about any issues at all, consider this as a

18   option and come see us, and go to this website,

19   and tell your doctor this, and it's -- those

20   kinds of websites exist.

21   BY MS. INGELHART:

22             Q.   Okay.  Okay.  So I apologize.

23   Could you just explain to me your understanding

24   of the word recruitment?

25                  MR. BLAKE:  Objection.

1           THE WITNESS:  It's sort of an

2    enticement, if you will, to consider

3    transgenderism as the answer to what they're

4    feeling about their lives.

5    BY MS. INGELHART:

6           Q.   Okay.  Doesn't recruitment kind

7    of, again -- active -- activity or an active

8    choice or an action?

9           MR. BLAKE:  Objection.

10          THE WITNESS:  If someone publishes

11   something on the internet that says, this is

12   the answer, read this list, come here, call

13   these people, go to this clinic, I would call

14   that recruitment.  That's an active -- somebody

15   has to go to that site, somebody has to be

16   interested in it to read it, but if you will,

17   they're not -- no, they're not doing telephone

18   robo calls and saying.

19          I guess if you're using the word

20   recruitment that way, no, it's not happening.

21   But if you have access to the internet and you

22   type in a word and you get to a website that it

23   encourages you to consider that as an option,

24   perhaps recruitment isn't the right -- but

25   encouragement.  Let's call it encouragement

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 51 of 332 PAGEID #: 892
STACIE RAY vs AMY ACTON                    Quentin L. Van Meter, M.D.

51

 1  then.

 2  BY MS. INGELHART:

 3       Q.   Okay.  And those websites are

 4  being created by entities.  Is that what you

 5  meant by the transgender movement?  Are they

 6  creating these platforms?

 7       A.   I don't know who creates them.

 8  Some of them are created individually, and

 9  they're personal things.  Personal stories, if

10  you will.

11       Q.   Okay.  But previously you talked

12  about the transgender movement and recruitment.

13  So is that --

14       A.   The transgender movement, I'm

15  referring to W-Path as an entity, because it is

16  an organization that is a social advocacy

17  organization.

18       Q.   Okay.  During your fellowship --

19  your fellowship was on pediatric endocrinology

20  at Johns Hopkins, correct?

21       A.   Correct.

22       Q.   Okay.  And I think you mentioned

23  before that you didn't actually treat any

24  children who had had transsexualism as it was

25  called at the time or gender disorder as we

1    call it now?

2              A.   Yes.   Those patients were not

3    recognized as existing in the world of academic

4    medicine and publication in the academic

5    institutions.  It was not part of a fellowship

6    training.  We touched on that, because the

7    adult endocrine service at Johns Hopkins

8    refused to work with the adult patients who

9    were transsexual, and professor John Money who

10   was on the faculty and taught us basically

11   introduced -- we had to deal with those

12   patients.  Adult endocrinologists would not

13   deal with those patients.  So their hormone

14   therapies, their medical follow-up, was done by

15   the pediatric endocrine division.

16             Q.   So you treated those patients?

17             A.    We treated them in the sense that

18   we had to review their cases and be part of it,

19   but we did not do primary interviews.  We did

20   not recommend the surgeries.  All that was sort

21   of done through the psycho hormonal division

22   and John Money.

23             Q.   So what was your treatment?  I'm

24   sorry.

25             A.   We had to follow those patients.

53

1    We had to examine those patients.  We had to

2    talk about, you know, their medical conditions.

3            Q.   Okay.

4            A.   And it was new enough and without

5    any essential checklist of what to be watching

6    for, it was sort of experiential.  Things were

7    done.  What did we see?

8            Q.   Okay.  So you didn't actually

9    provide any treatment for people with

10   transsexual gender identity disorder or gender

11   dysphoria during your fellowship, correct?

12               MR. BLAKE:  Objection.

13               THE WITNESS:  It was done by

14   attendings, and we were, as fellows, observers.

15   BY MS. INGELHART:

16           Q.   Okay.  So you, personally, did

17   not?

18           A.   I did not.

19           Q.   Okay.  In your report you mention

20   that you had, quote, an above average exposure

21   to children with disorders of sexual

22   differentiation.  What do you mean by above

23   average exposure to?

24           A.   Because of the sheer number of

25   patients that were referred to Johns Hopkins,

1   that fellowship program had larger numbers of

2   children with DSTs than other endocrine

3   programs have.  In University of California San

4   Francisco and in other programs that were not

5   sort of the epicenters, you would see disorders

6   that were much milder.  Kids with adrenal

7   hyperplasia, who were virilized, females that

8   were virilized or males that were

9   undervirilized.  But most often the ones that

10  required any kind of surgical intervention that

11  was going to be considered in young childhood,

12  all of them, you know, they sort of funneled

13  towards Johns Hopkins.

14          I think Cornell Hospital Children

15  Services had a number of patients above the

16  average of other centers, as well, at the time.

17  But Hopkins was sort of -- it's where all of

18  the pathways of hormonal actions were actually

19  discovered in the lab, and so because of that

20  it was sort of the epicenter of referrals.

21          Q.  Okay.  So at the epicenter, about

22  how many children were you exposed to?

23          A.  In the fellowship years, easily a

24  hundred.

25          Q.  Okay.  Again, what was the actual

1    nature of the exposure?

2           A.   Direct patient care.  Evaluation

3    and direct patient care.

4           Q.   So treatment?

5           A.   Yes.  Treatment.  Absolutely.

6           Q.   Okay.  What kind of treatment did

7    you provide to those patients?

8           A.   We provided hormonal replacement

9    therapy for those where it was appropriate to

10   solve the problem.  We treated some kids who

11   were boys who were undervirilized with

12   testosterone, with human chorionic

13   gonadotropin, in order to diagnose what was

14   going on and also begin some initial

15   treatments.  The urologists and the GYN

16   surgeons did surgical revisions on those

17   patients.  We did not.

18          Q.   Okay.

19          A.   But we worked hand in hand with

20   them to know the complications of the surgeries

21   and what needed to be done for surgical

22   follow-up.  So all of that was done as sort of

23   a conjoined clinic.

24          Q.   Okay.  So were any of the children

25   that you treated for their DSD also

1   transgender?

2          A.   No.

3          Q.   Have you been certified by the

4   World Professional Associates of Transgender

5   Health, WPATH?

6          A.   No.

7          Q.   Okay.  You've never completed any

8   course work with WPATH initiative committee,

9   right?

10         A.   No.

11         Q.   Are you familiar with it?

12         A.   I was not familiar with any

13  certification whatsoever.

14         Q.   Okay.  Are you familiar with the

15  WPATH's standards of care?

16         A.   Yes.

17         Q.   And do you disagree with them?

18         A.   I do.

19         Q.   Would you like to share what you

20  disagree with?

21         A.   Well, currently, the iteration is

22  the seventh version of their standards of care

23  and the eighth version is coming out, I

24  understand.  We don't know -- it's supposed to

25  be in January perhaps.  The recommendation for

57

```
1    puberty blocking at early age, at the onset of

2    puberty, the recommendation of cross-sex

3    hormone therapy, is counter to the proven

4    science of the adverse effects of those

5    entities as use, and the recommendation for

6    surgery.  This is all related to children in

7    particular.

8             Q.   Okay.  And so the basis for your

9    opinion there is what again?

10            A.   Is that the current medical

11   literature calls into question the safety of

12   and the efficacy of those interventions.

13            Q.   And what medical literature?

14   Could you be more specific?

15            A.   The very comprehensive article by

16   Lawrence Mayer and Paul McHugh, which is

17   probably the preeminent, most thorough, highly

18   referenced, cross referenced, balance

19   presentation of the issue of transgender health

20   that's ever been published.

21            Q.   Okay.  Have you made any public

22   comments to voice your disagreement with the

23   WPATH standards of care?

24            A.   Yes, I have.

25            Q.   Okay.  In what context were those
```

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 58 of 332  PAGEID #: 899
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

58

1    public comments?

2          A.    They were in court CME courses.

3    They were in interviews for publication, print

4    publication, and also radio interviews as well.

5          Q.    Okay.  Were those public comments

6    in your personal capacity?

7          A.    Yes.

8          Q.    Or like your personal/professional

9    capacity?

10         A.    Yes.

11         Q.    Okay.  Not on behalf of another

12   organization?

13         A.    No.

14         Q.    Okay.  Have you had any other

15   training since your fellowship ended in 1980?

16         A.    Ongoing CME.

17         Q.    Any training in psychiatry?

18         A.    Not psychiatry, specifically.  The

19   behavioral health as it relates to general

20   pediatrics and specifically as it relates to

21   pediatric endocrinology.  Depression is a very,

22   very prominent entity in Type 1 diabetes

23   patients.  It's clearly an entity in patients

24   who have disorders of sexual differentiation.

25   It's a large part of anything that requires

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 59 of 332 PAGEID #: 900
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

59

1  compliance.  Any kind of disorder which is not

2  going away, it impinges on the mental health of

3  the patient.  And so we are always reminded and

4  trained to recognize depression and anxiety and

5  social interactions of these patients with

6  their peers, with their family and educational

7  environment.

8          Q.    Okay.

9          A.    So it's part of our everyday

10 evaluation of every endocrine patient that

11 comes into the office.  If you have

12 particularly issues with poor growth, delayed

13 puberty, those issues are very, very important

14 to pay attention to.  We were trained that it's

15 basically a basic tenet of pediatric

16 endocrinology.  Anything that affects self

17 image is going to need to be paid attention to.

18 So every endocrine visit in the office for

19 whatever purpose the patient's there, we always

20 ask the issues about depression, anxiety,

21 school performance, interaction with peers.

22         Q.    Okay.

23         A.    As an assessment for, you know,

24 how they're doing.

25         Q.    So that was training from the

1    beginning on through your --

2          A.   On -- the beginning ongoing, yes.

3          Q.   Okay.  Do you hold yourself out as

4    an expert in psychiatry?

5          A.   No, I do not.

6          Q.   Okay.  Do you have any training in

7    psychology beyond what we just discussed?

8          A.   No.

9          Q.   And do you hold yourself out as an

10   expert in psychology?

11         A.   As it relates to illness, in terms

12   of behavioral health, yes.  Not as a licensed

13   physiologist.

14         Q.   Okay.  Sorry.  I couldn't read my

15   own writing.  So that experience at Hopkins, is

16   that the foundation of your expertise in issues

17   relating to sex differentiation as it relates

18   to gender identity?

19         A.   It was the beginning of that, yes.

20         Q.   Does board certification in

21   pediatrics require any course work on gender

22   dysphoria?

23         A.   It has not, because it's not been

24   part of a curriculum.  They're trying to

25   develop some curriculum.  I understand it's in

1    several medical schools, but it's not been part

2    of medical education specifically.

3            Q.   Okay.  And I think you mentioned

4    this.  You're required to complete continuing

5    medical education courses to maintain your

6    Georgia license?

7            A.   That's correct.

8            Q.   Okay.  Are any of those courses

9    required courses on trans related issues?

10           A.   No.

11           Q.   What about intersex related

12   issues?

13           A.   Not specifically requested.

14           Q.   Okay.  Or gender issues at all?

15           A.   Nothing is required specifically.

16           Q.   Okay.  But are there courses

17   offered on trans issues that you could take as

18   a part of your continuing medical education?

19           A.   There were CME presentations, but

20   unfortunately they're -- the few that I've

21   attended have not been really educational.

22   They're just sort of opinion pieces, if you

23   will, and it's sort of a certain reliable group

24   of individuals who are invited to speak and

25   only those individuals and no one else at major

1   CME conferences with professional societies is

2   invited or allowed to speak.

3           Q.   So you have, though, attended some

4   continuing medical education courses that

5   relate to trans issues?

6           A.   Yes, I have.

7           Q.   Okay.  They just weren't required?

8           A.   They were not required.

9           Q.   Got it.  Okay.  What about have

10  you attended continuing education on intersex

11  issues?

12          A.   Yes, I have.

13          Q.   Okay.  And gender issues,

14  generally, as well?

15          A.   Yes, I have.

16          Q.   Okay.  And you received credit for

17  all of those?

18          A.   I did.

19          Q.   Okay.  Okay.  I think you said

20  here today and in your report that you've

21  maintained a continued interest in gender

22  discordance since your fellowship and have read

23  extensively the literature in scientific peer

24  reviewed journals, have attended national and

25  international pediatric endocrine conferences

63

1    where the subjects presented and discussed.

2    Why did you have that continued interest in

3    gender discordance after your fellowship ended?

4              MR. BLAKE:  Objection.  Go ahead.

5              THE WITNESS:  Because of what I

6    knew about valid science, I was quite concerned

7    that invalid science was being represented by

8    the individuals presenting on the side of

9    affirmation therapies.  And I decided that was

10   something that if I was going to pick a

11   subject -- there's so many subjects in medicine

12   where there are controversies, but this I saw

13   as a really significant harm to children.

14              And because of my compassion and

15   care for kids, in general, this was an area

16   where my colleagues, when I would have

17   discussions -- who had no clinical experience

18   whatsoever -- had just essentially accepted

19   guidelines that I knew, and I had actually,

20   when the endocrine society guidelines were

21   proposed, we were invited to comment on them.

22              And the comments that I made for

23   both the first iteration of the Endocrine

24   Society and guidelines and the second and also

25   the comments that I made about the Pediatric

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 64 of 332 PAGEID #: 905
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

64

1    Endocrine Society guidelines as they were

2    presented -- because we had as members an

3    opportunity to comment on those cases --

4    nothing that I said was ever responded to, and

5    I was somewhat taken aback and surprised that I

6    didn't receive any kind of affirmation that I

7    had even sent in an opinion.

8                   And what came out was essentially

9    everything that I was critical of just was

10   passed through and accepted as the guidelines,

11   and that particularly hit a chord with me that

12   this is an area, if I'm going to focus my

13   energies at my age on something, I can either

14   be angry about dishonesty as I see it, my

15   personal opinion in presenting pseudo science,

16   as I would call it, on perhaps 10 or 15

17   different subjects and not be effective with

18   any of them.

19   BY MS. INGELHART:

20          Q.   Okay.

21          A.   And so I've always been an

22   advocate of child development and emotional

23   health.  In 1994 I wrote a set of guidelines

24   for the State of Georgia called the Children's

25   Agenda, in which I presented this as an entity

65

1   for the American Academy of Pediatrics to use

2   as a sort of, if you will, a Bill of Rights for

3   children.  So that it could be presented to

4   state legislators at the beginning of their

5   legislative session, much like Japan has such a

6   Bill of Rights for children, if you will.

7            And that any legislative effort

8   that would be carried out in the state had to

9   go back to this if you want to think of it as a

10  Bill of Rights for kids, and make sure that any

11  legislative effort that they proposed was not

12  contrary to that, for that set of rights.

13           And so I wrote this for the State

14  of Georgia as a project, and it was

15  comprehensive.  It had to do everything with

16  education.  It had to do with accessibility to

17  health care, support of family structure, the

18  right of the family and the responsibilities of

19  the family.  All these things.  And I presented

20  it to the American Academy of Pediatrics, and

21  it was soundly defeated in committee.  They

22  wouldn't even bring it to the floor as a

23  proposal, and that shocked me.  I was really

24  upset, and I went to the people in the

25  administrative part of the American Academy of

1    Pediatrics and said, what happened?

2              And one of the more senior

3    individuals in the AAP said to me, it's a hot

4    button issue here.  We cannot make statements

5    about what is best for children here, because

6    it's going to offend certain individuals.  It

7    will offend single moms.  It will offend same

8    sex individuals.  It will affect adoptive

9    parents of any kind, and so we can't offend

10   anybody.  So we're not going to make -- we

11   can't make this statement.

12             And I said, you know the social

13   science is clear about the benefits, the clear

14   advantage of a child growing up in society in

15   an intact family where the child was conceived

16   by consent of both parents, and those parents

17   have a commitment to that child until that

18   child takes its last breath.  And social

19   science says that child, a child in those

20   circumstances, has higher education, less drug

21   abuse, alcohol abuse, you know, criminal

22   behavior, et cetera, et cetera, hands down, but

23   we can't say that.

24             Q.   And what society was that for?

25             A.   American Academy of Pediatrics.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 67 of 332 PAGEID #: 908
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

67

 1            Q.   Okay.  One second.  Okay.  And

 2    when was that presentation you gave?

 3            A.   1994.

 4            Q.   1994?

 5            A.   Mm-hmm.

 6            Q.   Okay.  And they said that they

 7    couldn't make a statement?

 8            A.    They refused to endorse it.

 9            (Thereupon, Plaintiffs' Exhibit 1,

10    Ensuring Comprehensive Care and Support for

11    Transgender and Gender-Diverse Children and

12    Adolescents, was marked for identification

13    purposes.)

14    BY MS. INGELHART:

15            Q.   Okay.  So I'm going to introduce

16    to you Plaintiffs' Exhibit 1, and I have copies

17    for everyone.  Okay.  So do you recognize this

18    document here?

19            A.   I do.

20            Q.   Can you tell me what it is?

21            A.    It is a policy statement written

22    by Jason Rafferty.

23            Q.   On behalf of whom?

24            A.    On behalf of the American Academy

25    of Pediatrics.

1          Q.    Okay.  Can we turn to Page No. 4

2    here?

3          A.    Mm-hmm.

4          Q.    Do you see the section in the top

5    left starting with the bold heading,

6    gender-affirmative care?

7          A.    Yes.

8          Q.    Okay.  Can you read for us that

9    first sentence?

10          A.    In gender-affirmative care model

11   (GACM), pediatric providers offer

12   developmentally appropriate care that is

13   oriented toward understanding and appreciating

14   the youth's gender experience.  A strong,

15   nonjudgmental partnership with youth and their

16   families can facilitate exploration of

17   complicated emotions and gender-diverse

18   expressions while allowing questions and

19   concerns to be raised in a supportive

20   environment.

21          Q.    Okay.  And so just real quick, to

22   turn back to the first page, can you read this?

23   Let's see.  Yeah, this top line on the first

24   page that begins about policy statement.

25          A.    Policy statement organizational

69

 1   principles to guide and define the child health

 2   care system and/or improve the health of

 3   children.

 4           Q.   Okay.  I remember you said this

 5   was from the American Academy of Pediatrics.

 6           A.   That's correct.

 7           Q.   So this is a policy statement of

 8   the American Academy of Pediatrics?

 9           A.   It is.

10           Q.   Okay.  And so we've just reviewed

11   that in their policy statement they endorse the

12   gender affirmative care model?

13           A.   They certainly do.

14           Q.   Okay.  And so below where you just

15   read, the AAP highlights some primary messages

16   that are conveyed through GACM.  Can you review

17   the first bullet point there?

18           A.   Yeah.  Transgender identities and

19   diverse gender expressions do not constitute a

20   mental disorder.

21           Q.   Okay.  And then -- okay.  You know

22   what, we'll come back to this.

23                So do you have any reason to

24   believe that the policy proposal that you

25   submitted that went nowhere wasn't reviewed by

1    all of your colleagues or by the AAP?

2              MR. BLAKE:  Objection.

3              THE WITNESS:  It was reviewed by a

4    subcommittee before it was presented to what

5    was called the Chapter Chairman's Forum.  These

6    are opportunities for membership and state

7    chapters, and the Georgia State Chapter

8    sponsored this on my behalf to present an idea

9    for the academy to consider as a policy

10   statement.  So it was rejected in committee

11   before it ever got to a vote, and there is a

12   vote taken among what was then called the

13   Chapter Chairman's Forum.  And it never got to

14   that stage because the committee decided to nix

15   it before it could get to the floor.

16   BY MS. INGELHART:

17        Q.   Okay.  But the American Academy of

18   Pediatrics has this policy in place for

19   considering policy statements, correct?

20        A.   They develop policy statements by

21   getting an interested committee together, and

22   they make policy statements based on people who

23   are invited to give their opinion.

24        Q.   And that procedure is not

25   necessarily flawed, is it?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 71 of 332 PAGEID #: 912
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

71

1          A.    It's terribly flawed.

2          Q.    Okay.

3          A.    A review of the policy statements

4    of the American Academy of Pediatrics was done

5    and published in the Journal of Pediatrics.  I

6    don't have the exact reference, but it's been

7    within about -- I'm remembering within the past

8    10 years.  It said that the development of the

9    policy statements is flawed in the majority of

10   the policy statements.  It's the American

11   Academy of Pediatrics criticizing itself about

12   its development of policy statements.

13         Q.    Interesting.  Okay.

14         A.    This particular policy statement

15   was critiqued by a clinical psychologist last

16   name of Cox, and he published his critical

17   analysis of this evaluation and indicated that

18   it was flawed to the point where many of the

19   references that Dr. Rafferty used to make

20   statements that supported what he was saying

21   actually said exactly the opposite and did not

22   support them at all.  This is an independent.

23   This was not asked for.  It was just published

24   very quickly after this, and this was an

25   individual who'd come to this, went through

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 72 of 332 PAGEID #: 913
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

72

1   every reference in here and essentially said

2   this is an embarrassment.

3          Q.   And when was that?

4          A.   This was within the last year,

5   because this was published initially in

6   September, and within a month of its

7   publication, a month or two, Dr. Cox came out

8   and published a rebuttal to this and said this

9   is a travesty.

10         Q.   Okay.  So in your children's

11  agenda that you proposed to the committee in

12  Georgia that you tried to introduce, what

13  rights did it provide for children

14  specifically?

15         A.   It said the children need to --

16  should have the opportunity for education to

17  their full extent to be educated, that their

18  education should be tailored to their specific

19  needs and abilities, that they should have food

20  and shelter.  They should have a family unit to

21  support them and unconditionally provide care

22  for them throughout their entire life, that

23  ideally the children should be -- this is an

24  ideal.  This is not condemning anybody who

25  doesn't do this, but it is for the purpose of

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 73 of 332 PAGEID #: 914
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

73

1    saying if you are going to pass legislation

2    that in any way promotes things that will

3    inherently prevent these opportunities, you

4    should not pass that legislation.  So it was

5    not condemnation of anything, but it was sort

6    of a golden ideal.

7              Again, a child should be conceived

8    purposely.  And it doesn't happen.  This is

9    real life.  Okay?

10        Q.    Mm-hmm.

11        A.    But the reality is if you want to

12   give the best opportunity, a couple in a

13   committed, functional relationship, should want

14   a child, conceive the child, take care of that

15   child from birth until that child's death.  If

16   they pre-decease the child, obviously, that's

17   not going to happen.

18             And the elements that were

19   important for that child were to be educated,

20   fed, clothed, and not emotionally abused.

21        Q.    Okay.  So it was a part of your

22   advocacy in this children's rights document

23   that different sex parents are preferred?

24             MR. BLAKE:  Objection.

25             THE WITNESS:  An intact biological

1    family.  And I didn't condemn adoption.  Our

2    oldest child's adopted.  Adoption is a very

3    complex issue.  Even under the best of

4    circumstances, where parents are loving the

5    child, providing no intended negative

6    consequences of child rearing, that child still

7    grows up, as we have learned from our

8    daughter's experience and her networking with

9    other adopted adolescents and adults in her

10   life, it is a burden.  It's a burden for the

11   child who's adopted.  Some of them handle the

12   burden seemingly effortlessly, but many suffer

13   quietly and live with that and have to work

14   through all the issues.

15              So it's not ideal to be adopted

16   and be raised.  It's ideal to be conceived and

17   reared by your biologic parents.  It's just

18   sociologically it's the best outcome.  It's not

19   to say that anything that happens that's not in

20   those guidelines is intended harm.  It's just

21   that's the perfect thing.  Make sure that what

22   we do is in every circumstance where we have

23   control we don't do something that adds another

24   burden to the child in the child's life.  We

25   don't provide them education.  We don't provide

1   them adequate nutrition.  We don't provide them

2   sound parenting in a family that's not

3   psychologically detrimental.  All those things

4   are important to avoid happening, if you can.

5               So in the sense of, you know, it's

6   all about what is absolutely the best

7   circumstance for the child?  What is the best

8   circumstance?  And we know what that is.

9   BY MS. INGELHART:

10          Q.   So those guidelines, based on

11  those themes and principles, rearing a child by

12  same sex parents would not qualify or would

13  increase burdens on the children?

14              MR. BLAKE:  Objection.

15              THE WITNESS:  There are published

16  studies which show adverse outcomes.

17  BY MS. INGELHART:

18          Q.   Have you read any studies that

19  there are not adverse outcomes?

20          A.   I've read reports.  Yes, I have.

21          Q.   Okay.

22          A.   They're not validated studies.

23  They are individual case studies.  Not

24  cross-sectional.  The big studies that

25  essentially take the general population without

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 76 of 332 PAGEID #: 917
STACIE RAY vs AMY ACTON                              Quentin L. Van Meter, M.D.

76

1   a recruitment of population.  It's a review of

2   existing data without asking patients to come

3   and present ideas to you.  The only studies

4   done like that, the published studies show that

5   there are decreased rates of education, higher

6   increased drug abuse, sexual abuse, et cetera,

7   et cetera, in the lives of those patients.

8          Q.   And you've read the entire defend

9   of pot body of that research?

10              MR. BLAKE:  Objection.

11              THE WITNESS:  No, I have not.

12              MS. INGELHART:  Okay.

13              THE WITNESS:  I have not read the

14  entire body.

15  BY MS. INGELHART:

16         Q.   Okay.  But for the ones that you

17  disagree with, you disagree with based on

18  methodology?

19         A.   Yes.

20         Q.   Okay.  So how do you keep up with

21  the scientific literature on gender dysphoria?

22         A.   I read everything that is

23  published that I can find, and there is ample

24  opportunity to read the broad spectrum of

25  opinions, not just what -- I read everything

77

1   that I can find that comes across,

2   predominantly on the internet.  It's an access

3   way to get printed literature, public

4   discussions, synopses of presentations.  So I

5   read everything.  If the word transgender is in

6   it, I read it.

7          Q.   Okay.  So about how many articles

8   then would you say you read per week?

9          A.   Five or ten.

10         Q.   Okay.  So per month?

11         A.   Times four.

12         Q.   Okay.  All right.  And since about

13  five years ago, you've been keeping up with

14  this practice?

15         A.   Since 19 -- 2004, actually.  2004,

16  it's very interesting, because there was what

17  we call a throwaway journal called,

18  Contemporary Pediatrics, a cover story about

19  transgender.  It was out of the Boston service.

20  This was before they had really established

21  their transgender clinic officially, which Dr.

22  Norman Spack did in 2007, I believe, and it was

23  an article written that basically said this is

24  the new new.  This is transgenderism.  This is

25  what these children need.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 78 of 332 PAGEID #: 919
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

78

1          And it caught my attention,

2    because I happened to know one of the authors.

3    Actually, the lead author.  She was a fellow

4    staff pediatrician in the Navy.  So I said, oh,

5    there she is.  And I read through and I

6    thought, wait a minute.  Where is the science

7    here?  Where are you speaking from?

8          Now, I've never had a conversation

9    with her subsequently.  Something that's on my

10   to do list, if I can get some time, and I don't

11   know that she's still in Boston or not.  But

12   that caught my eye, and it was sort of at that

13   point in time I thought, wait a minute.  How is

14   this brought up as a standard issue describing

15   many children when we're not seeing those?  I

16   mean the endocrinologists don't see this.  We

17   don't see this at all.  This is in a pediatric

18   journal, not an endocrine publication.  Where

19   is this coming from?  How did that happen?

20         And then subsequently Dr. Spack,

21   from Boston, presented at the combined

22   Pediatric Endocrine Society/European Society

23   for Pediatric endocrinology meeting in New

24   York.  I can't specifically remember the exact

25   year, but it was soon after that, and he gave a

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 79 of 332 PAGEID #: 920
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

79

1    plenary session for CME, and I sat in the back

2    of the room, and my jaw dropped, because I was

3    hearing things that were contrary to what we

4    knew.  And so I said, I'm interested in this.

5    This has piqued my curiosity.

6              And so at that point in time I

7    began to saying, what is he talking about?

8    What's his experience?  And it was at that

9    meeting entirely anecdotal.  There was no

10   published research.  He did refer to the Dutch

11   study, the Dutch protocol, which had been

12   started in early 2000 in the Netherlands, and I

13   read that and I said, well, wait a minute, wait

14   a minute, wait a minute.  They're talking about

15   the few kids who fail the intensive

16   psychological background, and they talked about

17   the desistance, if you will, in gender identity

18   disorder, as it was called by Dr. Zucker at

19   that time and referred to as GID by Dr. Spack

20   and others who were members of WPATH.

21             And I thought, wait a minute.  You

22   didn't even bring up the psychological

23   evaluation.  You just went from, hi, I'm

24   transgender, to now we do social transition and

25   medical transition.  And you skipped the big

80

1    issue, which is the evaluation.  The in-depth

2    evaluation of the child and the in-depth

3    continuous treatment of the child and their

4    family.  You skipped by that, and you went

5    right to social affirmation and on to medical

6    treatment.  Why did you do that?  How did that

7    happen?

8              I've never spoken to Dr. Spack.

9    I've never had a conversation, never

10   communicated directly by writing or phone or

11   anything.  I was just flabbergasted that at a

12   preeminent meeting of world -- you know,

13   endocrine consortium that he presented that,

14   and there was no questioning.  No questioning

15   at all.

16             And I'm not very confrontational.

17   I'll be very honest.  In the back of the room,

18   as I sat there, I was more in a state of shock

19   than I was to raise my hand and say, excuse me,

20   Dr. Spack, but where did you get this

21   information?  How can you state what you're

22   stating?

23             And he reminded me very much of

24   Dr. John Money, who did exactly that kind of

25   thing.  I had an idea.  This is what I'm going

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 81 of 332 PAGEID #: 922
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

81

1   to do, and we're going to see what happens.

2          Q.   Okay.   So about 10 years ago you

3   started keeping up with the literature in a

4   very dedicated fashion.

5          MR. BLAKE:   Objection.

6   BY MS. INGELHART:

7          Q.   Does any of that literature affect

8   your treatment of your patients?

9          A.   My review of the literature keeps

10  essentially reconfirming my concerns about not

11  doing harm to children.   Above all, not doing

12  harm and having total compassion for these

13  kids, and the more I read about how what I'm

14  doing is supposed to be harmful, I'm very, very

15  cognizant of the fact that when the patient

16  that I treat walks in the room and I state to

17  them empirically at the very beginning and

18  throughout, I am your advocate.   I am looking

19  for your welfare, and I will not let go of you

20  throughout this whole process.   You may have

21  concerns.   I'm not judging you for anything,

22  but I am trying to gather information and

23  present to you what I believe is valid science,

24  so that you can understand it, and you can make

25  an appropriate decision.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 82 of 332 PAGEID #: 923
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

82

1          And I tell them that I,

2    personally, cannot in good faith give them

3    hormone therapy that blocks puberty or that

4    physically changes them, because I would be

5    doing them harm, and that is medical

6    malpractice, and I can't do that to them.  I

7    just cannot do that.  So that I will do

8    everything in my power to find the counseling,

9    to make sure the evaluation is done first.

10         And what happens in my own

11   personal experience in the transgender

12   patients, who are already filtered, okay --

13   people know who I am.  So if they come to my

14   office, they either are aware of my opinion or

15   they aren't, and so they've come to me to

16   basically treat their child or to get a

17   treatment plan.  So I don't have hundreds of

18   patients.  Okay?  And so the ones that I do

19   have absolutely unequivocally 100 percent of

20   them come from dysfunctional families and have

21   had a number of adverse childhood events in

22   their lifetime.  Death of a parent, sexual

23   abuse, death of a sibling, severe physical

24   trauma, multiple moves, and they are

25   significantly depressed and have anxiety.  And

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 83 of 332 PAGEID #: 924
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

83

1    that's the basis from which I start is to say,

2    we need to find a therapist who can deal with

3    all these emotional turmoils.  We need to have

4    a therapist who's willing to work with all

5    members of the family and interview them

6    extensively and figure out what the dynamics

7    are, the psychological dynamis of that child's

8    environment.  And if we don't do that, we are

9    doing an intense disservice to the child.

10           Q.   Okay.  So what you were just

11   referring to about the evaluation and patients

12   coming to you seeking hormones, was all of

13   that and subsequent about specifically children

14   patients who present or think that they have

15   gender dysphoria?

16           A.   Yes.

17           Q.   Okay.  How many patients like that

18   have you had?

19           A.   15.

20           Q.   Oh.  15?

21           A.   Mm-hmm.

22           Q.   Okay.  This year?

23           A.   No, no.  There are 15 active

24   patients so far that have been recruited over

25   the past three or four years.

1      Q.   Okay.  So 15 active patients, and

2  active means you still currently have a

3  relationship?

4      A.   Yes.

5      Q.   Okay.  That's all of the children

6  who have come to you presenting this kind of

7  issue where they want hormone treatment?

8           MR. BLAKE:  Objection.

9           THE WITNESS:  They come in with a

10  diagnosis of gender incongruence.

11 BY MS. INGELHART:

12     Q.   Okay.  And they come in to you.

13 They're recruited, you said?

14     A.   No.

15     Q.   Okay.

16     A.   The patients, they just call the

17 office and say, I need to make an appointment.

18     Q.   Okay.

19     A.   Some of them are referred by their

20 primary care physicians.

21     Q.   Okay.  15 active.  Were there any

22 before that?

23     A.   No.

24     Q.   Okay.  When did the first of those

25 15 come to your office?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 85 of 332 PAGEID #: 926
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

85

```
 1                  A.    Three or four years ago.

 2                  Q.    Okay.   Thank you.   Do these

 3      children have other pediatric endocrine issues,

 4      so that they remain in your treatment?

 5                  A.    The most recent one did.

 6                  Q.    Okay.   But there's 15 active?

 7                  A.    Yeah.

 8                  Q.    And so what treatment are you

 9      providing to those 14 that don't have other

10      endocrine issues?

11                  A.    Supportive education, evaluation

12      of all of their physical complaints that are

13      related.   And even non-endocrine, because I'm

14      at heart a pediatrician.   So I recognize, you

15      know, other system complaints that need

16      attention as well and sort of educate them on

17      those things without stepping on the toes of

18      the primary care physician in offering specific

19      treatment.   At least I give them a

20      comprehensive world view of everything about

21      them that I can glean from their history and

22      physical exam.   And then I maintain support of

23      the family and the child to keep in touch and

24      make sure that I'm having conversations with

25      their mental health care providers.
```

1          Q.    Okay.  So you have an intake

2    appointment?

3          A.    Yes.

4          Q.    Okay.  And then after that?

5          A.    The intake is staged, so that

6    initially the first appointment is a thorough

7    physical exam and a total review of medical

8    history, and then it is sort of focusing on

9    their specific complaint about transgender

10   issues.  I interview the child and the family

11   all together.  I find out what kind of mental

12   health support they're using and who that

13   person is.  If they haven't had any, then I

14   suggest like through their primary care a

15   general behavioral health person, because

16   that's a very difficult choice.  It has to be a

17   good fit.  It has to be somebody personality

18   wise.  It has to be somebody you know doesn't

19   have an agenda up front, that's not a

20   transgender specialist.  There is no such

21   reality of somebody who is not an activist, who

22   just does transgender health only, in terms of

23   mental health.  If they advertise that as

24   colleagues I interviewed and talked to, say

25   I've been doing this for 37 years in treating

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 87 of 332 PAGEID #: 928
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

87

1    transgender health in Atlanta, I sort of

2    question them and say, okay, what else do you

3    do?  And they often do nothing but transgender

4    health issues.

5              Transgender is a psychological

6    issue at its core, and you don't have to be

7    trained in transgender only issues.  You need

8    to recognize the world's literature in

9    transgender, but you need to be able to

10   recognize depression, anxiety and delve into

11   the adverse childhood events.  And if you can't

12   do that, you shouldn't really be in mental

13   health to begin with.

14              So any clinical psychologist can

15   deal with those core issues and needs to know

16   how to do that work with families to figure out

17   what's going on in the background, and that's

18   the only requirement I recommend is somebody

19   who can do that and is willing to do that.

20              I've actually interviewed over the

21   phone a person who is sort of a transgender

22   oriented expert, and I had a wonderful

23   conversation with that particular psychologist,

24   who agreed with me totally that the issues need

25   to be delved into and that that was her

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 88 of 332 PAGEID #: 929
STACIE RAY vs AMY ACTON                    Quentin L. Van Meter, M.D.

88

1    practice.  So I felt very good about referring

2    patients to her specifically, because she was

3    going to -- at least she stated and I believed

4    that she was going to be dealing with the core

5    issues, or the foundation for all of these

6    issues.

7            Q.   And you believe that people who

8    have a lot of trans experience as psychological

9    professionals and hold themselves out that way

10   don't deal with all of the other underlying

11   medical issues that you were highlighting?

12                  MR. BLAKE:  Objection.  Misstates.

13                  Go ahead.

14                  THE WITNESS:  Okay.  What my

15   experience is in my testimony and listening to

16   and being questioned by and reading depositions

17   of individuals who have testified as experts,

18   the one particular individual who's the head of

19   the transgender clinic in Cincinnati, she

20   specifically said she had never had a patient

21   that came in that didn't go immediately to

22   social and medical transition, that 100 percent

23   of the patients who walk in the door are

24   transitioned.

25                  I have had conversations with

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 89 of 332 PAGEID #: 930
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

89

1   parents and in some cases, cases where I've

2   done a medical statement of expert opinion,

3   where the family freely admits that no one

4   talked to them about any psychological issues.

5   My second most recent transgender patient, I

6   spoke to her psychological therapist about this

7   particular child.

8              A male who was a transfemale, and

9   this particular patient had not had any mental

10  health interventions until this psychologist

11  took up the case about a year ago, when the

12  child was having cutting behavior at school and

13  was referred by the school through their

14  psychological support services to a clinical

15  mental health professional.  This child had

16  suffered inordinately from adverse events from

17  shortly after birth all the way up through the

18  present time and had never had an evaluation

19  but was recommended by the school that they

20  needed to consider transgender as the answer,

21  that they had some conversations with this

22  child.

23             And so the clinical psychologist

24  said suddenly, in February, that this child

25  decided that she was going to take on a male

90

1   name and a male persona at school.  And she

2   said, so I went through, and since doing that

3   the child seems to be remarkably happy, has

4   stopped any self-harming behaviors.

5              And I said, okay, have you

6   interviewed the biological father?  No.  Have

7   you interviewed this person?  No.  I said,

8   well, I think it's probably important to delve

9   deeper into that.

10             So my experiences in dealing with

11  the cases where I've been asked to step in or

12  review that very often the initial evaluation

13  is not done.  And as a matter of fact, this

14  document states that any such evaluation is

15  essentially harmful.  This Dr. Rafferty said,

16  psychological evaluation is totally unnecessary

17  and does harm.

18  BY MS. INGELHART:

19             Q.   Okay.  I have a few questions.

20  We'll come back to that one.  Okay.  So in the

21  anecdote you just shared you said that the

22  child began -- sorry.  The child that you just

23  referred to in that anecdote, what sex were

24  they assigned at birth?

25             A.   Male.

1          Q.   Okay.

2          A.   No.  Excuse me.  Female.  I'm

3    sorry.  Female.

4          Q.   Okay.

5          A.   Assigned female, decided to take

6    on a male persona in February.

7          Q.   Okay.  And the medical

8    professional that you spoke with treating that

9    person, that child, said that since transition

10   they were remarkably happy?

11         A.   Yes.

12         Q.   Okay.  Before you said that of the

13   15 patients that you deal with right now with

14   trans issues, each and every one came from a

15   dysfunctional family; is that correct.

16         A.   They had significant family

17   dysfunction, yes.

18         Q.   Okay.  Could you give an example

19   of such family dysfunction?

20         A.   Divorce.

21         Q.   Okay.

22         A.   Alcohol or drug abuse, mental

23   health issues of the parent, severe depression

24   or anxiety in the parent, death of a sibling,

25   death of a parent, frequent moves.  Things that

STACIE RAY vs AMY ACTON                    Quentin L. Van Meter, M.D.

92

1   are classified as adverse childhood events.

2           Q.   Okay.  Thank you.  And who

3   classifies those as adverse childhood events?

4           A.   It's a list.  It's a published

5   list from -- I can't quote you the

6   organization, but there's a published list of

7   adverse childhood events, such as a

8   questionnaire that's proposed to be asked at

9   all general pediatric visits.  It's a screen

10  for adverse childhood events.

11          Q.   Okay.

12          A.   There's a published screen.

13          Q.   Yeah.  So that list, that

14  screening is publicly used and accessed by most

15  pediatricians?

16          A.   Yes.

17          Q.   Okay.

18          A.   It's available.  It's not often

19  used.

20          Q.   Oh, okay.

21          A.   That's the problem.  The

22  publications that say this should be part of a

23  pediatric well visit, they're trying to

24  advocate to get pediatricians to pay attention

25  to that.

93

1          Q.    Okay.  Why is it not often used?

2          A.    Because pediatricians don't often

3    delve into behavioral health.

4          Q.    Okay.  Amongst the list of adverse

5    conditions or experiences, is being raised by

6    parents of the same sex among that list?

7          A.    No.

8          Q.    Okay.  Okay.  So I think we got

9    into this because we were talking about the

10   treatment of those 15 patients that you have

11   now.  You do an intake, and you refer them to a

12   psychologist, because as you've stated you're

13   not an expert at who is a psychologist.  From

14   that point, what's your relationship with those

15   witnesses?

16         A.    As a place to come and sort of be,

17   if you will, a gate keeper to make sure that

18   the mental health issues are being dealt with.

19         Q.    Okay.  But you're not an mental

20   health expert, right?

21         A.    No.  But I'm in touch with

22   what's -- plus I provide education that is age

23   appropriate about what the risks and benefits

24   are of moving forward with affirmation,

25   medical, surgical or social.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 94 of 332 PAGEID #: 935
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

94

1          Q.   Okay.

2          A.   And so I will present those to the

3     patient, because areas, a dream and a hope, and

4     then there is reality, and I want to make sure

5     that they have their dreams and hopes and all

6     the reality all in front of them at all times

7     in a level that they can understand.

8               So if I have a 10-year-old child,

9     I kind of go back through, and I interview.  On

10    subsequent times I'll interview the parent, and

11    if I have only seen one parent, which is very

12    often the case, I will ask to visit with the

13    other parent if it's at all possible.  The

14    biologic parent, the step parent, anybody

15    that's been in an authority role in this

16    child's interface.  I want to have a chance to

17    interview those people.  Siblings, if possible.

18    So that I can -- serve a broad spectrum of

19    what's going on in the relations of these kids.

20         Q.   Okay.

21         A.   So that happens spread over time,

22    because you can't get all that done.  You can't

23    get everybody in the office at the same time.

24    Plus with younger children in particular, I

25    want to see what it is they remember that we

1    talked about at the prior visit, and really

2    commonly they don't remember or they state they

3    don't remember.

4              And so I want to make sure they

5    have an understanding.  And I specifically ask,

6    you know, your sex is male or female.  You're

7    at odds with that as believing who you are.

8    Are you aware that you can never become another

9    sex?  And in the concrete thinking nine or

10   ten-year-old, they tend not to get that.  They

11   don't understand that.  In an older adolescent,

12   they can wrap their head around that as a

13   concept.  So it's all based on age and mental

14   capacity and other things to see, what do you

15   understand?  Because I don't want you to have a

16   sense that you were told something that is not

17   actually true.  You need to be aware.

18             And for parents I provide them

19   with a list of references and say, this is

20   contrary to what you're telling me you've

21   understood, you've read and reviewed, from your

22   online searches.  I'm going to give you actual

23   references that would show a different opinion.

24   Understand that the reason I'm giving them to

25   you is because it's in contrast to what you've

1    picked up in the way of information so far.

2    Among those, I try to choose references that

3    actually are balanced in terms of they have

4    looked at everything.  They haven't just gone

5    to things that support an opinion and put those

6    in as references, but they have actually looked

7    at another side of the story, an affirmation

8    pathway.  What are the things?  And those are

9    brought up as references, and then they are

10   evaluated for their scientific validity, and

11   they're included in the treatise that I give

12   them.

13           So it's important I -- you know, I

14   said, you need to know everything.  I don't

15   want you just to go down not knowing what's

16   really out there.  And so that's an arduous

17   process, and it cannot be handled in just a

18   single visit.  So the subsequent visits are all

19   about what do we know?  What are you thinking?

20   What questions do you have for me?

21   Understanding that I will not be the one that's

22   going to provide hormone therapy.

23           Q.   Got it.  So your subsequent visits

24   are conversational check-ins?

25           A.   Yes.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 97 of 332 PAGEID #: 938
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

97

1          Q.   Okay.

2          A.   And if certain things are

3    happening and females who are menstruating and

4    if they are having issues with discomfort of

5    binding the breasts and things like that, I

6    talk to them about, you know, how to alleviate.

7    You know, if you're going to be wearing a

8    breast binder, please take it off if you can at

9    night.  Wear it as little number of hours per

10   day as you can tolerate, because it basically

11   crushes the tissue, and it creates secondary

12   issues with shoulder musculature and posture

13   and things like that that sort of give them

14   some secondary problems.  And so I try to point

15   out the things they could do to alleviate those

16   things that may be done at the present time.

17         Q.   Okay.  And that medical advice

18   that you're giving in those contacts for breast

19   binding, those aren't necessarily expertise

20   related to endocrinology; is that correct?

21              MR. BLAKE:  Objection.

22              THE WITNESS:  It's more general

23   pediatrics.

24   BY MS. INGELHART:

25         Q.   The materials that you provide to

1    patients and family, what's in that treatise
2    specifically?
3            A.    A balanced presentation.
4            Q.    Okay.  What is a balanced
5    presentation?
6            A.    Means that I looked at the
7    opinions of both sides of an issue.  It's like
8    how we do with clinical research.  You know,
9    clinical research has to be balanced in order
10   to be ethical.  It doesn't mean that you have
11   to have equal numbers of references.  It
12   doesn't mean that you have to do -- if there is
13   something that's published that is opposite of
14   that, you need to make sure that the person
15   knows that you are aware of that and that it's
16   discussed.  And if you're invalidating that,
17   the reason why that you would invalidate it.
18           Q.    Okay.
19           A.    So you haven't just quoted things
20   that you like.  You've quoted things that you
21   find contrary.
22           Q.    Okay.  Okay.  One more question,
23   and then we'll take a quick break.
24           A.    Okay.
25           Q.    So are you providing -- would you

99

```
 1   characterize those ongoing check-ins as a type

 2   of counseling?

 3          A.    In part, it's counseling.

 4          Q.    Okay.  And you have these meetings

 5   with patients as well as family members,

 6   correct?

 7          A.    Yes.

 8          Q.    Okay.  Do the family members and

 9   the patients understand that you are not a

10   mental health professional?

11          A.    They do.

12          MS. INGELHART:  Okay.  All right.

13   Let's take a quick bio break.

14          THE WITNESS:  Okay.

15          (Thereupon, a break was taken.)

16          MS. INGELHART:  Okay.  Back on the

17   record.

18   BY MS. INGELHART:

19          Q.    When we were discussing your

20   practice with the 14 or 15 children who

21   presented to you as gender dysphoric, you said

22   that, or something along the lines of, that

23   people know who you are, and therefore seek you

24   out.  Is that kind of --

25          MR. BLAKE:  Objection.
```

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 100 of 332 PAGEID #: 941
STACIE RAY vs AMY ACTON                          Quentin L. Van Meter, M.D.

100

1            THE WITNESS:  This is essentially

2   an opinion based on the fact that there's a

3   transgender clinic at Emory University.  Three

4   years ago when they reviewed the number of

5   patients that were referred per year that were

6   active patients, not referred per year, they

7   had I think in the mid thirties.  Two years

8   later they had increased AD patients that were

9   active patients in their clinic.  They were

10  essentially the only advertised transgender

11  center in town that is academic based.

12            There is a treatment facility in

13  Decatur, Georgia called Queer Med, and I didn't

14  realize.  I guess it's a franchised type of a

15  medical, because it exists in other cities I've

16  been told, and there is a family practice

17  doctor there who dispenses testosterone and

18  estrogen, does not use puberty blockers.  He's

19  a family practice doctor.  And the use of

20  puberty blockers is essentially restricted

21  because of insurance costs and whatnot to

22  pediatric endocrinologists and adult

23  oncologists, and so that person is unable to

24  write the prescription and have them be

25  accepted so doesn't do that.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 101 of 332 PAGEID #: 942
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

101

1        So there are some, evidently, sort

2    of lesser, not academic affiliated places for

3    transgender patients to go in the Atlanta

4    metropolitan area.  But the Emory Clinic has at

5    last full count 80 active patients in the year.

6    Well, I have 15 active patients over the past

7    three or four years.  I am in a practice that

8    sees about 20 percent of the endocrine

9    population in the Atlanta metro area and the

10   Emory Children's Health Care Consortium sees

11   about 80 percent.  I haven't really figured out

12   the proportionality of that, but I'm thinking

13   that if the majority of patients are going to

14   Emory, that they don't come to me for a

15   particular reason, and it's just sheerly a

16   guess.

17   BY MS. INGELHART:

18        Q.   Okay.  Do your patients or their

19   parents tell you why they choose to come to

20   you?

21        A.   A couple of them have said, you

22   know, I know who you are.  I've seen a video

23   presentation of one of your lectures, and I'm

24   here for that reason.  I came for a second

25   opinion.  One in particular.

1          Q.    Okay.

2          A.    That's sort of the one that sticks

3    in my mind.

4          Q.    Okay.  And so what are you

5    implying?  They've seen your videos, and

6    therefore they come to you?

7          A.    That I am all about psychologic

8    counseling and not about social, medical and

9    surgical affirmation.

10         Q.    Okay.  So is your goal to help

11   your patients align their gender with their

12   assigned sex through that counseling?

13              MR. BLAKE:  Objection.

14              THE WITNESS:  My goal is to make

15   sure they're mentally healthy and that that has

16   been addressed.

17   BY MS. INGELHART:

18         Q.    Okay.  Does being mentally healthy

19   relate to having a gender identity that aligns

20   with your birth assigned sex?

21              MR. BLAKE:  Objection.  Vague.

22   Relevance.

23              THE WITNESS:  So I do not believe

24   that gender incongruence is an issue that is

25   separate from emotional trauma and emotional

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 103 of 332 PAGEID #: 944
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

103

 1 | malagendment (sic).

 2 | BY MS. INGELHART:

 3 |        Q.   Okay.  But you know the parents of

 4 | these children, the guardians of these

 5 | children, some come to you because they are

 6 | aware of your medical opinions on trans issues,

 7 | correct?

 8 |              MR. BLAKE:  Objection.

 9 |              THE WITNESS:  Some of them.

10 | BY MS. INGELHART:

11 |        Q.   Okay.  These 15 children are the

12 | only ones you've ever treated with these

13 | issues?

14 |              MR. BLAKE:  Objection.

15 |              THE WITNESS:  Yes.  I'm familiar

16 | with many more cases, because I've been

17 | contacted by families who say, what resources

18 | would you recommend for me in my community?

19 | BY MS. INGELHART:

20 |        Q.   I understand.  Okay.  So all 15

21 | are currently active?

22 |        A.   Yes.

23 |        Q.   Okay.  So none have left your

24 | care?

25 |        A.   Some have strayed away, and we've

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 104 of 332 PAGEID #: 945
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

104

1    had to recontact them.  One in particular I

2    think we are attempting to kind of get back in

3    touch with, and I don't know whether or not

4    their purpose is they don't intend to come

5    back, but they're not very communicative.  It's

6    been like nine months since I've seen that

7    patient.

8          Q.   Okay.  And what's your interest in

9    reaching back out to them to reconnect?

10         A.   I care for them.  I deeply care

11   for these kids.

12         Q.   So do you believe or do you think

13   professionally that through psychotherapy you

14   can get a transgender patient to stop being

15   transgender?

16              MR. BLAKE:  Objection.

17              THE WITNESS:  I believe that the

18   desistance, so-call desistance rate, is

19   extremely high in both males and females, and

20   that if that is the case, then my job would be

21   to essentially minimize the kinds of medical

22   and psychological trauma that they're going to

23   have in their lifetime.

24              And so if we have emotional issues

25   that need healing, which I think is every

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 105 of 332 PAGEID #: 946
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

105

1  single case, and I can work them through and

2  they come out the other end without depression

3  and anxiety, that past the age of consent it's

4  their choice of what they're going to choose to

5  do.  But as a child who cannot really consent

6  and whose brain is not capable, I believe, of

7  making those kinds of decisions,

8              I worry about them, you know,

9  falling into harm, and the harms are

10  unequivocally described in medical literature.

11  We are giving them a medical condition for the

12  rest of their life.  They will need hormones

13  for the rest of their life.  They will need

14  surgical manipulation and repair for the rest

15  of their life.  They will not have biologic

16  function of the surgically altered body parts

17  for the rest of their life.

18              So there's just so much about

19  human physiology that's so complex.  We have to

20  warn them about cancers, and we have to warn

21  them about stroke, and we have to warn them

22  about cardiovascular disease that they would

23  not have had if we hadn't have done these

24  things to them.  And so to me that's a list of

25  horrific complications that far -- and of

1    course the big one is what if they're going to

2    kill themselves, because the suicide rate or

3    suicide attempt rate is so much higher.

4              And the answer to that is that the

5    data that is constantly referred to about the

6    41 percent of trans kids who are not allowed to

7    be socially affirmed will kill themselves -- or

8    attempt to kill themselves.  Not a completed

9    suicide but an attempt at suicide.  That is

10   actually from a study which didn't separate out

11   those which were counseled only and those that

12   actually had surgical interventions and medical

13   intervention.  It was every one of the patients

14   in the group.  The real article when you take

15   it apart is that it's a misrepresentation of

16   statistics to essentially push people -- and

17   this is stated over and over again.  What would

18   you rather have, a dead child or a trans boy or

19   a trans girl?  Okay?

20             And that's really not fair,

21   because the statistical evaluation doesn't show

22   that that's going to happen.  The only

23   nonselective, nonbiased study about suicide

24   completion is the Dhejne study from Sweden.

25   Where every single patient, whether they wanted

1    to be included in the study or not, in the

2    country of Sweden everybody's medical records

3    are known.

4              So if they want to look at a

5    population study, they don't have to do a

6    survey and say, if you are trans or if you are

7    this or if you are that, are you interested in

8    being part of a study, please call this number.

9    We're interested in interviewing you and

10   hearing your opinions.  This was completely

11   devoid of selection bias.

12   BY MS. INGELHART:

13         Q.   Okay.

14         A.   And a 20 fold increase in suicide

15   completion in those who were affirmed and

16   surgically treated.  Now, they did not have in

17   their data those that were just medically and

18   not surgery confirmed.  They also did not have

19   in their data a comparison of those who had

20   counseling only.  Okay?  They didn't.

21         Q.   Okay.  So --

22         A.   That study is criticized as

23   flawed, because there was no control.

24         Q.   Right.  Right.  Yes.

25         A.   Okay?

1          Q.    Okay.

2          A.    So if that criticism is to be a

3    gold standard, okay, then all the studies that

4    are being done now moving forward prospectively

5    in the United States and around the world need

6    to have a control group.

7          Q.    Right.

8          A.    And none of them do, on purpose.

9    And the reason that they claim and they're

10   approved to do the clinical study in the NIH

11   study is, well, we're going to help cause them

12   to kill themselves otherwise.  So we don't have

13   a control group.  If we have a control group

14   who are just socially counseled and -- and --

15   so what's called watch and wait, the maddening

16   thing is that watch and wait is not a passive

17   non-intervention.  It's an aggressive

18   intervention.  Okay?

19               And conversion therapy, so-called,

20   or affirmation therapy, is actually converting.

21   An attempt to convert one sex to the other.

22   Which can't happen.

23          Q.    Hold on real quick.  So are you

24   saying that affirmation counseling is

25   conversion therapy?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 109 of 332 PAGEID #: 950
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

109

1          A.   Is an attempt to convert a male to

2     a female.

3               Q.   Got it.  So --

4               A.   That's actually a conversion.  To

5     me, that would be conversion.

6               Q.   I just wanted to be clear on the

7     terms.

8               A.   Affirmation is not really anything

9     other than trying to convert a male into a

10    female or vice versa.  Okay?  Conversion

11    therapy, as it's called, is actually going to

12    the psychological aspect of what's going on to

13    maintain, not convert.  Not convert anything

14    but to maintain a congruence between the

15    concept of who the patient believes they are as

16    their gender, which is a psychologically based

17    thing -- it has no biologic basis whatsoever --

18    compared to biology and to get those aligned.

19    Because that happens as a result of

20    undercurrent psychological -- and then it self

21    propels.  Okay?

22               Are these people traumatized

23    emotionally from society?  Of course, they can

24    be.  But in this particular paper it talks --

25    which is one of its fallacies -- it says that

1   all of the psychologic morbidity is essentially

2   caused by society.  There is no internal basic

3   psychologic struggle as a basis for gender

4   incongruence, and that is patent nonsense.

5          Q.  Can you explain what that patent

6   nonsense is?

7          A.  Because we know that gender is a

8   psychologically based concept.  It has no

9   biology.  And that sex is biology.  The

10  American Psychological Association, the APA,

11  DCM5, stated absolutely and utterly clearly

12  gender identity is a very fluid thing.  People

13  go in and out of that, on and off, throughout

14  their lives.  People don't go in and out of a

15  sex.

16         Q.  Okay.  So I think I saw that in

17  your report.  The DSM-5 and the APA handbook

18  state what again?  I'm sorry.

19         A.  That there is no biologic basis

20  for gender, and the gender identity concept is

21  a fluid state.

22         Q.  And you reviewed that recently?

23         A.  Yes.

24         Q.  Okay.  Okay.  So many questions.

25  The study -- I think you referred to the term

STACIE RAY vs AMY ACTON                          Quentin L. Van Meter, M.D.

1    desist, correct?

2          A.   Yes.

3          Q.   Okay.  And just for the record,

4    could you repeat what that definition is?

5          A.   Okay.  So desistance is the term

6    that has been applied to patients who had

7    gender identity disorder and who through

8    counseling came to align their gender identity

9    with their sex.

10         Q.   Okay.  And do you know what like

11   the study was that you were referring to for

12   that desistance rate?

13         A.    There are several studies.

14   There's Kenneth Zucker's published studies of

15   all 560 of his patients, and then there is a

16   study from the Dutch protocol, Voorhees, I

17   believe is one of the authors of that that

18   looked at the desistance rate.

19         Q.   Okay.  And then the 19-fold

20   increase of completed suicides.  What study is

21   that?

22         A.   That's Dhejne.

23         Q.   And that's spelled D --

24         A.   -- j-e-i-n-e, I believe.

25         Q.   Thank you.  Okay.  Okay.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 112 of 332 PAGEID #: 953
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

112

1          A.   It's often referred to as the

2     Swedish study.

3          Q.   Yeah.  I think I've heard that.

4     Okay.  Great.  We'll come back to that.  Are

5     these materials a part of the education

6     materials that you provide to your patients and

7     their families?

8          A.   Yes.

9               MS. INGELHART:  Okay.  We'd like

10    to request that.  Do you want us to submit a

11    formal discovery request for that set of

12    documents, that treatise?

13              MR. BLAKE:  You're requesting the

14    treatise?

15              MS. INGELHART:  Yes.  Correct.

16              MR. BLAKE:  Okay.  Noted.

17              MS. INGELHART:  Would you like us

18    to --

19              MR. BLAKE:  Is that something that

20    you can easily get?

21              THE WITNESS:  Yes.

22              MR. BLAKE:  Okay.  Yeah, we should

23    be able to produce that.

24              MS. INGELHART:  Okay.  Cool.

25    Thanks.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 113 of 332 PAGEID #: 954
STACIE RAY vs AMY ACTON                          Quentin L. Van Meter, M.D.

113

1          THE WITNESS:  Specifically, just
2    the Dhejne setting?
3          MS. INGELHART:  No.  The whole
4    treatise.
5          THE WITNESS:  Okay.  And then the
6    article, Mayer McHugh?
7          MS. INGELHART:  Sure.
8          THE WITNESS:  Okay.
9          MS. INGELHART:  The ones that --
10   I'm not sure how you classify your treatise,
11   but the bundle of materials that you provide
12   that you said was balanced.
13         THE WITNESS:  Sure.
14   BY MS. INGELHART:
15         Q.   Okay.  You referred your patients,
16   these 15 patients, out to outside mental health
17   professionals who provide the counseling.  Are
18   they in the watch and wait program, the
19   counseling that you were talking about?  Is
20   that the kind of treatment they're receiving?
21         A.   No.  It's just general mental
22   health care.
23         Q.   Okay.  But as it regards to
24   treating their gender dysphoria symptoms?
25         A.   The symptoms of dysphoria are the

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 114 of 332 PAGEID #: 955
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

114

1    depression and the anxiety.

2           Q.    Okay.

3           A.    It's whether or not it's the

4    undercurrent or the reaction or a combination

5    of that, that's what's being addressed is

6    depression and anxiety.

7           Q.    But would you consider that that

8    treatment plan is the watch and wait, as you

9    described it before?

10          A.    Interestingly enough, it is what's

11   recommended by the endocrine society

12   guidelines, which says in-depth, comprehensive

13   evaluation of the patient and their family and

14   appropriate treatment.

15          Q.    Okay.

16          A.    So I'm following that part of the

17   endocrine society guidelines.  And if I do, the

18   medical part never happens.

19          Q.    Okay.  And so if one of your 15

20   patients were to, prior to reaching age of

21   majority, have treatment with an outside mental

22   health professional and begin to present as the

23   gender that matches their sex assigned at

24   birth, would you see that as a case study that

25   you no longer need to keep active?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 115 of 332 PAGEID #: 956
STACIE RAY vs AMY ACTON                    Quentin L. Van Meter, M.D.

115

 1          A.    No.

 2                LEFT:   Objection.

 3                THE WITNESS:   No.  I would keep

 4    following the patient.

 5    BY MS. INGELHART:

 6          Q.    Okay.  Okay.  So you wouldn't --

 7          A.    Perhaps less frequently, because I

 8    would use the mental health provider as the

 9    sort of, if you will, monitor of how things are

10    going.

11          Q.    Okay.  Okay.  Oh, okay.  You said

12    you read a lot of articles.

13          A.    Yes.

14          Q.    Like a ton.  Can you recall

15    specifically a few that you've read recently?

16          A.    The most recent one was an article

17    in a publication called Quilette,

18    Q-u-i-l-e-t-t-e, and it's a very beautifully

19    written treatise about sort of gender and

20    gender behaviors and the spectrum thereof.

21          Q.    Okay.

22          A.    And it's sort of enlightening.

23    It's sort of written from the mental health

24    perspective and not really from the standpoint

25    of endocrinology specifically.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 116 of 332 PAGEID #: 957
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

116

1          I just read -- there are a number

2    of what I call throwaway publications, in that

3    they're not peer reviewed.  They're just

4    invited people to come in and do opinions.

5    Endocrine News, Pediatric News, and those come

6    out sometimes twice a month or once a month.

7    Monthly, they'll have synopses of lectures that

8    are given, opinion pieces from people, and most

9    often those things are all completely and

10   utterly gender affirming.

11          Q.   How do you subscribe to those?

12   How do you come up on those?

13          A.   They're sent to you until you tell

14   them no.  And even if you tell them no, they

15   still come.

16          Q.   I get that.  Thank you, Banana

17   Republic.  Hey.

18          Who are the leader, in your

19   opinion, researchers in the area of gender

20   discordance?

21          A.   Kenneth Zucker.

22          Q.   Okay.

23          A.   Paul McHugh.

24          Q.   Can you spell McHugh for me,

25   please?

1          A.    M-c, Capital H-u-g-h.

2          Q.    Okay.  Thank you.

3          A.    David Pickup is a mental health

4    professional in Texas who writes extensively in

5    treats.  Peter Lee, who is a pediatric

6    endocrinologist, emeritus retired faculty

7    member at Hershey.  He does not write on the

8    subject, but he talks on the subject.  It's

9    interesting, because academic figures tend not

10   to express anything contrary publicly.

11   Contrary to affirmation publicly.

12         Q.    Okay.  Can you explain what you

13   mean?  I'm sorry.  I think you're trying to

14   pull out something.

15         A.    There is fear on the part of

16   academic pediatric endocrinologists to openly

17   state that affirmation is harmful.

18         Q.    Okay.  So did you mean that Lee

19   doesn't speak publicly, because he doesn't want

20   to share those affirmation type opinions

21   publicly?

22         A.    Yes.

23         Q.    Are Lee, Zucker, McHugh and Pickup

24   medical professionals who write or research or

25   print on affirmation type care?

1          A.    Yes.

2          Q.    Okay.  As you would define

3     affirmation?

4          A.    Yes.

5          Q.    Okay.  What's the best source for

6     learning the standards of care on professional

7     guidelines?

8               MR. BLAKE:  Objection.

9     BY MS. INGELHART:

10          Q.    In your opinion?

11          A.    Well, standard of care and

12     guidelines are different.

13          Q.    Okay.

14          A.    So a standard of care from my

15     world view is something that is prepared

16     essentially to use as a legal document.  I

17     mean, a statement -- you can be sued for

18     malpractice if you do something that is not a

19     standard of care, and there's an adverse

20     outcome.

21          Q.    Okay.

22          A.    A clinical guideline is just that.

23     It's a guideline.  You know, these ideas that

24     we think generally are appropriate.  We've got

25     literature that supports them or doesn't

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 119 of 332 PAGEID #: 960
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

119

1    support them, and we want you to know about

2    them.  Because this is something that either is

3    confusing or perhaps controversial, and so we

4    want to be able to present what we think

5    experts in the field would recommend that you

6    do.

7                   So the Endocrine Society does

8    clinical guidelines for a number of things.

9    Treatment of Cushing disease, for instance.  If

10   it's a very complex thing, it's a very

11   difficult diagnosis to make, there's a lot of

12   murkiness in terms of the studies that you use

13   to come up with a conclusion to intervene and

14   treat, and because of that they developed

15   clinical guidelines.  They just published the

16   clinical guidelines on congenital adrenal

17   hyperplasia.  It can be and most often is a

18   mild form of a differential sexual -- disorder

19   of sex differentiation.

20                   Treatment of Turner Syndrome.

21   These are things that are particularly in

22   pediatric endocrine purview.

23            Q.   And so there's guidelines?

24            A.   Right.  They are guidelines.  And

25   guidelines for treatment with adult males with

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 120 of 332 PAGEID #: 961
STACIE RAY vs AMY ACTON                    Quentin L. Van Meter, M.D.

120

1    testosterone or post menopausal with hormonal

2    replacement therapy.  So these are written not

3    as standards of care but to say, you know,

4    there are a lot of opinions on this.  What

5    we've tried to do is to call the world's

6    literature and show you the scientific basis,

7    and the Endocrine Society guidelines are graded

8    on a scale of 1 to 4.  1 being no scientific

9    evidence whatsoever, and 4 being very strong

10   scientific evidence.

11          Q.   Okay.

12          A.   And so every one of their

13   recommendations has --

14          Q.   I see.

15          A.   Yeah.  One or four checks or

16   circles filled in.  And so that gives you, if

17   you're sort of a critical reviewer, an idea

18   about is this scientifically based or not.

19          Q.   Okay.

20          A.   And so interestingly the endocrine

21   society guidelines for transgender care, the

22   majority of them have either no or very little

23   published science to back them up.

24          Q.   Okay.

25          A.   And that's alarming, but, you

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 121 of 332 PAGEID #: 962
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

121

1    know, as a practitioner, if something comes out

2    as a clinical guideline and you are a busy

3    practitioner who doesn't often see these

4    things, and that's the case for most

5    endocrinologists up until now, is that

6    transgender patients were far and few between

7    and particularly in pediatrics.  And so your

8    professional society comes out and publishes a

9    set of clinical guidelines, and you think,

10   okay, great, wow.  You go to the summary.  You

11   don't take the time necessarily to read through

12   it critically.  Okay?

13          Q.   Okay.

14          A.    If you are part-time academician,

15   part-time clinical practitioner, you read

16   everything in absolute and utter detail.  Okay?

17   And academic programs and their journal clubs

18   will very specifically take an article like

19   this, and they will literally take it totally

20   apart.  They'll go to every reference.  They'll

21   go back through.  They'll go out and research

22   things that, this paragraph says here, guess

23   what I found.  You know, a study in the journal

24   of whatever or whatever that's completely

25   against this.  Okay?

1          Q.    Okay.

2          A.    So that's not done by

3    endocrinologists in general or by pediatric

4    endocrinologists in general.  And in clinical

5    practice, you know, I see patients four days a

6    week and admin stuff sprinkled in.  Four full

7    days, if you count all the hours up, and, you

8    know, I haven't got time to do that unless I

9    make an effort.

10         Q.    Right.

11         A.    So I tend to just pay a lot more

12   attention to the transgender stuff, because it

13   becomes for me a necessity that somebody's got

14   to do the job.

15         Q.    Okay.

16         A.    And I'm willing to take the time

17   to do that as best I can.  The person that

18   critiqued this article actually went through

19   from stem to stern and point by point by point.

20   Something I would love to have the time to do

21   but didn't, and it was sort of done for me by

22   somebody who was clearly -- he actually is a

23   very LGB activist psychologist.

24         Q.    LGB?

25         A.    LGB.  Yeah.  And he said, whoa,

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 123 of 332 PAGEID #: 964
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

123

1  whoa, whoa, whoa.  You know.  Let's look at

2  this in-depth, because this is a

3  misrepresentation of facts.

4         Q.   And the doctor who did that kind

5  of annotation and the new article, did you say

6  that was Dr. Cox?

7         A.   Cox.  C-o-x.  And I can actually

8  get a copy of that to you.

9         Q.   That would be great.

10         A.   I don't have it on my memory.  If

11  you'll remind me to provide that.

12         Q.   Thank you.  We would appreciate

13  that.  Okay.  And -- oh, shoot.  I lost my

14  train of thought.  Oh, okay.  So guidelines are

15  found in documents like what we're looking at.

16  They are often, I don't want to say always,

17  often created by professional associations in

18  that specific field, but they're not the same

19  -- they're not using the same weight in like a

20  legal malpractice proceeding?  They're just

21  guidelines?

22         A.   That's correct.

23         Q.   Where are standards of care found,

24  or how is that established?

25         A.   If somebody wants to establish a

1   set of things that this is what should be done

2   and this is what's right and this is what's

3   wrong, and they just create those, and they

4   publish them.

5           Q.   Who does that?

6           A.   WPATH did that in this case.  I

7   don't know other standards of care,

8   specifically, but I'm sure they do exist,

9   because I have been asked in medical testimony

10  and depositions and stuff, are you aware of

11  standards of care versus clinical guidelines.

12  So I got most of my information about the

13  difference of those from attorneys in sort of

14  malpractice cases, particularly.

15          Q.   Okay.  Okay.  So what's the best

16  source for learning standards of care?

17               MR. BLAKE:  Objection.

18  BY MS. INGELHART:

19          Q.   What do you use to learn or to

20  access standards of care?

21          A.   I don't often access standards of

22  care.

23          Q.   Okay.

24          A.   I look for clinical guidelines for

25  support.

125

1        Q.    All right.  Were you on faculty

2   between -- anywhere between 1978 and 1980?

3        A.    Yes.

4        Q.    Where were you?

5        A.    1978 to -- excuse me.  From 1976

6   to '78, I was at LSU School of Medicine.  I was

7   a fellow until -- 1980 to 1986 I was on

8   clinical faculty at UC San Diego Medical

9   School.  From 1986 to 1991 I was clinical

10  faculty at University of California San

11  Francisco School of Medicine.

12       Q.    Okay.

13       A.    And from that to Emory and

14  Morehouse.

15       Q.    And when did you leave the UC

16  system?

17       A.    I was transferred when I completed

18  my Navy career and moved to Atlanta.

19       Q.    Did the Navy transfer you to

20  Atlanta?

21       A.    No.  I finished my career, and

22  that was my final move after I -- they say,

23  goodbye, thanks, and move you to wherever

24  you're going to go.

25       Q.    Oh, they moved --

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 126 of 332 PAGEID #: 967
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

126

1          A.   They move you, yeah.

2          Q.   So you choose where you want to

3     go, and the government --

4          A.   Yeah.  Yeah.

5          Q.   -- as a nice gift says, we'll pay

6     for that --

7          A.   Right.

8          Q.   -- expensive across country?

9          A.   Right.

10         Q.   Got it.  Why did you choose

11    Atlanta?

12         A.   One of the job opportunities that

13    was available was in Southern Suburbs of

14    Atlanta, in Fayette County, Georgia.

15         Q.   One of the pediatricians in the

16    multi-specialty group was a resident that I had

17    trained with many, many years before.  He had

18    left the Navy after a very short period of

19    time, and he was done with his obligated

20    service and moved back to Georgia and then was

21    recruited from his home in Macon to come up to

22    Fayette County, Georgia to practice.  And they

23    were looking for a pediatrician, and he knew me

24    and he said, would you come look?

25               And I said, Georgia?  I don't know

127

1    anything about Georgia.  We had no roots there,

2    no family, no experience whatsoever.  And

3    landed there and put our feet in red clay and

4    probably will never leave.

5          Q.   It's a great state.

6          A.   Yeah.

7          Q.   Well, thank you.  You've never

8    worked as a mental health professional, right?

9               MR. BLAKE:  Objection.

10              THE WITNESS:  Not as a certified

11   mental health professional, no.

12   BY MS. INGELHART:

13         Q.   You never worked as a

14   psychologist, correct?

15         A.   No.

16         Q.   Or as a psychiatrist?

17         A.   No.

18         Q.   You've never worked as a

19   geneticist either, correct?

20         A.   No.

21         Q.   What's the age range of your

22   patients?

23         A.   Birth to completion of first

24   undergraduate degree in college.  So it's 22,

25   23.  I have very few patients who are in their

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 128 of 332 PAGEID #: 969
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

128

1   late 20s who are neurologically compromised,

2   and they're essentially children for all

3   intents and purposes, an adult.  Endocrine

4   folks don't like to take care of them.  So

5   we're their home.

6            Q.   Are those patients often patients

7   you've treated over the course of their life?

8            A.   Yes.  I don't often accept

9   patients past 18, who have not been with me

10  before.

11           Q.   Okay.  Have you treated children

12  with intersex conditions?

13           A.   Yes.

14           Q.   Do you currently treat children

15  with intersex conditions?

16           A.   Yes.

17           Q.   How many do you currently treat?

18           A.   I think the number of active

19  patients I have now, perhaps 20 kids who have

20  adrenal hyperplasia, which is a very, very mild

21  form.

22           Q.   Okay.

23           A.   I have I think four patients with

24  complete androgen insensitivity.

25           Q.   Okay.

129

1         A.   I have one patient who is referred

2    to as an XX male.  That's sort of a catch

3    basket.  No one understands specifically what

4    happened, but his karyotype is XX, and he had

5    all male genitalia, produced testosterone.

6    It's just one of those very rare -- super rare

7    ones.

8              I have, gosh, two or three dozen

9    Klinefelter's kids, but I don't consider them

10   DSDs at all.  That's an inappropriate use of

11   the term.

12        Q.   Why is that?

13        A.   Because it's not a sexual

14   differentiation issue.  They have an extra X

15   chromosome, but the only effect is it causes

16   infertility to them.  They have no anatomic

17   female organs anywhere, and there's no

18   ambiguity of genitalia whatsoever.  They just

19   have dysfunctional testes.

20        Q.   Okay.  So it affects their

21   reproduction.  What about the XX male?  It

22   sounds like they don't have --

23        A.   This particular one -- I've never

24   had anybody tell me they've ever treated one

25   before.  It was so rare that essentially it's

 1    not even in endocrine textbooks really.  It's

 2    in genetics literature.  This is a boy who's

 3    autistic, who has male genitalia, and when they

 4    did the -- I can't remember specifically.  Oh,

 5    Mom had an -- she was older.  So they did in

 6    the pregnancy, sort of when you have a boy or

 7    girl or any Down syndrome or whatever, so she

 8    had an amniocentesis which said XX.  So they

 9    were all prepared for a girl.  This was

10    pre-ultrasound.  They weren't doing ultrasounds

11    routinely on every pregnancy that looked at

12    genitalia back then.  Ultrasound technology was

13    relatively crude, and they weren't thinking

14    they needed to do that.

15                  And so out comes a baby boy, and

16    they said, no, no, no, no.  What's wrong with

17    this?  Testicles descended.  No ambiguity of

18    genitalia whatsoever.  So they repeated the

19    chromosome analysis in the baby and came up

20    with XX.  A hundred percent XX.  So that

21    startled everybody, and that got me to go

22    searching, and I found the entity of XX male,

23    and that's what this child had.

24          Q.   Okay.  And that male has endocrine

25    medical needs?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 131 of 332 PAGEID #: 972
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

131

1        A.   No.  Actually, did not.  There was

2   a point in time where the testes sort of became

3   retractile and very difficult to find, but they

4   were there at birth.  I had documented they

5   were there at birth, and then I kept following

6   him just out of curiosity.  I mean I'm not

7   going to need to do any medical treatment, but

8   this is an educational experience for me.  And

9   because of his autism and the fact that I was

10  also a general pediatrician in practice at that

11  time, I became that child's general

12  pediatrician and followed him along for routine

13  medical care.

14            And then when I left my pediatric

15  practice behind in 2003 and did full-time

16  endocrine, the mom just came over to me and

17  said, can I continue to come to you even though

18  there's no really endocrine issues at all?

19            I made sure that he went through

20  puberty appropriately, which he did.

21  Everything was smooth.  Hormone levels were

22  fine.  There was no evidence of any gonadal

23  damage, and the autism was the key.  The key

24  problem for him.

25        Q.   Okay.  Have you done any

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 132 of 332 PAGEID #: 973
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

132

```
 1    scientific research related to the gender

 2    dysphoria?

 3          A.   I have not.

 4          Q.   Related generally to transgender

 5    people?

 6          A.   No.

 7          Q.   Anything related to any gender

 8    issues in scientific research?

 9          A.   No.

10          Q.   Okay.  Have you published any

11    books or articles addressing gender dysphoria?

12          A.   I have.

13          Q.   What are those?

14          A.   Most recently is actually an

15    article that will come out in October in Issues

16    in Law and Medicine, and it's a sort of

17    comparison of counseling treatment, so-called

18    watch and wait, versus affirmation, and the

19    pathways for each and the known outcomes for

20    each that are in published literature.

21          Q.   And just to be clear for the

22    record, watch and wait versus affirmation,

23    affirmation in this context means gender

24    affirming affirmation?

25          A.   That's correct.
```

133

1        Q.    Thank you.  Okay.  How does one

2   get an article published in Issues in the Law?

3            MR. BLAKE:  Objection.

4   BY MS. INGELHART:

5        Q.    Oh.  And Medicine.  I'm sorry.

6        A.    You're either invited to send it

7   in for peer review, or you can volunteer and

8   send it in for review.  Either way.

9        Q.    So it's a peer review journal?

10       A.    It's a peer review journal.

11       Q.    Got it.

12       A.    I'm sorry.

13       Q.    I should have asked that more

14   artfully.  Okay.  Issues in Law and Medicine.

15   Will your article have both issues of law and

16   medicine discussed within it?

17       A.    No.

18       Q.    Will your articles just have

19   issues of medicine discussed with that?

20       A.    Yes.

21       Q.    Okay.  So then will your peer

22   reviewers also only be medical professionals?

23       A.    I think there are bioethic people

24   as well.  So it crosses over a bit into law.

25       Q.    Oh, okay.  Bioethics and an area

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 134 of 332  PAGEID #: 975
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

134

1    of law.

2              A.    Yeah.

3              Q.    Okay.  I understand.  So that's

4    the most recent one, and have you published

5    other articles or books -- or articles, I

6    guess?

7              A.    Let me think.  I mean we did the

8    letter to the editor of Journal of Clinical

9    Endocrinology Metabolism, which was published

10   in March of 2019.

11             Q.    Okay.

12             A.    And that was essentially a

13   critique of the 2017 guidelines.

14             Q.    And that was not a peer reviewed

15   article.  It was a letter to the editor?

16             A.    It was a letter to the editor,

17   yeah.  It's very difficult to get anything

18   published.

19             Q.    Agreed.  Okay.  You belong to

20   professional associations, correct?

21             A.    Yes.

22             Q.    Could you list that?  Do you know

23   them off the top of your head?

24             A.    The endocrine Society, which it

25   requires training in the field of

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 135 of 332 PAGEID #: 976
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

135

1    endocrinology.

2         Q.    Okay.

3         A.    I don't think board certification

4    is required.  I belong to the Georgia Chapter

5    of the American Academy of Pediatrics, but I

6    left the membership with the National American

7    Academy of Pediatrics five years ago.

8         Q.    And why did you leave?

9         A.    I just got tired of nonsense.

10        Q.    Okay.  What nonsense?

11        A.    Policy statements like this one

12   that are based on profound lack of valid

13   science.  Essentially, it became a social

14   political organization and not a medical

15   professional organization in my personal

16   opinion.  The Georgia Chapter maintains a

17   strong interest in legislative efforts in the

18   State of Georgia for the benefit and welfare of

19   children, which is most often devoid of social

20   activism.  If it's activism, it's activism in

21   general for the proven benefit of children.

22   Its concept is if it's good for children, then

23   Georgia Chapter generally will be supportive.

24   It's not completely, but it's way more than the

25   national organization, its parent organization.

1              I belong to the American Diabetes

2     Association, which is just dues paying.  You

3     are a professional member or a nonprofessional

4     member.

5              I belong to the Pediatric

6     Endocrine Society, which is a national

7     organization.  And I honestly don't know

8     whether a degree is required, but the

9     membership categories are if you're a

10    practicing and board certified endocrinologist,

11    you're sort of listed one way.  If you're an

12    affiliate, you're listed.  Or if you're from a

13    foreign country, you can be an affiliate.

14             Q.   Okay.

15             A.   I am a member of the American

16    College of Pediatricians.  Which is a

17    professional organization established in 2002,

18    I believe.

19             Q.   Okay.

20             A.   And it's an organization that

21    specifically looked at the American Academy of

22    Pediatrics as an organization politically

23    bound, and they wanted politics to be separate

24    from that, and so that they said, if we can't

25    make decisions that are based on valid science,

1   that the goal is specifically what is

2   scientifically proven to be a clear benefit to

3   children and recommended those policies.  And

4   so we have some things in common with the

5   American Academy of Pediatrics on a number of

6   things.

7                 We're a little easier to get up

8   and run and make a statement about particular

9   things, because our size is significantly

10  smaller, and we can access our membership

11  fairly quickly and get a read from the

12  membership and executive board and board

13  members to say, is this a concern that we

14  should address or not?  The American Academy of

15  Pediatrics says 67,000 members.  It's a

16  gigantic organization centered near Chicago.

17  It used to be a group that would listen to the

18  constituency, bring in input and sort of digest

19  it.  But over the past 30 years it's moved

20  completely away from that and is essentially

21  run by an executive committee of 12 members and

22  a, if you will, sort of a cadre of long-term

23  career people that are the bureaucrats within

24  the organization, who essentially run the

25  organization.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 138 of 332 PAGEID #: 979
STACIE RAY vs AMY ACTON                              Quentin L. Van Meter, M.D.

138

1          And I maintained my membership in
2    that organization as long as I could.  I was on
3    their committee looking at guidelines and
4    appropriate things for peer reviewed education
5    opportunities and growth pubertal development.
6    That was sort of easy to do, because there
7    really wasn't any controversy.  There were
8    things that were beginning to creep in that
9    were inaccurate that I was able and I felt my
10   input was listened to and other people had
11   their opinion, and their educational material
12   then was guided back to a more essential and
13   scientifically based educational treatise.

14          On the case of obesity they went
15   off the deep end, and it's very difficult for
16   me to read what they recommend and what they
17   say, because it turns out it doesn't work.  And
18   that's my own personal opinion.  I have an
19   enormous amount of clinical experience with
20   obese children, approaching it in a vastly
21   different way and coming out with a remarkably
22   successful treatment option that works.
23   Whereas, what they're recommending is just the
24   same thing it has been forever, and it's not
25   successful.  Ten percent success rate over

1  obesity.  I have about a 75 percent success

2  rate.

3              And I gave input to that

4  committee, and it was as if I weren't even in

5  the room or on the telephone call.  And I

6  decided, you know, I just -- I'm spinning my

7  wheels, and I'm not getting anywhere.  It's

8  just yet another reason why I really don't want

9  to spend my time and effort at the American

10  Academy of Pediatrics.  So I left that

11  organization finally.

12        Q.    Why didn't they listen to your

13  opinions about the obesity?

14        A.    Because I'm a private practitioner

15  that doesn't do clinical research.

16        Q.    Okay.

17        A.    The American Academy of Pediatrics

18  began as an organization not of academicians

19  but of practicing physicians.

20        Q.    Okay.

21        A.    And actually the academic

22  pediatric community, their professional

23  organizations were the American Pediatric

24  Association and the Society for Pediatric

25  Research.  Very small cadre of academic

1    pediatricians who -- and I happen to be a

2    member of the regional meetings for the Society

3    for Pediatric Research and got to know a lot

4    about how those organizations work and what

5    their interests were, and it was a very snobby

6    academic environment that looked down on the

7    American Academy of Pediatrics as general

8    practitioners who were just local yocals.  I

9    mean, honestly, what were used to be referred

10   to as LMDs.  Okay?  Local medical doctors.

11          Q.   Oh.

12          A.   People who were not in touch with

13   academia.

14          Q.   Okay.

15          A.   Okay.  The AAP as an organization

16   had tons of members, because it provided an

17   opportunity for CME.  Gave conferences dozens

18   of times a year regionally, nationally, twice a

19   year, worked hand-in-hand with the governing

20   boards of the certification societies and

21   whatnot, and the academic pediatricians saw

22   that as a need.  They needed to be involved in

23   that and stop looking down at them.  So they

24   basically came in and essentially took over the

25   organization.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 141 of 332 PAGEID #: 982
STACIE RAY vs AMY ACTON                          Quentin L. Van Meter, M.D.

141

1            And it does not represent

2    pediatricians.  It represents academic

3    interests and social theory and politics.  And

4    it's just like -- politics exist.  They're

5    going to.  But when you start making policy

6    statements like this and others that are an

7    embarrassment in terms of lack of scientific

8    validity, and they are not the opinion of the

9    membership.  They are the opinion of a

10   committee.  Okay?  This paper does not

11   represent the opinion of pediatricians at all.

12            Q.   How do you know that?

13            A.   Because I've talked to

14   pediatricians.  All my referring pediatricians

15   that know me.  They were not asked.  This was

16   not put out for a review and your opinion.  The

17   American College, however, sends absolutely

18   every policy statement out to the full

19   membership and will not publish anything as a

20   policy statement unless it has approval of 75

21   percent of membership.

22            Q.   How big is the membership of the

23   college?

24            A.   It exceeds 500.

25            Q.   And how big is the membership of

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 142 of 332 PAGEID #: 983
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

142

1    the AAP?

2            A.    67,000.

3            Q.    Okay.  So you mentioned opinions,

4    politics, et cetera, at the AAP that you

5    disagreed with.  You also said there was

6    conflict with your professional opinions about

7    trans issues and OBC.  Were there any other

8    areas of medicine?

9            A.    Attention deficit disorder,

10   learning disabilities, in terms of the

11   evaluation, and that really kind of jelled in

12   with attention deficit disorder as an entity.

13   It's another entity for which there is no

14   diagnostic test.  Okay?  It's treated.  The

15   pharmacology industry has answers to

16   everything, and as a general pediatrician who

17   perks it from a different world view and was

18   much more successful in handling things and

19   actually getting to the root of the problems, I

20   had total disagreement with the guidelines and

21   representation there.

22              There were some developmental

23   pediatrician -- developmental pediatrics

24   became, aside from neurology, a subspecialty

25   that was full of really strange people who were

1   not dealing with science at all and who were

2   invited to speak and again were an

3   embarrassment because of their clearly sort of

4   anecdotal approach to everything.

5           Q.   Were they doctors?

6           A.   Yeah.

7           Q.   Oh, okay.

8           A.   They were pediatricians, actually.

9           Q.   Okay.

10          A.   So medicine is full of things like

11  that.  Again, when there are battles to choose

12  that you think you can possibly make a

13  difference with and the scope of trying to

14  approach ASMA management, from my standpoint, I

15  was a tiny, tiny, tiny, tiny drop in an ocean,

16  and I knew that I wasn't going to get anywhere

17  trying to fight that battle.

18              I just took care of my patients,

19  and I did well.  I did much better by then,

20  because of my methods of treatment.  Then those

21  that were recommended by the AAP and

22  guidelines, and so, you know, it's a situation

23  where always the focus is exactly what is best

24  for the children, what works, what creates the

25  least harm and what shows ongoing constant

144

1    compassion for the patient and why they came to

2    see you.

3            Q.   Okay.  Thank you.  So I understand

4    your relationship with the American Academy of

5    Pediatrics and the Georgia Chapter.  Are you a

6    leader or an officer in the Pediatric Endocrine

7    Society?

8            A.   No, I'm not.

9            Q.   Okay.  How many members are in

10   that group?  Do you know?

11           A.   I don't know.  I would guess about

12   a thousand.

13           Q.   Okay.  Do you know whether the

14   Pediatric Endocrine Society has a policy

15   statement on the treatment of trans or --

16           A.   They do.  They do.

17           Q.   Okay.  Are you familiar with that?

18           A.   I am.

19                (Thereupon, Plaintiffs' Exhibit 2,

20   Statement on gender-affirmative approach to

21   care from the pediatric endocrine society

22   special interest group on transgender health,

23   was marked for identification purposes.)

24   BY MS. INGELHART:

25           Q.   Okay.  Plaintiffs' Exhibit 2.  So

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 145 of 332 PAGEID #: 986
STACIE RAY vs AMY ACTON                              Quentin L. Van Meter, M.D.

145

1    do you recognize this document?

2           A.    I do.

3           Q.    And what is it?

4           A.    It's a statement on

5    gender-affirmative approach to care from the

6    pediatric endocrine society special interest

7    group on transgender health.

8           Q.    Okay.  Could we turn to what is

9    the second page, but it's called Page 476 here?

10          A.    Yes.

11          Q.    And look in the section on the

12   right-hand column called mental health care of

13   transgender youth.  Do you disagree with this

14   first paragraph statement here, there are no

15   data to support the use of reparative or

16   conversion therapy with the intention of

17   changing one's gender identity or sexual

18   orientation?  Furthermore, the American

19   Psychological Association, the American

20   Psychiatric Association and the American

21   Academy of Pediatrics, reject this form of

22   therapy and support a more trans-affirmative

23   model of care?

24          A.    I'm totally in opposition to that

25   statement.

1        Q.    Okay.  And why is that?

2        A.    Because it has no scientific

3   validity.

4        Q.    Okay.  So you --

5        A.    You know, the term -- and this is

6   a common thing -- reparative or conversion

7   therapy refers to essentially talk therapy.

8   You know, there is no standard of care that has

9   been practiced that anyone is aware of or can

10  prove has every actually happened, and there

11  are cases brought against them, litigation

12  against an individual, for electric shock and

13  rape and all the things that are constantly

14  brought up as what conversion therapy is or

15  aversive therapy.  Ice baths and things like

16  that.  Rubber band shocks and things like that.

17  That's not a standard of care, but it's always

18  referred to.

19            So if they're talking about those

20  things, yes, but those are not ever recommended

21  by anybody who is a reputable practitioner in

22  mental health, who's trained, who has any

23  certification.  Are they done?  I have no idea,

24  but there are no case reports of them actually

25  having been done.

1                        There are anecdotal reports of

2    this was done to me.  It's kind of like the

3    movie Monty Python and the Holy Grail.  How do

4    you know she's a witch?  Well, she turned me

5    into a newt.  Are you familiar with that

6    particular scene?

7            Q.    No.   I don't think I understand

8    that message.

9            A.    And of course the man is not a

10   newt, and the people around him look at him and

11   say, what?  And he says, oh, but I got better.

12           Q.    Okay.

13           A.    So that is the validity.   An

14   anecdotal report without any scientific or

15   documented actual happening.  Just a statement

16   by somebody.  Okay?

17           Q.    Okay.

18           A.    So that to me immediately negates

19   the entire thing, because we're not talking

20   about conversion at all.  We're not talking

21   about reparative, unless you're trying to

22   repair mental health issues and repair

23   depression, anxiety, and in that case that is a

24   repair, if you will.  But that is meant as a

25   pejorative term as harm.  Okay?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 148 of 332 PAGEID #: 989
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

148

1          And so by stating that, I know

2    already the entire bias.  I happen to know Dr.

3    Rosenthal personally.  I've known him since he

4    was in his fellowship training.

5          Q.   Okay.

6          A.   He is very agenda driven, and he's

7    never left academia.  He's only been where he

8    trained.  He's at UC San Francisco where he was

9    a fellow, and he's never departed from there.

10   I often, knowing him as I do and having been

11   familiar with that training program that he

12   came from, his mentors in that training program

13   are all deceased at this point in time, but

14   they were notorious for ripping to shreds, even

15   ripping each other to shreds, over the lack of

16   scientific validity of things.  And if I have

17   an opportunity, without being -- not affronting

18   him in any way, I would like to say, Stephen,

19   none of this would hold up with your faculty

20   members.  They would have torn this to shreds,

21   because it's not based on science, and you know

22   it, and I know it.  Okay?

23         Q.   Okay.  So have you reviewed this

24   entire document?

25         A.   I have.  I have.  I can't quote

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 149 of 332 PAGEID #: 990
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

149

1    chapter and verse, but when it came out I read

2    it.  I actually read the proposed version and

3    sent in a critique of it.  It was invited,

4    interestingly, by Stephen Rosenthal to

5    specifically write critiques.  He specifically

6    said after -- and this is how I know my letter

7    to the Endocrine Society and my critique of

8    their guidelines, because he was on that

9    committee as well -- the things that I

10   critiqued about the Endocrine Society

11   guidelines he specifically in the invite to

12   critique these guidelines said, above all,

13   don't bring  up this, this and this.  Which

14   were the things that I brought up and others

15   had brought up.  So he was aware of the things

16   that they didn't want, and they didn't include

17   anything here in these guidelines, didn't

18   change anything.

19           Q.   What were those things?

20           A.   Just the lack of scientific

21   validity and the issues of harm done by what's

22   called talk therapy and avoidance.  You know,

23   statements like the undercurrent emotional

24   issues don't exist.  They're only reactive.

25   And it says it right in here.

1    Q.   Okay.  So is talk therapy

2  conversion therapy?  I'm confused.

3    A.   Talk therapy is called conversion

4  therapy, yeah.  Talk therapy is essentially

5  conversion therapy.  That's what they're

6  referring to.

7    Q.   And talk therapy is not the type

8  of therapy you get when you watch and wait?

9    A.   No.

10    Q.   Okay.  Okay.  Okay.  So you're

11  just saying that they're using terms that you

12  think represent something else here?

13    A.   Yes.

14    Q.   Okay.

15    A.   And the next paragraph, although

16  rates of depression are two to three times

17  higher in transgender youth versus non, it's

18  basically in response to societal rejection.

19  Okay?  Totally unvalidated.

20    Q.   What's unvalidated?  I'm sorry.

21    A.   That their suicide and depression

22  and anxiety is related to societal rejection

23  entirely.

24    Q.   So it's been unvalidated in

25  scientific data that societal pressures lead to

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 151 of 332 PAGEID #: 992
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

151

1    those mental health issues?

2          A.   They are not the -- these kids

3    have these issues beforehand.  It's been

4    conservatively stated that 70 percent of

5    transgender kids have undercurrent emotional

6    issues.  In my clinical experience, it's a

7    hundred percent.  So it depends on what you

8    term psychological morbidity coming in.

9               But this paper says, essentially,

10   that all of that is entirely societal, and that

11   worrying about trying to do talk therapy to go

12   look at what's really in the basement and the

13   cobwebs is inappropriate and unnecessary.  And

14   that's what this statement said, as well.  So

15   it basically takes talk therapy and evaluation,

16   in-depth psychological evaluation and says

17   don't do it.

18         Q.   I see.  Oh, shoot.  If it comes to

19   me, I'll ask it later.

20         A.   Okay.

21         Q.   Okay.  So looking to the key

22   points section here on the same Page 2, at the

23   top, do you disagree with this first bullet

24   point that sex chromosomes and/or genitalia do

25   not determine one's gender identity?

1          A.   I would agree with that, yes.

2          Q.   So sex chromosomes and genitalia

3    do not determine one's gender identity?

4          A.   They're not a definitive

5    determination of gender identity, because

6    gender identity is a fluid concept of a

7    psychological basis.

8          Q.   Okay.

9          A.   So they are essentially many times

10   related, but they don't determine one's gender

11   identity entirely.  Because gender identity

12   disorder or gender dysphoria is caused by the

13   fact that there is a discordance between those

14   two.

15         Q.   Oh, that was my question.  So if

16   it's in your opinion that trans youths who

17   experience these mental health issues that are

18   concurrent with gender dysphoria and/or a

19   symptom in the criteria of gender dysphoria

20   aren't due to societal...

21         A.   Rejection?

22         Q.   Yes.  Societal factors,

23   environmental factors, from whence do you

24   believe those mental health issues come from?

25              MR. BLAKE:  Objection.  Vague.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 153 of 332 PAGEID #: 994
STACIE RAY vs AMY ACTON                           Quentin L. Van Meter, M.D.

153

1    Misstates.

2              Go ahead.

3              THE WITNESS:  From adverse

4    childhood events.

5    BY MS. INGELHART:

6         Q.   Okay.  Okay.  Is it possible that

7    adverse childhood events could be related to

8    somebody's gender non-congruity?

9              MR. BLAKE:  Objection.

10   Hypothetical.  Vague.

11             Go ahead.

12             THE WITNESS:  Down the pike later,

13   as the patient is rejected by family members or

14   peers, it could cause some secondary rejection

15   issues.

16   BY MS. INGELHART:

17        Q.   Okay.  Okay.  So do you believe

18   that talk therapy is the appropriate course of

19   treatment to get someone's gender identity to

20   realign with their birth assigned sex?

21             MR. BLAKE:  Objection.

22             THE WITNESS:  It is the most

23   effective, proven most effective means to

24   relieve gender dysphoria.

25   BY MS. INGELHART:

154

1          Q.   Okay.  We can set this aside for

2   now.  We might come back to it.  I apologize.

3   Can we take another break?  Is that okay?

4               THE COURT REPORTER:  Sure.

5               (Thereupon, a break was taken.)

6   BY MS. INGELHART:

7          Q.   Okay.  I think we left off talking

8   about the Pediatric Endocrine Society; is that

9   right?

10         A.   Right.

11         Q.   Okay.  And we were looking at that

12   document.  Actually, do you want to refer back

13   to it real quick?

14               Here.  There's where I put mine.

15   Thank you.

16               Okay.  I just wanted to quickly

17   look to the bottom of Page 476 here, where it

18   talks about desistance, I think.  So the author

19   notes it's important to note that not all young

20   gender-nonconforming children will persist as

21   such into adolescence, and that there might be

22   different paths of gender development and

23   degrees of complexity.  This has raised the

24   concern about supporting an early social

25   transition in young children who may not

1   persist into adolescence.  However, previous

2   studies may have underestimated or

3   misunderstood the likelihood of the long-term

4   persistence.

5              And then it highlights, I think, a

6   couple key issues that could explain, though

7   the author does not assert that they do, in the

8   left column.  A key issue is that criteria for

9   gender identity disorder from early versions of

10  the DSM on which the studies were based

11  included diagnosis on the basis of gender

12  atypical expression alone, which may or may not

13  be independent of gender identity.  Some have

14  suggested that the proportion of persisters

15  would likely be higher by applying current

16  gender dysphoria criteria and, for example,

17  including individuals who continue to express a

18  desire to be of the opposite sex or to believe

19  that they were the opposite sex, regardless of

20  gender-stereotypical behaviors per se.

21             I know that's a little wordy.  We

22  did talk about earlier that Dr. Zucker's study

23  was based on the gender identity disorder

24  criteria, right?

25             A.   The two were of the same actually,

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 156 of 332 PAGEID #: 997
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

156

1   So the name changed only because the -- and

2   this is from Dr. Zucker's own personal

3   statements and the people who understood the

4   process.  The APA committee wanted to

5   completely remove gender identity as any kind

6   of pathology or any kind of morbidity

7   whatsoever.  They wanted it stricken.  And so

8   Dr. Zucker was profoundly against that.  He

9   sort of held out and said, if you do that, then

10  all the patients that I've treated will have no

11  ability to have their care covered by

12  third-party payers.

13              So I am willing to compromise and

14  call this a gender dysphoria, because that --

15  if it's a category you're willing to agree

16  exists, is a level that will allow then to have

17  a code, a DSM code, that we can put on and

18  match in payments for services.  DSM is all

19  about mental health being quantified and

20  interventions being quantified.  And without

21  that you can't say, I had an hour session with

22  a cranky, angry teenager.  Well, what's that

23  diagnosis?  Cranky?  No, that's not a

24  diagnosis.  Oh, but oppositional defiant

25  disorder is a diagnosis.  So we're going to put

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 157 of 332 PAGEID #: 998
STACIE RAY vs AMY ACTON                    Quentin L. Van Meter, M.D.

157

1  a name to it.  We have to give it some sort of

2  entity that we all are going to agree exists,

3  so that there's coverage for your service.

4           So gender dysphoria in his mind

5  encompassed everybody who had gender

6  incongruence at all.

7      Q.   Right.

8      A.   Okay.  Anybody.  And so he took

9  all those patients, and that's what he took.

10 His was actually a very concrete definable

11 entity.  And so he's been criticized that, oh,

12 well back then, the desisters really were not

13 gender dysphoric.  Therefore, you were over --

14 you know.  You know.  And the answer is that's

15 patent B.S.  It really is.  You're just

16 basically saying anything that was old and

17 previously published that we don't agree with

18 is counter to promoting affirmation only.

19          And Zucker did not do that.

20 Zucker was all about talk therapy, all about

21 discovery, all about mental health issues as a

22 basis.  And here he was the world's leader in

23 literature, and the WPATH bibliography at the

24 time when he was running his clinic initially

25 quoted that he was a WPATH member.  He was on

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 158 of 332 PAGEID #: 999
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

158

1    their board.  I don't know that he ever assumed

2    the office of presidency of that organization,

3    but clearly a strong advocate for people who

4    were transgender.  And subsequently the

5    biography eliminated most of his references.

6              Here he was the person who was

7    responsible for getting care for these kids and

8    really working with them, and he was soundly

9    rejected, and his clinic was shuttered by

10   activists who wanted him to basically go away.

11             Q.   Okay.  But are you saying that

12   there was no change in the criteria listed in

13   the DSM between the change from gender identity

14   disorder to gender dysphoria?

15             A.   It's all wording.  I mean it's the

16   same entity.  It's just his described -- and I

17   can't remember word for word what was in

18   DSM-III.  DSM-IV I haven't referred to

19   recently, because DSM-5 is sort of the new

20   entity that we have

21   to -- like it or not, it's what's in there.

22   And so I have read, you know, the DSM-5

23   criteria and more familiar with them than I am

24   the prior ones.

25             But the idea is that it's -- you

1   know, it describes the same thing.  It's just

2   named differently, so that it wasn't

3   pathologic.  So that it was not a delusional

4   disorder.  Zucker believed and stated that

5   gender identity and gender incongruence is a

6   delusional state.  Period.

7           Q.   Do you agree with that?

8           A.   Yes, I do.

9           Q.   Okay.

10          A.   But it is not a delusional

11  disorder, and I didn't understand the

12  difference between the two of those things, but

13  he explained that sort of indirectly through a

14  third party that a delusional disorder is a

15  very specific psychiatric term and to say that

16  all kids with gender identity disorder are

17  delusional is incorrect.  The only people that

18  are delusional are the adults who persist in

19  their delusion, and that becomes a delusional

20  disorder.

21          So all people who go through all

22  the counseling and therapy who do not lose that

23  delusional thought process then have a

24  delusional disorder.  Period.  End of sentence.

25  That's his -- he's the professional.  I am not.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 160 of 332 PAGEID #: 1001
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

160

1    He's the one who published and treated, and so

2    I defer to experts in that field to use the

3    terminology that they choose.  But making

4    gender dysphoria the terms took it away from

5    being a disorder, and that was the entire

6    purpose of the APA committee that did that.

7              And there are people who are a

8    party to the discussions that occurred both

9    with Zucker in the room and with him out of the

10   room about how they were going to essentially

11   push him into dropping the disorder.

12         Q.   Okay.

13         A.   And he thought that would be a

14   disservice to the patients, that they would end

15   up on the streets with no --

16         Q.   Okay.  So just to be clear so I

17   understand Zucker.  Children lower than the age

18   of majority, who have what would be called now

19   gender dysphoria, then gender identity

20   disorder, have a term you used called the

21   delusional state, correct?

22         A.   Correct.

23         Q.   And do you agree with that?

24         A.   Delusional thought.  I want to

25   retract the word state.  Delusional thought.

161

1          Q.   Okay.  And then adult people over

2     the age of majority or at the age of majority,

3     who have gender dysphoria or gender identity

4     disorder as it was formerly called and

5     therefore persist with that have a delusional

6     disorder?

7          A.   Yes.  That was the original

8     statement.

9          Q.   Okay.

10         A.   But the word disorder was taken

11    away.

12         Q.   But do you agree with that?

13         A.   I do.  I agree with that.

14         Q.   Okay.  So this first critique here

15    says that the GID criteria were different in

16    kind in some ways than the gender dysphoria,

17    and that could explain some difference in prior

18    results from studies today.  And you disagree

19    with that?

20              MR. BLAKE:  Objection.

21              THE WITNESS:  I do.

22    BY MS. INGELHART:

23         Q.   Okay.  And then the second

24    criticism here is about follow-up after the

25    fact.  Do you happen to know Dr. Zucker's

162

1    methodology and how long after this study was

2    completed that he did the follow-up?

3             A.   He followed all the patients

4    through adulthood.  He was not limited to just

5    children.

6             Q.   Okay.

7             A.   His clinic was addiction medicine.

8    That was the subdivision.  So he took care of

9    primarily adults, but this was a very small

10   subset of patients who happened to be children.

11            Q.   Okay.  Do you know how far into

12   adulthood that he followed them?

13            A.   I don't.

14            Q.   All right.  I think we're going to

15   look at another exhibit, but just kind of

16   quickly.  So you can set this aside.

17                 (Thereupon, Plaintiffs' Exhibit 3,

18   a developmental, biopsychosocial model for the

19   Treatment of Children with Gender Identity

20   Disorder, was marked for identification

21   purposes.)

22   BY MS. INGELHART:

23            Q.   Okay.  So do you recognize this

24   document?

25            A.   I do.

1          Q.    What is it?

2          A.    It's Kenneth Zucker's compendium

3    of his experience with the patients in his

4    clinic.

5          Q.    Is this the study you were

6    referring to when you were making references

7    about rates of desistance among gender disorder

8    children?

9          A.    I can't remember if he

10   specifically looks at rates of desistance in

11   this article or it's a parallel publication,

12   but he looks at the methodology and the

13   undercurrent issues, the emotional issues and

14   how this happens, why it happens, and what one

15   can do.  And it has a lot of case studies in it

16   to kind of give examples of typical things,

17   and, you know, why it develops, when it

18   develops, how it goes through the child's life

19   and what his recommendations would be in terms

20   of helping these children to the best of his

21   ability.

22         Q.    Okay.  If you turn to Page 392,

23   it's a continuation of a section that starts

24   actually on 391, which is titled, is prevention

25   of adult transsexualism a reasonable treatment

164

1    goal, and given the low frequency with which

2    GID persists into adulthood, how is it possible

3    to determine the efficacy of treatment in

4    attaining that goal?

5              So the bottom of Page 392, that's

6    what is being discussed is the desistance.  Can

7    you read out the last full paragraph at the

8    bottom of 392?

9              A.   The guest editors have made

10   reference to the low frequency with which GID

11   persists into adulthood and the implications of

12   this fact in the evaluation of treatment

13   efficacy.  Persistence rates have varied fairly

14   substantially in long-term follow-up studies.

15   For example, Green reported that only 1 of 44

16   previously feminine boys appeared to be gender

17   dysphoric at the time of follow-up. In

18   contrast, Wallien and Cohen-Kettenis reported

19   that 50 percent of 18 GID girls were persisters

20   at follow-up.  In our own follow-up studies, we

21   found a persistence rate of 12 percent for GID

22   girls and persistence rate of 13 for GID boys.

23   Thus, there is a fair bit of variation in

24   persistence rates.

25              Q.   Okay.  Could you read on to the

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 165 of 332 PAGEID #: 1006
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

165

 1    paragraph that tracks between the two pages

 2    there?

 3            A.   How can this variation be

 4    understood?  One possibility is sampling

 5    differences.  Another possibility pertains to

 6    the degree of GID in childhood.  Both Wallien

 7    and Cohen-Kettenis and Singh showed several

 8    metrics of GID severity in childhood predicted

 9    persistence at follow-up.  Other possibility is

10    to contextualize the natural history data.  Is

11    there really such a thing as natural history

12    for GID or does its developmental course vary

13    as a function of contextual factors?  If, as in

14    our clinic, treatment is recommended to reduce

15    the likelihood of GID persistence, perhaps the

16    data can only be interpreted in that context.

17    In any event, we require more comparative data

18    to draw conclusions about the natural history

19    of GID in children and its relation to

20    contextual factors.

21            Q.   Thank you.  So the first paragraph

22    you read on Page 392 referred to a few studies

23    with varying rates of reported desistance,

24    correct?

25            A.   Yes.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 166 of 332 PAGEID #: 1007
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

166

1      Q.   Okay.  So there is difference in

2   studies about desistance rates?

3      A.   There are, but the majority of

4   them show a higher rate than the 50 percent in

5   the one study of girls that Wallien and

6   Cohen-Kettenis says.  Again, it looks as if --

7   and I haven't asked him why he put this in this

8   particular paper -- that he chose one that

9   showed a relatively low, 50 percent, and then

10  his which showed 80 and essentially 90, 88

11  percent and 80 percent in his.

12           The actual data that are in the

13  DSM-5 come from a coalescence of all the

14  studies.

15      Q.   Okay.

16      A.   Not just these two, what he

17  called, extremes.  He called his a high rate of

18  desistance and Wallien and Cohen-Kettenis a

19  relatively lower.  But still 50 percent is not

20  something to sneeze at, and he just chose those

21  two as ends.  In terms of what the DSM-5

22  criteria say, 98 percent of boys and 88 percent

23  of girls is the most that's been reported, not

24  by Zucker or that other person.

25      Q.   Okay.  And then, you know,

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 167 of 332 PAGEID #: 1008
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

167

1  throughout the paragraphs we were reading it

2  refers to GID, or gender identity disorder,

3  right?

4          A.   Right.

5          Q.   Okay.  And if we turn to the very

6  first page, just the front cover, yours looks

7  different than mine.  Does it have the

8  publication date?  It does.  What is that

9  publication date?

10         A.   That says 2012, I think.  Yes.  I

11  believe it's -- all right.  Yeah.  March 2012.

12         Q.   Great.  Okay.  And when was the

13  DSM-5 first published?

14         A.   I don't know.  I'm guessing 2014.

15  I think that's about right.

16         Q.   I think that's close.  So it was

17  after this?

18         A.   Yes.

19         Q.   So that's why they referred to

20  GID?

21         A.   Yeah.

22         Q.   Okay.  All right.  Thank you.

23  You're also a member of the Endocrine Society,

24  you said?

25         A.   Yes.

168

1        Q.    Okay.   Are you aware of whether

2   they have a position statement about the

3   treatment of transgender folks?

4        A.    They did their clinical

5   guidelines.

6        Q.    Okay.

7        A.    In 2009 and then the revision in

8   2017.

9        Q.    Okay.   Then you said that was a

10  society that's selective in such a way that it

11  requires training in the field of pediatrics?

12       A.    You know, I'd have to say you pay

13  dues, and you're in a category depending on

14  your degree.

15       Q.    Okay.   So let's look at that

16  position statement too.

17              (Thereupon, Plaintiffs' Exhibit 4,

18  transgender health, was marked for

19  identification purposes.)

20  BY MS. INGELHART:

21       Q.    Okay.   Have you seen this before?

22       A.    Yes.

23       Q.    And what is it again?

24       A.    This is the Endocrine Society

25  guidelines.   It's a position statement, and I

1   don't know whether or not this is the 2000 --

2   yeah, it's the 2017.  So it's the second

3   attenuation of this guideline.

4            Q.   Okay.  And looking at the second

5   paragraph on the first page, the first

6   paragraph under the word background, do you see

7   the last full sentence of that paragraph which

8   begins with the word considerable?

9            A.   Okay.  Do you want me to read that

10  to you?

11           Q.   Sure.

12           A.   I'll just read it, okay.

13           Q.   Do you disagree with that

14  statement?

15           A.   Considerable scientific evidence

16  has emerged demonstrating a durable biologic

17  element.  I totally disagree with that.

18           Q.   Okay.  And on what basis do you

19  disagree with that?

20           A.   There is no scientific basis for

21  that whatsoever.

22           Q.   Okay.

23           A.   And it's so stated in the DSM

24  criteria and the APA handbook.

25           Q.   Okay.  Yes.  I think you said

170

1    that.  So in both of those documents they

2    state, according to you, that there's no

3    biological basis, correct?

4              A.    That's correct.

5              Q.    Okay.  So can you see the I guess

6    second half of that sentence, or maybe it's a

7    whole new sentence, individuals may make

8    choices?

9              A.    Individuals make choices due to

10   other factors in their lives, but there do not

11   seem to be external forces that genuinely cause

12   individuals to change gender identity.

13              That's also totally not factual.

14             Q.    And on what basis do you say that?

15             A.    On the basis that 70 percent of

16   kids are reported to have -- no.  Excuse me.

17   40 percent of kids are reported to have

18   undercurrent psychological morbidity.

19             Q.    Okay.  So I do want to make a

20   distinction.  So you're a pediatric

21   endocrinologist, right?

22             A.    Yes.

23             Q.    And Dr. Zucker's also a pediatric

24   endocrinologist, correct?

25             A.    No.  He's a clinical psychologist.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 171 of 332 PAGEID #: 1012
STACIE RAY vs AMY ACTON                    Quentin L. Van Meter, M.D.

171

1           Q.   He's not a pediatric

2    endocrinologist?

3           A.   No, he is not.

4           Q.   Okay.  We'll come back to that.

5    We'll just have to come back to that.  Okay.

6    And then if we flip this over, it looks at

7    positions.  Do you see the second bullet point

8    under positions?

9           A.   Medical intervention for

10   transgender individuals, including both hormone

11   therapy and medically indicated surgery is

12   effective, relatively safe, and has been

13   established as the standard of care.

14          Q.   Do you disagree with that

15   statement?

16          A.   Yes, I disagree with that.  I

17   would say established as standard of care is

18   this document establishes a guideline but not a

19   standard of care.  The WPATH is the standard of

20   care.

21          Q.   Okay.

22          A.   And I would argue that they are --

23   that (A), it is not relatively safe at all, and

24   has been established as the standard of care.

25   That's the WPATH's standard of care.  It's a

172

1    self-serving social advocacy organization of

2    people who believe that's correct, and they all

3    believe it.

4           Q.    What makes WPATH a self-serving

5    social advocacy organization?

6           A.    It has no requirement for

7    education, certification or training.

8           Q.    Would it surprise you to know that

9    they do have a certification for training?

10          A.    Oh, they will do a certification,

11   if you attend a conference.  But it's not

12   required for membership.  Membership requires

13   paying dues.  That's it.

14          Q.    What is required of membership for

15   the American College of Pediatrics?

16          A.    Board certification in pediatrics.

17          Q.    And WPATH doesn't require any type

18   of board certification?

19          A.    Does not require it.  It is people

20   who are interested in the field of transgender

21   health.

22          Q.    Okay.

23          A.    And if I applied, they might

24   recognize my name and say, no, I can't become a

25   member.  They are evidently trying to -- well,

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 173 of 332 PAGEID #: 1014
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

173

1    I won't go into that.

2         Q.   What about the American Diabetes

3    Association?

4         A.   They're a professional section.

5    You have to have a degree certification.

6         Q.   Do you need a degree certification

7    for the professional part of WPATH?

8         A.   I didn't realize there was a

9    subsection that was professional only.

10        Q.   Okay.  Okay.

11        A.   So I went to their website and

12   said, if I want to become a member, what

13   information do I have to provide?  And degree

14   certification was absolutely not part of it.

15        Q.   Okay.  Well, very good.  Let's put

16   this aside.

17             Okay.  So are you a member of the

18   American College of Pediatrics?

19        A.   American College of Pediatricians.

20        Q.   Pediatricians.

21        A.   Yes.

22        Q.   I'm sorry.

23        A.   Mm-hmm.

24        Q.   Are you a leader within that

25   organization?

1          A.    I'm currently the president.

2          Q.    Okay.  How long have you been a

3    member?

4          A.    Since 2007.

5          Q.    How long have you been the

6    president?

7          A.    I assumed the position 13 months

8    ago.

9          Q.    Okay.  When was the American

10   College of Pediatricians formed?

11         A.    I believe, 2002.

12         Q.    Okay.  Were you a part of that

13   formation?

14         A.    No.

15         Q.    Do you know what motivated the

16   founding group, founding members to formally

17   organize?

18         A.    The American Academy of Pediatrics

19   produced a statement on the effects and

20   benefits of same sex adoption.  In that policy

21   statement they essentially said there was

22   absolutely no adverse effect whatsoever of same

23   sex couples adopting children and that the

24   outcome of these children was as good, and

25   without statistically significant findings,

1   perhaps even better, based on anecdotal

2   reporting of welfare of the families that they

3   surveyed that these kids were maybe even

4   perhaps better cared for.  But we can't prove

5   that scientifically, but certainly there is no

6   provable downside to same sex adoption.

7          Q.    Okay.

8          A.    And adoption is a very complex and

9   critical issue, and these members said, okay,

10  let's look at the scientific background.  And

11  then Dr. Sharon Quick, who's a pediatric

12  intensivist, took the time and went through

13  point by point of all the technical paper that

14  supported and said, these are not valid

15  scientific studies.  These are anecdotal

16  reports.  These are things that were basically

17  a survey from the LGB community.  Have you

18  adopted?  How happy are your children?  Okay?

19          And so it wasn't done

20  independently and professionally.  These were

21  just report after report after report, and they

22  were trying to, therefore, ergo, these kids are

23  very happy and very functional and without any

24  difference whatsoever and anecdotally maybe

25  even better, because they were, you know --

176

1    just a better environment in their opinion.

2                And so they took issue with that,

3    and they tried to speak within the academy.  A

4    former president of the American Academy

5    himself, Joe Zanga, took strong issue as a

6    member of the executive committee of past

7    presidents and an invited person, and he

8    realized where this came from.

9         Q.    Okay.

10        A.    And he knew the inside workings of

11   the academy, of the committee that generated

12   this report and said it's unethical what they

13   did, and this is not the American Academy of

14   Pediatrics that it's supposed to be.  We are

15   off the track.  They've gone off the wheels

16   here.  We need to speak with what is

17   scientifically valid for children.

18                And it was at that point that he

19   and a couple of other members at a meeting of

20   the AAP actually gathered together in a sidebar

21   meeting room and said, what can we do about

22   this?  And Joe specifically said there is no

23   way for us to change this position statement.

24   He knew how the position statement was put

25   together.  He knew that it did not represent a

```
 1    vote as a membership, that it was not with any

 2    input from the vote of the majority of the

 3    membership, that it was done by a committee.

 4    And he knew those members individually, and he

 5    said they are agenda oriented people.  They are

 6    misstating science, and the American Academy

 7    can't tolerate this.  He was told, sorry,

 8    Charlie.  You know, you don't like it, tough.

 9              He did not leave them.  He to this

10    day has not left the American Academy of

11    Pediatrics.  He's a stalwart that says, if

12    we're going to bring about change and rescue

13    the AAP, we have to stay within it and work

14    within it.  Okay?

15              Q.    Mm-hmm.

16              A.    But he has made no headway

17    whatsoever in that regard.  He encouraged me

18    all the way through to stay a member of the AAP

19    for the same purpose.  He said if everyone who

20    disagrees and is really disgusted with the AAP

21    leaves, the AAP will get more and more down

22    that pathway, and children will be harmed,

23    because everybody looks to the AAP.  It's

24    giant.  It's huge.  It was essentially the only

25    general pediatric, you know, advocacy group.
```

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 178 of 332 PAGEID #: 1019
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

178

1           And so he stuck with it, but a

2   number of individuals said no, and he was one

3   of the founding members of the American College

4   for that specific purpose.  Not casting

5   aspersions and name calling and hating and

6   being bigoted and awful, but basically saying

7   kids are who we're supposed to represent here.

8   What's happened is that we have left the

9   benefit for children, and we've gone off for

10  the wants and needs of the adults.

11          Q.    Okay.

12          A.    And that's how it was started.

13          Q.    Okay.  So let's look at another

14  exhibit.

15          (Thereupon, Plaintiffs' Exhibit 5,

16  Pro-Life Pediatric Group Stands Contrary to

17  Established American Academy of Pediatrics, was

18  marked for identification purposes.)

19  BY MS. INGELHART:

20          Q.    What I just had marked as

21  Plaintiffs' Exhibit No. 5 is an article from

22  the publication called the Catholic Exchange.

23  It's about the founding of the American College

24  of Pediatricians.  On the second page, Zanga,

25  Dr. Zanga, as you were speaking of before, is

179

1    quoted as describing his organization -- or not

2    quoted.  He's referenced as describing his

3    organization as one with Judeo-Christian,

4    traditional values that's open to pediatric

5    medical professionals of all religions who hold

6    true to the group's core beliefs, that life

7    begins at conception and that the traditional

8    family unit, headed by an opposite-sex couple,

9    poses fewer risk factors in the adoption and

10   raising of children.  Is that accurate?

11           A.    That's Dr. Zanga's opinion, okay?

12   In terms of Judeo.  It happens that

13   Judeo-Christian concepts happen to jibe with

14   the concept of what is best for children and

15   keeping politics out of that.  You know,

16   focusing on truly a core value that is ethical

17   and based on science.  And so life begins at

18   conception is a scientifically valid opinion.

19   It's proven in any number of ways, but people

20   have opposite opinions.  Okay?  So that happens

21   to jibe with Judeo-Christian, and in this case

22   Catholic theology.  So they report on that as

23   if that's the core, and this is a religious

24   based organization.

25                 There is absolutely no requirement

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 180 of 332 PAGEID #: 1021
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

180

1   to be of any particular religious faith at all

2   in membership.  It's not asked for.  It is

3   discussed among members collegially, if they

4   wish to share that information, but the

5   organization is completely devoid of a

6   religious basis.  There is nowhere in the

7   application -- no one is excluded for being an

8   atheist or any religion other than

9   Judeo-Christian religions.

10         Q.   Okay.  Why did you join ACP?

11         A.   Because I knew Joe Zanga

12  personally, and he asked me if I knew about the

13  organization and he said, would you become a

14  member?  Because he knew of my advocacy with

15  the Georgia Chapter.  He was in Columbus,

16  Georgia at the time and head of Columbus

17  Regional Medical Center's Pediatric Department,

18  and so he invited me down for CME.

19              I knew him from medical school

20  days.  He was a resident a couple years ahead

21  of me in the -- a medical student a couple

22  years ahead of me and in the residency program

23  at Medical College Virginia.  He also happened

24  to intersect with my wife and my brother, who's

25  an emergency room specialist in New Orleans,

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 181 of 332 PAGEID #: 1022
STACIE RAY vs AMY ACTON                    Quentin L. Van Meter, M.D.

181

1   and Joe was in New Orleans at the Children's

2   Hospital there as head of pediatrics for a

3   while and ran into my brother and said, do you

4   know -- not a very common last name.

5              And so our paths kept crossing,

6   and so he took the time to write me and said,

7   would you look into what our organization is?

8   And I did, and I thought this makes a lot of

9   sense, and it's exactly why I'm frustrated with

10  the direction the AAP is going, why I love the

11  Georgia Chapter, because they are far more

12  tuned into helping children and avoiding

13  political traps and working across the aisle

14  and getting state legislatures to understand

15  true science and benefit for children.  So I

16  joined.

17       Q.   Okay.  Thank you.  I'd like to

18  talk a little bit more about the group.  I'm

19  going to enter another exhibit.  I'm definitely

20  going to lose count.

21              THE COURT REPORTER:  This is No.

22  6.

23              MS. INGELHART:  Thank you.

24              (Thereupon, Plaintiffs' Exhibit 6,

25  About Us, American College of Pediatrics, was

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 182 of 332 PAGEID #: 1023
STACIE RAY vs AMY ACTON                                      Quentin L. Van Meter, M.D.

182

1    marked for identification purposes.)

2    BY MS. INGELHART:

3         Q.   Do you recognize this document,

4    this webpage?

5         A.   I do.

6         Q.   Can you tell me what it is?

7         A.   It's sort of the mission statement

8    explanation of what the college is about.  It's

9    from the website.

10        Q.   Okay.  So I want to start looking

11   at the core values portion, the heading that

12   falls at the bottom of the first page, but the

13   text is actually if we flip over to the second

14   page.  No. 2, under core values says -- I

15   assume the subject would be the American

16   College of Pediatricians -- recognizes that

17   good medical science cannot exist in a moral

18   vacuum and pledges to promote such science.

19   What does that mean?

20        A.   It means that ethics and a code of

21   behavior, of ethical behavior, which is the

22   basis of a civil society, has to be part of

23   that or we are in a vacuum that basically

24   allows for an anarchy of ideas, and that's what

25   it's about.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 183 of 332 PAGEID #: 1024
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

183

1        Q.   Okay.  So to your knowledge, is

2    there a reason that ethics wasn't used here

3    instead of referencing a moral vacuum?

4        A.   I think they tried to use a term

5    that people would understand, and ethics is

6    perhaps not -- I didn't write this particular

7    thing.  I read that, and I see ethics.

8        Q.   Okay.  The next one, No. 3,

9    recognizes the fundamental mother-father family

10   unit, within the context of marriage, to be the

11   optimal setting for the development and

12   nurturing of children and pledges to promote

13   this unit.

14       A.   Yes.

15       Q.   So this is a core value of the

16   ACP?

17       A.   Yes.

18       Q.   Okay.  So when you say that

19   science can exist in a moral vacuum, is the

20   belief about the optimal setting for the

21   development of children based on a moral

22   principle?

23       A.   No.  It's based on sociology

24   research.

25       Q.   Okay.  And --

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 184 of 332 PAGEID #: 1025
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

184

 1              A.    That's the science part.

 2              Q.    Okay.  If science research showed

 3     that children actually developed better with

 4     two mothers, would that cause ACP to alter its

 5     position?

 6              MR. BLAKE:  objection.

 7     Hypothetical.

 8              THE WITNESS:  No.

 9     BY MS. INGELHART:

10              Q.    Why not?

11              A.    Because if it's scientifically

12     valid, that's what the college is based on.

13              Q.    Okay.  So it would change its

14     position?  I'm sorry.  I think you --

15              A.    Yeah.  It would say that that was

16     not a critical part of welfare of children.  If

17     a sociologic study, cross-sectional, not

18     picking volunteer people to say that I'm a same

19     sex couple and what do I think about my

20     children.  If it was a total survey as the

21     sociologic studies that support the

22     mother-father intact unit family, if it's the

23     same quality and it comes up and says there is

24     no difference, then we would remove that

25     objection.

185

1        Q.   I see.  Okay.  Do you agree with

2   this statement at No. 3, with the core value to

3   promote the unit of the mother-father family

4   unit?

5        A.   Yes.

6        Q.   Do you also agree with the No. 2

7   statement about medical science shouldn't exist

8   in a moral vacuum?

9        A.   And when I refer to moral vacuum

10  as an ethicless vacuum, yes.

11       Q.   Okay.  So history section of this

12  webpage begins at the bottom of the page that

13  we're on.  It says that ACP was founded --

14  let's see if I can find it.  In Sentence 2

15  under history, it says that ACP was founded by

16  a group of concerned physicians who saw the

17  need for a pediatric organization that would

18  not be influenced by politically driven

19  pronouncements of the day.

20       A.   Yes.

21       Q.   Can you explain again what that's

22  referring to?

23       A.   Yes.  That was the statement on

24  same sex adoption.  That's the document that

25  they were concerned about.

1    Q.   Okay.  But did you say in a prior

2    statement that same sex adoption isn't harmful,

3    it turns out?  Is that what you said before?

4          A.   No.  That it was not as

5    beneficial.  That the most beneficial is a

6    heterosexual, married, intact, functional

7    family.

8          Q.   All right.  Thank you.  Okay.  The

9    third sentence says, the college bases its

10   policies and positions upon scientific truth

11   within a framework of ethical absolutes.  Not

12   to belabor, but can you explain what that

13   means?

14         A.   It looks at sort of ethics as an

15   issue.  It does not separate out ethics,

16   bioethics, and so you have issues of life and

17   death that you have to consider in terms of

18   interventions and policies and look at the

19   clinical research.  And it's through that lens.

20   So for that reason, very naturally, it's going

21   to look at life at the beginning and life at

22   the end.  And life at the end for pediatric

23   practice is situations where a terminal illness

24   is occurring, and what kind of support would

25   you give?  Would you withdraw support?  Is that

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 187 of 332 PAGEID #: 1028
STACIE RAY vs AMY ACTON                          Quentin L. Van Meter, M.D.

187

1   ethical?

2            And it takes a stand of ethics on

3   the side of, you know, life is precious, and

4   you really need to totally examine the ethical

5   issues with somebody independent, in the field

6   of bioethics, if necessary.  And we have

7   consultants in those fields to look at and

8   critically review policy statements and through

9   their eyes.

10           Q.   Okay.  Thank you.  Could you

11  define specifically what ethical absolutes

12  mean?  Maybe you have, but I just...

13           A.   I mean I didn't choose those

14  words.  Okay?  This is crafted by other people

15  who edit, but I think it's talking about you

16  can't ignore ethical issues, that you have to

17  take -- there is a limit which needs to be

18  established of what is ethical, and that if you

19  don't do that you could take science to a

20  harmful end.

21           Q.   Okay.

22           A.   Experimentation on children.  You

23  know.  Yeah.

24           Q.   That's an ethical absolute no?

25           A.   Yeah.  I mean if you're going

1    to -- let's do something and see what happens.

2         Q.   Okay.

3         A.   You know, without true informed

4    consent and knowledge of -- it's what guides

5    clinical research to this day.  We were all

6    trained repeatedly and endlessly on good

7    clinical practices, and so all the clinical

8    research studies I do I have to have

9    certification.  I didn't mention that, but I'm

10   certified in good clinical practices for

11   clinical research.  So we have to know about

12   informed consent assent, that balanced

13   presentations, stopping criteria, independent

14   reviews, safety and all that.  All those have

15   to be understood.  We have to know who

16   regulates those things and why they're

17   important.  So that's where that comes from.

18        Q.   Okay.  So I guess if -- I'm just

19   trying to understand these terms.  If there was

20   a conflict between one of these ethical

21   absolutes and what the scientific research

22   would show, then would the ethical absolute

23   take precedent?

24             MR. BLAKE:  Objection.

25   Hypothetical.

189

 1              THE WITNESS:  I'll give you an

 2    example.  Let's just say that the science said

 3    that if you poisoned children, a hundred

 4    percent of them come to harm, that would be an

 5    ethical issue that we'd say, no, you can't do

 6    that study.  Yes, it's a conclusion that might

 7    be valid based on a scientific study that you

 8    poisoned a hundred children and a hundred

 9    children had very adverse -- and the majority

10    of them, 90 percent, died.  Okay?  That's valid

11    science.

12    BY MS. INGELHART:

13         Q.    Okay.

14         A.    Okay.  It's not ethical.

15         Q.    Got it.  Okay.  Another exhibit to

16    be introduced.

17              (Thereupon, Plaintiffs' Exhibit 7,

18    Gender Ideology Harms Children, was marked for

19    identification purposes.)

20    BY MS. INGELHART:

21         Q.    So this is Plaintiffs' Exhibit No.

22    7.  Do you recognize this document?

23         A.    I do.

24         Q.    Could you tell me what it is?

25         A.    It's a statement by the college in

190

1   regard to the gender ideology, referring to the

2   sort of societal push to promote affirmation of

3   incongruent genders.

4            Q.   Okay.   The first sentence here

5   under the updated date, do you agree with that

6   statement there?

7            A.   Yes, I do.

8            Q.   Okay.   Would you read it?

9            A.   The American College of

10  Pediatricians urges healthcare professionals,

11  educators and legislators to reject all

12  policies that condition children to accept as

13  normal a life of chemical and surgical

14  impersonation of the opposite sex.

15           Q.   What does impersonation of the

16  opposite sex mean?

17           A.   It means the physical appearance

18  and -- the physical appearance, primarily, and

19  living as if they were the biologic opposite

20  sex.

21           Q.   But specifically the word

22  impersonation, like what's that word doing?

23           A.   That means that they are

24  pretending to be the opposite sex, when they

25  cannot be the opposite sex.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 191 of 332 PAGEID #: 1032
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

191

1        Q.   Okay.  Thank you.  Turning over to

2   paragraph numbered 8, could you read the bold

3   sentence?

4        A.   Conditioning children into

5   believing a lifetime of chemical and surgical

6   impersonation of the opposite sex is normal and

7   healthful is child abuse.

8        Q.   And do you agree with that?

9        A.   I thoroughly agree with that.

10       Q.   And then there's a paragraph

11  called bottom line, which starts at the bottom

12  of the second page and continues over onto the

13  third page.  So looking at the third page, the

14  last sentence says, the college maintains it's

15  abusive to promote this ideology, first and

16  foremost for the well-being of the gender

17  dysphoric children themselves, and secondly,

18  for all of their non-gender-discordant peers,

19  many of whom will subsequently question their

20  own gender identity, and face violations of

21  their right to bodily privacy and safety.  Do

22  you agree with that statement?

23       A.   Yes.

24       Q.   Okay.  What does it mean that

25  non-gender-discordant peers would subsequently

192

1    question their own gender identity in the

2    presence of gender dysphoric children

3    expressing --

4          A.    Well, the precepts of childhood

5    development from Ericson and others who are

6    experts in that field, and all I know is what

7    we learned as pediatricians about how children

8    develop and what their concept is of abstract

9    principles and what their brains can figure

10   out, is a six-year-old, in general, who sees a

11   boy go leave the room and come back in with a

12   wig, makeup, eye lashes, a dress, and Mary

13   Janes, believe that it's possible that that

14   child changed from one sex to the other.  Okay?

15   And that's concrete thinking.  Okay?  They

16   don't look at it as if it is a costume that

17   they're wearing.  It's that that person

18   changed.  And that's sort of the mindset of a

19   six-year-old.  A nine or ten-year-old has a

20   little bit of a different world view than a

21   16-year-old and a 20-year-old.

22              And so that if you are in a school

23   environment, in kindergarten, and anxiety

24   develops when there is conflict in reality and

25   fantasy.  You know, the scary stories and the

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 193 of 332 PAGEID #: 1034
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

193

1   boogeyman in the closet and the monsters, et

2   cetera, et cetera, all come from a crossover

3   between not knowing what's real and not knowing

4   what's fantasy.  And unless the child knows

5   real and fantasy, they begin to internalize

6   this concept and become anxious, and it

7   develops into an anxiety disorder as a result

8   of that.

9            So it's very important for

10  children to be taught concrete facts and to say

11  this is the pretend over here, and this is the

12  real over here.  And when a kindergartner, a

13  five or six-year-old child, has a person in

14  their class suddenly turn into somebody of the

15  opposite sex, their fear is that will happen to

16  me.  And there are any number of case reports

17  of that happening to children and them seeking

18  mental healthcare as a result of anxiety,

19  because they felt what I thought was real is

20  not real, where is reality, where is fantasy,

21  and is that going to happen to me?  And so they

22  suffer, okay, as a result of that happening to

23  them.

24            Q.   Are those case studies published?

25            A.   Yes.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 194 of 332 PAGEID #: 1035
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

194

1        Q.   Could I look at them?

2        A.   Yes.

3        Q.   Do you know who --

4        A.   I don't know who published them,

5   but I know they have been.  I've been referred

6   to.  I actually am involved in a case in

7   England where two boys suffered emotionally

8   from anxiety disorder as a result of that and

9   required treatment.

10        Q.   What's that case in England?

11        A.   Salley and Nigel Rowe Versus

12   whatever.  City of Isle of White or something.

13        Q.   Is that because I think I read in

14   England they've banded what's so-called

15   conversion therapy?  Is it a related matter to

16   that new policy?

17        A.   No.  It was just a school policy

18   that said acceptance of transgender students

19   will happen, and that it's going to happen.

20        Q.   Got it.

21        A.   Yeah.

22        Q.   Okay.  The questioning of their

23   own gender identity of -- just gender

24   identified or nontransgendered children, as a

25   result of seeing other children transition, is

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 195 of 332 PAGEID #: 1036
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

195

1    that an example of that social contagion

2    principle we were talking about before?

3            A.   No.

4            Q.   Oh, okay.  Can you explain the

5    difference then?

6            A.   So social contagion is sort of a

7    person who has anxiety and depression, who

8    talks to friends, goes to a meeting of issues

9    related to transgender and same sex attraction,

10   is introduced to the concept or is told by a

11   teacher, as is the cases in British Columbia,

12   that they are transgender.  They don't

13   understand what transgender is.  They go to the

14   internet, and they see, and it's like a

15   checklist.

16            I always say it's like the ADD

17   checklist on the front of Good Housekeeping

18   magazine at the grocery store.  If I go down

19   that list, I have severe ADD based on just

20   checking off a list of things that says this is

21   how you establish the diagnosis.  When in truth

22   that's not valid at all.

23            Q.   Okay.

24            A.   So these kids don't have that

25   level of sophistication, and when they're

196

1   troubled and they go to the internet and

2   someone has told them, go here and look here, I

3   think that's what you have, they'll go down a

4   checklist.  And by gosh they match the

5   criteria; therefore, that is me.  And then they

6   start communicating online with others, and

7   they say, yes.  Those people say, come on over.

8   This is exactly what you have.  You need to.

9   This is the answer to your prayers.  And that's

10  the recruitment of those kids.

11          Q.   Okay.

12          A.   It's different than being affected

13  by -- you know, and having anxiety as a

14  young -- and these are young children.  You

15  know, a 12 or a 13-year-old knows better.  I

16  mean this is a child who's suffering.  You

17  know, I want to have compassion for them.  My

18  school tells me we should have compassion.  We

19  should not bully them.  It's wrong to say

20  anything negative to them or to harm them

21  emotionally in any way, which is totally valid,

22  totally compassionate, totally supported by our

23  organization or my professional opinion.  But,

24  you know, those kids know that this is that

25  child, and this is not me.  I will not fear

197

1   that that is going to happen to me.

2          Q.   That's what you mean by know

3   better?

4          A.   Yes.

5          Q.   Okay.  And so the comments in this

6   most recent exhibit about children questioning

7   their gender identity is about young children?

8          A.   About young children.

9          Q.   With different cognitive abilities

10  than the type of people who are susceptible to

11  the social contagion pressures?

12         A.   That's correct.

13         Q.   Got it.  Thanks.

14              MS. INGELHART:  I have just this

15  many more, but we could pause if people are

16  hungry.

17              THE WITNESS:  I'm fine.

18              MR. BLAKE:  Let's finish this --

19              THE WITNESS:  Let's get through.

20              MR. BLAKE:  -- module.

21              (Thereupon, Plaintiffs' Exhibit 8,

22  On the Promotion of Homosexuality in the

23  Schools, was marked for identification

24  purposes.)

25  BY MS. INGELHART:

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 198 of 332 PAGEID #: 1039
STACIE RAY vs AMY ACTON                                          Quentin L. Van Meter, M.D.

198

1     Q.   I just placed in front you, or had

2   placed in front of you, Plaintiffs' Exhibit No.

3   8.  Do you recognize this documents?

4     A.   I do.

5     Q.   What is it?

6     A.   This is a statement by the college

7   in August of 2008 that was produced after the

8   letter to superintendents of schools by the

9   Obama administration, which promoted the

10  concept that there was absolutely no negativity

11  whatsoever to the homosexual lifestyle and

12  conditions that are medical conditions

13  associated with that particular diagnostic

14  criteria or lifestyle.

15    Q.   Okay.  Thank you.  That's helpful

16  context.  The checklist on the right column,

17  the fourth one down that says homosexual

18  lifestyle carries grave health risks.

19         MR. BLAKE:  I'm just going to

20  object to this entire exhibit as entirely

21  irrelevant.  It's not related to transgender

22  folks at all.  It's not a document which he's

23  said he's relied on to form his opinion, but if

24  you want to waste your time and ask more

25  questions about this --

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 199 of 332 PAGEID #: 1040
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

199

1          THE WITNESS:  Well, I mean I don't

2    see what it has to do with transgenderism.  So

3    but if I could just say that.

4    BY MS. INGELHART:

5          Q.   Okay.  I guess I appreciate that.

6    I'm just going to ask a couple of questions.

7    So these two checkmarks here, the fourth and

8    the fifth, do you disagree with those

9    statements?

10          MR. BLAKE:  Objection.

11          THE WITNESS:  The scientific

12    evidence that I know of indicates that those

13    are issues, and then actually Dr. McHugh and

14    Mayer's treatise on this subject, it's

15    documented as such.

16    BY MS. INGELHART:

17          Q.   Okay.  Does the mainstream medical

18    establishment agree that the sexual

19    reorientation therapy mentioned here is

20    effective?

21          MR. BLAKE:  Objection.  Vague.

22          THE WITNESS:  It depends on -- the

23    sexual reorganization therapy I think is not

24    something that is supported.  What is called

25    integrative therapy or talk therapy for anxiety

200

1   and depression is supported.  Okay?

2   BY MS. INGELHART:

3          Q.    Is that distinction similar to

4   what we made before about how conversion

5   therapy for some is -- that people have

6   different meanings for the word conversion

7   therapy?

8          A.    Absolutely.

9          Q.    Okay.  So some might read the word

10  sexual orientation and imagine something

11  extreme?

12         A.    That's correct.

13         Q.    Involving like physical

14  interaction?

15         A.    Correct.

16         Q.    And some may read it as talk

17  therapy?

18         A.    That's correct.

19         Q.    Okay.  Thanks.  That's all on that

20  one.  And then I'm going to switch forward to

21  this one.

22                While we're looking for that, do

23  you believe that talk therapy can have similar

24  effects for people who have same sex attraction

25  as people who are gender dysphoric?

201

```
 1                    MR. BLAKE:  Objection.  Relevance.
 2                    THE WITNESS:  The talk therapy is
 3    all aimed at the undercurrent anxiety,
 4    depression, related to ACEC, adverse childhood
 5    events.  And so there's a common thread that
 6    when that is the core issue that talk therapy
 7    works in both instances.
 8    BY MS. INGELHART:
 9         Q.   Okay.  So in the case of same sex
10    attraction it works to address underlying
11    concerns and therefore change sexual behavior?
12                    MR. BLAKE:  Objection.  Relevant.
13                    THE WITNESS:  The goal is not to
14    change sexual behavior.  It's to basically
15    address the undercurrent anxiety and
16    depression, so that you don't have suicide and
17    debilitating depression ongoing, because it's
18    not going to be paid attention to.
19    BY MS. INGELHART:
20         Q.   Okay.  So we have a new exhibit
21    here.
22                    (Thereupon, Plaintiffs' Exhibit 9,
23    American College of Pediatricians, The Best for
24    Children, was marked for identification
25    purposes.)
```

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 202 of 332 PAGEID #: 1043
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

202

1     BY MS. INGELHART:

2              Q.    Do you recognize this document?

3              A.    I do.

4              Q.    To whom was it addressed?

5              A.    To school superintendents.

6              Q.    Is it similarly broadly addressed

7     to the Obama letter where this was sent to more

8     than one or could be sent to more than one

9     school district?

10             A.    Yes.

11             Q.    Okay.  Does this document

12    reflect, specifically turning over to the

13    second and third paragraphs here -- okay.

14    Let's be more specific here.  Looking past the

15    colon in the second paragraph to (1)

16    individuals with unwanted same sex attraction

17    often can be successfully treated, does ACPs

18    agree with that statement?

19             MR. BLAKE:  Objection.  Relevance

20    again.  This is another document that at least

21    in part deals solely with same sex issues and

22    doesn't relate to transgender issues or Dr. Van

23    Meter's opinion.

24             Go ahead.  You can answer.

25             THE WITNESS:  The concept here is

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 203 of 332 PAGEID #: 1044
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

203

1   that if an individual is suffering, that to

2   deny them therapy that could be beneficial is

3   harmful.

4   BY MS. INGELHART:

5        Q.   And how are you characterizing a

6   denial of treatment?

7        A.   By law.

8        Q.   And what laws?  I'm sorry.

9        A.   State laws, in California.  I

10  think there are 14 states and the District of

11  Columbia which outlaw any therapy for people

12  who have unwanted same sex attraction that are

13  seeking counseling.

14       Q.   Okay.  Seeking counseling to what

15  end?

16       A.   To try to figure out why they're

17  unhappy with their sexual attraction, and they

18  would like to be relieved of that.

19       Q.   Okay.  And those are the same laws

20  that discuss similar treatment for people who

21  are gender dysphoric, right?

22       A.   That's correct.  It is now an

23  umbrella.

24       Q.   Got it.  Which is why these are

25  relevant.  So are you familiar with those laws?

1    Those banned laws?

2              MR. BLAKE:  Objection.  Relevance,

3    again.  I know you think this is relevant

4    because the same laws are involved, but these

5    laws are not part of this case or --

6              MS. INGELHART:  I appreciate it --

7              MR. BLAKE:  -- or.

8              MS. INGELHART:  You can --

9              MR. BLAKE:  Hold on please.  Or

10   his opinion.  I mean you've gone on now for

11   three or four hours.  I guess it's only been --

12   well, it's almost four hours.  About a lot of

13   things that tangentially relates to his

14   understanding of transgender issues and

15   potentially bias, but his opinion -- none of

16   his conclusions and his opinion have been

17   addressed once so far.

18              Go ahead.  You can answer.

19              THE WITNESS:  You probably need to

20   restate the question now.

21              MS. INGELHART:  Yeah.  Yeah.

22              MR. BLAKE:  Same objection.

23              MS. INGELHART:  And I appreciate

24   it.  And so we can have that standing

25   objection, because I think I understand

1   counsel's position, and we're going to try to

2   move efficiently in the speaking objections.

3   If we can just have it as a standing

4   objections.  If we can just have it as a

5   standing objection, we'll let it go faster.

6   BY MS. INGELHART:

7           Q.   This first -- next to No. 1 --

8   individuals with unwanted same sex attraction

9   can often be successfully treated.  That

10  implies that people with unwanted same sex

11  sexual attraction can often be treated and

12  therefore not have that same sexual attraction

13  anymore, correct?

14              MR. BLAKE:  Objection.

15              THE WITNESS:  It basically says

16  they can be treated for their undercurrent

17  depression and anxiety.

18  BY MS. INGELHART:

19          Q.   Then why doesn't it say that?

20              MR. BLAKE:  Objection.

21              MS. INGELHART:  He's the president

22  of this organization.  Presumably --

23              MR. BLAKE:  Not in 2010.

24              THE WITNESS:  I wasn't.

25  BY MS. INGELHART:

206

1          Q.    This is still a position statement
2     that is on your website and accessible.
3          A.    It is a letter to -- it was a
4     response to the Obama adminstration's treatise,
5     point by point.
6          Q.    So do you no longer agree with
7     this statement?
8          A.    We are in the process of revising
9     policy statements to be more germane and to
10    better express the intent, and so we are open
11    to critique of everything we've said.  So that
12    it does not get misconstrued as to what our
13    intent was.
14         Q.    Okay.  But you previously
15    testified that you didn't disagree with this,
16    right?
17         A.    Yes, I did.
18         Q.    Okay.  And this is still available
19    on your website?
20         A.    Yes, it is.
21         Q.    Okay.  All right.  Okay.  The last
22    question.  How many policy statements, about,
23    does the American College for Pediatricians
24    have?
25                   MR. BLAKE:  Objection.  Relevance.

207

1           THE WITNESS:  I would have to
2    guess.  I don't know.
3    BY MS. INGELHART:
4           Q.   Could you round for me?
5           A.   40.
6           Q.   Okay.  Do you know what proportion
7    reference LGBT related issues?
8           A.   Probably, 50 percent.
9           MS. INGELHART:  Okay.  We can go
10   off the record and break for lunch.
11           (Thereupon, a break was taken.)
12           MS. INGELHART:  Okay.  We'll go
13   back on the record.
14   BY MS. INGELHART:
15           Q.   Do you know whether transgender
16   people experience higher rates of
17   discrimination than the general population?
18           MR. BLAKE:  Objection.  Relevance.
19           Answer if you know.
20           THE WITNESS:  No.  I do not know.
21   BY MS. INGELHART:
22           Q.   Do you know whether transgender
23   people experience higher rates of harassment
24   than the general population?
25           MR. BLAKE:  Objection.  Basis

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 208 of 332 PAGEID #: 1049
STACIE RAY vs AMY ACTON                                        Quentin L. Van Meter, M.D.

208

1   foundation.

2   BY MS. INGELHART:

3          Q.   Okay.  Do you know whether

4   transgender people experience higher rates of

5   violence than the general population?

6               MR. BLAKE:  Objection.

7               THE WITNESS:  I do not.  No.

8   BY MS. INGELHART:

9          Q.   Do you know whether transgender

10  people may be exposed to immediate negative

11  outcomes, if they have to use identity

12  documents that reveal their transgender status?

13         A.   I do not.

14              MR. BLAKE:  Objection.

15  Foundation.

16  BY MS. INGELHART:

17         Q.   What determines gender identity?

18         A.   The individual.

19         Q.   Can you explain?

20         A.   Gender, as it was brought into

21  medical terminology by John Money, meant it's

22  sort of an internal sense of your sexual

23  identity.

24         Q.   Okay.  Okay.  Are there any

25  components of gender identity, or how do you

1    know someone's gender identity.

2                    MR. BLAKE:  Objection.  Vague.

3                    THE WITNESS:  You ask them.

4                    MS. BONHAM:  Is this all one

5    exhibit?

6                    MS. INGELHART:  It should be, but

7    we can triple check.

8                    (Thereupon, Plaintiffs' Exhibit

9    10, letter, CV, and rebuttal expert report from

10   Dr. Van Meter, was marked for identification

11   purposes.)

12   BY MS. INGELHART:

13        Q.   All right.  What we've just

14   presented is Plaintiffs' Exhibit 10.  For ease

15   of reference and flipping back and forth, we

16   have put your first report with your rebuttal.

17   So the order of the documents here is your

18   initial report, followed by your CV, followed

19   by your rebuttal report.

20        A.   Okay.

21        Q.   Thank you.  So do you recognize

22   this document?

23        A.   I do.

24        Q.   Okay.  And did you create this

25   document?

210

1          A.   I did.

2          Q.   Okay.  And you reviewed it in

3   advance of today, correct?

4          A.   Yes, I did.

5          Q.   Okay.

6          A.   Whether I reviewed this copy of my

7   CV, I can't tell you.  It depends on the date

8   of it.

9          Q.   Okay.  So I want to turn to the

10  rebuttal report at the back, which Paragraph 11

11  of it is the second to last page of this pile

12  of papers.

13         A.   Paragraph 11.  Okay.

14         Q.   Can you read Paragraph 11?

15         A.   Yes.  Dr. Ettner states elsewhere,

16  in Paragraph 20, that gender identity is

17  determined merely by the statement of the

18  adolescent or adult.  Mere statements by the

19  individual, obviously, do not indicate a

20  biologic basis for gender identity.  Nor do

21  such statements indicate that gender identity

22  is immutable.

23         Q.   Okay.  Did you just testify that

24  you determined somebody's gender identity by

25  asking them?

1          A.    Gender identity, yes.

2          Q.    Okay.  So this Paragraph 11 here,

3    you're saying that you disagree with Dr. Ettner

4    as to substance in your second two sentences,

5    not the first?

6          A.    I'm not sure I understand your

7    question.

8          Q.    Sure.  Okay.  So in Paragraph 11

9    you state that -- you reference back to Dr.

10   Ettner's report where she says to you,

11   according to you, that gender identity is

12   determined merely by the statement of the

13   adolescent or adult?

14         A.    That's correct.  So I don't

15   disagree with that.

16         Q.    Okay.  So you're highlighting your

17   divergence from her opinion in the second two

18   sentences, correct?

19         A.    That's correct.

20         Q.    Okay.  And what is your basis that

21   there's no biological basis for -- what's your

22   basis for the assertion that there's no

23   biological basis for gender identity?

24         A.    Because there is no valid

25   scientific study that indicates such.

1            Q.    Okay.

2            A.    There are attempts to look at

3    brain MRI studies to look at exon deletions or

4    couplings and pairs.  The numbers are extremely

5    small.  The interpretation that is presented

6    has been challenged by authorities in the

7    fields of neuroimaging and in molecular

8    genetics to say that the conclusions that were

9    reached in each case that are not valid.

10           Q.    Thank you.  In your view, a

11   person's sex does not include their gender

12   identity, correct?

13           A.    That's correct.

14           Q.    In your professional expert

15   opinion, is a gender identity something that is

16   fixed?

17           A.    No, I do not believe it's fixed.

18           Q.    Okay.

19           A.    But it may be persistent, but it

20   is not so that it cannot be changed.

21           Q.    In your opinion, does gender

22   identity crystallize for individuals at a

23   certain point in time?

24           A.    I do not know.

25           Q.    Okay.  Great.  We'll put this

213

1    aside.  We will certainly come back to it.

2            A.   Okay.

3            Q.   I'm going to introduce another

4    exhibit.  Exhibit 11.

5                 (Thereupon, Plaintiffs' Exhibit

6    11, Certification of Birth of Stacie Marie Ray,

7    was marked for identification purposes.)

8    BY MS. INGELHART:

9            Q.   Plaintiffs' Exhibit 11 has just

10   been handed to you.  Do you know what this

11   document is?

12           A.   It says it's a certification of

13   birth

14           Q.   From the State of Ohio, right?

15           A.   From the State of Ohio.

16           Q.   Do you happen to recognize the

17   name on this birth certificate?

18           A.   Yes, I do.

19           Q.   Do you know who it is?

20           A.   It's one of the plaintiffs, I

21   believe.

22           Q.   Okay.  Great.  Thank you.  Looking

23   at the right-hand side of the birth certificate

24   where there's a field that says sex, does it

25   say biological sex or sex?

214

1              MR. BLAKE:  Objection.

2              THE WITNESS:  It says sex, because

3    biological sex is sort of a redundancy.  Sex is

4    sex, and it is biologic.  So you don't have to.

5    It's like saying it's a green color.  Okay?

6    Sex is biologic.  So to say biologic sex is to

7    try to separate it from the construction of

8    gender identity.  So it has no biologic basis.

9    Sex and gender are often interchangeably used

10   on documents.

11             My Georgia driver's license has

12   sex.  My Delta frequent flyer card has gender.

13   The reason for that I can only, in conjecture,

14   say is because the word sex has so many

15   connotations in terms of a verb, you know, it's

16   a potentially adult word of some kind, but

17   gender is so squeaky clean that it's an easier

18   way to say what you really mean, which is the

19   sex of the patient.

20   BY MS. INGELHART:

21        Q.   Okay.  So --

22        A.   That's just --

23        Q.   No, no.

24        A.   I'm trying to figure it out.  Why

25   in the world would you ever use gender on a

215

1   document if you're applying for something, when

2   what you're really trying to say what is your

3   sex?

4          Q.   Okay.  So do you think that

5   government issued identity documents should

6   just list sex assigned at birth instead of a

7   marker for gender?

8          A.   No, I think it should just say

9   sex.  Sex assigned at birth is kind of another

10  inaccuracy.  Okay?  Sex is determined at

11  conception.

12         Q.   Okay.

13         A.   Calling it assigned is sort of a

14  judgmental kind of a thing, as if it were an

15  opinion.  It is something that is recognized at

16  birth by anatomy, or if there's confusion it's

17  recognized that there's confusion.  We do not

18  let a baby boy, that we think is a baby boy,

19  whose testicles are not in the scrotum -- both

20  of them or one or both of them in the

21  scrotum -- we do not let that baby leave the

22  nursery identified as a male or female until we

23  essentially determine whether or not the sex of

24  that baby is male or female.

25         Q.   Okay.  So did you say that

216

1   government issued any documents should have the

2   word sex, right?

3         A.   It should in that if they're

4   collecting data, which is what government

5   documents are supposed to do, and you are

6   looking at epidemiologist things such as the

7   things that are different from male sex to

8   female sex, and then you're going to need to

9   keep records of those things.  And for instance

10  a trans female who comes in -- excuse me.  A

11  trans male who comes into the emergency room

12  with abdominal cramping, it's important for the

13  medical diagnosis that it be obvious to

14  everyone that that person is a -- the sex they

15  were born, because their internal anatomy

16  likely in the case of the pregnancy that

17  essentially was a miscarriage, that was because

18  there was no recognition of sex, there was

19  recognition instead of gender.  So that's an

20  actual -- and it's rare.  I fully admit that

21  made a lot of news because it was splashy, but

22  it was an event which just illustrated the

23  point that you need to know sex differences,

24  not gender differences in terms of medicine and

25  outcomes.

1     Q.    Okay.

2          A.    The FDA recognizes sex as

3     important, because they make sure that drugs

4     are tested in males and they are tested in

5     females, before they can say they're safe and

6     effective.  Because the human body as a male

7     reacts differently than the human female body

8     does.  No matter what the gender is perceived

9     to be, the important thing is the sex.

10          Q.    So on like identity documents and

11     forms, just to be clear, you think that the sex

12     marked on a birth certificate, the original

13     birth certificate, should be what's on those

14     documents?

15          A.    The purpose is to collect data on

16     births to look at population, okay, to

17     establish an anchor of identity, but more

18     important to look at sex.  Say percentage of

19     males, percentage of females.  Accidents

20     involving -- epidemiologist studies involving

21     males and females.  If that's changed, then you

22     skew the data, and you all the sudden lose the

23     biologic proportion of male-to-females, and if

24     you're looking at laws and discrimination, et

25     cetera, et cetera, you're going to lose all the

218

1   benefit of being able to quantify your

2   population.  And this is a government document

3   establishing biologic population.

4           Q.   Okay.  So just to be clear,

5   though, you think it would be better if

6   documents required a person to list sex that

7   was originally on their birth certificate

8   whenever identifying sex or gender?

9               MR. BLAKE:  Objection.  Misstates.

10  Relevance.

11              THE WITNESS:  I'm saying that in a

12  birth record.  Birth record.

13  BY MS. INGELHART:

14          Q.   Okay.  So not generally identity

15  documents?

16          A.   You know, everything else is more

17  of a social construct.  So if you on your

18  driver's license say, I have blond hair and

19  blue eyes, and what you really have is brown

20  hair that you have bleached, and you're wearing

21  blue contacts, okay, the reason that the

22  driver's license says blond hair and blue eyes

23  is because if you are recognized in an event

24  where they have to have some kind of identity

25  that's right there and immediate, they have it,

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 219 of 332 PAGEID #: 1060
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

219

1    and it matches.  Okay?

2              Instead of saying you see someone

3    who's blond and blue eyed and on their driver's

4    license it says black hair and black eyes,

5    you're thinking, wait a minute.  This doesn't

6    represent what this is, where I need to know

7    right at this very second.  This is not a

8    document like that.  This is a health record of

9    demographics.

10             Q.   Okay.  But like in the

11   hypothetical that you introduced with the trans

12   man presenting at a hospital with abdominal

13   pain, you said that it's important that he on a

14   form would list female, right?

15             MR. BLAKE:  Objection.

16             THE WITNESS:  If there's not a

17   form, at least inform immediately all the

18   medical personnel, I need to tell you something

19   in private.  This is all HIPPA compliant.  You

20   know, you are my physician.  I'm sharing with

21   you the fact that I am actually a female in

22   terms of my sex, but my gender is male.

23   BY MS. INGELHART:

24             Q.   Okay.

25             A.   I'm concerned, therefore, that I

220

1    might be pregnant.  You know.

2           Q.    Yeah.   Okay.

3           A.    Yeah.

4                 (Thereupon, Plaintiffs' Exhibit

5    12, Transgender, a state of mind in search of

6    biology by Dr. Van Meter, PowerPoint photos,

7    was marked for identification purposes.)

8    BY MS. INGELHART:

9           Q.    Quickly, I'd like to introduce

10   another exhibit, Exhibit 12.  What I have just

11   had placed before you is Plaintiffs' Exhibit

12   12.  Do you recognize this document?

13          A.    I do.

14          Q.    What is it?

15          A.    It's a printout of a PowerPoint

16   presentation.

17          Q.    Is it a PowerPoint presentation of

18   your own?

19          A.    Yes.

20          Q.    Do you know when this PowerPoint

21   presentation was used?

22          A.    This I believe was what I

23   presented at the meeting of the Southern

24   Pediatric Endocrine Society meeting, in

25   Atlanta.

STACIE RAY vs AMY ACTON                    Quentin L. Van Meter, M.D.

221

1          Q.   Okay.

2          A.   In I think it was 2014.

3          Q.   Thank you.  Okay.  That's helpful.

4   So if you could turn -- unfortunately there's

5   not Bates numbers -- to the second to last

6   piece of paper that is titled, recapturing the

7   language, did you create this Power Point?

8          A.   I did.

9          Q.   So this third bullet point here

10  says, remove gender and replace with sex on all

11  government and business documents.

12             MR. BLAKE:  Objection.  That's not

13  what it says.

14             MS. INGELHART:  I literally just

15  read it.

16             MR. BLAKE:  You literally read it

17  wrong.

18             MS. INGELHART:  Remove gender and

19  replace with sex on all government and business

20  documents.

21             MR. BLAKE:  You read it again

22  wrong.  You're inserting the word all.

23             MS. INGELHART:  I'm saying on.

24             MR. BLAKE:  You said on all.

25             MS. BONHAM:  Why don't we read it

222

1    one more time for the record?

2                    MR. BLAKE:  Thank you.

3    BY MS. INGELHART:

4        Q.   Okay.  Remove gender and replace

5    with sex on government and business documents?

6        A.   Yes, I wrote that.

7        Q.   Okay.  Thank you.  This is

8    inconsistent with your prior statement,

9    correct?

10                   MR. BLAKE:  Objection.

11                   THE WITNESS:  This is a statement

12   of what if I were in charge and what I thought

13   made sense and what would be honest is what

14   should happen, but that's different than what I

15   previously stated.

16                   Okay.  Thank you.  That's all.

17                   MS. INGELHART:  For the record, I

18   wasn't trying to intentionally misread.

19                   MR. BLAKE:  I know you weren't.

20                   MS. INGELHART:  Okay.  Thank you.

21   BY MS. INGELHART:

22       Q.   What is gender dysphoria?

23       A.   It is a term that was created by

24   the APA committee in creation of DSM-5 to

25   replace the term gender identity disorder to

223

1   describe the emotional discomfort created by

2   having an incongruent gender and sex.

3          Q.   Okay.  And it replaced the term

4   gender identity disorder, correct?

5          A.   Essentially, in the DSM.  Yes, it

6   did.

7          Q.   Okay.  Is that why in your report

8   you sometimes use gender identity disorder

9   versus the term gender dysphoria?

10         A.   It's almost interchangeable with

11  gender incongruence and gender identity

12  disorder and gender dysphoria, because for me

13  they are all essentially the same thing with

14  just different names put to them.

15         Q.   Okay.  And can you clarify for me

16  what gender incongruence is?  I think I

17  understand but...

18         A.   It is when there's a mismatch

19  between the gender and the sex.

20         Q.   Okay.  Thank you.  Do you believe

21  it's ever appropriate for a transgender person

22  to undertake gender transition?

23         A.   Yeah.  I don't think there's any

24  appropriate time or age.

25         Q.   Thank you.  Is that the view

224

1    generally accepted within your field?

2          A.   Among nonprofessional societies,

3    among colleagues, absolutely.

4          Q.   Among all of your colleagues, all

5    pediatric endocrinologists in the U.S.?

6          A.   The majority of pediatric

7    endocrinologist colleagues.  When I give

8    presentations and take assessment of their

9    response and what they come up to me afterwards

10   and say, it's 75 percent.

11         Q.   Okay.  Are the people who attend

12   your panels and presentations representative of

13   the entire population of pediatric

14   endocrinologists?

15              MR. BLAKE:  Objection.

16              THE WITNESS:  I can't state that,

17   but they are representative of the people who

18   come to CME meetings.

19   BY MS. INGELHART:

20         Q.   Okay.  Thank you.  Have you ever

21   taken any steps to facilitate someone's gender

22   transition?

23         A.   Yes, I did.  In 1994, when I gave

24   that boy some estrogen.

25         Q.   Okay.  Any other time?

225

1              A.    No.

2              Q.    Okay.  And on what basis did you

3      do that?

4              A.    There was no precedent set in

5      children, and everyone who could advise me said

6      we don't know, but if you're going to do it,

7      this is how you should.

8              Q.    Okay.  And I'm sorry.  Who did you

9      consult with on that?

10             A.    Peter Lee, Claude Migeon, Mel

11     Grumbach, Gail Richards in Seattle.

12             Q.    And are they all also --

13             A.    They were all pediatric

14     endocrinologists, yeah.

15             Q.    Okay.  Thank you.  Thank you so

16     much.  Do you agree that individuals with

17     gender dysphoria, if not treated, often suffer

18     clinical significant emotional distress?

19             A.    Absolutely.

20             Q.    Including depression and suicidal

21     thoughts?

22             A.    Yes.

23             Q.    Okay.  And that it can impair the

24     functioning in their daily lives?

25             A.    It does.

226

1          Q.    Thank you.

2          A.    It's by definition.  That's what

3    gender dysphoria is.  It's a description of

4    that impairment.

5          Q.    Okay.  And again, without proper

6    treatment, do you agree that a significant

7    portion, like 30 to 40 percent, develop

8    suicidal ideation thoughts or attempt suicide?

9          A.    It's actually closer to about 20

10   percent, and the study's done at the Williams

11   Institute, where they looked at actual suicide

12   attempts.  It is equal to, I believe, autism

13   and just general anxiety and depression.

14         Q.    Okay.  Do you believe that

15   generally speaking transgender adults can

16   voluntarily change their gender identity?

17         A.    I don't know, because I don't

18   treat those.  I think at that end of the

19   spectrum it is far more difficult.  That would

20   be my experience of listening to the -- to Ken

21   Zucker and knowing what he's written is by the

22   time you get to adulthood, that if you have not

23   desisted, the desistance rate gets narrower and

24   narrower to that point in time.  But the point

25   is they need lifelong emotional support.

227

1   Lifelong psychiatric intervention or

2   psychological intervention.  And if you make

3   the assumption that they're done and you've

4   fixed them and let them go, that that's a grave

5   disservice.  His point was if they get to

6   adulthood and they choose to transition

7   medically and surgically, they need to be your

8   patients until the end of their life, and if

9   you let them go, they will be in grave danger

10  of harming themselves.

11          Q.   Okay.  On the in perpetuity,

12  danger of harming one's self if they're not in

13  care, what's the basis for that?

14          A.   His personal experience, and then,

15  you know, the Dhejne study talks about just the

16  suicide rate being 20 fold greater.

17          Q.   Like the Swedish study?

18          A.   Yeah.

19          Q.   Okay.  And also Zucker's research,

20  as well?

21          A.   Right.

22          Q.   Okay.  Thank you.  Do you agree

23  whether a trait is biological and whether a

24  trait can be changed are two different things?

25          MR. BLAKE:  Objection.  Vague.

228

1                    THE WITNESS:  Biological seems to

2    be that there is a genetic programming that,

3    again, I would say that biological means it

4    can't be successfully changed.  You can make

5    attempts to do so, but you will not succeed.

6    BY MS. INGELHART:

7            Q.    Is it your opinion that there's no

8    genetic component to gender identity?

9            A.    That's correct.

10           Q.    Okay.  Is it your opinion that

11   there's, therefore, no relationship to

12   transgender identity and inheritability?

13           A.    Correct.

14           Q.    I think we touched on this before,

15   but do you believe that the removal of gender

16   identity disorder from the DSM and its

17   replacement with gender dysphoria was a

18   disservice to patients?

19                   MR. BLAKE:  Objection.  Vague.

20                   THE WITNESS:  Yes.

21   BY MS. INGELHART:

22           Q.    Thank you.  Is it your opinion

23   that sex reassignment surgery and treatment for

24   gender dysphoria is a form of mutilation?

25           A.    Yes.

229

1          Q.   Okay.  For the record, let's turn

2     back to your report.  In the initial part of

3     it, Paragraph 24, which is on Page 5 of the

4     initial, so it is the third paper in that file.

5          A.   Okay.

6          Q.   I think this is what we talked

7     about earlier on the record or off.  I'd just

8     like to put it on the record.  This statement

9     here, do you hold firm that that's accurate?

10         A.   No.  I mean those numbers have

11    been modified considerably, depending on how

12    the question is asked in the population.  It is

13    now estimated in a study of high school

14    students of Oregon that it's 24 percent of the

15    population that says issues with gender

16    identity.

17         Q.   Okay.

18         A.   I mean that's the extreme on one

19    side, and somewhere in the middle, the actual

20    standard up until sort of the increase of the

21    adolescence female.  I talked about the strange

22    rush in gender incongruence.  Two to one

23    female-to-males.  Prior to that it was .06.  It

24    was 6 out of 100,000 males and 3 out of 100,000

25    females.  So that was a respected figure from

230

1   Europe.  Those were the WPATH statistics at the

2   time.  It has been modified considerably since

3   then, and I think that's the concern is the

4   repetity of the modification to a hundred fold.

5   You know, going from 200 cases a year to 2,400

6   cases a year in the UK, over a span of 10 years

7   made them sit up and say, what's going on?

8   Let's pause.  Let's go and examine exactly what

9   this phenomenon is, because that cannot be

10  explained by social acceptance.

11          Q.   Okay.  Can I just quickly ask you

12  the terminology here?  You used the term

13  biological females and biological males.

14          A.   It's redundant.

15          Q.   Okay.  Thank you.

16          A.   Well, actually, no.  Biological

17  females, yeah.  I mean what that is is the sex

18  is male or female is what that intent was.  To

19  use the word biologic sex, as I said, is sort

20  of a redundancy.

21          Q.   I see.  Okay.  Thank you.

22          A.   So the biological female refers to

23  female sex.  Biological male, male sex.

24          Q.   Got it.  Not to be confused with

25  female gender?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 231 of 332 PAGEID #: 1072
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

231

1          A.    Right.

2          Q.    Thank you.  And you cited to the

3    Endocrine News source for this?

4          A.    Yes.  And I went back, and I went

5    to see where I found that, and I will have to

6    go back and find out, because I've got a stack

7    in a folder exactly what I used, and somehow

8    inadvertently misstated that that came from

9    that source.  And I reread that, because I

10   could look it up, and I said, well, that's an

11   interesting criticism and I want to make sure

12   that I point by point go through.  And it's an

13   valid criticism.  So I fully say that did not

14   come from that source.

15         Q.    Mistakes in footnotes happen.

16         A.    I get concerned, because I signed

17   this.

18         Q.    Fair.  So but generally is the

19   Endocrine News a reputable source?

20         A.    No.  It's one of the throwaways.

21         Q.    Okay.  Before I said I wanted to

22   come back to this, and so quickly tie up a lose

23   end.  Can we refer back to the Zucker exhibit.

24   What's the number?

25         A.    It is 3.

232

1      Q.   Thank you.  Can we go back to

2  Exhibit 3 really quickly.  Just back to the

3  same place we were before, Page No. 392.

4  Apologies.  Can we look at Page 369, the very

5  first page?

6      A.   Okay.

7      Q.   In the first non-italicized

8  paragraph, this study is indicated to be 590

9  children.  Is that how you read that as well?

10     A.   Yes.  And I may have misstated 560

11 previously, but it's 590.

12     Q.   But this is the study you cite to

13 for rate of desistance and --

14          MR. BLAKE:  Objection.

15 BY MS. INGELHART:

16     Q.   And is that accurate?  Is this the

17 study that you cite to for rate of desistance?

18     A.   No.  DSM is what I also cited to

19 in that.

20     Q.   Okay.  But this is one of them?

21     A.   Yeah.  This is one of them.

22     Q.   Okay.  Thank you.  Thank you for

23 the clarification.  So this is one of the

24 documents that you cite to for rate of

25 desistance, but this document is just a study

233

1   of children, correct?

2          A.   That's correct.

3          Q.   And as we discussed before, rate

4   of desistance among children is higher than

5   rates of desistance amongst adults?

6          A.   That's correct.

7          Q.   Okay.  Okay.  Back to your report.

8   Sorry for all the jumping around.  We're going

9   to look at the rebuttal portion.  So we can

10  flip to the very last page of this stack of

11  papers and to Paragraph 15.  Can you refresh

12  your recollection?  Do you know what we're

13  talking about?

14         A.   Yes.  This is the Dhejne study.

15         Q.   Okay.  And that's the one where

16  you cited for what assertion again?

17         A.   That there was nearly 20 times

18  increase of suicide -- completed suicides, not

19  attempts, in patients who had completed the

20  entire gender affirmation process.  Social,

21  medical and surgical.

22         Q.   Okay.  Great.  Thank you.

23              (Thereupon, Plaintiffs' Exhibit

24  13, Long-Term Follow-Up of Transsexual Persons

25  Undergoing Sex Reassignment Surgery:  Cohort

234

1    Study in Sweden, was marked for identification

2    purposes.)

3    BY MS. INGELHART:

4         Q.   I'm going to introduce another

5    exhibit.  This is Plaintiffs' Exhibit 13.  If

6    you want to take a look at it.  Do you

7    recognize this document?

8         A.   I have not combed through it.

9    It's the second or a follow-up study by Cecilia

10   Dhejne.  So I'm aware of it, yes.

11        Q.   And I apologize, but looking back

12   to the last page here, Paragraph 15 of your

13   rebuttal -- oh, I'm sorry.  The other one

14   there.  This is where -- I'll wait until you

15   get there.

16        A.   Okay.

17        Q.   Okay.  So it shows on 19-fold

18   increase in completed suicides, and you don't

19   have a footnote here, but is this the study I

20   just introduced?  Is that the one that you're

21   referring to?

22        A.   No, it's not.

23        Q.   It's not?

24        A.   No.  It's a -- hang on.  Hang on.

25   Wait a minute.  I can tell you.

235

1          Q.   Yeah.  No problem.

2          A.   And this is 2000 -- what's the

3    date?  No, it is this one.

4          Q.   Okay.

5          A.   I'm sorry.  Yes.

6          Q.   Okay.  Thank you.

7          A.   Yes, yes, yes.

8          Q.   Thank you.

9          A.   Okay.

10          Q.   Okay.  So can you explain to me

11    what a 19-fold increase means?

12          A.   Well, 19 times the amount of

13    suicides compared to the general populations of

14    Sweden's.

15          Q.   Okay.  So it's 19 times greater.

16    It wasn't an increase from some other previous

17    measure?

18          A.   No.

19          Q.   Thank you.  Okay.  And then in

20    your second sentence here it says -- sorry.

21    I'll let you get there.  It says these studies

22    indicate that gender incongruent patients who

23    undergo appropriate treatment and return to

24    identification with their biologic sex are at

25    far less risk for suicide.  What do you mean by

1    this study indicates?

2              A.    These being --

3              Q.    Oh, these.  Yes.

4              A.    -- a conglomerate of all prior --

5    the studies that are mentioned in the paper.

6    It's not the Dhejne study specifically.

7              Q.    Oh, okay.  I misunderstood the

8    paragraph.  Thank you.

9              A.    Okay.

10             Q.    Okay.  We can set aside your

11   report and then look back to the Dhejne study.

12   Thank you for teaching me how to pronounce the

13   name.  We discussed earlier issues with control

14   groups in these studies.

15             A.    Right.

16             Q.    If you look on the very first

17   page, there's a quick section that's called

18   participants.  In the gray box --

19             A.    In the gray box.  Okay.  Right.

20             Q.    -- there's participant.  So what

21   are the two comparative groups here?

22             A.    Random population controls and the

23   trans male-to-females and female-to-males.

24             Q.    Okay.  And by general population

25   control, what is that specifically?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 237 of 332 PAGEID #: 1078
STACIE RAY vs AMY ACTON                              Quentin L. Van Meter, M.D.

237

1    A.    That is the population of Sweden,

2  and a sample of the population to look at

3  incidence of suicide.

4    Q.    Okay.  Thank you.  So the

5  non-control group were transgender people,

6  correct?

7    A.    That's correct.

8    Q.    Who had undergone medical gender

9  affirmation?

10    A.    Social, medical and surgical.

11    Q.    Thank you.  And the control group

12  was generally representative of non-transgender

13  people?

14    A.    That's correct.

15    Q.    Okay.  Can we turn to what in

16  my -- oh, I'm going to try to compare -- to the

17  results section.  Whatever that --

18    A.    I've got it.

19    Q.    Okay.  And there's a comment that

20  says, Table 1.

21    A.    Yes.

22    Q.    That's commenting upon Table 1.  I

23  apologize.  Could we go off the record really

24  quick?

25          THE COURT REPORTER:  Sure.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 238 of 332 PAGEID #: 1079
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

238

1              (Thereupon, the deposition briefly

2      went off the record.)

3      BY MS. INGELHART:

4              Q.    So on Page 4 of the document that

5      you're looking at in the results section,

6      subsection characteristics prior to sex

7      reassignment, there's a paragraph that starts

8      with the words Table 1.  The second sentence

9      says there were no substantial differences

10     between female-to-males and male-to-females

11     regarding measured baseline characteristics.

12     Immigrant status was twice as common among

13     transsexual individuals compared to controls,

14     living in an urban area somewhat more common,

15     and higher education about equally prevalent.

16     Transsexual individuals had been hospitalized

17     for psychiatric morbidity other than gender

18     identity disorder prior to sex reassignment

19     about four times more than the controls.

20             Really it's that last sentence

21     that's operative.  Do you understand what that

22     sentence says?

23             A.    Yeah.  Mm-hmm.

24             Q.    Okay.  The conclusion -- sorry.

25     There's so much jumping around.  In your

1   report, do you cite to the study to say that

2   transition can lead to higher rates of

3   suicidality?

4           A.    If you look at a four-fold

5   increase in psychiatric hospitalization versus

6   the 20-fold increase in completed suicides,

7   there is obviously a correlation that there is

8   psychiatric morbidity occurring, okay?  We

9   would say, in the trans population.  Which is,

10  as far as I'm concerned, indigenous to the

11  disorder or the dysphoria.  Okay?

12          Q.    Okay.

13          A.    So it's not surprising to see that

14  those patients are troubled, but despite that,

15  if it's four times the amount of psychiatric

16  admissions but 20-fold amount of completed

17  suicides, that in my mind, if you look at that,

18  that's a five-fold increase in suicidality, if

19  you will, or completed suicides perhaps.  I

20  mean it's an inference that this doesn't state,

21  but it says, we have troubled people to begin

22  with.  And what was done for them increased

23  their suicide rate far more than it would be

24  expected.  You might have a four-fold increase.

25  If their four-fold's emotionally sick or going

240

1    in, then that suicide completion would then be

2    maybe four times as much, but it was 20 times

3    as much as the general population.  So you've

4    got population that's in the hospital for

5    mental disorder is four times more than the

6    general population and kills themselves 20

7    times more often.  That's a multiple factor

8    that indicates that the affirmation was not a

9    successful concept in those patients.  The

10   affirmation had a higher risk.

11          Q.   So, Doctor, is your inference

12   based on an assumption that there's a direct

13   relationship between rate of hospitalization

14   and rate of suicide?

15          A.   No.  No.

16          Q.   Can you explain then what your

17   basis for saying the transition after these

18   hospitalizations is what caused suicide?

19          A.   Well, there was an increase.  And

20   so it's just a matter of -- it's an assumption.

21          Q.   And what is the increase, though?

22   From what to what?

23          A.   Four to twenty.

24          Q.   But the four represents the

25   number -- four times as likely represents the

241

1  number of hospitalizations, correct?

2          A.   Right.

3          Q.   And 20 represents the number of

4  completed suicides, correct?

5          A.   Right.

6          Q.   So you're saying an increase from

7  hospitalization to -- you're saying that a

8  change in number value of a hospitalization

9  rate to a rate of completed suicide is

10  something you could describe as an increase?

11          A.   It appears to me just on a cursory

12  analysis, and the problem is that there's

13  missing all of the explanations for the

14  hospitalizations and what had prompted them.

15  Was it a suicide attempt?  Was it something

16  else that was just an actual depression?  What

17  was the grade?  You know, why they were

18  hospitalized.

19              So all that's missing.  So if you

20  look at it as a comparative, it makes you think

21  these are troubled people, and the affirmation

22  seemed not to help at all and perhaps multiply

23  it.

24          Q.   Okay.

25          A.   And again I'm just looking at this

242

1  from the information that I can glean from that

2  statement.

3         Q.   Right.  Can you look to the

4  section, continuing on, morbidity, that says

5  Table 2 at the top of the paragraph.  It's just

6  below where we were before.

7         A.   Hang on.  Table 2.  Okay.

8         Q.   The second sentence that begins

9  with the hyphenated word sex-reassigned.

10         A.   Yes.  Okay.

11         Q.   Sex-reassigned transsexual persons

12  of both genders had approximately a three times

13  higher --

14         A.   I'm missing -- I'm sorry.

15         Q.   It's okay.

16         A.   It's under which?

17         Q.   It's on Page 4 of the document

18  you're looking at.

19         A.   Okay.

20         Q.   Under the right-hand column term

21  morbidity.

22         A.   I've got that's mortality actually

23  is what it says.

24         Q.   You're right.  You're right.

25         A.   Okay.

243

1          Q.   I'm having some reading trouble

2     today.

3          A.   That's okay.  That's all right.

4          Q.   Sex-reassigned transsexual persons

5     of both genders had approximately a three times

6     higher risk of all-cause mortality than

7     controls, also after adjustment for covariates.

8          A.   Okay.

9          Q.   Do you understand what that

10    sentence says?

11         A.   And I'm not sure I understand it.

12         Q.   Okay.  Could you tell me what your

13    understanding of it is?

14         A.   Actually I mean it sounds to me

15    like there was a three-fold increase of

16    mortality for any reason at all.

17         Q.   And you're using the word increase

18    to explain the difference between the

19    controller's measure --

20         A.   And control.  Right, right.

21         Q.   Okay.  So can you restate that

22    again?  What's your understanding of the

23    sentence?

24         A.   It says sex-reassigned transsexual

25    persons of both genders.  Meaning that there

244

1   was not any difference between male-to-female,

2   female-to-male.  Had an approximately

3   three-time higher risk of all-cause mortality.

4   Not suicide, but all causes.

5         Q.   Okay.  Do you think that their

6   transition is the cause of higher rates?

7         A.   That would be sheer conjecture.

8         Q.   Okay.  How is it then not

9   conjecture in the other inference?

10         A.   Well, it's a higher statistical

11   difference.  Okay?  Twenty versus three.  Three

12   times is possibly due to other confounding, and

13   this is any mortality, meaning that they could

14   have died of heart disease.  They could have

15   died by any other causes.  They could have been

16   hit by, you know, a trolley or whatever.

17         Q.   Okay.

18         A.   Suicide to me means an intended

19   death.

20         Q.   I understand.

21         A.   Okay.

22         Q.   Thank you.  We can set aside

23   the -- I already forgot how to say her name.

24         A.   Dhejne.

25         Q.   Dhejne -- thank you -- study.  But

245

1   one quick question.  Is in-patient care at a

2   psychiatric facility always a precursor for a

3   completed suicide?

4          A.    No.

5          Q.    Okay.  Thank you.  Do you agree

6   that transgender adults are at greater risk of

7   death by suicide than the general population?

8          A.    Yes.

9          Q.    What's the impotence of people

10  born with, as you call it, DSDs?

11         A.    For the ones that are what we

12  would call ambiguous to the point where

13  identification is not possible by appearance of

14  external anatomy, about 1 in 4,500.

15         Q.    Okay.  Let's turn to Page 3 of

16  your initial report.  So just 3 of that

17  document there.  Paragraph 16 here says, for

18  reasons most often occurring as random events,

19  there are malfunctions of the normal

20  differentiation.  These aberrations of normal

21  development are responsible for what we

22  classify as disorders of sexual

23  differentiation, or DSD, and they represent a

24  very small fraction of the human population.

25  The incidence of such circumstances occurs 1 in

246

1    4,500 to 1 in 5,500 births.

2          A.   Right.

3          Q.   Okay.  Does this refer to all

4    DSDs, as the sentence says?

5              MR. BLAKE:  Objection.

6              THE WITNESS:  It refers to DSDs in

7    the classic sense.  You know, ambiguitive

8    genitalia.

9    BY MS. INGELHART:

10         Q.   Okay.

11         A.   Not the Klinefelter's, not the

12   Turner's syndrome, not to people with

13   hypospadias.

14         Q.   Paragraph 14 above here.  You want

15   to review it very quick?

16         A.   Do you want me to read it out

17   loud?

18         Q.   No.  You can just read it to

19   yourself.

20         A.   Okay.

21         Q.   I'm thinking of the wrong one.  Is

22   it possible, as we discussed earlier today, for

23   a newborn with XX chromosomes to present

24   phenotypically with a penis and a scrotum at

25   birth?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 247 of 332 PAGEID #: 1088
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

247

1          A.    Yes.

2          Q.    Okay.  Would that be a DSD?

3          A.    That would be a DSD.

4          Q.    Okay.  So does that fit into the

5    general definition of DSD, as you said before?

6    Atypical genitalia?

7          A.    Well, it's one that will be

8    discovered accidentally, most likely.  Like the

9    one case of the XX male that I had, and that is

10   far rarer than the 1 in 5,000.  I can't quote

11   the statistic, but it's exceedingly -- I think

12   I'm the only person in my community in Atlanta

13   who's seen an XX male.

14         Q.    Okay.  Thank you.  And let's just

15   turn the page to Paragraph 17, and you can just

16   read it to yourself again.

17         A.    Okay.

18         Q.    In that paragraph, you referred to

19   the Intersex Society of North America consensus

20   statement and update, right?

21         A.    Right.

22         Q.    Okay.  That group presented the

23   ideas in their consensus statement that you

24   cite to to support your argument, right?

25         A.    Yes.

248

1          Q.   Okay.  All right.  Let's pull up

2     those two.

3               (Thereupon, Plaintiffs' Exhibit

4     14, Consensus statement on management of

5     intersex disorders, and Plaintiffs' Exhibit 15,

6     Global Disorders of Sex Development Update

7     since 2006:  Perceptions, Approach and Care,

8     were marked for identification purposes.)

9     BY MS. INGELHART:

10         Q.   I'm going to introduce two

11    exhibits at one time.  Do you recognize these

12    two documents?

13         A.   I do.

14         Q.   Are they what you refer to in the

15    third sentence of Paragraph 17 in your report?

16         A.   Yeah.  Both are Dr. Lee's

17    references, yes.

18         Q.   Okay.  Thank you.  Could you show

19    me in these reports where this consensus

20    statement is attributed to the Intersex Society

21    of North America?

22         A.   It's actually a term that was used

23    as a colloquial term.  I mean it was an

24    interest group, the Intersex Society.  It has a

25    different name and a professional name.  The

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 249 of 332 PAGEID #: 1090
STACIE RAY vs AMY ACTON                    Quentin L. Van Meter, M.D.

249

1   ones that actually ended up publishing.  They

2   went through a whole change of nomenclature.

3   Originally, it was called the Intersex Society

4   of North America -- I think, of North America.

5   And then they got together as a consortium and

6   decided on a better name.

7          Q.   Okay.

8          A.   But it's a colloquialism.

9          Q.   Okay.  Let's pull up just that

10  last one really quick.

11         A.   So just to show you.  LWPES is

12  actually the Pediatric Endocrine Society, and

13  ESPE is the European.  So that -- sort of if

14  you want to have it as a special interest group

15  called the Intersex Society came together to

16  these two organizations, and then they decided

17  we were going to publish guidelines under an

18  auspice of a new -- of sort of the general term

19  of PES and ESP.

20         Q.   And is that on the 2016 update or

21  the original?

22         A.   This is the updated.  I mean this

23  is the original, and this is the update.

24         Q.   Okay.  We're going to enter the

25  one-third exhibit for this line of questions.

250

1          (Thereupon, Plaintiffs' Exhibit

2     16, Dear ISNA Friends and Supporters, was

3     marked for identification purposes.)

4     BY MS. INGELHART:

5          Q.   Plaintiffs' Exhibit 16.  Do you

6     recognize just the title at the top?

7          A.   Yes.

8          Q.   Okay.  This you can see at the

9     bottom corner of the page where it came from,

10    isna.org?

11         A.   Yes.

12         Q.   From the Intersex Society of North

13    America's website.  The second bullet point on

14    the page, can you read that?

15         A.   More cautious approach to surgery.

16         Q.   I'm sorry.  No.

17         A.   In August 2006?

18         Q.   Correct.

19         A.   Okay.  A new standard of care was

20    published in Pediatrics.  The consensus

21    statement on management of intersex disorders

22    is an important inroad to resolving this

23    crisis.  It incorporates many of the concepts

24    and changes long advocated by ISNA.

25               So that is, again, the

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 251 of 332 PAGEID #: 1092
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

251

1  organization morphed into something that was a

2  bit more scientifically based, that was

3  broader.  It involved the professional

4  societies, because that group, ISNA, was a very

5  small nucleus of people, and they wanted again

6  to get to all pediatric endocrinologists and

7  develop a consensus policy.

8          Q.   Okay.  But the consensus statement

9  was not actually from --

10         A.   No.

11         Q.   Okay.  How do you know that the

12 consensus statement was conceived in the manner

13 you described?

14         A.   By talking to Dr. Lee.  He's a

15 personal friend and a mentor.

16         Q.   Okay.  Thank you.  You can set all

17 three of these exhibits aside.

18              Turning back to your report

19 document to Paragraph 19 in the original

20 report, which is on Page No. 4, can you just

21 read it and refresh your recollection to

22 yourself?

23         A.   DSD patients are not transgender.

24 They have objective, physical, medically

25 verifiable, physiologic conditions.

252

1   Transgender people generally do not have

2   intersex conditions -- yeah, generally, you

3   don't have -- or any other verifiable physical

4   anomaly.  People who identify feeling like the

5   opposite sex or somewhere in between do not

6   comprise a third sex.  They remain biological

7   men or biological women as determined by their

8   chromosomes and sex at birth.

9          Q.   Okay.  So would you agree that

10  transgender identity and intersex identity are

11  not necessarily mutually exclusive?

12         A.   There are obviously cases that --

13  I believe Dr. Gordon said he had had some cases

14  in his experience where there were kids with

15  DSDs, and it depends again on what are you

16  calling a DSD.  So if you have a patient who

17  has Klinefelter's, I would not consider that a

18  DSD.  All right?  If you have a Turner's girl,

19  that's not a DSD.  And he did not say which of

20  the DSDs he was talking about.

21         Q.   Okay.  So they can co-exist with

22  some definitions?

23         A.   Yeah.  But they're not -- they're

24  not -- it's sort of -- again, the concept of

25  having ambiguous, okay?  Or having gonads of

253

1    one sex and having the physical appearance of

2    the other does not essentially -- that's not an

3    issue of gender identity.

4         Q.    Okay.  Are you aware of whether

5    there's documentation of transgender people

6    having a different rate of karyotype

7    abnormalities as compared to the general

8    population?

9         A.    I'm aware that it's stated, but

10   again it would be a population study.  And if

11   you had took all transgenders, and the problem

12   is you can't find all transgenders, and looked

13   at chromosome analysis to see whether or not

14   there were anything.  It depends on who

15   presented to you, and also what is -- I guess

16   much like you did in Sweden, take a sample of

17   population and say, .5 percent has a chromosome

18   anomaly.

19        Q.    Okay.

20        A.    The problem is it's selection

21   bias.  We don't know how to find all

22   transgender people.  So if you have transgender

23   patients come in that volunteer to have a --

24   and we don't do karyotypes on transgender

25   people.  It's not part of the workup.  Again,

1    it has no -- the reason to do that is if they

2    had some concern about being an intersex

3    condition, you could verify that.

4             Q.    Okay.   Okay.   Just to the next

5    paragraph on Page 4.   In some DSDs there exists

6    more than one set of chromosomes.   Can you just

7    clarify for me?   What do you mean by more than

8    one set?

9             A.    Each cell contains a set of

10   chromosomes.   So the gonads can have one set of

11   chromosomes, and the rest of the body can be

12   entirely different.   It's called mosaicism.

13   Okay?   Skin cells can be -- particularly in

14   kids that have remarkably unusual pigmentation

15   of the skin and stripes and swirls, you can

16   take a biopsy of the one color skin and take a

17   biopsy of another color skin and find genetic

18   differences between the two of those.   So that

19   is a mosaicism.   It's called a mosaicism.   So

20   you can have differences in karyotype from

21   tissue to tissue.

22            Q.    So just for my science nerd

23   skills, there's different kinds of ways of

24   having more than one set of chromosomes?   It

25   can present in some people like with different

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 255 of 332 PAGEID #: 1096
STACIE RAY vs AMY ACTON                                      Quentin L. Van Meter, M.D.

255

1    skin tones across your body?

2           A.    Right.   Mosaicism in skin.   The

3    most commonly thought of ones is the mosaicism

4    of like a gonadal dysgenesis, which is Turner's

5    syndrome, can have XY, XO karyotype.   Both are

6    like 30 percent of the cells are XY.   70

7    percent of the cells are XO.   Meaning there's

8    no second X.   The patient typically is a girl

9    with Turner syndrome has no functioning gonadal

10   functioning that's testicular, but nonetheless

11   those girls are at risk of having a malignancy

12   develop in their gonad.

13          Q.    Okay.

14          A.    Their gonads are already damaged

15   by the process of atrophy as part of Turner

16   syndrome, but the standard of care is to go in

17   and take out any residual gonadal tissue or

18   scar to prevent -- if there's any possibility

19   that there was a Y chromosome in those cells,

20   it needs to be eliminated because it has a

21   higher potential for malignancy.

22          Q.    So in those instances, the XY

23   cells versus the ones that are XO, so like X

24   missing a sex chromosome, those can be

25   localized, generally?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 256 of 332 PAGEID #: 1097
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

256

1          A.    They generally are most throughout

2    the body one particular type, but in the gonads

3    you can have -- that's what true hermaphrodism

4    is is presence of both gonadal functioning,

5    gonadal tissue, that you find on laproscopic

6    exam.

7          Q.    I understand.  Thank you.  Okay.

8    Is it your opinion that biological sex is

9    binary?

10         A.    Yes.

11         Q.    Does the existence of people with

12   DSDs illustrate that not everyone falls within

13   the two binaries of sex?

14         A.    The true so-called, previously

15   called, true hermaphrodites had both cell

16   lines.  Okay?  So the predominant cell line is

17   the one that ends up taking over, programming

18   the body, creating the hormones, or making the

19   hormones absent to make a body male or a

20   female.  So in a case of -- you're either of

21   them.  A biologic man -- yeah, a biologic male.

22   You're either male sex or female sex, depending

23   on the predominant cell type and the functional

24   anatomy that goes along with that and the

25   hormones that have been produced.  So that's

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 257 of 332 PAGEID #: 1098
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

257

1  all binary.

2          Q.   So inartfully, so correct me, I'm

3  not trying to ask you to assent to my

4  misunderstanding, if one has a chromosomal DSD

5  that would place them somewhere between a

6  typical male or a typical female, you would

7  still designate them on the binary based on

8  like if the majority of their secondary sex

9  characteristics look a certain way?

10              MR. BLAKE:  Objection.

11              THE WITNESS:  If their body

12  function and response to hormones is one way,

13  you assign it.  That's the sex.

14  BY MS. INGELHART:

15          Q.   Okay.  So folks with DSDs --

16          A.   The complete androgen insensitive

17  male is female.

18          Q.   Okay.

19          A.   Okay.  And determined to be.

20          Q.   Thank you.  That clarifies it for

21  me.  Okay.  On Paragraph 14, just the page

22  before, you state in the first sentence, a

23  fetus is determined to be either a male, XY, or

24  female, XX.  That's correct.  Yes?

25          A.   That's correct.

258

1          Q.   Are fetus chromosomes karyotyped

2    generally?

3          A.   No.

4          Q.   Okay.  Do you agree that without

5    photographic or very detailed writing at the

6    time of birth, describing the genitals, you

7    cannot be certain that a person with an M on a

8    birth certificate had typical genitals compared

9    to most people marked with an M at birth?

10              MR. BLAKE:  Objection.

11              THE WITNESS:  I'm not sure I

12   understand your question.

13   BY MS. INGELHART:

14         Q.   Sure.  Do you agree that without

15   like a photo of a baby's genitals or somebody

16   really writing up what those characteristics

17   look like, that we can't be certain that

18   somebody with an M on a birth certificate had

19   typical genitals of an average male?

20              MR. BLAKE:  Objection.  Vague.

21              THE WITNESS:  So the exam of a

22   newborn, okay, the first thing is a quick

23   impression.  The second thing is before the

24   birth certificate is ever completed is the

25   complete head to toe exam by a physician or a

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 259 of 332 PAGEID #: 1100
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

259

1    second level provider who pays very detailed

2    attention to the genitalia.  So if there is

3    virilization of the female, it's noted.

4              If there is an absence of

5    testicles in the scrotum but everything else

6    looks fine, again, that is so important.  It's

7    not just looking.  It's actually hands on.  You

8    pull the testicles down in the scrotum, and at

9    that point of time in a term baby the testicles

10   are easily found in the scrotum.  They're not

11   retractile, because the baby has testosterone

12   levels very typical of an early pubertal male

13   at that point in time, at the end of the third

14   trimester.

15             If you just look across the room

16   and you don't touch the scrotum and you don't

17   find each testicle down, that's an incomplete

18   exam.  That would be called a cursory exam, and

19   there should be nothing cursory about an exam

20   of a newborn.  It needs to be head to toe,

21   totally detailed.  Heart, lungs, fingers, toes,

22   scalp hair patterns, presence of cataracts,

23   missing digits, dimples, sinus tracks,

24   everything.  Everything has to be looked at.

25             So if it's cursory, it's an

260

1    inappropriate exam, and it's inefficient and

2    inappropriate.  So determining that has a very

3    significant -- although it seems mundane.

4    Like, yeah, I can tell from here to there that

5    that's a baby boy across the room in the

6    bassinet, you don't know that until you've

7    actually examined the patient completely.

8    BY MS. INGELHART:

9           Q.   So two questions.  Is that a

10   standard of care?

11          A.   Yes, it is.

12          Q.   Okay.  And where did you learn

13   that information?

14          A.   From the first days of medical

15   school, and then really re-enforced in

16   pediatric rotations in medical school and then

17   in pediatric residency and certainly in

18   fellowship.

19          Q.   Does it ever happen that intersex

20   babies who have atypical genitals are still

21   marked with an M or an F, just based on an

22   exam?

23          MR. BLAKE:  Objection.

24          THE WITNESS:  Yes.  That has

25   happened, and it's a tragedy when it comes down

1   the pike as finally discovered to be

2   inappropriate, and it happens.

3   BY MS. INGELHART:

4           Q.   Without a karyotype, we can't be

5   certain what a person's sex chromosomes are,

6   right?

7                   MR. BLAKE:  Objection.

8                   THE WITNESS:  Yes.  By definition.

9   BY MS. INGELHART:

10          Q.   But in your report at Paragraphs

11  31 -- initial report, Page 5, Paragraphs 31 to

12  34 on Page 6, you conclude for each of the four

13  plaintiffs that you know what their sex

14  chromosomes are, correct?

15          A.   It's a conclusion based on

16  information provided, without a physical exam.

17  So I mean, totally inclusive, I've never

18  examined any of the patients.  So I cannot

19  state emphatically.  It is just the evidence

20  presented, done by other people, who I assume

21  did an exceptionally appropriate job, but

22  that's what was reported to me.  And by

23  information in their statements.

24          Q.   Okay.  But it is an assumption?

25          A.   It's an assumption.

262

1              MR. BLAKE:  And I'll say we're

2   willing to withdraw those conclusions if you

3   guys will submit for karyotypes.  I mean is

4   that what we're doing with these questions?  If

5   they want to submit for a karyotype, we'll

6   withdraw the conclusions.

7              MS. INGELHART:  No, thank you.

8              MR. BLAKE:  Okay.

9   BY MS. INGELHART:

10         Q.   What's the appropriate gender

11  pronoun for a transgender person who's

12  transitioned?

13         A.   I am told in order to be sensitive

14  and not offensive that you chose the pronoun

15  that they ask you.  So you ask a patient what

16  they wish to be called, and that's what you

17  call them.

18         Q.   And in general is that your course

19  of practice?

20         A.   That's my course of a practice,

21  and, you know, I sometimes stumble

22  accidentally, and I will apologize in that case

23  if I use a wrong name or a wrong pronoun.

24         Q.   Thank you.  Okay.  Do you think

25  that civil rights should be based only on

1  immutable biology?

2          MR. BLAKE:  Objection.  Relevance.

3          Answer, if you know.

4          THE WITNESS:  I don't have an

5  opinion, but I'm -- I can say I have experience

6  to say.

7          (Thereupon, Plaintiffs' Exhibit

8  17, Breitbart, Doctors' Political Group Places

9  Gender Ideology Above Biology, was marked for

10 identification purposes.)

11 BY MS. INGELHART:

12         Q.  What's being placed before you is

13 Plaintiffs' Exhibit 17.

14         A.  Mm-hmm.

15         Q.  Can you turn to the last

16 paragraph?  It starts with a quote, it is high

17 time?

18         A.  What page?

19         Q.  Oh, I'm sorry.  It should be the

20 third page of the, you know, the double-sided.

21 I think we have all of the comment sections in

22 there.

23         A.   It's high time that governmental

24 agencies at the national and local levels

25 return to valid science, which reveals that

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 264 of 332 PAGEID #: 1105
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

264

 1  there are two biologic sexes, and the only two,

 2  male and female.  Gender identity is a social

 3  construct, not a biologic one, and

 4  gender-specific rights have no place in

 5  regulation of law.

 6          Q.    So would you like to answer their

 7  question again?

 8          A.    Surely.  I mean that's my specific

 9  opinion, that gender specific rights are not

10  biologically based.  And to me race and sex are

11  biologic, and that's a fact.  And therefore,

12  rights are appropriate for the individuals, and

13  discrimination against the individuals based on

14  a biologic precept -- the patient has no

15  control, and there is no changing that.  You

16  don't change your race by wishing.  You don't

17  change your sex by wishing.  Okay?  So gender,

18  since it's a wish, is exactly that, and

19  therefore I can't imagine a civil right or a

20  law that would protect my wishes.

21          Q.    Is that a medical opinion?

22          A.    It's a personal opinion.

23          Q.    Do your professional opinions and

24  decisions generally concur with those of the

25  American College of Pediatricians?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 265 of 332 PAGEID #: 1106
STACIE RAY vs AMY ACTON                                     Quentin L. Van Meter, M.D.

265

1          A.   Generally.

2          Q.   Okay.  I think we can set aside

3    this Breitbart exhibit.

4               (Thereupon, Plaintiffs' Exhibit

5    18, Gender Identity Issues in Children and

6    Adolescents, was marked for identification

7    purposes.)

8    BY MS. INGELHART:

9          Q.   We just presented you with

10   Plaintiffs' Exhibit No. 18.  Do you recognize

11   this document?

12         A.   This was a document produced from

13   a presentation that I gave at the American

14   College of Pediatricians' meeting.  A CME

15   meeting.  I believe it was in Houston.

16         Q.   Okay.

17         A.   So it was basically a distillation

18   from my PowerPoint presentation.

19         Q.   The one that we looked at before?

20         A.   No.  A different one.

21         Q.   Oh, I'm sorry.

22         A.   Yeah.  A different one.

23         Q.   Okay.  Thank you.  Okay.  Can we

24   turn to Page 3, under the sub heading, the role

25   of psychotherapy?  Let me know when you're

266

1    there.

2          A.    I'm there.

3          Q.    Okay.  Could you read the third

4    sentence right after the Page No. 238?

5          A.    Yes.  There is clearly an

6    opportunity to recruit the gender change option

7    in the pre-adolescent if the therapist has such

8    an agenda.

9          Q.    Can you explain what you mean

10   there?

11         A.    Yes.  People who advertise that

12   their practice is gender dysphoria specialty or

13   gender identity specialty basically recruit

14   patients, and the one in Atlanta that claimed

15   her 37 years experience, I asked her

16   specifically, how many of your patients that

17   came to you of any age at any point in time

18   that walked in your door returned and desisted?

19   And it was like a deer in a headlight.  She had

20   never done that.  Not a single patient.

21               Now, that flies in the face of all

22   published studies, and she is labeled as a

23   transgender specialist psychologist in Atlanta.

24   Okay?  So that was the reference to that kind

25   of behavior in the therapist.  The Queer Med

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 267 of 332 PAGEID #: 1108
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

267

1   office that basically refers to specific

2   psychologists that when you walk in the door

3   you are as if somebody sent on the transgender

4   pathway.

5           Emory University.  One of the

6   patients that the mother came to me for a

7   second opinion.  There was never any discussion

8   about psychological evaluation of the patient,

9   of the family, of the background, but puberty

10  blockers were offered because this patient was

11  starting to develop breasts or they thought was

12  starting to develop breasts and had some pubic

13  hair.  And so that patient was scheduled to be

14  put on puberty blockers, but first the person

15  who was running the clinic, the physician in

16  charge, ordered some lab work just to verify

17  that this was puberty.  As it turned out, it

18  wasn't puberty.

19          When I saw this patient, she was

20  not pubertal at all.  It was things that looked

21  like puberty.  She had chest fat, but no breast

22  tissue, no estrogen effect anywhere.  Her pubic

23  hair growth was what we call premature

24  adrenarche.  It's not puberty, but it's the

25  adrenal gland component of future puberty that

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 268 of 332 PAGEID #: 1109
STACIE RAY vs AMY ACTON                          Quentin L. Van Meter, M.D.

268

1   starts body odor, acne and hair growth, and

2   that's what she had.  She did not have puberty.

3   The lab test came back showing she wasn't in

4   puberty, and only for that reason did this

5   physician not start her on puberty blockers.

6          Q.   Okay.

7          A.   The mother, I questioned her.  I

8   said, well, who from the staff?  She said, I've

9   never met any of the staff.  This is her father

10  who took her over to this clinic.  The father

11  and the father's girlfriend took her to this,

12  and that was at the recommendation of the

13  counselor that they see.  I've never been

14  interviewed by the counselor.  I've never had

15  anything to do with that.  I just heard she was

16  going over to get puberty blockers.  This is

17  the biologic mother of the child, and this

18  biologic mother had custody of this child

19  because of the abuse, physical abuse, by the

20  father and emotional abuse by the father.  The

21  mother acquiesced and let the girl live with

22  her father and gave permission to the court so

23  that she could live there, because her older

24  sister insisted, and her older sister wanted to

25  live with Dad, because Dad gave the girl

269

1   anything she wanted.  Phone privileges, access

2   to the internet 24/7, and Mom would not let

3   that happen.

4              So Mom said, fine.  You know, I'm

5   sick and tired of fighting.  I'll let this

6   happen.  You know, I'm going to be watching

7   what's going on.  And when she found out that

8   the child had been sent to Emory and was going

9   to be transitioned, she came to me and said,

10  what's going on here?  Can you help me?

11             So this is a case typical of

12  transgender clinics, unfortunately, where these

13  kids essentially walk in the door, and there

14  are no questions asked.  There is no evaluation

15  psychologically.  They are immediately transed,

16  and that's called the transgender experts, and

17  to me it's an abomination.  And it doesn't go

18  along with the Endocrine Society guidelines,

19  which say you need to be evaluated thoroughly

20  by a competent mental health care professional.

21        Q.    Okay.

22        A.    All right.

23        Q.    And you just stated that this

24  happens often?

25        A.    Yes.

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 270 of 332 PAGEID #: 1111
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

270

1      Q.   On what basis do you know the

2   frequency of it?

3      A.   So there are endocrinologists and

4   pediatricians who have made their way

5   physically into transgender clinics to observe.

6   The one case in Colorado, and the woman

7   specifically said, I'm not going to tell you

8   where it happened, because it's client

9   privilege and stuff, but she said I walked in

10  and I was a guest and I was held peripherally

11  so I was not allowed to hear deliberation of

12  the faculty at all, but the patient came in and

13  essentially the staff told her that everyone

14  that comes in is transitioned.  Everyone that

15  comes in is transitioned.

16          The woman who runs the clinic in

17  Cincinnati admitted everyone that comes in is

18  transitioned.  So if you ask a question of

19  three of four different transgender clinics and

20  you always get the same answer, I'm

21  extrapolating that that's more common than it

22  is uncommon.

23      Q.   Okay.  Thank you.  Are the gender

24  transition experts, people who hold themselves

25  out as experts, are they specialists?

1    A.   Not always.  The clinic in

2  Cincinnati is run by a nurse practitioner.

3    Q.   Okay.

4    A.   The clinic in San Francisco is run

5  by a clinical psychologist.

6    Q.   Okay.

7    A.   Emory's clinic is run by a

8  pediatric endocrinologist.  So I don't think

9  that's a requirement, and from the

10  publications, again, in the throwaway things,

11  where there are these repeated statements and

12  articles about affirmation being the way to go

13  and what you do and these are the guidelines,

14  they are often written by directors of clinics

15  who are not physicians and not medical

16  subspecialists.

17    Q.   Okay.  Do you know whether most

18  folks who arrive at one of these gender clinics

19  or to the offices of one of these experts like

20  the woman in Atlanta, if they're referred to

21  those offices?

22    A.   They are often referred by mental

23  health practitioners.

24    Q.   Okay.

25    A.   Or more commonly now the kids come

272

1    from the internet and say, this is what I want.

2    Or the schools will refer them.

3            Q.    Okay.

4            A.    A lot of the information comes

5    from the schools.

6            Q.    Okay.  So mental health treatment

7    that you've identified today as a part of the

8    wait and watch sort of treatment path, that

9    involves counseling, correct?

10           A.    That's correct.

11           Q.    Okay.  Do you know whether gender

12   affirmation type treatment that these

13   colleagues of the gender clinics provide

14   involve mental health treatment?

15           A.    I'm told that it does, but it's

16   aimed at the family for learning how to accept

17   or not be negative in any way.

18           Q.    You don't know whether it is aimed

19   at the individual patient?

20           A.    It is specifically stated not

21   aimed, in the Seattle clinic.  It's not aimed

22   at the patient specifically.  It's aimed at the

23   family.

24           Q.    Okay.  So I'm still looking at

25   this reduction of your PowerPoint to the ACP

273

1    here.   I want to turn the page to Page 4 and

2    look at the top of it.

3              A.    Okay.

4              Q.    You know what.   It might be

5    helpful actually, if you start reading the

6    paragraph at the bottom of Page 3.   I don't

7    want us to read out of context.   Could you

8    start the sentence that starts --

9              A.    All right.   The transgender

10   community has a worldwide organization, WPATH,

11   which promulgates the idea that humans are born

12   transgender and that these transgendered people

13   have civil rights as a class of individuals.

14   WPATH holds conferences internationally,

15   nationally and regionally to promote its

16   ideology.   WPATH maintains a bibliography for

17   use by its members to help provide testimony

18   for legal battles.   It developed standards of

19   care for transgender medical treatment.   It

20   provides expert opinion for the mainstream

21   medical societies which are so focused on

22   political correctness that they accept these

23   opinions without any credible scientific

24   scrutiny.   These networking efforts then

25   encourage the professional societies to write

274

1    policy guidelines which are sent to educators,

2    government agencies and to physicians.  Their

3    dogma is that gender must be taught to children

4    as a spectrum, not as male or female and that

5    this education should begin in kindergarten, if

6    not pre-school.  They promote early

7    cross-dressing, and are the major behind the

8    scenes pushers of anti-bullying campaigns.

9    People who question the validity of innate

10   transgenderism are labeled as racists, and the

11   transgendered are coddled as victims.

12          Q.   Okay.  I just have a few questions

13   about a term definition.

14          A.   Sure.

15          Q.   What do you mean by the word

16   dogma?

17          A.   A fact that's just a statement

18   that cannot be denied.  It is a core value that

19   no one can question.

20          Q.   Okay.  Is the dogma necessarily

21   not credible?  I'm just trying to understand

22   the connotation.

23          A.   A dogma can be credible.

24          Q.   Okay.

25          A.   Okay.  But dogma is often used in

275

1    terms of religion.  Okay?

2              Q.    Okay.

3              A.    So this is a profound belief which

4    is not to be questioned.

5              Q.    Okay.

6              A.    I mean you can answer it but

7    sorry, Charlie, it's not going to change.

8              Q.    Okay.  And then the anti-bullying

9    campaigns referenced there.  To what were you

10   referring?

11             A.    Bullying has been going on

12   forever.  It has only recently become an issue

13   when it had to do with same sex attracted kids

14   and transgender kids.  Okay?  No one cared a

15   whip or had any guidelines or protected bullied

16   kids when it was just a mean bully picking on a

17   kid who was, you know, victimized in fourth

18   grade because he had a pencil bag that was the

19   wrong color or jealousy or whatever it was.

20             So I look at bullying as a

21   two-part process.  We have a bullier who is

22   troubled, a very troubled person, and that

23   bully needs a lot of attention, not

24   condemnation.  But understanding, what happened

25   to you that makes you have to put somebody else

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 276 of 332 PAGEID #: 1117
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

276

1    down physically or emotionally to bring

2    yourself up?

3            So if we just go for the victim

4    and hold that victim and coddle them and say,

5    I'm sorry, the world is a terrible place,

6    you're going to be okay, and leave it at that,

7    we're not going to change the world at all.  So

8    that's been there since time and memorial.  It

9    only became a real hot button issue when it

10   involved the gay and transgender community.  It

11   should have been a hot button issue all along.

12   I mean it needed to be understood, and it was

13   just swept under the carpet until it had to do

14   with people who were of a class of, I mean, and

15   honest to goodness, victims.  There is no

16   question.  And so it's all about compassion,

17   but it all of the sudden became important, when

18   it should have been important forever.

19           And the context here is that

20   anti-bullying got to where it is today because

21   of the focus on gay bullying and transgender

22   bullying.  It should have been there all the

23   time.

24       Q.   So your sentence here, the

25   sentiment is meant to say that bullying is an

277

1  important topic; is that correct?

2          A.   Yes.

3          Q.   Is there any problem with the

4  anti-bullying campaigns that have focused on

5  LGBTQ kids?

6          A.   No.  None whatsoever.

7          Q.   Okay.  Okay.  All right.  And then

8  the last word is coddled as victims.  Can you

9  just explain to me what the connotation of the

10 word coddled means here?

11         A.   It basically takes somebody who is

12 not a victim but is an emotionally troubled

13 person, and it basically says you're not

14 emotionally troubled.  You know, we have a

15 solution for you with affirmation that will

16 completely eliminate all your troubles.  And so

17 we're going to protect you from essentially

18 going and getting the cobwebs and the dark

19 places out of your life, and we're going to

20 just paint over those with a really shiny coat,

21 and I'm sure it's going to be fine some day.  I

22 mean it's just going to be really fine.

23              And what we know is that -- and we

24 talked about the people who've come back all

25 the way from 30 or 40 years living as trans

1  people, who come back from that and are now

2  finally finding a voice as a group of

3  individuals and saying, oh my God.  These are

4  adults.  These are people who did things not

5  because they were talked into it as a child.

6  These are people who made the decision, who

7  sought the treatment, who sought the medicine,

8  who volunteered for the surgeries, and they are

9  coming back now and saying, this is tragic.

10  This is never the answer.  It's really --

11  please, don't do this.  Please, don't do this.

12  Come talk to me.  I will tell you how I felt,

13  all the things that I went through that I can

14  teach you that I thought was a solution to the

15  problem, and I found out that it is not.  It

16  never was a solution, and what I really needed

17  to do was to find the therapy that I needed

18  right at the very beginning.

19               And these people who are now

20  writing actually late in their life did that,

21  and they are crusaders standing up and saying,

22  please.  It's not that we're going to go and

23  sue the physicians that did this to us, because

24  we asked them to.  I mean, fully cognizantly

25  asked them to do this.  We chose this for

279

1    ourselves, but it's wrong for you, and I don't

2    want you to go that direction.

3          Q.   Are those like case study

4    publications?

5          A.   No.  These are actually people

6    who -- I mean they're individuals who have been

7    through that, who then come back and act as --

8    then they're using the internet and blogging to

9    say, hey, you know, you have a place to speak

10   here.  You don't have to hide.  These people

11   hid for the longest time out of shame.  I mean

12   their whole recommendation is that the majority

13   of transgender adults who are happy at their

14   point in life are going to be very strong at

15   promoting this as an answer, but the vast

16   majority that are unhappy have just been dead

17   quiet for fear that -- you know, they said, I'm

18   a fool.  I am the fool.  I'm going to stand up

19   in front of everybody and tell them that I'm a

20   fool.  You know, I'm just going to be quiet and

21   live my life.  I'm not going to answer surveys.

22   I'm not going to be a statistic.  I'm going to

23   disappear.  I probably am going to die early,

24   and so be it, and I'm a lonely, terrible

25   person.  And they have pulled these people out

280

```
 1    of the woodwork to discuss things with them on

 2    blogs.

 3              And so Walt Heyer is one of them,

 4    who has a blog, and I can't remember the name

 5    of his website, but I think the word is regret

 6    is in there.  But you can -- Heyer is his last

 7    name.  He's a beautiful human being who openly

 8    discussed all of the things he went through.

 9    Hasci Horvath, who's an epidemiologist at UC

10    San Francisco is another very articulate,

11    incredibly intelligent man, who knows.  He sort

12    of unraveled the myth of the suicide rates, and

13    he's written letters in blogs and published,

14    and that's another individual.  And they're

15    starting to support each other in network and

16    say, please, don't do this to yourself.

17         Q.   Okay.  Thank you.

18         A.   I'll spell that later.

19         Q.   Yeah.  I'm actually curious.  If

20    you don't mind spelling it now?

21         A.   Sure.  It's H-a-s-c-i

22    H-o-r-v-a-t-h or -- yeah.  Horvath, I think.

23         Q.   Thank you.

24         A.   Yeah.

25         Q.   Okay.  A few more exhibits here.
```

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 281 of 332 PAGEID #: 1122
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

281

1    We can put this to the side.

2              (Thereupon, Plaintiffs' Exhibit

3    19, Breitbart, Judge Finds Father Guilty of

4    Family Violence For Not Using Transgender

5    Teen's Preferred Pronouns, was marked for

6    identification purposes.)

7    BY MS. INGELHART:

8         Q.   Do you recognize this exhibit

9    that's been put before you?  It's Plaintiffs'

10   Exhibit 19.

11        A.   This one says, judge finds father

12   guilty of family violence for not -- yes.  Yes,

13   I am.  Yes.

14        Q.   Okay.  Thank you.

15        A.   This I believe is Vancouver case.

16        Q.   Okay.  Thank you for that.

17        A.   I only knew initials.  They never

18   gave us names.

19        Q.   Okay.  Yeah.  So this is

20   Plaintiffs' Exhibit No. 19.  It's a Breitbart

21   article.  5.7 million in tax payer funds for --

22   oh.  Am I looking at the wrong one?

23        A.   It's the wrong one.

24        Q.   Okay.  We can look at that one.

25   Sorry.

282

```
 1              A.    Okay.

 2              Q.    Okay.  My apologies.  They all

 3    look the same.  Okay.  So Plaintiffs' Exhibit

 4    No. 19.  We'll do that one.  Breitbart.  Judge

 5    finds a father guilty of family violence for

 6    not using transgender teen's preferred

 7    pronouns.  Can we turn to what will be Page 4

 8    of this printout?  Can you read into the record

 9    that quote from you on this page?

10              A.    There's nothing normal about the

11    environment where these children are brought

12    up.  There are emotional traumas left and

13    right.  It is so obvious that what we're doing

14    is painting over the trauma.

15              Q.    Okay.

16              A.    This is the recruitment of a cult.

17    It is so scary, and I am so overwhelmingly

18    worried about the welfare of this population of

19    people 30 years out.

20              Q.    Can you explain to me what you

21    mean by cult?

22              A.    It's a term that again is about

23    the recruitment online.  This is a -- it is

24    almost a religious faith, if you will, without

25    scientific basis.  It draws people in with a
```

1  promise of something that is not based on

2  reality.  It separates kids from families.  So

3  it's an indoctrination, if you will, and that's

4  what I mean by cult.

5         Q.   So you think the online presence

6  or the transgender community is a cult?

7         A.   It's an indoctrinating society.

8  Cult.  Yeah.  That's what I mean.

9         Q.   Thank you.  All right.  You can

10  put that aside.

11              (Thereupon, Plaintiffs' Exhibit

12  20, Breitbart, $5.7 Million In TaxPayer Funds

13  For Study To Justify Sterilizing Children Who

14  Are Gender Confused, was marked for

15  identification purposes.)

16  BY MS. INGELHART:

17         Q.   We'll introduce Plaintiffs'

18  Exhibit 20.  Do you recognize this document?

19         A.   Yes.

20         Q.   Can you read the title and the

21  publication name?

22         A.   It's Breitbart, I assume News.

23  I'm not sure.  It just says Breitbart at the

24  top.  $5.7 Million in taxpayer funds for study

25  to justify sterilizing children who are gender

1   confused.

2          Q.   Great.   Thank you.   On the what I

3   think is the third page of your document

4   there's a paragraph that starts with a

5   quotation mark, since this has all started.   Do

6   you see that?

7          A.   Yes.

8          Q.   Could you read that paragraph?

9          A.   Since this has all started, every

10  single transgender patient who has come to me

11  has come from a totally dysfunctional family.

12  There's nothing normal about the environment

13  where these children are brought up.   There are

14  emotional traumas left and right.   It is

15  obvious that what we're doing is painting over

16  the trauma.

17         Q.   What do you mean, since this has

18  all started?   Could you explain?

19         A.   Since the movement of transgender,

20  the expansion of the number of patients and

21  their presenting of symptoms.

22         Q.   And is that related to the

23  transgender civil rights movement?

24         A.   It's just related to the advocacy

25  movement.   I don't look at it really as a civil

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 285 of 332 PAGEID #: 1126
STACIE RAY vs AMY ACTON                                          Quentin L. Van Meter, M.D.

285

1    rights movement.

2            Q.    Okay.  Okay.  And once again, all

3    of these people come from dysfunctional

4    families.  All of your 14 or 15 active patients

5    now, each and every one comes from --

6            A.    A dysfunctional family, yes.

7            Q.    Okay.  Based on that criteria --

8            A.    Yes.

9            Q.    -- that we discussed before?

10   Okay.  We can put this aside.  Thank you.

11               (Thereupon, Plaintiffs' Exhibit

12   21, Emergency Petition For Writ of Mandamus,

13   was marked for identification purposes.)

14   BY MS. INGELHART:

15           Q.    Okay.  One more exhibit.  What's

16   been presented before you is Plaintiffs'

17   Exhibit No. 21.  Do you recognize this

18   document?

19           A.    Let me go through it.

20           Q.    Sure.

21           A.    It's been a while.

22           Q.    Take your time.

23           A.    This is an Amicus brief.

24           Q.    In what matter?

25           A.    It related to Obergefell, I think.

286

1    The decision.  Let's see here.  Let me go

2    through it.

3            Q.    Sure.  Take your time.

4            A.    This is about -- well, hang on.

5    We've done a number of amicus briefs.  So this

6    is in regard to same sex marriage.

7            Q.    Okay.  Thank you.  Is this in the

8    Supreme Court of the State of Alabama?

9            A.    Yes, it is.

10           Q.    Okay.  And the date on this should

11   be pretty -- yeah.  It's in the top left corner

12   of the first page.  What's the date on this?

13           A.    11/06/2015 is what I've got.

14           Q.    Okay.  Do you recall what you were

15   asking the Alabama Supreme Court to do when you

16   signed onto this amicus effort?

17               MR. BLAKE:  I'm just going to

18   object to this document and --

19               THE WITNESS:  Okay.  (A) I did

20   not --

21               MR. BLAKE:  Let me finish my

22   objection.

23               THE WITNESS:  Okay.  Sorry.

24   Sorry.

25               MR. BLAKE:  I'm just going to

1    object to this document and the line of

2    questioning on the same grounds that I objected

3    to the previous documents.

4              MS. INGELHART:  And we granted you

5    the standing objection.  So we can just --

6              MR. BLAKE:  I didn't ask for a

7    standing objection, but thank you.  On the same

8    grounds as before, involving relevancy of

9    questions and documents related to same sex

10   marriage in this case.

11             Go ahead.  You can answer.

12             THE WITNESS:  Okay.  So I did not

13   write this document, but it's a document where

14   the college chose to support the proven benefit

15   of a biological mother and father family to

16   raise a child.  And so to support that and to

17   say that disrupting that was not in the best

18   interest of children.

19   BY MS. INGELHART:

20        Q.   Okay.  Can you please turn to Page

21   37 of the actual brief.  The page numbering of

22   the brief changes many times.  I think you're

23   getting close to it, based on what I can see

24   across the table.  There's -- at the top of

25   Page 37 there's a sub heading that says, this

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 288 of 332 PAGEID #: 1129
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

288

1    Court should consider, et cetera, et cetera.

2    Do you see that?

3            A.   Yes, I do.

4            Q.   Okay.  Under that sub heading

5    below that, foundations of American

6    jurisprudence, can you read the first clause of

7    the first sentence?

8            A.   It is not beyond the scope of this

9    Court to acknowledge the moral foundation of

10   God's law when considering the institution of

11   marriage:  But from the beginning of creation,

12   God made them male and female.  Therefore, a

13   man shall leave his father and mother and hold

14   fast to his wife, and the two shall become one

15   flesh.

16           Q.   Thank you.  Do you agree with

17   those statements?

18               MR. BLAKE:  Objection.

19               THE WITNESS:  As a person of

20   religious faith, it's part of my religious

21   beliefs.

22   BY MS. INGELHART:

23           Q.   Okay.  Do you have any religious

24   beliefs related to -- other religious beliefs

25   related to LGBT people?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 289 of 332 PAGEID #: 1130
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

289

1      A.   Yes.  Love thy neighbor as

2  thyself.

3      Q.   Okay.  Do you have any religious

4  beliefs about people transitioning their

5  gender?

6      A.   Love thy neighbor, love thy child,

7  show compassion.  It's the religious basis of

8  what my faith tells me to do.

9      Q.   Okay.  Have you been asked to

10  render an expert opinion regarding how the Ohio

11  Department of Health's position -- not to make

12  corrections or changes to the sex field on a

13  transgender person's Ohio birth certificate

14  affects transgender people?

15      A.   Render an opinion?  No, I have

16  not.

17      Q.   Okay.  Did you render another

18  opinion in this matter?

19      A.   That sex is biologic and gender is

20  a state of mind.

21      Q.   Okay.  Do you know what the

22  underlying dispute in this case is?

23      A.   That the plaintiffs are indicating

24  that their lives are affected adversely by

25  having a birth certificate which is not -- it

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 290 of 332 PAGEID #: 1131
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

290

1  says that their sex is not identical to their

2  gender.

3          Q.   Okay.  Okay.  So that you were not

4  asked to render an opinion about how the Ohio

5  Department of Health's position, not to make

6  those changes, could affect transgender people?

7  That's not what you were asked to do?

8          A.   I recall to say what is the

9  difference between gender and sex and the basis

10  of those, and that's basically what I was

11  asked.

12          Q.   Okay.  And all of your expert

13  opinions are reflected in this report and this

14  rebuttal?

15          A.   Yes.  With the corrections of the

16  things that I misspoke.

17          Q.   Thank you.  Okay.

18          MS. INGELHART:  Can we take a

19  quick break?  I have just one module left.  I

20  just want to make sure I didn't miss anything

21  with my co-counsel.

22          MR. BLAKE:  Sure.

23          MS. INGELHART:  Can we go off the

24  record?

25          THE COURT REPORTER:  Yes.

291

1              (Thereupon, a break was taken.)

2    BY MS. INGELHART:

3         Q.   Okay.  Have you ever asked or

4    applied to be a member of WPATH?

5         A.   No, I have not.

6         Q.   Can we look back at your CV in

7    your report?  I just want to clarify my

8    understanding of your presentations.

9         A.   Okay.  Here's my report.

10         Q.   Sure.  Page 4 of your CV, when you

11    get to that, let me know.

12         A.   Mm-hmm.

13         Q.   Okay.  Under abstracts and

14    letters.  When we were researching these, some

15    of them had like locations and dates.  Are some

16    of these presentations?

17         A.   They were presentations.  Abstract

18    presentations.

19         Q.   Got it.

20         A.   Yeah.  So they were not then

21    included in a -- they were in a volume that was

22    germane to the meeting but not published.

23         Q.   I understand.  Is that the case

24    for all of them?

25         A.   No.

STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

292

1          Q.    Okay.

2          A.    Well, the third one was also a

3    companion.  It was done as a presentation,

4    which was not published.  The rest are Rogol

5    and Kurt Midyett and George Bright.  Those were

6    all part of presentations at meetings, and some

7    of them were published.

8          Q.    Okay.  Thank you.  And then on

9    Page 5, the one that says Endocrine Society

10   meeting in Orlando, Florida, there's a number

11   of it looks like co-presenters with you on that

12   matter.

13         A.    Which?

14         Q.    It starts with Wayne V. Moore,

15   Patricia Y.

16         A.    Yes, yes, yes.

17         Q.    Okay.  It looks like there were a

18   number of co-presenters with you on that.

19         A.    Mm-hmm.

20         Q.    And the title of your presentation

21   was Safety and Efficacy of Somavariatan, et

22   cetera, et cetera.  I was able I think to find

23   a study by that title with a number of your

24   co-presenters as authors.  Did you present on

25   like a study of theirs with them?

293

1          A.   I did not present.  There were a

2     number of papers that were from this group.  I

3     was part of a clinical study, and we had a

4     large number of patients, and therefore I was

5     asked to be -- it was a hierarchy of who gets

6     to have their name on the paper, if they did a

7     larger proportion of the work.  So the

8     abstracts are written.  They are passed by us

9     to review all the statistics.  Of course, we're

10    all part of that.  But I did not actually --

11    you know, I might have corrected a grammatical

12    error or something in there.  But they're asked

13    for us to review.

14               And I'm a very poor editor.  So I

15    tended to say, as long as the facts looked

16    good, I'm not going to, you know, mess with it

17    anyway.  So...

18          Q.   Okay.  And now we are truly done

19    with exhibits.

20          A.   Okay.

21          Q.   Maybe not.  We are.  Okay.

22               We talked earlier about a

23    conference I think you did in maybe Dallas or

24    Houston.  Houston.  Have you done other

25    conferences and presentations on transgender

294

1    related matters?

2            A.    I have.

3            Q.    How many-ish?

4            A.    I was invited by the Australian

5    Family Association last August to come and

6    present essentially the same concept of a talk,

7    historical background in comparisons of modes

8    of therapy, and there was the same talk given

9    in Sidney and Cabramurra and Melbourne and

10   Brisbane and Perth.

11           Q.    Okay.

12           A.    So that was last summer.  I gave a

13   presentation at the third meeting of the

14   International Federation of Therapeutic

15   Counseling Choice, in Budapest.

16                I gave a talk in March at the

17   combined meeting that -- it was called the

18   Matthew Bulfin, B-u-l-f-i-n, Conference, and

19   that was held in -- oh, it's foggy, but it was

20   in March of this year, and I can tell you where

21   it was, but I've been traveling so much I

22   forget what city.  It was a combined conference

23   that we presented.

24                And I presented at the Catholic

25   Medical and Dental Association in Ridgecrest,

1    North Carolina, in May.

2                  And I presented at the Support 4

3    Family Conference, in London, in June.

4          Q.   Is that the extent of the

5    conference presentations you've given on trans

6    issues?

7          A.   I don't want to misstate, but I

8    think, yes, that's it.

9          Q.   Okay.  Thank you.

10         A.   Oh.  Excuse me.  I also presented

11   a case report in the Southern Pediatric

12   Endocrine Society, in Orlando, in March.

13         Q.   Okay.  Great.  And just real quick

14   to clean up something from before.  The Dhejne

15   study in Sweden, just talking about the control

16   group versus not issue that I think we agreed

17   we understood each other on.  The study at no

18   point compares people who were affirmed through

19   social, medical and surgical treatment with

20   people who had gender dysphoria but were not

21   treated?

22         A.   That's correct.

23         Q.   Thank you.  During the course of

24   the deposition today, you frequently referred

25   to a number of publications and sources from

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 296 of 332 PAGEID #: 1137
STACIE RAY vs AMY ACTON                                          Quentin L. Van Meter, M.D.

296

1  your personal like data bank.  To the extent

2  that those aren't already included in your

3  report, we'd like to request that you produce

4  them, but we can do that after we kind of comb

5  through the deposition.  Like you can take the

6  time to see throughout the deposition, but we'd

7  like to request those studies and reports that

8  you developed your opinions upon.

9            MR. BLAKE:  If you'd like to put a

10  list together and send it to us, we'll look to

11  see which ones were relevant and which ones

12  weren't.

13            MS. INGELHART:  I mean, if they

14  were brought up today.

15            MR. BLAKE:  Obviously, if he

16  relied on it in forming his opinion.

17            MS. INGELHART:  Okay.

18            MR. BLAKE:  Just because it was

19  brought up today, we covered a lot of terrain

20  which I would say is not relevant to his

21  opinion.

22            MS. INGELHART:  I see what you're

23  saying.

24            MR. BLAKE:  But if it's relevant

25  to his opinion, we'll absolutely produce it.

297

1  Relevant or relied on to his opinion, we'll

2  produce it.

3              MS. INGELHART:  Okay.

4  BY MS. INGELHART:

5       Q.   Speaking to that, are there any

6  other bases or sources besides what we've

7  discussed today that you're relying on to

8  provide your testimony?

9       A.   I guess just sort of personal

10  conversations with mentors and colleagues.

11       Q.   Okay.  But no primary or

12  documented sources?

13       A.   No.

14              MS. INGELHART:  Thank you.  We

15  don't have any more questions at this time.

16              MR. BLAKE:  I just have a couple

17  of quick questions.

18              MS. INGELHART:  Okay.

19                   EXAMINATION

20  BY MR. BLAKE:

21       Q.   Dr. Van Meter, there was a lot of

22  conversation today about religious beliefs and

23  personal beliefs.  Do your religious or

24  personal beliefs prejudice you against

25  transgender people?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 298 of 332 PAGEID #: 1139
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

298

1          A.    No.  If anything, they increase my

2    compassion for those patients.

3          Q.    Do you harbor any animose or

4    prejudice towards transgender people?

5          A.    No.

6          Q.    Do you believe that people who

7    suffer from gender dysphoria deserve compassion

8    and respect?

9          A.    I certainly do.

10          Q.    Are any of your opinions in your

11    expert report or rebuttal report based on

12    agenda or political beliefs?

13          A.    No.

14          Q.    What are your opinions in your

15    report and rebuttal based on?

16          A.    Based on validated science, based

17    on the concept of being an advocate for

18    children.

19          Q.    And is it your opinion that many

20    of the opinions in Dr. Ettner's report are not

21    based on valid medical science?

22          A.    Yes.

23          Q.    And have you changed any of your

24    opinions based on any of the exhibits you've

25    seen or testimony you've given today?

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 299 of 332 PAGEID #: 1140
STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

299

1          A.   I did want to correct the one

2     reference that I obviously misquoted, and

3     that's the only thing I would change.

4          Q.   And so all of your opinions remain

5     the same?

6          A.   Yes.

7               MR. BLAKE:  No further questions.

8               MS. INGELHART:  None from us

9     either.

10               (Thereupon, the deposition was

11     concluded at 3:37 p.m.)

12                         *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

PLEASE NOTE ANY STENOGRAPHIC OR TYPOGRAPHICAL ERRORS BELOW, FIRST
IDENTIFYING THE PAGE AND LINE NUMBERS, AND THEN THE PROPOSED CORRECTION.

| PAGE | LINE | CORRECTION TO TEXT |
|------|------|---------------------|
| 58 | 2 | take out "court" |
| 60 | 13 | change "physiologist" to "psychologist" |
| 91 | 7 | change "medical" to "mental health" |
| 94 | 3 | change "areas" to "there is" |
| 100 | 8 | change "AD" to "eighty" |
| 100 | 18 | change "He's" to "She's" |
| 103 | 1 | change "maladjendment" to "maladjustment" |
| 117 | 4 | change "in" to "and" |
| 120 | 5 | change "call" to "cull" |
| 128 | 3 | add "Adult" |
| 130 | 4/5 | change "—" to "amniocentesis" |
| 137 | 15 | change "says" to "has" |
| 143 | 14 | change "ASMA" to "asthma" |
| 169 | 3 | change "attenuation" to "iteration" |
| 180 | 24 | strike "wife" — mis statement by me |
| 199 | 23 | change "reorganization" to "re-orientation" |
| 201 | 4 | change "ACEC" to "ACE's" |
| 207 | 8 | change "probably 50%" to 12% (I reviewed the actual data |
| 275 | 15 | change "whip" to "whit" |

*[signature]* 30 October 2019

300

1         I, QUENTIN L. VAN METER, M.D., do

2    hereby certify that the foregoing is a true and

3    accurate transcription of my testimony.

4

5

6                  *Quentin Van Meter* _ _ _ _ _ _ _ _ _ _ _ _ _

7

8        Dated _ _ _ _ *30 October 2019* _ _ _ _ _ _ _

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

301

1   STATE OF OHIO          )

2   COUNTY OF MONTGOMERY )   SS:   CERTIFICATE

3

4           I, Donald Correll, a Notary Public

5   within and for the State of Ohio, duly

6   commissioned and qualified,

7           DO HEREBY CERTIFY that the

8   above-named QUENTIN L. VAN METER, M.D., was by

9   me first duly sworn to testify the truth, the

10  whole truth and nothing but the truth.

11          Said testimony was reduced to

12  writing by me stenographically in the presence

13  of the witness and thereafter reduced to

14  typewriting.

15          I FURTHER CERTIFY that I am not a

16  relative or Attorney of either party, in any

17  manner interested in the event of this action,

18  nor am I, or the court reporting firm with

19  which I am affiliated, under a contract as

20  defined in Civil Rule 28(D).

21

22

23

24

25

STACIE RAY vs AMY ACTON                                    Quentin L. Van Meter, M.D.

302

1         IN WITNESS WHEREOF, I have hereunto set

2    my hand and seal of office at Dayton, Ohio, on

3    this 11th day of October 2019.

4

5

6

7

8

9

10

11

12                              _Donald Correll_

13                              DONALD CORRELL
                                NOTARY PUBLIC, STATE OF OHIO
                                My commission expires 8-9-2022

14

15

16

17

18

19

20

21

22

23

24

25

235:11

**$**

**$1,500** 38:22
**$2,800** 39:13
**$3,500** 39:2
**$350** 38:24
**$450** 38:24
**$5.7** 283:12,24

**(**

**(1)** 202:15
**(A)** 171:23 286:19

**0**

**06** 229:23

**1**

**1** 58:22 67:9,16 120:8
164:15 205:7 237:20,22
238:8 245:14,25 246:1
247:10
**10** 64:16 71:8 81:2 209:9,
14 230:6
**10-year-old** 94:8
**100** 82:19 88:22
**100,000** 229:24
**11** 210:10,13,14 211:2,8
213:4,6,9
**11/06/2015** 286:13
**12** 137:21 164:21 196:15
220:5,10,12
**13** 43:18 164:22 174:7
233:24 234:5
**13-year-old** 196:15
**14** 10:7 24:5 25:24 26:3
85:9 99:20 203:10 246:14
248:4 257:21 285:4
**15** 9:14,15 64:16 83:19,20,
23 84:1,21,25 85:6 91:13
93:10 99:20 101:6 103:11,
20 113:16 114:19 233:11
234:12 248:5 285:4
**16** 245:17 250:2,5
**16-year-old** 192:21
**17** 247:15 248:15 263:8,13
**18** 128:9 164:19 265:5,10
**19** 77:15 235:12,15 251:19
281:3,10,20 282:4
**19-fold** 111:19 234:17

**1970s** 47:10
**1973** 41:12 42:16
**1975** 15:25
**1976** 41:12,14 125:5
**1978** 13:10 42:24 125:2,5
**1980** 13:10 42:25 58:15
125:2,7
**1986** 125:7,9
**1990s** 14:7
**1991** 125:9
**1993** 43:14 45:14
**1994** 45:14 64:23 67:3,4
224:23

**2**

**2** 144:19,25 151:22 182:14
185:6,14 242:5,7
**2,400** 230:5
**20** 41:18 101:8 107:14
128:19 210:16 226:9
227:16 233:17 240:2,6
241:3 283:12,18
**20-fold** 239:6,16
**20-year** 41:21
**20-year-old** 192:21
**200** 230:5
**2000** 79:12 169:1 235:2
**2000s** 14:9 47:11
**2002** 136:17 174:11
**2003** 131:15
**2004** 77:15
**2006** 248:7 250:17
**2007** 77:22 174:4
**2008** 198:7
**2009** 168:7
**2010** 48:10 205:23
**2012** 167:10,11
**2014** 167:14 221:2
**2016** 249:20
**2017** 134:13 168:8 169:2
**2019** 134:10
**20s** 128:1
**21** 285:12,17
**22** 127:24
**23** 127:25
**238** 266:4

**24** 229:3,14
**24/7** 269:2
**25** 23:10 24:1,4

**3**

**3** 29:4 162:17 183:8 185:2
229:24 231:25 232:2
245:15,16 265:24 273:6
**30** 33:7 137:19 226:7 255:6
277:25 282:19
**31** 261:11
**34** 261:12
**369** 232:4
**37** 86:25 266:15 287:21,25
**391** 163:24
**392** 163:22 164:5,8 165:22
232:3
**3:37** 299:11

**4**

**4** 17:14,15,20,23 19:14
68:1 120:8,9 168:17 238:4
242:17 251:20 254:5 273:1
282:7 291:10 295:2
**4,500** 245:14 246:1
**40** 170:17 207:5 226:7
277:25
**41** 106:6
**44** 164:15
**476** 145:9 154:17

**5**

**5** 178:15,21 229:3 253:17
261:11 292:9
**5,000** 247:10
**5,500** 246:1
**5.7** 281:21
**50** 164:19 166:4,9,19 207:8
**500** 141:24
**560** 111:15 232:10
**590** 232:8,11

**6**

**6** 181:22,24 229:24 261:12
**67,000** 137:15 142:2

**7**

**7** 189:17,22
**70** 151:4 170:15 255:6
**75** 139:1 141:20 224:10
**78** 125:6

**8**

**8** 191:2 197:21 198:3
**80** 101:5,11 166:10,11
**80s** 47:10
**88** 166:10,22

**9**

**9** 201:22
**90** 166:10 189:10
**90s** 47:11
**94** 43:15
**98** 166:22

**A**

**AAP** 66:3 69:15 70:1
140:15 142:1,4 143:21
176:20 177:13,18,20,21,23
181:10
**aback** 64:5
**abdominal** 216:12 219:12
**aberrations** 245:20
**abilities** 72:19 197:9
**ability** 156:11 163:21
**abnormalities** 253:7
**abomination** 269:17
**absence** 259:4
**absent** 256:19
**absolute** 121:16 187:24
188:22
**absolutely** 55:5 75:6
82:19 110:11 141:17
173:14 174:22 179:25
198:10 200:8 224:3 225:19
296:25
**absolutes** 186:11 187:11
188:21
**abstract** 192:8 291:17
**abstracts** 291:13 293:8
**abuse** 66:21 76:6 82:23
91:22 191:7 268:19,20

STACIE RAY vs AMY ACTON                                                    Quentin L. Van Meter, M.D.

**abused** 73:20

**abusive** 191:15

**academia** 140:13 148:7

**academic** 41:20,23 46:9 52:3,4 100:11 101:2 117:9, 16 121:17 139:21,25 140:6,21 141:2

**academician** 121:14

**academicians** 139:18

**academy** 22:4 65:1,20,25 66:25 67:24 69:5,8 70:9,17 71:4,11 135:5,7 136:21 137:5,14 139:10,17 140:7 144:4 145:21 174:18 176:3,4,11,13 177:6,10 178:17

**accept** 128:8 190:12 272:16 273:22

**acceptance** 48:6,13,21 194:18 230:10

**accepted** 63:18 64:10 100:25 224:1

**access** 50:21 77:2 124:20, 21 137:10 269:1

**accessed** 92:14

**accessibility** 65:16

**accessible** 15:8 206:2

**accidentally** 247:8 262:22

**Accidents** 217:19

**accurate** 42:2 43:3 179:10 229:9 232:16

**accurately** 19:18

**ACEC** 201:4

**acknowledge** 288:9

**ACLU** 7:16

**acne** 268:1

**ACP** 180:10 183:16 184:4 185:13,15 272:25

**ACPS** 202:17

**acquiesced** 268:21

**act** 279:7

**action** 50:8

**actions** 54:18

**active** 40:20 50:7,14 83:23 84:1,2,21 85:6 100:6,9 101:5,6 103:21 114:25 128:18 285:4

**actively** 41:13

**activism** 135:20

**activist** 86:21 122:23

**activists** 158:10

**activity** 50:7

**actual** 8:8 10:9 54:25 95:22 147:15 166:12 216:20 226:11 229:19 241:16 287:21

**AD** 100:8

**ADD** 195:16,19

**addiction** 162:7

**address** 137:14 201:10,15

**addressed** 102:16 114:5 202:4,6 204:17

**addressing** 132:11

**adds** 74:23

**adequate** 75:1

**adjunct** 41:24 42:1

**adjustment** 243:7

**admin** 122:6

**administration** 198:9

**administrative** 65:25

**adminstration's** 206:4

**admissions** 239:16

**admit** 216:20

**admits** 89:3

**admitted** 270:17

**adolescence** 47:14 154:21 155:1 229:21

**adolescent** 47:6 95:11 210:18 211:13

**adolescents** 67:12 74:9 265:6

**adopted** 74:2,9,11,15 175:18

**adopting** 174:23

**adoption** 74:1,2 174:20 175:6,8 179:9 185:24 186:2

**adoptive** 66:8

**adrenal** 54:6 119:16 128:20 267:25

**adrenarche** 267:24

**adult** 44:11 52:7,8,12 100:22 119:25 128:3 161:1 163:25 210:18 211:13 214:16

**adulthood** 162:4,12 164:2,11 226:22 227:6

**adults** 44:10 74:9 159:18 162:9 178:10 226:15 233:5 245:6 278:4 279:13

**advance** 210:3

**advantage** 66:14

**advent** 46:19

**adverse** 34:19 57:4 75:16, 19 82:21 87:11 89:16 92:1, 3,7,10 93:4 118:19 153:3,7 174:22 189:9 201:4

**adversely** 289:24

**advertise** 86:23 266:11

**advertised** 100:10

**advice** 97:17

**advise** 225:5

**advised** 43:17,22 44:16

**advocacy** 46:21 51:16 73:22 172:1,5 177:25 180:14 284:24

**advocate** 64:22 81:18 92:24 158:3 298:17

**advocated** 250:24

**affect** 47:2 66:8 81:7 290:6

**affected** 196:12 289:24

**affects** 59:16 129:20 289:14

**affidavit** 11:24

**affiliate** 136:12,13

**affiliated** 19:23 41:16,19 101:2

**affiliation** 20:1

**affirm** 36:3

**affirmation** 32:22,25 33:1,16 34:6 35:23,24 63:9 64:6 80:5 93:24 96:7 102:9 108:20,24 109:8 117:11, 17,20,25 118:3 132:18,22, 23,24 157:18 190:2 233:20 237:9 240:8,10 241:21 271:12 272:12 277:15

**affirmative** 36:2 69:12

**affirmatively** 22:6

**affirmed** 106:7 107:15 295:18

**affirming** 34:16 116:10 132:24

**affronting** 148:17

**age** 7:2 35:7 47:13 57:1 64:13 93:22 95:13 105:3 114:20 127:21 160:17 161:2 223:24 266:17

**agencies** 263:24 274:2

**agency** 22:14,15

**agenda** 64:25 72:11 86:19 148:6 177:5 266:8 298:12

**aggressive** 108:17

**agony** 19:2

**advent** 46:19

**agree** 37:10 152:1 156:15 157:2,17 159:7 160:23 161:12,13 185:1,6 190:5 191:8,9,22 199:18 202:18 206:6 225:16 226:6 227:22 245:5 252:9 258:4,14 288:16

**agreed** 87:24 134:19 295:16

**ahead** 32:17 36:17 43:22 63:4 88:13 153:2,11 180:20,22 202:24 204:18 287:11

**aimed** 201:3 272:16,18, 21,22

**air** 20:18 21:1

**aisle** 181:13

**Alabama** 286:8,15

**alarmed** 48:19

**alarming** 120:25

**alcohol** 66:21 91:22

**align** 102:11 111:8

**aligned** 109:18

**aligns** 102:19

**all-cause** 243:6 244:3

**alleviate** 97:6,15

**allowed** 62:2 106:6 270:11

**allowing** 68:18

**alter** 184:4

**altered** 105:16

**ambiguitive** 246:7

**ambiguity** 13:21 129:18 130:17

**ambiguous** 245:12 252:25

**America** 247:19 248:21 249:4

**America's** 250:13

**American** 22:4 65:1,20,25 66:25 67:24 69:5,8 70:17 71:4,10 110:10 135:5,6 136:1,15,21 137:5,14 139:9,17,23 140:7 141:17 144:4 145:18,19,20 172:15 173:2,18,19 174:9,18 176:4,13 177:6,10 178:3, 17,23 181:25 182:15 190:9 201:23 206:23 264:25 265:13 288:5

**amicus** 285:23 286:5,16

**amniocentesis** 130:8

**amount** 39:14 138:19 235:12 239:15,16

STACIE RAY vs AMY ACTON											Quentin L. Van Meter, M.D.

**ample** 76:23

**analysis** 71:17 130:19
  241:12 253:13

**anarchy** 182:24

**anatomic** 129:16

**anatomy** 215:16 216:15
  245:14 256:24

**anchor** 217:17

**and/or** 69:2 151:24 152:18

**androgen** 128:24 257:16

**anecdotal** 79:9 143:4
  147:1,14 175:1,15

**anecdotally** 175:24

**anecdote** 90:21,23

**Angeles** 43:19

**angry** 64:14 156:22

**animose** 298:3

**annotation** 123:5

**anomaly** 252:4 253:18

**answers** 142:15

**anti-bullying** 274:8 275:8
  276:20 277:4

**anti-lgbt** 19:17

**anxiety** 18:16 19:10 20:8
  34:18 59:4,20 82:25 87:10
  91:24 105:3 114:1,6
  147:23 150:22 192:23
  193:7,18 194:8 195:7
  196:13 199:25 201:3,15
  205:17 226:13

**anxious** 193:6

**anymore** 205:13

**anytime** 8:23

**APA** 110:10,17 156:4
  160:6 169:24 222:24

**apologies** 23:25 232:4
  282:2

**apologize** 49:22 154:2
  234:11 237:23 262:22

**appearance** 190:17,18
  245:13 253:1

**appeared** 164:16

**appears** 241:11

**application** 180:7

**applied** 111:6 172:23
  291:4

**applying** 155:15 215:1

**appointment** 84:17 86:2,
  6

**appreciating** 68:13

**approach** 143:4,14
  144:20 145:5 248:7 250:15

**approaching** 138:20

**appropriately** 131:20

**approval** 141:20

**approved** 108:10

**approximately** 242:12
  243:5 244:2

**approximation** 15:25

**arduous** 96:16

**area** 45:3 63:15 64:12
  101:4,9 116:19 133:25
  238:14

**areas** 9:7 42:7 94:3 142:8

**argue** 171:22

**argument** 247:24

**arrive** 271:18

**artfully** 133:14

**article** 37:11 57:15 77:23
  106:14 113:6 115:16
  121:18 122:18 123:5
  132:15 133:2,15 134:15
  163:11 178:21 281:21

**articles** 77:7 115:12
  132:11 133:18 134:5
  271:12

**articulate** 280:10

**asks** 22:15

**ASMA** 143:14

**aspect** 109:12

**aspects** 13:24

**aspersions** 178:5

**assent** 44:18,22 188:12
  257:3

**assert** 155:7

**assertion** 211:22 233:16

**assessment** 59:23 224:8

**assign** 257:13

**assigned** 90:24 91:5
  102:12,20 114:23 153:20
  215:6,9,13

**Associates** 56:4

**Association** 110:10
  136:2 139:24 145:19,20
  173:3 294:5,25

**associations** 123:17
  134:20

**assume** 8:14 182:15
  261:20 283:22

**assumed** 158:1 174:7

**assumption** 227:3
  240:12,20 261:24,25

**atheist** 180:8

**Atlanta** 7:22 87:1 101:3,9
  125:18,20 126:11,14
  220:25 247:12 266:14,23
  271:20

**atrophy** 255:15

**attaining** 164:4

**attempt** 106:3,8,9 108:21
  109:1 226:8 241:15

**attempting** 104:2

**attempts** 212:2 226:12
  228:5 233:19

**attend** 18:4 20:16 22:19
  172:11 224:11

**attended** 61:21 62:3,10,
  24

**attendings** 53:14

**attention** 14:13,15 59:14,
  17 78:1 85:16 92:24
  122:12 142:9,12 201:18
  259:2 275:23

**attenuation** 169:3

**attorney** 7:10 36:10 44:17

**attorneys** 35:16 124:13

**attracted** 275:13

**attraction** 195:9 200:24
  201:10 202:16 203:12,17
  205:8,11,12

**attributed** 248:20

**atypical** 155:12 247:6
  260:20

**audibly** 8:4

**August** 198:7 250:17
  294:5

**auspice** 249:18

**Australian** 294:4

**author** 78:3 164:18 155:7

**authorities** 212:6

**authority** 94:15

**authors** 17:9 78:2 111:17
  292:24

**autism** 131:9,23 226:12

**autistic** 130:3

**avenue** 18:22

**average** 53:20,23 54:16
  258:19

**aversive** 146:15

**avoid** 75:4

**avoidance** 149:22

**avoiding** 181:12

**aware** 82:14 95:8,17 98:15
  103:6 124:10 146:9 149:15
  168:1 234:10 253:4,9

**awareness** 47:1,2

**awful** 178:6

---

**B**

**B-U-L-F-I-N** 294:18

**B.S.** 157:15

**babies** 260:20

**baby** 130:15,19 215:18,21,
  24 259:9,11 260:5

**baby's** 258:15

**back** 12:20 13:10 23:24
  31:15 37:9 47:10 65:9
  68:22 69:22 79:1 80:17
  90:20 94:9 99:16 104:2,5,9
  112:4 120:23 121:21
  126:20 130:12 138:12
  154:2,12 157:12 171:4,5
  192:11 207:13 209:15
  210:10 211:9 213:1 229:2
  231:4,6,22,23 232:1,2
  233:7 234:11 236:11
  251:18 268:3 277:24
  278:1,9 279:7 291:6

**background** 28:6 29:16
  30:10,21 33:13 34:20 35:9
  40:3 47:9 79:16 87:17
  169:6 175:10 267:9 294:7

**bag** 275:18

**balance** 57:18

**balanced** 96:3 98:3,4,9
  113:12 188:12

**Baltimore** 44:3

**Banana** 116:16

**band** 146:16

**banded** 194:14

**bank** 296:1

**banned** 204:1

**Baptist** 19:16,22

**based** 31:3 46:25 70:22
  75:10 76:17 95:13 100:2,
  11 109:16 110:8 120:18
  135:12 136:25 138:13
  148:21 155:10,23 175:1
  179:17,24 183:21,23
  184:12 189:7 195:19
  240:12 251:2 257:7 260:21
  261:15 262:25 264:10,13
  283:1 285:7 287:23
  298:11,15,16,21,24

**baseline** 238:11

**basement** 151:12

**bases** 186:9 297:6

**basic** 8:3 30:20 59:15
110:2

**basically** 18:12 33:9,12
43:6 52:10 59:15 77:23
82:16 97:10 140:24 150:18
151:15 157:16 158:10
175:16 178:6 182:23
201:14 205:15 265:17
266:13 267:1 277:11,13
290:10

**basis** 57:8 83:1 109:17
110:3,19 120:6 152:7
155:11 157:22 169:18,20
170:3,14,15 180:6 182:22
207:25 210:20 211:20,21,
22,23 214:8 225:2 227:13
240:17 270:1 282:25 289:7
290:9

**basket** 129:3

**bassinet** 260:6

**Bates** 221:5

**Bathroom** 11:23 27:6

**baths** 146:15

**battle** 143:17

**battles** 14:23 143:11
273:18

**beautiful** 280:7

**beautifully** 115:18

**began** 14:4,6,10,14,16
43:11 44:22 79:7 90:22
139:18

**begin** 55:14 87:13 114:22
193:5 239:21 274:5

**beginning** 60:1,2,19 65:4
81:17 138:8 186:21 278:18
288:11

**begins** 68:24 169:8 179:7,
17 185:12 242:8

**behalf** 58:11 67:23,24
70:8

**behavior** 66:22 89:12
182:21 201:11,14 266:25

**behavioral** 13:24 17:7
18:7 19:4 58:19 60:12
86:15 93:3

**behaviors** 90:4 115:20
155:20

**belabor** 186:12

**belief** 183:20 275:3

**beliefs** 179:6 288:21,24
289:4 297:22,23,24 298:12

**believed** 88:3 159:4

**believes** 109:15

**believing** 95:7 191:5

**belong** 134:19 135:4

136:1,5

**beneficial** 35:25 186:5
203:2

**benefit** 31:2,3 33:25 34:4
135:18,21 137:2 178:9
181:15 218:1 287:14

**benefits** 33:15 66:13
93:23 174:20

**Bethesda** 45:2

**bias** 107:11 148:2 204:15
253:21

**bibliography** 157:23
273:16

**big** 75:24 79:25 106:1
141:22,25

**bigoted** 178:6

**Bill** 11:24 27:6 65:2,6,10

**billed** 39:10

**binaries** 256:13

**binary** 256:9 257:1,7

**binder** 97:8

**binding** 97:5,19

**bio** 99:13

**bioethic** 133:23

**bioethics** 133:25 186:16
187:6

**biography** 158:5

**biologic** 49:15 74:17
94:14 105:15 109:17
110:19 169:16 190:19
210:20 214:4,6,8 217:23
218:3 230:19 235:24
256:21 264:1,3,11,14
268:17,18 289:19

**biological** 73:25 90:6
170:3 211:21,23 213:25
214:3 227:23 228:1,3
230:13,16,22,23 252:6,7
256:8 287:15

**biologically** 46:25 264:10

**biology** 109:18 110:9
220:6 263:1,9

**biopsy** 254:16,17

**biopsychosocial** 162:18

**birth** 73:15 89:17 90:24
102:20 114:24 127:23
131:4,5 153:20 213:6,13,
17,23 215:6,9,16 217:12,
13 218:7,12 246:25 252:8
258:6,8,9,18,24 289:13,25

**births** 217:16 246:1

**bit** 16:8 133:24 164:23
181:18 192:20 251:2

**black** 219:4

**Blake** 7:18 19:20,24 20:6
24:13 25:12 36:7 37:19,21
38:11 41:4 47:18 48:3
49:5,11,25 50:9 53:12 63:4
70:2 73:24 75:14 76:10
81:5 84:8 88:12 97:21
99:25 102:13,21 103:8,14
104:16 112:13,16,19,22
118:8 124:17 127:9 133:3
152:25 153:9,21 161:20
184:6 188:24 197:18,20
198:19 199:10,21 201:1,12
202:19 204:2,7,9,22
205:14,20,23 206:25
207:18,25 208:6,14 209:2
214:1 218:9 219:15
221:12,16,21,24 222:2,10,
19 224:15 227:25 228:19
232:14 246:5 257:10
258:10,20 260:23 261:7
262:1,8 263:2 286:17,21,
25 287:6 288:18 290:22
296:9,15,18,24 297:16,20
299:7

**bleached** 218:20

**blockers** 100:18,20
267:10,14 268:5,16

**blocking** 27:8 57:1

**blocks** 82:3

**blog** 280:4

**blogging** 279:8

**blogs** 280:2,13

**blond** 218:18,22 219:3

**blue** 43:25 218:19,21,22
219:3

**board** 60:20 135:3 136:10
137:12 158:1 172:16,18

**boards** 140:20

**bodily** 191:21

**body** 34:22 76:9,14
105:16 217:6,7 254:11
255:1 256:2,18,19 257:11
268:1

**bold** 68:5 191:2

**Bonham** 7:15 209:4
221:25

**boogeyman** 193:1

**books** 17:10 132:11 134:5

**born** 34:21 216:15 245:10
273:11

**Boston** 77:19 78:11,21

**bottom** 154:17 164:5,8
182:12 185:12 191:11
250:9 273:6

**bound** 136:23

**box** 236:18,19

**boy** 106:18 130:2,6,15

**192:11** 215:18 224:24
260:5

**boys** 55:11 164:16,22
166:22 194:7

**brain** 105:6 212:3

**brains** 192:9

**break** 9:3 43:20 98:23
99:13,15 154:3,5 207:10,
11 290:19 291:1

**breaks** 8:23 9:1,6

**breast** 97:8,18 267:21

**breasts** 97:5 267:11,12

**breath** 66:18

**Breitbart** 263:8 265:3
281:3,20 282:4 283:12,22,
23

**briefly** 238:1

**briefs** 286:5

**Bright** 292:5

**bring** 65:22 79:22 137:18
149:13 177:12 276:1

**bringing** 28:5

**brings** 18:20

**Brisbane** 294:10

**British** 11:21 195:11

**broad** 76:24 94:18

**broader** 251:3

**broadly** 29:2 202:6

**brother** 180:24 181:3

**brought** 14:13 48:22
78:14 96:9 146:11,14
149:14,15 208:20 282:11
284:13 296:14,19

**brown** 218:19

**Budapest** 294:15

**Bulfin** 294:18

**bullet** 69:17 151:23 171:7
221:9 250:13

**bullied** 275:15

**bullier** 275:21

**bully** 196:19 275:16,23

**bullying** 275:11,20
276:21,22,25

**bundle** 113:11

**burden** 74:10,12,24

**burdens** 75:13

**bureaucrats** 137:23

**bury** 18:18

**burying** 18:25

**business** 221:11,19 222:5

**busy** 121:2

**button** 66:4 276:9,11

---

**C**

**C-O-X** 123:7

**Cabramurra** 294:9

**cadre** 137:22 139:25

**Calfee** 38:12

**California** 15:18 54:3 125:10 203:9

**call** 50:12,13,25 52:1 64:16 77:17 84:16 107:8 116:2 120:5 139:5 156:14 245:10,12 262:17 267:23

**called** 13:11 17:24 44:1 45:5 51:25 64:24 70:5,12 77:17 79:18 100:13 108:15 109:11 115:17 145:9,12 149:22 150:3 160:18,20 161:4 166:17 178:22 191:11 199:24 236:17 249:3,15 254:12,19 256:15 259:18 262:16 269:16 294:17

**calling** 178:5 215:13 252:16

**calls** 50:18 57:11

**campaigns** 274:8 275:9 277:4

**Canada** 27:7

**cancers** 105:20

**capable** 105:6

**capacity** 58:6,9 95:14

**Capital** 117:1

**card** 214:12

**cardiovascular** 105:22

**care** 12:15 20:19 21:3 36:3 55:2,3 56:15,22 57:23 63:15 65:17 67:10 68:6,10, 12 69:2,12 72:21 73:14 84:20 85:18,25 86:14 101:10 103:24 104:10 113:22 117:25 118:6,11, 14,19 120:3,21 123:23 124:7,11,16,20,22 128:4 131:13 143:18 144:21 145:5,12,23 146:8,17 156:11 158:7 162:8 171:13,17,19,20,24,25 227:13 245:1 248:7 250:19 255:16 260:10 269:20 273:19

**cared** 175:4 275:14

**career** 41:21 125:18,21 137:23

**Carncano** 31:7

**Carolina** 11:23 27:6 31:9, 17 295:1

**carpet** 276:13

**carried** 65:8

**carries** 198:18

**case** 9:24 10:5 11:8,12,13 12:19 14:8 15:14,15,18,19, 24 16:1 25:5,6,7,11 26:19, 21 27:5,6,7 28:15 29:22,24 30:9,12,22 31:7,19,24 32:3 33:14 34:6,24 35:4 36:23 40:7 43:14 75:23 89:11 94:12 104:20 105:1 114:24 121:4 124:6 138:14 146:24 147:23 163:15 179:21 193:16,24 194:6,10 201:9 204:5 212:9 216:16 247:9 256:20 262:22 269:11 270:6 279:3 281:15 287:10 289:22 291:23 295:11

**cases** 10:16,18,20,24 11:1,2,5,16 12:12,16 13:7, 8 23:16 24:6,18,22,24 25:2,9 26:15,23 27:6,15 28:18,23 31:13 35:8 46:4 52:18 64:3 89:1 90:11 103:16 124:14 146:11 195:11 230:5,6 252:12,13

**casting** 178:4

**cataracts** 259:22

**catch** 129:2

**categories** 136:9

**category** 156:15 168:13

**Catholic** 178:22 179:22 294:24

**caught** 78:1,12

**causality** 46:19

**caused** 110:2 152:12 240:18

**cautioned** 7:3

**cautious** 250:15

**Cecilia** 234:9

**cell** 254:9 256:15,16,23

**cells** 254:13 255:6,7,19,23

**center** 45:2 100:11

**Center's** 180:17

**centered** 137:16

**centers** 54:16

**certificate** 213:17,23 217:12,13 218:7 258:8,18, 24 289:13,25

**certification** 43:7 56:13 60:20 135:3 140:20 146:23 172:7,9,10,16,18 173:5,6,

14 188:9 213:6,12

**certifications** 43:2,4

**certified** 7:4 56:3 127:10 136:10 188:10

**cetera** 66:22 76:6,7 142:4 193:2 217:25 288:1 292:22

**Chairman** 22:2

**Chairman's** 70:5,13

**challenged** 212:6

**challenges** 10:8

**chance** 94:16

**change** 149:18 158:12,13 170:12 176:23 177:12 184:13 201:11,14 226:16 241:8 249:2 264:16,17 266:6 275:7 276:7 299:3

**changed** 156:1 192:14,18 212:20 217:21 227:24 228:4 298:23

**changing** 145:17 264:15

**chapter** 22:3 70:5,7,13 135:4,16,23 144:5 149:1 180:15 181:11

**chapters** 70:7

**characteristics** 238:6,11 257:9 258:16

**characterize** 19:17 99:1

**characterizing** 203:5

**charge** 222:12 267:16

**Charlie** 177:8 275:7

**check** 21:5 209:7

**check-ins** 96:24 99:1

**checking** 195:20

**checklist** 53:5 195:15,17 196:4 198:16

**checkmarks** 199:7

**checks** 120:15

**chemical** 190:13 191:5

**chest** 267:21

**Chicago** 137:16

**child** 11:10 38:5 43:16,22 44:21 64:22 66:14,15,17, 18,19 69:1 73:7,14,15,16, 19 74:5,6,11,24 75:7,11 80:2,3 82:16 83:9 85:23 86:10 89:7,12,15,22,24 90:3,22 91:9 94:8 105:5 106:18 130:23 191:7 192:14 193:4,13 196:16,25 268:17,18 269:8 278:5 287:16 289:6

**child's** 73:15 74:2,24 83:7 94:16 131:11 163:18

**childhood** 34:19 54:11 82:21 87:11 92:1,3,7,10 153:4,7 165:6,8 192:4 201:4

**children** 13:14 44:8 45:11 46:20 51:24 53:21 54:2,14, 22 55:24 57:6 63:13 65:3,6 66:5 67:11 69:3 72:13,15, 23 75:13 77:25 78:15 81:11 83:13 84:5 85:3 94:24 99:20 103:4,5,11 128:2,11,14 135:19,21,22 137:3 138:20 143:24 154:20,25 160:17 162:5, 10,19 163:8,20 165:19 174:23,24 175:18 176:17 177:22 178:9 179:10,14 181:12,15 183:12,21 184:3,16,20 187:22 189:3, 8,9,18 190:12 191:4,17 192:2,7 193:10,17 194:24, 25 196:14 197:6,7,8 201:24 225:5 232:9 233:1, 4 265:5 274:3 282:11 283:13,25 284:13 287:18 298:18

**children's** 64:24 72:10 73:22 101:10 181:1

**choice** 50:8 86:16 105:4 294:15

**choices** 170:8,9

**choose** 96:2 101:19 105:4 126:2,10 143:11 160:3 187:13 227:6

**chord** 64:11

**chorionic** 55:12

**chose** 166:8,20 262:14 278:25 287:14

**chosen** 34:7

**chromosomal** 257:4

**chromosome** 129:15 130:19 253:13,17 255:19, 24

**chromosomes** 151:24 152:2 246:23 252:8 254:6, 10,11,24 258:1 261:5,14

**Cincinnati** 88:19 270:17 271:2

**circles** 120:16

**circumstance** 74:22 75:7,8

**circumstances** 34:7 66:20 74:4 245:25

**cite** 232:12,17,24 239:1 247:24

**cited** 231:2 232:18 233:16

**cities** 100:15

**city** 194:12 294:22

civil 182:22 262:25 264:19 273:13 284:23,25

claim 108:9

claimed 266:14

clarification 23:1 28:21 232:23

clarifies 257:20

clarify 12:2 28:4 223:15 254:7 291:7

class 193:14 273:13 276:14

classic 246:7

classified 92:1

classifies 92:3

classify 113:10 245:22

Claude 225:10

clause 288:6

clay 127:3

clean 43:20 214:17 295:14

clear 8:5,13 14:18 33:25 34:12 36:1 66:13 109:6 132:21 137:2 160:16 217:11 218:4

clearing 21:21

client 270:8

clinic 50:13 55:23 77:21 88:19 100:3,9 101:4 157:24 158:9 162:7 163:4 165:14 267:15 268:10 270:16 271:1,4,7 272:21

clinical 40:19 41:23 44:12 46:5 63:17 71:15 87:14 89:14,23 98:8,9 108:10 118:22 119:8,15,16 121:2, 9,15 122:4 124:11,24 125:8,9 134:8 138:19 139:15 151:6 168:4 170:25 186:19 188:5,7,10,11 225:18 271:5 293:3

clinics 14:10 269:12 270:5,19 271:14,18 272:13

close 167:16 287:23

closer 226:9

closet 193:1

clothed 73:20

clubs 121:17

CME 58:2,16 61:19 62:1 79:1 140:17 180:18 224:18 265:14

co-counsel 290:21

co-exist 252:21

co-presenters 292:11, 18,24

coalescence 166:13

coat 277:20

cobwebs 151:13 277:18

coddle 276:4

coddled 274:11 277:8,10

code 156:17 182:20

cognitive 197:9

cognizant 81:15

cognizantly 278:24

Cohen-kettenis 164:18 165:7 166:6,18

Cohort 233:25

colleagues 63:16 70:1 86:24 224:3,4,7 272:13 297:10

collect 217:15

collecting 216:4

college 41:25 42:13 127:24 136:16 141:17,23 172:15 173:18,19 174:10 178:3,23 180:23 181:25 182:8,16 184:12 186:9 189:25 190:9 191:14 198:6 201:23 206:23 264:25 265:14 287:14

collegially 180:3

colloquial 248:23

colloquialism 249:8

colloquially 34:14

colon 202:15

color 214:5 254:16,17 275:19

Colorado 270:6

Columbia 11:21 195:11 203:11

Columbus 180:15,16

column 145:12 155:8 198:16 242:20

comb 296:4

combed 234:8

combination 46:22 114:4

combined 78:21 294:17, 22

comfortable 18:23

comment 63:21 64:3 237:19 263:21

commenting 237:22

comments 57:22 58:1,5 63:22,25 197:5

commitment 66:17

committed 73:13

committee 22:3 56:8 65:21 70:10,14,21 72:11 137:21 138:3 139:4 141:10 149:9 156:4 160:6 176:6, 11 177:3 222:24

Committees 21:17

common 43:13 137:4 146:6 181:4 201:5 238:12, 14 270:21

commonly 95:2 255:3 271:25

communicate 18:14

communicated 80:10

communicating 196:6

communication 18:22

communicative 104:5

community 15:7 16:6 103:18 139:22 175:17 247:12 273:10 276:10 283:6

companion 292:3

comparative 165:17 236:21 241:20

compare 237:16

compared 34:10 109:18 235:13 238:13 253:7 258:8

compares 295:18

comparison 107:19 132:17

comparisons 294:7

compassion 63:14 81:12 144:1 196:17,18 276:16 289:7 298:2,7

compassionate 196:22

compendium 163:2

compensated 35:15 38:17,21

competent 269:20

complaint 86:9

complaints 85:12,15

complete 61:4 128:24 257:16 258:25

completed 56:7 106:8 111:20 125:17 162:2 233:18,19 234:18 239:6, 16,19 241:4,9 245:3 258:24

completely 107:10 116:9 121:24 135:24 137:20 156:5 180:5 260:7 277:16

completion 106:24 107:15 127:23 240:1

complex 74:3 105:19 119:10 175:8

complexity 154:23

compliance 59:1

compliant 219:19

complicated 68:17

complications 34:8 55:20 105:25

component 228:8 267:25

components 208:25

comprehensive 57:15 65:15 67:10 85:20 114:12

comprise 252:6

compromise 156:13

compromised 128:1

conceive 73:14

conceived 66:15 73:7 74:16 251:12

concept 14:14 95:13 109:15 110:8,20 135:22 152:6 179:14 192:8 193:6 195:10 198:10 202:25 240:9 252:24 294:6 298:17

conception 179:7,18 215:11

concepts 32:22 179:13 250:23

concern 137:13 154:24 230:3 254:2

concerned 49:16 63:6 185:16,25 219:25 231:16 239:10

concerns 68:19 81:10,21 201:11

conclude 261:12

concluded 299:11

conclusion 119:13 189:6 238:24 261:15

conclusions 33:17 35:4 165:18 204:16 212:8 262:2,6

concrete 95:9 157:10 192:15 193:10

concur 264:24

concurrent 152:18

condemn 74:1

condemnation 73:5 275:24

condemning 72:24

condition 46:2 105:11 190:12 254:3

Conditioning 191:4

**conditions** 13:22 40:15
53:2 93:5 128:12,15
198:12 251:25 252:2

**conference** 16:21,22
17:13,18,21 19:13,17
20:17 21:2 172:11 293:23
294:18,22 295:3,5

**conferences** 62:1,25
140:17 273:14 293:25

**confirmed** 107:18

**conflict** 142:6 188:20
192:24

**confounding** 244:12

**confrontational** 80:16

**confused** 150:2 230:24
283:14 284:1

**confusing** 28:11 119:3

**confusion** 215:16,17

**congenital** 119:16

**conglomerate** 236:4

**congruence** 109:14

**conjecture** 214:13 244:7,
9

**conjoined** 55:23

**connotation** 274:22
277:9

**connotations** 214:15

**consensus** 247:19,23
248:4,19 250:20 251:7,8,
12

**consent** 35:7 44:18,22
66:16 105:3,5 188:4,12

**consequences** 74:6

**conservatively** 151:4

**considerable** 169:8,15

**considerably** 229:11
230:2

**considered** 54:11

**consistent** 33:24

**consortium** 80:13 101:10
249:5

**constant** 143:25

**constantly** 106:5 146:13

**constituency** 137:18

**constitute** 69:19

**constraints** 22:19

**construct** 218:17 264:3

**construction** 214:7

**consult** 225:9

**consultants** 187:7

**consumes** 40:23

**contacted** 37:17 103:17

**contacts** 97:18 218:21

**contagion** 47:6,16,17
48:1 195:1,6 197:11

**Contemporary** 77:18

**context** 57:25 132:23
165:16 183:10 198:16
273:7 276:19

**contextual** 165:13,20

**contextualize** 165:10

**continuation** 163:23

**continue** 14:19 131:17
155:17

**continued** 62:21 63:2

**continues** 191:12

**continuing** 61:4,18 62:4,
10 242:4

**continuous** 80:3

**contrary** 65:12 79:3 95:20
98:21 117:10,11 178:16

**contrast** 95:25 164:18

**control** 74:23 107:23
108:6,13 236:13,25 237:11
243:20 264:15 295:15

**controller's** 243:19

**controls** 236:22 238:13,
19 243:7

**controversial** 119:3

**controversies** 63:12

**controversy** 138:7

**conversation** 8:17 78:8
80:9 87:23 297:22

**conversational** 96:24

**conversations** 36:11
85:24 88:25 89:21 297:10

**conversion** 34:14,16
108:19,25 109:4,5,10
145:16 146:6,14 147:20
150:2,3,5 194:15 200:4,6

**convert** 108:21 109:1,9,
13

**converting** 108:20

**conveyed** 18:9 69:16

**Cool** 112:24

**Cooley** 31:23

**copies** 67:16

**copy** 123:8 210:6

**core** 87:6,15 88:4 179:6,
16,23 182:11,14 183:15
185:2 201:6 274:18

**Cornell** 54:14

**corner** 250:9 286:11

**Corp** 41:21

**correct** 10:1 20:5 22:23,
24 27:12 30:13,14 36:4,6
39:21,22 45:22 51:20,21
53:11 61:7 69:6 70:19
91:15 97:20 99:6 103:7
111:1 112:15 123:22
127:14,19 132:25 134:20
160:21,22 165:24 170:3,4,
24 172:2 197:12 200:12,
15,18 203:22 205:13 210:3
211:14,18,19 212:12,13
222:9 223:4 228:9,13
233:1,2,6 237:6,7,14
241:1,4 250:18 257:2,24,
25 261:14 272:9,10 277:1
295:22 299:1

**corrected** 293:11

**corrections** 289:12
290:15

**correctly** 32:13

**correctness** 273:22

**correlation** 239:7

**costs** 100:21

**costume** 192:16

**counsel** 7:18 25:10,14
38:14

**counsel's** 205:1

**counseled** 106:11 108:14

**counseling** 32:23 33:4,5,
11,16,21 34:4,5,11,13 82:8
99:2,3 102:8,12 107:20
108:24 111:8 113:17,19
132:17 159:22 203:13,14
272:9 294:15

**counselor** 268:13,14

**count** 101:5 122:7 181:20

**counter** 57:3 157:18

**country** 29:5,6 44:3 107:2
126:8 136:13

**County** 11:9,22 26:19
27:5,7 30:2 32:12,15 34:24
37:25 126:14,22

**couple** 73:12 101:21
155:6 176:19 179:8
180:20,21 184:19 199:6
297:16

**couples** 174:23

**couplings** 212:4

**courses** 58:2 61:5,8,9,16
62:4

**court** 24:1 30:15 34:24
58:2 154:4 181:21 237:25
268:22 286:8,15 288:1,9

290:25

**covariates** 243:7

**cover** 44:18 77:18 167:6

**coverage** 157:3

**covered** 156:11 296:19

**Cox** 71:16 72:7 123:6,7

**crafted** 187:14

**cramping** 216:12

**cranky** 156:22,23

**create** 124:3 209:24 221:7

**created** 34:19 51:4,8
123:17 222:23 223:1

**creates** 51:7 97:11 143:24

**creating** 51:6 256:18

**creation** 222:24 288:11

**credible** 273:23 274:21,23

**credit** 62:16

**creep** 138:8

**criminal** 66:21

**crisis** 250:23

**criteria** 152:19 155:8,16,
24 158:12,23 161:15
166:22 169:24 188:13
196:5 198:14 285:7

**critical** 64:9 71:16 120:17
175:9 184:16

**critically** 121:12 187:8

**criticism** 108:2 161:24
231:11,13

**criticized** 107:22 157:11

**criticizing** 71:11

**critique** 134:13 149:3,7,
12 161:14 206:11

**critiqued** 71:15 122:18
149:10

**critiques** 149:5

**cross** 57:18

**cross-dressing** 274:7

**cross-sectional** 75:24
184:17

**cross-sex** 44:20 57:2

**crosses** 133:24

**crossing** 181:5

**crossover** 193:2

**crude** 130:13

**crusaders** 278:21

**crushes** 97:11

**crystallize** 212:22

**cult** 282:16,21 283:4,6,8

**cultural** 48:13

**curiosity** 79:5 131:6

**curious** 280:19

**current** 57:10 155:15

**curriculum** 13:12 60:24, 25

**cursory** 241:11 259:18, 19,25

**Cushing** 119:9

**custody** 34:25 35:1 268:18

**cutting** 89:12

**CV** 13:1 209:9,18 210:7 291:6,10

---

**D**

**D.C.** 45:3

**Dad** 268:25

**daily** 225:24

**Dallas** 293:23

**damage** 44:19 131:23

**damaged** 255:14

**danger** 227:9,12

**dark** 277:18

**data** 76:2 106:5 107:17,19 145:15 150:25 165:10,16, 17 166:12 216:4 217:15,22 296:1

**date** 39:10 167:8,9 190:5 210:7 235:3 286:10,12

**dates** 291:15

**daughter's** 74:8

**David** 117:3

**day** 39:8 97:10 177:10 185:19 188:5 277:21

**day's** 39:1

**days** 44:7 122:5,7 180:20 260:14

**DCM5** 110:11

**dead** 106:18 279:16

**deal** 18:14 19:1,2 45:10 52:11,13 83:2 87:15 88:10 91:13

**dealing** 11:17 19:10 44:8 88:4 90:10 143:1

**deals** 202:21

**dealt** 93:18

**Dear** 250:2

**death** 73:15 82:22,23 91:24,25 186:17 244:19 245:7

**debilitating** 201:17

**Decatur** 100:13

**deceased** 148:13

**decided** 22:6 63:9 70:14 89:25 91:5 139:6 249:6,16

**decision** 29:18 81:25 278:6 286:1

**decisions** 105:7 136:25 264:24

**declaration** 27:12,16 28:2

**decreased** 76:5

**dedicated** 81:4

**deep** 138:15

**deep-seeded** 18:15

**deeper** 90:9

**deeply** 104:10

**deer** 266:19

**DEFAS** 11:9,21

**defeated** 65:21

**defend** 76:8

**defendant** 7:19

**defendants** 10:25

**defense** 11:6,7 24:17,25 25:10,15 26:17

**defer** 160:2

**defiant** 156:24

**deficit** 142:9,12

**definable** 157:10

**define** 69:1 118:2 187:11

**definition** 111:4 226:2 247:5 261:8 274:13

**definitions** 252:22

**definitive** 152:4

**degree** 127:24 136:8 165:6 168:14 173:5,6,13

**degrees** 154:23

**delayed** 59:12

**deletions** 212:3

**deliberation** 270:11

**Delta** 214:12

**delusion** 159:19

**delusional** 159:3,6,10,14, 17,18,19,23,24 160:21,24, 25 161:5

**delve** 87:10 90:8 93:3

**delved** 87:25

**demographics** 219:9

**demonstrating** 169:16

**denial** 203:6

**denied** 274:18

**Dental** 294:25

**deny** 203:2

**departed** 148:9

**Department** 38:2 180:17 289:11 290:5

**dependent** 43:16

**depending** 168:13 229:11 256:22

**depends** 151:7 199:22 210:7 252:15 253:14

**deposed** 23:6 24:5,6 31:21

**deposition** 9:19 12:9,13 25:24 28:1 29:23 30:6 31:12 38:24 39:5,8 238:1 295:24 296:5,6 299:10

**depositions** 9:12 10:8 11:2 88:16 124:10

**depressed** 82:25

**depression** 18:16 19:10 20:8 34:18 58:21 59:4,20 87:10 91:23 105:2 114:1,6 147:23 150:16,21 195:7 200:1 201:4,16,17 205:17 225:20 226:13 241:16

**descended** 130:17

**describe** 43:8 223:1 241:10

**describes** 159:1

**describing** 78:14 179:1,2 258:6

**description** 226:3

**deserve** 298:7

**designate** 257:7

**desire** 155:18

**desist** 111:1

**desistance** 79:17 104:18 111:5,12,18 154:18 163:7, 10 164:6 165:23 166:2,18 226:23 232:13,17,25 233:4,5

**desisted** 226:23 266:18

**desisters** 157:12

**detail** 121:16

**detailed** 258:5 259:1,21

**determination** 152:5

**determine** 151:25 152:3,

**10** 164:3 215:23

**determined** 210:17,24 211:12 215:10 252:7 257:19,23

**determines** 208:17

**determining** 260:2

**detrimental** 75:3

**develop** 60:25 70:20 192:8 226:7 251:7 255:12 267:11,12

**developed** 119:14 184:3 273:18 296:8

**developing** 20:9,12

**development** 64:22 71:8, 12 138:5 154:22 183:11,21 192:5 245:21 248:6

**developmental** 142:22, 23 162:18 165:12

**developmentally** 68:12

**develops** 163:17,18 192:24 193:7

**devise** 44:17

**devoid** 107:11 135:19 180:5

**Dhejne** 106:24 111:22 113:2 227:15 233:14 234:10 236:6,11 244:24,25 295:14

**diabetes** 58:22 136:1 173:2

**diagnose** 55:13

**diagnosis** 84:10 119:11 155:11 156:23,24,25 195:21 216:13

**diagnostic** 142:14 198:13

**die** 279:23

**died** 189:10 244:14,15

**Diego** 125:8

**difference** 27:11 29:6 124:13 143:13 159:12 161:17 166:1 175:24 184:24 195:5 243:18 244:1,11 290:9

**differences** 165:5 216:23, 24 238:9 254:18,20

**differential** 119:18

**differentiation** 13:15 28:7,14,22 53:22 58:24 60:17 119:19 129:14 245:20,23

**differently** 159:2 217:7

**difficult** 86:16 119:11 131:3 134:17 138:15 226:19

STACIE RAY vs AMY ACTON                                                      Quentin L. Van Meter, M.D.

**difficulty** 12:19

**digest** 137:18

**digests** 40:24

**digits** 259:23

**diminished** 34:10

**dimples** 259:23

**direct** 55:2,3 240:12

**direction** 181:10 279:2

**directly** 80:10

**directors** 271:14

**disabilities** 142:10

**disagree** 56:17,20 76:17
145:13 151:23 161:18
169:13,17,19 171:14,16
199:8 206:15 211:3,15

**disagreed** 142:5

**disagreement** 57:22
142:20

**disagrees** 177:20

**disappear** 279:23

**disclosed** 23:2,7,8,24
24:11 25:3,9

**discomfort** 97:4 223:1

**discordance** 62:22 63:3
116:20 152:13

**discover** 33:12

**discovered** 54:19 247:8
261:1

**discovery** 112:11 157:21

**discrimination** 207:17
217:24 264:13

**discuss** 22:16 28:5
203:20 280:1

**discussed** 33:15 35:3
60:7 63:1 98:16 133:16,19
164:6 180:3 233:3 236:13
246:22 280:8 285:9 297:7

**discussing** 99:19

**discussion** 267:7

**discussions** 63:17 77:4
160:8

**disease** 105:22 119:9
244:14

**disgusted** 177:20

**dishonesty** 64:14

**dismissal** 36:20

**disorder** 28:22 51:25
53:10 59:1 69:20 79:18
111:7 119:18 142:9,12
152:12 155:9,23 156:25
158:14 159:4,11,14,16,20,
24 160:5,11,20 161:4,6,10

162:20 163:7 167:2 193:7
194:8 222:25 223:4,8,12
228:16 238:18 239:11
240:5

**disorders** 13:14 28:6,13
53:21 54:5 58:24 245:22
248:5,6 250:21

**dispenses** 100:17

**dispute** 289:22

**disrupting** 287:17

**disservice** 83:9 160:14
227:5 228:18

**distillation** 265:17

**distinct** 28:10

**distinction** 28:19,20
170:20 200:3

**distress** 225:18

**district** 31:20 202:9
203:10

**divergence** 211:17

**diverse** 69:19

**division** 52:15,21

**Divorce** 91:20

**doctor** 49:19 100:17,19
123:4 240:11

**doctors** 16:23 140:10
143:5

**Doctors'** 263:8

**document** 67:18 73:22
90:14 118:16 145:1 148:24
154:12 162:24 171:18
182:3 185:24 189:22
198:22 202:2,11,20
209:22,25 213:11 215:1
218:2 219:8 220:12 232:25
234:7 238:4 242:17 245:17
251:19 265:11,12 283:18
284:3 285:18 286:18
287:1,13

**documentation** 253:5

**documented** 31:1 131:4
147:15 199:15 297:12

**documents** 112:12
123:15 170:1 198:3 208:12
209:17 214:10 215:5
216:1,5 217:10,14 218:6,
15 221:11,20 222:5 232:24
248:12 287:3,9

**dogma** 274:3,16,20,23,25

**Don** 8:4

**door** 88:23 266:18 267:2
269:13

**double-sided** 263:20

**downside** 175:6

**dozen** 25:22,25 129:8

**dozens** 140:17

**draw** 165:18

**draws** 282:25

**dream** 94:3

**dreams** 94:5

**dress** 192:12

**drink** 9:5

**driven** 148:6 185:18

**driver's** 214:11 218:18,22
219:3

**drop** 143:15

**dropped** 79:2

**dropping** 160:11

**drug** 66:20 76:6 91:22

**drugs** 217:3

**DSD** 55:25 245:23 247:2,3,
5 251:23 252:16,18,19
257:4

**DSDS** 28:24 129:10
245:10 246:4,6 252:15,20
254:5 256:12 257:15

**DSM** 155:10 156:17,18
158:13 169:23 223:5
228:16 232:18

**DSM-5** 110:17 158:19,22
166:13,21 167:13 222:24

**DSM-III** 158:18

**DSM-IV** 158:18

**DSTS** 28:7 54:2

**due** 152:20 170:9 244:12

**dues** 136:2 168:13 172:13

**duly** 7:3

**durable** 169:16

**Dutch** 79:10,11 111:16

**dynamics** 83:6

**dynamis** 83:7

**dysfunction** 91:17,19

**dysfunctional** 82:20
91:15 129:19 284:11
285:3,6

**dysgenesis** 255:4

**dysphoria** 39:24 40:9,24
43:10 53:11 60:22 76:21
83:15 113:24,25 132:2,11
152:12,18,19 153:24
155:16 156:14 157:4
158:14 160:4,19 161:3,16
222:22 223:9,12 225:17
226:3 228:17,24 239:11
266:12 295:20 298:7

**dysphoric** 99:21 157:13
164:17 191:17 192:2
200:25 203:21

---

**E**

---

**earlier** 155:22 229:7
236:13 246:22 293:22

**early** 13:23 14:7,9 47:11
57:1 79:12 154:24 155:9
259:12 274:6 279:23

**ease** 209:14

**easier** 137:7 214:17

**easily** 15:8 54:23 112:20
259:10

**Eastern** 31:20

**easy** 138:6

**edit** 187:15

**editor** 134:8,15,16 293:14

**editors** 164:9

**educate** 16:24 85:16

**educated** 72:17 73:19

**education** 22:14 29:17
43:9 61:2,5,18 62:4,10
65:16 66:20 72:16,18
74:25 76:5 85:11 93:22
112:5 138:4 172:7 238:15
274:5

**educational** 29:12 59:6
61:21 131:8 138:11,13

**educators** 49:2 129:15 174:22
267:22

**effect** 49:2 129:15 174:22
267:22

**effective** 64:17 153:23
171:12 199:20 217:6

**effectively** 18:14

**effects** 13:24 57:4 174:19
200:24

**efficacy** 57:12 164:3,13
292:21

**Efficient** 9:6

**efficiently** 205:2

**effort** 65:7,11 122:9 139:9
286:16

**effortlessly** 74:12

**efforts** 135:17 273:24

**eighth** 56:23

**electric** 146:12

**element** 169:17

**elements** 73:18

**eliminate** 277:16

**eliminated** 158:5 255:20

**Elizabeth** 7:15

**embarrassment** 72:2
141:7 143:3

**emerged** 169:16

**emergency** 180:25
216:11 285:12

**emeritus** 117:6

**Emory** 41:24 100:3 101:4,
10,14 125:13 267:5 269:8

**Emory's** 271:7

**emotional** 18:15 64:22
83:3 102:25 104:24 149:23
151:5 163:13 223:1 225:18
226:25 268:20 282:12
284:14

**emotionally** 73:20 109:23
194:7 196:21 239:25 276:1
277:12,14

**emotions** 68:17

**emphatically** 261:19

**empirically** 81:17

**encompassed** 157:5

**encourage** 273:25

**encouraged** 177:17

**encouragement** 50:25

**encourages** 50:23

**end** 105:2 138:15 159:24
160:14 186:22 187:20
203:15 226:18 227:8
231:23 259:13

**ended** 58:15 63:3 249:1

**endlessly** 188:6

**endocrine** 52:7,15 54:2
59:10,18 62:25 63:20,23
64:1 78:18,22 80:13 85:3,
10 101:8 114:11,17 116:5
119:7,22 120:7,20 128:3
130:1,24 131:16,18 134:24
136:6 144:6,14,21 145:6
149:7,10 154:8 167:23
168:24 220:24 231:3,19
249:12 269:18 292:9
295:12

**endocrinologist** 7:21
40:23 45:1 117:6 136:10
170:21,24 171:2 224:7
271:8

**endocrinologists** 52:12
78:16 100:22 117:16 121:5
122:3,4 224:5,14 225:14
251:6 270:3

**endocrinology** 9:11,17
10:14,17 23:13 39:20 40:2
41:6 42:10,24 43:7 44:2,11
51:19 58:21 59:16 78:23
97:20 115:25 134:9 135:1

**endorse** 67:8 69:11

**ends** 166:21 256:17

**energies** 64:13

**engagement** 22:10

**England** 194:7,10,14

**enlightening** 115:22

**enormous** 138:19

**Ensuring** 67:10

**enter** 181:19 249:24

**enticement** 50:2

**entire** 72:22 76:8,14
147:19 148:2,24 160:5
198:20 224:13 233:20

**entities** 11:4 12:4,6 35:14,
18 51:4 57:5

**entity** 10:18 11:14 17:19
46:25 49:16 51:15 58:22,
23 64:25 130:22 142:12,13
157:2,11 158:16,20

**environment** 59:7 68:20
83:8 140:6 176:1 192:23
282:11 284:12

**environmental** 152:23

**epicenter** 13:17 54:20,21

**epicenters** 54:5

**epidemiologist** 216:6
217:20 280:9

**equal** 98:11 226:12

**equally** 238:15

**equivalent** 11:10

**ergo** 175:22

**Ericson** 192:5

**error** 293:12

**ESP** 249:19

**ESPE** 249:13

**essential** 53:5 138:12

**essentially** 18:14 35:22
44:12 63:18 64:8 72:1
75:25 81:10 90:15 100:1,
10,20 104:21 106:16 110:1
118:16 128:2 129:25
134:12 135:13 137:20,24
140:24 146:7 150:4 151:9
152:9 160:10 166:10
174:21 177:24 215:23
216:17 223:5,13 253:2
269:13 270:13 277:17
294:6

**establish** 123:25 195:21
217:17

**established** 77:20 123:24
136:17 171:13,17,24
178:17 187:18

**establishes** 171:18

**establishing** 218:3

**establishment** 199:18

**estimated** 229:13

**estrogen** 100:18 224:24
267:22

**estrogens** 44:23

**ethical** 98:10 179:16
182:21 186:11 187:1,4,11,
16,18,24 188:20,22 189:5,
14

**ethicless** 185:10

**ethics** 182:20 183:2,5,7
186:14,15 187:2

**Ettner** 37:1 210:15 211:3

**Ettner's** 36:14 211:10
298:20

**Europe** 230:1

**European** 249:13

**evaluated** 96:10 269:19

**evaluation** 33:10 55:2
59:10 71:17 79:23 80:1,2
82:9 83:11 85:11 89:18
90:12,14,16 106:21 114:13
142:11 151:15,16 164:12
267:8 269:14

**event** 165:17 216:22
218:23

**events** 22:1,10 34:19
82:21 87:11 89:16 92:1,3,
7,10 153:4,7 201:5 245:18

**everybody's** 107:2

**everyday** 59:9

**evidence** 120:9,10 131:22
169:15 199:12 261:19

**evidently** 101:1 172:25

**exact** 71:6 78:24

**exam** 85:2 86:7 256:6
258:21,25 259:18,19
260:1,22 261:16

**EXAMINATION** 7:5
297:19

**examine** 53:1 187:4 230:8

**examined** 7:4 260:7
261:18

**examples** 163:16

**exceedingly** 46:2 247:11

**exceeds** 141:24

**exceptionally** 261:21

**exchange** 21:5 178:22

**excluded** 180:7

**exclusive** 252:11

**exclusively** 26:17 28:3

**excuse** 37:24 80:19 91:2
125:5 170:16 216:10
295:10

**executed** 25:18 26:15,24
27:15

**executive** 137:12,21
176:6

**exhibit** 67:9,16 144:19,25
162:15,17 168:17 178:14,
15,21 181:19,24 189:15,
17,21 197:6,21 198:2,20
201:20,22 209:5,8,14
213:4,5,9 220:4,10,11
231:23 232:2 233:23 234:5
248:3,5 249:25 250:1,5
263:7,13 265:3,4,10 281:2,
8,10,20 282:3 283:11,18
285:11,15,17

**exhibits** 248:11 251:17
280:25 293:19 298:24

**exist** 49:20 124:8 141:4
149:24 182:17 183:19
185:7

**existence** 256:11

**existing** 52:3 76:2

**exists** 17:19 46:24 100:15
156:16 157:2 254:5

**exon** 212:3

**expand** 14:10

**expanded** 29:2

**expansion** 284:20

**expected** 239:24

**expensive** 126:8

**experience** 14:16 17:5
40:19 44:5,9,12 46:6 60:15
63:17 68:14 74:8 79:8
82:11 88:8,15 127:2 131:8
138:19 151:6 152:17 163:3
207:16,23 208:4 226:20
227:14 252:14 263:5
266:15

**experiences** 90:10 93:5

**experiential** 53:6

**Experimentation** 187:22

**expert** 7:24 9:8,21 10:13
11:6 13:7 14:23 16:7 23:2
24:12 25:3,10,15,18,23
26:15,17,18,24 27:11,12,
16,25 35:18 36:25 37:17
39:20,24 40:9,11,17,24
41:2 60:4,10 87:22 89:2
93:13,20 209:9 212:14
273:20 289:10 290:12
298:11

**expertise** 9:7 14:19 22:16
23:12 40:4 60:16 97:19

STACIE RAY vs AMY ACTON                                        Quentin L. Van Meter, M.D.

**experts** 15:7 18:10 88:17 119:5 160:2 192:6 269:16 270:24,25 271:19

**experts'** 36:23

**explain** 13:6 48:8,14,15, 21 49:23 110:5 117:12 155:6 161:17 185:21 186:12 195:4 208:19 235:10 240:16 243:18 266:9 277:9 282:20 284:18

**explained** 48:5,19 159:13 230:10

**explaining** 49:15

**explanation** 182:8

**explanations** 241:13

**exploration** 68:16

**explore** 14:19

**exponentially** 14:11 46:23

**exposed** 54:22 208:10

**exposure** 53:20,23 55:1

**express** 117:10 155:17 206:10

**expressing** 192:3

**expression** 155:12

**expressions** 68:18 69:19

**extensively** 62:23 83:6 117:4

**extent** 12:9 72:17 295:4 296:1

**external** 170:11 245:14

**extra** 129:14

**extrapolating** 270:21

**extreme** 200:11 229:18

**extremely** 104:19 212:4

**extremes** 166:17

**eye** 78:12 192:12

**eyed** 219:3

**eyes** 187:9 218:19,22 219:4

**F**

**face** 191:20 266:21

**facilitate** 68:16 224:21

**facility** 100:12 245:2

**fact** 30:25 81:15 90:13 100:2 131:9 152:13 161:25 164:12 219:21 264:11 274:17

**factor** 240:7

**factors** 152:22,23 165:13, 20 170:10 179:9

**facts** 123:3 193:10 293:15

**factual** 170:13

**faculty** 52:10 117:6 125:1, 8,10 148:19 270:12

**fail** 79:15

**fair** 106:20 164:23 231:18

**fairly** 137:11 164:13

**faith** 82:2 180:1 282:24 288:20 289:8

**fallacies** 109:25

**falling** 105:9

**falls** 40:1 182:12 256:12

**familiar** 56:11,12,14 103:15 144:17 147:5 148:11 158:23 203:25

**families** 16:12,21 18:13, 19,22 35:17 68:16 82:20 87:16 103:17 112:7 175:2 283:2 285:4

**family** 33:11 35:11,13 43:19,21 44:24,25 45:7 59:6 65:17,18,19 66:15 72:20 74:1 75:2 80:4 83:5 85:23 86:10 89:3 91:15,16, 19 98:1 99:5,8 100:16,19 114:13 127:2 153:13 179:8 183:9 184:22 185:3 186:7 267:9 272:16,23 281:4,12 282:5 284:11 285:6 287:15 294:5 295:3

**famous** 11:23

**fantasy** 192:25 193:4,5,20

**fare** 20:18 21:1

**fashion** 81:4

**fast** 16:18 288:14

**faster** 205:5

**fat** 267:21

**father** 90:6 268:9,10,20,22 281:3,11 282:5 287:15 288:13

**father's** 268:11

**Fayette** 126:14,22

**FDA** 217:2

**fear** 117:15 193:15 196:25 279:17

**February** 89:24 91:6

**fed** 73:20

**Federation** 294:14

**fee** 38:22

**feel** 18:23

**feeling** 50:4 252:4

**feet** 127:3

**fellow** 78:3 125:7 148:9

**fellows** 53:14

**fellowship** 13:9,12 14:2 42:23 43:11 44:7 45:19 51:18,19 52:5 53:11 54:1, 23 58:15 62:22 63:3 148:4 260:18

**felt** 88:1 138:9 193:19 278:12

**female** 43:17,23 91:2,3,5 95:6 109:2,10 129:17 215:22,24 216:8,10 217:7 219:14,21 229:21 230:18, 22,23,25 256:20,22 257:6, 17,24 259:3 264:2 274:4 288:12

**female-to-male** 244:2

**female-to-males** 229:23 236:23 238:10

**females** 47:6,8,12,13 54:7 97:3 104:19 217:5,19,21 229:25 230:13,17

**feminine** 164:16

**fetus** 257:23 258:1

**fewer** 179:9

**field** 119:5 123:18 134:25 160:2 168:11 172:20 187:5 192:6 213:24 224:1 289:12

**fields** 187:7 212:7

**fight** 143:17

**fighting** 269:5

**figure** 48:18 83:6 87:16 192:9 203:16 214:24 229:25

**figured** 101:11

**figures** 117:9

**file** 229:4

**filled** 120:16

**filtered** 82:12

**final** 125:22

**finally** 139:11 261:1 278:2

**find** 76:23 77:1 82:8 83:2 86:11 98:21 131:3 185:14 231:6 253:12,21 254:17 256:5 259:17 278:17 292:22

**finding** 278:2

**findings** 174:25

**finds** 281:3,11 282:5

**fine** 23:5 131:22 197:17 259:6 269:4 277:21,22

**fingers** 259:21

**finish** 197:18 286:21

**finished** 41:12 125:21

**firm** 38:11 229:9

**fit** 86:17 247:4

**five-fold** 239:18

**fixed** 212:16,17 227:4

**flabbergasted** 80:11

**flawed** 70:25 71:1,9,18 107:23

**flesh** 288:15

**flies** 266:21

**flip** 171:6 182:13 233:10

**flipping** 209:15

**floor** 65:22 70:15

**Florida** 30:3 292:10

**fluid** 110:12,21 152:6

**flyer** 214:12

**focus** 64:12 143:23 276:21

**focused** 31:5 34:18 273:21 277:4

**focusing** 86:8 179:16

**foggy** 294:19

**fold** 48:8 107:14 227:16 230:4

**folder** 231:7

**folks** 36:3 48:13 128:4 168:3 198:22 257:15 271:18

**follow** 8:7 52:25

**follow-up** 52:14 55:22 161:24 162:2 164:14,17,20 165:9 233:24 234:9

**food** 72:19

**fool** 279:18,20

**footnote** 234:19

**footnotes** 231:15

**forces** 170:11

**forefront** 46:22

**foreign** 136:13

**foremost** 191:16

**forever** 138:24 275:12 276:18

**forget** 294:22

**forgetting** 32:7

**forgive** 43:2

**forgot** 244:23

STACIE RAY vs AMY ACTON                                                                 Quentin L. Van Meter, M.D.

**form** 119:18 128:21 145:21 198:23 219:14,17 228:24

**formal** 112:11

**formally** 174:16

**formation** 174:13

**formed** 174:10

**forming** 296:16

**forms** 217:11

**Fort** 16:11 17:11

**forum** 16:14 70:5,13

**forward** 93:24 108:4 200:20

**found** 121:23 123:15,23 130:22 164:21 231:5 259:10 269:7 278:15

**foundation** 40:4 60:16 88:5 208:1,15 288:9

**foundations** 288:5

**founded** 185:13,15

**founding** 174:16 178:3,23

**four-fold** 239:4,24

**four-fold's** 239:25

**fourth** 198:17 199:7 275:17

**fraction** 245:24

**framework** 186:11

**franchised** 100:14

**Francisco** 44:3 54:4 125:11 148:8 271:4 280:10

**freely** 89:3

**frequency** 164:1,10 270:2

**frequent** 91:25 214:12

**frequently** 115:7 295:24

**friend** 251:15

**friends** 195:8 250:2

**friendships** 43:21

**front** 27:3 86:19 94:6 167:6 195:17 198:1,2 279:19

**frustrated** 181:9

**full** 72:17 101:5 122:6 141:18 142:25 143:10 164:7 169:7

**full-time** 131:15

**fully** 216:20 231:13 278:24

**function** 105:16 165:13 257:12

**functional** 73:13 175:23 186:6 256:23

**functioning** 225:24 255:9,10 256:4

**fundamental** 183:9

**funds** 281:21 283:12,24

**funneled** 54:12

**future** 267:25

---

**G**

**GACM** 68:11 69:16

**Gail** 225:11

**gate** 93:17

**gather** 81:22

**gathered** 176:20

**gave** 67:2 78:25 139:3 140:17 224:23 265:13 268:22,25 281:18 294:12, 16

**Gavin** 31:19

**gay** 276:10,21

**gender** 20:5,13 34:3 39:24 40:9,24 43:9 51:25 53:10 60:18,21 61:14 62:13,21 63:3 68:14 69:12,19 76:21 79:17 83:15 84:10 99:21 102:11,19,24 109:16 110:3,7,12,20 111:7,8 113:24 114:23 115:19,20 116:10,19 132:1,7,11,23 145:17 151:25 152:3,5,6, 10,11,12,18,19 153:8,19, 24 154:22 155:9,11,13,16, 23 156:5,14 157:4,5,13 158:13,14 159:5,16 160:4, 19 161:3,16 162:19 163:7 164:16 167:2 170:12 189:18 190:1 191:16,20 192:1,2 194:23 197:7 200:25 203:21 208:17,20, 25 209:1 210:16,20,21,24 211:1,11,23 212:11,15,21 214:8,9,12,17,25 215:7 216:19,24 217:8 218:8 219:22 221:10,18 222:4, 22,25 223:2,4,8,9,11,12, 16,19,22 224:21 225:17 226:3,16 228:8,15,17,24 229:15,22 230:25 233:20 235:22 237:8 238:17 253:3 262:10 263:9 264:2,9,17 265:5 266:6,12,13 270:23 271:18 272:11,13 274:3 283:14,25 289:5,19 290:2, 9 295:20 298:7

**gender-affirmative** 68:6, 10 144:20 145:5

**gender-diverse** 67:11 68:17

**gender-nonconforming** 154:20

**gender-specific** 264:4

**gender-stereotypical** 155:20

**genders** 190:3 242:12 243:5,25

**general** 9:10 21:18 28:11 41:6 58:19 63:15 75:25 86:15 92:9 97:22 113:21 122:3,4 131:10,11 135:21 140:7 142:16 177:25 192:10 207:17,24 208:5 226:13 235:13 236:24 240:3,6 245:7 247:5 249:18 253:7 262:18

**generally** 13:5 21:19 62:14 118:24 132:4 135:23 218:14 224:1 226:15 231:18 237:12 252:1,2 255:25 256:1 258:2 264:24 265:1

**generated** 176:11

**genetic** 228:2,8 254:17

**geneticist** 127:19

**genetics** 130:2 212:8

**genitalia** 13:21 129:5,18 130:3,12,18 151:24 152:2 246:8 247:6 259:2

**genitals** 258:6,8,15,19 260:20

**genuinely** 170:11

**George** 22:3 292:5

**Georgia** 7:22 21:16 61:6 64:24 65:14 70:7 72:12 100:13 126:14,20,22,25 127:1 135:4,16,18,23 144:5 180:15,16 181:11 214:11

**germane** 206:9 291:22

**get all** 94:22

**giant** 177:24

**GID** 79:19 161:15 164:2, 10,19,21,22 165:6,8,12,15, 19 167:2,20

**gift** 126:5

**gigantic** 137:16

**Gilmer** 30:13

**girl** 106:19 130:7,9 252:18 255:8 268:21,25

**girlfriend** 268:11

**girls** 164:19,22 166:5,23 255:11

**give** 9:8 12:23 17:4 30:5 35:22 70:23 73:12 82:2 85:19 91:18 95:22 96:11 97:13 157:1 163:16 186:25 189:1 224:7

**giving** 32:21 95:24 97:18 105:11

**gland** 267:25

**glean** 85:21 242:1

**Global** 248:6

**Gloucester** 27:7

**goal** 102:10,14 137:1 164:1,4 201:13

**God** 278:3 288:12

**God's** 288:10

**gold** 108:3

**golden** 73:6

**gonad** 255:12

**gonadal** 131:22 255:4,9, 17 256:4,5

**gonadotropin** 55:13

**gonads** 252:25 254:10 255:14 256:2

**good** 7:7,8 82:2 86:17 88:1 135:22 173:15 174:24 182:17 188:6,10 195:17 293:16

**goodbye** 125:23

**goodness** 276:15

**Google** 49:14

**Gordon** 37:1 252:13

**Gordon's** 36:15 37:7

**gosh** 129:8 196:4

**governed** 11:4

**governing** 140:19

**government** 10:18,21 11:14 12:4,5 22:9,13,21 27:20 126:3 215:5 216:1,4 218:2 221:11,19 222:5 274:2

**governmental** 263:23

**grade** 241:17 275:18

**graded** 120:7

**graduate** 42:15

**graduated** 41:11

**Grail** 147:3

**grammatical** 293:11

**granted** 287:4

**grave** 198:18 227:4,9

**gray** 236:18,19

**great** 19:2 112:4 121:10 123:9 127:5 167:12 212:25 213:22 233:22 284:2 295:13

**greater** 227:16 235:15

Case: 2:18-cv-00272-MHW-CMV Doc #: 57 Filed: 01/10/20 Page: 316 of 332 PAGEID #: 1157

STACIE RAY vs AMY ACTON · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · Quentin L. Van Meter, M.D.

245:6

**green** 164:15 214:5

**Grimm** 27:7 30:22 31:19

**grocery** 195:18

**grounds** 287:2,8

**group** 61:23 106:14 108:6,
13 126:16 137:17 144:10,
22 145:7 174:16 177:25
178:16 181:18 185:16
237:5,11 247:22 248:24
249:14 251:4 263:8 278:2
293:2 295:16

**group's** 179:6

**groups** 236:14,21

**grow** 18:12

**growing** 66:14

**grows** 74:7

**growth** 59:12 138:5
267:23 268:1

**Grumbach** 225:11

**guardians** 103:4

**guess** 9:14 23:4 25:19
26:9 50:19 100:14 101:16
121:22 134:6 144:11 170:5
188:18 199:5 204:11 207:2
253:15 297:9

**guessing** 167:14

**guest** 164:9 270:10

**guide** 47:22 69:1

**guided** 138:12

**guideline** 118:22,23
121:2 169:3 171:18

**guidelines** 14:12 44:15
47:21 63:19,20,24 64:1,10,
23 74:20 75:10 114:12,17
118:7,12 119:8,15,16,23,
24,25 120:7,21 121:9
123:14,21 124:11,24
134:13 138:3 142:20
143:22 149:8,11,12,17
168:5,25 249:17 269:18
271:13 274:1 275:15

**guides** 188:4

**guilty** 281:3,12 282:5

**guys** 262:3

**GYN** 55:15

---

**H**

**H-A-S-C-I** 280:21

**H-O-R-V-A-T-H** 280:22

**H-U-G-H** 117:1

**hair** 218:18,20,22 219:4
259:22 267:13,23 268:1

**half** 170:6

**Hamilton** 11:9,22 25:7,11
26:19 27:5 32:12,14 34:24
37:24

**hand** 25:21 55:19 80:19

**hand-in-hand** 140:19

**handbook** 110:17 169:24

**handed** 36:19 213:10

**handle** 74:11

**handled** 96:17

**handling** 142:18

**hands** 66:22 259:7

**hang** 234:24 242:7 286:4

**happen** 24:9 73:8,17
78:19 80:7 106:22 108:22
140:1 148:2 161:25 179:13
193:15,21 194:19 197:1
213:16 222:14 231:15
260:19 269:3,6

**happened** 45:8 66:1 78:2
129:4 146:10 162:10 178:8
180:23 260:25 270:8
275:24

**happening** 50:20 75:4
97:3 147:15 193:17,22

**happy** 90:3 91:10 175:18,
23 279:13

**harassment** 207:23

**harbor** 298:3

**hard** 8:9,12

**harm** 18:20 31:3 63:13
74:20 81:11,12 82:5 90:17
105:9 143:25 147:25
149:21 189:4 196:20

**harmed** 177:22

**harmful** 35:25 81:14
90:15 117:17 186:2 187:20
203:3

**harming** 227:10,12

**harms** 105:9 189:18

**Hasci** 280:9

**hating** 178:5

**head** 8:6 88:18 95:12
134:23 180:16 181:2
258:25 259:20

**headed** 179:8

**heading** 68:5 182:11
265:24 287:25 288:4

**headlight** 266:19

**headway** 177:16

**healing** 104:25

**health** 11:3,18 17:8 18:7
19:8 21:18 22:14 32:22

38:2 56:5 57:19 58:19 59:2
60:12 64:23 65:17 69:1,2
85:25 86:12,15,22,23 87:1,
4,13 89:10,15 91:23 93:3,
18,20 99:10 101:10
113:16,22 114:22 115:8,23
117:3 127:8,11 144:22
145:7,12 146:22 147:22
151:1 152:17,24 156:19
157:21 168:18 172:21
198:18 219:8 269:20
271:23 272:6,14

**Health's** 289:11 290:5

**healthcare** 190:10 193:18

**healthful** 191:7

**healthy** 102:15,18

**hear** 270:11

**heard** 17:24,25 40:9 45:4
47:15 112:3 268:15

**hearing** 21:9 79:3 107:10

**hearings** 21:17 22:24

**heart** 85:14 244:14 259:21

**held** 17:22 42:8 156:9
270:10 294:19

**helpful** 13:6 14:18 28:9
47:21,22 198:15 221:3
273:5

**helping** 163:20 181:12

**hereinafter** 7:3

**hermaphrodism** 256:3

**hermaphrodites** 256:15

**Hershey** 117:7

**heterosexual** 186:6

**hey** 116:17 279:9

**Heyer** 280:3,6

**hid** 279:11

**hide** 279:10

**hiding** 18:25

**hierarchy** 293:5

**high** 29:3 34:2 104:19
166:17 229:13 263:16,23

**higher** 49:2 66:20 76:5
106:3 150:17 155:15 166:4
207:16,23 208:4 233:4
238:15 239:2 240:10
242:13 243:6 244:3,6,10
255:21

**highlighting** 88:11
211:16

**highlights** 69:15 155:5

**highly** 57:17

**HIPPA** 219:19

**hired** 35:10

**historical** 294:7

**history** 15:3 16:15 85:21
86:8 165:10,11,18 185:11,
15

**hit** 64:11 244:16

**hold** 43:1 60:3,9 88:9
108:23 148:19 179:5 204:9
229:9 270:24 276:4 288:13

**holding** 16:7

**holds** 273:14

**Holy** 147:3

**home** 126:21 128:5

**homosexual** 198:11,17

**Homosexuality** 197:22

**honest** 80:17 222:13
276:15

**honestly** 8:18 136:7
140:9

**honorarium** 20:22,23

**hope** 94:3

**hopes** 94:5

**Hopkins** 13:10,16 42:24
44:10 45:18 51:20 52:7
53:25 54:13,17 60:15

**hormonal** 52:21 54:18
55:8 120:1

**hormone** 43:24 52:13
57:3 82:3 84:7 96:22
131:21 171:10

**hormones** 13:22 34:6
44:20 83:12 105:12
256:18,19,25 257:12

**horrific** 105:25

**Horvath** 280:9,22

**hospital** 41:16 42:22
54:14 181:2 219:12 240:4

**hospitalization** 239:5
240:13 241:7,8

**hospitalizations** 240:18
241:1,14

**hospitalized** 238:16
241:18

**hot** 66:3 276:9,11

**hour** 38:24 39:4 156:21

**hours** 97:9 122:7 204:11,
12

**Housekeeping** 195:17

**Houston** 265:15 293:24

**huge** 177:24

**human** 55:12 105:19
217:6,7 245:24 280:7

**humans** 29:5 273:11

**hundred** 48:8 54:24 130:20 151:7 189:3,8 230:4

**hundreds** 82:17

**hungry** 197:16

**hyperplasia** 54:7 119:17 128:20

**hyphenated** 242:9

**hypospadias** 246:13

**hypothetical** 153:10 184:7 188:25 219:11

**I**

**Ice** 146:15

**idea** 44:15 47:23 70:8 80:25 120:17 146:23 158:25 273:11

**ideal** 72:24 73:6 74:15,16

**ideally** 72:23

**ideas** 76:3 118:23 182:24 247:23

**ideation** 226:8

**identical** 290:1

**identification** 67:12 144:23 162:20 168:19 178:18 182:1 189:19 197:23 201:24 209:10 213:7 220:7 234:1 235:24 245:13 248:8 250:3 263:10 265:6 281:6 283:15 285:13

**identified** 194:24 215:22 272:7

**identify** 252:4

**identifying** 218:8

**identities** 69:18

**identity** 20:5,13 36:4 53:10 60:18 79:17 102:19 110:12,20 111:7,8 145:17 151:25 152:3,5,6,11 153:19 155:9,13,23 156:5 158:13 159:5,16 160:19 161:3 162:19 167:2 170:12 191:20 192:1 194:23 197:7 208:11,17,23,25 209:1 210:16,20,21,24 211:1,11, 23 212:12,15,22 214:8 215:5 217:10,17 218:14,24 222:25 223:4,8,11 226:16 228:8,12,16 229:16 238:18 252:10 253:3 264:2 265:5 266:13

**ideology** 189:18 190:1 191:15 263:9 273:16

**ignore** 187:16

**Illinois** 15:15 16:1

**illness** 60:11 186:23

**illustrate** 256:12

**illustrated** 216:22

**image** 59:17

**imagine** 200:10 264:19

**immediately** 88:21 147:18 219:17 269:15

**Immigrant** 238:12

**immutable** 210:22 263:1

**impair** 225:23

**impairment** 226:4

**impersonation** 190:14, 15,22 191:6

**impinges** 59:2

**implications** 164:11

**implies** 205:10

**implying** 102:5

**important** 28:12 59:13 73:19 75:4 90:8 96:13 154:19 188:17 193:9 216:12 217:3,9,18 219:13 250:22 259:6 276:17,18 277:1

**impossible** 28:4 29:9,11

**impotence** 245:9

**impression** 258:23

**improper** 12:24

**improve** 69:2

**in-depth** 33:9 34:5 80:1,2 114:12 123:2 151:16

**in-patient** 245:1

**inaccuracy** 215:10

**inaccurate** 138:9

**inadvertently** 231:8

**inappropriate** 35:6 129:10 151:13 260:1,2 261:2

**inartfully** 257:2

**incidence** 29:3 46:14 47:3,7 48:9 237:3 245:25

**incidents** 45:25

**include** 20:12 149:16 212:11

**included** 28:17 96:11 107:1 155:11 291:21 296:2

**including** 39:17,18 155:17 171:10 225:20

**inclusive** 20:15 261:17

**incomplete** 259:17

**incongruence** 34:3 84:10

102:24 110:4 157:6 159:5 223:11,16 229:22

**incongruent** 190:3 223:2 235:22

**inconsistent** 222:8

**incorporates** 250:23

**incorrect** 159:17

**increase** 48:4,9 75:13 107:14 111:20 229:20 233:18 234:18 235:11,16 239:5,6,18,24 240:19,21 241:6,10 243:15,17 298:1

**increased** 46:23 76:6 100:8 239:22

**incredibly** 280:11

**independent** 71:22 155:13 187:5 188:13

**independently** 175:20

**indicating** 289:23

**indigenous** 239:10

**indirect** 46:18

**indirectly** 159:13

**individual** 17:22 71:25 75:23 88:18 146:12 203:1 208:18 210:19 272:19 280:14

**individually** 51:8 177:4

**individuals** 17:2 18:21 61:24,25 63:8 66:3,6,8 88:17 155:17 170:7,9,12 171:10 178:2 202:16 205:8 212:22 225:16 238:13,16 264:12,13 273:13 278:3 279:6

**indoctrinating** 283:7

**indoctrination** 283:3

**industry** 142:15

**inefficient** 260:1

**Inevitably** 8:5

**inference** 239:20 240:11 244:9

**infertility** 129:16

**influenced** 185:18

**inform** 219:17

**information** 19:5 30:10, 20 32:21 46:20 80:21 81:22 96:1 124:12 173:13 180:4 242:1 260:13 261:16,23 272:4

**informed** 44:17 188:3,12

**Ingelhart** 7:6,9,13,23 19:21 20:2,10 23:23 24:2, 3,15 25:13 36:8 41:8 47:25 48:11 49:9,21 50:5 51:2

53:15 64:19 67:14 70:16 75:9,17 76:12,15 81:6 84:11 90:18 97:24 99:12, 16,18 101:17 102:17 103:2,10,19 107:12 112:9, 15,17,24 113:3,7,9,14 115:5 118:9 124:18 127:12 133:4 144:24 153:5,16,25 154:6 161:22 162:22 168:20 178:19 181:23 182:2 184:9 189:12,20 197:14,25 199:4,16 200:2 201:8,19 202:1 203:4 204:6,8,21,23 205:6,18,21, 25 207:3,9,12,14,21 208:2, 8,16 209:6,12 213:8 214:20 218:13 219:23 220:8 221:14,18,23 222:3, 17,20,21 224:19 228:6,21 232:15 234:3 238:3 246:9 248:9 250:4 257:14 258:13 260:8 261:3,9 262:7,9 263:11 265:8 281:7 283:16 285:14 287:4,19 288:22 290:18,23 291:2 296:13, 17,22 297:3,4,14,18 299:8

**inherently** 73:3

**inheritability** 228:12

**initial** 55:14 90:12 209:18 229:2,4 245:16 261:11

**initially** 72:5 86:6 157:24

**initials** 281:17

**initiative** 56:8

**innate** 274:9

**inordinately** 89:16

**input** 137:18 138:10 139:3 177:2

**inroad** 250:22

**insensitive** 257:16

**insensitivity** 128:24

**inserting** 221:22

**inside** 176:10

**insisted** 268:24

**instance** 21:10 119:9 216:9

**instances** 201:7 255:22

**Institute** 226:11

**institution** 41:16 288:10

**institutions** 41:20 46:10 52:5

**insurance** 100:21

**intact** 66:15 73:25 184:22 186:6

**intake** 86:1,5 93:11

**integrative** 199:25

**intelligent** 280:11

**intend** 104:4

**intended** 74:5,20 244:18

**intense** 33:24 83:9

**intensive** 79:15

**intensivist** 175:12

**intent** 206:10,13 230:18

**intention** 145:16

**intentionally** 222:18

**intents** 128:3

**interaction** 37:21 38:1
59:21 200:14

**interactions** 59:5

**interchangeable** 223:10

**interchangeably** 214:9

**interest** 15:4 40:20 62:21
63:2 104:8 135:17 144:22
145:6 248:24 249:14
287:18

**interested** 50:16 70:21
79:4 107:7,9 172:20

**interesting** 71:13 77:16
117:9 231:11

**interestingly** 114:10
120:20 149:4

**interests** 140:5 141:3

**interface** 94:16

**interim** 44:13

**internal** 110:2 208:22
216:15

**internalize** 193:5

**international** 62:25
294:14

**internationally** 273:14

**internet** 46:19 47:20
50:11,21 77:2 195:14
196:1 269:2 272:1 279:8

**internship** 42:22

**interpretation** 212:5

**interpreted** 165:16

**intersect** 180:24

**intersex** 27:23 28:17 29:8,
10,20 40:14 61:11 62:10
128:12,15 247:19 248:5,
20,24 249:3,15 250:12,21
252:2,10 254:2 260:19

**intervene** 119:13

**intervention** 35:5 54:10
106:13 108:18 171:9
227:1,2

**interventions** 57:12
89:10 106:12 156:20

186:18

**interview** 83:5 86:10 94:9,
10,17

**interviewed** 86:24 87:20
90:6,7 268:14

**interviewing** 107:9

**interviews** 52:19 58:3,4

**introduce** 67:15 72:12
213:3 220:9 234:4 248:10
283:17

**introduced** 52:11 189:16
195:10 219:11 234:20

**invalid** 63:7

**invalidate** 98:17

**invalidating** 98:16

**invite** 16:23 149:11

**invited** 17:12 22:5 61:24
62:2 63:21 70:23 116:4
133:6 143:2 149:3 176:7
180:18 294:4

**involve** 23:16 272:14

**involved** 9:25 11:4 13:4
14:20,23 35:16 140:22
194:6 204:4 251:3 276:10

**involves** 272:9

**involving** 11:9 15:15
200:13 217:20 287:8

**irrelevant** 198:21

**Isle** 194:12

**ISNA** 250:2,24 251:4

**isna.org** 250:10

**issue** 14:6 25:4 34:25
43:12,13 44:6 45:16 46:22
57:19 66:4 74:3 78:14 80:1
84:7 87:6 98:7 102:24
129:14 155:8 175:9 176:2,
5 186:15 189:5 201:6
253:3 275:12 276:9,11
295:16

**issued** 215:5 216:1

**issues** 10:13 12:10,14,15
13:7,21,25 15:20 16:5 17:2
18:24 19:6 21:17 22:22
23:17 24:7,10 25:3 26:5,8,
16,25 27:20,23 28:5,17
29:8,9,10,20 30:21,24
34:18 35:10 40:10,11,18
45:11 47:23 49:17 59:12,
13,20 60:16 61:9,12,14,17
62:5,11,13 74:14 85:3,10
86:10 87:4,7,15,24 88:5,6,
11 89:4 91:14,23 93:18
97:4,12 103:6,13 104:24
131:18 132:8,15 133:2,14,
15,19 142:7 147:22
149:21,24 151:1,3,6
152:17,24 153:15 155:6
157:21 163:13 186:16

187:5,16 195:8 199:13
202:21,22 204:14 207:7
229:15 236:13 265:5 295:6

**iteration** 56:21 63:23

---

**J**

**j-e-i-n-e** 111:24

**Jake** 38:11

**Janes** 192:13

**January** 56:25

**Japan** 65:5

**Jason** 7:18 38:11 67:22

**jaw** 79:2

**jealousy** 275:19

**jelled** 142:11

**Jessica** 32:2

**jibe** 179:13,21

**JNS** 32:14

**job** 104:20 122:14 126:12
261:21

**Joe** 176:5,22 180:11 181:1

**John** 52:9,22 80:24
208:21

**Johns** 13:10,16 42:23
45:17 51:20 52:7 53:25
54:13

**join** 180:10

**joined** 181:16

**journal** 71:5 77:17 78:18
121:17,23 133:9,10 134:8

**journals** 62:24

**Judeo** 179:12

**Judeo-christian** 179:3,
13,21 180:9

**judge** 281:3,11 282:4

**judging** 81:21

**judgment** 36:18

**judgmental** 215:14

**jumping** 233:8 238:25

**June** 295:3

**jurisdiction** 32:8

**jurisprudence** 288:6

**justify** 283:13,25

**juvenile** 34:24

---

**K**

**Kara** 7:9

**karyotype** 129:4 253:6
254:20 255:5 261:4 262:5

**karyotyped** 258:1

**karyotypes** 253:24 262:3

**keeper** 93:17

**keeping** 77:13 81:3
179:15

**Ken** 226:20

**Kenneth** 33:6 111:14
116:21 163:2

**key** 131:23 151:21 155:6,8

**kid** 275:17

**kids** 54:6 55:10 63:15
65:10 79:15 81:13 94:19
104:11 106:6 128:19 129:9
151:2,5 158:7 159:16
170:16,17 175:3,22 178:7
195:24 196:10,24 252:14
254:14 269:13 271:25
275:13,14,16 277:5 283:2

**kill** 106:2,7,8 108:12

**kills** 240:6

**Kimora** 30:13

**kind** 16:22 43:4 50:6 54:10
55:6 59:1 64:6 66:9 80:24
84:6 86:11 94:9 99:24
104:2 113:20 123:4 142:11
147:2 156:5,6 161:16
162:15 163:16 186:24
214:16 215:9,14 218:24
266:24 296:4

**kindergarten** 192:23
274:5

**kindergartner** 193:12

**kinds** 49:20 104:21 105:7
254:23

**Klinefelter's** 129:9
246:11 252:17

**knew** 44:1 63:6,19 79:4
126:23 143:16 176:10,24,
25 177:4 180:11,12,14,19
281:17

**knowing** 96:15 148:10
193:3 226:21

**knowledge** 28:6 183:1
188:4

**Kurt** 292:5

---

**L**

**lab** 54:19 267:16 268:3

**labeled** 266:22 274:10

**lack** 31:2 135:12 141:7
148:15 149:20

**laid** 14:4

Lambda 7:10

landed 127:3

language 221:7

laproscopic 256:5

large 58:25 293:4

larger 54:1 293:7

lashes 192:12

lastly 8:22

late 38:16 128:1 278:20

launched 44:21

law 10:9 38:11 132:16
133:2,14,15,24 134:1
203:7 264:5,20 288:10

lawful 7:2

Lawrence 57:16

laws 10:9 203:8,9,19,25
204:1,4,5 217:24

lead 78:3 150:25 239:2

leader 116:18 144:6
157:22 173:24

learn 124:19 260:12

learned 74:7 192:7

learning 118:6 124:16
142:10 272:16

leave 125:15 127:4 135:8
177:9 192:11 215:21 276:6
288:13

leaves 177:21

lectures 101:23 116:7

Lee 117:5,18,23 225:10
251:14

Lee's 248:16

left 68:5 103:23 115:2
126:18 131:14 135:6
139:10 148:7 154:7 155:8
177:10 178:8 282:12
284:14 286:11 290:19

legal 7:10 14:23 118:16
123:20 273:18

legislation 73:1,4

legislative 21:9,13,17
22:3 65:5,7,11 135:17

legislators 65:4 190:11

legislatures 181:14

leisure 8:23

lens 186:19

lesser 101:2

letter 134:8,15,16 149:6
198:8 202:7 206:3 209:9

letters 280:13 291:14

level 94:7 156:16 195:25
259:1

levels 131:21 259:12
263:24

LGB 122:23,24,25 175:17

LGBT 207:7 288:25

LGBTQ 277:5

license 61:6 214:11
218:18,22 219:4

licensed 41:13 60:12

life 34:9 72:22 73:9 74:10,
24 105:12,13,15,17 128:7
163:18 179:6,17 186:16,
21,22 187:3 190:13 227:8
277:19 278:20 279:14,21

lifelong 226:25 227:1

lifestyle 198:11,14,18

lifetime 82:22 104:23
191:5

likelihood 34:2 155:3
165:15

limit 187:17

limited 162:4

lines 99:22 256:16

liquids 9:5

Lisa 47:5

list 50:12 78:10 92:4,5,6,
13 93:4,6 95:19 105:24
134:22 195:19,20 215:6
218:6 219:14 296:10

listed 136:11,12 158:12

listen 137:17 139:12

listened 138:10

listening 88:15 226:20

literally 44:6 121:19
221:14,16

literature 40:6,21,23 46:7
57:11,13 62:23 76:21 77:3
81:3,7,9 87:8 105:10
118:25 120:6 130:2 132:20
157:23

litigation 10:1 14:21 23:3
27:21,22 146:11

Littman 47:5

live 74:13 268:21,23,25
279:21

lives 17:3 50:4 76:7
110:14 170:10 225:24
289:24

living 190:19 238:14
277:25

LMDS 140:10

local 140:8,10 263:24

localized 255:25

locations 291:15

lodging 20:18 21:2

London 295:3

lonely 279:24

long 9:2 15:22 41:9 45:20,
24 138:2 162:1 174:2,5
250:24 293:15

long-term 137:22 155:3
164:14 233:24

longer 46:11 114:25 206:6

longest 279:11

looked 13:24 96:4,6 98:6
111:18 130:11 136:21
140:6 226:11 253:12
259:24 265:19 267:20
293:15

Los 43:19

lose 159:22 181:20
217:22,25 231:22

lost 123:13

lot 9:5 13:20 14:11 18:11
88:8 115:12 119:11 120:4
122:11 140:3 163:15 181:8
204:12 216:21 272:4
275:23 296:19 297:21

loud 246:17

Louis 44:4

love 122:20 181:10 289:1,
6

loving 74:4

low 164:1,10 166:9

lower 160:17 166:19

LSU 125:6

Lujan 29:23

lump 39:5,7

lunch 207:10

lungs 259:21

LWPES 249:11

### M

M-C 117:1

M.D. 7:1

Macon 126:21

maddening 108:15

made 36:14 45:5 46:21
57:21 63:22,25 131:19
164:9 177:16 200:4 216:21
222:13 230:7 270:4 278:6
288:12

magazine 195:18

mainstream 199:17
273:20

maintain 61:5 85:22
109:13,14

maintained 41:23 62:21
138:1

maintains 135:16 191:14
273:16

major 61:25 274:7

majority 26:5 71:9 101:13
114:21 120:22 160:18
161:2 166:3 177:2 189:9
224:6 257:8 279:12,16

make 8:12 29:17 65:10
66:4,10,11 67:7 70:22
71:19 74:21 81:24 82:9
84:17 85:24 93:17 94:4
95:4 98:14 102:14 119:11
122:9 136:25 137:8 143:12
170:7,9,19 217:3 227:2
228:4 231:11 256:19
289:11 290:5,20

makes 40:17 47:1 172:4
181:8 241:20 275:25

makeup 192:12

making 105:7 141:5 160:3
163:6 256:18

malagendment 103:1

male 43:16 44:23 89:8,25
90:1,25 91:6 95:6 109:1,9
129:2,5,21 130:3,22,24
215:22,24 216:7,11 217:6
219:22 230:18,23 247:9,13
256:19,21,22 257:6,17,23
258:19 259:12 264:2 274:4
288:12

male-to-female 244:1

male-to-females 217:23
236:23 238:10

males 47:8,12 54:8 104:19
119:25 217:4,19,21 229:24
230:13

malfunctions 245:19

malignancy 255:11,21

malpractice 9:24 10:4,5
11:1 15:15,25 24:22,24
26:13 82:6 118:18 123:20
124:14

maltreatment 15:16

man 147:9 219:12 256:21
280:11 288:13

management 143:14
248:4 250:21

Mandamus 285:12

manifests 20:8

manipulation 105:14

**manner** 251:12

**many-ish** 294:3

**March** 134:10 167:11 294:16,20 295:12

**Marie** 213:6

**mark** 284:5

**marked** 67:12 144:23 162:20 168:18 178:18,20 182:1 189:18 197:23 201:24 209:10 213:7 217:12 220:7 234:1 248:8 250:3 258:9 260:21 263:9 265:6 281:5 283:14 285:13

**marker** 215:7

**marriage** 183:10 286:6 287:10 288:11

**married** 186:6

**Mary** 192:12

**Maryland** 45:2

**match** 26:2 156:18 196:4

**matches** 114:23 219:1

**material** 138:11

**materials** 97:25 112:5,6 113:11

**matter** 9:16 23:12 28:23 35:2 37:18 38:18 39:11,21 90:13 194:15 217:8 240:20 285:24 289:18 292:12

**matters** 14:21 24:11 294:1

**Matthew** 294:18

**Mayer** 57:16 113:6

**Mayer's** 199:14

**Mchugh** 57:16 113:6 116:23,24 117:23 199:13

**meals** 20:19

**meaning** 243:25 244:13 255:7

**meanings** 200:6

**means** 84:2 98:6 132:23 153:23 182:20 186:13 190:17,23 228:3 235:11 244:18 277:10

**meant** 51:5 147:24 208:21 276:25

**measure** 235:17 243:19

**measured** 238:11

**Med** 100:13 266:25

**medical** 10:13 11:1 13:22 16:23 33:2 35:5,23 40:2 41:10,11,20 42:13 43:3 45:2 52:14 53:2 57:10,13 61:1,2,5,18 62:4 79:25 80:5 82:5 86:7 88:11,22

89:2 91:7 93:25 97:17 100:15 102:8 103:6 104:21 105:10,11 106:12 107:2 114:18 117:24 124:9 125:8 130:25 131:7,13 133:22 135:14 140:10 171:9 179:5 180:17,19,21,23 182:17 185:7 198:12 199:17 208:21 216:13 219:18 233:21 237:8,10 260:14,16 264:21 271:15 273:19,21 294:25 295:19 298:21

**medically** 107:17 171:11 227:7 251:24

**medicine** 9:10 15:3 16:16, 25 17:1 41:25 52:4 63:11 125:6,11 132:16 133:5,14, 16,19 142:8 143:10 162:7 216:24 278:7

**meet** 22:15

**meeting** 78:23 79:9 80:12 176:19,21 195:8 220:23,24 265:14,15 291:22 292:10 294:13,17

**meetings** 99:4 140:2 224:18 292:6

**Mel** 225:10

**Melbourne** 294:9

**member** 17:23 117:7 136:3,4,15 140:2 157:25 167:23 172:25 173:12,17 174:3 176:6 177:18 180:14 291:4

**members** 64:2 79:20 83:5 99:5,8 137:13,15,21 140:16 144:9 148:20 153:13 174:16 175:9 176:19 177:4 178:3 180:3 273:17

**membership** 70:6 135:6 136:9 137:10,12 138:1 141:9,19,21,22,25 172:12, 14 177:1,3 180:2

**memorial** 276:8

**memory** 25:22 123:10

**men** 252:7

**menopausal** 120:1

**menstruating** 97:3

**mental** 59:2 69:20 85:25 86:11,23 87:12 89:9,15 91:22 93:18,19 95:13 99:10 113:16,21 114:21 115:8,23 117:3 127:8,11 145:12 146:22 147:22 151:1 152:17,24 156:19 157:21 193:18 240:5 269:20 271:22 272:6,14

**mentally** 102:15,18

**mention** 19:8 37:6 40:10 53:19 188:9

**mentioned** 28:13 30:23 51:22 61:3 142:3 199:19 236:5

**mentor** 251:15

**mentors** 44:2 148:12 297:10

**Mere** 210:18

**mess** 293:16

**message** 147:8

**messages** 18:9 69:15

**met** 268:9

**Metabolism** 134:9

**Meter** 7:1,20 209:10 220:6 297:21

**Meter's** 202:23

**methodology** 76:18 162:1 163:12

**methods** 143:20

**metrics** 165:8

**metro** 101:9

**metropolitan** 101:4

**mid** 14:9 47:13 100:7

**middle** 229:19

**Midyett** 292:5

**Migeon** 225:10

**mild** 119:18 128:20

**milder** 54:6

**military** 43:16

**million** 281:21 283:12,24

**mind** 8:25 102:3 157:4 220:5 239:17 280:20 289:20

**mindset** 192:18

**mine** 37:3 154:14 167:7

**minimize** 104:21

**minor** 34:1

**minute** 31:14 32:6 78:6,13 79:13,14,21 219:5 234:25

**miscarriage** 216:17

**misconstrued** 206:12

**mislabeled** 34:15

**mismatch** 223:18

**misquoted** 299:2

**misread** 222:18

**misrepresentation** 106:15 123:3

**missed** 37:12

**missing** 241:13,19 242:14 255:24 259:23

**mission** 182:7

**misspoke** 290:16

**misstate** 295:7

**misstated** 231:8 232:10

**Misstates** 88:12 153:1 218:9

**misstating** 177:6

**Mistakes** 231:15

**misunderstanding** 257:4

**misunderstood** 155:3 236:7

**Mm-hmm** 67:5 68:3 73:10 83:21 173:23 177:15 238:23 263:14 291:12 292:19

**model** 68:10 69:12 145:23 162:18

**modes** 294:7

**modification** 230:4

**modified** 229:11 230:2

**module** 197:20 290:19

**molecular** 212:7

**mom** 130:5 131:16 269:2, 4

**moment** 27:9

**moms** 66:7

**Money** 52:9,22 80:24 208:21

**monitor** 115:9

**monsters** 193:1

**month** 72:6,7 77:10 116:6

**Monthly** 116:7

**months** 44:24 104:6 174:7

**Monty** 147:3

**Moore** 292:14

**moral** 182:17 183:3,19,21 185:8,9 288:9

**morbidity** 110:1 151:8 156:6 170:18 238:17 239:8 242:4,21

**Morehouse** 41:25 125:14

**morning** 7:7,8

**morphed** 251:1

**mortality** 242:22 243:6,16 244:3,13

**mosaicism** 254:12,19 255:2,3

**mother** 267:6 268:7,17, 18,21 287:15 288:13

STACIE RAY vs AMY ACTON                                                                Quentin L. Van Meter, M.D.

**mother-father** 183:9 184:22 185:3

**mothers** 184:4

**motivated** 174:15

**move** 125:22,23 126:1 205:2

**moved** 43:19 44:25 125:18,25 126:20 137:19

**movement** 46:21 51:5,12, 14 284:19,23,25 285:1

**moves** 82:24 91:25

**movie** 147:3

**moving** 45:3 93:24 108:4

**MRI** 212:3

**multi-disciplinary** 16:22

**multi-specialty** 126:16

**multiple** 11:13 82:24 240:7

**multiply** 241:22

**mundane** 260:3

**murder** 15:17,19,24

**murkiness** 119:12

**musculature** 97:12

**mutilation** 228:24

**mutually** 252:11

**myth** 280:12

**N**

**named** 159:2

**names** 48:25 223:14 281:18

**narrower** 226:23,24

**national** 62:24 135:6,25 136:6 263:24

**nationally** 140:18 273:15

**natural** 165:10,11,18

**naturally** 186:20

**nature** 49:13 55:1

**Naval** 42:21 45:1

**Navy** 41:18,20,22 78:4 125:18,19 126:18

**necessarily** 40:25 70:25 97:19 121:11 252:11 274:20

**necessity** 122:13

**needed** 35:21 36:2 44:17 55:21 89:20 130:14 140:22 276:12 278:16,17

**negates** 147:18

**negative** 74:5 196:20 208:10 272:17

**negativity** 198:10

**neighbor** 289:1,6

**nerd** 254:22

**Netherlands** 79:12

**network** 280:15

**networking** 74:8 273:24

**neuroimaging** 212:7

**neurologically** 128:1

**neurology** 142:24

**newborn** 246:23 258:22 259:20

**news** 116:5 216:21 231:3, 19 283:22

**newt** 147:5,10

**nice** 126:5

**Nigel** 194:11

**night** 97:9

**NIH** 108:10

**nix** 70:14

**nod** 8:6

**nomenclature** 249:2

**non-congruity** 153:8

**non-control** 237:5

**non-endocrine** 85:13

**non-gender-discordant** 191:18,25

**non-intervention** 108:17

**non-italicized** 232:7

**non-transgender** 237:12

**nonbiased** 106:23

**nonetheless** 255:10

**nonjudgmental** 68:15

**nonprofessional** 136:3 224:2

**nonselective** 106:23

**nonsense** 110:4,6 135:9, 10

**nontransgendered** 194:24

**normal** 190:13 191:6 245:19,20 282:10 284:12

**Norman** 77:22

**North** 11:23 27:6 31:9,17 247:19 248:21 249:4 250:12 295:1

**note** 154:19

**noted** 112:16 259:3

**notes** 154:19

**notorious** 148:14

**nucleus** 251:5

**number** 14:5,9 16:13 47:9 53:24 54:15 82:21 97:9 100:4 107:8 116:1 119:8 128:18 137:5 178:2 179:19 193:16 231:24 240:25 241:1,3,8 284:20 286:5 292:10,18,23 293:2,4 295:25

**numbered** 191:2

**numbering** 287:21

**numbers** 54:1 98:11 212:4 221:5 229:10

**nurse** 271:2

**nursery** 215:22

**nurturing** 183:12

**nutrition** 75:1

**O**

**Oakland** 42:21

**oath** 8:18

**Obama** 198:9 202:7 206:4

**OBC** 142:7

**Obergefell** 285:25

**obese** 138:20

**obesity** 138:14 139:1,13

**object** 198:20 286:18 287:1

**objected** 287:2

**objection** 19:20,24 20:6 24:13 25:12 36:7 41:4 47:18 48:3 49:5,11,25 50:9 53:12 63:4 70:2 73:24 75:14 76:10 81:5 84:8 88:12 97:21 99:25 102:13, 21 103:8,14 104:16 115:2 118:8 124:17 127:9 133:3 152:25 153:9,21 161:20 184:6,25 188:24 199:10,21 201:1,12 202:19 204:2,22, 25 205:5,14,20 206:25 207:18,25 208:6,14 209:2 214:1 218:9 219:15 221:12 222:10 224:15 227:25 228:19 232:14 246:5 257:10 258:10,20 260:23 261:7 263:2 286:22 287:5, 7 288:18

**objections** 205:2,4

**objective** 251:24

**obligated** 126:19

**observe** 270:5

**observers** 53:14

**obvious** 216:13 282:13 284:15

**occurred** 160:8

**occurring** 186:24 239:8 245:18

**occurs** 245:25

**ocean** 143:15

**October** 132:15

**odds** 95:7

**ODH** 7:19

**odor** 268:1

**offend** 66:6,7,9

**offensive** 262:14

**offer** 68:11

**offered** 39:20 61:17 267:10

**offering** 85:18

**office** 39:1 43:15 59:11,18 82:14 84:17,25 94:23 158:2 267:1

**officer** 144:6

**offices** 271:19,21

**official** 43:5

**officially** 77:21

**Ohio** 7:16 11:9,22 25:7 27:5 32:12,15,18 37:23,25 38:2 213:14,15 289:10,13 290:4

**Okaloosa** 30:2

**older** 95:11 130:5 268:23, 24

**oldest** 74:2

**oncologists** 100:23

**one's** 34:17 145:17 151:25 152:3,10 227:12

**one-third** 249:25

**ongoing** 33:11 58:16 60:2 99:1 143:25 201:17

**online** 49:8,14 95:22 196:6 282:23 283:5

**onset** 47:13 57:1

**open** 179:4 206:10

**openly** 117:16 280:7

**operative** 238:21

**opinion** 9:8 28:23 29:6 35:18,22 36:5,24 38:18 45:23 46:13,17 57:9 61:22 64:7,15 70:23 82:14 89:2 95:23 96:5 100:2 101:25

116:8,19 118:10 135:16 138:11,18 141:8,9,11,16 152:16 176:1 179:11,18 196:23 198:23 202:23 204:10,15,16 211:17 212:15,21 215:15 228:7, 10,22 256:8 263:5 264:9, 21,22 267:7 273:20 289:10,15,18 290:4 296:16,21,25 297:1 298:19

**opinions** 76:25 98:7 103:6 107:10 116:4 117:20 120:4 139:13 142:3,6 179:20 264:23 273:23 290:13 296:8 298:10,14, 20,24 299:4

**opportunities** 70:6 73:3 126:12 138:5

**opportunity** 43:20 64:3 72:16 73:12 76:24 140:17 148:17 266:6

**opposite** 71:21 98:13 155:18,19 179:20 190:14, 16,19,24,25 191:6 193:15 252:5

**opposite-sex** 179:8

**opposition** 145:24

**oppositional** 156:24

**optimal** 183:11,20

**option** 49:18 50:23 138:22 266:6

**order** 36:20,24 55:13 98:9 209:17 262:13

**ordered** 267:16

**Oregon** 229:14

**organization** 17:16,18 19:23 28:25 29:1 51:16,17 58:12 92:6 135:14,15,25 136:7,17,20,22 137:16,24, 25 138:2 139:11,18 140:15,25 158:2 172:1,5 173:25 179:1,3,24 180:5, 13 181:7 185:17 196:23 205:22 251:1 273:10

**organizational** 68:25

**organizations** 139:23 140:4 249:16

**organize** 174:17

**organs** 129:17

**orientation** 20:5,13 145:18 200:10

**oriented** 68:13 87:22 177:5

**original** 161:7 217:12 249:21,23 251:19

**originally** 218:7 249:3

**Orlando** 292:10 295:12

**Orleans** 180:25 181:1

**outcome** 74:18 118:20 174:24

**outcomes** 75:16,19 132:19 208:11 216:25

**outlaw** 203:11

**overproduced** 13:23

**overwhelmingly** 282:17

**P**

**p.m.** 299:11

**pages** 165:1

**paid** 20:16 21:2 39:4 59:17 201:18

**pain** 219:13

**paint** 277:20

**painting** 282:14 284:15

**pairs** 212:4

**panels** 18:5 224:12

**paper** 109:24 141:10 151:9 166:8 175:13 221:6 229:4 236:5 293:6

**papers** 27:3 210:12 233:11 293:2

**paragraph** 121:22 145:14 150:15 164:7 165:1,21 169:5,6,7 191:2,10 202:15 210:10,13,14,16 211:2,8 229:3 232:8 233:11 234:12 236:8 238:7 242:5 245:17 246:14 247:15,18 248:15 251:19 254:5 257:21 263:16 273:6 284:4,8

**paragraphs** 167:1 202:13 261:10,11

**parallel** 163:11

**parent** 82:22 91:23,24,25 94:10,11,13,14 135:25

**parenting** 75:2

**parents** 18:24 32:11 44:22 66:9,16 73:23 74:4, 17 75:12 89:1 93:6 95:18 101:19 103:3

**part** 13:11 14:1 39:25 52:5,18 58:25 59:9 60:24 61:1,18 65:25 73:21 92:22 99:3 107:8 112:5 114:16, 18 117:15 173:7,14 174:12 182:22 184:1,16 202:21 204:5 229:2 253:25 255:15 272:7 288:20 292:6 293:3, 10

**part-time** 121:14,15

**participant** 21:25 236:20

**participants** 236:18

**participated** 22:11

**parties** 10:23

**parties'** 35:19

**partnership** 68:15

**parts** 105:16

**party** 10:1,17,21 35:10 159:14 160:8

**pass** 73:1,4

**passed** 64:10 293:8

**passive** 108:16

**past** 71:7 83:25 101:6 105:3 128:9 137:19 176:6 202:14

**patent** 110:4,5 157:15

**path** 272:8

**pathologic** 159:3

**pathology** 156:6

**paths** 154:22 181:5

**pathway** 33:5 96:8 177:22 267:4

**pathways** 54:18 132:19

**patient** 12:15 15:16 33:10, 11 34:20 35:7,12,13 43:15, 23 45:4 55:2,3 59:3,10 81:15 88:20 89:5,9 94:3 104:7,14 106:25 109:15 114:13 115:4 129:1 144:1 153:13 214:19 252:16 255:8 260:7 262:15 264:14 266:20 267:8,10,13,19 270:12 272:19,22 284:10

**patient's** 34:9 59:19

**patients** 13:18,20 29:4 33:25 46:14 47:22 49:8 52:2,8,12,13,16,25 53:1,25 54:15 55:7,17 58:23 59:5 76:2,7 81:8 82:12,18 83:11,14,17,24 84:1,16 88:2,23 91:13 93:10 98:1 99:5,9 100:5,6,8,9 101:3,5, 6,13,18 102:11 106:13 111:6,15 112:6 113:15,16 114:20 121:6 122:5 127:22,25 128:6,9,19,23 143:18 156:10 157:9 160:14 162:3,10 163:3 227:8 228:18 233:19 235:22 239:14 240:9 251:23 253:23 261:18 266:14,16 267:6 284:20 285:4 293:4 298:2

**Patricia** 292:15

**patterns** 259:22

**Paul** 31:24 57:16 116:23

**pause** 197:15 230:8

**pay** 59:14 92:24 122:11 126:5 168:12

**payer** 281:21

**payers** 156:12

**paying** 14:15 136:2 172:13

**payment** 39:1,6

**payments** 20:25 156:18

**pays** 259:1

**pediatric** 7:21 9:10,11,16 10:17 21:18 23:13 39:20 40:22 41:5 42:10,24 43:7 44:2 45:1 51:19 52:15 58:21 59:15 62:25 63:25 68:11 78:17,22,23 85:3 92:9,23 100:22 116:5 117:5,16 119:22 122:3 131:14 136:5 139:22,23,24 140:3 144:6,14,21 145:6 154:8 170:20,23 171:1 175:11 177:25 178:16 179:4 180:17 185:17 186:22 220:24 224:5,6,13 225:13 249:12 251:6 260:16,17 271:8 295:11

**pediatrician** 78:4 85:14 126:23 131:10,12 142:16, 23

**pediatricians** 92:15,24 93:2 126:15 136:16 140:1, 21 141:2,11,14 143:8 173:19,20 174:10 178:24 182:16 190:10 192:7 201:23 206:23 264:25 270:4

**Pediatricians'** 265:14

**pediatrics** 9:16 22:4 23:13 41:6 42:11,23 43:6, 13 58:20 60:21 65:1,20 66:1,25 67:25 69:5,8 70:18 71:4,5,11 77:18 97:23 121:7 135:5,7 136:22 137:5,15 139:10,17 140:7 142:23 144:5 145:21 168:11 172:15,16 173:18 174:18 176:14 177:11 178:17 181:2,25 250:20

**peer** 62:23 116:3 133:7,9, 10,21 134:14 138:4

**peers** 59:6,21 153:14 191:18,25

**pejorative** 147:25

**pencil** 275:18

**pending** 9:2

**penis** 246:24

**people** 14:22 15:6 16:5 22:23 29:17 44:1 46:5 48:24 50:13 53:9 65:24 70:22 82:13 88:7 94:17 99:23 106:16 109:22

110:12,14 116:4,8 132:5
133:23 137:23 138:10
140:12 142:25 147:10
156:3 158:3 159:17,21
160:7 161:1 172:2,19
177:5 179:19 183:5 184:18
187:14 196:7 197:10,15
200:5,24,25 203:11,20
205:10 207:16,23 208:4,10
224:11,17 237:5,13 239:21
241:21 245:9 246:12 251:5
252:1,4 253:5,22,25
254:25 256:11 258:9
261:20 266:11 270:24
273:12 274:9 276:14
277:24 278:1,4,6,19 279:5,
10,25 282:19,25 285:3
288:25 289:4,14 290:6
295:18,20 297:25 298:4,6

**people's** 15:4 46:23 47:1

**perceived** 217:8

**percent** 29:4 82:19 88:22
101:8,11 106:6 130:20
138:25 139:1 141:21
151:4,7 164:19,21 166:4,9,
11,19,22 170:15,17 189:4,
10 207:8 224:10 226:7,10
229:14 253:17 255:6,7

**percentage** 217:18,19

**Perceptions** 248:7

**perfect** 74:21

**performance** 59:21

**period** 44:13 126:18
159:6,24

**peripherally** 270:10

**perks** 142:17

**permission** 268:22

**perpetuity** 227:11

**persist** 154:20 155:1
159:18 161:5

**persistence** 155:4
164:13,21,22,24 165:9,15

**persistent** 212:19

**persisters** 155:14 164:19

**persists** 164:2,11

**person** 35:16 45:6 86:13,
15 87:21 90:7 91:9 98:14
100:23 122:17 158:6
166:24 176:7 192:17
193:13 195:7 216:14 218:6
223:21 247:12 258:7
262:11 267:14 275:22
277:13 279:25 288:19

**person's** 212:11 261:5
289:13

**persona** 90:1 91:6

**personal** 17:4 51:9 58:6
64:15 82:11 135:15 138:18

156:2 227:14 251:15
264:22 296:1 297:9,23,24

**personal/professional**
58:8

**personality** 86:17

**personally** 53:16 82:2
148:3 180:12

**personnel** 219:18

**persons** 233:24 242:11
243:4,25

**perspective** 115:24

**pertains** 165:5

**Perth** 294:10

**PES** 249:19

**Peter** 117:5 225:10

**Petition** 285:12

**pharmacology** 142:15

**phenomenon** 230:9

**phenotypically** 246:24

**phone** 8:24 80:10 87:21
269:1

**photo** 258:15

**photographic** 258:5

**photos** 220:6

**physical** 82:23 85:12,22
86:7 190:17,18 200:13
251:24 252:3 253:1 261:16
268:19

**physically** 82:4 270:5
276:1

**physician** 41:10,14 47:21
85:18 219:20 258:25
267:15 268:5

**physicians** 46:15 84:20
139:19 185:16 271:15
274:2 278:23

**physiologic** 251:25

**physiologist** 60:13

**physiology** 105:19

**pick** 63:10

**picked** 96:1

**picking** 184:18 275:16

**Pickup** 117:3,23

**piece** 221:6

**pieces** 61:22 116:8

**pigmentation** 254:14

**pike** 153:12 261:1

**pile** 210:11

**piqued** 79:5

**place** 70:18 93:16 232:3
257:5 264:4 276:5 279:9

**places** 101:2 263:8 277:19

**plaintiff** 25:2 26:19

**plaintiffs** 7:11,16 10:24
11:6,13 24:17,20,23
213:20 261:13 289:23

**Plaintiffs'** 67:9,16 144:19,
25 162:17 168:17 178:15,
21 181:24 189:17,21
197:21 198:2 201:22
209:8,14 213:5,9 220:4,11
233:23 234:5 248:3,5
250:1,5 263:7,13 265:4,10
281:2,9,20 282:3 283:11,
17 285:11,16

**plan** 82:17 114:8

**platforms** 51:6

**pledges** 182:18 183:12

**plenary** 79:1

**point** 44:8 47:11 69:17
71:18 78:13 79:6 93:14
97:14 122:19 131:2 148:13
151:24 171:7 175:13
176:18 206:5 212:23
216:23 221:7,9 226:24
227:5 231:12 245:12
250:13 259:9,13 266:17
279:14 295:18

**points** 151:22

**poisoned** 189:3,8

**policies** 10:11 137:3
186:10,18 190:12

**policy** 67:21 68:24,25
69:7,11,24 70:9,18,19,20,
22 71:3,9,10,12,14 135:11
141:5,18,20 144:14 174:20
187:8 194:16,17 206:9,22
251:7 274:1

**political** 135:14 181:13
263:8 273:22 298:12

**politically** 136:22 185:18

**politics** 136:23 141:3,4
142:4 179:15

**poor** 59:12 293:14

**population** 75:25 76:1
101:9 107:5 207:17,24
208:5 217:16 218:2,3
224:13 229:12,15 236:22,
24 237:1,2 239:9 240:3,4,6
245:7,24 253:8,10,17
282:18

**populations** 235:13

**portion** 182:11 226:7
233:9

**poses** 179:9

**position** 16:6 35:19
168:2,16,25 174:7 176:23,

24 184:5,14 205:1 206:1
289:11 290:5

**positions** 41:24 171:7,8
186:10

**possibility** 35:23 165:4,5,
9 255:18

**possibly** 143:12 244:12

**post** 120:1

**posture** 97:12

**pot** 76:9

**potential** 44:19 255:21

**potentially** 204:15 214:16

**power** 82:8 221:7

**Powerpoint** 220:6,15,17,
20 265:18 272:25

**practice** 7:21 10:14 41:17,
22 42:5,8 77:14 88:1 99:20
100:16,19 101:7 122:5
126:22 131:10,15 186:23
262:19,20 266:12

**practiced** 41:9 146:9

**practices** 188:7,10

**practicing** 41:13 44:11
136:10 139:19

**practitioner** 121:1,3,15
139:14 146:21 271:2

**practitioners** 140:8
271:23

**prayers** 196:9

**pre-adolescent** 266:7

**pre-decease** 73:16

**pre-school** 274:6

**pre-ultrasound** 130:10

**precedent** 188:23 225:4

**precept** 264:14

**precepts** 192:4

**precious** 187:3

**precursor** 245:2

**predicted** 165:8

**predominant** 256:16,23

**predominantly** 77:2

**preeminent** 57:17 80:12

**preferred** 73:23 281:5
282:6

**pregnancy** 130:6,11
216:16

**pregnant** 220:1

**prejudice** 297:24 298:4

**premature** 267:23

**preparation** 38:23

**prepare** 36:12

**prepared** 25:20 118:15 130:9

**prescription** 100:24

**presence** 15:7 47:19 192:2 256:4 259:22 283:5

**present** 41:14 70:8 76:3 81:23 83:14 89:18 94:2 97:16 114:22 119:4 246:23 254:25 292:24 293:1 294:6

**presentation** 15:2 16:4,9 10,12 57:19 67:2 98:3,5 101:23 220:16,17,21 265:13,18 292:3,20 294:13

**presentations** 18:5 61:19 77:4 188:13 224:8,12 291:8,16,17,18 292:6 293:25 295:5

**presented** 13:15 16:14 63:1 64:2,25 65:3,19 70:4 78:21 80:13 99:21 209:14 212:5 220:23 247:22 253:15 261:20 265:9 285:16 294:23,24 295:2,10

**presenters** 19:9

**presenting** 46:15 63:8 64:15 84:6 219:12 284:21

**presidency** 158:2

**president** 174:1,6 176:4 205:21

**presidents** 176:7

**pressures** 150:25 197:11

**pretend** 193:11

**pretending** 190:24

**pretty** 28:2 45:20 286:11

**prevalent** 238:15

**prevent** 73:3 255:18

**prevention** 163:24

**previous** 155:1 235:16 287:3

**previously** 16:3 51:11 157:17 164:16 206:14 222:15 232:11 256:14

**primarily** 20:4,7 162:9 190:18

**primary** 18:8 52:19 69:15 84:20 85:18 86:14 297:11

**principle** 183:22 195:2

**principles** 69:1 75:11 192:9

**print** 58:3 117:25

**printed** 77:3

**printout** 220:15 282:8

**prior** 11:8 14:16 37:21 38:10 95:1 114:20 158:24 161:17 186:1 222:8 229:23 236:4 238:6,18

**privacy** 191:21

**private** 7:21 10:24 41:17, 22 42:4 139:14 219:19

**privilege** 270:9

**privileged** 36:11

**privileges** 269:1

**Pro-life** 178:16

**problem** 55:10 92:21 131:24 235:1 241:12 253:11,20 277:3 278:15

**problems** 18:15 97:14 142:19

**procedure** 70:24

**proceeding** 123:20

**process** 29:13 81:20 96:17 156:4 159:23 206:8 233:20 255:15 275:21

**produce** 112:23 296:3,25 297:2

**produced** 13:22 14:12 25:25 129:5 174:19 198:7 256:25 265:12

**product** 36:10

**professed** 46:5

**professional** 29:1 33:17 56:4 62:1 89:15 91:8 99:10 114:22 117:4 118:6 121:8 123:17 127:8,11 134:20 135:15 136:3,17 139:22 142:6 159:25 173:4,7,9 196:23 212:14 248:25 251:3 264:23 269:20 273:25

**professionally** 104:13 175:20

**professionals** 88:9 113:17 117:24 133:22 179:5 190:10

**professor** 52:9

**profound** 135:12 275:3

**profoundly** 156:8

**program** 54:1 113:18 148:11,12 180:22

**programming** 228:2 256:17

**programs** 54:3,4 121:17

**project** 65:14

**prominent** 58:22

**promise** 283:1

**promote** 182:18 183:12 185:3 190:2 191:15 273:15 274:6

**promoted** 198:9

**promotes** 73:2

**promoting** 157:18 279:15

**Promotion** 197:22

**prompted** 241:14

**promulgates** 273:11

**pronoun** 262:11,14,23

**pronounce** 236:12

**pronouncements** 185:19

**pronouns** 281:5 282:7

**propels** 109:21

**proper** 226:5

**proponents** 29:3

**proportion** 155:14 207:6 217:23 293:7

**proportionality** 101:12

**proposal** 65:23 69:24

**proposed** 33:6 63:21 65:11 72:11 92:8 149:2

**prospectively** 108:4

**protect** 264:20 277:17

**protected** 275:15

**Protective** 11:10 38:5

**protocol** 79:11 111:16

**provable** 175:6

**prove** 146:10 175:4

**proven** 57:3 135:21 137:2 153:23 179:19 287:14

**provide** 29:16 30:9,18 31:11 34:8 40:2 53:9 55:7 72:13,21 74:25 75:1 93:22 95:18 96:22 97:25 112:6 113:11,17 123:11 173:13 272:13 273:17 297:8

**provided** 20:19 22:21 30:12 31:7 35:9 55:8 140:16 261:16

**provider** 115:8 259:1

**providers** 68:11 85:25

**providing** 19:5 74:5 85:9 98:25

**pseudo** 64:15

**psychiatric** 145:20 159:15 227:1 238:17 239:5,8,15 245:2

**psychiatrist** 43:18 127:16

**psychiatry** 58:17,18 60:4

**psycho** 52:21

**psychologic** 102:7 110:1,3

**psychological** 13:25 33:10,13 79:16,22 83:7 87:5 88:8 89:4,6,14 90:16 104:22 109:12,20 110:10 145:19 151:8,16 152:7 170:18 227:2 267:8

**psychologically** 75:3 109:16 110:8 269:15

**psychologist** 71:15 87:14,23 89:10,23 93:12, 13 122:23 127:14 170:25 266:23 271:5

**psychologists** 267:2

**psychology** 60:7,10

**psychotherapy** 104:13 265:25

**pubertal** 138:5 259:12 267:20

**puberty** 57:1,2 59:13 82:3 100:18,20 131:20 267:9, 14,17,18,21,24,25 268:2,4, 5,16

**pubic** 267:12,22

**public** 21:25 57:21 58:1,5 77:3

**publication** 37:14 52:4 58:3,4 72:7 78:18 115:17 163:11 167:8,9 178:22 283:21

**publications** 92:22 116:2 271:10 279:4 295:25

**publicly** 92:14 117:10,11, 19,21

**publish** 48:24 124:4 141:19 249:17

**published** 46:6 47:4,10 57:20 71:5,16,23 72:5,8 75:15 76:4,23 79:10 92:4, 6,12 98:13 111:14 119:15 120:23 132:10,20 133:2 134:4,9,18 157:17 160:1 167:13 193:24 194:4 250:20 266:22 280:13 291:22 292:4,7

**publishes** 50:10 121:8

**publishing** 249:1

**pull** 13:1 117:14 248:1 249:9 259:8

**pulled** 279:25

**purely** 48:5,21

**purpose** 29:15 59:19 72:25 104:4 108:8 160:6 177:19 178:4 217:15

**purposely** 73:8

**purposes** 67:13 128:3 144:23 162:21 168:19 178:18 182:1 189:19 197:24 201:25 209:11 213:7 220:7 234:2 248:8 250:3 263:10 265:7 281:6 283:15 285:13

**purview** 119:22

**push** 106:16 160:11 190:2

**pushers** 274:8

**put** 96:5 127:3 141:16 154:14 156:17,25 166:7 173:15 176:24 209:16 212:25 223:14 229:8 267:14 275:25 281:1,9 283:10 285:10 296:9

**Python** 147:3

**Q**

**Q-U-I-L-E-T-T-E** 115:18

**qualified** 9:8

**qualify** 75:12

**quality** 34:9 184:23

**quantified** 156:19,20

**quantify** 218:1

**Queer** 100:13 266:25

**Quentin** 7:1,20

**question** 8:11,13,14 9:2,4 12:21 57:11 87:2 98:22 152:15 191:19 192:1 204:20 206:22 211:7 229:12 245:1 258:12 264:7 270:18 274:9,19 276:16

**questioned** 88:16 268:7 275:4

**questioning** 80:14 194:22 197:6 287:2

**questionnaire** 92:8

**questions** 13:1 68:18 90:19 96:20 110:24 198:25 199:6 249:25 260:9 262:4 269:14 274:12 287:9 297:15,17 299:7

**quick** 68:21 98:23 99:13 108:23 154:13 175:11 236:17 237:24 245:1 246:15 249:10 258:22 290:19 295:13 297:17

**quickly** 71:24 137:11 154:16 162:16 220:9 230:11 231:22 232:2

**quiet** 14:5 43:12 279:17, 20

**quietly** 74:13

**Quilette** 115:17

**quotation** 284:5

**quote** 53:20 92:5 148:25 247:10 263:16 282:9

**quoted** 37:11 98:19,20 157:25 179:1,2

**R**

**race** 264:10,16

**racists** 274:10

**radio** 58:4

**Rafferty** 67:22 71:19 90:15

**raise** 43:22 80:19 287:16

**raised** 68:19 74:16 93:5 154:23

**raising** 179:10

**ran** 181:3

**random** 236:22 245:18

**range** 127:21

**rape** 146:13

**rare** 45:10 46:2,11,16 129:6,25 216:20

**rarely** 29:21

**rarer** 247:10

**rarity** 14:8

**rate** 47:2 49:3 104:18 106:2,3 111:12,18 138:25 139:2 164:21,22 166:4,17 226:23 227:16 232:13,17, 24 233:3 239:23 240:13,14 241:9 253:6

**rates** 76:5 150:16 163:7, 10 164:13,24 165:23 166:2 207:16,23 208:4 233:5 239:2 244:6 280:12

**ratio** 47:7

**Ray** 213:6

**re-enforced** 260:15

**reach** 38:14

**reached** 17:23 212:9

**reaching** 104:9 114:20

**reaction** 114:4

**reactive** 149:24

**reacts** 217:7

**read** 36:13,14,15,20,22 50:12,16 60:14 62:22 68:8, 22 69:15 75:18,20 76:8,13, 22,24,25 77:5,6,8 78:5 79:13 81:13 95:21 115:12, 15 116:1 121:11,15 137:11 138:16 149:12 158:22

164:7,25 165:22 169:9,12 183:7 190:8 191:2 194:13 200:9,16 210:14 221:15, 16,21,25 232:9 246:16,18 247:16 250:14 251:21 266:3 273:7 282:8 283:20 284:8 288:6

**reading** 88:16 167:1 243:1 273:5

**real** 46:24 68:21 73:9 106:14 108:23 154:13 193:3,5,12,19,20 276:9 295:13

**realign** 153:20

**reality** 73:11 86:21 94:4,6 192:24 193:20 283:2

**realize** 100:14 173:8

**realized** 176:8

**reared** 74:17

**rearing** 74:6 75:11

**reason** 8:18 28:16,19 40:5 69:23 95:24 98:17 101:15, 24 108:9 139:8 183:2 186:20 214:13 218:21 243:16 254:1 268:4

**reasonable** 29:18 163:25

**reasons** 245:18

**reassignment** 228:23 233:25 238:7,18

**rebuttal** 36:15 37:7 72:8 209:9,16,19 210:10 233:9 234:13 290:14 298:11,15

**recall** 11:15 12:17 19:16 22:11 24:16 26:23 30:16 31:23 32:9 35:13 115:14 286:14 290:8

**recalling** 12:19

**recapturing** 221:6

**receive** 20:23 64:6

**received** 62:16

**receiving** 113:20

**recent** 36:23 85:5 89:5 115:16 134:4 197:6

**recently** 23:20,21 36:19 110:22 115:15 132:14 158:19 275:12

**recognition** 43:5 216:18, 19

**recognize** 18:20,23 59:4 67:17 85:14 87:8,10 145:1 162:23 172:24 182:3 189:22 198:3 202:2 209:21 213:16 220:12 234:7 248:11 250:6 265:10 281:8 283:18 285:17

**recognized** 28:25 46:9

**recognizes** 182:16 183:9 217:2

**recollection** 233:12 251:21

**recommend** 52:20 87:18 103:18 119:5 138:16

**recommendation** 56:25 57:2,5 268:12 279:12

**recommendations** 120:13 163:19

**recommended** 89:19 114:11 137:3 143:21 146:20 165:14

**recommending** 138:23

**reconfirming** 81:10

**reconnect** 104:9

**recontact** 104:1

**record** 8:5 99:17 111:3 132:22 207:10,13 218:12 219:8 222:1,17 229:1,7,8 237:23 238:2 282:8 290:24

**records** 38:23 107:2 216:9

**recruit** 266:6,13

**recruited** 83:24 84:13 126:21

**recruiting** 49:8,10

**recruitment** 49:24 50:6, 14,20,24 51:12 76:1 196:10 282:16,23

**red** 127:3

**reduce** 165:14

**reduction** 272:25

**redundancy** 214:3 230:20

**redundant** 230:14

**refer** 79:10 93:11 154:12 185:9 231:23 246:3 248:14 272:2

**reference** 71:6 72:1 121:20 164:10 207:7 209:15 211:9 266:24 299:2

**referenced** 57:18 179:2 275:9

**references** 37:7,12 71:19 95:19,23 96:2,6,9 98:11 158:5 163:6 248:17

**referencing** 183:3

**referral** 13:17

**referrals** 54:20

**referred** 33:22 34:14 44:25 45:6 53:25 79:19 84:19 89:13 90:23 100:5,6

**52:3** 215:15,17 218:23

106:5 110:25 112:1 113:15 129:1 140:9 146:18 158:18 165:22 167:19 194:5 247:18 271:20,22 295:24

**referring** 51:15 83:11 88:1 111:11 141:14 150:6 163:6 185:22 190:1 234:21 275:10

**refers** 146:7 167:2 230:22 246:6 267:1

**reflect** 202:12

**reflected** 290:13

**refresh** 233:11 251:21

**refresher** 8:3

**refused** 52:8 67:8

**regard** 21:15 177:17 190:1 286:6

**regional** 140:2 180:17

**regionally** 140:18 273:15

**registering** 31:25

**regret** 280:5

**regular** 8:16

**regulates** 188:16

**regulation** 264:5

**Regulations** 10:11

**reimbursed** 20:24 21:1

**reintroduced** 45:16

**reject** 145:21 190:11

**rejected** 70:10 153:13 158:9

**rejection** 150:18,22 152:21 153:14

**relate** 62:5 102:19 202:22

**related** 10:8,14 12:13 15:19 22:10,21,22 23:12 24:6 26:5,8,11,16,24 27:20 28:3 29:19 31:1 35:3 43:9 57:6 61:9,11 85:13 97:20 132:1,4,7 150:22 152:10 153:7 194:15 195:9 198:21 201:4 207:7 284:22,24 285:25 287:9 288:24,25 294:1

**relates** 58:19,20 60:11,17 204:13

**relating** 60:17

**relation** 165:19

**relations** 94:19

**relationship** 38:10 73:13 84:3 93:14 144:4 228:11 240:13

**Relevance** 102:22 201:1 202:19 204:2 206:25 207:18 218:10 263:2

**relevancy** 287:8

**relevant** 201:12 203:25 204:3 296:11,20,24 297:1

**reliable** 61:23

**relied** 198:23 296:16 297:1

**relieve** 153:24

**relieved** 203:18

**religion** 180:8 275:1

**religions** 179:5 180:9

**religious** 20:1 179:23 180:1,6 282:24 288:20,23, 24 289:3,7 297:22,23

**relying** 297:7

**remain** 85:4 252:6 299:4

**remained** 43:12

**remarkably** 90:3 91:10 138:21 254:14

**remember** 17:25 21:7 24:14 69:4 78:24 94:25 95:2,3 130:4 158:17 163:9 280:4

**remembering** 32:13 71:7

**remind** 19:15 29:25 123:11

**reminded** 59:3 80:23

**removal** 228:15

**remove** 156:5 184:24 221:10,18 222:4

**render** 289:10,15,17 290:4

**rendering** 38:18

**reorganization** 199:23

**reorientation** 199:19

**repair** 105:14 147:22,24

**reparative** 145:15 146:6 147:21

**repayment** 21:5

**repeat** 23:23 111:4

**repeated** 130:18 271:11

**repeatedly** 188:6

**repetity** 230:4

**replace** 221:10,19 222:4, 25

**replaced** 223:3

**replacement** 55:8 120:2 228:17

**report** 25:18 26:16,20 27:11,23 28:1 30:4 53:19 62:20 110:17 147:14 175:21 176:12 179:22 209:9,16,18,19 210:10 211:10 223:7 229:2 233:7

236:11 239:1 245:16 248:15 251:18,20 261:10, 11 290:13 291:7,9 295:11 296:3 298:11,15,20

**reported** 46:4 164:15,18 165:23 166:23 170:16,17 261:22

**REPORTER** 24:1 154:4 181:21 237:25 290:25

**reporting** 175:2

**reports** 25:25 26:4,24 28:12,17 36:23,25 75:20 146:24 147:1 175:16 193:16 248:19 296:7

**represent** 7:10 141:1,11 150:12 176:25 178:7 219:6 245:23

**representation** 142:21

**representative** 224:12, 17 237:12

**represented** 63:7

**representing** 35:12

**represents** 141:2 240:24, 25 241:3

**reproduction** 129:21

**Republic** 116:17

**reputable** 146:21 231:19

**request** 112:10,11 296:3, 7

**requested** 61:13

**requesting** 112:13

**require** 60:21 165:17 172:17,19

**required** 54:10 61:4,9,15 62:7,8 135:4 136:8 172:12, 14 194:9 218:6

**requirement** 87:18 172:6 179:25 271:9

**requires** 58:25 134:25 168:11 172:12

**reread** 231:9

**rescue** 177:12

**research** 40:6,20 76:9 79:10 98:8,9 117:24 121:21 132:1,8 139:15,25 140:3 183:24 184:2 186:19 188:5,8,11,21 227:19

**researchers** 116:19

**researching** 291:14

**residency** 41:12 42:17,22 180:22 260:17

**resident** 15:18 126:16 180:20

**residual** 255:17

**resolving** 34:3 250:22

**resources** 103:17

**respect** 298:8

**respected** 229:25

**responded** 64:4

**response** 150:18 206:4 224:9 257:12

**responsibilities** 65:18

**responsible** 158:7 245:21

**rest** 31:3 105:12,13,14,17 254:11 292:4

**restate** 11:8 204:20 243:21

**restricted** 100:20

**result** 19:3 109:19 193:7, 18,22 194:8,25

**resulted** 28:1

**results** 161:18 237:17 238:5

**retainer** 38:22

**retired** 117:6

**retirement** 41:21

**retract** 160:25

**retractile** 131:3 259:11

**return** 235:23 263:25

**returned** 266:18

**reveal** 208:12

**reveals** 263:25

**review** 37:4 38:23 40:20 52:18 69:16 71:3 76:1 81:9 86:7 90:12 133:7,8,9,10 141:16 187:8 246:15 293:9,13

**reviewed** 37:13 48:7 62:24 69:10,25 70:3 95:21 100:4 110:22 116:3 134:14 138:4 148:23 210:2,6

**reviewer** 120:17

**reviewers** 133:22

**reviews** 188:14

**revising** 206:8

**revision** 168:7

**revisions** 55:16

**revisit** 12:20,25

**Richards** 225:11

**Richmond** 42:14

**Ridgecrest** 294:25

**right-hand** 145:12 213:23 242:20

**rights** 65:2,6,10,12 72:13
73:22 262:25 264:4,9,12
273:13 284:23 285:1

**ripping** 148:14,15

**risk** 179:9 235:25 240:10
243:6 244:3 245:6 255:11

**risks** 93:23 198:18

**robo** 50:18

**Rogol** 292:4

**role** 94:15 265:24

**room** 79:2 80:17 81:16
139:5 160:9,10 176:21
180:25 192:11 216:11
259:15 260:5

**rooms** 31:3

**root** 142:19

**roots** 127:1

**Rosenthal** 148:3 149:4

**rotations** 260:16

**roughly** 39:10

**round** 207:4

**routine** 131:12

**routinely** 130:11

**Rowe** 194:11

**Rubber** 146:16

**rules** 8:3

**run** 137:8,21,24 271:2,4,7

**running** 157:24 267:15

**runs** 270:16

**rush** 229:22

---

**S**

**safe** 171:12,23 217:5

**safety** 57:11 188:14
191:21 292:21

**Salley** 194:11

**sample** 237:2 253:16

**sampling** 165:4

**San** 44:3 54:3 125:8,10
148:8 271:4 280:10

**sat** 79:1 80:18

**scale** 120:8

**scalp** 259:22

**Scandinavian** 48:8

**scar** 255:18

**scary** 192:25 282:17

**scene** 147:6

**scenes** 274:8

**scheduled** 267:13

**Schneider** 29:22

**school** 11:20 41:11 42:12
59:21 89:12,13,19 90:1
125:6,9,11 180:19 192:22
194:17 196:18 202:5,9
229:13 260:15,16

**schools** 61:1 197:23
198:8 272:2,5

**science** 28:24 29:16 31:2
33:15 57:4 63:6,7 64:15
66:13,19 78:6 81:23
120:23 135:13 136:25
143:1 148:21 177:6 179:17
181:15 182:17,18 183:19
184:1,2 185:7 187:19
189:2,11 254:22 263:25
298:16,21

**scientific** 62:23 76:21
96:10 120:6,8,10 132:1,8
141:7 146:2 147:14 148:16
149:20 150:25 169:15,20
175:10,15 186:10 188:21
189:7 199:11 211:25
273:23 282:25

**scientifically** 120:18
137:2 138:13 175:5 176:17
179:18 184:11 251:2

**scope** 143:13 288:8

**screen** 92:9,12

**screening** 92:14

**scrotum** 215:19,21
246:24 259:5,8,10,16

**scrutiny** 273:24

**search** 220:5

**searched** 15:6

**searches** 95:22

**searching** 130:22

**Seattle** 225:11 272:21

**secondary** 97:11,14
153:14 257:8

**section** 68:4 145:11
151:22 163:23 173:4
185:11 236:17 237:17
238:5 242:4

**sections** 263:21

**seek** 22:1 99:23

**seeking** 83:12 193:17
203:13,14

**seemingly** 74:12

**sees** 101:8,10 192:10

**selection** 107:11 253:20

**selective** 168:10

**self-harming** 90:4

**self-serving** 172:1,4

**send** 133:6,8 296:10

**sends** 141:17

**senior** 66:2

**sense** 46:24 52:17 75:5
95:16 181:9 208:22 222:13
246:7

**sensitive** 262:13

**sentence** 68:9 159:24
169:7 170:6,7 185:14
186:9 190:4 191:3,14
235:20 238:8,20,22 242:8
243:10,23 246:4 248:15
257:22 266:4 273:8 276:24
288:7

**sentences** 211:4,18

**sentiment** 276:25

**separate** 102:25 106:10
136:23 186:15 214:7

**separately** 39:4

**separates** 283:2

**September** 72:6

**serve** 94:18

**service** 52:7 77:19 126:20
157:3

**services** 11:10 38:6 54:15
89:14 156:18

**serving** 9:20

**session** 65:5 79:1 156:21

**set** 34:20 64:23 65:12
112:11 121:9 124:1 154:1
162:16 225:4 236:10
244:22 254:6,8,9,10,24
265:2

**set all** 251:16

**setting** 21:13 113:2
183:11,20

**seventh** 56:22

**severe** 82:23 91:23
195:19

**severity** 165:8

**sex** 34:17 43:16 60:17
66:8 73:23 75:12 90:23
93:6 95:6,9 102:12,20
108:21 110:9,15 111:9
114:23 119:19 151:24
152:2 153:20 155:18,19
174:20,23 175:6 184:19
185:24 186:2 190:14,16,
20,24,25 191:6 192:14
193:15 195:9 200:24 201:9
202:16,21 203:12 205:8,10
212:11 213:24,25 214:2,3,
4,6,9,12,14,19 215:3,6,9,
10,23 216:2,7,8,14,18,23

**217:**2,9,11,18 218:6,8
219:22 221:10,19 222:5
223:2,19 228:23 230:17,
19,23 233:25 235:24
238:6,18 248:6 252:5,6,8
253:1 255:24 256:8,13,22
257:8,13 261:5,13 264:10,
17 275:13 286:6 287:9
289:12,19 290:1,9

**sex-reassigned** 242:9,11
243:4,24

**sexes** 264:1

**sexual** 13:15 20:4,13 28:7,
13,22 53:21 58:24 76:6
82:22 119:18 129:13
145:17 199:18,23 200:10
201:11,14 203:17 205:11,
12 208:22 245:22

**sexuality** 19:11 20:9,12
27:23

**shake** 8:6

**shame** 279:11

**share** 56:19 117:20 180:4

**shared** 90:21

**sharing** 36:10 219:20

**Sharon** 175:11

**sheer** 53:24 244:7

**sheerly** 25:19 101:15

**shelter** 72:20

**shiny** 277:20

**shock** 80:18 146:12

**shocked** 65:23

**shocks** 146:16

**shoot** 123:13 151:18

**short** 126:18

**shortly** 89:17

**shoulder** 97:12

**shoulders** 40:2

**show** 46:18 75:16 76:4
95:23 106:21 120:6 166:4
188:22 248:18 249:11
289:7

**showed** 31:2 47:5 165:7
166:9,10 184:2

**showing** 268:3

**shows** 143:25 234:17

**shreds** 148:14,15,20

**shuttered** 158:9

**sibling** 82:23 91:24

**Siblings** 94:17

**sic** 103:1

**sick** 239:25 269:5

**side** 25:2 63:8 96:7 187:3 213:23 229:19 281:1

**sidebar** 176:20

**sides** 98:7

**Sidney** 294:9

**Siefert** 32:12,18

**Siefert's** 32:3

**signed** 231:16 286:16

**significant** 63:13 91:16 174:25 225:18 226:6 260:3

**significantly** 34:10 82:25 137:9

**silence** 8:24

**similar** 31:6 200:3,23 203:20

**similarly** 202:6

**simply** 35:9

**Singh** 165:7

**single** 66:7 96:18 105:1 106:25 266:20 284:10

**sinus** 259:23

**sister** 268:24

**sit** 230:7

**site** 21:3 50:15

**situation** 143:22

**situations** 186:23

**six-year-old** 192:10,19 193:13

**size** 137:9

**skew** 217:22

**skills** 254:23

**skin** 254:13,15,16,17 255:1,2

**skipped** 79:25 80:4

**small** 139:25 162:9 212:5 245:24 251:5

**smaller** 137:10

**smooth** 131:21

**sneeze** 166:20

**snobby** 140:5

**so-call** 104:18

**so-called** 108:19 132:17 194:14 256:14

**social** 33:2 34:6 35:23 47:5,16,17 48:5 51:16 59:5 66:12,18 79:24 80:5 88:22 93:25 102:8 135:13,19 141:3 154:24 172:1,5 195:1,6 197:11 218:17 230:10 233:20 237:10 264:2 295:19

**socially** 106:7 108:14

**societal** 150:18,22,25 151:10 152:20,22 190:2

**societies** 62:1 140:20 224:2 251:4 273:21,25

**society** 63:20,24 64:1 66:14,24 78:22 109:23 110:2 114:11,17 119:7 120:7,21 121:8 134:24 136:6 139:24 140:2 144:7, 14,21 145:6 149:7,10 154:8 167:23 168:10,24 182:22 220:24 247:19 248:20,24 249:3,12,15 250:12 269:18 283:7 292:9 295:12

**Society/european** 78:22

**sociologic** 184:17,21

**sociologically** 74:18

**sociologist** 48:17

**sociologists** 48:6,18,20, 23

**sociology** 183:23

**solely** 202:21

**solution** 277:15 278:14, 16

**solve** 55:10

**Somavariatan** 292:21

**somebody's** 122:13 153:8 210:24

**someone's** 20:9 153:19 209:1 224:21

**sophistication** 195:25

**sort** 13:16 14:6,13 22:20 43:20,25 47:5 49:7 50:1 52:20 53:6 54:5,12,17,20 55:22 61:22,23 65:2 73:5 78:12 85:16 86:8 87:1,21 93:16 97:13 101:1 102:2 115:9,19,22,23 120:17 122:21 124:13 129:2 130:6 131:2 132:16 136:11 137:18,22 138:6 143:3 156:9 157:1 158:19 159:13 182:7 186:14 190:2 192:18 195:6 208:22 214:3 215:13 229:20 230:19 249:13,18 252:24 272:8 280:11 297:9

**sorts** 16:7

**sought** 278:7

**sound** 75:2

**soundly** 65:21 158:8

**sounds** 129:22 243:14

**source** 118:5 124:16 231:3,9,14,19

**sources** 295:25 297:6,12

**Southern** 126:13 220:23 295:11

**space** 12:10

**Spack** 77:22 78:20 79:19 80:8,20

**span** 45:21,24 230:6

**sparked** 15:3

**speak** 8:4 14:16 16:15 17:3,12 18:2 22:1,6 27:17 61:24 62:2 117:19 143:2 176:3,16 279:9

**speakers** 16:23

**speaking** 19:6 21:19 22:10 78:7 178:25 205:2 226:15 297:5

**special** 144:22 145:6 249:14

**specialist** 86:20 180:25 266:23

**specialists** 17:8 18:8 19:5 270:25

**specialization** 43:4

**specialty** 266:12,13

**specific** 12:19 28:18 29:1 37:10 57:14 72:18 85:18 86:9 123:18 159:15 178:4 202:14 264:8,9 267:1

**specifically** 11:16,18 12:17 13:5 17:25 20:14 21:7,15 23:14 28:13 29:25 30:25 31:5 32:7 35:3,14 39:16 42:8 48:25 58:18,20 61:2,13,15 72:14 78:24 83:13 88:2,20 95:5 98:2 113:1 115:15,25 121:18 124:8 129:3 130:4 136:21 137:1 149:5,11 163:10 176:22 187:11 190:21 202:12 236:6,25 266:16 270:7 272:20,22

**specifics** 25:21

**spectrum** 38:7 76:24 94:18 115:20 226:19 274:4

**spell** 116:24 280:18

**spelled** 111:23

**spelling** 280:20

**spend** 139:9

**spinning** 139:6

**splashy** 216:21

**spoke** 17:9 89:6 91:8

**spoken** 80:8

**sponsored** 70:8

**spread** 94:21

**Springfield** 15:14 16:1

**sprinkled** 122:6

**squeaky** 214:17

**St** 44:4

**Stacie** 213:6

**stack** 231:6 233:10

**staff** 7:10 17:22 78:4 268:8,9 270:13

**stage** 70:14

**staged** 86:5

**stalwart** 177:11

**stand** 187:2 279:18

**standard** 78:14 108:3 118:11,14,19 146:8,17 171:13,17,19,24,25 229:20 250:19 255:16 260:10

**standards** 56:15,22 57:23 118:6 120:3 123:23 124:7, 11,16,20,21 273:18

**standing** 204:24 205:3,5 278:21 287:5,7

**standpoint** 115:24 143:14

**Stands** 178:16

**start** 83:1 141:5 182:10 196:6 268:5 273:5,8

**started** 79:12 81:3 178:12 284:5,9,18

**starting** 68:5 267:11,12 280:15

**startled** 130:21

**starts** 163:23 191:11 238:7 263:16 268:1 273:8 284:4 292:14

**state** 16:19 21:16 37:23 38:25 64:24 65:4,8,13 70:6,7 80:18,21 81:16 95:2 110:18,21 117:17 127:5 135:18 159:6 160:21,25 170:2 181:14 203:9 211:9 213:14,15 220:5 224:16 239:20 257:22 261:19 286:8 289:20

**stated** 16:3 35:22 88:3 93:12 106:17 110:11 151:4 159:4 169:23 222:15 253:9 269:23 272:20

**statement** 36:14,15 66:11 67:7,21 68:24,25 69:7,11 70:10 71:14 89:2 118:17 137:8 141:18,20 144:15,20 145:4,14,25 147:15 151:14 161:8 168:2,16,25 169:14 171:15 174:19,21 176:23, 24 182:7 185:2,7,23 186:2 189:25 190:6 191:22 198:6 202:18 206:1,7 210:17 211:12 222:8,11 229:8 242:2 247:20,23 248:4,20

250:21 251:8,12 274:17

**statements** 36:13 66:4 70:19,20,22 71:3,9,10,12,20 135:11 141:6 149:23 156:3 187:8 199:9 206:9,22 210:18,21 261:23 271:11 288:17

**states** 13:19 14:7 90:14 108:5 203:10 210:15

**stating** 80:22 148:1

**statistic** 37:10 247:11 279:22

**statistical** 106:21 244:10

**statistically** 174:25

**statistics** 46:18 106:16 230:1 293:9

**status** 208:12 238:12

**statutory** 10:9

**stay** 177:13,18

**stem** 122:19

**step** 90:11 94:14

**Stephen** 148:18 149:4

**stepping** 85:17

**steps** 224:21

**sterilizing** 283:13,25

**stern** 122:19

**sticks** 102:2

**stop** 104:14 140:23

**stopped** 90:4

**stopping** 188:13

**store** 195:18

**stories** 51:9 192:25

**story** 77:18 96:7

**strange** 142:25 229:21

**strayed** 103:25

**streets** 160:15

**stricken** 156:7

**strictly** 16:24

**stripes** 254:15

**stroke** 105:21

**strong** 68:14 120:9 135:17 158:3 176:5 279:14

**structure** 65:17

**struggle** 110:3

**stuck** 178:1

**student** 180:21

**students** 194:18 229:14

**studies** 47:10 75:16,18,22,23,24 76:3,4 108:3

111:13,14 119:12 155:2,10 161:18 163:15 164:14,20 165:22 166:2,14 175:15 184:21 188:8 193:24 212:3 217:20 235:21 236:5,14 266:22 296:7

**study** 47:4 79:11 106:10,23,24 107:1,5,8,22 108:10,11 110:25 111:11,16,20 112:2 114:24 121:23 155:22 162:1 163:5 166:5 184:17 189:6,7 211:25 227:15,17 229:13 232:8,12,17,25 233:14 234:1,9,19 236:1,6,11 239:1 244:25 253:10 279:3 283:13,24 292:23,25 293:3 295:15,17

**study's** 226:10

**stuff** 122:6,12 124:10 270:9

**stumble** 262:21

**subcommittee** 70:4

**subdivision** 162:8

**subject** 9:16 11:3 15:2,5 18:3 23:12 35:2 63:11 117:8 182:15 199:14

**subjects** 16:13 19:10 63:1,11 64:17

**submit** 112:10 262:3,5

**submitted** 69:25

**subscribe** 116:11

**subsection** 173:9 238:6

**subsequent** 83:13 94:10 96:18,23

**subsequently** 43:23 78:9,20 158:4 191:19,25

**subset** 162:10

**subspecialists** 271:16

**subspecialty** 142:24

**substance** 211:4

**substantial** 238:9

**substantially** 164:14

**Suburbs** 126:13

**succeed** 228:5

**success** 138:25 139:1

**successful** 138:22,25 142:18 240:9

**successfully** 202:17 205:9 228:4

**sudden** 217:22 276:17

**suddenly** 89:24 193:14

**sue** 278:23

**sued** 35:17 118:17

**suffer** 74:12 193:22 225:17 298:7

**suffered** 89:16 194:7

**suffering** 19:2 196:16 203:1

**suggest** 86:14

**suggested** 155:14

**suggestions** 47:20

**suicidal** 225:20 226:8

**suicidality** 239:3,18

**suicide** 106:2,3,9,23 107:14 150:21 201:16 226:8,11 227:16 233:18 235:25 237:3 239:23 240:1,14,18 241:9,15 244:4,18 245:3,7 280:12

**suicides** 111:20 233:18 234:18 235:13 239:6,17,19 241:4

**sum** 39:5,7

**summary** 121:10

**summer** 294:12

**super** 14:17 129:6

**superintendents** 198:8 202:5

**support** 37:8 65:17 67:10 71:22 72:21 85:22 86:12 89:14 96:5 119:1 124:25 145:15,22 184:21 186:24,25 226:25 247:24 280:15 287:14,16 295:2

**supported** 71:20 175:14 196:22 199:24 200:1

**Supporters** 250:2

**supporting** 154:24

**supportive** 68:19 85:11 135:23

**supports** 118:25

**supposed** 56:24 81:14 176:14 178:7 216:5

**Supreme** 286:8,15

**Surely** 264:8

**surface** 14:6

**surgeons** 55:16

**surgeries** 52:20 55:20 278:8

**surgery** 34:7 57:6 107:18 171:11 228:23 233:25 250:15

**surgical** 33:3 35:24 54:10 55:16,21 93:25 102:9 105:14 106:12 190:13 191:5 233:21 237:10

295:19

**surgically** 105:16 107:16 227:7

**surprise** 172:8

**surprised** 64:5

**surprising** 239:13

**survey** 107:6 175:17 184:20

**surveyed** 175:3

**surveys** 279:21

**susceptible** 197:10

**Sweden** 106:24 107:2 234:1 237:1 253:16 295:15

**Sweden's** 235:14

**Swedish** 112:2 227:17

**swept** 276:13

**swirls** 254:15

**switch** 200:20

**sworn** 7:3 8:17

**symptom** 152:19

**symptoms** 113:24,25 284:21

**syndrome** 119:20 130:7 246:12 255:5,9,16

**synopses** 77:4 116:7

**system** 69:2 85:15 125:16

**systems** 11:20

---

**T**

**table** 7:14 237:20,22 238:8 242:5,7 287:24

**tailored** 72:18

**takes** 66:18 151:15 187:2 277:11

**taking** 256:17

**talk** 8:10 16:8 18:19,24 53:2 97:6 146:7 149:22 150:1,3,4,7 151:11,15 153:18 155:22 157:20 181:18 199:25 200:16,23 201:2,6 278:12 294:6,8,16

**talked** 17:8 27:20 51:11 79:16 86:24 89:4 95:1 141:13 229:6,21 277:24 278:5 293:22

**talking** 29:10 79:7,14 93:9 113:19 146:19 147:19,20 154:7 187:15 195:2 233:13 251:14 252:20 295:15

**talks** 109:24 117:8 154:18 195:8 227:15

**tangentially** 204:13

**taught** 52:10 193:10 274:3

**tax** 281:21

**taxpayer** 283:12,24

**teach** 278:14

**teacher** 195:11

**teaching** 41:23 236:12

**technical** 175:13

**technology** 130:12

**teen's** 281:5 282:6

**teenager** 156:22

**teenagers** 16:12 17:4

**teens** 16:21 17:14,15,20,
23 18:11,13,23 19:14

**telephone** 50:17 139:5

**telling** 95:20

**tells** 196:18 289:8

**ten** 77:9 138:25

**ten-year-old** 95:10
192:19

**tend** 95:10 117:9 122:11

**tended** 293:15

**tenet** 59:15

**term** 20:11 33:1 43:3 48:2
110:25 111:5 129:11 146:5
147:25 151:8 159:15
160:20 183:4 222:23,25
223:3,9 230:12 242:20
248:22,23 249:18 259:9
274:13 282:22

**terminal** 186:23

**terminology** 160:3
208:21 230:12

**terms** 20:12 28:11,24
33:12 46:4 60:11 86:22
96:3 109:7 119:12 141:7
142:10 150:11 160:4
163:19 166:21 179:12
186:17 188:19 214:15
216:24 219:22 275:1

**terrain** 296:19

**terrible** 276:5 279:24

**terribly** 71:1

**test** 142:14 268:3

**tested** 217:4

**testes** 129:19 131:2

**testicle** 259:17

**testicles** 130:17 215:19
259:5,8,9

**testicular** 255:10

**testified** 27:22 29:23
88:17 206:15

**testify** 8:17,19 21:25 36:2
210:23

**testimony** 7:24 9:9,20
12:9,13 15:11 21:9,13,16
22:21 25:24 27:21,25 28:1
29:9 30:9,12,19,23 31:6,12
32:9,20 39:5 88:15 124:9
273:17 297:8 298:25

**testosterone** 55:12
100:17 120:1 129:5 259:11

**Texas** 16:11 117:4

**text** 182:13

**textbooks** 130:1

**themes** 18:8 75:11

**theology** 179:22

**theory** 141:3

**Therapeutic** 294:14

**therapies** 52:14 63:9

**therapist** 83:2,4 89:6
266:7,25

**therapy** 32:23 34:14,16
35:6 43:24 55:9 57:3 82:3
96:22 108:19,20,25 109:11
120:2 145:16,22 146:7,14,
15 149:22 150:1,2,3,4,5,7,
8 151:11,15 153:18 157:20
159:22 171:11 194:15
199:19,23,25 200:5,7,17,
23 201:2,6 203:2,11
278:17 294:8

**thereof** 10:15 115:20

**thing** 29:2 74:21 80:25
108:16 109:17 110:12
119:10 138:24 146:6
147:19 159:1 165:11 183:7
215:14 217:9 223:13
258:22,23 299:3

**things** 17:9 18:11,18 41:3
46:23 51:9 53:6 65:19 73:2
75:3 79:3 85:17 91:25
95:14 96:5,8 97:2,5,13,15,
16 98:19,20 105:24 115:9
116:9 119:8,21 121:4,22
124:1 137:4,6,9 138:4,8
142:18 143:10 146:13,15,
16,20 148:16 149:9,14,15,
19 159:12 163:16 175:16
188:16 195:20 204:13
216:6,7,9 227:24 267:20
271:10 278:4,13 280:1,8
290:16

**thinking** 95:9 96:19
101:12 130:13 192:15
219:5 246:21

**third-party** 156:12

**thirties** 100:7

**thought** 78:6,13 79:21
123:14 159:23 160:13,24,
25 181:8 193:19 222:12
255:3 267:11 278:14

**thoughts** 225:21 226:8

**thousand** 144:12

**thread** 201:5

**three-fold** 243:15

**three-time** 244:3

**throwaway** 77:17 116:2
271:10

**throwaways** 231:20

**thy** 289:1,6

**thyself** 289:2

**tie** 231:22

**time** 8:10 12:20 16:18
22:4,19 34:2 35:6,15 41:19
43:18 44:9 45:12,13,16,17
51:25 54:16 78:10,13 79:6,
19 89:18 94:21,23 97:16
121:11 122:8,16,20 126:19
131:2,11 139:9 148:13
157:24 164:17 175:12
180:16 181:6 198:24
212:23 222:1 223:24
224:25 226:22,24 230:2
248:11 258:6 259:9,13
263:17,23 266:17 276:8,23
279:11 285:22 286:3 296:6
297:15

**times** 13:3 15:11 23:1,10,
24 24:4,5 25:17,22,24,25
26:3 77:11 94:6,10 140:18
150:16 152:9 233:17
235:12,15 238:19 239:15
240:2,5,7,25 242:12 243:5
244:12 287:22

**tiny** 143:15

**tired** 135:9 269:5

**tissue** 97:11 254:21
255:17 256:5 267:22

**title** 250:6 283:20 292:20,
23

**titled** 163:24 221:6

**today** 8:20 36:12 39:1,17,
18 62:20 161:18 210:3
243:2 246:22 272:7 276:20
295:24 296:14,19 297:7,22
298:25

**Today's** 8:16

**toe** 258:25 259:20

**toes** 85:17 259:21

**told** 95:16 100:16 177:7
195:10 196:2 262:13
270:13 272:15

**tolerate** 97:10 177:7

**ton** 115:14

**tones** 255:1

**tons** 140:16

**top** 68:4,23 134:23 151:23
242:5 250:6 273:2 283:24
286:11 287:24

**topic** 277:1

**topics** 20:3

**torn** 148:20

**total** 81:12 86:7 142:20
184:20

**totally** 87:24 90:16 121:19
145:24 150:19 169:17
170:13 187:4 196:21,22
259:21 261:17 284:11

**touch** 85:23 93:21 104:3
140:12 259:16

**touched** 52:6 228:14

**tough** 177:8

**town** 100:11

**track** 176:15

**tracks** 165:1 259:23

**traditional** 179:4,7

**tragedy** 260:25

**tragic** 278:9

**train** 123:14

**trained** 59:4,14 87:7
126:17 146:22 148:8 188:6

**training** 13:9 14:20 40:19
43:9 52:6 58:15,17 59:25
60:6 134:25 148:4,11,12
168:11 172:7,9

**trait** 227:23,24

**trans** 23:17 24:6 26:5,8,
16,24 27:20 28:3,5,15,18
29:9,19 30:23 32:22 35:3,
10 36:3,4 48:13 61:9,17
62:5 88:8 91:14 103:6
106:6,18,19 107:6 142:7
144:15 152:16 216:10,11
219:11 236:23 239:9
277:25 295:5

**trans-affirmative** 145:22

**transed** 269:15

**transfemale** 89:8

**transfer** 125:19

**transferred** 125:17

**transgender** 11:3,17
12:10,13 13:6 14:6,10
15:2,17,20 16:5,15 19:6,8
21:15 22:22 25:3 30:11,21
40:10,11 43:14 44:8 46:14,
21 47:24 49:14 51:5,12,14
56:1,4 57:19 67:11 69:18

STACIE RAY vs AMY ACTON                                                    Quentin L. Van Meter, M.D.

77:5,19,21 79:24 82:11
86:9,20,22 87:1,3,5,7,9,21
88:19 89:5,20 100:3,10
101:3 104:14,15 120:21
121:6 122:12 132:4 144:22
145:7,13 150:17 151:5
158:4 168:3,18 171:10
172:20 194:18 195:9,12,13
198:21 202:22 204:14
207:15,22 208:4,9,12
220:5 223:21 226:15
228:12 237:5 245:6 251:23
252:1,10 253:5,22,24
262:11 266:23 267:3
269:12,16 270:5,19 273:9,
12,19 275:14 276:10,21
279:13 281:4 282:6 283:6
284:10,19,23 289:13,14
290:6 293:25 297:25 298:4

**transgendered** 44:10
45:11 273:12 274:11

**transgenderism** 40:1,5
48:9 49:15 50:3 77:24
199:2 274:10

**transgenders** 253:11,12

**transition** 33:2,3 43:17
79:24,25 88:22 91:9
154:25 194:25 223:22
224:22 227:6 239:2 240:17
244:6 270:24

**transitioned** 88:24
262:12 269:9 270:14,15,18

**transitioning** 289:4

**transsexual** 13:11 52:9
53:10 233:24 238:13,16
242:11 243:4,24

**transsexualism** 51:24
163:25

**traps** 181:13

**trauma** 82:24 102:25
104:22 282:14 284:16

**traumas** 282:12 284:14

**traumatized** 109:22

**traveling** 294:21

**travesty** 72:9

**treat** 51:23 81:16 82:16
119:14 128:14,17 226:18

**treated** 52:16,17 55:10,25
103:12 107:16 128:7,11
129:24 142:14 156:10
160:1 202:17 205:9,11,16
225:17 295:21

**treating** 44:23 86:25 91:8
113:24

**treatise** 96:11 98:1
112:12,14 113:4,10 115:19
138:13 199:14 206:4

**treatment** 33:18 34:13
36:3 40:3 52:23 53:9 55:4,

5,6 80:3,6 81:8 82:17 84:7
85:4,8,19 93:10 100:12
113:20 114:8,14,21 119:9,
20,25 131:7 132:17 138:22
143:20 144:15 153:19
162:19 163:25 164:3,12
165:14 168:3 194:9 203:6,
20 226:6 228:23 235:23
272:6,8,12,14 273:19
278:7 295:19

**treatments** 55:15

**treats** 117:5

**trial** 15:11

**trimester** 259:14

**triple** 209:7

**trolley** 244:16

**trouble** 243:1

**troubled** 196:1 239:14,21
241:21 275:22 277:12,14

**troubles** 277:16

**true** 95:17 179:6 181:15
188:3 256:3,14,15

**truth** 17:14,15,20,23 19:14
34:16 186:10 195:21

**truthfully** 8:19

**tumors** 13:23

**tuned** 181:12

**turmoils** 83:3

**turn** 68:1,22 145:8 163:22
167:5 193:14 210:9 221:4
229:1 237:15 245:15
247:15 263:15 265:24
273:1 282:7 287:20

**turned** 147:4 267:17

**Turner** 119:20 255:9,15

**Turner's** 246:12 252:18
255:4

**turning** 191:1 202:12
251:18

**turns** 138:17 186:3

**twenty** 240:23 244:11

**two-part** 275:21

**type** 22:10 28:18 50:22
58:22 99:1 100:14 117:20,
25 150:7 172:17 197:10
256:2,23 272:12

**typical** 163:16 257:6
258:8,19 259:12 269:11

**typically** 255:8

___

**U**

**U.S.** 224:5

**UC** 125:8,15 148:8 280:9

**UK** 48:7 230:6

**Ultrasound** 130:12

**ultrasounds** 130:10

**umbrella** 38:6 203:23

**unable** 22:18 100:23

**unaware** 19:25 44:20

**uncommon** 46:1 270:22

**unconditionally** 72:21

**undercurrent** 109:20
114:4 149:23 151:5 163:13
170:18 201:3,15 205:16

**underestimated** 155:2

**undergo** 235:23

**Undergoing** 233:25

**undergone** 17:2 237:8

**undergraduate** 127:24

**underlying** 24:10 88:10
201:10 289:22

**understand** 48:2 56:24
60:25 81:24 94:7 95:11,15,
24 99:9 103:20 134:3
144:3 147:7 159:11 160:17
181:14 183:5 188:19
195:13 204:25 211:6
223:17 238:21 243:9,11
244:20 256:7 258:12
274:21 291:23

**understanding** 49:23
68:13 95:5 96:21 204:14
243:13,22 275:24 291:8

**understands** 129:3

**understood** 8:15 95:21
156:3 165:4 188:15 276:12
295:17

**undertake** 223:22

**undervirilized** 54:9 55:11

**unequivocally** 82:19
105:10

**unethical** 176:12

**unhappy** 203:17 279:16

**unit** 72:20 179:8 183:10,13
184:22 185:3,4

**United** 13:19 14:7 108:5

**University** 41:25 54:3
100:3 125:10 267:5

**unnecessary** 90:16
151:13

**unraveled** 280:12

**unusual** 254:14

**unvalidated** 150:19,20,24

**unwanted** 202:16 203:12

205:8,10

**unwittingly** 37:12

**update** 247:20 248:6
249:20,23

**updated** 190:5 249:22

**upset** 49:16 65:24

**upwards** 39:13

**urban** 238:14

**urges** 190:10

**urologists** 55:15

**utter** 121:16

**utterly** 110:11 116:10

___

**V**

**vacuum** 182:18,23 183:3,
19 185:8,9,10

**Vague** 102:21 152:25
153:10 199:21 209:2
227:25 228:19 258:20

**valid** 63:6 81:23 135:12
136:25 175:14 176:17
179:18 184:12 189:7,10
195:22 196:21 211:24
212:9 231:13 263:25
298:21

**validated** 75:22 298:16

**validity** 96:10 141:8 146:3
147:13 148:16 149:21
274:9

**values** 179:4 182:11,14

**Van** 7:1,20 202:22 209:10
220:6 297:21

**Vancouver** 281:15

**variation** 164:23 165:3

**varied** 164:13

**vary** 165:12

**varying** 165:23

**vast** 279:15

**vastly** 138:20

**verb** 214:15

**verifiable** 251:25 252:3

**verify** 254:3 267:16

**versa** 109:10

**verse** 149:1

**version** 56:22,23 149:2

**versions** 155:9

**versus** 27:7 32:23 33:16
124:11 132:18,22 150:17
194:11 223:9 239:5 244:11
255:23 295:16

STACIE RAY vs AMY ACTON                                          Quentin L. Van Meter, M.D.

vice 109:10

victim 276:3,4 277:12

victimized 275:17

victims 274:11 276:15 277:8

video 101:22

videos 47:20 102:5

view 15:4 34:21 48:20 85:20 118:15 142:17 192:20 212:10 223:25

violations 191:20

violence 208:5 281:4,12 282:5

Virginia 27:8 31:20 42:13,14 180:23

virilization 259:3

virilized 54:7,8

visit 59:18 92:23 94:12 95:1 96:18

visits 92:9 96:18,23

voice 57:22 278:2

volume 291:21

voluntarily 226:16

volunteer 133:7 184:18 253:23

volunteered 278:8

Voorhees 111:16

vote 70:11,12 177:1,2

---

**W**

W-PATH 51:15

wait 31:14 33:22 78:6,13 79:13,14,21 108:15,16 113:18 114:8 132:18,22 150:8 219:5 234:14,25 272:8

waiting 33:23

walk 88:23 267:2 269:13

walked 266:18 270:9

walks 81:16

Wallien 164:18 165:6 166:5,18

Walt 280:3

wanted 106:25 109:6 136:23 154:16 156:4,7 158:10 231:21 251:5 268:24 269:1

warn 105:20,21

Washington 45:3

waste 198:24

watch 33:22 108:15,16 113:18 114:8 132:18,22 150:8 272:8

watching 33:23 53:5 269:6

Wayne 292:14

ways 161:16 179:19 254:23

Wear 97:9

wearing 97:7 192:17 218:20

webpage 182:4 185:12

website 49:18 50:22 173:11 182:9 206:2,19 250:13 280:5

websites 49:20 51:3

week 77:8 122:6

weigh 18:12

weight 123:19

welfare 81:19 135:18 175:2 184:16 282:18

well-being 191:16

wellness 14:1

whatnot 100:21 140:21

whatsoever 56:13 63:18 109:17 120:9 127:2 129:18 130:18 156:7 169:21 174:22 175:24 177:17 198:11 277:6

wheels 139:7 176:15

whip 275:15

White 194:12

who'd 71:25

who've 277:24

whoa 122:25 123:1

wife 180:24 288:14

wig 192:12

Williams 226:10

wise 86:18

wishes 264:20

wishing 264:16,17

witch 147:4

withdraw 186:25 262:2,6

witnesses 93:15

woke 14:14

woman 270:6,16 271:20

women 252:7

wonderful 87:22

woodwork 280:1

word 49:24 50:19,22 77:5 158:17 160:25 161:10 169:6,8 190:21,22 200:6,9 214:14,16 216:2 221:22 230:19 242:9 243:17 274:15 277:8,10 280:5

wording 158:15

words 8:8 187:14 238:8

wordy 155:21

work 36:10 39:1 52:8 56:8 60:21 74:13 83:4 87:16 105:1 138:17 140:4 177:13 267:16 293:7

worked 55:19 127:8,13,18 140:19

working 158:8 181:13

workings 176:10

works 138:22 143:24 201:7,10

workup 253:25

world 13:18 15:4 34:21 48:20 52:3 56:4 80:12 85:20 108:5 118:15 142:17 192:20 214:25 276:5,7

world's 87:8 120:5 157:22

worldwide 273:10

worried 282:18

worry 105:8

worrying 151:11

Worth 16:11 17:11

wow 121:10

WPATH 56:5,8 57:23 79:20 124:6 157:23,25 171:19 172:4,17 173:7 230:1 273:10,14,16 291:4

WPATH's 56:15 171:25

wrap 95:12

Writ 285:12

write 30:4 100:24 117:7,24 149:5 181:6 183:6 273:25 287:13

writes 117:4

writing 40:6 60:15 80:10 258:5,16 278:20

written 17:10 27:2,22 67:21 77:23 115:19,23 120:2 226:21 271:14 280:13 293:8

wrong 34:22 124:3 130:16 196:19 221:17,22 246:21 262:23 275:19 279:1 281:22,23

wrote 64:23 65:13 222:6

---

**X**

XO 255:5,7,23

XX 129:2,4,21 130:8,20,22 246:23 247:9,13 257:24

XY 255:5,6,22 257:23

---

**Y**

year 38:16 72:4 78:25 83:22 89:11 100:5,6 101:5 140:18,19 230:5,6 294:20

years 14:5 16:2,19 33:7 41:18 43:12 47:9 54:23 71:8 77:13 81:2 83:25 85:1 86:25 100:4,7 101:7 126:17 135:7 137:19 180:20,22 230:6 266:15 277:25 282:19

yocals 140:8

York 78:24

young 54:11 154:19,25 196:14 197:7,8

younger 94:24

youth 68:15 145:13 150:17

youth's 68:14

youths 152:16

Youtube 47:20

---

**Z**

Zanga 176:5 178:24,25 180:11

Zanga's 179:11

Zucker 33:6 79:18 116:21 117:23 156:8 157:19,20 159:4 160:9,17 166:24 226:21 231:23

Zucker's 111:14 155:22 156:2 161:25 163:2 170:23 227:19