```
                                              Page 1

 1          IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4             ~~~~~~~~~~~~~~~~~~~~~

 5    STACIE RAY, BASIL ARGENTO, JANE DOE,

 6    AND ASHLEY BREDA,

 7                 Plaintiffs,

 8

 9       vs.                Civil Action No.

10                          2:18-CV-00272-MHW-CMV

11    AMY ACTON, IN HER OFFICIAL CAPACITY

12    AS DIRECTOR OF THE OHIO DEPARTMENT

13    OF HEALTH, et al.,

14

15                 Defendants.

16             ~~~~~~~~~~~~~~~~~~~~~

17                 Deposition of

18                 BASIL ARGENTO

19

                   August 29, 2019

20                   11:00 a.m.

21                  Taken at:

          Calfee Halter & Griswold, LLP

22        41 South High Street, Suite 1200

                   Columbus, Ohio

23

24       Kimberly A. Kaz, RPR, Notary Public

25
```

```
                                              Page 2

 1    APPEARANCES:

 2

 3        On behalf of the Plaintiffs:

 4            American Civil Liberties Union of

 5            Ohio Foundation, by

 6            ELIZABETH BONHAM, ESQ.

 7            (via videoconference)

 8            4506 Chester Avenue

 9            Cleveland, Ohio  44103

10            (216) 472-2220

11            ebonham@acluohio.org

12

13        On behalf of the Defendants:

14            Calfee Halter & Griswold, LLP, by

15            JAKE BLAKE, ESQ.

16            41 South High Street, Suite 1200

17            Columbus, Ohio  43215

18            (614) 621-7789

19            jblake@calfee.com

20                   ~ ~ ~ ~ ~

21

22

23

24

25
```

CONFIDENTIAL

Page 3

1                    TRANSCRIPT INDEX

2

3    APPEARANCES..............................    2

4

5    INDEX OF EXHIBITS .......................    4

6

7    EXAMINATION OF BASIL ARGENTO

8    By Mr. Blake............................    5

9    By Ms. Bonham...........................  125

10

11   REPORTER'S CERTIFICATE..................  129

12

13   EXHIBIT CUSTODY

14   EXHIBITS RETAINED BY COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 4

1                  INDEX OF EXHIBITS

2    NUMBER            DESCRIPTION              MARKED

3    Exhibit 6    Birth Certificate............  52

4    Exhibit 9    E-mail Communications........  41

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

1          BASIL ARGENTO, of lawful age,

2   called for examination, as provided by the

3   Federal Rules of Civil Procedure, being by me

4   first duly sworn, as hereinafter certified,

5   deposed and said as follows:

6          EXAMINATION OF BASIL ARGENTO

7   BY MR. BLAKE:

8       Q.    Okay.  Mr. -- is it "Argento" or

9   "Argento"?

10      A.    "Argento."  It's Italian.

11      Q.    "Argento."  It's Italian.

12            Okay.  Could you spell your name

13   for the record, please?

14      A.    Basil, B-a-s-i-l, Argento,

15   A-r-g-e-n-t-o.

16      Q.    Great.  Thank you.

17            And have you ever had your

18   deposition taken before?

19      A.    No.

20      Q.    All right.  So I'm just going to go

21   over a few ground rules, then, just so we can

22   be on the same page regarding how this is going

23   to proceed and so we don't trip over ourselves.

24   So as you know, there's a court reporter here.

25   The court reporter is typing everything I say,

CONFIDENTIAL

1    is going to type everything you say and

2    everything your attorney says, but in order to

3    do that, she needs us to all talk -- well, for

4    us to talk one at a time.  We can't talk over

5    one another.  So when I ask you a question,

6    please wait for me question to finish, and as

7    you answer the question, I'll try to do the

8    same, I'll try to wait until you finish before

9    I ask another question.  Does that make sense?

10        A.    Uh-huh.  Yes.

11        Q.    So you've just brought up the

12   second rule, which is all of your answers need

13   to be oral, auditory.  You can't nod your head

14   because the court reporter can't indicate that

15   on the -- on her transcript, and because things

16   like "uh-huh," "huh-uh" look ambiguous on a

17   transcript, to the extent the answer calls for

18   a "yes" or "no" response, I would appreciate it

19   if you said "yes" or "no" or affirmative or

20   "correct" or something similar.  And if you

21   don't, I may ask you to clarify.

22              The other rule is it's your

23   deposition, so if at any time you want to stop,

24   take a break, get a glass of water, go to the

25   restroom, anything like that, that's perfectly

CONFIDENTIAL

Page 7

1  okay.  The only caveat to that is that if

2  there's a question pending, I'd ask that you

3  finish the question or answer the question

4  before we take a break.  Does that make sense?

5          A.    Yes.

6          Q.    All right.  And just for your

7  information, you know, we've taken two other of

8  the plaintiffs' depositions in this case, and

9  they've each gone three hours or so, and I

10  anticipate that that's probably about the

11  length of time yours will go, okay?

12          A.    Yep.

13          Q.    All right.  So if there are other

14  things that we've missed, we'll sort of learn

15  on the way, but for me, that's about all I have

16  as far as ground rules, so we can kind of

17  proceed into the substantive portion of your

18  deposition, all right?

19          A.    (Nods head.)

20          Q.    "Yes"?

21          A.    Yes.

22          Q.    Okay.  All right.  So I'm going to

23  use several terms, and there's a lot of

24  disagreement about what terms mean in this

25  case.  I just want to make sure you understand

CONFIDENTIAL

Page 8

```
 1   what I mean when I use certain terminology in
 2   this case, okay?
 3        A.   Yep.
 4        Q.   And that's another -- that's
 5   another important point.  If I ask a question
 6   and it's unclear or confusing to you, you need
 7   to tell me because if you answer the question,
 8   I'm going to assume and the record's going to
 9   reflect that you understood the question and
10   you were -- you were answering it, okay?
11        A.   Yes.
12        Q.   So if you need me to clarify, just
13   say so, okay?
14             MS. BONHAM:  And just because we've
15   been through this before, I'm just going to put
16   a standing objection on the record, if I can to
17   the extent that any of the terminology calls
18   for us to accept any of defendants' definition,
19   we don't, and to the extent that any question
20   or use of terminology calls for expert or legal
21   testimony, we'll just put a standing objection
22   on the record, if that's okay with you.
23             MR. BLAKE:  Yeah.  I agree.  You
24   guys can have your standing objection, and I
25   would appreciate it if we treated it that way
```

CONFIDENTIAL

1   and so it wouldn't be necessary, then, to

2   object on that grounds at every question.

3          Q.    Okay.  So the first term is "ODH,"

4   and that generically stands for the Ohio

5   Department of Health, which is one of the

6   defendants in this case.  You know that, right?

7          A.    Yes.

8          Q.    And when I refer to "ODH," because

9   there's multiple defendants that have been

10  sued, I'm referring to all of them.  So do you

11  understand that?

12         A.    Yes.

13         Q.    To the extent I need to refer to

14  any one of the defendants as an individual or

15  in their individual capacity, I'll let you

16  know.  I'll make that clear on the record,

17  okay?

18         A.    Yes.

19         Q.    All right.  The term "transgender,"

20  "transgendered," "transgenderism" or any

21  related term is someone whose gender identity

22  does not align with their birth or biological

23  sex.  When I use that term or terms, that's

24  what I mean.  Do you understand that?

25         A.    I understand that you think that's

CONFIDENTIAL

Page 10

1    what that means.

2         Q.    And we'll get into what your

3    definition is during the deposition, okay?

4              And then "cisgendered" is someone

5    whose gender identity aligns with their birth

6    or biological sex.  Do you understand that's

7    what I mean when I use that term?

8         A.    I understand that's what you mean.

9         Q.    Okay.  All right.  Mr. Argento,

10   what is your address?

11         ████    ████  ████  ████  ████

12   ████  ████

13         Q.    And how long have you lived there?

14         A.    Moved in July 2nd of this year.

15         Q.    And where did you live before that?

16         A.    In Columbus.

17         Q.    Where did you live in Columbus?

18         A.    Think of my address.

19         Q.    I don't need the address, but, you

20   know, just part of town.

21         A.    ████  ████  ████  ████  ████

22   ████

23         Q.    When you said "we," who did you

24   live with?

25         A.    My husband.

CONFIDENTIAL

1      Q.    And did your husband move out to
2  Colorado with you?
3      A.    Yes.
4      Q.    What's his name?
5      A.    ████ ████
6      Q.    ████ █ ███ ████ ██████
7      A.    ████████
8      Q.    How long have you been married?
9      A.    Two years approximately.
10     Q.    So married approximately 2017?
11     A.    Yeah.  ████ ████ ████
12     Q.    And before you were married, did
13  you have a relationship with ██ ████
14     A.    Yes.
15     Q.    I mean, would you -- would you call
16  it, like, a dating relationship?  Were you guys
17  a couple?
18     A.    Yes.
19     Q.    How long were you guys together
20  before you got -- before you were married
21  approximately?
22     A.    Between three and four years.
23     Q.    And so you started seeing
24  ██ ████ sometime 2013, 2014.  Is that about
25  right?

Page 12

1          A.      That's about right, yeah.

2          Q.      And how long have you lived with

3    ██████  ████████      approximately?

4          A.      Around three -- I would say three,

5    three-and-a-half years.

6          Q.      Okay.  So you met him and things

7    were going well.  You guys moved in together

8    pretty soon thereafter?

9          A.      Uh-huh.

10         Q.      "Yes"?

11         A.      Yes.

12         Q.      Okay.  All right.  What is your --

13   what's your highest level of education?

14         A.      I have a Bachelor's degree, and I

15   am currently pursuing my Master's.

16         Q.      Is that a Bachelor's of Arts or a

17   Bachelor's of Science?

18         A.      Bachelor of Arts.

19         Q.      What was your Bachelor of Arts in?

20         A.      Psychology.

21         Q.      And when did you -- when did you

22   obtain the degree?

23         A.      2010.

24         Q.      From what institution did you

25   obtain the degree?

Page 13

1          A.     Columbia College.

2          Q.     Is that an online university or

3     where is that university located?

4          A.     They're in Missouri.  They also

5     have online.

6          Q.     And did you take the classes

7     remotely?

8          A.     Yes.

9          Q.     When did you start taking classes

10    at Columbia College?

11         A.     Probably about a year before I

12    graduated.  I had transferred and had credits.

13         Q.     So you started taking classes at

14    Columbia College in 2009, right?

15         A.     Approximately.

16         Q.     And it took you a year or so to

17    complete your Bachelor's of Arts in psychology;

18    is that right?

19         A.     Yes.

20         Q.     And you said you had some transfer

21    credits.  Where did you obtain those credits?

22         A.     Oh, about ten different schools

23    over ten or 15 years.

24         Q.     So you started taking college

25    classes in the late '90s, mid-'90s or so.  Does

1    that sound about right?

2         A.    Yes.

3         Q.    And you -- it wasn't, like, one

4    continuous course of study, you -- you changed

5    schools throughout that time, right?

6         A.    Yes.

7         Q.    Were those schools all online

8    schools or were some of them brick and mortar?

9         A.    Some were brick and mortar.

10        Q.    Okay.  And I don't intend to go

11   through all ten or so schools over the last ten

12   or 15 years, but in general, what -- what was

13   the reason why you decided to leave or stop

14   attending the various schools?

15        A.    I mean, there were lots of

16   different reasons at different times in my

17   life.  The first one, I was, you know, dealing

18   with the transition and I was poor.

19        Q.    So at least with regard to some of

20   them, it was issues related to your gender

21   transition, right, and then --

22        A.    Yes.

23        Q.    And then other times, it had to do

24   with, you know, not having the finances to

25   continue on with your education at that time,

CONFIDENTIAL

Page 15

1   right?

2        A.    Yes.

3        Q.    Okay.  But you stuck with it and

4   eventually obtained your degree in 2010?

5        A.    Yes.

6        Q.    Okay.  And you said now you're

7   pursuing a Master's degree?

8        A.    Yes.

9        Q.    When did you start pursuing your

10  Master's degree?

11       A.    About a year and a half ago.

12       Q.    So 2018, 2017-ish?

13       A.    Yeah.  Yes.

14       Q.    And from what institution are you

15  seeking your Master's degree from?

16       A.    Adams State University.

17       Q.    And is the Master's degree also in

18  psychology?

19       A.    It's in clinical mental health

20  counseling.

21       Q.    Is that a branch of psychology?

22       A.    I mean, that depends on your

23  opinion.  It's focused on counseling as a

24  profession.

25       Q.    Is a psychology degree required

1   before you can take a Master's course in

2   clinical mental health counseling?

3         A.    No.

4         Q.    Is it common?

5         A.    As far as I understand, there's

6   people from many different backgrounds that

7   change to get a Master's in that, in that

8   specialty.

9         Q.    Is Adams State another online

10  university or is that one located in Colorado

11  somewhere?

12        A.    It's located in Colorado and they

13  also have online classes.

14        Q.    Do you attend classes in person or

15  do you do them online?

16        A.    I do most of them online, but I go

17  in the summer to face-to-face courses.

18        Q.    When you anticipate graduating?

19        A.    July 2020, I believe.

20        Q.    All right.  What is your current

21  employment?

22        A.    I'm not employed.

23        Q.    You're unemployed?

24        A.    I just go to school right now.

25        Q.    Is there a reason why you only do

CONFIDENTIAL

Page 17

1  the in-person classes during the summer as

2  opposed to all year?

3        A.    That's how the program's set up.

4        Q.    As part of your coursework in

5  clinical mental health counseling, has there

6  been any additional coursework or special

7  emphasis on issues or gender or sex?

8        MS. BONHAM:  Objection.  We've been

9  through a long line of questioning now about

10  his educational background, and I want to

11  clarify for the record that he's not testifying

12  as an expert and he's not going to testify as

13  an expert, he's testifying only on his personal

14  experience, and so his education related to the

15  issues in the case is irrelevant.  Go ahead.

16        THE WITNESS:  There's not been a

17  class in the Master's program.

18        Q.    What about when you obtained your

19  Bachelor of Arts in psychology, was there any

20  special class or coursework or course of study

21  that was directed towards issues relating to

22  sex or gender?

23        MS. BONHAM:  Same objection.  Go

24  ahead.

25        THE WITNESS:  Yeah.  Yes, I believe

CONFIDENTIAL

1  there was a general sexuality course.

2       Q.    You said there was a general

3  sexuality course?

4       A.    I believe so, yeah.

5       Q.    Did you take that class?

6       A.    Yes.

7       Q.    Did that course talk about gender

8  and gender identity and gender issues?

9            MS. BONHAM:  Same objection.

10            THE WITNESS:  This has been -- it's

11  been a long time ago, and what I believe is it

12  was very briefly talked about as far as

13  transgender.

14       Q.    So you recall taking a general

15  sexuality course as part of your Bachelor's of

16  Arts when you were studying psychology, right?

17       A.    Yes.

18       Q.    And although it was several years

19  ago, you do recall that there was at least

20  some -- some small amount of discussion

21  regarding transgender issues.  Is that your

22  recollection?

23       A.    Yes.

24       Q.    Approximately how long ago did you

25  take the general sexuality course during your

CONFIDENTIAL

Page 19

1  studies?

