Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4              ~~~~~~~~~~~~~~~~~~~~~
 5   STACIE RAY, BASIL ARGENTO, JANE DOE,
 6   AND ASHLEY BREDA,
 7               Plaintiffs,
 8
 9       vs.              Civil Action No.
10                        2:18-CV-00272-MHW-CMV
11   AMY ACTON, IN HER OFFICIAL CAPACITY
12   AS DIRECTOR OF THE OHIO DEPARTMENT
13   OF HEALTH, et al.,
14
15               Defendants.
16              ~~~~~~~~~~~~~~~~~~~~~
17                  Deposition of
18                   ASHLEY BREDA
19
                    August 21, 2019
20                    12:00 p.m.
21                    Taken at:
             Calfee Halter & Griswold, LLP
22          41 South High Street, Suite 1200
                    Columbus, Ohio
23
24       Kimberly A. Kaz, RPR, Notary Public
25
```

Page 2

1    APPEARANCES:

2

3         On behalf of the Plaintiffs:

4              Lambda Legal, by

5              KARA N. INGELHART, ESQ.

6              (via videoconference)

7              105 West Adams Street, Suite 2600

8              Chicago, Illinois  60603

9              (312) 663-4413

10             kingelhart@lambdalegal.org

11

12        On behalf of the Defendants:

13             Calfee Halter & Griswold, LLP, by

14             JAKE BLAKE, ESQ.

15             41 South High Street, Suite 1200

16             Columbus, Ohio  43215

17             (614) 621-7789

18             jblake@calfee.com

19                   ~ ~ ~ ~ ~

20

21        Also present:

22             Rachel Belenker, Esq.

23

24

25

CONFIDENTIAL

Page 3

1                  TRANSCRIPT INDEX

2

3    APPEARANCES................................    2

4

5    INDEX OF EXHIBITS ........................    4

6

7    EXAMINATION OF ASHLEY BREDA

8    By Mr. Blake.............................    5

9

10   REPORTER'S CERTIFICATE...................  122

11

12   EXHIBIT CUSTODY

13   EXHIBITS RETAINED BY COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    INDEX OF EXHIBITS

2    NUMBER            DESCRIPTION            MARKED

3    Exhibit 7    Birth Certificate............. 78

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                            Page 5
 1              ASHLEY BREDA, of lawful age, called

 2   for examination, as provided by the Federal

 3   Rules of Civil Procedure, being by me first

 4   duly sworn, as hereinafter certified, deposed

 5   and said as follows:

 6              EXAMINATION OF ASHLEY BREDA

 7   BY MR. BLAKE:

 8        Q.    Could you please state and spell

 9   your name for the record?

10        A.    My name is Ashley Breda,

11   A-s-h-l-e-y B-r-e-d-a.

12        Q.    Okay.  And you're here to testify

13   as -- as the plaintiff or one of the plaintiffs

14   in the case by you, among others, against the

15   Ohio Department of Health, among others; is

16   that right?

17        A.    I do apologize.  Can you repeat

18   that again?  You cut out.

19        Q.    Yes.  You're one of the plaintiffs

20   in a case against the Ohio Department of

21   Health, among others, correct?

22        A.    Yes.

23        Q.    And you're here to testify in a

24   deposition in that case, right?

25        A.    Yes.
```

CONFIDENTIAL

Page 6

1      Q.    Okay.  And as we've already

2   experienced, you're by video and we're by

3   video, and so sometimes the audio is a little

4   challenging, so if we could all take extra care

5   to speak clearly and slowly, I think that will

6   help the court reporter.  Is that okay with

7   you?

8          A.    Yes.

9          Q.    And I suspect that from time to

10  time, the court reporter is going to interrupt

11  and indicate to either you or me that she did

12  not get the -- the last statement clearly, and

13  so we may have to backtrack to some respect.

14         A.    Understood.

15         Q.    Okay.  Ms. Breda, is this your

16  first deposition that you've ever sat for?

17         A.    Yes.

18         Q.    Never testified in any sort of case

19  either as a party or a witness or anything like

20  that?

21         A.    No.

22         Q.    All right.  So just to lay some

23  very basic ground rules, seeing as how this --

24  this might be a first-time experience for you.

25  As you know, there's a court reporter.  That

Page 7

```
 1   court reporter is copying everything
 2   stenographically, and in order for her to do
 3   that, only one of us can talk at a time.  Do
 4   you understand?
 5          A.    Yes, I do.
 6          Q.    All right.  And I'll try to make an
 7   effort not to speak over you as well, and I'm
 8   sure we'll both, at various points throughout
 9   the day, foul that up.
10               The other thing that's important is
11   that all of our answers, all of your answers in
12   particular are auditory.  The court reporter's
13   very good, but she can't type down a nod or
14   shake of the head, and even some, like,
15   utterances like "um," "uh-huh" are ambiguous
16   when she types them.  So if we could answer
17   questions, you know, with -- orally and to the
18   extent needed, you know, with "yes" or "no" and
19   things like that.  Does that make sense?
20          A.    Yes.
21          Q.    Look at that.  You're already --
22   you've already got it.  All right.  Hold on.
23   We're going to take a brief pause since my IT
24   person is poking their head in, so wait one
25   second and we'll go off the record.
```

Page 8

1          (Discussion held off the record.)

2          Q.   Okay.  The other, I think,

3    important rule is that if you ever need to take

4    a break or stop, go to the restroom, just step

5    out of the room for whatever reason, it's your

6    deposition, you can ask for a break.  And so

7    long as a question is not pending, you know,

8    I'll -- everyone will agree and then the

9    deposition will just pause and you'll go do

10   whatever it is you think you need to do and

11   then we'll come back and continue the

12   deposition.  Do you understand that?

13         A.   Yes.

14         Q.   Okay.  Other than that, you know,

15   if anything else comes up, we'll just sort of

16   fix it as we go, but those are kind of the main

17   pieces that trip people up for the first time.

18   So with that, we can turn into some of the more

19   substantive matters.  Is that all right with

20   you?

21         A.   Yes.

22         Q.   Okay.  So the first thing I'd like

23   to do is just lay the ground work for some

24   terminology that I want to use during the

25   deposition.  The first term is "ODH," and

Page 9

1   that's an acronym for Ohio Department of

2   Health.  That is one of the defendants in this

3   case, but I'm going to just generically refer

4   to all the defendants as the Department of

5   Health or the Ohio Department of Health or ODH,

6   if that's okay with you.

7        A.    Yes.

8        Q.    Okay.  I also am going to use the

9   term "transgender" or "transgendered" or

10  "transgenderism" collectively.  You will

11  understand those or we can agree that those

12  refer to someone whose gender identity does not

13  align with his or her birth or biological sex.

14  Do you understand that?

15            MS. INGELHART:  Objection.  Calls

16  for expert testimony.  These terms of art are

17  at issue in the case.  You can answer.

18       Q.    Yeah, but you understand that I'm

19  using -- when I use the word "transgender,"

20  that's what I'm referring to?

21            MS. INGELHART:  Same objection.

22  Standing objection to terms of art, but you can

23  answer.

24            THE WITNESS:  Okay.

25            MR. BLAKE:  And your standing

CONFIDENTIAL

1  objection is noted.  So I understand there's a

2  dispute in this litigation regarding the terms

3  "gender" and "sex" and those sorts of things.

4         MS. INGELHART:  Thanks, Jake.

5     Q.  Similarly, "cisgendered," sort of

6  the reverse of the last term, someone who whose

7  gender identity aligns with their birth or

8  biological sex.  If I happen to use that term,

9  you'll understand that's what I mean.  Is that

10  okay?

11         MS. INGELHART:  And I just want to

12  clearly object for the record, not to belabor

13  the point, but the objection is to the fact

14  that these kind of terms and qualifications

15  call for expert testimony and it's not just the

16  word "cisgender" that you're requesting

17  clarification on, it's the word "sex,"

18  "gender," "biological sex," et cetera, that are

19  at issue.  Thank you.

20         MR. BLAKE:  Understood.

21     Q.  Can you answer the question?

22     A.  Okay.

23     Q.  All right.  Yeah.  Okay.  Let's

24  talk a little bit about your background.  What

25  is your address?

Page 11

1   ████      ███  ████████  ███  ████  █████   ██████

2   ████████   ██████   ███████  ██████   ██████   █████

3        Q.    And what is your highest level of

4   education?

5        A.    I have a Bachelor's degree.

6        Q.    What did you obtain your Bachelor's

7   degree in?

8        A.    Criminal justice.

9        Q.    When did you obtain your Bachelor's

10  degree in criminal justice?

11       A.    I'm sorry.  Do you mean when did I

12  graduate or when did I start?

13       Q.    When did you obtain the degree?

14  When did you graduate?

15       A.    I graduated, I believe, in 2013.

16       Q.    2013?

17       A.    No, '14.

18       Q.    '14.  And was that a four-year

19  degree?

20       A.    Yes.

21       Q.    And where did you -- what

22  institution did you obtain the degree from?

23       A.    Youngstown State University.

24       Q.    Is that where you're from, that

25  area, Youngstown area?

Page 12

```
 1          A.     Yes.
 2          Q.     And how old are you?
 3          A.     Twenty-nine.
 4          Q.     When you graduated Youngstown, did
 5    you -- did you work anywhere immediately
 6    following your graduation?
 7          A.     Yes, I did.
 8          Q.     Where did you work?
 9          A.     After my graduation, I worked at
10    Mahoning Valley Race Course as a security
11    officer.
12          Q.     I think you said the Mahoning
13    Valley --
14          A.     I'm not sure what it's called now,
15    but it's the Mahoning Valley Race Course,
16    C-o-u-r-s-e.
17          Q.     Oh, race course.  Mahoning Valley
18    Race Course, okay, as a security guard?
19          A.     Yes.
20          Q.     And how long did you do that for?
21          A.     Almost six months.
22          Q.     Okay.  And so approximately six
23    months after starting as a security guard, you
24    left that job, and what did you do next?
25          A.     I worked at Alorica.
```

CONFIDENTIAL

Page 13

```
 1          Q.     Could you spell that?

 2          A.     It's A-l-o-r-i-c-a.

 3          Q.     Alorica?

 4          A.     A-l-o-r-i-c-a.

 5          Q.     Oh, Alorica.

 6          A.     Yes.

 7          Q.     And what kind of company is

 8   Alorica?

 9          A.     It's a call center.

10          Q.     Is that where you work now?

11          A.     No.

12          Q.     All right.  How long did you work

13   at Alorica?

14          A.     Almost three years.

15          Q.     Three years.  Okay.  And when did

16   you leave, approximately?

17          A.     I left beginning of 2018.

18          Q.     And why did you leave?

19          A.     I moved to Phoenix, Arizona.

20          Q.     Where is Alorica located?

21          A.     It is located in Warren, Ohio.

22          Q.     Oh, it's in Warren.  Okay.  Why did

23   you decide to move to Phoenix, Arizona?

24          A.     I wanted a change.

25          Q.     Any other reason?
```

1      A.    No.

2      Q.    Just -- just wanted a change of

3  scenery, get out of the midwest, huh?

4      A.    Yes.

5      Q.    All right.  So you would have been

6  about 27, 28 at the time you moved out to

7  Phoenix?

8      A.    Yes.

9      Q.    Did you have work when you moved to

10  Phoenix or did you just kind of pull up root

11  and say catch as catch can?

12      A.    I pulled up root and didn't have a

13  job lined up.

14      Q.    Okay.  And do you have a job now?

15      A.    Yes, I do.

16      Q.    All right.  Was that the -- well,

17  let's back up.

18          When did you get employment after

19  moving to Phoenix?

20      A.    Between April and May.

21      Q.    Of?

22      A.    Of last year.

23      Q.    Of 2018?

24      A.    2018.

25      Q.    And who was that with?

CONFIDENTIAL

Page 15

1        A.    That is with Asurion,

2   A-s-u-r-i-o-n.

3        Q.    Asurion.  And is that where you

4   work now?

5        A.    Yes.

6        Q.    That's your current employer,

7   Asurion?

8        A.    Yes.

9        Q.    What kind of company is Asurion?

10       A.    A call center.

11       Q.    And what's your title at Asurion?

12       A.    I'm a tech support agent.  I don't

13   know my exact title.  It's changed multiple

14   times.

15       Q.    Tech support agent?

16       A.    Yes.

17       Q.    And so is Asurion, you know, like a

18   company where if people are having various

19   technical problems with something, they call

20   the help line and it gets to you and then you

21   try to walk them through and resolve whatever

22   problem they're having?  Is that accurate?

23       A.    Yes.  They're also the phone

24   insurance company.

25       Q.    Oh, okay.  And so if I were to call

```
 1   with an issue, depending on what I'm calling

 2   about, I might get routed to you; is that

 3   accurate?

 4        A.    Depending on which carrier you

 5   have, yes.

 6        Q.    Okay.  So you've been there about a

 7   year and a half?

 8        A.    Just over a year.

 9        Q.    Just over a year.  Any other

10   employment since graduating from Youngstown

11   that we haven't covered or discussed?

12        A.    I don't believe so.  I worked for

13   Sam's Club, but I believe I finished that

14   before I graduated.  If not, it would have been

15   shortly afterwards.

16        Q.    Okay.  Do you have any areas of

17   special expertise or knowledge which you may

18   have developed either during your education or

19   since you graduated that would not necessarily

20   fall into areas of criminal justice or the --

21   the jobs that we've talked about thus far?

22        A.    No.

23        Q.    You understand that sex and gender

24   are two different concepts, right?

25              MS. INGELHART:  Objection.  Calls
```

CONFIDENTIAL

Page 17

1    for expert testimony.

2         Q.    Go ahead and answer.

3         A.    As far as that goes, I would

4    consider them the same.

5         Q.    Okay.  You're not a medical doctor,

6    so you don't consider yourself having any

7    special expertise on a person's biological sex,

8    right?

9              MS. INGELHART:  Objection.  Calls

10   for expert testimony and to the standing

11   objection about terms of art, but you can

12   answer.

13             THE WITNESS:  Yeah.

14        Q.    Well, you're not a medical doctor,

15   right?

16        A.    No.

17        Q.    And you don't consider yourself

18   having expertise on biological sex, right?

19             MS. INGELHART:  Objection.  Calls

20   for expert testimony as to the term of art.

