Page 1

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF OHIO

3                       EASTERN DIVISION

4                          *   *   *

5   STACIE RAY, BASIL ARGENTO,

6   JANE DOE, and ASHLEY BREDA,

7        Plaintiffs,

8        vs.              CASE NO. 2:18-CV-00272-MHW-CMV

9   AMY ACTON, IN HER OFFICIAL

10  CAPACITY AS DIRECTOR OF THE

11  OHIO DEPARTMENT OF HEALTH,

12  et al.,

13       Defendants.

14                         *   *   *

15          Deposition of JANE DOE, Plaintiff

16  herein, called by the Defendants for

17  cross-examination pursuant to the Rules of Civil

18  Procedure, taken before me, Kathy S. Wysong, a

19  Notary Public in and for the State of Ohio, at the

20  offices of Calfee Halter & Griswold, 41 South High

21  Street, Suite 1200, Columbus, Ohio, on Friday,

22  September 13, 2019, at 11:02 a.m.

23                         *   *   *

24

25

Page 2

1                    EXAMINATION CONDUCTED              PAGE

2      BY MR. BLAKE:.........................       5

3

4                        EXHIBIT MARKED

5      (Thereupon, Defendants' Exhibit 8,

6      birth certificate of Jane Doe, was

7      marked for purposes of

8      identification.).......................     93

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   APPEARANCES:
 2      On behalf of the Plaintiffs:
 3           Lambda Legal
 4      By:  Kara N. Ingelhart (Videoconference)
             Attorney at Law
 5           105 West Adams Street
             Suite 2600
 6           Chicago, Illinois  60603
             312-663-4413
 7           kingelhart@lambdalegal.org
 8      On behalf of the Defendants:
 9           Calfee Halter & Griswold, LLP
10      By:  Jason J. Blake
             Attorney at Law
11           41 South High Street
             Suite 1200
12           Columbus, Ohio  43215
             614-621-7789
13           jblake@calfee.com
14   ALSO PRESENT:
15           Rachel Belenker
16                      *   *   *
17
18
19
20
21
22
23
24
25
```

```
                                              Page  4
 1                      JANE DOE
 2    of lawful age, Plaintiff herein, having been first
 3    duly cautioned and sworn, as hereinafter
 4    certified, was examined and said as follows:
 5                 MR. BLAKE:  Do you prefer for
 6    purposes of the record that we use the Jane Doe to
 7    prevent it from being -- you know, the whole thing
 8    being attorneys' eyes only or --
 9                 MS. INGELHART:  So my only concern is
10    that some of the facts she may divulge could also
11    be identifying even without her name, I mean, like
12    different places she's worked --
13                 MR. BLAKE:  Sure.
14                 MS. INGELHART:  -- for instance,
15    so --
16                 MR. BLAKE:  Well, I think we can
17    handle that by just going through -- you know,
18    when the transcript is produced, you can designate
19    certain portions.  My preference would be not to
20    designate the whole deposition attorneys' eyes
21    only.
22                 MS. INGELHART:  Yeah.  Referring to
23    her as Jane Doe would solve that issue then, yeah.
24                 MR. BLAKE:  Okay.
25                 MS. INGELHART:  And for the witness,
```

1   is the witness comfortable with that?

2                    THE WITNESS:  Sure.

3                    MR. BLAKE:  Okay.  So I'll refer to

4   you then just as Jane Doe to the extent I need to

5   say your name somewhere.

6                      CROSS-EXAMINATION

7   BY MR. BLAKE:

8          Q.   Let me just go over a few ground

9   rules.  Is that okay?

10         A.   Absolutely.

11         Q.   All right.  So have you ever had

12  your deposition taken before?

13         A.   Yeah.

14         Q.   How many times?

15         A.   I'm making a rough guess, probably

16  about fifty.

17         Q.   Fifty?

18         A.   Five zero.

19         Q.   So you're pretty familiar with how

20  this works?

21         A.   I'm fairly familiar.  I haven't

22  given a deposition for several years, but I've

23  done quite a bit.

24         Q.   And have most of those depositions

25  been in the context of like your medical

Page 6

1    expertise?

2              A.    Exactly.

3              Q.    Okay.  Any other -- any other

4    context besides -- you know, besides medicine?

5              A.    No.

6              Q.    Okay.  And have you been hired as

7    an expert witness in any of those instances?

8              A.    Yes.

9              Q.    And then what about just as like a

10   fact witness for some sort of medical

11   malpractice defense or something like that?

12             A.    I served as an expert witness for

13   plaintiffs in medical malpractice lawsuits for

14   an approximately twenty to twenty-five year

15   span.

16             Q.    It sounds like you've done quite a

17   number -- several dozen expert witnesses for

18   plaintiffs over the course of your career; is

19   that accurate?

20             A.    That is accurate.

21             Q.    Is that the only kind of

22   circumstance that you've been deposed in?

23             A.    No.  I also testified at trial as

24   an expert witness probably about ten times if I

25   had to guess.  I don't have an exact number to

1  give you.

2          Q.    Okay.

3          A.    But it was over the same period of

4  time for the same reasons.

5          Q.    And then have you ever just served

6  as a regular fact witness in any case?

7          A.    I'm not sure I'm understanding

8  what your question is.

9          Q.    Sure.  So you mentioned these

10  times that you've served as an expert witness,

11  that's where a party hires you to come and

12  testify in your expert opinion about a matter I

13  assume relating to your field of expertise,

14  right?

15          A.    Correct.

16          Q.    Have there been any other -- well,

17  have you given testimony in a deposition or at

18  trial in any other context besides as an

19  expert?

20          A.    I was called up in perhaps a total

21  of six medical malpractice actions where I was

22  the party, but I was a party among numerous

23  other physicians who were involved in the care

24  of the patient and I was -- I had to give a

25  deposition.  I was severed before trial in each

                                                        Page 8

 1   case.

 2            Q.    Okay.

 3            A.    All of those occurred more than

 4   twenty years ago, as far as I can recall.

 5            Q.    Okay.  So you've been both an

 6   expert witness hired for your expertise and

 7   you've been also subject to discovery as a

 8   defendant in medical malpractice cases; is that

 9   right?

10            A.    That is right.

11            Q.    Okay.  Now, I guess I'm less

12   interested sort of in the details of those

13   medical malpractice cases, but as a result of

14   any of those, did you ever have any -- like

15   your license suspended or revoked or under

16   investigation or anything like that?

17            A.    Well, as I had said, I was severed

18   from these cases after I gave deposition.  I

19   never actually had to testify at trial.  I

20   continued in these lawsuits after I gave the

21   deposition obviously as just a bystander, so to

22   speak, in what happened to the patient, okay.

23   So I never went to trial.  There was never a

24   payment made on my behalf.  If you were to go

25   to the national practitioner databank, you'd

```
                                              Page 9
 1    find no interest.
 2            Q.   Okay.  I guess maybe the
 3    terminology where you practice is different
 4    than here, but, you know, here in Ohio when you
 5    get severed from a case, that doesn't
 6    necessarily mean your involvement in the case
 7    is over as a defendant.  It sounds like you
 8    were dismissed, you no longer were a party --
 9    or a defendant in the case after your
10    deposition; is that accurate?
11            A.   That's accurate.
12            Q.   Okay.  Well, I won't spend a long
13    time then beating the -- you know, beating the
14    rules in a deposition to death.  It sounds like
15    you have a lot of experience, and if there's
16    something that crops up, you know, you can let
17    me know and we can work it out.  I will just
18    point out, you know, if you need to take a
19    break at any time, you know, you're free to do
20    that provided that there's not a question
21    pending.  You know, if there's a question
22    pending, answer the question and then at that
23    point you're free to take a break.  Okay?
24            A.   Sure.
25            Q.   And the other depositions of the
```

Page 10

1    other plaintiffs I'll say have gone about three

2    hours so I would anticipate us to go about that

3    length of time today.  Okay?

4              A.    Okay.

5              Q.    Let me see if there's anything

6    else.  All right.  As with the other

7    plaintiffs, I just want to lay some groundwork

8    for some terms I'm going to use for the

9    deposition and that way there's no confusion

10   when I refer to something what I'm referring

11   to.  Okay?

12              So the first term is ODH, and when

13   I say ODH, that means all defendants

14   collectively.  All right?

15              A.    I presume that's Ohio Department

16   of Health.

17              Q.    That's right.  But the Ohio

18   Department of Health is just one of several

19   defendants here, right, you've also named the

20   Department of Vital Statistics, among others,

21   and you've named the directors or heads of

22   those various agencies in their official

23   capacity, so just so there's no confusion, ODH

24   means all the defendants, not just the Ohio

25   Department of Health.  All right?

1          A.    That's actually fine.  You know,

2    ODH is not part of my normal working vocabulary

3    so I'm now adding it.

4          Q.    Yeah, that's why I'm defining it

5    ahead of time.  Now, if I do need to refer to

6    the Ohio Department of Health specifically,

7    I'll let you know that I'm doing it in that

8    instance.  Okay?

9          A.    Okay.

10         Q.    All right.  And if there's ever

11   any confusion about what I'm referring to, let

12   me know and I can clarify.  Okay?

13         A.    Okay.

14         Q.    All right.  The second term is

15   transgender, and when I use that term, I am

16   using it to refer to someone whose gender

17   identity does not align with their birth or

18   biological sex.  Do you understand that?

19              MS. INGELHART:  Objection.  That

20   calls for expert testimony.  Based on previous

21   experience, I think there's going to be a few

22   terms of art, like transgender, like transgender

23   sex, biological sex, gender identity perhaps,

24   later some others, but if we could just have sort

25   of an ongoing standing objection to those terms

Page 12

1    and an understanding that those are terms of art

2    in dispute here, but I do understand the

3    efficiency here of trying to define terms.  So

4    I'll object now but you can continue and you can

5    answer.

6                    THE WITNESS:  Okay.  What was the

7    question?

8    BY MR. BLAKE:

9         Q.   It was just me telling you when I

10   use the word transgender what it is I mean when

11   I say that.  And when I use the term

12   transgender, I mean someone whose gender

13   identity does not align with their birth or

14   biological sex.  All right?

15        A.   I suppose that -- I don't suppose

16   that's unreasonable.  We have to have some kind

17   of working terminology.

18        Q.   Okay.  Thank you.  And cisgender

19   is -- when I use that term, I'm referring to

20   someone whose gender identity aligns with their

21   birth or biological sex.  Okay?

22        A.   Same stipulation.

23        Q.   Okay.  And I also know your

24   counsel's standing objection to the use of

25   various terms which are likely to come up

Page 13

1  during the course of your deposition.  Okay?

2          A.    Yes.

3          Q.    All right.  Let's talk a little

4  bit about your background, and just first, what

5  is your address?

6  ███  ████ █████████  █ █ █ █ █ █ █

7  ███████████  ████████  ███████  █  ███████  █████

8  ████████  █████  █████  ████  ██████

9          Q.    All right.  And how long have you

10 lived in ████████?

11         A.    Approximately four years.

12         Q.    And have you been at that address,

13 the ████████  ██████  address the whole time?

14         A.    Yes.

15         Q.    Okay.  Where did you live before

16 ████████?

17         A.    A combination of Manhattan in New

18 York and in upper ████  ████████

19         Q.    Okay.

20         A.    I had a period of time where I had

21 two residences.

22         Q.    Okay.  So you were living back and

23 forth between ████  ███████  and ████  ██████  is that

24 fair?

25         A.    Yes.

Page 14

1          Q.    For how long did you do that?

2          A.    Oh, approximately two years.

3          Q.    Okay.

4          A.    And then prior to that ██ ████

5    ████████ ███ ██████████ ████ █████ ████ █████

6          Q.    Okay.

7          A.    -- ████ ████████████ ██████████████

8    ████████

       ██         Okay.  All right.  So that takes

10   us back about thirty-one or thirty-two years.

11   Prior to that where were you living?

12         A.    In ███████████ █████ ██████ where I

13   lived for I believe it was four years.

14         Q.    Okay.

15         A.    I'm getting a little rusty now.

16         Q.    Yeah.  Okay.  I'm just trying to

17   get back to Ohio.  So when did you -- when did

18   you move from Ohio?

19         A.    When I was a child.

20         Q.    Approximately --

21         A.    A young child.

22         Q.    Approximately how old?

23         A.    I was under the age -- I was

24   approximately five.

25         Q.    Okay.

Page 15

```
 1          A.    My parents had -- they're separate
 2    families, they span both Dayton, Ohio and New
 3    York City, and the family moved back and forth
 4    for several years.
 5          Q.    Okay.
 6          A.    Then we settled in Long Island.
 7          Q.    Okay.  So you were born at one of
 8    the stints in between ████  ████  and Ohio?
 9          A.    I presume so.
10          Q.    Yeah.
11          A.    I don't know what other place they
12    were.
13          Q.    We'll get into it, I guess.  We've
14    got proof that you were born in Ohio, and I
15    hope we can all agree to that later on in the
16    deposition, but then you moved back to ████  ████
17    and were kind of raised there and at least
18    initially educated there and then worked there
19    for a long time?
20          A.    It's more complicated.  █ ████  █
21    ████  ████  █ ███  ████  █ █ ████  ████
22    ████  ██  ███  █  ████  ████  █ █ ███
23    ████  ████  ███  ████  █ █ ████  █ ████
24          Q.    Okay.
25          A.    I went to high school in ████████
```

Page 16