2       A.    If I had to guess, probably six to

3  eight years ago.

4       Q.    Was that the only coursework you

5  took in either your Bachelor of Arts or

6  Master's programs that looked at transgender

7  issues?

8            MS. BONHAM:  Objection.  Asked and

9  answered.  Continuing objection to the

10  questions that seem to get at expert testimony.

11  Go ahead.

12            THE WITNESS:  I honestly -- I think

13  one or two classes, they may have, like,

14  briefly mentioned it in a paragraph, but

15  nothing extensive.

16       Q.    Is it your understanding that sex

17  and gender are different?

18            MS. BONHAM:  Objection.  Calls for

19  expert testimony.  Go ahead.

20            THE WITNESS:  It's a very complex

21  topic, and I don't think you can say something

22  like that and have it be accurate, no.

23       Q.    So you believe that sex and gender

24  are the same?

25            MS. BONHAM:  Same objection.

CONFIDENTIAL

1    Misstates testimony.

2              THE WITNESS:  It's a very complex

3    thing.  You can't just, like, make a blanket

4    statement like that, in my opinion.

5         Q.    So it's your -- your understanding

6    of the difference between sex and gender is

7    that it's a complicated question and you

8    can't -- you can't definitively say one way or

9    the other whether they're the same?

10             MS. BONHAM:  Objection.  Misstates

11    testimony.  Foundation.  Go ahead.

12             THE WITNESS:  My opinion, it's a

13    very complex personal issue for each person to

14    decide for themselves.

15         Q.    And have you -- have you reached a

16    decision on that -- on that complicated issue?

17         A.    For me, myself, my sex and gender

18    are the same.

19         Q.    And on what basis have you

20    concluded that your sex and gender are the

21    same?

22         A.    I'm not sure how to answer what

23    basis.  This is just my reality.

24         Q.    It's just what you believe?

25             MS. BONHAM:  Objection.

CONFIDENTIAL

Page 21

1                THE WITNESS:  It's the reality that

2    I live with, yes.

3         Q.    You're not a medical doctor, right?

4         A.    No.

5         Q.    And you don't consider yourself an

6    expert on a person's biological sex, right?

7         A.    I'm only an authority for my own

8    life, as is each individual person.

9         Q.    So that's a no, you don't consider

10   yourself an expert on a person's biological

11   sex?

12        A.    I'm not an expert on another person

13   outside of myself.

14        Q.    Do you understand from a medical

15   perspective how a person's sex is determined?

16             MS. BONHAM:  Objection.  Calls for

17   expert testimony.  Go ahead.

18             THE WITNESS:  You'd have to restate

19   your question.  That question does not compute.

20        Q.    Sure.  From a medical perspective,

21   do you know how a person's sex can be

22   determined?

23        A.    You're asking me to believe in a

24   whole system of thought that I don't believe

25   in.

CONFIDENTIAL

1      Q.    Do you believe that medical

2   professionals are capable of determining

3   someone's sex?

4           MS. BONHAM:  Objection.  Calls for

5   expert testimony.  Foundation.  Calls for

6   speculation.  Go ahead.

7           THE WITNESS:  Could you repeat the

8   question?

9      Q.    Yeah.  I'm asking whether or not

10  you personally believe whether the medical

11  profession is capable of determining a person's

12  biological sex.

13          MS. BONHAM:  Same objection.

14          THE WITNESS:  Biology is quite

15  misunderstood.  The biological idea that gender

16  can be determined by, you know, things, is -- I

17  do not believe that is correct, no.

18     Q.    You don't believe that medical

19  professionals using science, using biology can

20  determine a person's gender.  Is that what your

21  belief is?

22          MS. BONHAM:  Objection.  Misstates

23  testimony.  Calls for expert testimony.

24          THE WITNESS:  There have been many

25  scientific studies showing there's not just

CONFIDENTIAL

1    genetics.  It's very complex stuff.  It's not

2    something simplistic.

3         Q.    I understand you believe it's

4    complicated, but my question was a little

5    different.  My question was whether or not you

6    believe -- you said gender, whether you believe

7    gender can be determined using biology and

8    science.

9              MS. BONHAM:  Objection.  Vague.

10   Asked and answered.  Calls for expert

11   testimony.

12             THE WITNESS:  I believe that each

13   individual person can determine and tell you

14   their gender.

15        Q.    But that a medical doctor can't

16   tell you your gender?

17             MS. BONHAM:  Objection.  Vague.

18   Misstates testimony.  Continuing objection to

19   calls for expert testimony.

20             THE WITNESS:  When you're asking me

21   about an individual doctor, I could possibly

22   answer that question.  A particular doctor

23   might be able to, another doctor might not be

24   able to.

25        Q.    Do you have an understanding of how

CONFIDENTIAL

1  a particular doctor would be able to determine

2  someone's gender?

3              MS. BONHAM:  Objection.  Calls for

4  expert testimony.

5              THE WITNESS:  By asking.

6      Q.    Any other ways besides just asking

7  them?

8      A.    No other ways are necessary.

9      Q.    I didn't ask you whether or not

10  they were necessary, sir, I asked you whether

11  or not you were aware of any other methods

12  besides simply asking somebody.

13              MS. BONHAM:  Same objection.

14              THE WITNESS:  No.  I do not think

15  that's necessary, no.

16      Q.    And then what about a particular

17  doctor's ability to determine someone's

18  biological sex, are you aware of the ways in

19  which a medical doctor might be able to do

20  that?

21              MS. BONHAM:  Objection.  Calls for

22  expert testimony.  Objection to the term

23  "biological sex."

24              THE WITNESS:  Well, you're saying

25  biological sex as a way to determine someone's

CONFIDENTIAL

1 gender, which I don't want -- I don't see why

2 we're bringing that up.

3          Q.    So did you -- I don't think I heard

4 an answer in there.  I think I heard you say

5 something about what you were inferring from my

6 question, so let me re-ask it.

7                Do you have an understanding of how

8 a medical professional could determine

9 someone's biological sex?

10                MS. BONHAM:  Same objection.  Calls

11 for speculation.  Vague.

12                THE WITNESS:  No, I don't.  I do

13 not believe that that's a possibility.

14          Q.    You don't know if it's possible to

15 determine someone's biological sex from a

16 medical perspective, or you don't have an

17 understanding of how they -- they make that

18 determination?

19                MS. BONHAM:  Objection.  Asked and

20 answered.  Calls for expert testimony.  He's

21 asked you whether or not you can think of how.

22                THE WITNESS:  It's a loaded

23 question.  You know, you're asking me to accept

24 your definition.

25          Q.    I haven't asked you to accept a

CONFIDENTIAL

1  definition, I've asked you simply to say

2  whether or not you're aware of ways in which a

3  medical professional can or does determine

4  someone's biological sex.

5           MS. BONHAM:  Objection.  Vague.

6  Asked and answered.

7           THE WITNESS:  Again, you're asking

8  me to accept that that is the reality, that

9  somebody could -- you're asking me if I have an

10  understanding of something that I don't

11  believe.

12      Q.    You don't believe that there's such

13  a thing as biological sex?

14      A.    Correct.

15           MS. BONHAM:  Objection to the term

16  "biological sex."

17           THE WITNESS:  Yes.

18      Q.    Do you believe that there's such a

19  thing as gender?

20      A.    That's another really complicated

21  thing.  I mean, I believe in gender.

22      Q.    You believe in gender?

23      A.    As a range, not in a black or white

24  way.

25      Q.    You don't view gender as an

1    either/or construct; is that correct?

2         A.    Yes.

3         Q.    You believe gender -- or you

4    believe gender is a spectrum; is that fair?

5         A.    Yes.

6         Q.    Are -- is it fair to say the ends

7    of the spectrum for gender are one end male and

8    one end female, or is that not a fair

9    characterization?

10               MS. BONHAM:  Objection.  Vague.

11    Calls for expert testimony.  Calls for

12    speculation.

13               THE WITNESS:  That's -- I mean,

14    that's up to each individual person, how they

15    view gender.

16         Q.    Well, what is your belief?

17         A.    I can only speak for myself, and

18    I'm male, and that's all I can say about that.

19         Q.    I guess I was asking you about your

20    belief about the spectrum.  I wasn't asking

21    about what your belief about your gender is, I

22    was asking you about your belief about the

23    spectrum and whether or not you believe that

24    one end of the spectrum is male and the other

25    end of the spectrum is female.  That's all I

CONFIDENTIAL

Page 28

1   was asking.

2        A.    I mean, you can make any number of

3   models for how it could possibly work.  I don't

4   see any value in creating a specific --

5        Q.    So you don't necessarily agree that

6   the spectrum would be male to female, right?

7        A.    No.

8        Q.    You think it could be any number of

9   different ways to characterize the ends of that

10  spectrum, not necessarily male and female?

11       A.    Yes.  It's up to each person how

12  they view gender.

13       Q.    Okay.  And so my question to you

14  was how do you personally view it.  You agreed

15  with my characterization of it as a spectrum,

16  and I was just wondering how you viewed -- in

17  your view, how you viewed that spectrum.

18            MS. BONHAM:  Objection.  Calls for

19  speculation.  Calls for expert testimony.

20            THE WITNESS:  I view people as

21  individuals, and they can tell me their gender

22  or how they feel about it or their model of

23  what the gender or whatever you want to call it

24  looks like.

25       Q.    Do you believe biological sex is on

CONFIDENTIAL

1  a spectrum?

2           MS. BONHAM:  Objection.  Calls for

3  expert testimony.  Continuing objection to the

4  term "biological sex."

5           THE WITNESS:  Biological sex,

6  that's just -- it's a concept, you know, and

7  it's a concept that I don't believe is correct.

8      Q.    But like you said before, you're

9  not a medical doctor, so you don't consider

10 yourself an expert on biological sex, right?

11     A.    Of course not.

12     Q.    And you don't consider yourself an

13 expert on gender either, do you?

14     A.    Of course not.  I'm only an expert

15 in my own life.

16     Q.    And you haven't received any

17 certifications or degrees regarding sex and

18 gender, right?

19     A.    No.

20     Q.    You haven't published any papers

21 regarding sex and gender, right?

22     A.    No.

23     Q.    And you haven't given any talks or

24 presentations on the topics of sex and gender,

25 right?

CONFIDENTIAL

Page 30

1      A.    No.

2      Q.    Do you believe birth certificates

3  are a form of identification?

4      A.    Yes.

5      Q.    Do you believe that birth

6  certificates reflect biological data that

7  exists at the time of birth?

8      A.    Some of it, yes.

9      Q.    Okay.  Do you know whether the

10  information on a birth certificate is recorded

11  by the individual whose birth record is

12  reflected or by the Ohio Department of Health?

13      A.    The Ohio Department of Health is --

14  issues birth certificates and has control over

15  them.

16      Q.    It's not the responsibility of the

17  individual who was just born to, you know, fill

18  in or fill out their birth certificate, right?

19      A.    Of course not.

20      Q.    And at the time that the birth

21  certificates are made, does the individual have

22  any control over what information is recorded

23  or displayed on the birth record?

24      A.    Of course not.

25      Q.    And the individual doesn't certify

1    or attest to the accuracy of the birth record,
2    right?
3              MS. BONHAM:  Objection.
4              THE WITNESS:  Of course not.
5         Q.    It's ODH that certifies the
6    accuracy of the birth record, right?
7         A.    Yes.
8         Q.    Do you hold yourself as a
9    transgendered to the public?
10        A.    That's a complicated matter.  I am
11   out in some circumstances and not in others.
12        Q.    What circumstances are you out in?
13        A.    With family and friends and with
14   other trans people, especially trans youth and
15   in my counseling practice.
16        Q.    Do you have a counseling practice?
17        A.    Yes.  I just began it.
18        Q.    Oh, 'cause earlier, you said you
19   were unemployed.  Is that until recently you've
20   been unemployed?
21        A.    I just -- well, I just signed the
22   lease for my office space, so I haven't started
23   yet.  Will be shortly.
24        Q.    In the next week or two or --
25        A.    Probably in about two weeks, yeah.

CONFIDENTIAL

Page 32

1      Q.    Did you have a counseling practice

2  before that?

3      A.    I had a practicum.

4      Q.    What is a practicum?

5      A.    It's where you work under another

6  professional.

7      Q.    Counseling professional?

8      A.    Yes.

9      Q.    And when did you leave there?

10     A.    May of last year.

11     Q.    May of 2018?

12     A.    May of this year.

13     Q.    May of 2019.  And that was in

14  Denver?

15     A.    That was in Columbus, Ohio.

16     Q.    Oh, that's right, 'cause you just

17  moved in July, right?

18     A.    Yes.

19     Q.    Who did you work for in Columbus,

20  Ohio?

21     A.    I have to look up her name.  I

22  can't think of her name right now.

23     Q.    How long did you work there?

24     A.    Five months.

25     Q.    And what kind of counseling did you

CONFIDENTIAL

Page 33

```
 1   do there?
 2         A.    I counseled many different kinds of
 3   clients, and then I also counseled people in
 4   the -- in the substance abuse program we had
 5   there.  I remember her name.  It's ████████
 6   ████████ .
 7         Q.    And then otherwise, it was just
 8   general counseling?
 9         A.    Yes.
10         Q.    How long did you do that for?
11         A.    It was about five months.
12         Q.    Oh, I think I asked you that.
13               Before that, were you employed as a
14   counselor anywhere else or --
15         A.    No.
16         Q.    Did you have any other form of
17   employment prior to that?
18         A.    In my life?
19         Q.    Well, just in the last few years.
20         A.    I have a few websites that I
21   created that I sell merchandise from.
22         Q.    So you were selling things online?
23         A.    Yes.
24         Q.    Like, through Pinterest or
25   something like that?
```

Page 34

```
 1         A.    Did you say Pinterest?

 2         Q.    Yeah.

 3         A.    Oh, no.  Just -- just my own

 4   website.  It wasn't on another --

 5         Q.    It wasn't hosted by anybody?

 6         A.    No.

 7         Q.    What kind of things did you sell?

 8         A.    On my main website, I sell, you

 9   know, like, gender and sexuality products for

10   transgender men.

11         Q.    Like, personal care products or

12   clothing?  Like, what are you talking about?

13         A.    Sexuality-related products.

14         Q.    Okay.  Do you still operate that

15   website?

16         A.    It still exists, but I don't

17   have -- I haven't had time to work on it, so...

18         Q.    Okay.  You said that it was more

19   than one.  What other kinds of -- what other

20   kinds of websites did you sell things on?

21         A.    They were basically other -- other

22   sexuality-related items, but not specifically

23   for transgender people.

24         Q.    When you say "sexuality products,"

25   are you referring to, like, items used during
```

CONFIDENTIAL

Page 35

1   sex or during intimate moments, things like

2   that?

3          A.    Yes.

4          Q.    Okay.  I just -- it wasn't clear to

5   me.

6                All right.  While we're on the

7   topics, and you don't have to pull these out,

8   but these are the interrogatories and discovery

9   requests that were served in this case.  Do you

10  recall providing your counsel with information

11  so that those could be answered and returned to

12  me?

13         A.    Yes.

14         Q.    Okay.  So in response to one of

15  the -- well, one of the interrogatories called

16  for social media accounts and things of that

17  nature.  Do you recall that?