21   Standing objection, but you can answer.

22             THE WITNESS:  I do not.

23        Q.    And from a medical perspective, do

24   you understand how a person's sex is

25   determined?

1            MS. INGELHART:  Objection.  Calls

2    for expert testimony, but you can answer.

3            THE WITNESS:  I do.

4        Q.    So what is your understanding of

5    how a person's biological sex is determined?

6            MS. INGELHART:  Objection.  Calls

7    for expert testimony.

8            THE WITNESS:  In my personal

9    opinion, sex and gender are the same and it's

10   dependent on the gender identity of the

11   individuals.

12           Can I take a break?

13       Q.    Is that the end of your

14   understanding?  Have you finished answering

15   question?

16       A.    Yes.

17       Q.    Yep, you can take a break.

18           (Recess taken.)

19       Q.    So we left off, you had said that

20   your understanding of how a person's biological

21   sex is determined is based on their gender

22   identity.  Is that -- is that accurate?  Does

23   that accurately reflect your testimony?

24           MS. INGELHART:  Objection.

25   Misstates testimony and also calls for expert

1    testimony, but you can answer.

2                THE WITNESS:  I said I believe sex

3    and gender are the same thing.

4        Q.    And then what is your understanding

5    of how a person's biological sex is determined?

6                MS. INGELHART:  Objection.  Calls

7    for expert testimony.  You can answer.

8                THE WITNESS:  I'm not entirely

9    certain.

10       Q.    Okay.  So -- and maybe I misheard

11   your testimony before we took a break, but you

12   testified that you thought it depended on

13   someone's gender identity.  Are you -- are you

14   saying that it may depend on that or other

15   things, or are you saying you just don't know?

16               MS. INGELHART:  Objection.  Vague.

17   Misstates prior testimony, but you can answer.

18               THE WITNESS:  I believe you

19   stated -- you said "sex" before and you're

20   saying "biological sex" now, that's why I

21   was --

22       Q.    Let me ask you this:  In your mind,

23   is there a difference between someone's

24   biological sex and sex?

25               MS. INGELHART:  Objection.  Calls

CONFIDENTIAL

Page 20

```
 1   for expert testimony.  You can answer.

 2             THE WITNESS:  I am not sure how to

 3   answer that question.

 4        Q.    So you don't know if there's a

 5   difference between biological sex and sex?

 6        A.    Correct.

 7             MS. INGELHART:  Objection.  Expert

 8   testimony.  That's fine.

 9        Q.    And you don't know if there's a

10   difference between someone's sex or gender?

11             MS. INGELHART:  Objection.  Calls

12   for expert testimony.  You can answer.

13             THE WITNESS:  I believe that's the

14   same thing.

15        Q.    Okay.  And then what about the

16   difference between someone's biological sex and

17   their gender, do you know if there's a

18   difference between those two things?

19             MS. INGELHART:  Objection.  Calls

20   for expert testimony.

21             THE WITNESS:  I'm unfamiliar with

22   that term, but I don't believe it -- there's a

23   difference.

24        Q.    Do you have an understanding of how

25   a person's gender identity is determined?
```

CONFIDENTIAL

```
                                                 Page 21
 1              MS. INGELHART:  Objection.  Calls
 2   for expert testimony, but you can answer.
 3              THE WITNESS:  Personally, I do.
 4         Q.    Okay.  What is your -- what is your
 5   personal understanding?
 6         A.    My personal understanding is that
 7   is determined by what they present as.
 8         Q.    And "they" being the individual?
 9         A.    Yes.
10         Q.    You're not a psychiatrist or
11   psychologist, are you?
12         A.    No.
13         Q.    You don't consider yourself an
14   expert on gender or gender identity, do you?
15         A.    I do not.
16         Q.    You haven't taken any courses on
17   distinction between sex and gender, right?
18         A.    I have not.
19         Q.    You don't have an certifications or
20   degrees under which you've achieved -- that
21   you've achieved, sorry, on the distinction
22   between sex and gender?
23         A.    I do not.
24         Q.    You haven't published any papers on
25   the distinction between sex and gender?
```

CONFIDENTIAL

Page 22

1        A.      I have not.

2        Q.      Nor have you given any talks or

3    presentations on the topic of sex and gender?

4        A.      I have not.

5        Q.      Do you believe birth certificates

6    are a form of identification?

7                MS. INGELHART:  Objection.  Calls

8    for expert testimony and legal conclusion, but

9    you can answer.

10               THE WITNESS:  Personally, I do.

11       Q.      And do you believe that birth

12   certificates reflect a person's biological data

13   that exists at the time of birth?

14               MS. INGELHART:  Objection.

15   Apologies.  Objection.  Calls for expert

16   testimony and legal conclusion.

17               THE WITNESS:  Can you clarify the

18   question?

19       Q.      I can repeat it and then we can go

20   from there.  If you need further clarification,

21   I'm happy to do so.

22               Do you believe that birth

23   certificates reflect biological data that

24   exists at the time of an individual's birth?

25               MS. INGELHART:  Same objection.

Page 23

1           THE WITNESS:  I apologize, but what
2    do you mean by "biological data"?
3        Q.    Okay.  So do you understand what
4    the term "biological data" means?
5        A.    Not completely.
6        Q.    Would you consider a person's name
7    biological data?
8           MS. INGELHART:  Objection.  Calls
9    for legal conclusion and to the term of art
10   issue we've been discussing.  It appears that
11   "biological information" is being used as a
12   term of art and plaintiff isn't an expert in
13   such definition, but you can answer.
14          THE WITNESS:  Can you give me the
15   definition of it?
16       Q.    Well, I can try.  I think it might
17   be more productive, though, to -- well, let's
18   put it this way:  You have a Facebook page,
19   right?
20       A.    I do.
21       Q.    And on that Facebook page, you
22   enter certain information, your name, maybe
23   some of your interests, maybe some of your
24   hobbies, approximately where you're from or
25   where you live, right?

Page 24

1    A.    Yeah.

2    Q.    So that's the kind of information

3    which I'm referring to as biological data.  Do

4    you understand?

5    A.    Yes, I do know.

6    Q.    So based on that understanding, do

7    you agree that a birth certificate contains

8    biological data that exists at the time of

9    birth of an individual?

10        MS. INGELHART:  Objection.  Calls

11   for expert testimony, a term of art, but you

12   can answer.

13        THE WITNESS:  Personally, as a form

14   of identification, I believe it should require

15   information as of -- that is current.

16   Q.    Okay.  So your belief is that the

17   birth certificate should have current

18   information on it, right?

19   A.    That's correct.

20   Q.    But I guess my question wasn't

21   about what you believe should be, my question

22   is about what actually is, and so does the

23   birth certificate contain information,

24   biological or otherwise, which existed at the

25   time of birth of the individual?

Page 25

```
1              MS. INGELHART:  Objection.  Calls

2    for expert testimony and the term of art

3    issues, but you can answer.

4              THE WITNESS:  It would contain

5    information from then, yes.

6         Q.    Do you know whether the information

7    on the birth certificate is recorded by the

8    individual who was born or by the Ohio

9    Department of Health?

10             MS. INGELHART:  Objection.  Calls

11   for expert testimony.  Beyond the scope of

12   plaintiff's knowledge.

13             THE WITNESS:  I am not sure who

14   fills that information out.  My apologies.

15        Q.    So you don't know who fills it out?

16        A.    That's correct.

17        Q.    Do you have any -- well, let me ask

18   you this:  Do you believe the individual who's

19   identified on the birth certificate fills out

20   the information?

21        A.    Obviously not.

22        Q.    But who else it might have been,

23   you don't have any idea?

24        A.    That's correct.  If it was the

25   parents, the Department, I am not familiar with
```

Page 26

1  how that works.

2       Q.    And do you have any understanding

3  on what ODH's role is in recording information

4  that has reported to it on the birth

5  certificate?

6            MS. INGELHART:  Objection.  Expert

7  testimony.

8            THE WITNESS:  Not entirely.

9       Q.    Well, what about partially, do you

10 have any partial understanding?

11           MS. INGELHART:  Objection.  Vague.

12           THE WITNESS:  I understand a little

13 bit about it, but I don't know the actual

14 policies and procedures as to how it's done.

15      Q.    What is your understanding about

16 how the Department of Health records that

17 information?

18           MS. INGELHART:  Objection.  Calls

19 for expert testimony.  You can answer.

20           THE WITNESS:  That some of the

21 information is recorded when the person is

22 born.

23      Q.    Anything else?

24      A.    No.

25      Q.    Recorded by ODH, right?

CONFIDENTIAL

Page 27

1              MS. INGELHART:  Objection.  Expert

2      testimony.  You can answer.

3              THE WITNESS:  If that's who does

4      it.  I wasn't sure if it was that or the

5      doctors.  I'm not familiar how that procedure

6      works.  I've never had a child.

7          Q.    Understood.

8              To your knowledge, does the

9      individual whose information is recorded on the

10     birth certificate certify the accuracy of the

11     birth certificate?

12             MS. INGELHART:  Objection.  Expert

13     testimony.  You can answer.

14             THE WITNESS:  Do you mean, at the

15     time that it's there or later on?

16         Q.    Well, let's start with at the time

17     that the birth record is prepared.

18         A.    Obviously not.

19         Q.    And what about in any other time

20     after that?

21         A.    If there are any mistakes,

22     inconsistencies, then yes.

23         Q.    Do you know what the process would

24     be for an individual to certify the accuracy of

25     their birth certificate?

Page 28

1           MS. INGELHART:  Objection.  Calls

2   for expert testimony.

3           THE WITNESS:  I do not.

4      Q.    Have you ever attempted to --

5           MS. INGELHART:  Calls for a legal

6   conclusion.

7      Q.    Have you ever attempted to certify

8   the accuracy or mistakes, as you characterize

9   them, on your birth certificate?

10     A.    I had my name changed on the birth

11  certificate, if that's what you're asking.

12     Q.    No, not exactly.  But other than

13  your name change, have you attempted to certify

14  any accuracies or inaccuracies or mistakes on

15  your birth record?

16     A.    No.

17     Q.    At the time you were born on your

18  birth record, was your name is correct?

19          MS. INGELHART:  Objection.  Calls

20  for legal conclusion.  You can answer.

21          THE WITNESS:  I suppose not.

22     Q.    No.  Your name was accurate as of

23  the time you were born.  Later on in life, you

24  changed your name, right?

25     A.    Correct.

1      Q.    And then you submitted some filings

2  or paperwork with the Department of Health to

3  have that name changed on your birth record,

4  right?

5      A.    I believe so, but it wasn't the

6  courthouse that I gave the information to.

7      Q.    All right.  The courthouse, then,

8  filed or submitted that paperwork to ODH,

9  right?

10     A.    Most likely, yeah.

11     Q.    Is it your understanding, then,

12  that that information was actually changed on

13  your -- on your birth record?

14     A.    I was told it was.

15     Q.    Have you seen a copy of your birth

16  record that includes that new information?

17     A.    Yes.

18     Q.    We'll take a look later at your

19  birth record, but I want to move on to another

20  topic for the moment.

21            Do you hold yourself out as a

22  transgendered individual to the public?

23            MS. INGELHART:  Objection.  Vague.

24            THE WITNESS:  What do you mean by

25  that exactly?

Page 30

1      Q.    Well, I mean, do you advertise the
2    fact that you're transgendered?
3           MS. INGELHART:  Objection.  Vague.
4    Foundation.
5           THE WITNESS:  To the public, no.
6      Q.    Are you part of any groups
7    associated with transgendered individuals?
8      A.    What would be your definition of
9    "groups" be?
10      Q.    Any support groups or organizations
11    or charities or advocacy groups, anything.
12      A.    No.
13      Q.    How many people have you told that
14    you are transgendered?
15           MS. INGELHART:  Objection.  Vague.
16    You can answer.
17           THE WITNESS:  Quite a few.
18      Q.    Can you ballpark the -- the number?
19    Is it greater than 50?  Is it less than 50?
20      A.    I came out to my Facebook friends,
21    so I don't have an exact number.
22      Q.    How many Facebook friends do you
23    have?
24      A.    I'm not sure.
25      Q.    Is it hundreds?

CONFIDENTIAL

Page 31

1        A.    Most likely.  I don't keep track of

2   that.

3        Q.    So it's a number that's so great,

4   you don't even keep track of it; is that right?

5                MS. INGELHART:  Objection.

6   Misstates prior testimony.  You can answer.

7                THE WITNESS:  No.  I just don't

8   keep track of how many friends I have on

9   Facebook.

10        Q.    And you've came out to all of them

11   as transgendered, correct?

12                MS. INGELHART:  Objection.

13   Misstates prior testimony and is vague, but you

14   can answer.

15                THE WITNESS:  Actually, no.  I came

16   out a few years ago, so anyone after that may

17   not know I'm trans.

18        Q.    All right.  So it's your testimony

19   that you came out on Facebook a few years ago,

20   but since then, any new friends that have

21   joined or friended you on Facebook may or may

22   not know your status as a transgendered person.

23   That's your testimony?

24        A.    Yes.

25        Q.    You could easily find out how many

CONFIDENTIAL

Page 32

1   friends you have on Facebook, right?

2          A.    Yeah.

3          Q.    I know I don't have an exhibit to

4   show you of your Facebook page, but I've had a

5   chance to look at it, and on the top of your

6   Facebook page, on your -- at the top of your

7   profile, there's a picture of someone who looks

8   like you.  Does that ring a bell?

9              MS. INGELHART:  Objection.  Lacks

10  foundation and speculation, but you can answer.

11             THE WITNESS:  Are you talking about

12  my profile picture?

13         Q.    I'm talking about your Facebook

14  profile picture to which your attorney has

15  objected on foundation grounds, yes.

16         A.    Yes.

17         Q.    And it says your name, Ashley

18  Breda, right?

19         A.    Ashley Breda.

20         Q.    Ashley Breda, right?

21         A.    Yes.

22         Q.    And then right underneath that,

23  there's a box labeled "intro," and on that book

24  box, it says:  I'm a 29-year-old trans woman

25  who lives all things anime, gaming and tech

Page 33

1   related.

2            Does that ring a bell?

3            MS. INGELHART:  Same objection to

4   foundation and calling for speculation, but you

5   can answer.

6            THE WITNESS:  I actually didn't

7   realize it said that.  My Facebook login

8   changed and there's no intros anymore.