```
 1    And when I finished high school, then I went to
 2    undergraduate college ███ ████████ ██ ██████
 3    Then I went to medical school ███ ███ █████ ███████
 4    ██████████
 5           Q.   Okay.  All good schools.  So when
 6    you were in ████████ for your undergraduate,
 7    what degree -- or what did you study while you
 8    were at ███████████?
 9           A.   Chemistry and physics.  I
10    completed separate majors.
11           Q.   And were those four-year degrees,
12    bachelor's of science?
13           A.   Yes.  It was one degree, it's just
14    the underlying courses of study were chemistry
15    and physics.
16           Q.   And then I guess at that point
17    you -- did you go right to med school after
18    that, after graduating?
19           A.   I did.
20           Q.   And I assume you had taken enough
21    coursework to qualify you for the entrance into
22    medical school while you were at ███████ as
23    part of your undergraduate degree?
24           A.   Absolutely.
25           Q.   Sorry?
```

Page 17

1    A.    Absolutely.

2    Q.    Oh, absolutely.  Okay.  And you

3  mentioned you went to ▮▮▮▮▮  for medical

4  school, right?

5    A.    Correct.

6    Q.    And that's another four years at

7  med school; is that right?

8    A.    Correct.

9    Q.    When did you graduate?

10    A.    From?

11    Q.    Columbia.

12    A.    ▮  ▮▮

13    Q.    Okay.  And following your

14  graduation from medical school I assume you

15  started a residency program of some sort at a

16  hospital; is that right?

17    A.    I completed a full internship and

18  residency in internal medicine at ▮▮  ▮▮▮

19  ▮▮▮▮  ▮  ▮▮▮▮.  After that, I completed

20  a two-year fellowship in cardiology.  And after

21  that, a one-year preceptorship in doing ▮▮▮

22  ▮▮▮▮

23    Q.    So you had a two-year fellowship

24  in cardiology.  Was that also at ▮▮  ▮▮▮  or

25  was that somewhere else?

Page 18

1          A.    It was all at the same
2    institution.
3          Q.    So all at ████  ██████?
4          A.    Yes.
5          Q.    Okay.  And then the one-year
6    program following the fellowship, you said it
7    was a term I didn't recognize.  It was -- could
8    you tell me what that is?
9          A.    At that time there was no such
10   thing as a fellowship in doing ██████
11   ██████████████████
12        ██  ████████████████████
13        A.    Yeah, ████████ █ ██████████ ████████
14   ██████ ████████ ████████ ██████ ██████ ████ ████
15   ████████ ████████.  There was no formal
16   fellowship that existed in the United States.
17   The system was that you basically got yourself
18   hired by the chief of the department and worked
19   for the chief for a year, at the end of which,
20   assuming that he approved of you, he provided a
21   letter saying that you were qualified in that
22   area.
23        Q.    Okay.
24        A.    But there was no fellowship
25   program that was approved by the American

Page 19

1    College of Cardiology.  It didn't exist at the

2    time.  This was before ████████   ████████████

3    ████   ████████   ████████   ██   ████████   ██   ████████████

4            Q.    Okay.

5            A.    The year after I finished I was

6    asked to work for the chief for another year

7    because he couldn't find somebody else to fill

8    that slot.  During that year we did the first

9    ████████   ████████████   in the hospital and I was

10   the fellow on the case.

11           Q.    All right.  And this -- I guess

12   what year did you complete your, I'm going to

13   call it medical training, you know, and that

14   captures the fellowship, the internship, and

15   this ████████████   program?

16           A.    ████████

17           Q.    ████████   Okay.  And then since that

18   time you've practiced as a cardiologist, it

19   sounds like, both in ████   ████   and ████   ████████

20   and ████   ████████   right?

21           A.    Well, I stayed at ████   ████████   in

22   ████   ████   from ████   ██   ████   working at ████

23   ████████   ████████   where I had an appointment as a

24   clinical instructor at ████████.  I was

25   simultaneously in private practice in

Page 20

```
 1   cardiology.
 2                   And then left ███   ███   in '97 and
 3   moved back to practice in lower ███   ███   state,
 4   about ████████████   ███████   outside of Manhattan
 5   at a place called ████████████   where I opened an
 6   office, I had two other satellite offices, and
 7   I practiced at that location until 1995 -- no,
 8   2015.
 9           Q.   Okay.  So --
10           A.   At which time --
11           Q.   Hold on.  Let me just -- sorry.
12   Let me just go back real quickly and summarize
13   what you said.  You're cutting in and out and
14   so I just want to make sure that the record is
15   clear.  This stuff is not critical to your
16   testimony today, but I do appreciate the
17   detail.
18                   My understanding then is for about
19   fifteen years following the completion of your
20   medical training you worked at ███   ██████   as a
21   cardiologist and clinical instructor, and then
22   after 1997 you worked until about 2015 in
23   private practice outside of ███   ███   and you
24   had several offices where you maintained your
25   private practice.  Is that more or less
```

                                        Page 21

1    accurate?

2            A.    That's very accurate.

3            Q.    Okay.  And then I take it, based

4    on the chronology you gave us earlier, in 2015

5    you moved to ███  ███████  is that right?

6            A.    That is right.

7            Q.    And I assume you're in private

8    practice now or do you work for a hospital?

9            A.    I work for a hospital.

10           Q.    Okay.  And what hospital do you

11   work for?

12           A.    ████████ ████ █████ ███████ ████████

13           Q.    Okay.  What prompted the move from

14   ████ ██████  to ████  ████████?

15           A.    It was -- there were several

16   factors.  One is I had gotten a divorce, and I

17   really didn't like being in the same area where

18   my prior life had been.  It was problematic

19   going into a restaurant and being asked where

20   my ex was.  I just wanted a fresh start.  That

21   was one.

22                 Number two, because of the fact

23   that I was in the process of going through a

24   gender transition, I had a drop in the volume

25   of patients that were coming to see me, who

Page 22

1    objected because of their belief that they

2    wanted a different doctor, and so I probably

3    lost maybe a third of my patients.  And the

4    consequence was there just wasn't enough income

5    to sustain a practice and with the expenses of

6    the divorce, ended up going bankrupt.

7              Made the conclusion that this was

8    either a very bad time in my life or God's way

9    of giving me a message to go do something else.

10   It took about six to eight months of searching

11   but I ultimately found this job in ███████.

12             MS. INGELHART:  Hey, Jake, could we

13   take just a one-minute break off the record.  I

14   just need to adjust the temperature in this room?

15             MR. BLAKE:  Sure.

16             MS. INGELHART:  Thank you.

17             (Pause in proceedings.)

18   BY MR. BLAKE:

19        Q.   As part of your medical training

20   and your undergraduate degree, is it your

21   understanding that sex and gender are

22   different?

23             MS. INGELHART:  Objection.  Calls for

24   expert testimony, but you can answer.

25             THE WITNESS:  Look, I'm an

1 ████████████████████████████ I spend my day

2 worrying about ████████ █ ███████ ████████.

3 That topic is not something that ever comes up.

4 BY MR. BLAKE:

5         Q.    Gender and sex don't come up

6 during the -- during the -- within the context

7 of your practice of medicine?

8         A.    Maybe with cardiologists that you

9 know but not me.

10        Q.    So you wouldn't consider yourself

11 an expert on issues pertaining to biological

12 sex and gender identity?

13        A.    Not in the slightest.

14        Q.    You didn't have any medical

15 curriculum that was focused on transgender

16 issues?

17        A.    No.

18        Q.    And then you're not a specialist

19 or a practitioner in the field of

20 endocrinology, right?

21        A.    Correct.

22        Q.    Same with molecular genetics?

23        A.    I'm sorry?

24        Q.    Molecular genetics, you don't

25 practice in that field, right?

Page 24

1          A.   Correct.

2          Q.   And psychology?

3          A.   Extremely little.

4          Q.   Have you taken any coursework in

5    psychology?

6          A.   Only during medical school.

7          Q.   All right.  Just the basic, you

8    know, like introductory course or courses that

9    every medical student would take?

10         A.   Yes.

11         Q.   And I assume that you've taken

12   some amount of, you know, coursework in

13   endocrinology as well, right?

14         A.   Absolute minimum.

15         Q.   Yeah.  There's not a certification

16   or a course of study in transgender medicine,

17   right?

18         A.   I believe that such courses are

19   starting to appear in a limited number in the

20   United States, but if they are, they are not

21   widespread.

22         Q.   Do you know what schools --

23         A.   I'm not familiar with them.

24         Q.   Okay.  You're not sure what those

25   courses relate to or where those courses can be

Page 25

1  taken?

2          A.    Correct.

3          Q.    And do you know whether or not

4  those are even within the context of medical

5  training?

6          A.    Again, I have no knowledge of

7  that.

8          Q.    Have you taken any courses about

9  the distinction between sex and gender?

10         A.    No.

11         Q.    Have you published any papers on

12  the distinguishment of sex and gender?

13         A.    No.

14         Q.    Have you given any talks or

15  presentations on the topics of sex and gender?

16         A.    No.

17         Q.    All right.  And I think as you

18  indicated, you certainly don't consider

19  yourself an expert in gender issues or issues

20  pertaining to biological sex, right?

21         A.    Correct.

22         Q.    From a medical perspective, do you

23  understand how a person's sex is determined?

24         A.    I'm not even sure I understand

25  what your question is.

1          Q.   Well, you understand that -- well,

2    do you know that people have a sex, a

3    biological sex?  Do you at least recognize

4    that?

5          A.   I actually find that very

6    difficult to respond to because what one person

7    means by biological sex is different from

8    another person.  Anything that you might try to

9    pin down is subject to a lot of error.  This is

10   not something that I'm an expert on, okay.  I

11   do not know what criteria one would use

12   defining biological sex.  I don't know what the

13   term really means.

14         Q.   Well, let me ask you this way, if

15   you are going to perform heart surgery on

16   someone -- that's something you do, right?

17         A.   No.  I don't do heart surgery.

18         Q.   You don't do heart surgery.  Okay.

19   I guess what is it you do medically in the

20   field of cardiology?

21         A.   ███████████  ████  ██████  ███████████████

22   ████████

23         Q.   Okay.  So as part of your

24   █████████  ████  ████████████  ███  █████████████

25   █████████████do you ask people what their sex is?

                                          Page 27

1            A.    No.
2            Q.    So your form when people are
3     in-processed don't ask people to write down M
4     or F or anything like that?
5            A.    I believe it is recorded in our
6     record, but that's not something I discuss with
7     my patients.
8            Q.    All right.  Do you associate any
9     biological outcomes or responses with a
10    person's sex?
11           A.    Actually, I'm not sure I
12    understand what the question is.
13           Q.    Well, you would agree that the
14    risk for heart disease correlates -- or there's
15    some correlation between a person's sex and
16    their risk for heart disease, right?
17           A.    Actually, I would argue that.
18           Q.    All right.
19           A.    I personally don't think that's
20    true.
21           Q.    So you don't -- so you don't
22    believe that males have any greater risk of
23    heart disease than females?
24           A.    Not in my practice.
25           Q.    Okay.  Is it recognized --

Page 28

```
 1          A.    It's separated by maybe a ten year
 2     higher incidence in males, but we see a huge
 3     number of women with advanced cardiovascular
 4     disease so we very much try not to start off
 5     with a prejudice that a particular woman is
 6     less likely to have cardiovascular disease.  We
 7     usually just proceed that they're probably or
 8     at approximately the same risk and that the age
 9     relevance is markedly offset by their lipid
10     problems, their smoking history, whether they
11     have diabetes, their family history.  These are
12     far bigger factors than whether they're male or
13     female.
14          Q.    But you recognize if a person is
15     male or female, that is going to be one of many
16     factors that you're going to consider in ███
17     ███████████ ██ ████████████ ██ ████████████████
18     ████████  correct?
19          A.    One of many factors, but in my
20     opinion, it's extremely small.
21          Q.    Okay.  And I'm not asking you
22     whether it's the main factor or if it's even in
23     the top hundred of the factors, I was just
24     trying to clarify whether or not in your field
25     of cardiology it's recognized that a person's
```

1   sex as male or female has any bearing on their

2   risk for cardiological disease, and as I

3   understand --

4          A.    There is a wide -- I'm sorry.

5          Q.    -- and as I understand your

6   testimony, it's your opinion that yes, it can

7   but there are other factors which have far more

8   relevance; is that accurate?

9          A.    That's accurate.

10         Q.    So I guess I'll go back to my

11  original question, which is, you know,

12  determining someone's biological sex is a

13  component of diagnosing someone's risk for

14  cardiovascular disease; is that right?

15         A.    Well, here's the problem.  If I

16  have a patient who comes in who's, say,

17  presenting as female, I'm not going to be

18  looking for proof of whether or not they have a

19  particular genetic makeup.  We don't do

20  karyotypes or chromosomal analysis.  We don't

21  take pictures of their genitalia.  I have no

22  actual idea when someone is in the office truly

23  whether or not the person in front of me is

24  male or female.

25         Q.    So if they came in -- if this

1    hypothetical patient came in and was showing

2    signs of cardiovascular disease and they

3    indicated to you that you were female -- or

4    that they were female and you proceeded with

5    the treatment or course of treatment and then

6    you later discovered that they were, in fact,

7    transgendered and they had a biological sex as

8    male, that would be a factor that you would,

9    you know, take note of during your diagnosis,

10   correct?

11               MS. INGELHART:  Objection.  Asked and

12   answered but --

13               MR. BLAKE:  There's no way I asked

14   and answered that question.

15   BY MR. BLAKE:

16         Q.   But go ahead.

17         A.   I'm confused by a term you used.

18   What is transgendered?

19         Q.   Well, sorry, I thought that was

20   the term I defined, someone whose gender

21   identity does not align with their birth or

22   biological sex.

23         A.   You're using transgender as an

24   adjective.

25         Q.   Okay.  So transgender, any related

1   part of speech, means someone whose gender
2   identity does not align with their birth or
3   biological sex, that's the noun, but a person
4   who is transgendered would be a person whose
5   gender identity does not align with their birth
6   or biological sex.  I guess we could do it as a
7   verb too but that wouldn't really make sense.
8           A.   You're making it into an
9   adjective.  It's like saying someone who is
10  black is blackened.
11          Q.   Well, no, but is there a different
12  way in which you would prefer me to say it?  A
13  transgendered individual?  A transgendered
14  individual; is that --
15          A.   Yes, it's much better to use
16  transgender as a noun.
17          Q.   Okay.  So a transgender individual
18  comes to your office, okay?
19          A.   Yes.
20          Q.   All right.  And they indicate to
21  you that they are a female.  Still with me?
22          A.   Okay.
23          Q.   And you begin -- right, that's
24  what you record in your file, in your patient
25  notes, and begin your diagnosis and course of

Page 32

1   treatment for what appears to you to be

2   cardiovascular disease, all right?

3          A.    Okay.

4          Q.    You later learn during the course

5   of treatment that this person is a transgender

6   person and, in fact, was born a biological

7   male.  You still with me?

8          A.    Yes.

9          Q.    Do you in your practice update or

10  take note of the fact that this person's

11  genetics are male to the extent that that may

12  have a factor or impact on your diagnosis and

13  course of treatment?

14          MS. INGELHART:  Objection.  Compound.

15  You can answer.

16          THE WITNESS:  The predominant reason

17  why people have cardiovascular disease is because

18  they have a genetic disorder of the way that the

19  liver handles their cholesterol, and they have an

20  elevation in what's called an LDL particle.  And

21  this is a genetic defect that's transmitted in

22  families.  There are multiple defects of this

23  kind -- of this type.  Some of them are probably

24  sex linked.  The majority of them appear to be

25  autosomal linked.

1              We do not currently have the

2      technology to identify the specific defects that

3      people have.  Whether or not someone is male or

4      female at the moment has no bearing on whether or

5      not they have this kind of defect, and it's not

6      something that we would be using as part of

7      something that we change the way we would do

8      diagnostic testing or treatment.  It's literally

9      of no -- in my practice, it's of no relevance.

10     BY MR. BLAKE:

11             Q.   Can you rule out any causes of

12     cardiovascular disease based on what you've

13     referred to as sex-linked defects?

14             A.   There's -- well, we don't know

15     that they're sex linked because there are so

16     many different defects, and we do not have

17     specific testing of which defect we're dealing

18     with unless you're in a research hospital.  So

19     we know that they have a defect because their

20     particle levels are elevated, but the exact

21     nature of the defect will be unknown when

22     you're in an office practice.

23             Q.   So it's possible in some settings

24     to eliminate certain causes of cardiovascular

25     disease because of a defect linked to a

1   person's sex but just not in your practice?

2         A.   I'm not sure that I understand

3   that.

4         Q.   Well, you said that in your

5   setting you couldn't do it, you couldn't make

6   the determination because you don't have a test

7   but that you could do it in maybe a laboratory

8   setting or something of that nature; is that

9   accurate?

10         A.   That's possible, but, again, on a

11   practical basis, there is no availability for

12   testing of that nature.  So we don't have the

13   ability to determine whether or not somebody

14   has a defect -- a genetic -- a sex-linked

15   defect as opposed to a nonsex-link defect.

16         Q.   Okay.  And that's with regard to

17   the LDL particles, right?

18         A.   Correct.

19         Q.   What about other causes of

20   cardiovascular disease, are any of those sex

21   linked?

22         A.   Well, the only other causes that

23   I'm aware of are tobacco smoking and diabetes

24   accelerate the formation of cardiovascular

25   plaques, but there is no other underlying cause

Page 35

1    for cardiovascular plaques to form that I'm

2    aware of.

3           Q.    Does the impact of smoking or

4    diabetes have a greater or lesser impact on

5    someone's cardiovascular health dependent upon

6    their sex?

7           A.    The primary impact is their

8    particle level, and you can't in any given

9    person indicate that their sex has anything to

10   do with their particle level.

11          Q.    So if a male and a female smoke

12   the identical amount of cigarettes for an

13   identical amount of time, would you expect one

14   or the other's LDL particle level to be

15   greater?

16          A.    I think you may have missed the

17   concept.  The underlying reason why the

18   particle levels are elevated is due to a

19   genetic defect in the way that the liver

20   removes particles from the bloodstream and it

21   has nothing to do with sex.

22          Q.    Except for in the cases where

23   there's a genetic defect --

24          A.    Yes.

25          Q.    -- that is then sex linked?

Page 36

1              A.    Yes.

2              Q.    But for your purposes, it's

3     immaterial what's causing the liver to fail to

4     extract those particles, it's just -- you

5     just -- you're diagnosing -- you know, you're

6     diagnosing the symptom and proceeding from

7     there, right?

8              A.    No, I wouldn't say that.  We're

9     diagnosing the fact that they have an elevated

10    particle level, but whether or not the reason

11    why they have an elevated particle level is

12    because of any given specific defect, we don't

13    have the ability to do that.

14             Q.    Do you treat equal numbers of

15    males and females?

16             A.    I believe so.

17             Q.    A person's biological sex is a

18    factor in his or her risk of stroke, right?

19             A.    Actually, I don't believe that.  I

20    believe the primary risk is what their LDL

21    particle level is.

22             Q.    Do you know what the rates of

23    stroke are for males and females?

24             A.    No.  All of the patients that we

25    see in our office, they have strokes from

Page 37