18         A.    Yes.

19         Q.    And in response to that, you -- you

20  identified an Instagram page called "Eat

21  Me Organic."  Does that ring a bell?

22         A.    Yes.

23         Q.    And I went on the page, and it

24  looked like a baked goods store or some sort of

25  advertisement for baked goods; is that

CONFIDENTIAL

1   accurate?

2          A.    Yes.

3          Q.    All right.  So is that another one

4   of the things that you sell and market online,

5   or is that kind of a defunct website?

6          A.    It's defunct now.  It was a project

7   I did for probably three or four months.

8          Q.    That was something you were doing

9   in Ohio?

10         A.    Yes.

11         Q.    Okay.  So besides the gender

12  sexuality products, the baked goods, anything

13  else you can recall selling online, or is that

14  the landscape?

15         A.    Yeah.  That's it as far as online.

16         Q.    Okay.  What about not online, did

17  you ever sell anything, like, in a storefront

18  or out of your house or anything?

19         A.    I mean, the -- the cookie business

20  was in person.  I would go to festivals.

21         Q.    Okay.  All right.  We were talking

22  about the number of people that you were,

23  quote/unquote, out with regarding your status

24  as a transgendered person.  You identified

25  family, friends, other trans people and folks

CONFIDENTIAL

Page 37

1  that you were counseling; is that accurate?

2      A.   Yes.  Not all clients that I

3  counsel, but some.

4      Q.   Okay.  Is there anything particular

5  that would cause you to reveal that information

6  during a counseling session?

7      A.   Yes.  I would reveal that during

8  counseling for someone who is transgender or

9  gender questioning.

10     Q.   Okay.  Was that a -- was that a

11  large number of your clients?

12     A.   Maybe a third.

13     Q.   How many people would you say

14  you've disclosed or revealed your transgender

15  status to?

16     A.   How many people, like, in my life?

17     Q.   Yeah.

18     A.   I have no idea.  How could I

19  possibly -- I mean, it's been -- I

20  transitioned --

21     Q.   I'm sorry.  You said you

22  transitioned when what?

23     A.   When I was pretty young.  I don't

24  know how many people's been told.

25     Q.   Would you say it's in the hundreds?

Page 38

1      A.     Probably not hundreds, no.

2      Q.     Greater than 50?

3      A.     Yeah.

4      Q.     Somewhere between 50 and a hundred

5   people; is that fair?

6      A.     As far as I can guesstimate.

7      Q.     You don't keep a running list,

8   right?

9      A.     Of course not.

10      Q.     Do you know how many people have

11   found out about your transgendered status due

12   to your birth certificate?

13      A.     Maybe around ten, but they're not

14   people I've chose to disclose to, I was forced

15   to.

16      Q.     Has the disclosure of your birth

17   certificate ever led to bodily harm?

18      A.     Bodily harm, no.

19      Q.     Those ten people or so that you've

20   disclosed your birth certificate to that's led

21   to the revelation of your transgendered status,

22   have those all been people that have been in

23   connection with some sort of state or federal

24   government agency?

25      A.     Yes.

CONFIDENTIAL

Page 39

1        Q.    You used to be a Buckeye, at least.
2    You no longer are, but I'm sure that you're
3    familiar with the Pride festival in Columbus;
4    is that fair?
5        A.    Yes.
6        Q.    And you would agree that it's a
7    celebration of a lot of things, but one of
8    those things is transgendered individuals,
9    right?
10        A.    It should be.  It is not always.
11        Q.    Okays.  In your experience, though,
12    has that celebration included transgender
13    celebration and -- well, celebration of
14    transgendered people?
15        A.    Usually, yes, at least in small
16    part.
17        Q.    Have you ever participated in the
18    Pride festival?
19        A.    I've attended it.
20        Q.    Okay.  What about in Colorado, is
21    there a similar festival out there?
22        A.    Probably.
23        Q.    You just -- you don't know, you
24    haven't been there long enough?
25        A.    Right.

CONFIDENTIAL

Page 40

1      Q.    And if there is, is it your intent

2   to participate in the future?

3      A.    Yes.

4      Q.    The fact that you're a

5   transgendered person doesn't humiliate you,

6   does it?

7            MS. BONHAM:  Objection.

8            THE WITNESS:  My status as

9   transgender is very personal, and it does not

10  humiliate me in itself, what's humiliating is

11  how people have treated me, particularly these

12  government officials once I've been forced to

13  disclose.

14     Q.    Okay.  And being transgendered

15  isn't something that you're ashamed about,

16  right?

17     A.    No.

18           MS. BONHAM:  Objection.

19           THE WITNESS:  No, I'm not.

20     Q.    You're proud of your status as a

21  transgendered person, right?

22     A.    Yes.

23     Q.    And it's fair to say that you're so

24  proud of that transgendered status, that you're

25  happy to share your story about being

CONFIDENTIAL

Page 41

1    transgendered with anyone who's willing to

2    listen; isn't that right?

3              MS. BONHAM:  Objection.

4    Argumentative.  Misstates testimony.

5              THE WITNESS:  That's absolutely

6    incorrect.

7         Q.    You said that --

8         A.    It's absolutely incorrect.  I'm not

9    happy to share it with just anyone.  It's very

10   personal and I've had very, very bad

11   experiences with certain people.

12        Q.    I'm going to ask you to take a look

13   at Exhibit 9, Defendants' Exhibit 9, which your

14   counsel should have.

15                   -  -  -  -  -

16             (Thereupon, Deposition Exhibit 9,

17             E-mail Communications, was marked

18             for purposes of identification.)

19                   -  -  -  -  -

20             MS. BONHAM:  I'm just going to put

21   on the record, so this is a video deposition.

22   Opposing counsel has e-mailed us the exhibits

23   that he intends to use, and we'll put them up

24   on an adjacent screen here during the

25   deposition.  So you said Exhibit 9?

CONFIDENTIAL

Page 42

1          MR. BLAKE:  Yes, Exhibit 9.  Let me
2    know when you have it on the screen.
3          MS. BONHAM:  All right.  We're
4    ready.
5      Q.    Defendants' Exhibit 9 is a group
6    exhibit of e-mails that was provided by counsel
7    in response to some of our document requests.
8    Mr. Argento, do you, at least on the top page,
9    recognize this document?
10      A.    Yes.
11      Q.    Okay.  And if you could turn to --
12    and at the bottom -- well, at the bottom are a
13    sear of Bates numbers.  The first page is Bates
14    numbered 000026.  Do you see that?
15      A.    Yes.
16      Q.    And if you could turn to Bates
17    No. 41, 000041, and let me know when you're
18    there.
19      A.    Yes.
20      Q.    At the bottom of -- I guess, the
21    middle is an e-mail from a woman named Alana
22    Jochum.  Do you see that?
23      A.    Yes.
24      Q.    And Alana Jochum has an e-mail
25    address that indicates that she is affiliated

Page 43

```
 1   with qualityohio.org.  Do you see that?
 2        A.    Yes.
 3        Q.    Are you familiar with the
 4   organization qualityohio.org?
 5        A.    Yes.
 6        Q.    And if you look over to the right,
 7   there's a date of Wednesday, July 27th, 2016.
 8   Do you see that?
 9        A.    Yes.
10        Q.    And according to this e-mail, at
11   that date and time, she sent you, among others,
12   an e-mail to an account,
13   ████████████████████████.  Do you see that?
14        A.    Yes.
15        Q.    Is ████████████████████  your
16   e-mail address?
17        A.    Yes.
18        Q.    Is it still your e-mail address?
19        A.    Yes.
20        Q.    Okay.  And do you recall receiving
21   this e-mail or at least communicating with
22   Ms. Jochum or about --
23        A.    Yes.
24        Q.    -- Wednesday, July 27th, 2016?
25        A.    Yes.
```

CONFIDENTIAL

Page 44

1    Q.    Okay.  And as far as you can tell,
2  is there a true and accurate copy of that
3  e-mail correspondence?
4    A.    Yes.
5    Q.    All right.  If you look down to the
6  middle paragraph in this e-mail, and it begins
7  with the sentence "Of Course..."  Do you see
8  that?
9    A.    Yes.
10    Q.    And she says:  Of course, we will
11  continue to change the policy here causing this
12  issue in the first place.
13          Do you see that?
14    A.    Yes.
15          MS. BONHAM:  Objection.  That
16  slightly misstates document.  It reads:  Of
17  course, we will continue to work to change the
18  policy here.
19    Q.    Causing this issue in the first
20  place!  Right?  I tried to read it accurately,
21  and it's probably the additional buffer of
22  technology that we have between us maybe cuts
23  out.  So I'm not going to misread anything
24  that's quoted directly in front of us, at least
25  not intentionally.

CONFIDENTIAL

Page 45

1          Okay.  So we all agree what it says

2    now.  My question is:  What was your

3    understanding of the issue she was referring to

4    in that -- in that sentence?

5          A.    The issue is that I was trying to

6    get my Italian citizenship recognized, and they

7    were giving me a lot of difficulties because of

8    the fact that my Ohio birth certificate said

9    the wrong gender on it.

10          Q.    Okay.  And that issue was related

11    to your status as a transgendered person,

12    right?

13          A.    Yes.

14          Q.    Okay.  That same day, you

15    responded, and if we go to the e-mail below

16    that, it's an e-mail before you back to

17    Ms. Jochum and others.  Do you see that e-mail?

18          A.    Yes.

19          Q.    And you respond:  Alana, I would be

20    happy to share my story in any way that is

21    helpful, and I am grateful for your assistance

22    with this issue.

23          Do you see that?

24          A.    Yes.

25          Q.    So at least with regards to what

CONFIDENTIAL

1   Ms. Jochum was talking about, you were happy to

2   share your story with anyone, right?

3           A.    Not with anyone.  I'm happy to

4   share my story in a way that would help fix

5   this terrible problem that we're discussing

6   here today.

7           Q.    Okay.  So you would share your

8   story in any way that would help fix that

9   problem, but not necessarily to anyone; is that

10  accurate?

11          A.    Yes.

12          Q.    Okay.  Let's go to Bates No. 69,

13  000069.  Let me know when you're there.  It's

14  about four pages from the back of the document.

15          A.    Okay.

16          Q.    Okay.  This is another e-mail

17  correspondence with Ms. Jochum, right?

18          A.    Yes.

19          Q.    And this one occurred on or about

20  April 6th, 2017.  Do you see that?

21          A.    Yes.

22          Q.    And like the other one, as far as

23  you're aware, is there a true and accurate copy

24  of the e-mail correspondence you had with

25  Ms. Jochum on or about that date?

CONFIDENTIAL

Page 47

1      A.    Yes.

2      Q.    And if you look at --

3            MS. BONHAM:  That's April 2017.  I

4  realize, Jake, you're trying to read this

5  accurately, and I just want to make a good

6  record on the transcript.

7            MR. BLAKE:  Yeah.  What did I say?

8            MS. BONHAM:  2016.

9            MR. BLAKE:  Well, 2017 it is.

10     Q.    So if you look at the last full

11  e-mail on April 6th, 2017 at 3:54 p.m. from

12  Ms. Jochum, do you see that?

13     A.    Yes.

14     Q.    And she says:  Would you be willing

15  to share your story about this process and the

16  hurdles you had to go through due to the fact

17  that Ohio does not have a clear process to

18  correct a person's gender marker on their birth

19  certificate?

20            Did I read that accurately?

21     A.    Yes.

22     Q.    And then you responded a few

23  minutes later:  I would love to.  Nothing I

24  would love more than to have that happen in

25  this state.  Thank you for all your efforts.

CONFIDENTIAL

1          Do you see that?

2     A.    Yes.

3     Q.    So it's accurate to say you were

4  more than willing to share your story, to tell

5  people, to let people know about this -- this

6  transgender issue that was impacting you and

7  others, right?

8     A.    Well, let me be clear.  I would not

9  choose to be doing this if it wasn't so

10  important.  In this context, I am willing to do

11  this, and it's in invasive and it's

12  uncomfortable.  I don't want to be doing it,

13  but transgender people are marginalized and at

14  risk and young trans people die of suicide,

15  and, therefore, I'm here.

16     Q.    So is that a "yes"?

17     A.    Yes.

18     Q.    And have you, in fact, been sharing

19  your story with others?

20          MS. BONHAM:  Objection.  Vague.

21          THE WITNESS:  I mean, can you

22  restate that?

23     Q.    Sure.  You -- you promised

24  Ms. Jochum that you would be happy to share

25  your story with others.  Have you, in fact,

CONFIDENTIAL

Page 49

1  done that since you made that promise in
2  April 2017 and at other times?
3      A.    Okay.  So you're asking me if I did
4  in that specific instance.  She never contacted
5  me further about doing so.  I would have, but I
6  didn't -- I wasn't asked.
7      Q.    What about with others besides
8  people affiliated with Quality Ohio and
9  Ms. Jochum?
10     A.    Of course I've told certain people
11  about parts of my life.
12     Q.    So other than your communications
13  with your counsel here, have you worked with
14  any other organizations or advocacy groups
15  trying to get your story out and talk about the
16  issues that we're talking about today in this
17  case?
18     A.    No.
19     Q.    One of the claims in the complaint
20  is that the -- that ODH discriminates against
21  transgendered people because they are not
22  permitted to change the sex identifier on their
23  birth certificate, right?
24     A.    Yes.
25     Q.    Are you aware of any laws in Ohio

CONFIDENTIAL

Page 50

1    related to birth certificates that mention

2    transgender individuals?

3                MS. BONHAM:  Objection.  Calls for

4    a legal conclusion.

5                THE WITNESS:  I mean, I don't know

6    any specifics about laws.

7         Q.    So are you aware of any laws in

8    Ohio related to birth certificates that make

9    any mention to gender?

10               MS. BONHAM:  Same objection.

11               THE WITNESS:  No.

12        Q.    Do you know whether Ohio laws

13   permit anyone, regardless of gender, to change

14   their sex marker on their birth certificate?

15               MS. BONHAM:  Objection.  Vague and

16   calls for a legal conclusion.

17               THE WITNESS:  I mean, I talked

18   to -- I've talked to people at the Ohio

19   Department of Health who told me it was

20   impossible to change it.

21        Q.    It's your understanding that ODH

22   will not change a birth certificate based on

23   gender identity, right?

24               MS. BONHAM:  Same objection.

25               THE WITNESS:  It's my understanding

CONFIDENTIAL

Page 51

1    that they will not change the gender listed on
2    a birth certificate.
3         Q.    For any reason or based on a change
4    in gender identity?
5              MS. BONHAM:  Objection.  Calls for
6    legal conclusions.  Vague.  Objection to the
7    terms "sex" and "gender" and "gender identity"
8    as they're being used.
9              THE WITNESS:  It's my understanding
10   that if they believe they made an error, they
11   will change it, but that's up to them to decide
12   what was an error.
13        Q.    And when you say "they," you mean
14   if ODH made an error?
15        A.    Yes.
16        Q.    Do you know when Ohio's laws
17   related to birth certificates were enacted?
18             MS. BONHAM:  Objection.
19   Foundation.  Calls for a legal conclusion.
20             THE WITNESS:  No.
21        Q.    Do you know whether Ohio law
22   applies differently to transgendered or
23   cisgendered individuals?
24             MS. BONHAM:  Same objections.
25             THE WITNESS:  Yes, it clearly does.