9        Q.   So does that change your answer on

10  whether or not the entire collection of your

11  Facebook friends, which you said likely numbers

12  in the hundreds, know about your status as a

13  transgendered individual?

14           MS. INGELHART:  Objection.  Calls

15  for speculation.

16           THE WITNESS:  I said I --

17       Q.   I'm sorry.  It came back again.

18  It's not you, it's the system.  It's literally

19  cutting out.

20       A.   Okay.  I said I speculate that most

21  do, but I'm sure there's a few who don't.

22       Q.   And that's because you've

23  advertised that on the front page of your

24  Facebook profile that you are a 29-year-old

25  trans woman, right?

1        MS. INGELHART:  Misstates --

2   objection.  Misstates prior testimony and lack

3   of foundation, but you can answer.

4        THE WITNESS:  To my friends, yes.

5   I believe my Facebook is private.

6      Q.    Would a private Facebook account

7   prevent people from viewing this information

8   about you being a trans woman?

9        MS. INGELHART:  Objection.  Calls

10  for speculation.  Lack of foundation.  You can

11  answer.

12       THE WITNESS:  I thought it did.

13     Q.    That -- if -- well, that wouldn't

14  explain how I was able to just type it in and

15  look it up, though, right?

16       MS. INGELHART:  Objection.  Calls

17  for speculation.  You can answer.

18       THE WITNESS:  Yes.  You taught me

19  something new.

20     Q.    Well, I think we've all

21  demonstrated that I am not technological expert

22  today 'cause I couldn't even turn up the volume

23  on the video conferencing, so I will assure you

24  I didn't do anything highly advanced to get

25  onto your Facebook page, and it says what it

```
 1   says.  And so, I mean, you would agree that at
 2   least that information is available to the
 3   public at large, right?
 4             MS. INGELHART:  Objection.  Calls
 5   for speculation.  You can answer.
 6             THE WITNESS:  From the information
 7   you've given me, I suppose it is.
 8        Q.    And while we're on the subject,
 9   let's just briefly talk about your Twitter
10   handle.  You have a Twitter handle or you tweet
11   as @▬▬▬▬▬▬ is that right?
12        A.    That's correct.
13        Q.    And if you go to that Twitter
14   handle, it -- it says Ashley Breda at the top
15   and @▬▬▬▬▬▬ right?
16             MS. INGELHART:  Objection.
17   Foundation.  You can answer.
18             THE WITNESS:  I believe so, yes.
19        Q.    And then you've got, like, on your
20   banner, it looks like some screen captures or
21   graphics related to some anime and final
22   fantasy.  Does that ring a bell?
23        A.    Yes.
24             MS. INGELHART:  Objection.
25   Foundation.  It's fine.  You can answer.
```

CONFIDENTIAL

Page 36

```
 1        Q.    And like your Facebook account, at
 2   least some aspects of your Twitter account are
 3   open to the public, are they not?
 4              MS. INGELHART:  Objection.
 5   Foundation.  Speculation.  You can answer.
 6              THE WITNESS:  I would assume so.
 7        Q.    And anyone with log onto Twitter
 8   and see that you, Ashley Breda, tweet under the
 9   handle of ██████████████     right?
10        A.    Yeah.
11              MS. INGELHART:  Calls for
12   speculation.  You can answer.
13        Q.    And like your Facebook page, it
14   says you're 29, right?
15        A.    Yes.
16        Q.    And it also says you're trans,
17   right?
18        A.    It does.
19        Q.    And "trans" is short for
20   "transgender," right?
21        A.    Yes.
22        Q.    And it also says ██████████   right?
23              MS. INGELHART:  Objection.
24   Foundation.  You can answer.
25              THE WITNESS:  That's correct.
```



Page 37

1
2
3
4
5

6          MS. INGELHART:  Objection.  Sorry.
7   Objection.  Calls for expert testimony and to
8   the standing objection on terms of art at issue
9   in the case, but you can answer.
10          THE WITNESS:  Can you repeat the
11   question?
12      Q.    Yeah.  I'd love to.  Well, let's
13   back up.
14
15
16          MS. INGELHART:  Objection.  Vague,
17   but you can answer.
18
19
20
21
22
23          MS. INGELHART:  Objection.  Vague.
24   Misstates, but you can answer.
25          THE WITNESS:  That's correct.

CONFIDENTIAL

Page 38

1  ██████████ ██ ███ █ ███ ████████ ██ ██ ██ ████

2  ███ █████

3       Q.    2014, yeah.

4       A.    Yeah.  So it would have been

5  sometime in the beginning, in the winter to

6  spring of 2015.

7              Can I take another break?

8              MR. BLAKE:  Sure.  Absolutely.

9              (Recess taken.)

10      Q.    So when we took a break, we were

11 just trying to understand what -- what this

12 entry ██ ████████ meant on your Twitter page,

13 and I understand now, based on your testimony,

14 ████ ████ ████ ███ ██ ██ ███ ███ ████ ████

15 ███ ████ ███ ████ ███████ ██ ████████

16 ██ ██ ███████

17      A.    Yeah.

18      █ ███ ████ ███ ███ ████ ████ ██ ████

19 ██████ ██ ████ ███ ██ ██ ████ ████

20      A.    That's correct.

21      █ ███ ████ ████ ███ ████ ██ ██ ████

22 ████ ██ ███ ███ ██ ██ ████ ████████

23             MS. INGELHART:  Objection.  Expert

24 testimony.  You can answer.

25             THE WITNESS:  To the best of my

1  knowledge, ▇▇▇ ▇▇ ▇▇▇▇ ▇▇ ▇▇▇▇ ▇▇▇▇ ▇

2  ▇▇▇▇ ▇▇▇▇ ▇ ▇▇▇ ▇▇▇ ▇▇▇ ▇▇▇

3      Q.    ▇▇ ▇ ▇ ▇▇ ▇▇▇ ▇▇▇ ▇▇▇ ▇

4  ▇▇▇ ▇▇▇ ▇▇▇▇ ▇▇▇ ▇ ▇ ▇ ▇▇▇ ▇▇▇

5  ▇▇▇ ▇▇▇ ▇▇▇ ▇▇ ▇▇ ▇▇▇▇

6            MS. INGELHART:  Objection.  Calls

7  for expert testimony and vague, but you can

8  answer.

9            THE WITNESS:  Personally to me,

10 yes.

11     Q.    And like your Facebook page, this

12 Twitter page is available for anyone, including

13 me, to go and see, right?

14     A.    That's correct.

15     Q.    Do you have any idea how many

16 people have gone onto your Twitter page and

17 seen that you are a -- identified as a trans?

18            MS. INGELHART:  Objection.

19 Speculation.  You can answer.

20            THE WITNESS:  I have absolutely no

21 idea.

22     Q.    You would expect that to be a large

23 number, though, right?

24            MS. INGELHART:  Objection.

25 Speculation.  You can answer.

CONFIDENTIAL

1          THE WITNESS:  Maybe.  I don't use

2     Twitter much.

3          Q.    Today's date is the 21st of August,

4     right, correct?

5          A.    Probably.  I actually don't know

6     the date.

7          Q.    Okay.  I will represent to you

8     today is August 21st, 2019, and if I have

9     messed that up, I assure you your counsel will

10    object.  Assuming today is the 21st, even in

11    your time zone, on August 18th, you tweeted:  I

12    love Windows 10 LOL.

13          Do you recall making that tweet?

14          MS. INGELHART:  Objection.

15    Foundation.  You can answer.

16          THE WITNESS:  Yes.

17          Q.    And on August 17th, you tweeted:

18    How is it that every fire emblem is better than

19    the last?  I love it.

20          Do you recall making that tweet?

21          MS. INGELHART:  Objection.

22    Foundation.  You can answer.

23          THE WITNESS:  I do.

24          Q.    And on August 10th:  This is long,

25    but it's an amazing read, and then there's some

CONFIDENTIAL

Page 41

1  link.  Do you recall tweeting that?

2             MS. INGELHART:  Objection.

3  Foundation.  You can answer.

4             THE WITNESS:  Yes.  That's

5  automated.

6      Q.    And on August 9th, you wrote or

7  tweeted:  Sure, LOL.  Right?

8             MS. INGELHART:  Objection.

9  Foundation.  You can answer.

10            THE WITNESS:  Probably.

11     Q.    All right.  So that's at least four

12  tweets in the last week or so, 11 days.  Is

13  that -- does that -- is that consistent with

14  your Twitter usage over the past few months?

15            MS. INGELHART:  Objection.

16  Foundation, but you can answer.

17            THE WITNESS:  Probably.

18     Q.    So I guess with regards to a

19  question I asked previously, you know, the

20  number -- trying to put a finger on the number

21  of people you've told that you're

22  transgendered.  You can't really be certain but

23  if you include Facebook friends and potential

24  people who viewed your Twitter page, that could

25  be in the hundreds, if not higher; is that fair

Page 42

1    to say?

2              MS. INGELHART:  Objection.  Calls

3    for speculation.  You can answer.

4              THE WITNESS:  I would speculate

5    that's true.

6        Q.   Do you know how many people have

7    found out about your transgendered status due

8    to your birth certificate?

9              MS. INGELHART:  Objection.  Calls

10   for speculation.  You can answer.

11             THE WITNESS:  I know of a few, yes.

12       Q.   Which -- can you identify those few

13   instances?

14       A.   When I had to present my birth

15   certificate at Alorica, and another example is

16   at the Arizona DMV or whatever it is.  It's a

17   different acronym than Ohio.

18       Q.   All right.  So let's just take

19   those one at a time.

20             Alorica is the employer you

21   discussed earlier, which was the call center in

22   Warren, Ohio; is that right?

23       A.   That's correct.

24       Q.   And your testimony is that you

25   were -- you had to -- or you turned over your

CONFIDENTIAL

Page 43

1    birth certificate to that employer, what, as

2    part of your hiring process?

3          A.    Yes.

4          Q.    And were you required to turn over

5    that birth certificate in order to start work

6    with Alorica?

7          A.    That's correct.

8          Q.    And when you turned over that

9    information or your birth to Alorica, were

10   there any other documents that they would have

11   taken in substitution of the birth certificate?

12         A.    They needed my birth certificate

13   and a state ID.  They needed both.

14         Q.    Okay.  And whom at Alorica did you

15   give your birth certificate to?

16         A.    The HR department.

17         Q.    And when you handed it to the HR

18   department, did you hand it to a specific

19   individual or did you just put it in an

20   envelope and kind of send it into the

21   department?

22         A.    I handed it to the secretary.  I

23   don't know the name.

24         Q.    And when you handed it to the

25   secretary, did she review the birth

CONFIDENTIAL

Page 44

1    certificate, or do you know?

2         A.    She looked at it.

3         Q.    All right.  And do you know

4    whether -- well, did they make a copy of it and

5    give it back to you, or did you have to leave

6    it with them for a while?  What do you know?

7         A.    I left it with them for a while.  I

8    don't know what they did with it.

9         Q.    And then at some point in time,

10   they gave it back?

11        A.    Yes.

12        Q.    Did anyone at Alorica question you

13   about the sex identifier on your birth

14   certificate?

15             MS. INGELHART:  Objection to the

16   ongoing term of art issue at issue in this

17   case, but you can answer.

18             MR. BLAKE:  Yeah.  And I've granted

19   you the standing objection on that term, and if

20   you want to sort of write down the terms and

21   read for the record the exact terms you're

22   objecting to.  I just think if you object to

23   every single question that I have that includes

24   any one of those terms, particularly with the

25   difficulty of the video, we might be here

Page 45

1   forever.  So if that's satisfactory to you,

2   that's what I'd recommend.  Will that work for

3   you?

4            MS. INGELHART:  Yeah.  So let's

5   make a list now of terms that I have heard so

6   far, and then if there's a new term introduced

7   or one that I missed, is that fine?

8            MR. BLAKE:  Fantastic.

9            MS. INGELHART:  Okay.  So great.

10  Great.  Thanks.  So "sex," "biological sex,"

11  "gender," "gender identity," "transgender" and

12  variations thereof like "transgenderism" or

13  "transgendered" and also "cisgender."  I

14  believe those are the terms.  Do you recall any

15  others, Jake, that I've objected to?

16           MR. BLAKE:  Yeah, "sex identifier."

17           MS. INGELHART:  Thank you.  Thank

18  you.  "Sex identifier."  And, yes, thank you.

19  Sorry.  Apologies.  I will --

20           MR. BLAKE:  And just so the

21  record's clear, counsel for ODH is granting a

22  standing objection on the grounds that such

23  terms are potentially terms of art.  Is that a

24  fair characterization of your objection?

25           MS. INGELHART:  Yes.  Thank you.  I

CONFIDENTIAL

Page 46

1    appreciate it.

2              MR. BLAKE:  Okay.  And, of course,

3    the Department of Health and the other

4    defendants do not waive their rights to oppose

5    those objections if and when that becomes

6    necessary.

7         Q.    Okay.  Very good.

8              See if I can figure out where I

9    was.  Alorica, Warren, Ohio, a lovely city.  So

10   did anyone either from the HR department or

11   anyone else at Alorica ever talk to you about

12   the sex identifier on your birth certificate?

13        A.    They did, yes.

14        Q.    Okay.  Who talked to you about the

15   sex identifier?

16        A.    Multiple people in my HR

17   department, multiple supervisors, employees.

18   The HR department told everyone I was trans.

19        Q.    So I wrote down multiple people in

20   the HR department, supervisors and other

21   employees.  Is that the list?

22        A.    That's correct.

23        Q.    All right.  Approximately when --

24   when did this occur, date?

25        A.    It was once when I was first hired,

Page 47

1    and also I had to present it again later on
2    down the line.  I don't have exact dates.
3         Q.    I don't know if I got the
4    approximate date when you started at Alorica.
5    I have that you left at the beginning of 2018,
6    and you were there for three years, so would
7    the beginning of 2015 be an approximate time
8    frame for when you started at Alorica and had
9    to hand over your birth certificate to the HR
10   department?
11        A.    The beginning or middle of 2015, I
12   believe.  I don't recall the exact time.
13   
14
15
16        A.    That's correct.
17        Q.    And it says you joined Facebook in
18   September 2018.  Have you updated your
19   introductory information since you joined in
20   September 2008?
21        A.    I would assume so.
22        Q.    When did you come out to your
23   friends on Facebook about your status as a
24   trans person?
25        A.    Sometime in early 2015, I believe.