```
 1   emboli from their heart and they have strokes
 2   from plaque disease in their neck, and if they
 3   have plaque disease in their neck, then they,
 4   without exception, will have elevated LDL
 5   particle levels.
 6         Q.   Do you know whether the types or
 7   kinds of anesthesia or the amounts of
 8   anesthesia that are given to patients prior to
 9   surgery, do you know whether that depends, in
10   part, upon their biological sex?
11         A.   Well, I don't deliver anesthesia.
12   Okay.  We have certified registered nurse
13   anesthesiologists in our hospital who do
14   everything anesthesia.  I'm aware that physical
15   size, body fat, these are all likely factors.
16   I'm not aware that male versus female is a
17   major issue in delivering anesthesia.  We have
18   far more problems with massively overweight
19   people or people with respiratory disease, we
20   worry about those people.  We don't sit and
21   worry about one patient having a certain
22   anesthesia risk because they're female.
23         Q.   There are various postoperative
24   procedures associated with a person's
25   biological sex, right?
```

1            MS. INGELHART:  Objection.  It may
2    call for speculation.
3            THE WITNESS:  I have no idea.  I
4    don't know what you're referring to.
5    BY MR. BLAKE:
6        Q.   So you don't know whether someone
7    post-surgery is given a different prognosis or
8    recovery or treatment plan based upon, at least
9    to some degree, their biological sex as male or
10   female?
11       A.   Like, I'm ████ ████████████████
12   ████████████   I do ████████████
13   ██████████████████ █ ████ ██████ ███ █████████
14   ████ ████ ████ █████████  Okay.  I don't do
15   what is considered surgery.  I'm not cutting
16   into people with a scalpel.  I am not sure what
17   procedures you're talking about.
18       Q.   All right.  Do you prescribe
19   medications to any of your patients?
20       A.   Of course.
21       Q.   Okay.  And I assume the
22   medications you prescribe have all been
23   approved by the FDA, right?
24       A.   Correct.
25       Q.   And from time to time during your,

Page 39

1   you know, over thirty years of practice

2   there's, I assume, been lots of new medications

3   approved for treatment by the FDA, right?

4           A.    Correct.

5           Q.    And prior to authorizing new

6   medication from coming on the market and being

7   able to be prescribed and given to patients,

8   the FDA, you know, makes sure that that

9   medication is safe, right?

10          A.    Yes.

11          Q.    And in order to do so, they

12  conduct various studies, you know, as the

13  medication goes through its approval process,

14  right?

15          A.    Yes.

16          Q.    And that as part of that, the FDA

17  requires new medications be studied separately

18  on males and females to determine whether a

19  person's biological sex has an impact on the

20  response to the therapy, right?

21               MS. INGELHART:  Objection.  Calls for

22  speculation.  You can answer.

23               THE WITNESS:  Oh, okay.  To tell you

24  the honest truth, I have no idea if they do that

25  or not.

Page 40

1   BY MR. BLAKE:

2          Q.   So you don't know whether the FDA,

3   when they're approving a new medicine, would

4   test it in a group of people in a study that

5   was comprised only of males and then

6   nevertheless approve it for both males and

7   females?

8          A.   I would hope that they would.  All

9   of the medications that I use do not have any

10  sex difference in terms of the FDA

11  recommendations for dosing.

12         Q.   All right.  But --

13         A.   So it's something that is an

14  inactive issue in my practice with the current

15  medication that we have.

16         Q.   But you would hope that the FDA,

17  prior to approving medicine for -- new medicine

18  for patients, would at least look at whether or

19  not that medicine had a differing impact based

20  on someone's biological sex, right?

21         A.   I hope they look at everything.

22         Q.   Whether someone is transgendered

23  has no impact on their risk of cardiovascular

24  disease, right?

25         A.   I'm sorry, could you repeat that

```
                                                    Page 41
  1   question?

  2           Q.    Whether a person is a transgender

  3   person has no impact on his or her risk of

  4   stroke, right?

  5           A.    Well, first of all, I'm going to

  6   object to you using the term transgendered.  I

  7   don't like to be described as a transgendered

  8   person.  I don't know what that means.  We

  9   discussed that previously.  So I'd prefer if

 10   you use transgender as a noun.

 11           Q.    Yeah.  It may be the audio but I

 12   intended to say transgender person.

 13           A.    Okay.

 14           Q.    So that's -- that was, I thought,

 15   the term we had agreed on so --

 16           A.    Okay.

 17           Q.    -- I'm not trying to be, you know,

 18   disrespectful, certainly not.  So let me

 19   rephrase it or try again.

 20               Whether a person is a transgender

 21   person has no impact on their risk of a stroke,

 22   right?

 23           A.    I don't believe that it does.

 24           Q.    And whether a person is a

 25   transgender person has no impact on their risk
```

Page 42

1   of cardiovascular disease, right?

2         A.   Well, I don't know you can say --

3   that's an awfully broad statement.  Okay.

4   People who are transgender, a high percentage

5   of them are very economically disadvantaged.

6   They often can't get a job.  They're often

7   heavily discriminated against.  They're subject

8   to excessive violence.  I think they're subject

9   to all sorts of physical problems as a result

10  of those prejudices that they experience in

11  society.  But in terms of whether or not they

12  are inherently more subject to one kind of

13  disease or another, I have no knowledge or

14  awareness of that.

15        Q.   Right.  I mean, whether a person

16  is a transgender person is irrelevant in

17  determining whether or not they have an LDL

18  particle defect, right?

19        A.   Well, your LDL particle defect is

20  an inherent genetic disease.  The only thing

21  that affects that in ninety-nine percent of

22  people is who their parents were.

23        Q.   And you're not aware of the FDA,

24  when they approve new medications, studying

25  separately how that new medicine impacts a

Page 43

1  transgender person, right?

2          A.   I have never heard of anything

3  where there was a sentence that involved the

4  FDA and transgender in the same sentence.

5          Q.   And that's because there's no

6  evidence indicating that a transgender person

7  and a cisgender person have differing responses

8  to therapy, right?

9              MS. INGELHART:  Objection.  Calls for

10  speculation.

11              THE WITNESS:  Well, I have no medical

12  knowledge of that.

13  BY MR. BLAKE:

14          Q.   You agree that birth certificates

15  are a form of identification, right?

16          A.   Correct.

17          Q.   And you agree that birth

18  certificates reflect certain biographical data

19  existing at the time of birth, right?

20              MS. INGELHART:  Objection to that

21  term biographical information.  I just want to put

22  that on our disputed list or standing objection.

23  It calls for a legal conclusion.

24              THE WITNESS:  I don't know what

25  biographical means.

Page 44

1    BY MR. BLAKE:

2            Q.   So it includes your birth date,

3    right?

4            A.   Correct.

5            Q.   It includes your location of

6    birth, right?

7            A.   Correct.

8            Q.   It includes your parents' names on

9    there as well, right?

10           A.   Correct.

11           Q.   That's all biographical data, you

12   would agree, right?

13           A.   So far.

14           Q.   It includes your sex, right?

15           A.   No, I would not agree with that.

16           Q.   You would disagree that the birth

17   certificate includes your sex?

18           A.   Well, my definition of sex is

19   gender identity --

20           Q.   Okay.

21           A.   -- and the State doesn't make much

22   of an effort to record a child's -- newborn's

23   gender identity.  It's really hard for them to

24   do that on a birth.

25           Q.   We'll get into that in a minute,

Page 45

1  but you do at least recognize that the birth
2  certificate contains -- or reflects a sex
3  identifier, right?
4          A.   Yes, but I don't agree that it's
5  either accurate or reliable.
6          Q.   Okay.  At the time the birth
7  certificates are made, does the individual have
8  any control over what information is displayed?
9          A.   No.
10         Q.   And is it your understanding that
11 it's ODH that records the information reflected
12 on the birth certificate?
13         A.   Yeah.  Obviously there's an
14 interaction with the physician, but to that
15 extent, yes.
16         Q.   All right.  The physician -- the
17 medical provider who is there at or near the
18 time of birth records certain data, we won't
19 call it biographical data, but they record
20 certain data, right?
21         A.   Right.
22         Q.   And then they somehow transmit
23 that information to ODH, right?
24         A.   Correct.
25         Q.   And the individual whose

Page 46

1  information or data is recorded on that birth
2  certificate, they don't certify the accuracy of
3  that information, right?
4          A.  Correct.
5          Q.  It's ODH that certifies the
6  accuracy of the birth record, right?
7          A.  Correct, but I don't think that
8  they are in a situation where they can certify
9  the accuracy.
10         Q.  Right.  Well --
11         A.  The information is inherently
12 inaccurate.
13         Q.  Right.
14         A.  They're not taking pictures of the
15 baby's genitalia and recording it.  They're not
16 doing a karyotype or a -- doing genetic testing
17 to be sure what the nature is of the underlying
18 sex by your term.  So if there is an error, it
19 just slips through the system.  There's
20 approximately, I think, about one in a thousand
21 kids are born with indeterminate genitals so I
22 don't know what ODH does in those
23 circumstances.  Obviously there are
24 circumstances where there's inaccuracies.
25         Q.  Do you know what ODH's process is

Page 47

1   for recording the sex of an individual born

2   with indeterminate sex characteristics?

3           A.   No, I have no idea.

4           Q.   Do you know what ODH's process is

5   for correcting typographical errors or

6   misidentified individuals at the time of birth?

7           A.   No.  All I know is that they got

8   mine wrong.

9   ████    ████  ████  ████   ████  ████

10  ██████████████████  ██  ████████████  ████████

11       ██   █ █████   ████  █████   █ ███   █

12  ████  ██  ██████  █████  █ █  ██████████  ███

13  ██████████  █████  ████  █ ███  ██████  ███  █

14  ████  █ █████  █████  I have no way of knowing

15  that.

16       ██   ████  ████  ████  ████  █ ████████

17  ████  ████  ███

18       ██   ██████

19       ██   ████  ████  ████  ████  ██  ████

20  ██████  ████  ████  ████  █  ████  ████  ████

21  ████  ██  ████  ██  ████  ████  ██████████

22       ██   ██

23       ██   ████  ████  ████  █  ██████████

24  ██████  ████  ████  ████  ████  ████  ████

25  ████  ██  ██  ████  ████  ████  ██  ████

Page 48

1 ████████████████████████████████████

2                    MS. INGELHART:  Objection.  Calls for

3     speculation.  You can answer.

4                    THE WITNESS:  To tell you the truth

5     at the moment, I have no idea what the policy is

6     other than they're refusing to change my gender

7     identifier.

8     BY MR. BLAKE:

9          Q.   Is it your understanding that

10    ODH's, I call it a policy, but is it your

11    understanding that ODH's procedure for changing

12    the sex identifier on a birth certificate is

13    that they will do so when there was an error at

14    the time of birth?

15                    MS. INGELHART:  Objection.  Calls for

16    a legal conclusion and some speculation.  You can

17    answer.

18                    THE WITNESS:  I don't think it's --

19    you know, I feel that from my perspective, sex and

20    gender are the same thing.  I don't think I should

21    be in a position of having to prove what my gender

22    identity is to the Ohio Department of Health.

23    BY MR. BLAKE:

24         Q.   Your opinion that sex and gender

25    are the same thing, is that based on any

Page 49

1   medical or scientific information?

2                   MS. INGELHART:  Objection.  Calls for

3   expert testimony.

4                   THE WITNESS:  Look, I'm not -- as we

5   talked about before, I am not an expert in this

6   field.  I have had no training in this field.  All

7   I know is that from my belief, gender is the same

8   thing as sex for this purpose.  I don't see why

9   the State should be refusing to honor my request

10  to give me a corrected document.

11  BY MR. BLAKE:

12          Q.   So setting aside a chromosomal

13  abnormality, if I told you someone had XX

14  chromosomes, that would indicate a biological

15  sex as female, right?

16                  MS. INGELHART:  Objection.  Expert

17  testimony.  You can answer.

18                  THE WITNESS:  I'm not sure.

19  BY MR. BLAKE:

20          Q.   You don't know whether someone

21  with XX chromosomes in a normal circumstance

22  would be a biological female?

23          A.   No, I -- I'm sorry, maybe I didn't

24  hear your question correctly.  The answer to

25  that is yes.

Page 50

1          Q.   And if they were born with XX
2    chromosomes, you would have no idea whether or
3    not that person was a transgender individual,
4    right?
5          A.   I didn't hear that question
6    clearly.
7          Q.   Yeah.  So whether or not someone
8    has XX chromosomes has no bearing on whether
9    that individual is a transgender individual,
10   right?
11         A.   XX?  Let's see.
12              MS. INGELHART:  Inserting an
13   objection.  Calls for expert testimony.  You can
14   answer.
15              THE WITNESS:  I don't -- I don't know
16   how currently looking at someone's karyotype is
17   going to allow somebody to understand whether or
18   not an individual is transgender.
19   BY MR. BLAKE:
20         Q.   Okay.  And if a person has a
21   biological sex as female and absent any
22   indeterminate sex characteristics or other
23   abnormalities, that individual's external
24   genitalia at birth would also indicate a
25   biological sex of female, right?

Page 51

1              MS. INGELHART:  Objection.  Expert

2    testimony.  You can answer.

3              THE WITNESS:  I really don't know

4    what you mean by biological sex.

5    BY MR. BLAKE:

6         Q.   Well, I mean, we've just talked

7    about that an XX -- a person with an XX

8    chromosome, right, absent any chromosomal

9    abnormality, they would -- they would be born a

10   female, right?

11        A.   Most usually, but in this -- I'm

12   not an expert in that area.

13        Q.   Right.  I get it.  And we're

14   excluding the things where people have, you

15   know, intersex conditions or their karyotype is

16   one of the nonregular karyotypes, you know, one

17   of the one and a thousand people that you

18   referenced earlier, okay?

19        A.   Okay.  But, again, my definition

20   for sex is gender identity, and it appears that

21   your definition for sex is what their genitals

22   look like at birth --

23        Q.   And --

24        A.   -- and I would argue that that's

25   something that's open to a lot of error.

1              Q.   Understood.  So what I -- what my

2    question was, someone who has XX chromosomes,

3    all right, absent any other abnormalities,

4    their external genitalia at birth would

5    indicate -- also indicate a biological sex of

6    female, right?

7                   MS. INGELHART:  Objection.  Expert

8    testimony.  You can answer.

9                   THE WITNESS:  Again, you're asking me

10   for -- literally to be an expert about the

11   genitalia of young infants, and I am not.

12   BY MR. BLAKE:

13             Q.   So you had four years of medical

14   training, I assume four years of residency, two

15   years of a fellowship, and then one year of

16   like a post-doctorate fellowship and your

17   testimony is that you don't know whether a

18   normal human baby born with XX chromosomes

19   would also have external genitalia that conform

20   to a female?

21                  MS. INGELHART:  Objection.  Misstates

22   prior testimony.  Asked and answered.  You've

23   really been beating this over and over again, but

24   you can answer.

25                  THE WITNESS:  Okay.  I had six weeks

1    of pediatrics when I was a medical student

2    approximately fifty years ago, okay, so for you to

3    ask me to be an expert in inspecting the genitalia

4    of newborns to be sure that I'm not making an

5    error, well, I don't look at newborns.  I haven't

6    looked at newborns for fifty years, other than my

7    two children.  But being able to reliably discern

8    people's genitalia reliably, I don't think I'd put

9    myself in a professional position of doing that.

10   BY MR. BLAKE:

11        Q.   Do you think that the medical

12   providers, the obstetricians, the pediatricians

13   who record the information, medical and

14   otherwise, about a child at or near the time of

15   birth, do you think they have the expertise and

16   capability to record that information?

17             MS. INGELHART:  Objection.  Calls for

18   speculation and expert testimony.  You can answer.

19             THE WITNESS:  Again, my definition of

20   sex is gender identity.  I don't know currently

21   how obstetricians and gynecologists are able to

22   assess the gender identity of children when

23   they're just born.  I don't know how this is done.

24   BY MR. BLAKE:

25        Q.   You don't have any idea how a

Page 54