CONFIDENTIAL

Page 52

1      Q.    In what way does Ohio law apply

2  differently to transgendered or cisgendered

3  individuals?

4            MS. BONHAM:  Same objections.

5            THE WITNESS:  Cisgendered people

6  have an accurate birth certificate and

7  transgendered people cannot have an accurate

8  birth certificate.

9      Q.    In what way is a transgendered

10  birth certificate inaccurate?

11            MS. BONHAM:  Objection.  Vague.

12            THE WITNESS:  The gender is

13  incorrect.

14            MS. BONHAM:  Let's take a break.

15  We got to take a bathroom break.

16            MR. BLAKE:  Sure.

17            (Recess taken.)

18                 -  -  -  -  -

19            (Thereupon, Deposition Exhibit 6,

20            Birth Certificate, was marked for

21            purposes of identification.)

22                 -  -  -  -  -

23      Q.    So I was going to show you

24  Defendants' Exhibit 6, so let me know when you

25  have that pulled up on your screen.

CONFIDENTIAL


Page 53

1          MS. BONHAM:  Okay.

2      Q.    All right.  Do you have 6 in front

3  of you?

4      A.    Yes.

5      Q.    All right.  Defendants' Exhibit 6

6  is a document, which is a copy of your

7  certification of birth.  Have you seen this

8  before?

9      A.    Yes.

10     Q.    And right before we left for break,

11 you had indicated that one way, at least, in

12 which you thought that Ohio laws discriminated

13 against transgendered people was because the

14 gender was inaccurate for a transgendered

15 person, but accurate for a cisgendered person.

16 Do you recall that testimony?

17     A.    Yes.

18     Q.    All right.  Where on this document

19 does the word "gender" appear?

20     A.    It's the sex, which is the same as

21 gender, in my opinion.

22     Q.    But you acknowledge that the Ohio

23 birth record does not contain the word

24 "gender," right?

25     A.    It has "sex," which is the same as

Page 54

1    gender, yes.

2         Q.    Do you know how the Ohio Department

3    of Health received information about your sex

4    at the time of your birth?

5              MS. BONHAM:  Objection.

6    Foundation.

7              THE WITNESS:  I wasn't there.  You

8    know, I was there, but I was a baby.

9         Q.    So you don't know how the Ohio

10   Department of Health received this information

11   at or near the time of your birth; is that

12   accurate?

13        A.    Not without speculating.

14        Q.    Do you have any understanding about

15   how they received that information?

16        A.    Again, not without speculating how

17   it happened.

18        Q.    So you have an understanding, but

19   it's just a guess; is that accurate?

20             MS. BONHAM:  Objection.  Misstates.

21             THE WITNESS:  I mean, it could --

22   it could be any number of ways.  I don't know.

23        Q.    Well, what are the ways in which

24   you believe that ODH could have received this

25   information?

CONFIDENTIAL

Page 55

1              MS. BONHAM:  Objection.

2    Foundation.  Calls for speculation.  Asked and

3    answered.

4              THE WITNESS:  I mean, it could have

5    been -- I don't know if it was erred from the

6    hospital.  That's just a guess.

7         Q.    It could have been reported from

8    the hospital, right?  Right?

9         A.    Yes.

10        Q.    Could have been reported by your

11   parents, right?

12        A.    Yes.

13        Q.    Any other ways?

14             MS. BONHAM:  Same objections.

15             THE WITNESS:  Sure.  There's any

16   number of ways.

17        Q.    Well, I can't think of any, so I

18   was just wondering if you could.

19        A.    No.

20        Q.    Okay.  Let's assume it's one of

21   those two ways, and I understand you don't know

22   for sure, right, but do you believe that it was

23   incorrect to report your sex as female at or

24   near the time of your birth?

25        A.    Yes.

CONFIDENTIAL

1          Q.    On what basis do you believe that

2     was inaccurate?

3          A.    Because I -- you can't -- because

4     you can't tell gender just from looking at

5     someone.

6          Q.    All right.  Can you tell sex just

7     by looking at someone?

8          A.    No.

9          Q.    But you're not a medical doctor,

10    right?

11         A.    Of course not.

12         Q.    Do you have any evidence to

13    contradict that your sex was recorded as female

14    by ODH based on information provided by the

15    medical provider at or near the time of your

16    birth?

17              MS. BONHAM:  Objection.  Compound.

18    Vague.

19              THE WITNESS:  Like I said, I don't

20    know what happened.  I was a baby.

21         Q.    Would it have been -- would it have

22    been accurate for the medical provider to

23    report that your sex was male to ODH at or near

24    the time of your birth?

25         A.    It would have been just as valid as

CONFIDENTIAL

1    putting that.  I mean, it's just a guess.

2         Q.    Do you have any information about

3    what a medical provider uses to report sex at

4    the time of birth to ODH?

5              MS. BONHAM:  Asked and answered.

6              THE WITNESS:  I mean, I can guess

7    what they do, but...

8         Q.    What's your guess?

9         A.    My guess is they just look at a

10   person's genitals, a baby's genitals.

11   ████ ████ ██████ ████ █████ ███████ ███ ████

12   ██████ ███ █████ ███ ████ ██████████ ██████

13   ████████ ███ █████ ███████ ████ ███ ███ ████████

14   ███ ████ ██████

15             MS. BONHAM:  Objection.

16             THE WITNESS:  It doesn't -- a

17   person's genitals does not reflect gender or

18   sex, in my opinion.

19   ████ ██ █████ █████ ████ ███████ ███

20   █████████ ███ █████ ██████ ████ ██████ ██ ████

21   ██████████ ██ ██ ██ █████ ████████ ████ █████

22   ████ ████████ ██ ████ ████ █████████ ████ ████

23   ███████ ██ █████ █████ ██ ██████ ██████

24             MS. BONHAM:  Objection.

25             THE WITNESS:  You're asking me to

CONFIDENTIAL

Page 58

1    agree with that -- with, you know, that whole

2    philosophy, which I cannot.

3    ████ ████ ████ ████ ████ ████ ████ ████

4    ███ █ ████ ████ ████ ████ ████ █ ████

5    ████ █ ████ ████ ████ ████ ████

6    ███ ████ █ ████ ████ █ ████ █ ████

7    ████ ████ ████ ████ ████

8    ██████ ██████

9            MS. BONHAM:  Objection.

10   ████ ████ ████ ████ ████ █ ████

11   ████ █ ████ ████ ████ ████ █ ████

12   ████ █ ████ █ ████ ████ ████ █

13   ████ █ ████ ████ ████ ████ ████

14       Q.    It's your belief that the Ohio

15   Department of Health shouldn't track a person's

16   sex at the time of birth?

17           MS. BONHAM:  Objection.

18           THE WITNESS:  Yes.

19   ████ ████ ████ ████ ████ ████

20   █████ ████ ████ ████ ████ ████ ██████

21   ████

22           MS. BONHAM:  Objection.

23   ████ ████ █ █ ████ ████ ████ █

24   █████ █ █ ████ ████ ████ █

25   ████ ████ ████ ████ ████ ████ ████

CONFIDENTIAL

Page 59

9       MS. BONHAM:  Objection.  Misstates

10  testimony.  Calls for speculation.  Calls for

11  expert testimony.  Calls for a legal

12  conclusion.

13       THE WITNESS:  It's my belief that

14  sex or gender should not have been reported

15  based on a baby's genitalia.

16       Q.    What basis do you have to support

17  your assertion that the sex recorded on your

18  birth certificate was incorrect at the time of

19  birth?

20       MS. BONHAM:  Objection.  Calls for

21  expert testimony.  Calls for legal conclusions.

22  To the extent he's able to give a lay answer.

23  Asked and answered.

24       THE WITNESS:  Well, I mean, just my

25  reality.  I've always felt male from my

Page 60

1   earliest memories, and I believe there was no

2   need for them to report either way on a birth

3   certificate or to track it on a birth

4   certificate at all.

5          Q.     Are you aware of any method by

6   which a medical provider can identify gender at

7   the time of birth?

8                 MS. BONHAM:  Objection.  Calls for

9   expert testimony.

10                 THE WITNESS:  I mean, this is the

11   same question you're asking me if someone can

12   tell genitalia and classify them as male or

13   female, which I do not believe is reflective of

14   reality.

15          Q.     Well, it's because you -- you -- as

16   you testified before, you don't believe

17   biological sex is a real thing, right?

18                 MS. BONHAM:  Objection.  Misstates

19   testimony.  Calls for a legal conclusion.

20   Calls for expert testimony.

21                 THE WITNESS:  Biological sex, in my

22   opinion, it's in the brain.

23          Q.     And so it's your belief that a

24   medical doctor can determine neither biological

25   sex nor gender identity at the time of birth?

CONFIDENTIAL

Page 61

1          MS. BONHAM:  Objection.  Misstates

2   testimony.  Calls for expert testimony.

3          THE WITNESS:  Yes.

4     Q.    Could you pull up Exhibit 3?

5     A.    Okay.

6     Q.    All right.  The document that's

7   being shown to you is a document which was

8   previously marked as Exhibit 3.  I'll represent

9   to you that this is the template for the long

10  form of data which is collected and recorded by

11  the Ohio Department of Health at or near the

12  time of birth.  Do you see that document?

13    A.    Yes.

14    Q.    Do the words "gender" or "gender

15  identity" appear anywhere in that form?

16    A.    The word "sex" is on there, which

17  is the same as gender, in my opinion.

18         MS. BONHAM:  And I just want to let

19  the record reflect, this looks like a 14-page

20  document.  He's scrolling through it and he

21  didn't produce it and can't authenticate it.

22    Q.    Have you finished reviewing the

23  document?

24    A.    Yes.

25    Q.    And did you see the word "gender"

CONFIDENTIAL

Page 62

1    or "gender identity"?

2         A.    There's a synonym for "gender,"

3    which is "sex."

4         Q.    Okay.  But other than the sex

5    identifier, which is included on that -- that

6    document, you don't see the word "gender" or

7    "gender identity," right?

8         A.    No.  But like I said, "sex" is a

9    synonym for "gender," so it's the same as if it

10   said "gender" on it.

11        Q.    And that's your personal opinion,

12   right?

13        A.    That is my opinion, yes.

14        Q.    Are you aware of any forms or

15   records maintained by ODH that track a person's

16   gender or gender identity?

17             MS. BONHAM:  Objection.

18   Foundation.

19             THE WITNESS:  Sex, which is the

20   same, yes.

21        Q.    So just the birth certificate and

22   the long form that I've shown you.  Any other

23   documents besides those two?

24             MS. BONHAM:  Same objection.

25             THE WITNESS:  You're asking me

CONFIDENTIAL

1    what -- what other documents they have in their

2    internal system?

3          Q.    I'm asking you whether or not

4    you're aware of any other documents which track

5    gender or gender identity.  You've testified to

6    two documents, which include the word "sex,"

7    which you consider a synonym, and I'm asking

8    you whether you're aware of any other -- any

9    other such documents.

10          A.    No.

11          Q.    And your gender identity is male,

12    right?

13          A.    Yes.

14          Q.    Which contradicts with the sex,

15    which is identified on your birth certificate

16    as female, right?

17          A.    The gender or sex as a synonym is

18    incorrect on my birth certificate, yes.

19          Q.    Are you familiar with the term

20    "karyotype"?

21          A.    I have heard of it, yes.

22          Q.    And if I told you someone had XX

23    chromosomes, that would indicate a sex as

24    female, right?

25                MS. BONHAM:  Objection.

CONFIDENTIAL

Page 64

1   Foundation.  Calls for expert testimony.  Calls

2   for speculation.

3               THE WITNESS:  That's actually

4   incorrect.  There are people that have XX

5   chromosomes who are male and there are people

6   with XY chromosomes who are female.  Some have

7   even given birth.  That's just incorrect.

8   There's also many other besides XX or XY.

9        Q.    So when you say someone with XX

10  chromosomes is male, are you referring to their

11  gender or their biological sex?

12              MS. BONHAM:  Objection.

13              THE WITNESS:  Those are the same,

14  in my opinion.

15       Q.    Okay.  So is it your understanding,

16  then, that your chromosomes do not dictate your

17  biological sex?

18              MS. BONHAM:  Same objection.

19              THE WITNESS:  It's not an

20  understood science and it's been highly

21  oversimplified by popular science.

22       Q.    So what science are you relying on

23  when you say that you do not believe that an XX

24  chromosome indicates someone's sex is female?

25              MS. BONHAM:  Objection.

CONFIDENTIAL

Page 65

```
 1   Foundation.  Asked and answered.  Calls for
 2   expert testimony.  He's obviously not relying
 3   on science as a lay witness.
 4              THE WITNESS:  There have been
 5   plenty of studies outside of whatever
 6   mainstream beliefs, but you can look up and
 7   find out that there are people with XY
 8   chromosomes who have given birth and there are
 9   people with, you know, XX, XO, XX, whatever,
10   there's many different variations.
11        Q.    Do you recall any of those studies
12   or papers that you're referring to?
13        A.    Not off the top of my head, but
14   there are many.
15        ██    ████ ████ ████ ████ █ ██████  ████
16   ███████ ██ ██████ ███ █████████
17              MS. BONHAM:  Objection.
18              THE WITNESS:  ████
19        Q.    ████ ███ ████ ████ █████ ████  ██
20   ████████ ██ ████ ████ █ █ ██ ██████████
21              MS. BONHAM:  Objection.
22   Argumentative.  Foundation.
23              THE WITNESS:  ████ ████ █████
24   ██████
25        Q.    In your opinion, right?
```

CONFIDENTIAL

1     A.    In my opinion.

2     Q.   ██ ██ ██ ██ ███ ████ ██ ████

3   ███ ███ ███ ███ ████ ████ ███ ██

4   █████ ████ ████

5          MS. BONHAM:  Same objections.

6          THE WITNESS:  ███  ████ ████  ████

7   ████ ████ ████

8     Q.   And you're not aware of any

9  procedure by which a person can change their

10  chromosomes, right?

11          MS. BONHAM:  Same objections.

12          THE WITNESS:  I am not aware of a

13  procedure that a person can change their

14  chromosomes, but there are variations besides

15  XX or XY.

16     Q.   Are you aware of any legislative

17  purpose when Ohio enacted its laws related to

18  birth certificates?

19          MS. BONHAM:  Objection.

20  Foundation.  Calls for a legal conclusion.

21          THE WITNESS:  I don't really

22  understand your question.  I don't understand

23  that question and I don't know about legal type

24  of matters.  That's why I have counsel.

25     Q.   Do you have any evidence at all

CONFIDENTIAL

1    that Ohio's laws regarding the amendment of its

2    birth records were motivated by an hatred or

3    animus or ill will towards transgendered

4    people?

5            MS. BONHAM:  Same objections.

6    Calls for legal conclusions.

7            THE WITNESS:  Yeah.  I mean, I can

8    speculate on what people were thinking when

9    they created whatever laws are there, but it's

10   clear that now, in the present day, they are

11   motivated to keep transgendered people from

12   having accurate records.

13       Q.    What basis do you have to say that

14   ODH is motivated to keep transgendered people

15   from having accurate birth records?