Page 48

1      Q.     So prior to --

2      A.     I don't remember the exact date.

3      Q.     Prior to or around the same time as

4   the time you started at Alorica?

5      A.     Prior.

6      Q.     Prior to that.  And would you have

7   included that blurb about "I am a 29-year-old

8   trans woman who loves all things anime, gaming

9   and tech related" on your Facebook page at

10  about the same time you came out to your

11  friends on Facebook as being trans?

12     A.     I don't believe so.  I believe

13  that's much -- I believe that's more recent.

14     Q.     Okay.  Understood.  But you made at

15  least some disclosure on Facebook to whomever

16  your Facebook friends were at that point about

17  your status as a trans individual, correct?

18     A.     Yes.

19     Q.     What did the multiple people in the

20  HR department talk to you about regarding your

21  birth certificate?

22     A.     They made various jokes about it,

23  what you would expect.

24     Q.     I wouldn't expect that at all,

25  frankly, and I'm sorry to hear that.  But your

1    testimony is that the HR department at Alorica

2    came up to you after you handed in your birth

3    certificate and mocked you for being a

4    transgendered person; is that right?

5            A.    Yes.

6            Q.    All right.  Well, I'm sorry to hear

7    that.  I refer to my prior comment about

8    Warren, Ohio, but I guess that puts me in the

9    same boat, I suppose.  I'm making fun of them.

10               All right.  Anything else regarding

11   your birth certificate, or I should say

12   anything actually related to some business

13   purpose regarding the birth certificate from

14   the HR department?

15           A.    Yes.  They also requested when I

16   asked to use the women's bathroom, to see my

17   birth certificate again, which caused more

18   issues.

19           Q.    So that's the time you said they

20   requested the birth certificate when you

21   started your employment, and then later on

22   during your employment when you were trying to

23   use the bathroom that was appropriate for your

24   gender, they wanted to see your birth

25   certificate again; is that accurate?

Page 50

1        A.    That's correct.

2        Q.    And -- well, let's back up.

3              When you turned in your birth

4    certificate and they talked to you at the

5    beginning, they never indicated that you

6    wouldn't be hired or would be unsuitable for a

7    particular job based on your gender, right?

8        A.    No.

9        Q.    Okay.  And then later, with the

10   bathroom incident, did you actually present

11   your birth certificate again?

12       A.    I did.

13       Q.    And did that resolve the issue?

14       A.    It did not.

15       Q.    What did they -- after you turned

16   in your birth certificate, what did they tell

17   you to do?

18       A.    I believe her words were, "I'll

19   never be a woman.  I'll always be a man in

20   God's eyes," and then the site director become

21   involved and let me use the bathroom.

22       Q.    So who was this woman?  Was it

23   someone in HR?

24       A.    She was the head of HR.  I don't

25   recall her name anymore.

1      Q.    This was the head of HR came up to
2   you?
3      A.    I do believe so, yes.
4      Q.    And said that you would never be a
5   woman in God's eyes.  That was the head of HR
6   for this company?  Is that -- do I have that
7   right?
8      A.    For that site, yes.  And this was
9   in her private office.
10     Q.    I understand why you left for
11  Phoenix.  I think I fully understand why you
12  went to Phoenix.
13     A.    I'm sorry.  We're getting some
14  feedback here.
15     Q.    Oh, sorry.
16           MS. INGELHART:  We put ourselves on
17  mute.  Yeah, I don't know what's causing it.
18           MR. BLAKE:  How's that?
19           THE WITNESS:  I think --
20     Q.    I was just commenting that I think
21  I understand why you went to Phoenix.
22     A.    Yeah.
23     Q.    I don't blame you.
24           Okay.  So the site supervisor at
25  Alorica got involved and allowed you to use

Page 52

```
 1   the -- the restroom appropriate for your
 2   gender; is that right?
 3        A.    That's correct.
 4        Q.    And when, approximately, was that?
 5        A.    I don't remember the exact date.  I
 6   know it was maybe a couple of months after I
 7   started.
 8        Q.    Okay.  So in the beginning part of
 9   your employment?
10        A.    Yeah.  It would have been a few
11   months after I started.
12        Q.    And other than this incident with
13   the HR director and the various folks from HR
14   making jokes, were there any other -- were
15   there any other times that you were confronted
16   by HR about your gender or your birth
17   certificate or anything like that?
18        A.    I don't believe so.
19        Q.    Okay.  Let's talk about the
20   supervisor incidents, then.  Was it one
21   supervisor or many supervisors?
22        A.    The HR lead told -- from what I was
23   told, she told everyone.
24        Q.    So the head HR person -- is this
25   the same person that had the bathroom issue?
```

1      A.     Yes.

2      Q.     She told everyone.  And when you

3  say "everyone," everyone that worked at that

4  site?

5      A.     I'm sure not everyone, but majority

6  of the people I came in contact with found out

7  either from her or from someone she told.

8      Q.     And that included some of your

9  supervisors?

10     A.     That's correct.

11     Q.     All right.  And what did your

12  supervisors do with that information?

13     A.     Well, some of them started treating

14  me differently.  A few of them, from that

15  point, purposely misgendered me and offhand

16  comments.

17     Q.     How did they treat you differently?

18     A.     I'm not sure how to put that into

19  words.

20     Q.     So you're unable to -- you're

21  unable to -- you're unable to convey the way in

22  which they were treating you differently?  Is

23  it just your general sense?

24     A.     That, and like I said, some of them

25  would -- started purposes misgendering me and I

Page 54

1    stopped being called for a couple of things by

2    them.

3          Q.    You stopped being called for, like,

4    certain tasks or work?

5          A.    Both, yeah.

6          Q.    So you felt as if your supervisors

7    were intentionally directing work away from you

8    based on your gender?

9          A.    Some of them, yes.

10         Q.    Some, but not all?

11         A.    Correct.

12         Q.    And you said misgendered.  What do

13    you mean by misgendering you?

14         A.    I mean as far as spread that I was

15    trans, everyone referred to me as "he"

16    afterwards.  Quite a few people started saying

17    "he."

18         Q.    Okay.  And the offhanded comments

19    coming from your supervisors, what did those

20    entail?

21         A.    Various comments involving --

22    trying to think of a way to put this in a kind

23    official way, but my downstairs area.

24         Q.    So they would -- they would

25    actually remark on your anatomy?

Page 55

1        A.      That's correct.

2        Q.      At a place of work?

3        A.      That's correct.

4        Q.      In 2015?

5        A.      That's correct.

6        Q.      Okay.  And then you -- you

7   mentioned coworkers, other employees.  Could

8   you describe the circumstances involving those

9   individuals?

10       A.      I know quite a few made comments

11  behind my back.  I don't know exactly what the

12  comments are, but I do know quite a few of them

13  were very, very much anti-trans.

14       Q.      So you don't --

15       A.      And it made me very uncomfortable.

16       Q.      Did you overhear any of the

17  comments?

18       A.      I did, but I don't recall what the

19  exact comments were.

20       Q.      So you overheard anti-trans

21  comments being relayed by some of your -- your

22  colleagues at work.  Would you characterize it

23  as a handful or -- or some?  I mean, what

24  number of colleagues?

25       A.      I would probably say a handful.

Page 56

1      Q.    Okay.  So not -- not most, but some

2   of your -- your colleagues were passing around

3   sort of anti-transgendered comments; is that

4   right?

5      A.    Yes.

6      Q.    Did Alorica have any policies about

7   workplace harassment or hostile workplace

8   activities?

9           MS. INGELHART:  Objection.  Calls

10   for speculation.  You can answer.

11           THE WITNESS:  For some things, not

12   others.  It wasn't until the -- near the end of

13   my tenure that they added being trans to that

14   list.

15      Q.    Oh, so when you joined Alorica,

16   they had a workplace harassment policy, right?

17      A.    That covered some things, but not

18   that.

19      Q.    And is it your understanding that

20   it covered things like probably sex and race

21   and religion, those sorts of things?

22      A.    It covered race and religion, but

23   the original guideline did not -- I don't

24   believe it said that.

25      Q.    Oh, okay.  So -- but sometime

CONFIDENTIAL

Page 57

1   during your employment, they -- they added --

2   well, did they add transgender to the list

3   of -- of items?

4        A.    I don't recall.  I do know that

5   they added sex to it.

6        Q.    I see.  So you don't know if they

7   specifically added transgender to their

8   workplace harassment policy, but you know they

9   added sex to their workplace harassment policy;

10  is that right?

11       A.    That's correct.

12       Q.    After they added sex to the

13  workplace harassment policy, did the harassment

14  against you stop?

15       A.    It did.

16       Q.    Were there ever any site-wide or

17  company meetings about what kind of behavior

18  was appropriate and inappropriate at the

19  workplace?

20       A.    Yeah.

21       Q.    And do you feel that at least some

22  of those meetings or that meeting was as a

23  result of some of the harassment that had been

24  going on against you?

25       A.    It could have been.  I'm not able

CONFIDENTIAL

Page 58

1    to speculate if that was the case or if that

2    was just company-wide.

3          Q.    Did you report any of these

4    activities to others in the company?

5          A.    You mean did I report me being

6    harassed by HR to HR?

7          Q.    Well, that was going to be my next

8    question, but did -- my question was, you know:

9    Did you report any of these activities?  And it

10   sounds like the answer might be no, but I want

11   you to --

12         A.    I did provide these to some of my

13   immediate supervisors.

14         Q.    Okay.  And I understand the issues

15   with HR, which probably deterred you from

16   finding that a very useful pursuit, but did

17   you -- did you report any of this to HR?

18         A.    I did complain about it, I believe,

19   and reported two of my supervisors to HR.

20         Q.    Okay.  But as far as whether or not

21   any action was taken based on your reports, you

22   don't know one way or the other?

23         A.    No.  They did not share that with

24   me.

25         Q.    Except for that one time when the

1 site supervisor intervened and said, no, you

2 can use this bathroom, which matches your

3 gender?

4      A.    Yes.

5      Q.    All right.  Okay.  Very good.  I

6 know that that's difficult to relay, so I

7 appreciate your willingness to go through it in

8 detail with me today.

9           All right.  Let's turn our

10 attention briefly to the Arizona -- what you

11 called the DMV.  I take it that you mean the

12 Arizona Department of Motor Vehicles or

13 whatever their equivalent is, right?

14      A.    Yes.  It's a different acronym than

15 it is in Ohio, so I get them confused.

16      Q.    I'm sorry?

17      A.    I said it's a different acronym

18 than in Ohio, so I get them confused.

19      Q.    I think we're the BMV.

20      A.    I believe so.

21      Q.    Anyway, it's not important.  We're

22 all talking about the same thing.

23           And can you just go into a little

24 bit of detail about that incident?

25      A.    Sure.  I had gone there to get a

Page 60

1   new ID since I had moved to Arizona.  When I

2   did that, even though I showed them my Ohio ID

3   with female on it, they refused because they

4   said it's not a valid form of identification

5   and that they only accept based on the birth

6   certificate.

7        Q.    So you went to the Arizona DMV to

8   get a new state issued ID, right?

9        A.    That's correct.

10        Q.    And was that a driver's license or

11   just an ID?

12        A.    It's a state ID.  I don't have a

13   driver's license.

14        Q.    Okay.  And in order to get that new

15   ID, you thought just showing your Ohio ID would

16   be sufficient, right?

17        A.    That is what I assumed, yes.

18        Q.    But when you got there, the clerk

19   at the DMV told you, "No, we don't accept the

20   Ohio ID, I need to see your birth certificate";

21   is that right?

22        A.    That is correct.  They said they

23   needed both.

24        Q.    All right.  So you then -- at that

25   point, did you show your birth certificate to

Page 61

1    the clerk?

2         A.    I did.

3         Q.    So you happened to have it with

4    you, I guess, right?

5         A.    I try to be prepared.

6         Q.    Yeah.  All right.  And what

7    happened when you showed the clerk the birth

8    certificate?

9         A.    They said they would be happy to

10   give me a state ID, but they said according to

11   Arizona law, they would not be allowed to put

12   female on it because my birth certificate said

13   male.  It wasn't until two supervisors got

14   involved who then talked about it quite loudly

15   and then they made an exception.

16        Q.    All right.  So, ultimately, after

17   the two supervisors got involved, they gave you

18   a state identification card which matches your

19   gender; is that accurate?

20        A.    That's correct.

21        Q.    And was the clerk wrong when he or

22   she said according to Arizona law, they

23   wouldn't be able to enter your gender on

24   their -- on their state ID?

25             MS. INGELHART:  Objection.  Calls

www.veritext.com                                    888-391-3376

CONFIDENTIAL

1  for speculation and a legal conclusion, but you
2  can answer.
3              THE WITNESS:  I don't know.
4      Q.    But they made the change, so does
5  that indicate to you that she was incorrect
6  about her interpretation of Arizona law?
7              MS. INGELHART:  Objection.  Calls
8  for speculation.  You can answer.
9              THE WITNESS:  Like I said, I'm not
10  sure.
11     Q.    Okay.  I want to look at
12  Exhibit No. 2, which let me know when you have
13  that in front of you.
14             MS. INGELHART:  I've got all of
15  them right here.  Could you remind me which one
16  is 2?  I apologize.  They're not numbered.  I
17  apologize.
18             MR. BLAKE:  It's the complaint.
19             MS. INGELHART:  Perfect.  I'm going
20  to put the number on it now to avoid that.
21  Here you go.
22     Q.    Do you have that in front of you
23  now?
24     A.    I do.
25     Q.    All right.  So what you've just

Page 63

1   been handed as been previously marked as

2   Defendants' Exhibit 2, and this is the

3   complaint filed by you and others against the

4   Ohio Department of Health and others.  Do you

5   recognize this document?

6           A.    I do.

7           Q.    And before today, have you -- have

8   you seen this document?

9           A.    Yes.

10          Q.    Did you provide information that

11  was used to form or draft the allegations in

12  this document?