```
 1   doctor --
 2           A.   I'm sure they take -- I'm sure
 3   they take a cursory look at the an individual's
 4   genitalia and they make a rapid rough
 5   assessment, but I don't see how they can assess
 6   individual's gender identity.
 7           Q.   Yeah, you're not aware of any
 8   tests where a newborn infant could be
 9   identified as a transgender individual, right?
10           A.   Listen, I'm not trying to be
11   difficult, but as I said before, I'm ███
12   ████████████   ██████████████   I'm not a
13   gynecologist or obstetrician.  You're asking me
14   medical questions that are outside of my scope
15   of practice.
16           Q.   I get that it's outside of your
17   scope of practice.  What I guess I'm struggling
18   with is whether or not you think that
19   identifying a boy or a girl is outside the
20   scope of your just experience as a human being.
21   Is that also your testimony?
22           A.   No.  I think that routinely that
23   people make rapid cursory assessments, but I
24   don't think they're accurate.
25           Q.   I mean, your understanding of what
```

1    the medical provider does at or near the time

2    of birth is quickly look at the external

3    genitalia of the newborn and then records that

4    information on the appropriate forms; is that

5    your understanding?

6            A.   They make a rapid assessment and

7    record what their initial impression is, but I

8    don't think that's reliable, accurate, or

9    answers what the question is, which is what is

10   their gender identity.

11           Q.   Right.  And the question I had

12   asked before which you didn't answer is you're

13   not aware of any tests that can be conducted at

14   or near the time of birth that would reveal a

15   newborn's gender identity, right?

16           A.   Correct.  I'm not aware of any

17   such thing.

18           Q.   If a medical --

19                MS. INGELHART:  Can we --

20                MR. BLAKE:  Go ahead.

21                MS. INGELHART:  Can we take a quick

22   bio break and go off the record?

23                MR. BLAKE:  Yeah, that's fine.

24                MS. INGELHART:  Thanks so much.

25                (Pause in proceedings.)

Page 56

1    BY MR. BLAKE:

2         Q.   Do you understand how a person's

3    sex is determined from a medical perspective?

4              MS. INGELHART:  Objection.  Expert

5    testimony.  You can answer.

6              THE WITNESS:  I don't understand the

7    question.  I'm not an expert in the area of sex or

8    gender identity.  I don't know.

9    BY MR. BLAKE:

10        Q.   All right.  You understand that

11   there are males and there are females, right?

12        A.   Even that I would have to beg off.

13   You're asking from me for, I presume, a

14   scientific definition.  I'm not aware of one.

15   That field is not something I am trained in and

16   so I don't think I can answer.

17        Q.   So you don't know, despite your

18   years and years of medical training and decades

19   of practice in the field of medicine, whether

20   or not it's important to identify a person's

21   biological sex?

22        A.   And, again, as I said, I'm an

23   ███████████████████████████  We don't look at

24   people's gender as being a major impact on

25   diagnosis or treatment and it's not -- I don't

Page 57

1   sit there and confirm with patients in the
2   office are you truly male or female.  We don't
3   do any specific testing to confirm people's
4   karyotype.  None of this is relevant to my
5   practice.  I haven't had training in pediatrics
6   for over fifty years, and this is not something
7   that comes up in the course of my practice so
8   why should I be knowledgeable about that?
9           Q.   What about as a general matter, do
10  you have any idea how sex is identified in an
11  individual?
12          A.   Well, again, this is -- that's not
13  my area of expertise.  I've had enough battles
14  of my own about sex and gender.  I don't think
15  about it.  I haven't thought about it in years.
16  I don't have any specific opinions, okay, I
17  just want a corrected birth certificate for me.
18          Q.   You mentioned you were married
19  before, right?
20          A.   Yes.
21          Q.   Did you have kids?
22          A.   Yes.
23          Q.   Do you know the sex of your
24  children?
25          A.   Yes.

1          Q.    And at what time did you have an
2    understanding of the sex of your children?
3          A.    When they were born.
4          Q.    And how did you make that
5    determination?
6          A.    Myself visually.
7          Q.    Based upon what criteria?
8          A.    Well, now you're -- I'm going to
9    beg off answering that.  Now you're asking me
10   to start elaborating on the genitalia of my
11   children and I find that offensive.
12         Q.    But without disclosing the
13   genitalia -- what the genitalia of your
14   children was, that's the criteria you used to
15   identify their sex at birth, right?
16         A.    Correct.
17         Q.    And that information was either
18   confirmed by the medical provider or related to
19   the medical provider who in any event
20   transmitted that information I assume to
21   whatever Department of Health equivalent they
22   had in whatever state your children were born,
23   right?
24         A.    I don't know how they confirmed
25   it.  ██████  ████████  ██ █  █████████████   ██████  ███████

1 ███████ ██████ █████████ ██████ ██████ ██████ █████████

2 ███ ███ ███████   It was a roughshod assessment of

3 what their gender and sex was.  I don't -- from

4 my personal belief, I don't think that's

5 particularly reliable.

6          Q.   Okay.  And, you know, regardless

7 of your perception of the reliability of the

8 doctor's visual inspection of your child to

9 determine their sex, that's your understanding

10 of the process, right?

11          A.   Yeah, but are you aware just how

12 many errors are made in the medical profession

13 every day that cause death?  I mean, the number

14 of medical errors our population is subject to

15 is enormous.  I have no confidence, okay, about

16 what you're asking me about.

17          Q.   Well --

18          A.   It's a rough-hand assessment,████

19 ███████ ██ ██ ██ ████████ ██ █ ███████████ █

20 ██████ ███ ████████ ████████

21          Q.   Right.  But do you believe that

22 your children have had their sex misidentified

23 on their birth records?

24          A.   Personally, no.

25          Q.   Okay.

Page 60

1        A.   Does that mean that it could have

2    been misidentified?   Sure.

3        Q.   But you don't have any evidence of

4    that, right?

5        A.   No.  Well, I have no reason to go

6    searching for it.

7        Q.   Okay.  And when you were born, you

8    were identified as a male, correct?

9        A.   Correct.

10       Q.   And do you have any reason to

11   believe that that identification occurred under

12   circumstances any different than what you're

13   familiar with with your own children?

14       A.   No.

15   ▇▇   ▇▇▇   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

16   ▇▇▇▇▇▇▇▇▇▇▇

17           MS. INGELHART:  Objection.  Calls for

18   expert testimony, speculation.

19   BY MR. BLAKE:

20       Q.   Go ahead.

21       A.   I honestly can't answer you.  I

22   was there, but I wasn't in any condition to

23   make a personal assessment.

24   ▇▇   ▇▇▇▇▇▇▇▇▇▇▇

25   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Page 61

1  ████████████████████

2              MS. INGELHART:  Objection.  Calls for

3  expert testimony.

4              THE WITNESS:  No.  Again, why or

5  would I?  Again, except that I was there, they

6  didn't have a camera.  I have no way of knowing.

7  BY MR. BLAKE:

8        Q.   Do you contend it was inaccurate

9  for the medical provider to record your sex as

10  male at the time of your birth?

11       A.   Again, I believe you're asking me

12  the same question essentially over and over

13  again.  The -- I'm sure he did his best, but,

14  again, there were no scientific methods used to

15  determine what my actual gender identity was;

16  and as to the accuracy of his assessment, I was

17  there but not in a condition to make my own

18  opinion.

19       Q.   Do you believe the doctor -- the

20  medical provider should have reported your sex

21  at birth as female?

22       A.    I don't think he should have

23  reported it at all.  I personally don't see

24  what the slightest real use of the State of

25  Ohio is for recording a sex or gender identity

Page 62

1    at birth.  I don't understand what the value of

2    it is.

3         Q.   Do you have an understanding why

4    the Department of Health records an

5    individual's sex at birth?

6              MS. INGELHART:  Objection.  Calls for

7    speculation.

8              THE WITNESS:  I could speculate, but,

9    again, I have no personal knowledge of why they do

10   it.

11   BY MR. BLAKE:

12        Q.   All right.  Are you familiar with

13   infant growth charts?

14        A.   Vaguely from fifty years ago.

15   Again, I'm not a pediatrician.

16        Q.   Yeah.  I'm not asking for any

17   expertise about you being a pediatrician.  I'm

18   just wondering whether or not as a parent you

19   were ever shown or provided information related

20   to a childhood growth chart?

21        A.   Sure, I looked at the growth

22   charts for my children.

23        Q.   And you knew that your child based

24   on their sex was, you know, in such and such

25   percentile for height and weight and head

Page 63

1   circumference and things like that, right?

2          A.   Again, I presumed that they were

3   within normal limits at the time.

4          Q.   I guess that wasn't my question.

5   I apologize if you interpreted my question as

6   trying to delve into whether or not your

7   children were on a particular percentile or

8   anything like that.  I was just simply asking

9   whether or not you were generally familiar with

10  that's how children are tracked for their

11  growth, right?

12         A.   Yeah, I'm aware that's one of the

13  things that's done.

14         Q.   And that they have this growth

15  chart for both males and females, right?

16         A.   Sure.

17         Q.   And a child that weighs fifteen

18  pounds at, you know, four months is going to be

19  in a different percentile, you know, based on

20  whether they're a male or a female, right?

21         A.   We made an assumption that my

22  children were of the gender identity/sex,

23  however you want to argue it, that they

24  appeared to be on face value and they both fit

25  within the growth charts of normal.

Page 64

1          Q.    Right.  But you recognize there's

2     different growth charts for males and females,

3     right?

4          A.    Correct.

5          Q.    And do you know that -- do you

6     know the organization or entity that publishes

7     the information that goes into creating those

8     growth charts?

9          A.    No idea.

10         Q.    All right.  Would it surprise you

11    if I told you it was the CDC or that's one of

12    the entities?

13         A.    I have no idea.

14         Q.    Do you know what the CDC is?

15         A.    Sure.

16         Q.    Okay.  The Center for Disease

17    Control, right?

18         A.    I believe that's correct.

19         Q.    Just to make sure we're talking

20    about the same thing.  And they compile a bunch

21    of information related to illnesses and vital

22    statistics and things of that nature, right?

23         A.    Correct.

24         Q.    All right.  And that the Ohio

25    Department of Health, ODH, provides information

Page 65

1    about the children that are born in its state

2    to the CDC, are you aware of that?

3         A.    No.

4         Q.    Okay.  Well, would that surprise

5    you if that's where the CDC gets its

6    information, from the various Departments of

7    Health around the country?

8         A.    I'm not sure what would surprise

9    me.  I'm not sure what disease they're trying

10   to control with getting that kind of

11   information.

12        Q.    They're not trying to control a

13   disease.  They're merely assembling data to

14   maintain the growth charts, you know, in the

15   nation, right?

16        A.    Their mandate is to be the Center

17   for Disease Control.  What disease is it that

18   they're worried about that they're tracking

19   growth charts?

20        Q.    So do you think that it's not

21   valuable information for a parent or a medical

22   provider to know whether a child falls within a

23   normal range of growth for height, weight, head

24   circumference?  Is that your testimony?

25        A.    Again, I have -- I'm curious

Page 66

1  because that's outside of what I perceive their

2  mandate to be, and I have no idea of what

3  disease they're trying to control by looking at

4  growth charts.

5       Q.   Okay.  Did you find -- go ahead.

6       A.   I'm not an expert in epidemiology

7  so I have no idea what they're doing.

8       Q.   Okay.  Did you find the

9  information about your own children, their

10 growth information, did you find that

11 information useful as a parent?

12      A.   Not particularly.

13      Q.   Would you have been concerned if

14 your child was, you know, below the first

15 percentile or above the ninety-ninth percentile

16 for things like height, weight, or head

17 circumference?

18      A.   I'm sure I would, but they

19 weren't.

20      Q.   And so you can see the value of

21 those growth charts then for children who are

22 born which fall outside, you know, the normal

23 range of the growth chart, right?

24      A.   I guess so.  Again, I'm not a

25 pediatrician so I'm not sure whether or not

Page 67

1   those charts are more reliable than just a
2   physical inspection of a child.  I have no
3   idea.
4          Q.   All right.  So just going back to
5   your statement about why the State of Ohio is
6   collecting information about a person's birth
7   sex, you would agree that if the State didn't
8   collect that information and report that
9   information, there would be no way to compile
10  the data which forms the basis for those
11  percentile charts, right?
12              MS. INGELHART:  Objection.  Calls for
13  speculation, expert testimony.  You can answer.
14              THE WITNESS:  Again, I don't know why
15  they're collecting this data.  I don't know what
16  its use is.  I don't know why the Center for
17  Disease Control would be interested in this.
18  Okay.  You're asking me to speculate about an
19  entire bunch of activity that I have no awareness
20  or knowledge of.
21  BY MR. BLAKE:
22          Q.   Well, wait a minute.  Look, I
23  mean, let's try to be -- let's try to be
24  consistent and I think honest here.  You just
25  testified that you would find the information

1    on the growth charts useful if your child fell

2    outside of the normal ranges, right?

3            A.   No.  No, I didn't say that.

4            Q.   Okay.  What did you testify then

5    because that's what I -- that's what I

6    recollect.

7                 MS. INGELHART:  Object to form.

8                 THE WITNESS:  No awareness that

9    looking at a growth chart as opposed to the visual

10   assessment by a trained pediatrician, which of

11   them is more useful.  I didn't say that the growth

12   chart was more of greater benefit.

13   BY MR. BLAKE:

14           Q.   So when you prescribe treatments

15   or therapies for your patients, do you ever

16   rely on historical data regarding the

17   effectiveness of such treatment?

18           A.   I'm not sure how to answer that

19   because I've been in practice doing what I do

20   for forty years so most of what I rely on is my

21   own personal experience in diagnosing or

22   treating a disease inside my scope of practice.

23   So there's relatively little that I'm relying

24   on other people's opinions about what to do.

25           Q.   So you don't ever rely on studies

1  or reports which reflect outcomes or expected

2  outcomes or anything of that nature?

3          A.   When you're using the term

4  relying, you're meaning the physician is making

5  their entire judgment about how to diagnose and

6  treat off of other -- outside data.  I hope you

7  don't go to a doctor like that.

8          Q.   Yeah, I mean, that's -- you're

9  obviously mischaracterizing what I said.

10  Reliance -- I didn't say solely rely.  I said

11  whether or not you ever look at such studies to

12  help inform your decision on how to treat a

13  patient or prescribe a medicine or proceed with

14  a therapy, right?

15          A.   I misunderstood your question.

16  I'm sorry.

17          Q.   Okay.  So --

18          A.   Actually, I do look at -- I read

19  the literature constantly.

20          Q.   Do you ever consider whether or

21  not someone is obese in your practice when you

22  look at treatment therapies or options or

23  diagnosing a disease?

24          A.   We look at it, but it's actually a

25  relatively minor risk factor for cardiovascular

1  disease.  It's much weaker than -- the most

2  strongest indicator is your LDL particle limit.

3          Q.   When you make the determination

4  about someone's obesity level, doesn't that in

5  part depend upon whether they're a male or

6  female?

7          A.   No.

8          Q.   No?  So someone's body mass index,

9  right, if that's a term I can use, doesn't that

10  tell you whether or not they're obese?

11          A.   Yes.

12          Q.   And doesn't the body mass index

13  for a female -- what is the body mass index for

14  a female, what qualifies them as obese?

15          A.   Usually the number thirty is used.

16          Q.   And then what about for males?

17          A.   I believe they use the same

18  number.

19          Q.   Okay.  So you think the BMI level

20  is the same for male or female?

21          A.   I could be wrong about that.  As

22  far as I know in our office we're using the

23  same number for body mass index and it's an

24  objective number, it's not based on a table.

25          Q.   And do you think that the body

Page 71

1  mass index -- the healthy body mass index is