16       A.    Because it's a very simple matter

17   to change somebody's birth certificate for

18   other reasons such as name change or such as

19   adopted parents and will not even having any

20   sort of way to change -- to correct a

21   transgendered person's record.

22       Q.    Are you aware that specific

23   statutes which allow a person to undergo a name

24   change or a change of parentage on their birth

25   certificate?

CONFIDENTIAL

Page 68

1          MS. BONHAM:  Objection.  Calls for

2     a legal conclusion.  Foundation.

3          THE WITNESS:  I don't specifically

4     know the law specifically about that, no.

5     Q.    Is it your understanding that ODH

6     will only change the sex marker on a birth

7     certificate if there is a clerical error

8     reporting or recording the sex at the time of

9     birth?

10    A.    It's my understanding that they

11    judge what a clerical error is, and that is the

12    only way they will allow as evidence to be

13    changed, yes.

14    Q.    And you would agree that there was

15    no clerical error on your birth certificate,

16    right?

17         MS. BONHAM:  Objection.

18    Argumentative.  Calls for a legal conclusion.

19         THE WITNESS:  No, I would not agree

20    with that.

21    Q.    You think there was a clerical

22    error on your birth certificate?

23         MS. BONHAM:  Same objections.

24         THE WITNESS:  Yes.

25    Q.    What was the clerical error?

CONFIDENTIAL

Page 69

1       A.      Putting down a gender or sex.  Sex
2    or gender, synonym.
3       Q.      Let's turn back to Exhibit 9.  Let
4    me know when it's in front of you.
5       A.      Yeah.
6       Q.      All right.  And if you turn to the
7    third page, which is Bates numbered 000028, let
8    me know when you're there.
9       A.      Okay.
10       Q.      Starting at the top, there's a --
11    an e-mail from you to
12    probateinfo@franklincountyohio.gov.  Do you see
13    that e-mail?
14       A.      Yes.
15       Q.      And it's dated July 8th, 2016,
16    right?
17       A.      Yes.
18       Q.      And there's a series of e-mails
19    following that.  Looks like three or four
20    communications.  To the best of your knowledge,
21    is that a true and accurate reflection of the
22    correspondence you had with the probate court
23    in Franklin County?
24       A.      Yes.
25       Q.      All right.  And at the very top,

1  the first e-mail in the chain, it says:  Hello.
2  Can you tell me if there's a form or procedure
3  for a legal gender change?
4           Do you see that?
5      A.    Yes.
6      Q.    And the probate court responded
7  four minutes later, which is incredible for
8  lots of reasons, but they say:  Was there an
9  error on the birth certificate?
10          Do you see that?
11     A.    Yes.
12     Q.    And you said:  It is a case of
13 transsexualism, not a clerical error.
14          Do you see that?
15     A.    Yes.
16     Q.    Okay.  So you being transgendered
17 and you having female on your birth certificate
18 isn't a clerical error, right?
19          MS. BONHAM:  Objection.  Calls for
20 a legal conclusion.
21          THE WITNESS:  Well, I'm speaking as
22 somebody trying to quickly help them understand
23 my situation.  I was not going to try to act as
24 if I wasn't transgender, I was trying to
25 explain that.  I still consider it a clerical

Page 71

1    error because, you know, I'm -- I've been male

2    my entire life.  I was trying to quickly

3    explain myself to the person.

4         Q.    You described it -- you described

5    it to the probate court as not a clerical

6    error, right?

7         A.    Yes.  I said that, but that is so I

8    can explain to them my situation.  I do

9    consider it a clerical error, but I did not

10   want to misrepresent that I'm not trans.

11              MS. BONHAM:  To the extent that the

12   term "clerical error" is going to create legal

13   conclusions, we'll have a standing objection to

14   the use of that term in the interchange.

15              MR. BLAKE:  Well, it's his word,

16   not mine.

17              THE WITNESS:  It was them.

18        Q.    Whatever you told to the probate

19   court, it's your testimony today, though, that

20   it's not a clerical error.  Is that my

21   understanding?

22              MS. BONHAM:  Objection.  Misstates

23   testimony.

24              THE WITNESS:  Well, as I said, I

25   was trying to explain myself in a quick, simple

CONFIDENTIAL

Page 72

1   way to a bureaucrat, but I do consider it a

2   clerical error, yes.

3           Q.    In what way was the state's

4   recording of your sex at birth as female a

5   clerical error?

6           A.    Because it's not accurate.

7           Q.    How is it inaccurate?

8           A.    You can't tell someone's gender by

9   just looking at them.

10          Q.    What about their sex, can you tell

11  someone's sex by looking at them?

12                MS. BONHAM:  Objection.

13                THE WITNESS:  Again, sex, no, you

14  cannot tell because "sex" is a synonym of

15  "gender."

16          Q.    Earlier, you testified that you

17  didn't think biological sex existed.  Is that

18  still accurate?

19                MS. BONHAM:  Objection.  Misstates

20  testimony.  Calls for expert testimony.

21                THE WITNESS:  Biological sex is

22  complicated and misunderstood, and it's usually

23  that term used to oppress trans people.

24          Q.    Do you know why the state records

25  sex at the time of birth?

Page 73

1        MS. BONHAM:  Objection.

2   Foundation.  Calls for speculation.

3        THE WITNESS:  The state is a straw

4   man or human people, you know, like, people

5   deciding to do things.  I can't speculate on

6   why they did that.

7        Q.    You don't know whether the state or

8   the Department of Health has any particular

9   interest or reason for tracking people's birth

10  sex?

11        MS. BONHAM:  Same objections.

12        THE WITNESS:  I don't know what

13  their reasons are, but I believe that it's not

14  necessary.

15        Q.    Upon what do you base your belief

16  that it's not necessary to track someone's

17  birth sex?

18        MS. BONHAM:  Objection to the term

19  "birth sex."

20        THE WITNESS:  Yes, because when

21  you're saying "birth sex," the state or the

22  Ohio Department of Health has no business

23  knowing anything about people's genitals.

24        Q.    Do you know what the CDC is?

25        A.    It's in there somewhere.  No.  Tell

Page 74

1   me.

2           Q.      No.

3                   Do you know what Social Security

4   is?

5           A.      Yes.

6           Q.      Okay.  Are you aware that the

7   Department of Social Security collects

8   information regarding individuals' birth sex

9   for enrollment in the Social Security program?

10          A.      I'm aware that they do it, not that

11  they have a good reason for it.

12          Q.      Do you know what an infant growth

13  chart is?

14          A.      I mean, I've heard of such a thing.

15          Q.      Have you ever heard your friends

16  discuss their kids or your own kid and have a

17  doctor or someone say they're in such and such

18  percentile for weight or height?  Have you ever

19  heard that?

20          A.      Yes.

21          Q.      And are you aware that there are

22  different growth charts for males and females?

23          A.      Yes, but individuals don't fall

24  immediately to a chart.  That is on an average.

25          Q.      Do you know who compiles that

Page 75

1  information?

2       A.    No.

3       Q.    Do you know why that information's

4  compiled?

5       A.    I can speculate.

6       Q.    What do you speculate?

7       A.    A growth chart, I'm sure, is to see

8  how healthy a child is.

9       Q.    And you would degree that if we

10 didn't track information about the birth weight

11 and sex of children at birth and at various

12 times through life, there would be no way to

13 compile that information and present it as a

14 chart, right?

15      A.    I agree that that would be

16 possible, but I do not agree that that is

17 necessary.

18      Q.    So you're not a medical doctor,

19 right?

20      A.    No.

21      Q.    Okay.  And you don't believe that a

22 medical provider should have reported your sex

23 at birth as male, right?

24           MS. BONHAM:  Objection.

25           THE WITNESS:  I don't believe there

CONFIDENTIAL

1  was any reason to report gender or sex at all.

2      Q.    So you don't think they should have

3  reported male or female, right?

4      A.    Right.

5      Q.    When did you determine that your

6  gender did not match your biological sex?

7          MS. BONHAM:  Objection.

8          THE WITNESS:  Again, I don't

9  believe in the term "biological sex."  I

10  remember when I was three years old becoming

11  aware of myself as a person, when I was three

12  years old, and being shocked that I had been

13  dressed in a stereotypically female way 'cause

14  I thought I would be dressed like my father.

15      Q.    And have you, since that time,

16  identified yourself as female?

17      A.    No.

18      Q.    What have you identified yourself

19  as?

20      A.    Well, I always felt male and I

21  always believed myself to be male, but I didn't

22  know until I was in -- probably around 1996

23  that it was possible to correct my gender.

24      Q.    So from the age of three until the

25  mid-'90s, you felt yourself as a male.  And

1  were you aware that that was incongruous with

2  what your sex was?

3          MS. BONHAM:  Objection.

4          THE WITNESS:  I was aware that it

5  was incongruous with what people told me I was

6  supposed to be.

7      Q.    If you go to Defendants' Exhibit 5.

8  Let me know when you have that in front of you.

9      A.    Okay.

10     Q.    And if you look on Page 3, it's

11  Interrogatory No. 2.

12     A.    Okay.

13     Q.    And we asked you to identify the

14  date you understood that your biological sex

15  did not align with your gender identity.  Do

16  you see that interrogatory?

17     A.    Yes.

18     Q.    And you responded.  Your response

19  is on the following page and it says that your

20  first memory of bodily awareness was at the age

21  of three years old.  That's consistent with

22  what you just testified with, right?

23     A.    Yes.

24     Q.    And at that time, you knew yourself

25  to be a boy and knew that your gender identity

Page 78

1   as a boy did not align with the feminine

2   clothing that you were dressed in, right?

3          A.    Yes.

4                MS. BONHAM:  I'll note that that

5   answer was made subject to objections that

6   we're not waiving.  And also with the

7   documents, just want to note that there's a

8   protective order in this case, and if we could

9   agree to keep any exhibits already designated

10  as confidential or attorneys eyes' only under

11  the protective order with that same designation

12  in the depositions.

13               MR. BLAKE:  Sure.  Yeah.  These

14  interrogatory responses were not marked and

15  you'll have an opportunity to designate,

16  obviously, after the transcript is prepared.

17         Q.    What do you mean new -- and I'm

18  changing, obviously, the pronouns from

19  "himself" to "yourself" because I'm talking to

20  you in the first person now.  But what do you

21  mean when you stated that you knew yourself to

22  be a boy?  What does that mean?

23         A.    The same as any other boy knows

24  himself to be a boy.  There's no way to -- it's

25  just you know.

1      Q.    Something internal?  Something
2  innate?  I mean, what was it?
3      A.    Yeah.  It was just how I always
4  felt.
5      Q.    And in what ways at that time did
6  you identify as a boy instead of a girl?
7      A.    In all ways.
8      Q.    I mean, what are some of those way?
9  I don't --
10            MS. BONHAM:  Objection.  Vague.
11            THE WITNESS:  I mean, I could tell
12  you stereotypically male things like to do, but
13  that doesn't mean anything.  I mean, a lot of
14  other people do things that are not
15  stereotypically things that are part of their
16  gender.
17      Q.    So at the age of three, what are
18  the stereotypical boy things that you wanted to
19  do?
20      A.    Well, at three, I mean, I don't
21  know, I just felt male.  I mean, when I was a
22  little older, I played baseball, things like
23  that.  I didn't have any interest in girlie
24  things or anything like that.
25      Q.    So sports and more traditionally

Page 80

1   boys clothing.  Anything else?

2        A.    I think that's basically it.

3        Q.    And so at least in your early

4   years, your interest in sports and the type of

5   clothing you preferred was an indication to you

6   that -- that you were, in fact, a male and not

7   a female, right?

8            MS. BONHAM:  Objection.  Misstates

9   testimony.  I also played sports.

10           THE WITNESS:  Yeah.  Not -- that's

11  not right because I knew internally, and

12  there's no real -- how do you know you're a

13  girl?  How do you know you're a boy?  I just

14  knew, and that's just how it was.

15       Q.    Is there anything about your

16  knowing yourself to be a boy as early as the

17  age of three which could have been detected or

18  reported at the time of your birth?

19           MS. BONHAM:  Objection.  Calls for

20  speculation.  Calls for expert testimony.

21           THE WITNESS:  I mean, that's

22  impossible to say.  I don't know.

23       Q.    You're not aware of anything,

24  right?

25       A.    I mean, I'm not aware of any reason

CONFIDENTIAL

Page 81

1  that they have to put a gender on there.

2       Q.    And you're not aware of any way in

3  which they could have detected what your

4  gender, which you identified at three years

5  old, was, right?

6            MS. BONHAM:  Same objections.

7            THE WITNESS:  At three, they could

8  have asked me at three.  When I was a baby --

9       Q.    You're not aware of anything when

10 you were a baby, right?

11      A.    No.

12      Q.    They couldn't have asked you when

13 you were a baby, right?

14      A.    Right.

15      Q.    And you wouldn't have known

16 anyways, right?

17            MS. BONHAM:  Objection.  Calls for

18 speculation.

19            THE WITNESS:  Nobody knows anything

20 when they're a baby.

21      Q.    They know some things.  I mean,

22 come on, right?  I mean, they know how to feed

23 to some degree and there's some involuntary

24 things that happen, right?

25      A.    Nothing to do with higher level

CONFIDENTIAL

Page 82

1    intellectual development.

2        Q.    Right.  Like, for example, gender

3    identity, correct?

4              MS. BONHAM:  Objection.

5              THE WITNESS:  Gender identity or

6    awareness of one's self.

7        Q.    All right.  You're familiar with

8    the term "gender dysphoria," right?

9        A.    Yes.

10       Q.    And my understanding of that -- of

11   gender dysphoria is that it's a clinical

12   diagnosis where a person's biological sex does

13   not match his or her gender identity.  Does

14   that comport with your understanding of that

15   diagnosis?

16             MS. BONHAM:  I'm going to object to

17   the use of the terms and to questions that call

18   for expert testimony.

19             THE WITNESS:  That is a diagnosis

20   that is -- well, first of all, it's hotly

21   contested.  I see it as something that it makes

22   it easy to explain to cisgender people what the

23   situation is, but it does not reflect reality,

24   you know, as far as -- you know, I don't accept

25   that there's the biological sex that's

CONFIDENTIAL

Page 83

1    separated from the gender identity.

2         Q.    Like you said about not being a

3    medical doctor, you're not an expert in

4    diagnosing gender dysphoria either, are you?

5         A.    No, I'm not an expert.  That is

6    also not just limited to the medical

7    profession.

8         Q.    You received a diagnosis of gender

9    dysphoria in early 2000; is that right?

10        A.    Yes.

11        Q.    Sorry.  Are you finished?

12        A.    I was just going to say I was

13   forced into the situation to get medical

14   treatment, yes.

15        Q.    Forced in by whom?

16        A.    In order to get medical treatment

17   at that time, you had to get a diagnosis of

18   gender dysphoria.  It was not an option to do

19   any other method.

20   ████    ███ ████ ███ ███ ███ █████

21   ██████

22   ███   ███ ██ ████ █████ ███ ████

23   █████

24   ███   ████ ███ ████ ███ ███ ███ ███

25   █████ ██████ ██

www.veritext.com                                    888-391-3376

CONFIDENTIAL

Page 84

1

2

3

4        A.     Yes.

5        Q.     Okay.  You were approximately 25 at

6    that time?