13          A.    Yes.

14          Q.    Okay.  I want you to turn to

15  Page 21.  At the top of that page, it's

16  Paragraph 97.

17          A.    You said Page 21?

18          Q.    Correct.

19              MS. INGELHART:  You know what?

20  She's looking at the wrong document.  I'm

21  correcting.  Here's Page 21 of Exhibit 3,

22  Paragraph 97.

23              THE WITNESS:  Okay.

24          Q.    So if you look at Paragraph 97,

25  about two-thirds to the bottom, there's a

Page 64

1  sentence which reads:  The clerk erroneously

2  indicated that the gender marker on one's state

3  identification card would need to match the

4  gender marker on one's birth certificate.

5            Do you see that sentence?

6       A.   I do.

7       Q.   And you previously had testified

8  that you weren't sure whether the clerk was

9  properly interpreting the law.  Now that I've

10  read that sentence to you, does that refresh

11  your recollection as to whether or not the

12  clerk was properly applying Arizona law?

13       A.   I believe she wasn't.

14       Q.   That's what you meant when you said

15  "erroneously," right?

16       A.   Yes.  What I was saying before was

17  that I don't know the specific law, but yes.

18  You are -- uh-huh.

19       Q.   Thank you.

20            THE WITNESS:  Can I take another

21  break?

22            MR. BLAKE:  Sure.  Yeah.  It's

23  fine.  Thank you.

24            (Recess taken.)

25       Q.   If you look at the next paragraph

CONFIDENTIAL

Page 65

1    in the complaint, Paragraph 98.

2         A.    Give me one moment.

3              MS. INGELHART:  Page 21.

4              THE WITNESS:  Okay.

5         Q.    You indicate that it was

6    humiliating to defend your sex to the Arizona

7    government employee; is that accurate?

8         A.    Yeah.

9         Q.    And in the previous paragraph, you

10   indicate that that interaction occurred in a

11   public place.  Do you see that?

12        A.    That's correct.

13        Q.    Were there other people at the

14   Arizona DMV within earshot of the conversation

15   of the two supervisors with their employee?

16        A.    Yes.

17        Q.    How many would you say?

18        A.    I don't know.  There was a lot of

19   people in line behind us.

20        Q.    Did anyone that was in line behind

21   you come up afterwards and confront you or talk

22   to you about what they had overheard?

23        A.    No, but I left incredibly quickly.

24        Q.    Okay.  So you don't know one way or

25   the other whether --

1        A.    Like I said, it was humiliating.

2        Q.    But you don't know one way or the

3  other what any of those people thought or how

4  they reacted to the conversation that they --

5  they could have overheard at the Arizona DMV;

6  is that accurate?

7        A.    Yeah.  There was a few people that

8  was staring, but no one said anything.

9        Q.    So the Ohio Department of Health is

10  a government agency of the State of Ohio.  Is

11  that your understanding?

12        A.    That is my understanding, yes.

13        Q.    And Alorica is a private employer,

14  and, in particular, this site located in

15  Warren, Ohio, right?

16        A.    That's correct.

17        Q.    Are you aware of any connection

18  between the Ohio Department of Health and

19  Alorica?

20        MS. INGELHART:  Objection.  Calls

21  for speculation and calls for a legal, but you

22  can answer.

23        THE WITNESS:  I don't know.

24        Q.    You don't know if you're aware or

25  you're not aware?

CONFIDENTIAL

Page 67

1          A.    I'm not aware.  I don't know what
2     you mean.
3          Q.    Do you have any evidence or
4     information to support any connection between
5     the Ohio Department of Health and Alorica?
6          A.    Like, a direct connection or an
7     indirect connection?
8          Q.    Either.
9          A.    Well, I don't believe it would have
10    happened if my birth certificate had correctly
11    identified me.
12         Q.    Yeah.  I guess that wasn't my
13    question.  My question was:  What evidence do
14    you have that suggests that there's any
15    connection direct or indirect between the Ohio
16    Department of Health and the Alorica call
17    center in Warren, Ohio?
18              MS. INGELHART:  Object.  Calls for
19    a legal conclusion.  You can answer.
20              THE WITNESS:  I'm not aware of any.
21         Q.    I mean, Alorica's not a government
22    entity, right?
23         A.    As far as I'm aware.
24         Q.    It's not an office of the -- Office
25    of Vital Statistics, right?

Page 68

1          A.      Not that I'm aware.  I'm not sure
2     what contracts they have right now.
3          Q.      When you were taking calls during
4     your time of employment, you were receiving
5     calls regarding phone providers, right?
6          A.      That's correct.
7          Q.      You never took a call where someone
8     was having trouble accessing, say, ODH's web
9     page or understanding the process for
10    correcting their birth certificate, right?
11         A.      That's correct.
12         Q.      ODH didn't direct Alorica to
13    request your birth certificate as part of your
14    on-boarding as an employee at the company,
15    correct?
16              MS. INGELHART:  Objection.  Calls
17    for speculation.  You can answer.
18              THE WITNESS:  No, but it is a
19    common practice.
20         Q.      And ODH didn't direct the head of
21    HR to make jokes about your gender, correct?
22         A.      No.
23         Q.      And ODH didn't direct HR to tell
24    everyone else at the site about your gender,
25    right?

Page 69

1              MS. INGELHART:  I mean, objection.

2    Calls for a legal conclusion and speculation,

3    but you can answer.

4              THE WITNESS:  Like I said before,

5    no, but if my birth certificate was correct,

6    this wouldn't have happened.

7        Q.    And ODH didn't direct your

8    supervisors to start treating you differently

9    based on the information recorded on your birth

10   certificate, right?

11             MS. INGELHART:  Objection.  Calls

12   for a legal conclusion.  Speculation.  You can

13   answer.

14             THE WITNESS:  No, but them knowing,

15   it is very common.

16       Q.    And ODH didn't direct your

17   colleagues or the other employees at the site

18   to make the anti-transgender comments about

19   you, right?

20             MS. INGELHART:  Same objection.

21   You can answer.

22             THE WITNESS:  No.

23       Q.    To your knowledge, ODH didn't do

24   anything to direct or authorize anyone at

25   Alorica to do any of the things that you've

CONFIDENTIAL

Page 70

1  discussed today while you were employed there,

2  right?

3          A.    No.  But, like I said, if this

4  would not have happened, they would not have

5  found out if it was on my birth certificate

6  showing male.

7          Q.    You believe that the only thing

8  that caused employees and HR director and

9  supervisors at Alorica to harass you was the

10 fact that your birth certificate includes the

11 sex identifier of male?  That's your testimony?

12              MS. INGELHART:  Object.  Sorry.

13 Objection.  Misstates prior testimony.  You can

14 answer.

15              THE WITNESS:  It announced me as

16 trans, which made me become open to the

17 problem.

18         Q.    Did anyone at Alorica ever tell you

19 if it hadn't been for your birth certificate,

20 none of this harassment would have ever

21 occurred?

22         A.    Yes.

23         Q.    Who told you that?

24         A.    I had quite a few friends that said

25 that they would not have known I was trans if

CONFIDENTIAL

1  it wasn't for that information being presented

2  and them being told.

3      Q.    And so it's your assumption or

4  belief that had that information not been

5  included on your birth certificate, the head of

6  HR, for example, wouldn't have harassed you

7  about the bathroom?

8          MS. INGELHART:  Objection.  Calls

9  for speculation.  You can answer.

10          THE WITNESS:  Yes.

11      Q.    In the situation at the Arizona

12  Department of Motor Vehicles, you understand

13  that that agency is run by the State of

14  Arizona, right?

15      A.    Yes.

16      Q.    And that the State of Arizona

17  isn't -- well, that the laws and rules issued

18  in and enforced by the State of Arizona aren't

19  issued and enforced by ODH, right?

20          MS. INGELHART:  Objection.  Calls

21  for a legal conclusion.  You can answer.

22          THE WITNESS:  Can you repeat the

23  question again?

24      Q.    Sure.  ODH has nothing to do with

25  the Arizona Department of Motor Vehicles,

CONFIDENTIAL

Page 72

1  right?

2            MS. INGELHART:  Objection.  Calls

3  for legal conclusion and speculation.  You can

4  answer.

5            THE WITNESS:  I'm not sure.  I'm

6  sure they share information with each other.

7       Q.    And on what basis to you contend

8  that the Arizona Department of motor vehicles

9  shares information with the Ohio Department of

10  Health?

11       A.    Because they typed in my ID number

12  and my identification came up.

13       Q.    Which ID number did they type in?

14       A.    The ID on my Ohio ID.

15       Q.    The Ohio -- your state issued ID?

16       A.    Yeah.

17       Q.    Not the ID number on your birth

18  certificate?

19       A.    No.

20       Q.    And, I mean, is it -- is it your

21  understanding that the Ohio Department of

22  Health does not manage or record or track Ohio

23  State identifications, including the state

24  identification that was issued to you?

25       A.    Okay.  Yeah.

1      Q.    All right.  That would be probably

2   managed, and I don't know, maybe you know, by

3   the Ohio Bureau of Motor Vehicles, right?

4            MS. INGELHART:  Objection.  Calls

5   for speculation.  You can answer.

6            THE WITNESS:  I would assume so.

7      Q.    Yeah.  That's a safe assumption.

8   That's my assumption, at least, but you don't

9   have any -- you don't have any evidence to

10  suggest that that assumption's incorrect,

11  right?

12     A.    No.

13     Q.    So let me ask the question again

14  about Arizona.  The Ohio Department of Health

15  has nothing to do with the Arizona Motor

16  Vehicle Division, right?

17            MS. INGELHART:  Objection.  Asked

18  and answered.  You can answer.

19            THE WITNESS:  As far as I know.

20     Q.    And do you know whether Arizona's

21  Motor Vehicle Division is required by law or

22  rule to inspect the birth certificate before

23  providing a state identification?

24     A.    I don't know.

25     Q.    You don't know for certain, right?

CONFIDENTIAL

1        A.    Yes.

2        Q.    And whether or not Arizona has such

3   a law or rule, you aren't contending that the

4   Ohio Department of Health has any role in

5   enforcing or enacting Arizona's laws or rules

6   or policies, right?

7             MS. INGELHART:  Objection.  Calls

8   for speculation.  You can answer.

9             THE WITNESS:  Can you repeat the

10  question again?

11       Q.    Yeah.  Whether or not Arizona has

12  such a law or rule, you aren't contending that

13  the Ohio Department of Health has any role in

14  enforcing or enacting Arizona laws, rules or

15  policies, right?

16       A.    Yes.

17       Q.    And ODH certainly doesn't have

18  anything to do with whether an Arizona state

19  employee is properly interpreting or applying

20  Arizona law, right?

21            MS. INGELHART:  Objection.  Calls

22  for a legal.  Speculation, but you can answer.

23            THE WITNESS:  I suppose that.

24       Q.    If you go back to Page 20 on

25  Defendants' Exhibit 2, which is the complaint

CONFIDENTIAL

1  we previously looked at, and look at

2  Paragraph 95.  Let me know when you're there.

3      A.    Yes.

4      Q.    That paragraph reads:  Ms. Breda is

5  aware of the high incidents of harassment,

6  discrimination and violence directed at

7  transgender people.  She has personally been a

8  target of online harassment.

9          Do you see that?

10     A.    Yes.

11     Q.    When were you a target of online

12  harassment?

13     A.    Multiple times, I would get -- I

14  would get messages on Facebook.  Twitter is

15  pretty good at making sure that those messages

16  don't reach me, so I don't know about Twitter.

17     Q.    Okay.  So your -- the harassment

18  would come through Facebook; is that accurate?

19     A.    For the most part, yes.

20     Q.    And when did the harassment begin

21  approximately?

22     A.    It began shortly after I came out

23  before I made my Facebook private.

24     Q.    Okay.  So that would have been

25  in -- and I apologize.  What was the year where

Page 76

1    you came out on Facebook?

2          A.    2015, I believe.

3          Q.    2015.  And at that point, you know

4    for a fact your Facebook profile was public,

5    right?

6          A.    I believe so, yes.

7          Q.    And you started receiving

8    harassment through Facebook, and is that what

9    prompted you to make your profile private or at

10   least semiprivate?

11         A.    That's correct.

12         Q.    And that would have been, when,

13   towards the end of 2015 or --

14         A.    Probably.  I'm not sure of the time

15   I made it private.

16         Q.    The harassment carried on for a few

17   months, though?

18         A.    Yeah.  I still get some messages on

19   occasion, even now.

20         Q.    Okay.  And the harassment, just to

21   be clear, this is harassment directed at your

22   status as a transgender individual?

23         A.    Yep.

24         Q.    And as we saw before, at least some

25   public elements of your Facebook account which

Page 77

```
 1   still advertise your status as a transgender
 2   individual, right?
 3          A.    Yes.
 4          Q.    Did you ever display your birth
 5   certificate online on your Facebook page or
 6   anything like that?
 7          A.    I don't recall.
 8          Q.    And so assuming you hadn't done
 9   that, how did the people harassing you online
10   know that you were transgendered, do you know?
11               MS. INGELHART:  Objection.  Calls
12   for speculation.  You can answer.
13               THE WITNESS:  I'm not sure.
14   Probably because it's printed on my page.
15          Q.    So you don't contend that anything
16   ODH has done has resulted in the online
17   harassment, right?
18               MS. INGELHART:  Objection.  Calls
19   for speculation.  You can answer.
20               THE WITNESS:  I guess not.
21   Actually, I'd like to correct something I said.
22          Q.    Go ahead.
23          A.    I believe I did put a partial
24   picture of my birth certificate on my Facebook
25   profile.
```

Page 78

1    Q.    All right.  When did you do that?

2    A.    It would have been shortly after my

3  name change.

4    Q.    We can go ahead and go to

5  Exhibit 7, if you like.

6                  -  -  -  -  -

7            (Thereupon, Deposition Exhibit 7,

8            Birth Certificate, was marked for

9            purposes of identification.)

10                 -  -  -  -  -

11    Q.    Got that in front of you?

12    A.    Yes, I do.

13    Q.    What's just been handed to you has

14  been previously marked as Exhibit 7, and this

15  is a copy of your certification of birth issued

16  by the Ohio Department of Health and the

17  Mahoning County General Health District.  Do

18  you see that?

19    A.    Yes.

20    Q.    It says at the -- well, the name is

21  Ashley Abigail Breda.  That's you, right?

22    A.    That's correct.

23    Q.    Date of birth, ███████ ███████ ███████?

24    A.    That's correct.

25    Q.    All right.  Your mother's and your

CONFIDENTIAL

Page 79

1    father's name is there.  That's all correct,

2    right?