2  the same regardless of whether you're a male or
3  a female?
4          A.   I wouldn't use the term healthy
5  because you're trying to describe -- no,
6  seriously, you're trying to describe health as
7  being that if their body mass index is below a
8  certain number, then they're healthy.  That's
9  not true.
10          Q.   Well, what term would you use?
11  Would you use the term normal?
12          A.   Well, no, I'd say their weight is
13  below their recommended body mass index; but,
14  again, as I said before, it's a very weak part
15  of assessing cardiovascular risk.
16          Q.   And is the recommended body mass
17  index the same for males and females?
18          A.   As far as I know, the number
19  thirty is used for both.
20          Q.   So anything below thirty, that's
21  the recommended level male or female; is that
22  your testimony?
23          A.   It's a goal, okay.
24          Q.   And then anything above thirty,
25  male or female, obese; is that your testimony?

Page 72

1          A.    Up to a point.  It's usually

2    divided up into mild, moderate, and severe.

3    The number thirty is usually used as a cutoff.

4          Q.    Okay.  Do you know whether average

5    birth weights for males and females are the

6    same?

7               MS. INGELHART:  Objection.  Calls for

8    expert testimony, speculation.  You can answer.

9               THE WITNESS:  It's a short answer.  I

10   have no idea.

11   BY MR. BLAKE:

12         Q.    You have no idea.  So if they're

13   not the same, all right, assuming that the

14   average male and the average female when born

15   are different weights, would you agree that

16   it's important to track those birth weights and

17   childhood weights separately in order to

18   determine whether or not such children are

19   falling out of the normal or healthy range?

20              MS. INGELHART:  Objection.  Calls for

21   speculation, hypothetical.  You can answer.

22              THE WITNESS:  Again, I'm not a

23   pediatrician.  You're asking me to have an opinion

24   about something I have no knowledge of.

25   BY MR. BLAKE:

1        Q.    All right.  So you have no opinion
2   one way or the other whether it's important to
3   track the sex of a child when born as part of
4   tracking their early childhood development?
5        A.    Let me answer this this way.
6   There's a widespread belief that watching an
7   individual's cholesterol and diet is important
8   for preventing cardiovascular disease.  In
9   fact, that's not true.  What's really important
10  is controlling their particle level.  So
11  there's this widespread belief that you're
12  going to provide better care by worrying about
13  somebody's cholesterol and their diet, and I
14  believe that's not true.
15           So how do I know that following a
16  child's growth chart actually, in reality,
17  makes a material difference in their care?  I
18  have no way of knowing that.  You're asking me
19  to speculate as if I'm some knowledgeable
20  pediatrician.  If there's data to suggest if
21  you follow their growth chart that you do a
22  better job, I don't know that that's true.  I
23  have no idea.
24        Q.    Yeah, that's not what I'm asking
25  you.  Did you have -- by the way, how many

Page 74

1   children did you have?

2          A.   Two.

3          Q.   And do you have a boy and a girl,

4   a girl and a boy, two girls, two boys?

5          A.   Boy and a girl.

6          Q.   And do you recall whether or not

7   they had the same growth chart?

8          A.   No.

9          Q.   Okay.  Would it surprise you if

10  there were different growth charts for a boy

11  and a girl?

12         A.   I don't remember anything about

13  their growth charts.

14         Q.   I asked you whether it would

15  surprise you if there was different growth

16  charts for boys and girls?

17         A.   No, it wouldn't surprise me.

18         Q.   And would it surprise you if boys

19  and girls grew at different rates?

20         A.   I presume they do.

21         Q.   Right.  Boys are taller,

22  generally, right?

23         A.   Generally, but there are a lot of

24  tall girls.

25         Q.   There are a lot of tall girls, and

1    there's also a period of time in childhood

2    development where girls actually tend to be a

3    little taller than boys, right?

4                 MS. INGELHART:  Objection.  This

5    calls for expert testimony.  She's not a

6    pediatrician.  She's testified to this repeatedly.

7    We keep beating this question down.  You ask it in

8    various ways, but it's the same question over and

9    over again.  She continues to tell you she's not

10   an expert in this field.  You can answer.

11                MR. BLAKE:  Got it.  I would

12   appreciate if you just limit the speaking

13   objections.  I'm not asking for expert testimony.

14   I'll give you a standing objection to anything

15   that calls for expert testimony, and I think the

16   witness has testified she's not an expert.  You

17   know, we can have a dispute about whether or not

18   we think knowing that boys and girls are different

19   sizes requires expert testimony or if that's

20   something that's generally observable to the lay

21   witness, particularly a parent who's had both a

22   boy and a girl, but, you know, I don't think this

23   is the proper form for that.

24                THE WITNESS:  I'm sixty-eight years

25   old, okay.  You're talking about things with my

Page 76

1   children that were more than fifty years ago.  I
2   don't remember those things.
3   BY MR. BLAKE:
4        Q.    Okay.  Do you understand how a
5   person's gender identity is determined?
6        A.    No.
7        Q.    What is your understanding of a
8   person's gender identity?
9        A.    It's their -- the way it's often
10  phrased is deep set internal belief about
11  whether or not they are male or female in their
12  essence, the way in which they need to express
13  themselves.
14       Q.    Does that have anything to do with
15  what a person's karyotype is?
16       A.    I have no idea.
17       Q.    If a physician found you
18  unconscious -- and not you individually but
19  just like found an individual unconscious --
20  let me start again.
21            If a physician found someone
22  unconscious on the street, there aren't any
23  tests that that physician could perform to
24  determine whether or not that person was
25  transgender, right?

Page 77

1          A.    That's an incredibly vague

2    question because you're lumping people who are

3    transgender who are at widely ends of a

4    spectrum of physical transitions.  You could be

5    talking about someone who is just beginning the

6    process who hasn't taken any physical steps to

7    change their appearance all the way through to

8    someone who is totally physically transitioned,

9    has had gender confirmation surgery, has breast

10   implants.  For that person, an average

11   gynecologist is going to identify the

12   individual as female.  But to the person who is

13   just starting, well, there's nothing really to

14   look at.  So you're asking me to talk about an

15   infinite spectrum of different people so I

16   don't know how to answer that.

17          Q.    You're talking about a physician

18   who would find someone, this hypothetical

19   unconscious person, and identify whether or not

20   they were transgender based on looking at their

21   external genitalia, right?

22          A.    Their breast, their hair, their

23   clothing, their makeup, how they're dressed.

24          Q.    That just tells you what their

25   outward physical appearance is, that doesn't

Page 78

1    say anything about whether or not they're a

2    transgender individual, right?

3            A.    Isn't that how we normally

4    identify people on the street anyway, we look

5    at how they're dressed and what their hairstyle

6    looks like, their makeup, and whether or not

7    they're carrying a purse.  That's how we assess

8    whether they're male or female.  We don't ask

9    them to lift their skirt up and show us their

10   genitals.  How do we know otherwise?  I'm not

11   sure what your point is.

12           Q.    Could that same physician identify

13   a person's sex based on their genitals?

14           A.    I don't know.  What do you mean by

15   sex?

16           Q.    Well, we were talking about how

17   biological sex is recognized in the medical

18   field and you said you didn't know how that was

19   done, right?

20           A.    Not -- not reliably.  And, again,

21   my definition of sex is gender identity, yours

22   isn't, okay.  So to identify somebody's gender

23   identity, I don't know that there's a test for

24   that.

25           Q.    And that's my question, right,

Page 79

1    that you couldn't -- you couldn't come upon an

2    unconscious person and determine through any

3    sort of test or inspection, visual or

4    otherwise, what their gender identity is,

5    right?

6            A.    But isn't their gender identity

7    something inside their head?  So how are you

8    going to identify something that's inside their

9    head?  You don't have a test for that.  You

10   don't have a helmet that we can put on their

11   head and say, oh, you're a transgender or

12   you're not.

13           Q.    And gender identity is not

14   correlated with any specific biological

15   response, right?

16           A.    Well, look, again, I'm not an

17   expert, but from my cursory reading of the

18   literature, there have been various studies

19   done to suggest that there are biological

20   correlates of individuals who are transgender.

21               There are abnormal brain wave

22   studies.  I believe I read somewhere that the

23   incidents of left-handedness in transgender

24   people is approximately forty percent and in

25   the population at large is about ten percent.

1    So there is strong evidence that there is a

2    link between people's brains and their gender

3    identity because that kind of studies or work

4    is in its infancy.  And, again, I'm definitely

5    not an expert about those kinds of studies.

6             Q.    Right.  You're not a molecular

7    geneticist, right?

8             A.    No way.

9             Q.    And you don't have any special

10   expertise in the neurology -- field of

11   neurology, right?

12            A.    No, nothing like that.

13            Q.    And this brain study you're

14   referring to, is that the MRI brain study?

15            A.    Yeah.  I think there are others,

16   but, again, I'm not -- I'm just aware that

17   there are such studies, but I'm not -- I

18   couldn't tell you the details of how they were

19   done or what the ultimate results were of their

20   research, I just know that there have been such

21   studies.

22            Q.    You haven't looked at any

23   particulars about the study and the number of

24   individuals who are associated with the study,

25   right?

Page 81

1         A.    No, nothing like that.

2         Q.    And you haven't conducted an

3   analysis of the impact of selection bias on

4   that study, right?

5         A.    Not in the slightest.

6         Q.    You don't know what

7   neuroplasticity is?

8         A.    No.

9         Q.    You don't know whether or not that

10  study controlled for neuroplasticity?

11        A.    Never heard of it.

12        Q.    Sex, as I've been referring to

13  related to the karyotype of XX and XY, that is

14  correlated with a biological response, right?

15        A.    I don't know how to answer that.

16  That's really kind of vague.  I'm not sure I

17  know what you're referring to.

18        Q.    Okay.  You don't know whether or

19  not someone's sex at birth as identified by

20  their external genitalia and as related in

21  normal circumstances to their karyotype,

22  whether that has any biological response?

23        A.    I'm sorry, what --

24             MS. INGELHART:  Objection.  Vague.

25  You can answer.

Page 82

1                 THE WITNESS:  What do you mean by

2    biological response?

3    BY MR. BLAKE:

4          Q.    Yeah.  So outcomes related to

5    medical treatments or growth patterns or

6    hormone levels, anything of that nature, you're

7    not aware?

8          A.    No, I am not aware.  I have no

9    idea.

10                MR. BLAKE:  Can we take a quick

11   break?

12                MS. INGELHART:  Yes.

13                MR. BLAKE:  Thanks.

14                (Pause in proceedings.)

15   BY MR. BLAKE:

16         Q.    All right.  Do you hold yourself

17   out as a transgender individual to the public?

18         A.    No.

19         Q.    Are you part of any groups

20   associated with transgender individuals?

21         A.    No.  I want to qualify that.  ████

22   ███████ █ █ ███ █ █████████ ██ █████ ███ ████

23   █████████ ████ ██ █████ █████ █████ ████ ██ █

24   ██████

25         Q.    What is ██████

Page 83

1            A.   I believe it's ███ ████
2   ████████ ██████████ ████ ████████nder
3   ██████

4            Q.   And how does one obtain membership
5   to that organization?

6            A.   Apply online.

7            Q.   Is there like a fee?

8            A.   Yeah.  It wasn't huge.

9            Q.   And do you have to have any
10  special medical or other credentials to join?

11           A.   I don't believe so.

12           Q.   So any individual who's interested
13  in transgender issues can go online, fill out
14  some information, and pay a fee and join?

15           A.   They have a newsletter that they
16  send out.

17           Q.   They have a newsletter?

18           A.   Yes.  Pretty much anybody can
19  join.

20           Q.   Okay.

21           A.   But I do not belong to any
22  organizations.

23           Q.   How many people have you told that
24  you are transgender?

25           A.   Good grief.  Probably five or ten

Page 84

1   that I've actually told outright.

2           Q.   Is that primarily family and

3   friends?

4           A.   Correct.  A few people at

5   ████████  ████████  back in ███  ███████  when I

6   was transitioning.

7           Q.   And is that when you -- where you

8   underwent some degree of medical treatment to

9   transition from male to female?

10          A.   Correct.

11          Q.   Those were just primarily medical

12  providers?

13          A.   Well, I was transitioning so I was

14  starting to change my outward gender

15  appearance, and it was appropriate for me to go

16  and talk to the administration about what was

17  happening so I certainly had to reveal to them

18  the nature of the situation.

19          Q.   Oh, this is where you worked?

20  This is the facility where you worked?

21          A.   Yes.

22          Q.   I understand.  I was thinking that

23  this is where you actually were having the

24  transition occur.

25          A.   Well --

Page 85

1              MS. INGELHART:  Objection.  Vague.

2              THE WITNESS:  Let me help you.  I had

3    a private office.  I saw patients in my private

4    office.  When they needed advanced care, the

5    hospital that I was using for their cursory care

6    was this hospital so I had admitting privileges

7    and privileges to use their ███████

8    ████████████  laboratory.  I had a staff

9    appointment and so I wasn't employed by them, I

10   was self-employed, but, again, I'm using their

11   facilities.  It was necessary for me to divulge to

12   them what was happening to me.

13   BY MR. BLAKE:

14        Q.   Okay.  How many people have found

15   out that you are a transgender individual due

16   to your birth certificate?

17        A.   I have no idea.

18        Q.   Do you think it's --

19        A.   Honestly.

20        Q.   -- five, ten, fifteen?

21        A.   Well, here's the problem.  I

22   relocated to this hospital in ████████  My

23   status as a transgender individual was

24   disclosed against my knowledge by the human

25   resources director at the hospital who decided

Page 86

1    to have a town hall meeting with both the ██████

2    ██████staff and the card -- coronary care unit

3    staff and divulge my status as a transgender

4    individual.  She had access to my -- all of the

5    documents that had been submitted to the

6    hospital for my application for staff

7    privileges.  I don't know whether or not she

8    was looking at my birth certificate or some

9    other document, but basically she outed me to

10   the entire hospital.

11           Q.   Did you have to hand over --

12           A.   So --

13           Q.   Go ahead.

14           A.   I'm sorry.

15           Q.   Sorry.  If you're not finished,

16   please continue.

17           A.   That's probably enough

18   explanation.

19           Q.   So you provided your birth

20   certificate to the HR person at the new

21   hospital in ██████?

22           A.   As far as I recall.

23           Q.   You don't -- you don't know for

24   certain that you actually had to turn over your

25   birth certificate?

Page 87

1          A.    You're asking me to recall what
2    was in a packet five years -- well, four and a
3    half years ago, as to exactly what document was
4    in it, okay, and I don't recall.  I don't know
5    if it had the birth certificate, what was all
6    in it, but they knew.
7          Q.    Well, your claim is based on
8    part -- the claims against ODH, that you were
9    forced to disclose your birth certificate in
10   circumstances like receiving certain
11   identification and employment, and so it's
12   critical for ODH to understand whether or not
13   you have actually been required to turn over
14   your birth certificate in those contexts.  And
15   if I understand, your testimony right now is
16   that you do not recall whether or not you were
17   required to disclose your birth certificate as
18   part of your employment onboarding with the
19   hospital in ███████; is that accurate?
20         A.    That's accurate.  I can tell you,
21   though, that I was required to provide my birth
22   certificate when I was trying to get my Social
23   Security Administration identifier changed.
24         Q.    Yeah, we'll get to the Social
25   Security Administration circumstance here in a

Page 88