7        A.     Yes.

8        Q.     Before your diagnosis, had you

9    heard of gender dysphoria?

10        A.     Yes.

11        Q.     So according to the diagnosis, if

12    your biological sex and your gender identity do

13    not match, that means that the biological sex

14    and the gender identity are different, right?

15               MS. BONHAM:  Objection.

16               THE WITNESS:  No.  I mean, they

17    don't know -- they don't know the complex

18    biology of a person, they're just using the

19    term for simplification or to, you know, treat

20    people with hormones or whatever treatment they

21    need.

22        Q.     And by that, you mean the medical

23    experts who are actually rendering the

24    diagnosis of gender dysphoria, they're the ones

25    that you say don't understand the complexity of

CONFIDENTIAL

1   gender and sex.  Is that your testimony?

2               MS. BONHAM:  Objection.  Objection.

3   Misstates testimony.  Calls for expert

4   testimony.

5               THE WITNESS:  I can't answer for

6   every doctor out there, what they're thinking.

7   There are certain people that know very well

8   that this term is just something used to get

9   people treatment, and it does not mean

10  biological sex and gender identity are

11  different.

12       Q.    Which people know that?

13       A.    I don't understand that question.

14       Q.    Well, you said there are certain

15  people out there who know that these two things

16  don't mean biological sex and gender identity

17  are different.  I'm just curious to know what

18  your understanding is of who those people are.

19       A.    Well, the people who know their

20  head from their ass from a hole in the ground.

21       Q.    Okay.  So --

22       A.    There's not a specific person I can

23  point to.  There are plenty of people who know.

24       Q.    Can you name any?

25       A.    Can I name, like, specific doctors?

1      Q.    Sure.  Sure.

2      A.    No.

3      Q.    Okay.  You would agree, logically,

4  though, that two items that are incongruent

5  with one another can't be the same, correct?

6            MS. BONHAM:  Objection.  Vague.

7            THE WITNESS:  Two items that are

8  incongruent with each other can't be the same?

9  I'm not sure that I understand.  I mean, I see

10  where you're trying to go with that, but I

11  don't really have an answer to that one.

12      Q.    So you don't know one way or the

13  other whether incongruence indicates sameness?

14            MS. BONHAM:  Objection.  Vague.

15  Incomplete hypothetical.

16            THE WITNESS:  The terms mean that,

17  but you're applying it to transgender people,

18  which does not apply.

19      Q.    Okay.  So from a general sense,

20  that might be true, but as applied to

21  transgendered folk, it's your opinion that that

22  is not true, the statement is incorrect?

23            MS. BONHAM:  Objection.  Misstates

24  testimony.  Vague.

25            THE WITNESS:  Your statement that

CONFIDENTIAL

1   sex and gender identity are incongruent, I do

2   not agree with.

3        Q.   Okay.  Even for someone with a

4   diagnosis of gender dysphoria, you disagree

5   that that means that sex and gender are

6   incongruent?

7             MS. BONHAM:  Continuing objections

8   to the terms as defendants have defined them.

9             THE WITNESS:  Again, my diagnosis

10  is contested and it does not mean the same

11  thing to everyone.

12            MR. BLAKE:  All right.  Can we take

13  a quick break?

14            MS. BONHAM:  Yeah.

15            (Recess taken.)

16       Q.   Do you recall when you first

17  realized that the sex identifier on your birth

18  record did not match your gender identity?

19            MS. BONHAM:  Objection.

20            THE WITNESS:  I honestly don't

21  remember the first time I saw my birth

22  certificate, but it was when I was very young

23  and felt the gender was incorrect on it.

24       Q.   You don't remember approximately

25  when that -- that was?

CONFIDENTIAL

1      A.    I would guess I was maybe ten.

2      Q.    Do you have a driver's license?

3      A.    Yes.

4      Q.    Is it issued by the State of Ohio?

5      A.    Yes.

6      Q.    Does that reflect your sex as male

7   or female?

8      A.    Male.

9      Q.    How often do you update your

10  driver's license?

11     A.    Update it how?

12     Q.    Well, I mean, have you ever had to

13  update your driver's license?

14     A.    Well, I renew it.  I mean, not

15  really updating it.

16     Q.    Okay.  So how many -- so you've

17  renewed your driver's license, I take it,

18  probably several times?

19     A.    Yes.

20     Q.    And you intend to get a driver's

21  license in Colorado, too?

22     A.    Yes.  I actually tried.

23     Q.    Go ahead.

24     A.    This comes to one of my -- back to

25  the injury thing that we haven't really talked

1   about, but I tried to get my Colorado Driver's

2   License and I brought all the paperwork they

3   said I needed, Social Security card, passport,

4   and two pieces of mail, I think, and they would

5   not process my driver's license here because my

6   middle initial is "J" and they said that they

7   had to see my birth certificate because they

8   did not believe that my middle initial was just

9   "J" and they wanted to see my whole,

10  quote/unquote, middle name, so I have not been

11  able to get my driver's license yet and I will

12  be forced to show them my birth certificate

13  with the incorrect gender on it.

14       Q.   Are you fearful that someone at the

15  Colorado Bureau of Motor Vehicles is going to

16  injure or harm you when you show them your

17  birth certificate?

18       A.   My usual experience with showing

19  bureaucratic officials my birth certificate is

20  that they treat me very poorly and then do

21  whatever they can to make it more difficult to

22  get whatever I'm trying to do done.

23       Q.   But you don't fear bodily harm by

24  the Colorado official, right?

25       A.   I don't fear bodily harm, I just

CONFIDENTIAL

Page 90

```
 1   know that there's emotional trepidation and it
 2   will not be pleasant.
 3        Q.    All right.  So you talked about
 4   having to renew your Ohio Driver's License
 5   periodically while you were a resident of Ohio,
 6   and acknowledging now that you're a resident of
 7   Colorado, you're going to need to get a
 8   Colorado Driver's License.  When you've
 9   conducted these renewals, have you ever changed
10   your hair color on your driver's license?
11        A.    I don't believe so.
12        Q.    Have you ever changed your weight?
13        A.    Yes.  My weight has changed over
14   the years.
15        Q.    And you've updated that information
16   on your driver's license, right?
17        A.    Yes.
18        Q.    What about your address, have you
19   ever had to update or change your address on a
20   driver's license?
21        A.    Yes.  At least one time when it was
22   renewed, yeah.
23        Q.    When you initially got your
24   driver's license in the State of Ohio, what sex
25   did you put on it?
```

CONFIDENTIAL

Page 91

1      A.    When I first got my driver's

2  license, they, of course, forced me to put

3  female.

4      Q.    And when did you change it to male?

5      A.    Around 2000, I believe.

6      Q.    Was that before or after you had

7  underwent transition?

8      A.    After.

9      Q.    Have you ever been pulled over?

10     A.    Yes.

11     Q.    And when you were pulled over, the

12  officer asked you to show your driver's

13  license, among other things, right?

14     A.    Yes.

15     Q.    Did police officer ever ask you for

16  your birth certificate during a traffic stop?

17     A.    They don't have for people's birth

18  certificate at a traffic stop.

19     Q.    You would agree that a driver's

20  license needs to be current so that law

21  enforcement can, you know, do its law

22  enforcement job, right?

23          MS. BONHAM:  Objection.

24  Foundation.  Calls for speculation.

25          THE WITNESS:  It's to be updated to

```
                                              Page 92
 1   circumstances.  So it's, you know, human using
 2   the identity document has, you know, their full
 3   dignity, yeah.
 4        Q.    Have you ever used your birth
 5   certificate to buy beer?
 6        A.    That's not a thing.
 7        Q.    Have you ever used your birth
 8   certificate to get into an R rated movie?
 9        A.    That's not a thing either.
10        Q.    Have you ever used your birth
11   certificate to get into a bar?
12        A.    None of these things you're listing
13   would accept a birth certificate.
14        Q.    What about to verify a credit card
15   purchase?
16        A.    I don't believe, no.  They wouldn't
17   accept that, I'm sure.
18        Q.    Have you ever had to show your
19   birth certificate to TSA when boarding a plane?
20        A.    No.  They wouldn't accept that.
21        Q.    What about renting a car?
22        A.    No.
23        Q.    But in all those circumstances, you
24   have used your driver's license or other state
25   identification, right?
```

Page 93

```
 1        A.    Yes, but that doesn't mean I don't
 2   also need a birth certificate.
 3        Q.    And you would agree that a driver's
 4   license is a much different form of
 5   identification document than a birth
 6   certificate, right?
 7              MS. BONHAM:  Objection.  Calls for
 8   a legal conclusion.  Argumentative.
 9              THE WITNESS:  No.  I don't consider
10   them much different.  I consider them that they
11   have separate uses in certain situations.
12        Q.    Well, we've identified some very
13   common uses for state identification document
14   or a driver's license, and you've testified
15   that none of those -- the birth certificates
16   are used in none of those circumstances, but
17   nevertheless, it's still your testimony that
18   they're similar documents?
19        A.    They are both identity documents
20   that every person needs to have in their life
21   and it needs to be accurate.
22        Q.    Your picture is not on your birth
23   certificate, right?
24        A.    Right.
25        Q.    You don't routinely carry your
```

CONFIDENTIAL

Page 94

1 birth certificate with you when you go places,

2 right?

3          A.    No.

4          Q.    How many times a month would you

5 say you look at your birth certificate?

6          A.    I don't look at it on purpose

7 because it's upsetting that it has an incorrect

8 gender on it.

9          Q.    So less than one time per month?

10          A.    I only get it out when I absolutely

11 need to.

12          Q.    How many times a month would you

13 say you handle or look at your Ohio Driver's

14 License?

15          A.    Probably at least every other day.

16          Q.    All right.  Let's go to Exhibit 2.

17 Let me know when you have it in front of you.

18          A.    Okay.

19          Q.    All right.  What is -- what has

20 been marked as Defendants' Exhibit 2 is a copy

21 of the complaint, which you filed with others

22 against ODH.  Do you see that?

23          A.    Yes.

24          Q.    Have you seen this document before?

25          A.    Yes.

1     Q.    Did you provide information to
2  counsel so that they could prepare this
3  document and make the allegations contained
4  within it?
5     A.    Yes.
6     Q.    All right.  Turn to Page 14, if you
7  would.  Let me know when you're there.
8     A.    Okay.
9     Q.    Paragraph 59 just states that:
10  Plaintiff, Basil Argento, is a 42-year-old man
11  who was born in Tuscarawas County, Ohio, and
12  currently resides in Columbus, Ohio.
13         Do you see that?
14     A.    Yes.
15     Q.    That's, obviously, not correct.
16  Since the time that this was filed, you've
17  moved to Colorado, right?
18     A.    Yes.
19     Q.    Okay.  If you turn to the next
20  page, Page 15, and go to Paragraph 67.  Let me
21  know when you're there.
22     A.    Okay.
23     Q.    Paragraph 67 describes an incident
24  when you attempted to get an Italian passport,
25  right?

Page 96

1          A.    Yes.
2          Q.    And you presented the consular
3    officials at the Italian Consulate with your
4    birth certificate, right?
5          A.    Yes.
6          Q.    And the birth record indicates your
7    birth sex as female, correct?
8          A.    Yes.
9          Q.    And you also presented the consular
10   officials with your driver's license, right?
11         A.    Yes.
12         Q.    Which indicates your sex is male,
13   correct?
14         A.    Yes.
15         Q.    And the consular officials told you
16   that they did not know how to proceed with
17   processing your application for an Italian
18   passport in that circumstance, right?
19         A.    Yes.
20         Q.    And that resulted in a lot of back
21   and forth between you and the officials at the
22   Italian Consulate, right?
23         A.    Yes.
24         Q.    And the correspondence, phone
25   calls, I presume e-mails, went on for over a

CONFIDENTIAL

Page 97

1  year, right?

2        A.    Yes.

3        Q.    You tried to get the Consulate to

4  process your application, and they would say

5  they couldn't do it, right?

6        A.    Yes.

7        Q.    And the reason why they couldn't do

8  it was this incongruence between the sex

9  identified on your birth certificate as female

10  and the sex identified on your driver's license

11  as male; is that accurate?

12        A.    Yes.

13        Q.    But, eventually, they did figure

14  out how to do it and they processed your

15  application, right?

16        A.    They did.  It took three years

17  instead of the typical one year it would take

18  for a cisgendered person.  It took extra -- I

19  had to drive from Columbus to Detroit extra

20  times.  And also, now, I'm trying to get them

21  to issue my passport, which would be absolutely

22  no problem for a cisgendered person, but they

23  will not issue my passport due to still this

24  problem with the gender being wrong on my birth

25  certificate.

CONFIDENTIAL

Page 98

1      Q.    All right.  So you're a citizen of
2  Italy, but you don't yet have the passport; is
3  that accurate?
4      A.    Yes.
5      Q.    Okay.  When you presented your
6  birth record to the consular officials at the
7  Italian Consulate, were you in any way fearful
8  that you were going to be physically harmed by
9  those officials?
10     A.    There are cameras in places like
11 that, so, of course, nobody working at the
12 consulate was going to physically harm me.
13     Q.    All right.  And you would agree
14 that it's not the Ohio Department of Health's
15 responsibility to set the guidelines for what
16 Italy requires to grant citizenship to a
17 foreign-born individual?
18          MS. BONHAM:  Objection.  Vague.
19 Compound.  Calls for legal conclusions.
20 Foundation.
21          THE WITNESS:  My opinion is the
22 ability to have documents reflect the living
23 people's circumstances because birth
24 certificates are for use by living people.
25     Q.    But that doesn't answer the

CONFIDENTIAL

1   question.  ODH has no responsibility over

2   whether the Italian Consulate grants

3   citizenship to a U.S. born individual, right?

4           MS. BONHAM:  Objection.  Calls for

5   a legal conclusion.

6           THE WITNESS:  They're not

7   responsible for that, however -- for that

8   specific thing, however, they are -- they

9   should be responsible to make someone's birth

10  certificate accurate.  And if I had -- if I

11  had -- if I were a cis person, then this

12  process would have been easy and, you know, it

13  would have been less expensive and less

14  harrowing.

15      Q.    I mean, that's your opinion that if

16  you were a cis person, the process would have

17  been easier.  I mean, you don't know that for a

18  fact, right?

19      A.    I do know that for a fact.  There

20  are forums online where people talk about how

21  long it took them, and the average is one year

22  for somebody who doesn't even have their

23  documents completely all together, and I had my

24  documents all completely together and it took

25  three years.

Page 100

1      Q.    Would you consider yourself an

2   expert on what it takes to obtain Italian

3   citizenship?

4      A.    That depends on your definition of

5   expert.  Do I know all the ins and outs of it,

6   yes.

7      Q.    Okay.  So it's based on your

8   expert -- on your expert opinion that one year

9   should be all that's required to obtain -- for

10  U.S. born citizen to obtain Italian

11  citizenship?

12            MS. BONHAM:  Objection.  Misstates

13  testimony.  He's obviously testifying as a lay

14  witness.

15            THE WITNESS:  Yes.  My opinion and

16  from what I've seen and read is the average is

17  one year.

18     Q.    Other than what you've read on, I

19  assume, what is the Italian Consulate's

20  website, do you have any personal experience

21  with how long it would take a cisgendered

22  person to obtain their Italian citizenship?