3          A.    Yep.

4          Q.    And if you keep doing down, it says

5    legal name change on file, CO No. 120995.  Do

6    you see that?

7          A.    I do.

8          Q.    Is it your understanding that that

9    reflects there was a name change to the name on

10   this birth record?

11         A.    That's correct.

12         Q.    And so that's what you're referring

13   to when you said that you had a name change on

14   your birth certificate and you posted it on

15   your profile, right?

16              MS. INGELHART:  Objection.

17   Misstates prior testimony.  You can answer.

18              THE WITNESS:  For the most part,

19   yes.  I believe the picture that I posted only

20   showed the small section where it says my name,

21   date of birth, and I'm not sure if I had the

22   sex section there or not.

23         Q.    All right.  So at least at this

24   time, your recollection as to what you posted

25   on Facebook was just a small section of the

1   birth certificate showing your name and your

2   date of birth, correct?

3          A.     That's correct.

4          Q.     And as far as you know, you did not

5   post the sex category on the birth record,

6   which here indicates male, correct?

7          A.     I can't recall if I did or not.

8          Q.     Is that information that you can

9   find out?

10          A.     I could attempt to if it's still

11   there.

12          Q.     And was this done before or after

13   you made your profile public -- or, sorry, made

14   your profile private on Facebook?

15          A.     It would have -- I'm not sure.  It

16   would most likely have still been public then.

17          Q.     Okay.  So you think at some point

18   in time, you publicly posted a partial picture

19   of your birth certificate and it may or may not

20   have included the sex identifier as indicated

21   on Exhibit 7; is that accurate?

22                 MS. INGELHART:  Objection.

23   Misstates prior testimony.  You can answer.

24                 THE WITNESS:  Can you repeat what

25   you just said?

CONFIDENTIAL

Page 81

1          Q.     Yeah.  Let me try.

2               It's your testimony, then, that

3     during the time when your Facebook profile was

4     still public, you posted a partial picture of

5     your birth record, which, among other things,

6     may have revealed the sex identifier as male,

7     which is indicated on Exhibit 7; is that

8     accurate?

9               MS. INGELHART:  Objection.

10    Misstates prior testimony.  It's also compound.

11    You can answer, if you can.

12               THE WITNESS:  I believe so.

13               MR. BLAKE:  And I would just note

14    for the record that to the extent it's possible

15    for Ms. Breda to verify the photo she posted

16    publicly, we would just like confirmation one

17    way or the other whether that photo included

18    the sex information recorded on Exhibit 7.

19               MS. INGELHART:  Noted.  We will

20    inquire.  Thank you.

21               MR. BLAKE:  No.  Thank you.

22         Q.    I know before you said you weren't

23    currently involved in any transgender groups,

24    but have you ever been involved in any groups

25    that are focused on transgender issues or

CONFIDENTIAL

Page 82

1    anything of that nature?

2         A.    That's why I asked you before about

3    what do you mean by "groups"?  I'm on a few

4    sub-Reddits, but I don't know if that would

5    fall under "group."  Otherwise, no.

6         Q.    I guess I don't know until I look.

7    I'm -- I'm happy to hear that people born in

8    the '90s still find Reddit useful, but what are

9    the sub-Reddits that you're involved in?

10        A.    A couple trans positive.  I don't

11   really say anything, I just, like, read them.

12        Q.    So are these groups that are open

13   to anybody or do you have to register, do you

14   know?

15        A.    I don't recall.

16        Q.    And when you post or, you know,

17   view these Reddits, sub-Reddits, is your -- is

18   anything identifying -- is there any

19   identifiable information about you that would

20   allow another user to track you down and know

21   who you are, or are you operating under an

22   alias like Valkyrieash or something like that?

23        A.    Yeah.  I operate under the alias.

24        Q.    Here in Columbus, we have a

25   festival called the Pride festival.  Are you

Page 83

1  familiar with the Pride festival?

2       A.    Yes.

3       Q.    And my understanding, at least, of

4  the Pride festival here in Columbus is that

5  it's a celebration of LGBTQ issues and people,

6  and part of the LGBTQ is transgender.  Is that

7  your understanding?

8       A.    Yes.

9       Q.    Have you ever participated in the

10  Columbus Pride festival?

11       A.    Unfortunately, I haven't

12  participated in any Pride festivals yet.

13       Q.    So have you heard of Phoenix Pride?

14       A.    I have, yes.

15       Q.    Is it -- is it your intent to one

16  day take -- participate in the festival?

17       A.    Potentially, maybe.  I don't know.

18       Q.    No plans as of today?

19       A.    That's correct.

20       Q.    Okay.  Well, whether or not you

21  attend any of the Pride festivals around the

22  country, including Phoenix Pride festival, your

23  status as a transgendered person does not

24  humiliate you, right?

25                 MS. INGELHART:  Objection.  Vague.

Page 84

1         THE WITNESS:  Well, I don't like my
2  friends knowing about it, but it feels unsafe
3  to have strange people that don't know about
4  it.  I don't know what their opinions are on
5  it.  I don't know if I will face violence from
6  them because of it.
7         Q.    It's not something you're ashamed
8  of, right?
9         A.    No.
10        Q.    You're proud of your status as a
11  transgendered individual, right?
12        A.    I wouldn't say I'm fully proud of
13  it.  I'd rather just be seen as a woman, but I
14  do accept it.
15        Q.    I mean, that's why you advertise it
16  on your Facebook page, which is, to some
17  degree, available to the public, and why you
18  advertise it on your Twitter feed, which is
19  certainly available to the public, because
20  you're proud of it, right?
21        MS. INGELHART:  Objection.
22  Misstates prior testimony, but you can answer.
23        THE WITNESS:  I mean, I put it
24  there, but I wouldn't necessarily say I'm proud
25  of it, but I'm not unproud of it, if that makes

Page 85

1  sense.

2      Q.    Your profile pic on your Facebook

3  page includes you on what appears to be a pen

4  or a sticker which says:  Trans rights are

5  human rights.  I mean, that's a statement that

6  you're proud of, right?

7      A.    Well, trans rights are human

8  rights.

9      Q.    Of course they are, but this is

10 something that you, espouse as of you, which is

11 something that you advertise to the public and

12 to the community that is part of your identity

13 and something which makes you proud and unique,

14 right?

15          MS. INGELHART:  Objection.

16 Misstates prior testimony, but you can answer.

17          THE WITNESS:  I'm vocal about trans

18 rights because I don't think it's right that we

19 get discriminated against.  I wish we could

20 just be seen as women that we are.

21      Q.    So part of your claim in your

22 complaint is that the Department of Health

23 discriminates against transgendered people

24 because they're not permitted to change the sex

25 identifier on their birth certificate, right?

CONFIDENTIAL

Page 86

1      A.     Yes.

2      Q.     Are you aware of any laws in Ohio

3  related to birth certificates that mention

4  transgender individuals?

5              MS. INGELHART:  Objection.  Calls

6  for a legal conclusion.  You can answer.

7              THE WITNESS:  I'm not sure.

8      Q.     You're not aware of any such laws?

9              MS. INGELHART:  Same objection.

10  You can answer.

11             THE WITNESS:  Yeah.  I haven't -- I

12  haven't kept up to date with them because I'm

13  not in Ohio right now.

14      Q.     Well, before you left for Ohio,

15  were you aware of any laws that dealt with

16  transgendered individuals, and in particular

17  related to their birth certificates?

18             MS. INGELHART:  Objection.  Calls

19  for a legal conclusion.  You can answer.

20             THE WITNESS:  I don't know.

21      Q.     You don't know if you were aware or

22  you don't know if there are any such laws?

23      A.     I don't know if there are any such

24  laws.

25      Q.     Do you know whether Ohio laws

CONFIDENTIAL

Page 87

1    permit anyone, regardless of gender, change

2    their sex marker on their birth certificate?

3             MS. INGELHART:  Objection.  Calls

4    for a legal conclusion.  You can answer.

5             THE WITNESS:  I'm -- I don't know.

6        Q.   You don't know if anyone's

7    permitted to change their sex marker, or you

8    don't know of any laws?

9             MS. INGELHART:  Objection.  Calls

10   for a legal conclusion.  You can answer.

11            THE WITNESS:  I don't know if there

12   are any laws that do that.  I'm sure there

13   might be, but I don't know for certain.

14       Q.   Okay.  It's your understanding that

15   ODH will not change a birth certificate based

16   on gender identity, right?

17            MS. INGELHART:  Objection.  Calls

18   for a legal conclusion.  You can answer.

19            THE WITNESS:  In my opinion, yes.

20       Q.   And that that law applies whether a

21   person is transgender or cisgender or anything

22   else, right?

23            MS. INGELHART:  Objection.  Calls

24   for a legal conclusion.  You can answer.

25            THE WITNESS:  Can you repeat the

Page 88

1   question one more time?

2        Q.    Sure.  That the law, that ODH will

3   not change a birth certificate based on gender

4   identity applies whether a person is

5   transgendered or cisgender or anything else,

6   correct?

7        A.    Well, there would be no reason for

8   cisgendered persons to change their birth

9   certificate 'cause they identify correctly with

10  it, so this would only be in regards to trans

11  people.

12       Q.    That's --

13       A.    I'm not 100 percent understanding

14  why you're saying it that way.

15       Q.    I mean, that's your opinion that a

16  cisgendered person has no reason to change

17  their birth certificate or the sex identifier

18  on they are birth certificate, but at least

19  nothing you can think of, right?

20       A.    Not that -- nothing that I can

21  think of at the moment.

22       Q.    Do you know when Ohio's laws

23  related to birth certificates were enacted?

24            MS. INGELHART:  Objection.  Calls

25  for a legal, but go ahead.

Page 89

1          THE WITNESS:  I don't.  And can I

2    take another break?

3          MR. BLAKE:  Sure.  Yeah.  Fine.

4          (Recess taken.)

5      Q.    All right.  So you're not aware of

6    anything related to the legislative process of

7    how any of Ohio's laws related to birth

8    certificates were enacted, right?

9      A.    That's correct.  That's why I have

10   my lawyer.

11     Q.    And you're not aware of any

12   legislative purpose when Ohio's laws were

13   enacted related to any hatred or ill will

14   towards transgender people?

15         MS. INGELHART:  Objection.  Calls

16   for a legal conclusion.  You can answer.

17         THE WITNESS:  I have no idea.  I

18   have no way of knowing that.

19     Q.    All right.  Let's turn back to

20   Exhibit 7, if you would.  And as we said,

21   Exhibit 7 is a copy -- a copy of your

22   certification of birth.  Do you know what a

23   public record is?

24     A.    Yes.

25     Q.    What is your definition of a public

Page 90

1    record?

2         A.    A record that's public.

3         Q.    Yeah.  I guess I deserve that.

4              Well, would you characterize your

5    birth certificate as a record that is public?

6              MS. INGELHART:  Objection.  Calls

7    for a legal conclusion.  You can answer.

8              THE WITNESS:  I don't know.

9         Q.    Are you aware that anyone can go to

10   any county health department in Ohio, and as

11   long as they know your name and approximate

12   birth year, they can request your birth

13   certificate?

14        A.    I was not aware of that.

15        Q.    If that is, in fact, the procedure

16   for requesting a birth record, does that change

17   your opinion on whether or not a birth record

18   in Ohio is a public record?

19        A.    I suppose.

20        Q.    And in what way does it change your

21   opinion?

22        A.    Well, my opinion would change from

23   I don't know to yes if what you're saying is

24   true because you just told me it was a public

25   record.

CONFIDENTIAL

Page 91

1    Q.    Thank you.

2          Your birth certificates sex is

3    male, right?

4          MS. INGELHART:  Objection.  Calls

5    for a legal conclusion.  You can answer.

6          THE WITNESS:  The birth certificate

7    does say male.

8    Q.    And that information was recorded

9    by ODH based on information provided to ODH at

10   or near the time of your birth, correct?

11   A.    Yes.

12         MS. INGELHART:  Objection.  Calls

13   for expert testimony.  Legal conclusion.

14   Speculation.  Foundation.  You can answer.

15         THE WITNESS:  As far as I'm aware

16   of, yes.

17   Q.    You don't have any evidence to

18   contradict that your sex was recorded as male

19   by ODH based on information provided by anyone

20   else at or near the time of birth, right?

21         MS. INGELHART:  Objection.  Expert

22   testimony.  Speculation.

23         THE WITNESS:  I have no idea.

24   Q.    Do you know who determined your sex

25   was male at the time of birth?

Page 92

1           MS. INGELHART:  Objection.  Calls

2    for speculation, expert testimony.  You can

3    answer.

4           THE WITNESS:  I would speculate the

5    doctor.

6       Q.    Right.  The medical provider

7    determined your sex as male at the time of your

8    birth, right?

9           MS. INGELHART:  Objection.  Calls

10   for expert testimony.  You can answer.

11          THE WITNESS:  I suppose.

12      Q.    Let's go back to Exhibit 2, the

13   complaint, just so we can clear up any

14   confusion about what is being asked here.  And

15   if you look at Paragraph 20, it says:  A

16   person's gender marker on a birth certificate

17   is usually designated at birth based solely on

18   the appearance of external genitalia.

19          Do you see that?

20      A.    I do.

21      Q.    That would have been the medical

22   provider that would have relayed that

23   information to ODH, right?

24          MS. INGELHART:  Objection.  Calls

25   for expert testimony.  You can answer.

Page 93

1              THE WITNESS:  I don't know the
2    procedure in regards to that.
3         Q.    Well, there was -- as far as you're
4    aware, there wasn't anyone from ODH present at
5    your birth, right?
6         A.    I don't know.
7         Q.    Your mom was there, presumably,
8    right?
9         A.    I would assume so.
10         Q.    Did she ever work for the Ohio
11    Department of Health?
12         A.    I don't know.
13         Q.    Okay.  No evidence to suggest she
14    ever did, right?
15         A.    As far as I'm aware.
16         Q.    And there would have been a medical
17    provider there, maybe several, a doctor and
18    some nurses, right?
19         A.    Yeah.
20         Q.    All right.  And is it your
21    understanding that those doctors and nurses do
22    not work for the Ohio Department of Health?
23         A.    I don't know what jobs they may or
24    may not have had.
25         Q.    Okay.  So you don't know one way or

CONFIDENTIAL

Page 94

1    the other whether the doctors or nurses who

2    attended your birth are employees of the

3    hospital where you were born or the Ohio

4    Department of Health?

5          A.    That's correct.  For all I know,

6    they could be both.