```
 1   minute.  I'm just trying to tie up the loose
 2   ends on your employment with          .
 3              So do you recall prior to turning
 4   in your information to HR at the
 5   Hospital whether you had to obtain a certified
 6   copy of your birth certificate.
 7        A.   No, I don't recall.
 8        Q.   Do you recall specifically an
 9   instance where you had to produce your birth
10   certificate and show it to somebody?
11        A.   Again, the only specific instance
12   that I can recall where I had to do that was
13   with the Social Security Administration.
14        Q.   Okay.  And you don't recall any
15   other time prior to          -- employment at
16          having to show your birth certificate
17   to any other employer, do you?
18        A.   No.
19        Q.   Has your disclosure of your birth
20   certificate ever led to bodily harm?
21        A.   No.
22        Q.   Here in Columbus we have something
23   called the Pride Festival, and among other
24   things the Pride Festival celebrates
25   transgender individuals and equality for those
```

Page 89

1    individuals.  Do you have a similar festival in

2    ███████?

3              A.    No.

4              Q.    Have you ever taken part in a

5    festival like the Pride Festival?

6              A.    Not to my knowledge.  There could

7    be one and I don't know about it, but not to my

8    knowledge.

9              Q.    Are you humiliated by your status

10   as a transgender person?

11             A.    That's -- to me, that's a vague

12   question.  Can you kind of pin it down a little

13   better as to --

14             Q.    Sure.

15             A.    You mean like in general do I feel

16   humiliated or are there specific circumstances

17   where I've been humiliated?

18             Q.    Yes.  Do you believe or do you

19   feel that the -- well, let's take a step back.

20                   You are a transgender individual,

21   correct?

22             A.    Correct.

23             Q.    Does that fact humiliate you?

24                   MS. INGELHART:  Objection.  Vague.

25   You can answer.

Page 90

1          THE WITNESS:  If you mean on an
2    everyday basis do I get up in the morning and say
3    I'm transgender and I feel humiliated, no.
4    BY MR. BLAKE:
5          Q.   The fact that you're a transgender
6    individual does not ashame you, correct?
7          A.   Correct.
8          Q.   It's fair to say you're proud of
9    your status as a transgender individual, right?
10         A.   I'm not sure that I would say that
11   I'm proud of it.  It's something that I've
12   learned to live with.
13         Q.   You claim that the Ohio Department
14   of Health discriminates against transgender
15   individuals because they are not permitted to
16   change the sex identifier on their birth
17   certificate, right?
18         A.   I'm sorry, I didn't hear your
19   whole question.  Would you please repeat it?
20         Q.   Yeah.  You claim that ODH
21   discriminates against transgender individuals
22   because they are not permitted to change the
23   sex identifier on their birth certificate,
24   right?
25         A.   Yes.

1          Q.   Are you aware of any laws in Ohio

2     related to birth certificates that mention

3     transgender individuals?

4               MS. INGELHART:  Objection.  Legal

5     conclusion.  You can answer.

6               THE WITNESS:  I am not a

7     knowledgeable expert of Ohio state laws.

8     BY MR. BLAKE:

9          Q.   Are you aware of any laws in Ohio

10    regarding birth certificates that make any

11    mention of gender?

12              MS. INGELHART:  Objection.  Legal

13    conclusion.  You can answer.

14              THE WITNESS:  Again, I'm not a lawyer

15    so I couldn't answer that.

16    BY MR. BLAKE:

17         Q.   Do you know whether or not Ohio

18    law permits anyone, regardless of gender, to

19    change their sex marker on their birth

20    certificate?

21         A.   Again --

22              MS. INGELHART:  Yeah, objection.

23    Legal conclusion.  You can answer.

24              THE WITNESS:  Same thing, I'm just

25    not an expert on Ohio state law.

Page 92

1    BY MR. BLAKE:
2         Q.    But it's your understanding that
3    ODH will not change a birth certificate based
4    on a gender identity, right?
5         A.    That is my understanding.
6         Q.    And the law applies whether a
7    person is transgender or a cisgender, right?
8         A.    Again, you're asking me to be
9    knowledgeable about all the circumstances that
10   would affect this topic in the state of Ohio
11   and I am not an attorney.
12        Q.    Do you know when Ohio's laws
13   related to birth certificates were enacted?
14        A.    I have no idea.
15        Q.    Do you know who sponsored the
16   bill?
17        A.    No.
18        Q.    How the bill was received in
19   committee?
20        A.    Unfortunately, no.
21        Q.    Whether it was started in the
22   House or the Senate?
23        A.    No idea.
24        Q.    Whether there was any testimony
25   regarding the bill before any committee?

Page 93

1          A.    No.

2          Q.    Whether there was any evidence or

3    argument presented on the floor of either

4    chamber regarding the bill?

5          A.    No, no idea.

6          Q.    Are you aware of any legislative

7    purpose behind Ohio's laws related to birth

8    certificates?

9          A.    No.

10         Q.    Do you have any evidence at all

11   that Ohio's laws regarding the amendment of its

12   birth records were motivated by any hatred,

13   animus, or ill will toward transgender

14   individuals?

15              MR. BLAKE:  Objection.  Calls for a

16   legal conclusion.  You can answer.

17              THE WITNESS:  I can?  I have no idea

18   what the motives were of the various legislatures

19   who passed that legislation.  I have no idea.

20              (Thereupon, Defendants' Exhibit 8,

21   birth certificate of Jane Doe, was marked for

22   purposes of identification.)

23   BY MR. BLAKE:

24         Q.    Okay.  I'm going to go to Exhibit

25   8, which was previously marked.  And I'll just

Page 94

1  note for the record that this Defendants'

2  Exhibit 8 is marked attorney's eyes only.  Have

3  you seen this document before?

4          A.    Of course.

5          Q.    Okay.  What is this document?

6          A.    Birth certificate.

7          Q.    Who's birth certificate?

8          A.    For me.  Mine.  This is my birth

9  certificate --

10         Q.    Okay.

11         A.    -- in the state of Ohio.

12         Q.    Do you know what a public record

13  is?

14               MS. INGELHART:  Objection.  Legal

15  conclusion.  You can answer.

16               THE WITNESS:  I don't know what the

17  technical definition is of a public record.  I

18  believe it relates to whether or not it is

19  accessible by anybody in the public.

20  BY MR. BLAKE:

21         Q.    And do you know whether or not

22  anyone can go to any county health department

23  in Ohio and as long as they know your name and

24  approximate birth year, they can request your

25  birth certificate?

Page 95

1              A.    Apparently that's true.

2              Q.    The birth certificate indicates

3     sex is male, right, in block number four?

4                   MS. INGELHART:  Objection.  You can

5     answer.

6                   THE WITNESS:  Yes, that's what's

7     written there.

8     BY MR. BLAKE:

9              Q.    And that information was recorded

10    by ODH based on information provided by the

11    medical provider at or near the time of your

12    birth, right?

13             A.    Appears to be true.

14             Q.    Do you have any evidence to

15    contradict that your sex was recorded as male

16    by ODH based on information provided by the

17    medical provider at or near the time of your

18    birth?

19             A.    I'm sorry, that was very

20    confusing.

21             Q.    Yeah.  I'm asking whether -- you

22    said that it appears to be true, and I'm just

23    trying to understand whether or not you have

24    any evidence to contradict that your sex was

25    recorded as male by ODH based on information

Page 96

1    provided by the medical provider at or near the

2    time of birth?

3            A.    I have no evidence that it was

4    anything other than what's written.

5            Q.    But nonetheless, as you've

6    testified earlier, you believe that it was

7    inaccurate for the medical provider to record

8    your sex as male at the time of birth, right?

9            A.    Again, because my contention is

10   that sex is one's gender identity and that's

11   something you can't determine at the time of

12   birth, and so I don't think that this was an

13   accurate inscription.  I think that it

14   represents something that is not what I wrote.

15           Q.    Gender identity, those words don't

16   appear on this record, right?

17           A.    Correct.

18           Q.    Gender doesn't appear on this

19   record, right?

20                 MS. INGELHART:  Objection.  You can

21   answer.

22                 THE WITNESS:  No, it does not.

23   BY MR. BLAKE:

24           Q.    Okay.  And as you've testified

25   before, you're not aware of any tests that can

1  be conducted on a person at the time of their
2  birth to determine their gender identity,
3  right?
4        A.    Correct.
5        Q.    And also as you testified before,
6  what the medical provider likely did in
7  determining your sex was conduct a cursory look
8  at the external genitalia, right?
9        A.    Correct.
10       Q.    Wrote down male, right?
11       A.    Correct.
12       Q.    ████████████████████████████████
13  ████████████████████████████████████████████
14  ████████████████████████████
15            MS. INGELHART:  Objection.  You can
16  answer.
17            THE WITNESS:  I think that, again,
18  from my point of view, this inscription here is
19  not possible for somebody to accurate record
20  someone's gender identity at the time of birth.
21  There's no provision here for an individual to
22  change their gender marker on the document.  The
23  State of Ohio is one of only two remaining states
24  that refuses to allow an individual to change
25  their birth certificate marker.  I don't

Page 98

1    understand why.

2    BY MR. BLAKE:

3           Q.    Well, the record of live birth

4    doesn't record a person's gender, it records a

5    person's sex, right?

6           A.    I think it should be recording

7    their gender identity, it's just not -- we've

8    went over this before.  I think it's not an

9    accurate recording of someone's gender

10   identity.

11          Q.    Do you believe that the medical

12   provider should have reported female under the

13   sex designation on your birth record?

14          A.    I think there should be an

15   opportunity for someone to change this.

16          Q.    Okay.  But you don't believe that

17   the medical provider should have wrote --

18   recorded female at the time of your birth,

19   right?  That's not what you believe, right?

20          A.    Correct.

21          Q.    Okay.  So based on the information

22   available to the medical provider at the time

23   of your birth, you would agree that your birth

24   record is accurate, right?

25               MS. INGELHART:  Objection.

Page 99

1              Calls for a legal conclusion and

2     vague.  You can answer.

3              THE WITNESS:  Again, we're beating

4     around the same topic here.  I don't think the

5     gender marker inscription here is accurate.  Okay.

6     There should be a mechanism for dealing with

7     inaccuracies on a document of this nature and so I

8     think it was his best attempt to make an

9     assessment, but, again, I don't think it was

10    correct at the time.  He had no way of knowing

11    that.

12    BY MR. BLAKE:

13         Q.   Do you think the medical provider

14    inaccurately or incorrectly identified your sex

15    at the time of birth?

16         A.   Based on my definition of sex,

17    which is gender identity, okay, it subsequently

18    turned out to be incorrect, but I don't think

19    he had any way of knowing that at the time.

20         Q.   At the time, like I said, based on

21    the information he had, that was an accurate

22    determination of your sex at birth, correct?

23         A.   I think other than the stipulation

24    about the definition of sex, I think we're

25    agreeing.

Page 100

1          Q.    Okay.  Are you aware of any forms

2    or records maintained by the Ohio Department of

3    Health or any other agency in Ohio that records

4    or tracks a person's gender or gender identity?

5                MS. INGELHART:  Objection.  Legal

6    conclusion, but you can answer.

7                THE WITNESS:  I have no idea.

8    BY MR. BLAKE:

9          Q.    Your gender identity is female,

10   right?

11         A.    Yes.

12   █     ██████████████████████████████████

13   ████████████████████████████

14                MS. INGELHART:  Objection.  Expert.

15   You can answer.

16            ████████████████    ██████████████████

17   ████████████████    ██████████████████████████████

18   ███████████████████    ██████████████████

19   BY MR. BLAKE:

20         Q.    Whatever your chromosomes are,

21   they've been the same since birth, right?

22         A.    Yes, we can assume that.

23         Q.    You're not aware of any procedure

24   by which a person can change their chromosomes,

25   right?

Page 101

1          A.    Correct.

2          Q.    When did you determine that your

3    gender identity did not match your biological

4    sex?

5          A.    Honestly, I'm not sure that I

6    could reliably answer that.  I was aware of

7    identifying as a female when I was a young

8    child, but how early that started to occur, I

9    don't really recall.

10              MR. BLAKE:  Counsel, can you please

11   hand the witness Defendants' Exhibit 5?

12   BY MR. BLAKE:

13         Q.    Let me know when you have that in

14   front of you?

15         A.    I have it.

16         Q.    And if you turn -- what has been

17   previously marked as Defendants' Exhibit 5 are

18   plaintiffs' answers to defendants' first set of

19   interrogatories, first requests for admission,

20   and first requests for production of documents.

21   Have you seen this document before?

22         A.    Yes.

23         Q.    All right.  And if you turn to

24   page three, interrogatory number two at the

25   bottom half of the page states for each

Page 102

1 plaintiff, identify the date he or she

2 understood that his or her biological sex did

3 not align with his or her gender identity. If

4 an exact date is not determinable, please

5 identify an approximate date. Do you see that?

6          A.   Yes, I do.

7          Q.   And each of the plaintiffs

8 responded in turn and your response is recorded

9 on the following page, page four. At the

10 bottom it says Jane Doe came to understand

11 herself as a girl when she was eight or nine

12 years old but did not ever identify as a boy or

13 man. She did not have the terminology for

14 transgender identity until she was in her late

15 fifties. Do you see that?

16          A.   I'm looking for it. Yes.

17          Q.   All right. So does that refresh

18 your recollection as to when you determined

19 that your gender did not match your biological

20 sex?

21          A.   Listen, again, we're talking about

22 something, you know, from over fifty years ago.

23 I don't have an exact recollection of what I

24 felt or thought. I can tell you that when I

25 was a young child, I routinely had fantasies in

1    which I identified as a girl.  These fantasies

2    began sometime after the age of five and

3    probably before the age of ten, and they've

4    been with me my whole life.

5            Q.    So are you saying -- are you

6    agreeing with your statement --

7            A.    Yes.

8            Q.    -- in the interrogatories that it

9    was around the age of eight or nine or are you

10   disagreeing with that statement?

11           A.    I believe it was around eight or

12   nine, but, you know, I can't tell you exactly

13   the year.  You know, it's hard, okay.

14           Q.    Okay.

15           A.    But to the best of my

16   recollection, it was around eight or nine.

17           Q.    Okay.  Great.  And since that time

18   have you identified as a female?

19           A.    Yes.

20           Q.    Since --

21           A.    Well --

22           Q.    Go ahead.

23           A.    Leave it -- that's fine.

24           Q.    All right.  Since the age of eight

25   or nine have you ever presented yourself as a

Page 104

1  male to any friends, family, or the public?

2              MS. INGELHART:  Objection.  Vague.

3  You can answer.

4              THE WITNESS:  I identified myself as

5  female in my mind, but I was not outwardly

6  presenting myself as female.

7  BY MR. BLAKE:

8        Q.   So, in fact --

9        A.   That didn't happen until roughly

10  about five, six years ago.

11       Q.   Yeah.  So, in fact, for the first

12  sixty-plus years of your life you actually

13  lived as a male, right?

14       A.   Correct.

15       Q.   So when you had to show your birth

16  certificate to, say, get a passport or some

17  other governmental function, your birth

18  certificate said male, your driver's license

19  said male, you presented as a male, so there

20  was no incongruence, right?

21              MS. INGELHART:  Objection.  Vague.

22  You can answer.

23              THE WITNESS:  There was an

24  incongruence in my mind but not physically.

25  BY MR. BLAKE:

Page 105

1          Q.   And not with any of your other

2     documents, right?

3          A.   Correct.

4          Q.   It was only within the last few

5     years, like you said, the last four or five

6     years, that you started to live your life

7     openly as a female, right?

8          A.   Yes.  I had a very bad childhood.

9     I had a father who was a dictatorial tyrant who

10    was physically abusive.  It was totally

11    unacceptable for me to have -- let any of my

12    feelings of being female out with him.  I think

13    he would have killed me.  I repressed it.

14         Q.   And then you got married, right?

15         A.   Uh-huh.

16         Q.   And you got married to a female?

17         A.   Uh-huh.  Yes.

18         Q.   And you -- I mean, I assume she

19    believed she was marrying a male, right?

20         A.   Yes.

21         Q.   In fact, you had kids together?

22         A.   Yes.

23         Q.   Which is not an unusual thing for

24    males and females to do when they're married,

25    right?

1          A.    Yes.

2          Q.    And I assume you were a father to

3   your children?

4          A.    Yes.

5          Q.    They called you dad, right?

6          A.    Yes.

7          Q.    But then many years afterwards,

8   all right, only just recently, you decided to

9   start living your life as a female, right?

10         A.    Yes.

11         Q.    And it's only now, after you

12  decided to start living your life as a female