23     A.    No, other than online forums.  They

24  were not on the Consulate website.

25     Q.    Okay.  And ODH doesn't have any

Page 101

1   control over how long it takes Italy to process

2   citizenship requests, right?

3                 MS. BONHAM:  Objection.  Calls for

4   a legal conclusion.

5                 THE WITNESS:  They only have

6   control over whether they update my birth

7   certificate to be correct or not.

8        Q.    So that's a no, ODH doesn't have

9   any control, right?

10                MS. BONHAM:  Objection.

11                THE WITNESS:  They only have

12   control, again, over my birth certificate.

13   They don't have control over any other

14   authorities.

15        Q.    They don't dictate what information

16   Italy requires to process its passport

17   applications, right?

18        A.    No, but they dictate what

19   information they're going to get.

20        Q.    They dictate -- they dictate what

21   information is reported at the time of birth

22   and reflected on the birth certificate.  Is

23   there any other information that ODH dictates?

24                MS. BONHAM:  Objection.  Compound.

25                THE WITNESS:  It's not just what

CONFIDENTIAL

Page 102

1    was recorded at birth, it is a reflection of my

2    current -- should be a reflection of my current

3    reality, such as name and things like that, so,

4    I mean, that's what they have control over.

5         Q.    Okay.  Do you know why Italy or the

6    Italian Consulate requires the sex on your

7    birth certificate and driver's license to

8    match?

9              MS. BONHAM:  Objection.

10   Foundation.

11             THE WITNESS:  They told me many

12   things over three years.  One thing they say,

13   they could write down two things that mismatch,

14   then they told me it still took as long as it

15   did.  And then now for my passport, they

16   won't -- they won't give me a passport with,

17   you know, even the wrong gender on it because

18   they said that if it's a male name, it has to

19   say male, but they won't put male on it because

20   my birth certificate is wrong.

21        Q.    Do you have a U.S. passport?

22        A.    Yes.

23        Q.    What is the sex reflect on your

24   U.S. passport?

25        A.    Male.

Page 103

1      Q.    Have you been issued any sort of
2  identification or citizenship card from Italy?
3      A.    No.  All I have is an e-mail
4  stating that I'm in the system now and I have
5  to send in a form that has my current address
6  updated.
7      Q.    Are you working towards getting
8  your Italian passport?
9      A.    I am going to.  I haven't moved
10  forward with it over the past however many
11  months it been 'cause I've been busy, but, yes,
12  I am going to do that.
13      Q.    What's the next step?
14      A.    The next step is probably getting a
15  lawyer, unless Ohio fixes my birth certificate.
16  Otherwise, I'm probably going to get a lawyer
17  in Italy.
18      Q.    You said earlier that Italy was
19  originally willing to issue a passport that
20  reflected your sex as female; is that right?
21      A.    No.  They would not do either
22  because I said, well, if it's wrong, at least
23  I'll have my passport and then I can work
24  towards updating it to the correct gender, but
25  they will not do that because in Italy, if a

CONFIDENTIAL

Page 104

1    person has a masculine name, then the gender is

2    to be male.  I cannot put that on there until

3    my birth certificate is fixed.

4         Q.    But at least at some point, you

5    were willing to have an Italian passport that

6    reflected female, right?

7         A.    Not willing, per se, but it's

8    better than not having a passport at all

9    because then you can work towards changing it,

10   just like I did with my U.S. passport.

11        Q.    You were going to be okay with

12   having a female listed on your passport as long

13   as you could just get the passport initially,

14   right?

15             MS. BONHAM:  Objection.  Misstates

16   testimony.

17             THE WITNESS:  No.  I'm not okay

18   with that at all, but it's better than having

19   no passport and no proof that I'm an Italian

20   citizen.

21        Q.    Can you turn to Exhibit 9, please?

22   Let me know when you're there.

23        A.    Yes.

24        Q.    And if you turn to the page Bates

25   numbered 000030, it's five pages into the

Page 105

1   document.

2        A.    Okay.

3        Q.    This is another e-mail exchange

4   between you and it looks like the Italian

5   Consulate in Detroit.  Do you recognize these

6   e-mails?

7        A.    Yes.

8        Q.    To the best of your knowledge, is

9   this e-mail chain a true and accurate copy of

10  the correspondence you had with the Italian

11  consulate on or about April 18th, 2016?

12       A.    Yes.

13       Q.    2016?

14       A.    Yes.

15       Q.    And it looks like that that

16  correspondence actually began in 2015.  And I

17  don't speak Italian, so I don't know what month

18  Giugno is, but I'm going to guess June.

19       A.    Yeah.

20       Q.    Okay.  So it looks like on or about

21  June 25th, 2015, you sent an e-mail to an

22  individual at the Italian Consulate, and the

23  subject was update on case.  Do you see that

24  e-mail at the bottom of Bates Page 000030?

25       A.    Yes.

CONFIDENTIAL

1      Q.    And you say:  Signore Paladino,

2   thank you for your help.  Do I understand that

3   my legal name change is not recognized by

4   Italy?  I don't mind the gender marker being

5   wrong on my Italian passport.

6            Do you see that?

7      A.    Yes, I see that.

8      Q.    So at least at that time, you

9   didn't mind having an incorrect gender marker

10  on your Italian passport, right?

11           MS. BONHAM:  Objection.  Misstates

12  testimony and misstates the document, which

13  goes on to say, quote, I will go to Italy and

14  petition for it to be changed later, but I

15  can't live my life as a trans person with the

16  wrong name on my passport.

17           THE WITNESS:  I wrote this because,

18  obviously, I'm talking to this bureaucrat.  I

19  want him to give me my passport.  I do not want

20  the wrong gender on there, but it is far less

21  likely that someone will notice the incorrect

22  gender on the passport than my name being

23  wrong.  I am not okay with it being wrong, but

24  I do want my Italian passport.

25       Q.    Do you know if the Italian passport

```
 1   includes -- is it a sex or gender word that
 2   they use to track male or female, do you know?
 3            MS. BONHAM:  Objection.
 4            THE WITNESS:  It's the same word,
 5   so...
 6        Q.   They only have the one word for it?
 7        A.   I'm saying, in English "gender" and
 8   "sex" is the same.
 9        Q.   I got it, I'm just wondering what's
10   actually on the Italian passport, if you know.
11        A.   I don't have one yet.
12        Q.   Sorry?
13        A.   I don't have one yet, so...
14        Q.   So you don't know if it says
15   "gender" and "sex" on the passport?
16        A.   It makes no difference 'cause
17   that's the same word.
18        Q.   Is it the same word in Italian?
19   'Cause it's not the same word in English.  I
20   mean, they're two words.  Do they only?
21            MS. BONHAM:  Objection.
22            THE WITNESS:  There are many words
23   in English that mean the same thing.
24        Q.   I got it.  I'm not asking you
25   whether or not they're synonymous, I'm asking
```

CONFIDENTIAL

Page 108

1   you what the actual word is.

2            MS. BONHAM:  Objection.

3   Foundation.  Vague.  It sounds like what you're

4   asking him is to define a word that's disputed

5   in this case in English in Italian.

6            MR. BLAKE:  Nope.  That's not what

7   I'm doing at all.

8            MS. BONHAM:  Okay.  What's --

9       Q.   The U.S. passport says the word

10  "sex" on it, right?

11      A.   I honestly don't know because I

12  read those words at the same.  I don't know

13  which one.

14      Q.   So "sex" is spelled out s-e-x,

15  right?

16      A.   Yes.  S-e-x spells sex, and it is

17  the same word as "gender," though, in my

18  opinion.

19      Q.   Your testimony is that it means the

20  same word, but they are, in fact, different

21  words.  They appear in different locations in

22  the dictionary, right?

23      A.   Uh-huh.

24      Q.   One has three letters and one has

25  six, seven?

CONFIDENTIAL

1          A.    Yeah.  Like kindergarten all over.

2          Q.    I guess it's six letters, right?

3          A.    I don't know which one's on there.

4     I never noticed.  Like I said, those words mean

5     the same thing to me.

6          Q.    I got it.  I was just asking in

7     case you knew.  Do you know if -- well, is the

8     Italian passport written in English or Italian?

9          A.    It's written in Italian.

10         Q.    Okay.  Do you speak Italian?

11         A.    A little bit.  I believe it says

12    "sex," but I could not tell you for certain.

13         Q.    Well, I was going to ask you that.

14    Do you know what the Italian word is for "sex"?

15              MS. BONHAM:  Objection.  Go ahead.

16              THE WITNESS:  "Sessuale."

17         Q.    "Sessuale."  And that's, what,

18    probably spelled s-e-x-u-a-l or something like

19    that?

20         A.    No.  I think it's s-e-s-s-u-a-l-e,

21    but I could be wrong.

22         Q.    And do you know if there's an

23    Italian word for "gender"?

24              MS. BONHAM:  Objection.

25              THE WITNESS:  I'm sure there is.

CONFIDENTIAL

Page 110

1      Q.    But you don't know?

2      A.    I don't know it.

3      Q.    You don't know it.

4      A.    It may be the same word.

5      Q.    Okay.  But at least at -- when you

6  were writing that e-mail to the Italian

7  Consulate in Detroit, you were okay with the

8  sessuale -- the sessuale entry on your passport

9  being female so long as you could just get the

10  passport, right?

11      A.    It was more important to me to get

12  the passport than not have the passport, yes,

13  but I'm not okay with it saying the wrong

14  thing.  I would want it changed, but it was a

15  step in the right direction.

16      Q.    Do you travel a lot

17  internationally?

18      A.    A lot, no.

19      Q.    In the last five years, have you

20  had to use your passport?

21      A.    Yes.

22      Q.    And because you don't have an

23  Italian passport yet, you've had to use your

24  U.S. passport, right?

25      A.    Yes.

1      Q.    Had you had your Italian passport

2   issued, would you have used your Italian

3   passport instead of your U.S. passport?

4      A.    It depends on the circumstances,

5   but if we were just going on vacation and it

6   was to a country that has no problem with U.S.

7   passports, I would use it.

8      Q.    So what countries is it beneficial

9   to use your Italian passport instead of the

10  U.S. passport?

11     A.    If you're going to be staying a

12  long time, it is pretty much hassle free if you

13  have an Italian passport.

14     Q.    So would you have -- well, have you

15  taken any trips like that in the last five

16  years?

17     A.    No, but we plan to.  I have family

18  in Italy.

19     Q.    So if you had an Italian passport,

20  even with an incorrect designation or what you

21  contend is an incorrect designation, would you

22  use that passport for this upcoming trip to

23  Italy?

24          MS. BONHAM:  Objection.  Incomplete

25  hypothetical.

CONFIDENTIAL

1           THE WITNESS:  Well, most likely,
2     I'm going to go to Italy to get this corrected
3     unless Ohio updates my birth certificate, so
4     yes, I would have to.
5          Q.    And in doing so, you would have to
6     show people, either the TSA agents or the
7     people at the port of entry, this passport with
8     the female designation on it, right?
9           MS. BONHAM:  Objection.  Incomplete
10    hypothetical.  He, obviously, doesn't have the
11    hypothetical document 'cause he can't get it.
12          THE WITNESS:  Yeah.  And that's not
13    something that anyone wants to do.  To have an
14    identity document with the wrong gender on it
15    is very stressful.
16         Q.    But you nevertheless would disclose
17    this document with that female sex designation
18    on it instead of showing them the U.S.
19    passport, which has the male sex designation on
20    it, right?
21          MS. BONHAM:  Objection.  Misstates
22    testimony.  Incomplete hypothetical.
23          THE WITNESS:  Only when it was
24    necessary.  I wouldn't use it as a preference,
25    I would want a document that was correct.

Page 113

1     Q.    But when traveling to Italy to
2  attempt to change this designation, you would
3  use the Italian passport, right?
4           MS. BONHAM:  Objection.  There's --
5  it appears there's a misunderstanding, and I
6  just want the record --
7           MR. BLAKE:  Well, let him clear it
8  up.  If you think it's inaccurate, let him
9  clear it up.  We don't need speaking
10  objections.  If there's a misunderstanding, let
11  him answer, you can object, and then we can
12  take it from there.  I don't want to hear your
13  characterization of what you think the
14  misunderstanding is, I want to hear his
15  testimony, okay?
16          MS. BONHAM:  I understand, but I'm
17  telling you, you're continually asking
18  questions that seem to have the premise wrong,
19  and we can go off the record and correct it.  I
20  think it's a true misunderstanding, but we can
21  continue.  That's your prerogative.
22          MR. BLAKE:  Thank you.
23     Q.    Go ahead.
24     A.    I am not sure what choice you think
25  I would have if I had this passport, which I

Page 114

1  don't. I would have to take it there and show
2  it to people for a change. There would be no
3  other option, but I don't have it because of
4  this situation. I don't have my passport,
5  correct or incorrect.
6      Q.  I guess I was talking about when
7  you physically got on the plane to Italy,
8  right, and when you go through customs, right,
9  they -- you show them a passport and they stamp
10  it to let you in, would you use the U.S.
11  passport with the male identifier on it to go
12  through that process or would you use the
13  as-of-yet un-obtained Italian passport with the
14  incorrect, according to you, female designation
15  for sex?
16      MS. BONHAM:  Objection.
17  Hypothetical.
18      THE WITNESS:  I would consult with
19  the Italian lawyer and ask them if it was the
20  correct thing to do.
21      Q.  Okay. 'Cause you think it might be
22  required -- if you have the Italian passport to
23  travel to Italy, it might be required to use
24  that, the Italian passport versus the U.S.
25  passport?

CONFIDENTIAL

Page 115

1          A.     Yes.

2          Q.     Okay.  You just don't know if

3    that's true.  If it's not true, you would use

4    the document with the male sex identifier on

5    it, right?

6          A.     Yes.

7          Q.     Okay.  All right.  If you go to the

8    next page -- sorry, Page 17, Paragraph 77.  Let

9    me know when you're there.  We're on exhibit --

10   we're still on Exhibit 2.

11         A.     Okay.

12         Q.     Paragraph 77, you state that you

13   have been required to show your birth

14   certificate in other contexts.  Do you see

15   that?

16         A.     Yes.

17         Q.     We've talked about the Italian

18   Consulate, we've talked about the upcoming

19   incident or upcoming occurrence with the --

20   with Colorado.  What other -- what other

21   incidents have you been required to show your

22   birth certificate?

23         A.     When I originally tried to change

24   my Social Security information, I went into the

25   office in San Jose, California where I lived at

1  the time and gave them my birth certificate and

2  had to fill out the forms, said I wanted to

3  update it, and the guy just looked at me like I

4  was crazy.  Said he had no idea what to do, so

5  he went in the back.  But when he went to the

6  back, one at a time, all the other people that

7  worked in the office came up to the window,

8  practically pressed their face against the

9  window and then left.  And they did this, there

10 were, like, ten of them.  They all each came

11 and stared at me.  And then he came back and

12 said they can't change it, and that was the end

13 of that.  So they basically all treated me like

14 a zoo specimen and then did not update my

15 information.

16        Q.    Did you feel bodily harm from the

17 Social Security Administration in San Jose?

18        A.    It was not bodily harm, it was

19 emotional distress.