7          Q.    Okay.  But you don't have any

8    evidence to suggest that, right?

9          A.    No.

10         Q.    All right.

11         A.    I would have no way of saying.

12         Q.    Was there anyone else that you're

13   aware of present when you were born?

14         A.    I have no idea.

15         Q.    Okay.  So you're not aware of

16   anyone else?

17         A.    I'm sure my father was there.

18         Q.    Okay.  So was your father ever an

19   employee of the Ohio Department of Health?

20         A.    No.

21         Q.    Okay.  To the best of your

22   knowledge, one of those individuals who was

23   present at the time of your birth would have

24   relayed information related to your birth to

25   the Department of Health, right?

CONFIDENTIAL

Page 95

1        A.    I don't know.

2        Q.    So you don't know one way or the

3    other whether -- one of those individuals sent

4    the information or someone else.  Is that what

5    your testimony is?

6        A.    I don't know how it works.

7        Q.    Okay.  All right.  I think I

8    understand.  You're not sure how the

9    information was conveyed to ODH, but you're

10   not -- you're not testifying that someone from

11   ODH was literally in the birthing suite

12   recording biographical information about your

13   birth has it was happening, right?

14       A.    Yeah.  That's correct.

15       Q.    And that the information that was

16   relayed to ODH was accurate at the time it was

17   relayed, right?

18             MS. INGELHART:  Objection.  Calls

19   for legal conclusion, expert testimony.  You

20   can answer.

21             THE WITNESS:  I don't know.

22       Q.    All right.  So let's look at your

23   birth record.  All right.  And setting aside

24   your name change, which we know was changed

25   because of the note at the bottom of the birth

Page 96

1    record, your date of birth, that information's

2    accurate, right?

3         A.    Yeah.

4         Q.    You were born ███████ ███████ ███████,

5    right?

6         A.    As far as I know.

7         Q.    And your birth place was Ohio, as

8    far as you know, right?

9         A.    Yes.

10         Q.    And your mother's name was ███████

11    ███████ ███████, right?

12         A.    That's correct.

13         Q.    Last name prior to first marriage

14    ███████ right?

15         A.    That's correct.

16         Q.    And she was born in New York,

17    right?

18         A.    As far as I know.

19         Q.    Your father, ███████ ███████ ███████,

20    is that information correct?

21         A.    Yes, it is.

22         Q.    Father's birth place, Pennsylvania,

23    right?

24         A.    That's correct.

25         Q.    And date record filed, you probably

CONFIDENTIAL

Page 97

1   don't know one way or the other, but

2   May 25th, 1990, right?

3        A.    As far as I'm aware.  It says it on

4   the paper.

5        Q.    Okay.  And like all the other

6   information on this birth record, you would

7   agree that it was accurate for the medical

8   provider to report your sex as male on or about

9   ███████ ███████ ███████  right?

10              MS. INGELHART:  Objection.  Calls

11   for expert testimony.  Legal conclusion.  You

12   can answer.

13              THE WITNESS:  As far as I know, I

14   don't know.  ████ ████ ████ █████ █████ ██████

15   ████████████ ██ █████████

16        Q.    Do you have any information to

17   dispute the -- the sex designation of male as

18   of ███████ ███████ ███████

19        A.    No.

20              MS. INGELHART:  Objection.  Calls

21   for a legal conclusion.  Expert testimony.

22        Q.    I'm sorry.  Your answer was "no"?

23        A.    As far as I'm aware, no.

24        Q.    And you would also agree, then,

25   that your birth certificate accurately

CONFIDENTIAL

1  reflected your sex as reported at the time of

2  birth, right?

3                MS. INGELHART:  Objection.  Calls

4  for expert testimony.  Legal conclusion.

5  Compound.

6                THE WITNESS:  I suppose.

7        Q.    I want you to take a close look at

8  your birth record.  Does it include a gender

9  marker?

10                MS. INGELHART:  Objection.  Calls

11  for a legal conclusion, expert testimony.  You

12  can answer.

13                THE WITNESS:  In my personal

14  opinion, yes.

15        Q.    Which entry indicates gender?

16                MS. INGELHART:  Objection.  Calls

17  for expert testimony and legal conclusion.  You

18  can answer.

19                THE WITNESS:  The one that says

20  "male."

21        Q.    Yeah.  So if you look to the left

22  of that, the word "sex" appears, right?

23        A.    Yes.

24        Q.    It doesn't say "gender," does it?

25        A.    I believe both of those are the

Page 99

1  same.

2      Q.    Right.  And as you testified

3  earlier, though, you're not an expert on the

4  distinction between sex and gender, correct?

5      A.    That's correct.

6      Q.    The term "gender identity" doesn't

7  appear anywhere on your birth record, does it?

8      A.    The actual term, no.

9      Q.    And could you please go to

10  Exhibit 3?

11      A.    Okay.

12      Q.    What you've just been handed is a

13  document which you may have never seen before

14  today, and that is a long form example of all

15  of the biological data and information which is

16  relayed to the Department of Health by the

17  medical providers at or near the birth of an

18  individual.  Do you have that document in front

19  of you?

20      A.    I do.

21      Q.    I'm not going to ask you to

22  authenticate or -- or attest to the accuracy of

23  that document.  It's not your document.  You

24  can't do that, but I am going to ask you is

25  whether you can find in that multi-page

CONFIDENTIAL

1   document any reference to gender, gender

2   identity or anything involving gender.

3             MS. INGELHART:  Objection.  Calls

4   for a legal conclusion, expert testimony.  You

5   can answer.

6             THE WITNESS:  Well, let me take a

7   look at it.

8        Q.    Take your time.

9        A.    There's a lot of information here.

10  It'll just take me one moment.

11       Q.    Yeah.  Don't feel rushed.  The

12  delays do not show up on the transcript, so you

13  can take your time.  That's one of the

14  beautiful things about a deposition is that I

15  rustle around for papers and then when you read

16  it afterwards, you think I was just whipping

17  out these documents, but that's not the case.

18       A.    Okay.  Now that I've looked through

19  it, can you state your question once more?

20       Q.    Yes.  Does the Ohio Department of

21  Health long form contain any reference to the

22  terms "gender" or "gender identity"?

23            MS. INGELHART:  Objection.  Vague.

24  Legal conclusion.  Calls for legal conclusion.

25  Calls for expert testimony.  You can answer.

Page 101

1            THE WITNESS:  It states "sex."

2    Like I stated before, I believe sex and gender

3    are the same.

4        Q.    So just the Department's

5    recordation of the sex information is the only

6    thing which you contend relates to gender or

7    gender identity, right?

8        A.    That's -- I saw it in my cursory

9    glance.

10       Q.    And it doesn't -- it doesn't

11   contain, as far as you're aware, any specific

12   category for gender or gender identity, right?

13            MS. INGELHART:  Objection.  Calls

14   for a legal conclusion, expert testimony.  You

15   can answer.

16            THE WITNESS:  There's no category

17   that specifically states "gender."

18       Q.    And you're not aware of any form or

19   records maintained by ODH that would track a

20   person's gender specifically or gender identity

21   specifically, correct?

22            MS. INGELHART:  Objection.  Calls

23   for a legal conclusion, expert testimony.  You

24   can answer.

25            THE WITNESS:  I'm not sure.

Page 102

1        Q.    You're not sure if you're aware or

2    you're not sure if ODH actually tracks that

3    information?

4        A.    I'm not sure if ODH tracks that

5    information.

6        Q.    And your gender identity is female,

7    right?

8        A.    That's correct.

9        Q.    And you mentioned earlier that

10   ██████ ██████ █ ██████ ██████ ██ █████████ █

11   ██████ ██████ ██████ █████ █████ ██████ as far as

12   you're aware, right?

13       A.    That's correct.

14       Q.    And are you familiar with the term

15   "karyotype"?

16       A.    Slightly.

17       Q.    All right.  If I told you that

18   someone had XX chromosomes, that would indicate

19   a sex as female, right?

20             MS. INGELHART:  Objection.  Calls

21   for expert testimony.  You can answer.

22             THE WITNESS:  I am not familiar

23   enough with genetics to know, but I believe in

24   most cases, yes.

25       Q.    And that, conversely, someone with

1    XY chromosomes would indicate sex is male,

2    right?

3                MS. INGELHART:  Objection.  Calls

4    for expert testimony.  You can answer.

5                THE WITNESS:  The same as my

6    previous statement, so I suppose, but I'm sure

7    that there's more exceptions to that than just

8    that being that simple.

9         Q.    Right.  And as you've indicated,

10   there are various irregularities that can

11   result in a person having something other than

12   XX or XY chromosomes, right?

13        A.    Uh-huh.

14              MS. INGELHART:  I'm going to

15   objection.  Expert testimony.

16        Q.    That's your general understanding

17   of how the karyotypes of XX and XY work,

18   though, right?

19        A.    Yes.

20        Q.    Okay. ████ ███ ███ ███ █

21   ██████ ████ ██████ █ █████ █████

22   ████ ████ ████

23        ██ ███ ███ █ ███ ███

24        ██ ███ ███ ███ ███ ███ ███

25   ████ ███ ███ ███ ███ ███ ██

CONFIDENTIAL

Page 104

1  ███████████ ██████ █████. ████████ ████ ██████

2           MS. INGELHART:  Objection.  Calls

3  for expert testimony.

4           THE WITNESS:  I'm sorry.  Can you

5  say that one more time?

6      ██  ███████ ██ ██ ██ ██ ████████ ██

7  ████████ ████ ██████ ██ █████████████ ██████ ████

8  █████████ ██████ ██████ █████ ████████

9      ██   ████

10          Q.    And that you would have had --

11  whatever your chromosomes are, you would have

12  had those chromosomes since birth, right?

13          MS. INGELHART:  I mean, objection.

14  Calls for expert testimony.  You can answer.

15          THE WITNESS:  As far as I'm aware.

16          Q.    And you're not aware of any

17  procedure by which a person can change their

18  chromosomes, right?

19          MS. INGELHART:  Same objection.

20  You can answer.

21          THE WITNESS:  Not currently, no.

22          Q.    All right.  So you indicated that

23  your gender identity is female.  Are you aware

24  of any method by which a person's gender

25  identity can be identified at the time of

Page 105

1    birth?

2              MS. INGELHART:  Objection.  Calls

3    for expert testimony, legal conclusion.  You

4    can answer.

5              THE WITNESS:  I am not sure.

6        Q.    You're not sure that you're aware,

7    or you're not sure that there's a method by

8    which a person's gender identity can be

9    identified at the time of birth?

10       A.    I'm not sure there's a method.

11       Q.    And when did you determine that

12   your gender did not match your biological sex?

13             MS. INGELHART:  Objection.  Calls

14   for expert testimony.  You can answer.

15             THE WITNESS:  As far as I can

16   remember, going back to being a little child.

17       Q.    Right.  And, in fact, in your

18   response to discovery requests, I think your

19   response was since the age of 3 or 4, you

20   identified as a girl; is that accurate?

21       A.    Yes.

22       Q.    What do you mean "identified as a

23   girl"?

24       A.    I knew at even that age that I was

25   a girl, whether people would accept it or not.

CONFIDENTIAL

1      Q.    So -- what is -- I suppose at the

2   age of three or four, you know, in your mind,

3   what distinguished that from identifying as a

4   boy?

5      A.    I'm not sure how to answer that.  I

6   just knew.

7      Q.    You just had this internal sense of

8   being a female as opposed to a male; is that

9   accurate?

10      A.    Yes.

11      Q.    But you can't exactly articulate

12   what that sense of identifying as a girl

13   actually is; is that correct?

14      A.    Yes.

15      Q.    You know, from the age of three or

16   four when you first identified as a girl, have

17   you ever identified as a boy at any time in the

18   interim?

19      A.    No.

20      Q.    Have you ever presented yourself as

21   male to any friends, family or the public?

22           MS. INGELHART:  Objection.  Expert

23   testimony and vague.

24           THE WITNESS:  I was supposed to

25   outwardly present myself by my parents.

CONFIDENTIAL

1          Q.    Are you familiar with the terms

2    "gender dysphoria" and "gender incongruence"?

3          A.    I'm familiar with the first term,

4    not the second one.

5          Q.    Okay.  So gender dysphoria, we'll

6    stick with that one.  Is it your understanding

7    that that's a clinical diagnosis where a

8    person's biological sex does not match his or

9    her gender identity?

10               MS. INGELHART:  Objection.  Calls

11   for expert testimony.

12               THE WITNESS:  I'm not 100 percent

13   certain.

14         Q.    Well, you received that diagnosis

15   in the spring or summer of 2015, right?

16         A.    That's correct.

17         Q.    And you were approximately 23 or 24

18   or something like that?

19         A.    Something like that.

20         Q.    And before your diagnosis, had you

21   heard of gender dysphoria, or was that the

22   first time?

23         A.    I had already heard of it.

24         Q.    Okay.  So you at least have some

25   understanding of what that diagnosis means,

CONFIDENTIAL

Page 108

1  right?

2        A.    Yeah, but it's worded differently

3  than you're wording it.

4        Q.    I'm sorry.  I didn't catch that.

5        A.    Oh, no.  I remember it being worded

6  differently than how you're wording it.

7        Q.    Oh, I see.  I see.  You -- well,

8  how do you remember it being worded?

9        A.    I don't remember exactly how it was

10  worded, but how you're saying it doesn't sound

11  like how I remember it being worded.

12        Q.    Well, I guess regardless of how it

13  was worded at the time you received the

14  diagnosis, would you agree that a gender -- a

15  diagnosis of gender dysphoria includes a

16  mismatch of a person's biological sex and his

17  or her gender identity?

18              MS. INGELHART:  Objection.  Calls

19  for expert testimony.  You can answer.

20              THE WITNESS:  I suppose.

21        Q.    And if your biological sex and

22  gender identity are mismatched, that logically

23  means that biological sex and gender identity

24  are different things, right?

25              MS. INGELHART:  Objection.  Calls

CONFIDENTIAL

1  for expert testimony.  You can answer.

2            THE WITNESS:  I suppose, but I do

3  believe they changed the definition and what it

4  is, but I don't know what they changed it to.