13  within the last three, four, or five years,

14  that you contend that your birth certificate is

15  somehow inaccurate, right?

16         A.    Correct.

17         Q.    When was the first time you

18  believed that your birth certificate became

19  inaccurate?

20         A.    Probably about five or six years

21  ago.

22         Q.    Are you familiar with the term

23  gender dysphoria?

24         A.    Yes.

25         Q.    You understand that that's a

1  clinical diagnosis where a person's biological

2  sex does not coincide with his or her gender

3  identity, right?

4          A.   Yes.

5          Q.   And to the best of your

6  recollection, you received a diagnosis of

7  gender dysphoria in approximately 2013, 2014,

8  right?

9          A.   Correct.

10         Q.   Does that coincide with this, you

11 know, time where you first started to believe

12 that your birth certificate was inaccurate?

13         A.   Yes.

14         Q.   At that time you were

15 approximately sixty-one or sixty-two; is that

16 right?

17         A.   Approximately, yes.

18         Q.   Before your diagnosis had you

19 heard of gender dysphoria?

20         A.   No.

21         Q.   All right.  Regardless of whether

22 or not you had heard of gender dysphoria,

23 that's about the same time that you decided to

24 start living your life as a female, right?

25         A.   Yes.

Page 108

1          Q.   If your biological sex and gender
2    identity do not match, all right, as per your
3    diagnosis of having gender dysphoria, that
4    means that biological sex and gender identity
5    are different, right?
6               MS. INGELHART:  Objection.  You can
7    answer.
8               THE WITNESS:  I think the answer was
9    that my gender identity has always been constant
10   and it did not match my physical appearance.
11   BY MR. BLAKE:
12          Q.   All right.  So --
13          A.   And I -- go ahead.
14          Q.   No.  So you were going to say
15   something.  Go ahead.
16          A.   No, I think -- I think I answered
17   what you wanted.
18          Q.   Okay.  Well, logically, your
19   gender identity and your biological sex, if
20   they're incongruent, they can't be the same
21   thing, right?
22               MS. INGELHART:  Objection.  Vague.
23   You can answer.
24               THE WITNESS:  I'm not sure I
25   understand that question.  I believe my gender

1    identity has been constant through my life, okay,

2    I just -- a lot of it was suppressed.  When it was

3    no longer being suppressed, I had to make things

4    congruent.

5    BY MR. BLAKE:

6         Q.   Yeah.  I'm not disagreeing with

7    you that your gender identity has been constant

8    throughout your life.

9         A.   Okay.

10        Q.   What I'm trying to understand is

11   if you have this diagnosis of gender dysphoria,

12   which you agree occurs when a person's

13   biological sex does not match his or her gender

14   identity, logically --

15             MS. INGELHART:  Objection --

16   BY MR. BLAKE:

17        Q.   -- two things which are

18   incongruent, in this case gender identity and

19   biological sex, cannot be the same, right?

20             MS. INGELHART:  Objection.  Sorry.

21   Objection.  It misstates prior testimony such that

22   it's in conflict with the standing objection as

23   well.  You can answer.

24             THE WITNESS:  I do not really know

25   how to answer your question.  I repressed my

                                        Page 110

1    gender identity for many years.  I was not
2    experiencing gender dysphoria during all of that
3    time.  And then at a time roughly around 2013,
4    2014, for reasons that I'm still not sure of, I
5    stopped repressing my awareness of my gender
6    identity and at that point my physical appearance
7    did not match my gender identity and I developed
8    gender dysphoria and I felt compelled to take
9    steps to alter my physical appearance.
10   BY MR. BLAKE:
11           Q.   Because your biological sex and
12   your gender identity no longer coincided,
13   right?
14           A.   Again, I believe that my
15   biological sex and my gender identity are
16   really the same.  Okay.  You're trying to make
17   a distinction that I can't agree with.
18           Q.   Well, it's right there in the
19   diagnosis of gender dysphoria, it's a clinical
20   diagnosis where a person's biological sex does
21   not match his or her gender identity, you agree
22   with that, right?
23           MS. INGELHART:  Objection.  Asked and
24   answered.  Expert testimony.
25           THE WITNESS:  Again, I don't know how

Page 111

1    to answer that.  Okay?

2    BY MR. BLAKE:

3           Q.    What is your definition of gender

4    dysphoria?

5           A.    What's the definition of gender

6    dysphoria?  I don't have a definition of gender

7    dysphoria.  I don't walk around with

8    definitions of terms like this in my head.  I'm

9    not an expert in this field.

10          Q.    All right.  But you've been

11   diagnosed with that, right?

12          A.    I had a specialist in ███ ███ who

13   said that that was what I had.

14          Q.    At the time --

15          A.    I'm not that specialist, okay.  I

16   know what I felt, but the definition of it, I

17   wasn't schooled in it.

18          Q.    At the time you received that

19   diagnosis, what was your understanding of what

20   that diagnosis meant?

21          A.    That I was severely distressed

22   over the fact that I did not appear to be

23   female.

24          Q.    Do you know one way or the other

25   whether a diagnosis of gender dysphoria has

1  anything to do with incongruence between one's

2  gender identity and their biological sex?

3          A.   Again, you're using a term that I

4  don't understand.  Biological sex, I don't know

5  what that really means so I don't know how to

6  answer your question.

7          Q.   The sex identified on your birth

8  certificate is male, right?

9          A.   Yes.

10          Q.   Does your gender dysphoria relate

11  to your gender identity as female being

12  incongruent with the sex identified on your

13  birth certificate?

14          A.   Again, I don't know this gender

15  identifier here, this is based on the gen --

16  one's genitalia, okay, not on the basis of my

17  gender identity.

18          Q.   All right.  Those are -- you would

19  agree that those are two different things,

20  right?

21          A.   Yes.

22          Q.   You have a driver's license,

23  right?

24          A.   Yes.

25          Q.   How often do you update that?

Page 113

 1          A.    I think it's every four years,
 2    five years.
 3          Q.    Have you ever changed your hair
 4    color?
 5          A.    Not in about probably six years.
 6          Q.    Okay.  So six years ago what hair
 7    color did you have on your driver's license?
 8          A.    Brown.
 9          Q.    And now I assume you've recorded
10    blond?
11          A.    Yes.
12          Q.    Ever change your weight on your
13    driver's license?
14          A.    I have not in a long time.
15          Q.    But you've done that before,
16    right?
17          A.    I haven't changed anything on it
18    since I moved to ██ ██████.
19          Q.    Four years ago?
20          A.    Yes.
21          Q.    And I assume you changed your
22    address because you got a ██ ██████ driver's
23    license as opposed to a ██ █████ driver's
24    license, right?
25          A.    ██ ██████ actually.

Page 114

1          Q.    ███  ████    driver's license, okay.
2    Very good.  Have you ever been pulled over,
3    traffic stop?
4          A.    Yes.
5          Q.    And have you ever had to show the
6    police officer your driver's license?
7          A.    Of course.
8          Q.    Did they ever ask for your birth
9    certificate?
10         A.    No.
11         Q.    Is it your understanding that the
12   driver's license needs to be current so that
13   law enforcement can do its job?  Right?
14         A.    Yes.
15         Q.    Did you ever use your birth
16   certificate to buy beer or alcohol or anything
17   like that?
18         A.    No.
19         Q.    What about get into a bar or a
20   club or anything like that?
21         A.    Birth certificate?  No.
22         Q.    Have you ever used your birth
23   certificate to verify a credit card purchase at
24   the grocery store or department store?
25         A.    No.  My birth certificate stays at

Page 115

1    home in a drawer.

2         Q.   You don't carry your birth

3    certificate with you, right?

4         A.   Correct.

5         Q.   The driver's license has a much

6    different purpose than a birth certificate,

7    right?

8              MS. INGELHART:  Objection.  Calls for

9    a legal conclusion, but you can answer.

10             THE WITNESS:  I suppose so.  I'm not

11   sure exactly what you're asking about it.

12   BY MR. BLAKE:

13        Q.   Well, you've used your driver's

14   license for everyday identification and, you

15   know, in instances where you need to verify

16   your identity, right?  Right?

17        A.   I said sure.  I don't think you

18   heard me.

19        Q.   Sorry.  I didn't hear you.

20   Whereas a birth certificate is not used for,

21   you know, everyday identification, right?

22             MS. INGELHART:  Objection.  Vague,

23   legal -- calls for a legal conclusion.  You can

24   answer.

25             THE WITNESS:  I suppose I could, but

Page 116

1  I'm not in the habit of carrying my birth

2  certificate around.

3  BY MR. BLAKE:

4        Q.  Do you know anyone who does that?

5            MS. INGELHART:  Objection.  Calls for

6  speculation.  You can answer.

7            THE WITNESS:  No.

8  BY MR. BLAKE:

9        Q.  I'm going to turn to Exhibit 2.

10 You've just been handed a document previously

11 marked as Defendants' Exhibit 2, which is a

12 copy of the complaint you filed in this case.

13 You recognize this document?

14       A.  Yes.

15       Q.  I'm going to ask you to turn to

16 Paragraph 83 which is on page eighteen of this

17 document.  Let me know when you're there.

18       A.  I'm sorry, which page?

19       Q.  Eighteen.

20       A.  Okay.

21       Q.  All right.  And if you look at

22 Paragraph 83, it says Dr. Doe is aware of the

23 high incidents of harassment, discrimination,

24 and violence directed at transgender people.

25 She has been harassed and discriminated against

Page 117

1    as a transgender person herself in the past,

2    including verbal harassment in her workplace.

3    Do you see that?

4             A.    Yes, I do.

5             Q.    How many times have you been

6    verbally harassed in the workplace due to your

7    status as a transgender individual?

8             A.    Yes.

9             Q.    No, how many times?

10            A.    Oh, fairly constant.  I'm not sure

11   I could put a number on it.  The place where I

12   currently work, there have been a small

13   collection of physicians there who are in the

14   habit of discussing my status as a transgender

15   person behind my back to anybody who will

16   listen, and I get reports of this behavior from

17   other staff members that it's ongoing.  I have

18   filed over the past four years several

19   complaints with the administration over it.

20            Q.    How did those doctors, those

21   colleagues of yours find out that you were a

22   transgender individual?

23            A.    Well, as I told you before, before

24   I came to the hospital the human resources

25   director decided to conduct a town meeting for

 1   both the cardiac ████  ████ and coronary care

 2   unit to discuss with them the fact that a

 3   transgender cardiologist was coming to work at

 4   the hospital.  So she probably informed about

 5   fifty people of my status as a transgender

 6   individual, and I'm sure by word of mouth these

 7   physicians became aware of this.

 8          Q.   So that's your -- your

 9   understanding is that your colleagues at the

10   hospital learned of your transgender status

11   from the human resources individual; is that

12   right?

13          A.   Ultimately, yes, that was the

14   original source.

15          Q.   But as you testified, you can't be

16   certain or you don't recall whether or not you

17   actually provided your birth certificate to

18   that human resources individual, right?

19          A.   I didn't provide anything to the

20   human resources individual.  I provided

21   documents to the hospital administration and

22   told them that my gender identity was a matter

23   of something that I did not want made public

24   within the institution, that I considered it as

25   protected health information, and they violated

Page 119

1  my confidant.
2        Q.   So you provided certain
3  information to the administrative component of
4  the hospital, but you don't recall one way or
5  the other whether you provided your birth
6  certificate to them, right?
7        A.   Correct.  Yes.
8        Q.   But you do recall discussing with
9  them certain aspects regarding your gender
10  identity, right?
11        A.   When you're a physician, the paper
12  trail behind you is enormous.  There was no way
13  that I could hide my past history of who I am
14  with the hospital.  That would be impossible.
15        Q.   Right, because that information is
16  probably reflected on things like your, you
17  know, license -- your medical license
18  information, right?
19        A.   Even before that, pretty much
20  anyplace where you're applying for privileges
21  or licensing or for malpractice insurance, one
22  of the questions on the forms is have you ever
23  practiced with any other name.
24        Q.   And then based on the name change,
25  it's clear to anybody who knows names that you

Page 120

1    used to have a male name and then later had a
2    female name, right?
3              A.   My prior name was quite masculine.
4              Q.   Right.  And your current name is
5    not, right?
6              A.   Correct.
7              Q.   So it's your understanding that
8    the hospital was able to discern your gender
9    identity through the context of your name
10   change and maybe information included on your
11   license and other documents, right?
12             MS. INGELHART:  Objection.  Calls for
13   speculation.  You can answer.
14             THE WITNESS:  I talked to them about
15   my transgender status right up front when I
16   applied.
17   BY MR. BLAKE:
18             Q.   Okay.
19             A.   It was not something that was
20   hidden or it was divulged later.  I would
21   rather have them know about this aspect of me
22   right up front because if they've got a problem
23   with it, I didn't want to waste my time.
24             Q.   So prior to even providing them
25   any documents, you told them, hey, look, this

Page 121

1    is who I am, I am a transgender individual,

2    right?

3              A.   I had applied for approximately

4    somewhere six to eight other positions, okay,

5    during the roughly six to twelve months before

6    I relocated to find another job, and in these

7    instances, as soon as they became aware of the

8    fact that I was transgender, they basically

9    terminated their interest in me, and it became

10   obvious that the best thing to do was to inform

11   people right up front so you don't waste your

12   time.

13             Q.   And that's what you did in this

14   circumstance, right?

15             A.   Correct.

16             Q.   So having the sex identifier

17   changed on your birth certificate would not

18   have prevented the harassment that you're

19   currently experiencing in your workplace,

20   right?

21                  MS. INGELHART:  Objection.  Calls for

22   speculation.  You can answer.

23                  THE WITNESS:  I doubt it.  I think

24   they would have harassed me anyway.

25   BY MR. BLAKE:

1          Q.    Have you taken any steps or

2     measures to pursue legal remedies against any

3     of these employers or potential employers who

4     didn't hire you based on your transgender

5     status?

6          A.    You know, the reality is, is that

7     if you get involved -- as a physician, if you

8     get involved with a lawsuit with a hospital,

9     you can pretty much guarantee that you're never

10    going to get employed anywhere because

11    basically the fact that you were engaged in a

12    lawsuit with a hospital is going to be widely

13    known and they just wouldn't even talk to you.

14    So there's a huge penalty involved with

15    pursuing legal action about any of these

16    aspects of these events of discrimination.  I

17    just didn't see it being worthwhile.  I thought

18    it was killing -- it would kill me in terms of

19    getting further employment with somebody who

20    didn't care about it.

21         Q.    But you believe you've been

22    discriminated against by these hospitals,

23    right?

24         A.    I don't believe.  I know.

25         Q.    And you know that you've been

Page 123

1    discriminated against by your colleagues that

2    you work with now, right?

3              A.    Not all of them, but some of them.

4              Q.    And nevertheless, though, you've

5    taken no steps to file a lawsuit against any of

6    these hospitals or colleagues, right?

7                    MS. INGELHART:  Objection.  Asked and

8    answered.

9                    THE WITNESS:  Again, I was advised

10   multiple times by attorneys that it would be

11   foolish for me to initiate a lawsuit.  I was not

12   guaranteed of winning such a lawsuit, and the

13   consequences of even filing one would be enormous.

14   BY MR. BLAKE:

15             Q.    So the answer to that question is

16   no, right?

17             A.    Correct.

18             Q.    All right.  Look at Paragraph 85,

19   which is the bottom paragraph on page eighteen

20   and then carries over to page nineteen of

21   Defendants' Exhibit 2.  Let me know when you're

22   there.

23             A.    I'm there.

24             Q.    And that says -- well, instead of

25   reading it, Paragraph 85 describes an incident

Page 124

1   when you attempted to have your sex changed on

2   your Social Security records, right?

3          A.   Correct.

4          Q.   And according to your allegation,

5   an employee at the Social Security

6   Administration loudly announced that you could

7   not change your sex simply based on your

8   say-so, right?

9          A.   Yes.

10          Q.   And according to your allegations,

11   that was announced in a room containing over a

12   hundred people, right?

13          A.   Correct.

14          Q.   Ultimately, though, the employee

15   of the Social Security Administration was

16   incorrect about changing what was required --

17   or -- yeah, about what was required to change

18   the sex on the Social Security records, right?

19          A.   She was wrong.  The policy had

20   been changed.  The policy was available on the

21   Social Security Administration website.  I had

22   a copy of the policy and they refused to look

23   at it.

24          Q.   Right.  The employee's comment was

25   contrary to what the Social Security