20        Q.    Do you believe that ODH had

21 anything to do with the policies and rules of

22 the Social Security Administration in San Jose,

23 California?

24        A.    Well, indirectly, all of this is

25 due to them not doing the simple thing of

CONFIDENTIAL

Page 117

1    updating my birth certificate to reflect my

2    reality.

3         Q.    ODH doesn't control the way in

4    which employees of the federal government at an

5    office in San Jose, California react to the

6    recordation of female on your birth

7    certificate, right?

8              MS. BONHAM:  Objection.  Calls for

9    a legal conclusion.  Argumentative.

10             THE WITNESS:  They're responsible

11   for the fact that I have to disclose that in

12   the first place.

13        Q.    ODH is responsible for the policy

14   or the rule that requires the Social Security

15   Administration to review your birth

16   certificate?

17             MS. BONHAM:  Same objection.

18   Misstates testimony.

19             THE WITNESS:  They're responsible

20   for not updating my birth certificate and

21   forcing me to out myself to bureaucratic

22   officials.

23        Q.    But they're not acting in their

24   official capacity, right?

25             MS. BONHAM:  Objection.  Calls for

CONFIDENTIAL

1  a legal conclusion.  Vague.

2            THE WITNESS:  Who was acting in

3  their official capacity?

4        Q.    These employees.  You aren't, like,

5  out in a park or something and they were

6  shaking you down for your birth certificate,

7  right?

8            MS. BONHAM:  Objection.

9            THE WITNESS:  Well, they require

10  the birth certificate to update the -- well,

11  they didn't update it, but they wanted to see

12  it.

13        Q.    And they requested it as part of

14  their duties that they were performing for the

15  Social Security Administration, right?

16        A.    Yes.  If you can call it their

17  duties staring at someone like a zoo specimen,

18  yes.

19        Q.    And ODH doesn't have anything to do

20  with whether or not Administration requires

21  submission of that document, right?

22            MS. BONHAM:  Objection.  Calls for

23  a legal conclusion.

24            THE WITNESS:  ODH does very well

25  and at let living people use documents for all

Page 119

1  kinds of purposes that they need to do in their

2  lives, so yes.

3       Q.    Yes, what?

4       A.    They are responsible for that.

5       Q.    So when or upon what basis do

6  you -- do you claim that ODH has set the

7  requirements or directed the Social Security

8  agency to review the birth certificate?

9            MS. BONHAM:  Objection.  Misstates

10 testimony and calls for a legal conclusion.

11           THE WITNESS:  They're not directing

12 them to do anything, all they control is the

13 birth certificate, which they refuse to update.

14      Q.    Yeah.  ODH is the one that puts the

15 information on the birth certificate, right?

16      A.    And refuses to change it, yes.

17      Q.    And -- well, they change it

18 pursuant to what their law requires them to do.

19 You would agree with that, right?

20           MS. BONHAM:  Objection.  Calls for

21 a legal conclusion.  Argumentative.

22           THE WITNESS:  I don't know what

23 their law is.

24      Q.    Okay.  Any other context besides

25 the Social Security agency that Italian

CONFIDENTIAL

                                        Page 120

1    Consulate and the Colorado Bureau of Motor

2    Vehicles?

3              MS. BONHAM:  Yeah.  I was also

4    forced to produce my birth certificate when I

5    got married in Buffalo, New York, and they

6    hassled us and we ended up having to go,

7    instead of Buffalo, we had to go to Niagara to

8    get our wedding -- what do you call it -- our

9    marriage license because they just accepted a

10   passport there, and they did not want to accept

11   documents that didn't match at the Buffalo

12   location.

13        Q.   All right.  And do you -- do you --

14   well, you would agree that the Ohio Department

15   of Health doesn't dictate to whatever official

16   you went to in Buffalo, New York about what

17   documents they require before they issue a

18   marriage license, right?

19        A.   Of course they don't dictate to any

20   other authority, they only have control over

21   the birth certificates they refuse to change.

22        Q.   And when you presented this birth

23   certificate to the official in Buffalo, New

24   York, you didn't fear bodily harm, did you?

25        A.   Again, I don't fear bodily harm

CONFIDENTIAL

Page 121

1    from government officials.  They usually just

2    cause emotional distress.

3         Q.    Are there any other circumstances

4    besides the Colorado Bureau of Motor Vehicles,

5    the Italian Consulate, the Social Security

6    Administration and the official in Buffalo, New

7    York who refused to issue the marriage license?

8              MS. BONHAM:  Objection.  He's

9    previously testified in the litigation that

10   it's impossible to list every such

11   circumstance.

12             THE WITNESS:  Another one I can

13   think of off the top of my head is when I went

14   to get my United States passport.  Several

15   instances there.  My very first passport they

16   issued, they only gave me a one-year limited

17   valid passport that had a phrase in it about

18   the Department of State expressly gives

19   permission to renew this passport, like I was a

20   criminal or something.  And then a couple years

21   later, they renewed it one more time and

22   another one-year limited passport.  Like, I

23   don't know, maybe 15 years, I had a passport

24   for two years, and when finally -- they changed

25   the law during the Obama administration, I

www.veritext.com                                          888-391-3376

CONFIDENTIAL

1    went -- you have to go to the post office to

2    present your documents, so I had to give them

3    to postal worker my birth certificate in.  And

4    I had gone to a different post office than I

5    normally go to, but it was a gentleman I had

6    seen before, he did not want to be disclosed

7    to.  He looked at it and turned 20 shades of

8    red, and so it was very uncomfortable for both

9    of us.  And, yeah, so it's just a lot of

10   hassles and a lot of emotional suffering.

11        Q.    And like the other circumstances

12   you've described, ODH doesn't set the policies

13   or requirements for the U.S. passport service

14   to what documents they require to issue the

15   passport, right?

16             MS. BONHAM:  Objection.

17             THE WITNESS:  Of course they don't.

18   They only control their own system and the

19   things that they decide to do.  They don't

20   control other authorities.

21        Q.    And when you presented the birth

22   certificate to the folks in connection with

23   obtaining your U.S. passport, you did not fear

24   bodily harm, did you?

25        A.    Like I said, I don't fear bodily

CONFIDENTIAL

Page 123

1    harm from government officials.

2         Q.    None of these government officials

3    are particularly dangerous, right?

4              MS. BONHAM:  Objection.

5              THE WITNESS:  I mean, who knows

6    individually what anybody's capable of, but

7    they are in a facility with cameras.  They're

8    not going to physically assault me when I come

9    in.

10        Q.    Are there any other circumstances

11   which you can recollect as you sit here today?

12        A.    That's all I can think of right

13   now.

14        Q.    Have you had to produce or provide

15   your birth certificate to anyone in connection

16   with attendance at any school?

17        A.    I do not believe so, no.

18        Q.    Have you ever showed it to any of

19   your friends?

20        A.    No.

21        Q.    Have you ever had to show your

22   birth certificate to any medical professionals?

23        A.    I don't believe so.

24        Q.    Have you ever had to provide your

25   birth certificate to receive any insurance?

Page 124

```
 1        A.    I don't believe so.
 2        Q.    Employee benefits?
 3        A.    Before I had a passport, yes, I
 4   believe I had to show my birth certificate.
 5   Yes, I did once.
 6        Q.    You showed your birth certificate
 7   to an employer?
 8        A.    Yes.
 9        Q.    Which employer?
10        A.    It would have been the Kroger
11   company in 2001, maybe.
12        Q.    You were applying for a position at
13   Kroger?
14        A.    Yes.
15        Q.    Did you get the job?
16        A.    Yes.
17        Q.    And who did you show your birth
18   certificate to there?
19        A.    The HR person.
20        Q.    Did they make any comments or
21   remarks about your birth certificate?
22        A.    No.
23        Q.    Did you fear bodily harm from the
24   HR person at Kroger?
25        A.    No.
```

1      Q.    Did the HR person harass you in any

2  way?

3      A.    No.  Kroger is a very -- very --

4  what's the word -- fair.

5      Q.    Progressive?

6      A.    Yes, progressive.  They hire lots

7  of diverse staff.

8      Q.    What about any other type of

9  benefits, governmental or anything like that,

10  have you ever had to show your birth

11  certificate in circumstances other than the

12  ones we've already talked about?

13      A.    I don't think so.

14          MR. BLAKE:  I think that's all I

15  have, Elizabeth.

16          MS. BONHAM:  Okay.  We'll take a

17  short break.  We might have a couple.

18          MR. BLAKE:  All right.

19          (Recess taken.)

20        EXAMINATION OF BASIL ARGENTO

21  BY MS. BONHAM:

22      Q.    Defendants' counsel has asked you

23  to testify about whether you feel bodily harm

24  or physical harm in instances where you have to

25  disclose your birth certificate.  Can you talk

CONFIDENTIAL

```
 1   about what you do feel in those instances?
 2        A.   Yeah.   There's a lot of anxiety
 3   about how I'll be treated.  As you can see,
 4   there are many instances where I was treated
 5   poorly and it's a lot of times dehumanizing
 6   because I'm telling something very personal
 7   about myself that I don't want to be telling, a
 8   stranger, especially one that I think is going
 9   to use it against me to make my life harder.
10   So, yeah, it's emotional.  It takes an
11   emotional toll.  And, you know, it's something
12   very simple that the Ohio Department of Health
13   could fix to cause trans people to have a much
14   easier time in their lives and not have to go
15   through this.
16        Q.   We've also talked today about
17   several disputed terms and disputed theories
18   around sex and gender in the litigation.  Have
19   you hired experts in this litigation?
20        A.   Yes.
21        Q.   And do you work with the experts
22   you've hired?
23        A.   Yes.
24        Q.   Are you relying on them to testify
25   about these matters?
```

CONFIDENTIAL

Page 127

1          A.    Yes.

2          Q.    What are you asking for in the

3    litigation?

4          A.    I'm asking for my birth certificate

5    to be corrected to say "male."

6               MS. BONHAM:  We don't have anything

7    further.

8               MR. BLAKE:  I'm good.  I have

9    nothing.

10               MS. BONHAM:  Okay.  Thanks very

11    much.  He'll read and sign.

12               (The deposition was concluded at

13               1:55 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 128

1   Whereupon, counsel was requested to give

2   instruction regarding the witness's review of

3   the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6   Transcript review was requested pursuant to the

7   applicable Rules of Civil Procedure.

8

9                    TRANSCRIPT DELIVERY:

10  Counsel was requested to give instruction

11  regarding delivery date of transcript.

12  Mr. Blake original regular.

13  Ms. Bonham copy regular.

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 129

```
 1              REPORTER'S CERTIFICATE
 2   The State of Ohio,    )
 3                                   SS:
 4   County of Fairfield. )
 5
 6            I, Kimberly A. Kaz, RPR, a Notary
 7   Public within and for the State of Ohio, duly
 8   commissioned and qualified, do hereby certify
 9   that the within named witness, BASIL ARGENTO,
10   was by me first duly sworn to testify the
11   truth, the whole truth and nothing but the
12   truth in the cause aforesaid; that the
13   testimony then given by the above-referenced
14   witness was by me reduced to stenotypy in the
15   presence of said witness; afterwards
16   transcribed, and that the foregoing is a true
17   and correct transcription of the testimony so
18   given by the above-referenced witness.
19            I do further certify that this
20   deposition was taken at the time and place in
21   the foregoing caption specified and was
22   completed without adjournment.
23
24
25
```

CONFIDENTIAL

Page 130

1            I do further certify that I am not

2    a relative, counsel or attorney for either

3    party, or otherwise interested in the event of

4    this action.

5            IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 13th day of

8    September, 2019.

9

10

11

12

13

14            Kimberly A. Kaz, RPR, Notary Public

15            within and for the State of Ohio

16

17    My commission expires March 31, 2023.

18

19

20

21

22

23

24

25

```
                                                    Page 131
1                      Veritext Legal Solutions
                           1100 Superior Ave
2                             Suite 1820
                         Cleveland, Ohio 44114
3                        Phone: 216-523-1313
4

    September 13, 2019
5

    To: Ms. Bonham
6

    Case Name: Ray, Stacie, et al. v. Director, Ohio Department Of Health,
7   Et Al.
8   Veritext Reference Number: 3493802
9   Witness:  Basil Argento        Deposition Date:  8/29/2019
10

    Dear Sir/Madam:
11

12  Enclosed please find a deposition transcript.  Please have the witness
13  review the transcript and note any changes or corrections on the
14  included errata sheet, indicating the page, line number, change, and
15  the reason for the change.  Have the witness' signature notarized and
16  forward the completed page(s) back to us at the Production address
    shown
17
    above, or email to production-midwest@veritext.com.
18

19  If the errata is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21

    Sincerely,
22

    Production Department
23

24

25  NO NOTARY REQUIRED IN CA
```

CONFIDENTIAL

Page 132

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS

 2
         ASSIGNMENT REFERENCE NO: 3493802
 3       CASE NAME: Ray, Stacie, et al. v. Director, Ohio Department
    Of Health, Et Al.
         DATE OF DEPOSITION: 8/29/2019
 4       WITNESS' NAME: Basil Argento
 5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have made no changes to the testimony
    as transcribed by the court reporter.
 8

    _____     _____
 9  Date                 Basil Argento
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
             Statement; and
14       Their execution of this Statement is of
             their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                  _____
18                Notary Public
19                _____
                  Commission Expiration Date
20
21
22
23
24
25
```

Veritext Legal Solutions

CONFIDENTIAL

Page 133

1                    DEPOSITION REVIEW
                    CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 3493802
3        CASE NAME: Ray, Stacie, et al. v. Director, Ohio Department
   Of Health, Et Al.
        DATE OF DEPOSITION: 8/29/2019
4        WITNESS' NAME: Basil Argento
5        In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9        I request that these changes be entered
   as part of the record of my testimony.
10

        I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
   that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____       _____
   Date                     Basil Argento
14

        Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
   the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
        They have listed all of their corrections
18            in the appended Errata Sheet;
        They signed the foregoing Sworn
19            Statement; and
        Their execution of this Statement is of
20            their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23        _____
        Notary Public
24

        _____
25        Commission Expiration Date

Veritext Legal Solutions

CONFIDENTIAL

Page 134

1              ERRATA SHEET

      VERITEXT LEGAL SOLUTIONS MIDWEST
2            ASSIGNMENT NO: 3493802

3  PAGE/LINE(S) /        CHANGE        /REASON
4  121:18 / insert "must" before "expressly" / transcription error

5  121:18 / replace "gives" with "give" / grammar

6  121:23 / insert "over" before "maybe" / transcription error

7  122:2-3 / replace "them to" with "the" / grammar

8  122:3 / omit "in" / grammar

9  125:23 / replace "feel" with "fear" / transcription error

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19

    __10/11/19__               ___[signature]___
20  Date                       Basil Argento

21  SUBSCRIBED AND SWORN TO BEFORE ME THIS ___11___

22  DAY OF ___October_____, 20 _19__  .

23  _____[signature]_____
    Notary Public

                              ┌──────────────────────────┐
                              │   MICHAEL WELLS          │
24                            │   NOTARY PUBLIC          │
                              │   STATE OF COLORADO      │
                              │  NOTARY ID 20184042146   │
    ___10/29/2022___          │ MY COMMISSION EXPIRES 10/29/2022 │
25  Commission Expiration Date└──────────────────────────┘

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.