5  I know it was recent, though.

6        Q.    Understood.

7            And do you know what -- when you

8  say they changed it or it was changed, do you

9  know what organization changed that definition?

10           MS. INGELHART:  Objection.  Expert

11  testimony.  You can answer.

12           THE WITNESS:  I don't remember off

13  the top of my head.

14       Q.    Are there any websites or resources

15  you regularly consult that would discuss those

16  issues that you might have picked up that --

17  that change in the definition?

18       A.    Various psychology websites,

19  Reddit.

20       Q.    Okay.  So when you say various --

21  sorry.

22       A.    I said I forget which manual the

23  change was in.

24       Q.    Okay.  Does the W Path Manual sound

25  familiar?

Page 110

1       A.      It does.

2       Q.      Does the APA, does that ring a
3  bell?

4       A.      No.

5       Q.      Okay.  Are there any others that
6  come to mind?

7       A.      DSM.

8       Q.      Could you spell that?

9       A.      I think I'm -- I think I'm getting
10 it wrong, but I know it starts with a "D" and
11 it was an acronym.

12      Q.      Oh, the DSM.  Okay.  Yeah, the DSM.
13 Yep.  I'm familiar with that one.  Anything
14 else?

15      A.      Not that I can recall.

16      Q.      All right.  We talked earlier about
17 your state identification document, the one you
18 used in Arizona.  Do you remember that
19 testimony?

20      A.      Yes.

21      Q.      You've only recently moved to
22 Arizona, so I doubt you've had the chance to
23 update that document, but since you recently
24 applied for it, do you have any idea how often
25 you do have to update that document?

Page 111

1        A.     I do.

2        Q.     And how often do you have to update

3    it?

4        A.     You don't.  It's infinite.

5        Q.     The state identification record in

6    Arizona is not required to be updated?

7        A.     That's correct.  That's why it's

8    not legally classified as a federal ID.

9        Q.     Oh, so you could move and you

10   wouldn't have to change the address on the

11   state identification?

12       A.     I'm sure you'd have to change the

13   address, but they never expire.

14       Q.     They never expire.  Understood.

15              Do you know what the -- do you

16   understand what the purpose is of that state

17   identification you received?

18              MS. INGELHART:  Objection.  Calls

19   for a legal conclusion.  You can answer.

20              THE WITNESS:  As far as I'm aware,

21   it's to identify me.

22       Q.     And you use that identification

23   record to do things, like if you ever do this,

24   get into, like, an R rated movie, right?

25       A.     I suppose.  I've never been carded.

1      Q.    Okay.  Do you -- and I don't want

2  to assume anything.  Do you buy beer?

3      A.    Yes.

4      Q.    And do you use that state

5  identification to buy beer?

6      A.    Yes.

7      Q.    And would you use the state

8  identification to get into, like, an over 21

9  club or bar or something, right?

10     A.    Yes.

11     Q.    And do you ever use it to -- well,

12 I guess for the next few years, you could still

13 use that to get onto a plane, right?

14     A.    Yes.  I don't remember when the

15 cutoff is.

16     Q.    Yeah.  I think it's --

17     A.    But it does stop eventually.

18     Q.    I think it's 2021, so you still

19 have some time, but just be prepared to bring

20 basically every biological piece of information

21 you have.  It is the most horrendous process

22 invented, I think, so just make sure --

23     A.    I'm aware.

24     Q.    Save your utility bills.

25     A.    I flew here.

Page 113

1       Q.    You ever rent a car?

2       A.    I don't drive.

3       Q.    Oh, that's right.  This is a state

4 identification, not a driver's license, so that

5 one doesn't work.

6             Verify credit card purchase?

7       A.    I'm sure it can be used for that.

8       Q.    Right.  And you carry that around

9 with you pretty much at all times, right?

10      A.    That's correct.

11      Q.    You have that on you, your state

12 identification card?

13      A.    Right now?

14      Q.    Yeah.

15      A.    Yes.

16      Q.    Now, I almost hesitate to ask

17 because I asked this to an earlier witness, so

18 everybody's up to speed on this, but you don't

19 happen to have a copy of your birth certificate

20 other than this exhibit I gave you earlier on

21 you, do you?

22      A.    No.

23      Q.    And you would agree that at least

24 as you go about your daily life, that the state

25 identification is a much different document and

CONFIDENTIAL

Page 114

1   record than a birth certificate, right?

2            MS. INGELHART:  Objection.  Vague.

3   Calls for a legal conclusion.  You can answer.

4            THE WITNESS:  It depends what I'm

5   doing if I bring it with me or not.  There's a

6   lot of things that require a birth certificate,

7   especially involving the government.

8        Q.    All right.

9        A.    Everything I need to do involves a

10  birth certificate.

11       Q.    But you're not involved with the

12  government on a day-to-day basis like you are

13  in commerce or travel or buying a sixpack after

14  a hard day at work, right?

15       A.    No.  But for anything like

16  disability or food stamps or anything like

17  that, I do need to present it every time.

18       Q.    Okay.  Understood.

19            So then -- but you would agree that

20  the documents are used for different purposes

21  and at different frequencies, right?

22       A.    At different frequencies, yes, but

23  they are both used for identification now.

24       Q.    We're almost done, but I have to go

25  back to something that we talked about earlier

CONFIDENTIAL

```
 1   because it's been bugging me.  So we talked
 2   extensively about some of the horrendous acts
 3   that occurred at your employer, and I'm going
 4   to try to pronounce the name right, Alorica; is
 5   that right?
 6          A.    "Alorica."
 7          Q.    "Alorica."  So we talked
 8   extensively about some of the horrendous acts
 9   that occurred while you were working at
10   Alorica.  Did you ever talk to an attorney
11   about any of the actions or activities that
12   took place while you were employed there?
13          MS. INGELHART:  Objection.  To the
14   extent that it doesn't touch on attorney-client
15   privileged information, you can answer.
16          Q.    Yeah.  And let me specify:  I'm not
17   interested in your talking to this counsel in
18   this case, what I really am interested in is
19   whether or not you ever went to an attorney to
20   say, "Hey, I'm being harassed and I don't think
21   this is right."  That's all I'm interested in.
22          A.    I believe I reached out to someone
23   online that was an attorney, but I don't
24   remember what the firm was, but they said I
25   couldn't do anything about it.
```

Page 116

1      Q.    Okay.  So you considered legal

2   action against Alorica at some point in time?

3      A.    I did.

4      Q.    Okay.  And do you think what

5   Alorica did -- aside from harassing you and

6   discriminating against you, do you think that

7   anything they did violated your right to

8   privacy?

9           MS. INGELHART:  Objection.  Calls

10   for legal conclusion.  You can answer.

11           THE WITNESS:  I would say yes.

12      Q.    And you understand that one of the

13   claims that you have in this lawsuit against

14   the Ohio Department of Health is that you

15   believe the Ohio Department of Health is

16   violating your right to privacy under the due

17   process clause of the United States

18   Constitution, right?

19      A.    Yes.

20      Q.    But despite all the horrendous

21   things Alorica did to you, you haven't sued

22   your employer for a violation of your right to

23   privacy, right?

24      A.    I have not.

25      Q.    You haven't sued them at all, have

Page 117

1  you?

2          A.     I have not.

3          Q.     Other than the context that we've

4   discussed today about -- at Alorica and the

5   Arizona DMV, have you ever been required to

6   show your birth certificate to other entities?

7          A.     Yes.

8          Q.     What are those other entities?

9          A.     Every job I applied to when I came

10  here, which is over 30 of them, the Arizona

11  government, for disability and food stamps.

12         Q.     Okay.  Anyone else?

13         A.     Not that I can think of at the

14  moment.

15         Q.     Do you -- do you have any --

16         A.     But I might be missing one.

17         Q.     Okay.  Well, if you recall it,

18  chime in.

19                But do you have any inclination or

20  idea why the jobs require you to present a

21  birth certificate when you apply?

22         A.     Because they use it as a form of

23  identification to prove you're a U.S. citizen.

24         Q.     So at least from the employer's

25  perspective, you would agree that it's

Page 118

1    important that those documents are accurate and

2    reflect information which can be verified and

3    traced, right?

4              MS. INGELHART:  Objection.

5    Speculation.  You can answer.

6              THE WITNESS:  I suppose.

7         Q.   And in these jobs, other than the

8    Alorica and the Arizona Department of Motor

9    Vehicles, in these other instances where you've

10   had to turn over your -- your birth certificate

11   or apply for disability or food stamps, did you

12   ever feel the individual or entity you were

13   disclosing your birth certificate to was

14   dangerous in any way?

15             MS. INGELHART:  Objection.  Vague.

16             THE WITNESS:  Well, can you clarify

17   that?

18        Q.   Sure.  I'm just wondering whether,

19   you know, you walk into employer -- employer's

20   office and apply for a job and one of the

21   requirements is to display your birth

22   certificate, did you fear that you were going

23   to be harmed when you did that?

24        A.   Well, I mean, that's always a fear.

25        Q.   All right.  So you -- you went into

CONFIDENTIAL

Page 119

1    these jobs and you felt that this -- this

2    particular individual was going to be dangerous

3    for you to disclose your birth certificate to?

4         A.    A few of them, yes.

5         Q.    Which -- which ones?

6         A.    There was a couple that I gave it

7    to that were wearing pieces of clothing that

8    made me understand that it could be a danger.

9         Q.    So you -- you suspected or were

10   concerned about harm based on the items of

11   clothing that the person receiving your

12   application was wearing; is that accurate?

13        A.    Yes.

14        Q.    And what were those articles of

15   clothing?  Can you give me an example?

16        A.    The best example I can give is a

17   "Make America Great Again" hat.

18        Q.    Did that person say or do anything

19   to you to confirm your fear of being harmed?

20        A.    I'm not sure how to answer that.

21   Can you repeat that?

22        Q.    Sure.  Yeah.  I mean, you -- you

23   went into the place that -- the job, right, the

24   office to apply for the job, and this person

25   was wearing a Donald Trump campaign hat or

CONFIDENTIAL

Page 120

1   shirt or something, and you indicated that that

2   made you fearful to show them your birth

3   certificate, right?

4        A.    Yes.

5        Q.    And what I'm asking is:  After you

6   showed them your birth certificate, did they do

7   anything to confirm your fear of harm?

8        A.    No.

9        Q.    Okay.  And have you ever been or

10  received bodily harm or anything like bodily

11  harm based on the disclosure of your birth

12  certificate?

13       A.    No.

14            MR. BLAKE:  I don't have any other

15  questions at this time.

16            MS. INGELHART:  Thank you, Jake.  I

17  don't think I have any questions.

18            (The deposition was concluded at

19            3:00 p.m.)

20

21

22

23

24

25

Page 121

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to the

7    applicable Rules of Civil Procedure.

8

9                 TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12   Mr. Blake original regular.

13   Ms. Ingelhart copy regular.

14

15

16

17

18

19

20

21

22

23

24

25

Page 122

1              REPORTER'S CERTIFICATE

2    The State of Ohio,    )

3                                    SS:

4    County of Fairfield. )

5

6              I, Kimberly A. Kaz, RPR, a Notary

7    Public within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, ASHLEY BREDA,

10   was by me first duly sworn to testify the

11   truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the

13   testimony then given by the above-referenced

14   witness was by me reduced to stenotypy in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above-referenced witness.

19              I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25

CONFIDENTIAL

Page 123

1          I do further certify that I am not

2    a relative, counsel or attorney for either

3    party, or otherwise interested in the event of

4    this action.

5          IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 11th day of

8    September, 2019.

9

10

11

12

13    _____

14          Kimberly A. Kaz, RPR, Notary Public

15          within and for the State of Ohio

16

17    My commission expires March 31, 2023.

18

19

20

21

22

23

24

25

```
                                                 Page 124
 1                    Veritext Legal Solutions
                          1100 Superior Ave
 2                            Suite 1820
                        Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4
      September 11, 2019
 5
      To: Kara N. Ingelhart, Esq.
 6
      Case Name: Ray, Stacie, Et al. v. Director, Ohio Department Of Health,
 7    Et Al.
 8    Veritext Reference Number: 3493797
 9    Witness:  Ashley Breda       Deposition Date:  8/21/2019
10
      Dear Sir/Madam:
11
12    Enclosed please find a deposition transcript.  Please have the witness
13    review the transcript and note any changes or corrections on the
14    included errata sheet, indicating the page, line number, change, and
15    the reason for the change.  Have the witness' signature notarized and
16    forward the completed page(s) back to us at the Production address
      shown
17
      above, or email to production-midwest@veritext.com.
18
19    If the errata is not returned within thirty days of your receipt of
20    this letter, the reading and signing will be deemed waived.
21
      Sincerely,
22
      Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

CONFIDENTIAL

Page 125

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS

2
    ASSIGNMENT REFERENCE NO: 3493797
3   CASE NAME: Ray, Stacie, Et al. v. Director, Ohio Department Of
Health, Et Al.
    DATE OF DEPOSITION: 8/21/2019
4   WITNESS' NAME: Ashley Breda
5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have made no changes to the testimony
    as transcribed by the court reporter.

8
    _____          _____
9   Date                      Ashley Breda
10      Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:

12
        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.

15
        I have affixed my name and official seal

16
    this _____ day of_____, 20_____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25

---

Veritext Legal Solutions

CONFIDENTIAL

Page 126

1                    DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 3493797
3    CASE NAME: Ray, Stacie, Et al. v. Director, Ohio Department Of
  Health, Et Al.
     DATE OF DEPOSITION: 8/21/2019
4    WITNESS' NAME: Ashley Breda
5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7          I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9          I request that these changes be entered
     as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                        Ashley Breda
14
           Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18             in the appended Errata Sheet;
           They signed the foregoing Sworn
19             Statement; and
           Their execution of this Statement is of
20             their free act and deed.
21         I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23         _____
                Notary Public
24
           _____
25              Commission Expiration Date

Veritext Legal Solutions

CONFIDENTIAL

Page 127

1                    ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2                 ASSIGNMENT NO: 3493797
3    PAGE/LINE(S) /        CHANGE        /REASON
4     84:1  /  "like" should be "mind"  / transcription error
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

      _10/15/19_____           _____
20   Date                    Ashley Breda
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                  _____
                    Notary Public
24
                    _____
25   Commission Expiration Date

CONFIDENTIAL

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

CONFIDENTIAL

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.