```
                                       Page 125
 1   Administration's written policies were, right?
 2          A.   Yes.
 3          Q.   And ultimately you were able to
 4   get your sex changed in your Social Security
 5   records, right?
 6          A.   I had to go to a different Social
 7   Security office.
 8          Q.   But you were ultimately able to
 9   get it changed, right?
10          A.   Ultimately, yes, but I -- that
11   experience in that Social Security office was
12   awful.  I ran out of that place in tears.  I
13   sat in the parking lot in my car for about
14   forty-five minutes crying.  I still -- when I
15   have to think about that experience even
16   currently I get emotionally distraught.
17          Q.   When you presented your birth
18   record to the Social Security Administrator --
19   or Administration, were you in any way fearful
20   that you were going to be physically harmed by
21   that employee?
22          A.   They're behind a glass booth,
23   wall.  I really wasn't considering being
24   harmed, but I did not think they considered the
25   fact that I was overtly humiliated.
```

Page 126

1      Q.   It's not ODH's responsibility to

2  set the guidelines for what the Social Security

3  Administration requires to change the sex on a

4  Social Security record, right?

5           MS. INGELHART:  Objection.  Calls for

6  speculation and legal conclusion.  You can answer.

7           THE WITNESS:  I would hope they would

8  be consistent with, you know, federal rules and

9  regulations and guidelines.

10  BY MR. BLAKE:

11      Q.   Right.  And that's not ODH's

12  responsibility to set federal rules and

13  guidelines, right?

14      A.   I'm not familiar with what the

15  actual guidelines and rules are for the ODH.

16      Q.   You don't believe ODH has any

17  input into what the federal government says,

18  here's what we do to update Social Security

19  records, right?

20      A.   No, I don't think they're directly

21  connected.

22      Q.   And you don't believe that ODH has

23  any control over whether certain employees for

24  the Social Security Administration properly

25  apply such Administration's own policies,

Page 127

1    right?

2                    MS. INGELHART:  Objection.  Calls for

3    a legal conclusion, speculation.  You can answer.

4                    THE WITNESS:  At the time when this

5    happened, I was certainly not thinking that this

6    was, you know, the particular fault of the Ohio

7    Department of Health, except the fact that I

8    didn't have a corrected birth certificate and I

9    couldn't get one.

10   BY MR. BLAKE:

11        Q.   ODH didn't instruct the employee

12   of the Social Security Administration to

13   disclose your sex, right?

14        A.   Instruct them?  I'm sure they had

15   no awareness that I was even coming to visit

16   them.

17        Q.   Have you been required to show

18   your birth certificate in other contexts?

19        A.   I was required to provide my birth

20   certificate when I had my passport updated.

21        Q.   When was that?

22        A.   I think it was in 2014.

23        Q.   Was that before or after you

24   started living openly as a female?

25        A.   I think it was during the initial

Page 128

1    transition, fairly early.

2         Q.    When you displayed your --

3         A.    I'm guessing it was probably about

4    a year into it.

5         Q.    Okay.  When you presented your

6    birth certificate to the U.S. passport agency,

7    did you have any fear of bodily harm?

8         A.    No.

9         Q.    Were you humiliated in any way

10   during that experience?

11        A.    No.

12        Q.    Any other instances where you had

13   to show your birth certificate?

14        A.    Well, once I got my passport, then

15   I used the passport for most of the instances

16   where I had to supply a primary document.

17        Q.    All right.  What about to the

18   court in ███   ████████ where you had your name

19   changed, did you have to show your birth

20   certificate then?

21        A.    Yes, I believe so.

22        Q.    You didn't fear any bodily harm

23   from the court in ████   ██████ right?

24        A.    Correct.

25        Q.    You didn't experience any

Page 129

1  humiliation when you had your name changed,

2  right?

3          A.   No, the judge was very nice.

4          Q.   Have you had to show your birth

5  certificate in connection with any schooling

6  that you've received?

7          A.   No.

8          Q.   Have you had to show it to any

9  friends or relatives?

10          A.   No.

11          Q.   What about to any medical

12  professionals, to your knowledge?

13          A.   No.

14          Q.   What about for insurance purposes,

15  receive any other benefits?

16          A.   No.

17          Q.   And when you got your ████  ████

18  driver's license, I take it you used your

19  passport?  Correct?

20          A.   Actually, I'm not even sure if

21  they wanted that.  They wanted multiple

22  identifiers.  I'm not sure if I used the

23  passport.  I might have.

24          Q.   But you didn't use your birth

25  certificate, right?

Page 130

1          A.    Correct.

2                MR. BLAKE:  Can you give me just one

3     minute.  I'm going to look over my notes.  I might

4     be done, but I'm just going to look over my notes

5     real fast, okay?

6                MS. INGELHART:  Sure.

7                (Pause in proceedings.)

8                MR. BLAKE:  Okay.  I don't have

9     anything further.

10               MS. INGELHART:  And I don't have any

11    questions, but Jane Doe wants to say something.

12               MR. BLAKE:  Oh, sure, go ahead.

13               THE WITNESS:  I just want to say

14    thank you for allowing us to do this interview

15    this way and not having me come to Ohio.  I

16    appreciate it very much.

17               MR. BLAKE:  Yeah.  Let's go off the

18    record.

19               (Thereupon, signature was not

20    waived.)

21               (Thereupon, the deposition was

22    concluded at 2:01 p.m.)

23

24

25

1  STATE OF OHIO          )

2  COUNTY OF MONTGOMERY )  SS: CERTIFICATE

3              I, Kathy S. Wysong, a Notary

4  Public within and for the State of Ohio, duly

5  commissioned and qualified,

6              DO HEREBY CERTIFY that the

7  above-named JANE DOE, was by me first duly sworn

8  to testify the truth, the whole truth and

9  nothing but the truth.

10             Said testimony was reduced to

11 writing by me stenographically in the presence

12 of the witness and thereafter reduced to

13 typewriting.

14             I FURTHER CERTIFY that I am not a

15 relative or Attorney of either party, in any

16 manner interested in the event of this action,

17 nor am I, or the court reporting firm with which

18 I am affiliated, under a contract as defined in

19 Civil Rule 28(D).

20

21

22

23

24

25

Page 132

1      IN WITNESS WHEREOF, I have hereunto set my

2   hand and seal of office at Dayton, Ohio, on this

3   23rd day of September, 2019.

4

5

       *Kathy J. Wyong*
       ──────────────────────
6      KATHY S. WYONG, RPR
       NOTARY PUBLIC, STATE OF OHIO
       My commission expires 12-25-2023

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 133

1          Veritext Legal Solutions
                1100 Superior Ave
2                  Suite 1820
              Cleveland, Ohio 44114
3              Phone: 216-523-1313
4
    September 24, 2019
5
    To: Kara N. Ingelhart
6
    Case Name: Ray, Stacie, et al. v. Acton, Amy, etc., et al.
7
    Veritext Reference Number: 3511588
8
    Witness:  Jane Doe          Deposition Date:  9/13/2019
9
10   Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA

Page 134

1              DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3511588
3  CASE NAME: Ray, Stacie, et al. v. Acton, Amy, etc., et al.
   DATE OF DEPOSITION: 9/13/2019
4  WITNESS' NAME: Jane Doe
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _10/24/19_____          ___Jane Doe_____
9  Date                         Jane Doe
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
       I have affixed my name and official seal
16
   this _24_ day of _October_____, 20_19_.
17
   __Elvia A. Garcia_____
18 Notary Public
19 _4/15/80_____
   Commission Expiration Date
20
21
22
23
24
25

1                      DEPOSITION REVIEW
                     CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 3511588
3       CASE NAME: Ray, Stacie, et al. v. Acton, Amy, etc., et al.
        DATE OF DEPOSITION: 9/13/2019
4       WITNESS' NAME: Jane Doe
5            In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
6       my testimony or it has been read to me.
7            I have listed my changes on the attached
        Errata Sheet, listing page and line numbers as
8       well as the reason(s) for the change(s).
9            I request that these changes be entered
        as part of the record of my testimony.
10
             I have executed the Errata Sheet, as well
11      as this Certificate, and request and authorize
        that both be appended to the transcript of my
12      testimony and be incorporated therein.
13      _____        _____
        Date                           Jane Doe
14
             Sworn to and subscribed before me, a
15      Notary Public in and for the State and County,
        the referenced witness did personally appear
16      and acknowledge that:
17           They have read the transcript;
             They have listed all of their corrections
18           in the appended Errata Sheet;
             They signed the foregoing Sworn
19           Statement; and
             Their execution of this Statement is of
20           their free act and deed.
21           I have affixed my name and official seal
22      this _____ day of_____, 20____.
23           _____
                      Notary Public
24
             _____
25                    Commission Expiration Date

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.