```
                                              Page 1
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4              ~~~~~~~~~~~~~~~~~~~~~
 5   STACIE RAY, BASIL ARGENTO, JANE DOE,
 6   AND ASHLEY BREDA,
 7              Plaintiffs,
 8
 9       vs.              Civil Action No.
10                     2:18-CV-00272-MHW-CMV
11   AMY ACTON, IN HER OFFICIAL CAPACITY
12   AS DIRECTOR OF THE OHIO DEPARTMENT
13   OF HEALTH, et al.,
14
15              Defendants.
16              ~~~~~~~~~~~~~~~~~~~~~
17                 Deposition of
18                  STACIE RAY
19
                   August 19, 2019
20                   1:05 p.m.
21                  Taken at:
             Calfee Halter & Griswold, LLP
22          41 South High Street, Suite 1200
                   Columbus, Ohio
23
24       Kimberly A. Kaz, RPR, Notary Public
25
```

CONFIDENTIAL

Page 2

1    APPEARANCES:

2

3         On behalf of the Plaintiffs:

4              American Civil Liberties Union of

5              Ohio Foundation, by

6              ELIZABETH BONHAM, ESQ.

7              4506 Chester Avenue

8              Cleveland, Ohio  44103

9              (216) 472-2220

10             ebonham@acluohio.org

11

12             Lambda Legal, by

13             KARA N. INGELHART, ESQ.

14             105 West Adams Street, Suite 2600

15             Chicago, Illinois  60603

16             (312) 663-4413

17             kingelhart@lambdalegal.org

18

19             American Civil Liberties Union

20             Foundation, by

21             DAVID J. CAREY, ESQ.

22             1108 City Park Avenue, Suite 203

23             Columbus, Ohio  43206

24             (614) 586-1972

25             dcarey@acluohio.org

Page 3

1    APPEARANCES (continued):

2

3         On behalf of the Defendants:

4              Calfee Halter & Griswold, LLP, by

5              JAKE BLAKE, ESQ.

6              41 South High Street, Suite 1200

7              Columbus, Ohio  43215

8              (614) 621-7789

9              jblake@calfee.com

10                  ~ ~ ~ ~ ~

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 4

1                    TRANSCRIPT INDEX

2

3    APPEARANCES................................    2

4

5    INDEX OF EXHIBITS ........................    5

6

7    EXAMINATION OF STACIE RAY

8    By Mr. Blake.............................    6

9    By Ms. Bonham...........................  167

10

11   REPORTER'S CERTIFICATE...................  170

12

13   EXHIBIT CUSTODY

14   EXHIBITS RETAINED BY COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                 INDEX OF EXHIBITS

2   NUMBER              DESCRIPTION          MARKED

3   Exhibit 1   Birth Certificate.............  23

4   Exhibit 2   Complaint....................  79

5   Exhibit 3   Ohio Department of Health ....  85
                Form

6

    Exhibit 4   August 12th, 2017 ............ 133

7               Communication; Attachments,

8   Exhibit 5   Plaintiffs' Answers to ....... 140
                Defendant Lance Himes First

9               Set of Interrogatories,
                First Request for

10              Admissions, First Request
                for Production of Documents

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

```
 1              STACIE RAY, of lawful age, called
 2    for examination, as provided by the Federal
 3    Rules of Civil Procedure, being by me first
 4    duly sworn, as hereinafter certified, deposed
 5    and said as follows:
 6              EXAMINATION OF STACIE RAY
 7    BY MR. BLAKE:
 8        Q.    Okay.  Ms. Ray, my name is Jason
 9    Blake.  I am one of the attorney representing
10    State of Ohio.  I work at Calfee, Halter &
11    Griswold, and we're here today for your
12    deposition.  Is that your understanding?
13        A.    Yes.
14        Q.    In the case that you, among others,
15    have filed against several officials at the
16    Department of Health.  And just to get some
17    terminology straight, I'm going to generally
18    refer to the Department of Health or ODH, and
19    when I do so, that's going to mean all
20    defendants collectively.  Is that okay if we --
21        A.    That is fine.
22        Q.    And if there's a reason to
23    distinguish between the two, I'll try to do so
24    or if you -- if you could do that too, that
25    would be great.
```

CONFIDENTIAL

1      A.    Yes.

2      Q.    I don't foresee that happening,

3  but...

4            Is this your first deposition

5  you've ever had or --

6      A.    The first deposition, yes.

7      Q.    Okay.  So I don't know if your

8  attorneys have generally explained to you how

9  this works, but I'll just run through some

10 stuff real fast, and if you have any questions,

11 stop me.  This is the one part of the

12 deposition where I think it's okay for you to

13 ask me questions, although I'm sure that might

14 happen as we go along.

15           So, you know, you're under oath, so

16 all your answers have to be truthful and to the

17 best of your knowledge and all that, and I

18 don't anticipate us having any problem with

19 that.

20           As you'll see, there's a court

21 reporter, she's typing everything that I say

22 and she's going to type everything you say,

23 everything your attorney says.  The only trick

24 to it, she's very competent, very good at it,

25 she can only do one person at a time, so allow

Page 8

1   me to finish before you answer and I'll try to

2   do the same.

3          A.    Okay.

4          Q.    If you need to stop for whatever

5   reason, it's your deposition, feel free to

6   stop, take a break.  The only thing I would ask

7   is that if a question is pending, you answer

8   that question, and then we can take a break.

9   If you need any water or anything, I see you

10  brought some liquids with you, but water, sodas

11  are over there, and feel free to get up and

12  help yourself.

13              Other than that, you know, we can

14  just kind of play things by ear, see how things

15  go.  I don't -- I don't -- I suppose one other

16  thing, audible answers only.  This is something

17  that we all struggle with.

18         A.    Correct.

19         Q.    Well, nods of the head, but also

20  things like "huh-uhs" and "uh-huhs," those are

21  hard to sort of like figure out.  They look

22  ambiguous on the transcript 'cause everything's

23  going to be written.

24              Other than that, I don't have any

25  other opening sort of remarks, and I think we

CONFIDENTIAL

Page 9

1  can start digging in, if that's okay with you.

2       A.    That is fine.

3       Q.    All right.  Great.  Okay.  So we

4  already talked about the definition of ODH or

5  how I'm going to use ODH.  I want to go over

6  some other terminology that we're going to try

7  to use.  So, "transgendered," when I use the

8  word "transgender" or "transgendered," you'll

9  understand that I'm referring to someone whose

10  gender identity does not align with their birth

11  or biological sex.  Is that a definition that

12  you're okay with?

13            MS. BONHAM:  I'm going to make a

14  standing objection to any of your terminology

15  that's at issue in the case to the extent these

16  are terms of art and to the extent we have

17  disagreements over them.

18            MR. BLAKE:  Sure.

19            MS. BONHAM:  So her testimony isn't

20  going to be any kind of acceptance of your uses

21  of these terms.

22            MR. BLAKE:  Understood.

23       Q.    But you understand as we go along,

24  you know, if I refer to "transgendered," that

25  will refer to someone whose gender identity

CONFIDENTIAL

1   does not align with his or her birth or

2   biological sex; is that fair?

3        A.    I understand that's your definition

4   of it, yes.

5        Q.    Do you have any different

6   definition of someone who's transgendered?

7             MS. BONHAM:  Objection to the

8   extent --

9        Q.    And I understand you're not an

10  expert, but do you have a different definition?

11       A.    In my opinion, yes, I do.

12       Q.    And what is that?

13       A.    That would be for me to give a

14  definition that I'm not an expert on.

15       Q.    Okay.  I get that you're not an

16  expert on things like gender identity and sex

17  or transgendered, I understand that.  You're

18  here as a witness in your personal capacity as

19  a plaintiff in this case, right?

20       A.    Okay.  Yes.

21       Q.    But if you have a working

22  definition of what you perceive as the

23  plaintiff in this case as a transgendered --

24  when a transgendered person is or what that

25  means, I'd be interested in hearing it.

1        A.     For me, for my transgenderism, my

2    definition for myself and myself only would be

3    that I do not correspond what they assigned me

4    at birth.

5        Q.     Okay.  So you have -- your

6    definition for a transgendered person is

7    someone who's gender identity does not

8    correspond with the sex assigned at birth?

9              MS. BONHAM:  Objection.  Misstates

10   testimony.

11             THE WITNESS:  For my particular

12   person, my identity.

13       Q.     I see.  So --

14       A.     Me only.

15       Q.     So other transgendered people might

16   have a different definition or understanding of

17   that word, but for your -- your expression of

18   transgendered -- of your transgenderism, if

19   that's a word, it is that your gender identity

20   does not correspond with your biological or

21   birth sex; is that accurate?

22             MS. BONHAM:  Same objection.

23             THE WITNESS:  No.

24       Q.     No.  Then I guess I'm missing

25   something, 'cause I thought I used your words.

CONFIDENTIAL

1        A.    My personal opinion about my

2   transgenderism is what -- I do not agree with

3   what the doctors assigned me at birth.

4        Q.    Okay.  So it's not about

5   correlation or alignment, it's that you

6   disagree with what the medical provider at the

7   time of your birth assigned you?

8             MS. BONHAM:  Objection.  Misstates

9   testimony.  Continued objection to questions

10  that call for expert testimony or legal

11  conclusions.  Foundation.

12       Q.    Go ahead.

13       A.    Again, you're -- you kind of are

14  twisting my words.

15       Q.    And I'm not trying to, trust me,

16  but go ahead.

17       A.    My personal identity for

18  transgenderism for myself and myself only is

19  that I do not agree with what the doctors

20  assigned me at birth, the gender identity they

21  assigned me.

22       Q.    You believe you were assigned

23  gender identity at birth?

24            MS. BONHAM:  Objection.  Asked and

25  answered.  Foundation.  Calls for expert

Page 13

1    testimony.  She's answered this a couple of

2    times now in different ways that you seem to be

3    seeking.  I think we should move on to

4    something relevant.

5                 MR. BLAKE:  I haven't asked that

6    question.

7        Q.    Can you answer whether you believe

8    you were assigned a gender identity at birth?

9                 MS. BONHAM:  Same objection.

10                THE WITNESS:  Same answer.  I

11   disagree with what the doctors assigned me

12   gender identity at birth.

13       Q.    Okay.  Let me ask you about the

14   term "cisgendered."  Would you agree that that

15   is someone whose gender identity aligns with

16   their birth or biological sex?

17                MS. BONHAM:  Restate the objections

18   to calling for expert testimony and/or a legal

19   conclusion.

20                THE WITNESS:  My personal opinion

21   about cisgenderism is someone that agrees with

22   the -- the doctor's given recommendations of

23   assigned sex.

24       Q.    Okay.

25       A.    And that's my personal opinion

www.veritext.com                                    888-391-3376

CONFIDENTIAL

1   only.

2         Q.    All right.  And what is your

3   highest level of education?

4         A.    Some college.

5         Q.    Which college did you attend?

6         A.    Columbus State.

7         Q.    And what coursework were you

8   working, taking?

9         A.    Last was civil engineering, unless

10  you want to count I'm getting ready to go back

11  to school again.

12        Q.    We'll get to that.

13              Approximately when did you attend

14  Columbus State?

15        A.    2008, 2009.

16        Q.    And before that, did you have any

17  other post-high school education?

18        A.    I took some correspondence courses

19  when I was in high school for college credits.

20        Q.    You mean, like, college math or

21  something like that?

22        A.    Correct.

23        Q.    Nothing specialized?

24        A.    No.

25        Q.    And you said -- you said civil

1   engineering.  Did you have any other areas of

2   study while you were at CSU?

3        A.    I mean, an Associate of arts,

4   Associate's of arts.

5        Q.    An Associate of arts.  Was that,

6   like, a two-year degree?  A one-year degree?

7        A.    That's your generalized

8   undergraduate and then your major of civil

9   engineering.

10       Q.    Okay.  So the Associate's of arts

11   would have, like, your general coursework, your

12   Englishes, your sciences, your maths?

13       A.    Correct.

14       Q.    And then the civil engineering

15   would be additional coursework focused

16   primarily on the engineering aspect of that

17   profession?

18       A.    Correct.

19       Q.    Okay.  And I think you've already

20   answered this, but would you consider yourself

21   to be an expert on the distinction between sex

22   and gender?

23       A.    No.

24       Q.    Okay.  You haven't taken any

25   courses on the distinction between sex and

CONFIDENTIAL

Page 16

1   gender?

2           A.      No.

3           Q.      And doesn't sound like you've

4   obtained any certifications or degrees related

5   to sex and gender?

6           A.      No.

7           Q.      You haven't published any papers or

8   written any articles or anything like that on

9   the distinction between sex and gender?

10          A.      No.

11          Q.      From a medical perspective, do you

12  understand how a person's sex is determined?

13                  MS. BONHAM:  Objection.

14  Foundation.

15                  THE WITNESS:  No.

16          Q.      Do you have any understanding of

17  what a person's biological sex is?

18                  MS. BONHAM:  Objection.  Calls for

19  legal conclusion.  Calls for expert testimony.

20  Foundation.

21                  THE WITNESS:  Could you repeat the

22  question, please?

23          Q.      Sure.  Do you have any

24  understanding of what a person's biological sex

25  is?

www.veritext.com                                                    888-391-3376

CONFIDENTIAL

1          MS. BONHAM:  Same objection.

2          THE WITNESS:  I have no medical

3  knowledge of how they determine that, so the

4  answer would be no.

5      Q.    And what about gender, do you

6  understand how a person's gender identity is

7  determined?

8          MS. BONHAM:  Same objection as to

9  foundation and to the extent these are terms of

10  art at issue in the case that she can't testify

11  about from her personal knowledge.

12          THE WITNESS:  No.

13      Q.    Other than your own gender

14  identity, do you have any understanding of a

15  person's gender identity as a general matter?

16          MS. BONHAM:  Same objection.

17          THE WITNESS:  I cannot speculate

18  what's in someone's head and how they identify,

19  so no.

20      Q.    We're going to look at your birth

21  certificate in a moment, but as a general

22  matter, are you or would you agree that birth

23  certificates are a form of identification?

24          MS. BONHAM:  Objection.  Calls for

25  a legal conclusion.  Foundation.

CONFIDENTIAL

Page 18

```
 1              THE WITNESS:  My personal opinion
 2   is they can be.
 3         Q.    So not all the time, but sometimes
 4   birth certificates are used as identification;
 5   is that accurate?
 6              MS. BONHAM:  Objection.  Misstates
 7   testimony.
 8              THE WITNESS:  Again, my personal
 9   opinion is it can be a form of identity used at
10   will.
11         Q.    Do you consider your birth
12   certificate to be a form of identification?
13              MS. BONHAM:  Objection.  Vague.
14              THE WITNESS:  I personally have had
15   to present my birth certificate as a form of
16   identification.
17         Q.    So the answer to that question is
18   "yes"?
19         A.    I've had to present it as a form of
20   identification, so yes.
21         Q.    Is it your understanding that birth
22   certificates reflect biographical data that
23   exists at the time of that individual's birth?
24              MS. BONHAM:  Objection.
25   Foundation.
```

Page 19

1                THE WITNESS:  Yes and no.

2        Q.    All right.  Which information on a

3   birth certificate is biographical?

4                MS. BONHAM:  Objection.

5   Foundation.

6                THE WITNESS:  City, state, place

7   where the hospital, presenting physician,

8   parents.

9        Q.    Which information isn't

10  biographical?

11               MS. BONHAM:  Same objection.

12               THE WITNESS:  Gender and name of

13  child.

14       Q.    On what basis do you contend that

15  gender is not biographical?

16               MS. BONHAM:  Objection.  Vague.

17  Foundation.  We don't have any definition for

18  the term "biographical."  We also have no birth

19  record that we're looking at to refer to.

20  Speculative.

21               THE WITNESS:  My personal opinion

22  per my instance and for me is that no one can

23  know one's gender just by looking at them.

24       Q.    What about someone's sex, can

25  someone know one's sex just by looking at them?

1           MS. BONHAM:  Objection.  Calls for

2   expert testimony.  Calls for legal conclusions

3   and to the terms of art being presented without

4   definitions.

5           THE WITNESS:  No.

6      Q.    You also said that you didn't think

7   name was biographical data.  Can you explain

8   that?

9           MS. BONHAM:  Same objection to

10   biographical data.  If you know this stuff.

11          THE WITNESS:  In my opinion, one's

12   name can be changed.

13      Q.    So is your assertion that sex and

14   name on a birth certificate is not biographical

15   because it's subject to change?

16          MS. BONHAM:  Objection.  Misstates

17   testimony.  Calls for a legal conclusion.

18          THE WITNESS:  No.

19      Q.    That's not your testimony?

20      A.    No.

21      Q.    Okay.  So let me ask the question

22   about name again because you just said

23   someone's name could be changed in response to

24   my question about whether or not it was

25   biographical data.  Upon what basis do you

CONFIDENTIAL

Page 21

1    contend that a person's name as recorded on a

2    birth certificate is not biographical data?

3              MS. BONHAM:  Objection.  Calls for

4    expert testimony.  I don't even understand what

5    person would know this because we don't have a

6    definition of "biographical data."  Asked and

7    answered.

8              THE WITNESS:  Basically, I'm unsure

9    of what your definition of "biographical data"

10   is, so I'm going by the conclusion of what I'm

11   assuming the definition of biographical, and I

12   put that in quotes, so, therefore, if a

13   person's name can change, then it can't be

14   biographical under my definition.

15       Q.    And what's your definition of

16   biographical data?

17             MS. BONHAM:  Objection.  She's

18   going to define a term that you started using

19   now?

20             MR. BLAKE:  I just want to know.

21   She's answered the question.

22       Q.    If you have a definition.

23       A.    I'll give you my definition of it,

24   yes.

25       Q.    Sure.

Page 22

1      A.    Let's break it down.  Bio, life;

2  graphical, of geographical reference.  Life

3  reference or life graphical reference.  So,

4  therefore, at the time of life and at that geo

5  point, that's what it was, but I don't consider

6  it a -- one point of existence of time.

7      Q.    Okay.  But the birth record, as far

8  as know, records some information at a certain

9  point in time, correct?

10      A.    Some information, which I stated as

11  an earlier, city, state, hospital, doctor,

12  parents.

13      Q.    And then it would record a name of

14  the individual born, correct, at that point in

15  time, correct?

16          MS. BONHAM:  Objection.

17          THE WITNESS:  What was assigned to

18  them.

19      Q.    And the same with sex, right?  It

20  was -- their sex was recorded at that time,

21  correct?

22          MS. BONHAM:  Objection.  Calls for

23  expert testimony.  Calls for a legal

24  conclusion.  Foundation.  Calls for

25  speculation.  Hypothetical.

CONFIDENTIAL

Page 23

1           THE WITNESS:  That would refer back
2   to my -- your question earlier of can one
3   determine one's sex by looking at them, and my
4   answer was no, so no.
5       Q.   So you don't know whether or not
6   the person's sex is recorded on the birth
7   certificate?
8           MS. BONHAM:  Objection.  Misstates
9   testimony.  Vague.
10          THE WITNESS:  Again, I answered as
11  no.
12      Q.   Okay.  Well, we can look at one
13  birth certificate.
14                  -   -   -   -   -
15          (Thereupon, Deposition Exhibit 1,
16           Birth Certificate, was marked for
17           purposes of identification.)
18                  -   -   -   -   -
19      Q.   I've just handed you a document
20  which has been marked as Defendants' 1.  Do you
21  have that in front of you?
22      A.   I do.
23      Q.   And this is a document which I
24  believe was produced by your attorneys, and
25  it's a birth certificate.  Do you recognize

1    this document?

2          A.     I do.

3          Q.     This is a document which reports to

4    be your birth certificate, correct?

5          A.     Correct.

6          Q.     At the top, it says:  State of

7    Ohio, Office of Vital Statistics.

8                 Do you see that?

9          A.     I do.

10         Q.     And right underneath that, it says:

11   Certification of birth.

12                Do you see that?

13         A.     I do.

14         Q.     Name, Stacie Marie Ray.

15                Do you see that?

16         A.     I do.

17         Q.     Has date of birth, ███ ███ ███,

18   right?

19         A.     It does.

20         Q.     Birth place, Ohio, correct?

21         A.     It does.

22         Q.     The date the record was filed,

23   May 15th, 1973 in the top right-hand corner.

24   Do you see that?

25         A.     I do.

Page 25

1      Q.    And underneath that, it says:  Sex,

2  male.  Right?

3      A.    I see it.

4      Q.    So let me ask you again:  Is it

5  your understanding that birth record records

6  sex at the time of birth?

7           MS. BONHAM:  Objection:  Calls for

8  expert testimony.  Calls for a legal

9  conclusion.  Continuing objection to the use of

10  the terms of art.

11           THE WITNESS:  This document says

12  "sex," but I do not agree with its recording.

13      Q.    Understood.  I understand that.  My

14  question to you is whether or not it records

15  sex.

16           MS. BONHAM:  Same objection.  The

17  term "sex" is one of the key disputes in this

18  case, the key legal disputes in this case.

19           THE WITNESS:  Again, it says it,

20  but I'm in disagreeance [sic] with it.

21      Q.    The birth record says "sex," right?

22      A.    There's the word "sex" on the birth

23  certificate.

24      Q.    And there's an entry for male next

25  to the word "sex" on the birth record, right?

CONFIDENTIAL

Page 26

```
 1        A.     That is correct.
 2        Q.     Okay.  Do you know whether the
 3   information on the birth certificate -- your
 4   birth certificate was recorded by you or by the
 5   Department of Health?
 6        A.     To the best of my knowledge,
 7   neither of the above.
 8        Q.     All right.  So who prepared this
 9   document, do you know?
10             MS. BONHAM:  Objection.
11   Foundation.
12             THE WITNESS:  I don't know.
13        Q.     Okay.  So you don't know whether
14   someone within the Department of Health
15   prepares the birth records?
16             MS. BONHAM:  Same objection.
17             THE WITNESS:  I don't know.
18        Q.     All right.  So if you look at the
19   bottom right-hand corner, it says:  This is a
20   true certification of the name and birth facts
21   as recorded in the Office of Vital Statistics,
22   Columbus, Ohio.  Witness my signature and seal,
23   the Department of Health, this 8th day of
24   September 2016.
25             Do you see that?
```

1         A.      I do.

2         Q.      And then underneath that, it's

3    Judith B. Nagy, State Registrar, Vital

4    Statistics.  Do you see that?

5         A.      I do.

6         Q.      So the Office of Vital Statistics

7    is a defendant in this case, right?

8         A.      To the best of my knowledge, yes.

9         Q.      Okay.  And this is Judith B. Nagy,

10   who's one of the named defendants, certifying

11   that these are the name and birth facts as

12   recorded in the Office of Vital Statistics.  Do

13   you see that?

14        A.      Please repeat the question.

15        Q.      Sure.  Her certification is that

16   the name and birth facts as -- that this

17   document reflects the name and birth facts as

18   recorded in the Office of Vital Statistics.  Do

19   you see that?

20             MS. BONHAM:  Okay.  Objection.

21   She's obviously reading back exactly what's on

22   the document.  It says what it says.  She lacks

23   the foundation.

24             MR. BLAKE:  I'm not asking her to

25   authenticate the document.

1              THE WITNESS:  Your question is

2      vague to the point of it can be misconstrued.

3           Q.    All right.  Do you have any

4      evidence or basis to contend that someone other

5      than the Department of Health prepared this

6      document?

7           A.    No.

8           Q.    Okay.  Did you have any control

9      over what information was recorded and

10     displayed on this certification of birth?

11          A.    No.

12          Q.    Did you ever certify the accuracy

13     of the birth record?

14              MS. BONHAM:  Objection.

15     Foundation.  I don't know what that means.

16              MR. BLAKE:  Okay.  So it's not a

17     foundation objection, it's a vague -- it's a

18     vagueness objection.

19              MS. BONHAM:  Thanks.  Either way, I

20     don't know what it means and she doesn't

21     understand how -- couldn't understand how to

22     testify about it.

23          Q.    Have you ever attested to the

24     accuracy of this document?

25          A.    I was never given the chance to.

1      Q.    Okay.  And as I just read to you,

2   it looks like Judith B. Nagy has certified to

3   the accuracy of this document, right, not

4   yourself?

5      A.    That is the name upon here that

6   says they certified it, but appears to be a

7   stamp.

8      Q.    And her title is the State

9   Registrar of Vital Statistics, right?

10     A.    That is what it says below it, yes.

11     Q.    And, in fact, you actually don't

12   agree with everything on this record, right?

13     A.    I do not.

14     Q.    So what information on this record

15   do you disagree with?

16     A.    The wording of "sex" and what

17   they've marked down.

18     Q.    All right.  What is inaccurate

19   about the wording of "sex" and what they've

20   marked down?

21         MS. BONHAM:  Objection to the form.

22   Inaccurate.

23     Q.    Okay.  Go ahead.

24     A.    Again, that refers back to the

25   question you asked me earlier, can one

CONFIDENTIAL

1  determine sex by looking at someone, and my

2  answer was no, so, therefore, she should not be

3  making the assumptions of someone's sex, and

4  they've classified me in a category.

5      Q.    But like you said earlier, you're

6  not an expert on the distinction between sex

7  and gender, right?

8      A.    Correct.

9      Q.    That's your personal opinion,

10  correct?

11      A.    Correct.

12      Q.    Anything else on the birth record

13  that you think is inaccurate?

14      A.    Not to my knowledge.

15      Q.    Your name, Stacie Marie Ray, that's

16  accurate, right?

17      A.    It is.

18      Q.    And you see there's a little note

19  down there that says:  Legal name change on

20  file CO No. 123593.

21          Do you see that?

22      A.    I do.

23      Q.    So you submitted at some point

24  something to get your name changed on the birth

25  record, right?

CONFIDENTIAL

Page 31

1          A.      I did.

2          Q.      Okay.  Do you recall approximately

3     when that was?

4          A.      February 2016 or -- it was in 2016.

5     I don't remember the exact month.  Let's go

6     with that.

7          Q.      You were approximately 43 years old

8     at that time?

9          A.      Approximately.

10         Q.      Maybe 42 if it was early 2016?

11         A.      Hence the word "approximate."

12         Q.      Yeah.  What prompted you to file

13     your name change paperwork?

14         A.      The name that was given to me by my

15     parents did not align with my identity.

16         Q.      You can put that aside for a

17     moment.  We'll come back to it in a little bit.

18              Do you hold yourself out as

19     transgendered, as you define that term, to the

20     public?

21         A.      No.

22         Q.      Are you part of any groups

23     associated with transgendered individuals?

24         A.      As in?

25         Q.      I don't know.  Like, any rights

Page 32

1    groups, advocacy groups, associations?  I mean,

2    I --

3         A.    Not that I regular -- not that I

4    participate in.  Nothing that I can think of,

5    no.

6         Q.    Okay.  How many people have you

7    told that you were transgendered?

8         A.    Approximately five to ten people.

9         Q.    Who are they?

10        A.    Let's see.  My wife.

11        Q.    What's her name?

12        A.    Tanya ██████████

13        Q.    Okay.

14        A.    Tegan ███████████  a very close friend

15   of mine.

16        Q.    Okay.

17        A.    Anna Marie ██████████

18        Q.    Okay.  Who's that?

19        A.    Another close friend of mine.

20        Q.    Okay.  Thank you.

21        A.    Who's the fiance of Tegan ████████

22   Or wait a second.  I'm sorry.  Is the mother

23   of.  I was thinking of the next person I was

24   going name, which is ████████and that's the

25   fiance of Tegan ███████  My apologies.  I do

Page 33

1    not know his last name.

2         Q.    ████████

3         A.    Yes.  I do know it, I just can't

4    think of it right now.

5         Q.    That's okay.  Close friend or --

6         A.    He's a close friend also.  I mean,

7    he's the fiance of.

8         Q.    Another close friend?

9         A.    Yes.  And then my father, Gary

10   ██████  which is on the birth certificate.  And

11   then one other person named Erica is a very

12   close friend of mine, and that's it.

13        Q.    So Anna Marie ██████ is mother of?

14        A.    Tegan.

15        Q.    Tegan.  Sorry.  What was this last

16   close friend, what was her name?

17        A.    Erica.

18        Q.    Erica, do you know her last name?

19        A.    I can't think of it right at the

20   moment.

21        Q.    So not that close?

22        A.    She is.  I mean, let's got get into

23   semantics about it.

24        Q.    I get it.

25        A.    Thank you.

CONFIDENTIAL

1      Q.   I --

2      A.   That would be like asking you if

3 you knew every address of all your friends.

4      Q.   No.  It would be like asking me if

5 I knew every last name of all my friends.

6          MS. BONHAM:  Okay.

7      Q.   But I understood.

8          So what about your mother, have you

9 told your mother?

10     A.   No.

11     Q.   No.  Okay.  Do you have a

12 relationship with your mother?

13     A.   It's very hard to have a

14 relationship with someone who's dead.

15     Q.   Okay.  I didn't know that.  I'm

16 sorry to hear that.  When did she pass?

17     A.   Relevancy?

18     Q.   I just -- when did she pass?

19 Answer the question, if you know.

20         MS. BONHAM:  You can answer.

21         THE WITNESS:  2009.

22     Q.   Okay.

23         THE WITNESS:  I need a break.

24         MS. BONHAM:  Can we take a

25 little --

CONFIDENTIAL

Page 35

1          MR. BLAKE:  Absolutely.

2          (Recess taken.)

3     Q.    All right.  I want to go and just

4  talk briefly about each of these individuals

5  that you've identified.  Tanya ████   you

6  mentioned, was your wife.  How long have you

7  been married?  Well, actually, let me retract

8  that question.

9          How long have you been together as

10  a couple?

11     A.    Since 2002, I believe.

12     Q.    And you referred to her as your

13  wife, but are you married?

14     A.    Yes.

15     Q.    Okay.  And when was that

16  approximately?

17     A.    Approximately late 2007, 2008.

18  Right in that range.  It was

19  January 22nd, 2008.

20     Q.    Okay.  That's fine.

21     A.    I believe.

22     Q.    Did your wife know -- well, let me

23  ask you this:  What was your gender identity

24  when you first became a couple?

25     A.    Female.

Page 36

1           MS. BONHAM:  Objection.

2       Q.    And when did you -- well, did you

3  ever tell -- well, I guess you answered this.

4  You told Ms. ███████ that you were transgendered.

5  When did you tell her that were transgendered?

6       A.    I do not recall the specific date.

7       Q.    Was it prior to or after you became

8  a couple in 2002?

9       A.    After.

10      Q.    Long after?  A few months?  Few

11  years?  When?

12      A.    It -- I tell didn't tell her,

13  quote/unquote, that was transgendered --

14      Q.    Yeah.

15      A.    -- as your term.

16      Q.    Sure.

17      A.    And I do not recall how long after,

18  but it was no too long after.

19      Q.    Within a year?

20      A.    Approximately.

21      Q.    And you say that, you know, did

22  you, like, say, "Hey, I'm transgendered"?  And

23  I understand that.  What -- what is it you told

24  her, roughly?

25      A.    That I do not identify as male.

CONFIDENTIAL

Page 37

1      Q.      Tegan ███████ did I pronounce that

2   right?

3      A.      I believe we both are pronouncing

4   that correctly.

5      Q.      Okay.  Tegan.  Let's just say

6   "Tegan."

7      A.      Correct.

8      Q.      Your close friend, when did you

9   tell her about your identity -- your gender

10   identity?  Is it fair to say that?  Is that a

11   fair way to say it?

12      A.      No.

13      Q.      Okay.  I'm not trying to be tricky,

14   I'm just trying to pin on dates when you told

15   these people about your gender identity or your

16   transgenderism or however you want to define

17   it.  So how would you like to characterize what

18   you communicated to Tegan?

19      A.      I told him.

20      Q.      Him.  Oh, okay.  There's an

21   assumption.  Tegan, I thought, was a girl's

22   name, but I guess I'm wrong about that.

23      A.      I told him pretty much when we met.

24      Q.      Which was?

25      A.      2016.

CONFIDENTIAL

Page 38

1    Q.    And what did you tell him?

2    A.    My name.

3    Q.    And?

4    A.    That's all I needed to tell him.

5    Q.    So from your name, he was able to

6  discern that you didn't identify as a male?

7    A.    Seeing as we were in a

8  transgendered support group, I think that was

9  pretty -- yes.

10    Q.    Okay.  What -- what was the name of

11  that support group?

12    A.    Transgendered support group.

13    Q.    Pretty self-explanatory, huh?

14    A.    Correct.

15    Q.    And is that a local group?

16    A.    It is.

17    Q.    How long have you attended that

18  group?

19    A.    I'm no longer attending.

20    Q.    When did you start attending the

21  transgendered support group?

22    A.    2016.

23    Q.    Early part of the year?  Middle

24  part of the year?

25    A.    It was in January of 2016, I

1    believe.

2          Q.    And you meet Tegan at that group?

3          A.    I did.

4          Q.    How long did you attend the

5    transgendered support group?

6          A.    I attended that particular one for

7    three months.

8          Q.    So approximately March or April of

9    2016?

10         A.    It was either the end of March or

11   the beginning of April, yes.  Correct.

12         Q.    After you stopped attending the

13   transgendered support group at the end of

14   March of beginning of April 2016, did you

15   attend any other support groups?

16         A.    I attended one more later in that

17   same year.

18         Q.    What was that one called?

19         A.    Same thing.

20         Q.    And you said later in that same

21   year.  A few months later?  Approximately?

22         A.    I'm wanting to say approximately

23   around the time frame of August.  It could have

24   been late July, early September, but in that

25   time frame.

Page 40

1          Q.    So late summer 2016?

2          A.    That would be correct assumption.

3          Q.    How long did you attend that second

4    transgendered support group?

5          A.    Roughly, the same time frame.

6          Q.    So through the fall?

7          A.    They roughly go for almost 11

8    weeks.

9          Q.    I see.  So these are -- "courses"

10   isn't the right word, but these are programs

11   that run for a certain length of time?

12         A.    Correct.

13         Q.    People sign up for them, they

14   attend, and then when the program ends, your

15   involvement ends, right?

16         A.    In that particular course, yes.

17         Q.    Are these courses sponsored by the

18   same people, same organization?

19         A.    Same organization.

20         Q.    What's the name of that

21   organization?

22         A.    Stonewall.

23         Q.    That's the same organization that

24   sets up the Pride parade here in town, right,

25   Stonewall?

Page 41

1      A.    To the best of my -- yes.

2           MS. BONHAM:  And just to clarify

3    for the record, I think we're using -- at some

4    point, you said "courses," we're discussing a

5    couple of support groups.

6           MR. BLAKE:  Sure.  Yeah.

7      Q.    These are support groups, they run

8    for 11 weeks or so, and they're put on by this

9    organization called Stonewall Columbus, I

10   assume, right?

11      A.    They are attended at Stonewall.

12   Who is the actual financial backer, I can't

13   make -- pinpoint accuracy.  They're at

14   Stonewall.

15      Q.    Okay.  And it's your impression

16   that that they're organized by Stonewall, but

17   you're not sure?

18      A.    I don't know for certain of who

19   actually organizes it.  I don't know the

20   behind-the-scenes.

21      Q.    So the -- and if we just call it

22   the Stonewall support group for ease of

23   reference.  The Stonewall support group that

24   you attended in January 2016 or started to

25   attend in 2016, was that the first such support

1    group you had attended?

2          A.     It is.

3          Q.     Okay.  And then the second one you

4    described in the late summer of 2016 also at

5    the Stonewall Columbus facility, was that the

6    last one you attended?

7          A.     It is.

8          Q.     Okay.  Any other type of support

9    group or --

10         A.     No.

11         Q.     So I suppose when I ask that

12   question at the beginning of the deposition

13   about organizations or associations that you

14   were affiliated with with transgendered things,

15   I also was looking for, you know, this kind of

16   information about the support group.  Is there

17   anything else that you think would fall into

18   that category of affiliations or clubs, for

19   kind of a generic word?

20         A.     Because you had not set a time

21   frame on it, it was implied that you meant

22   currently attending.

23         Q.     Okay.  So I apologize for that.

24         A.     So, therefore, I am not currently

25   attending any.

Page 43

1    Q.    Okay.  What about in the past?

2    A.    Nor have I attended any others

3    aforementioned.

4    Q.    Okay.  Understood.  Thank you for

5    clarifying that.

6    A.    Yes.

7    Q.    Okay.  So you met Tegan at the

8    transgendered support group in January 2016.

9    Anna Marie ████████ Tegan's mother, I assume you

10   would have met around the same time?

11   A.    Correct.

12   Q.    And Kaiden, Tegan's fiance?

13   A.    Correct.

14   Q.    You met at some point after

15   January 2016?

16   A.    Correct.

17   Q.    Now, with either Anna Marie or

18   Kaiden, was there ever a conversation that you

19   had with them about what your gender identity

20   was or that -- or did they just automatically

21   assume or know based on your association with

22   Tegan?

23   A.    It was implied of how we met.

24   Q.    One of those things Tegan

25   introduces you to his mom, hey, so-and-so, this

Page 44

1    is Stacie.  We met at the transgendered support

2    group and you assume and they assumed; is that

3    right?

4          A.    It was implied, yes.

5          Q.    Okay.  All right.  Your father,

6    when did you tell him about your gender

7    identity?

8          A.    Summer of 2017 sometime.

9          Q.    What prompted you to tell your

10   father about your gender identity?

11         A.    In all honesty, to see if it'd give

12   him a heart attack.

13         Q.    Oh, gees.  Okay.  I assume it

14   didn't give him a heart attack, but...

15         A.    Unfortunately, no.

16         Q.    Oh, gees.  So you don't have a

17   great relationship with your dad; is that fair

18   to say?

19         A.    That would be an assumption on your

20   part that I would have to say is correct.

21         Q.    It's the first time I've ever made

22   an assumption in a deposition I've had the

23   witness agree with me.

24               Before summer of 2017, I take it

25   you're already living in a way that was

Page 45

```
 1   consistent with your gender identity, correct?

 2        A.    Yes.

 3        Q.    Approximately how long or when did

 4   you start living in a way that you would

 5   consider consistent with your gender identity?

 6        A.    Could you be more specific on the

 7   question?

 8        Q.    Sure.  And, again, I'm not trying

 9   to trick you, I'm just trying to get a sense of

10   the chronology.  You started in -- well, you

11   met and started seeing Tanya in 2002, and you

12   said within a year, you had told her that you

13   did not identify as a male.  So prior to

14   telling Tanya about your identity, were you

15   living in a way that was consistent or that

16   aligned with your gender identity?  Does that

17   make sense?

18        A.    Yes and no because I put a good

19   front on for people when I was out in front of

20   them, but behind the scenes, I was me.  I still

21   was me in front of them --

22        Q.    Sure.

23        A.    -- just they perceived me the way

24   they wanted to perceive me.

25        Q.    All right.  So prior -- okay.  So
```

Page 46

1   during that time -- and we'll just say prior to

2   2002; is that fair?

3          A.     Okay.

4          Q.     Prior to 2002 -- you actually don't

5   know the question.

6                 MS. BONHAM:  Objection.  Vague.

7          Q.     Prior to 2002, were you at least

8   publicly presenting in a way that allowed other

9   people to perceive you how they wanted to

10  perceive you; is that accurate?

11                MS. BONHAM:  Objection.  Vague.

12                THE WITNESS:  No.

13         Q.     No?

14         A.     No.

15         Q.     All right.  Well, then, I guess

16  explain to me, if you can, when you started to

17  live in a way that aligned with your gender

18  identity?

19                MS. BONHAM:  Objection.  Vague.

20                THE WITNESS:  ███ ███ ███

21         Q.     ███ ███ ███   That's your

22  birthday, right?

23         A.     It is.

24         Q.     And your testimony is that as an

25  infant, you were living in a way that was in

Page 47

1    alignment with your gender identity?

2              MS. BONHAM:  Objection.  Vague.

3    Mischaracterizes.

4              THE WITNESS:  Yes.

5         Q.    Okay.  So your gender identity --

6    what was your gender identity as of

7    ███ ███ ███

8         A.    Well, seeing as I really didn't

9    have much conscience experience around me,

10   there really wasn't much of a gender identity,

11   but I've always believed that I was female, so

12   therefore, I have to assume that even on my

13   birth date, that I was female.

14        Q.    So you don't know, but you're

15   assuming that as an infant, you were living in

16   a way that was consistent with your gender

17   identity as a female?

18        A.    Correct.

19             MS. BONHAM:  Objection.

20   Mischaracterizes testimony.

21        Q.    Did you ever -- did you ever live

22   or present yourself to the public in a way that

23   you would deem inconsistent with your gender

24   identity?

25        A.    No, because I always presented as

1   female.

2        Q.    Okay.

3            MS. BONHAM:  I can I just have one

4   second off the record?

5            MR. BLAKE:  Go ahead.  Oh, with

6   her?

7            MS. BONHAM:  No.  Just one second

8   off the record just to get something straight

9   as a matter of protocol.

10            (Discussion held off the record.)

11            THE WITNESS:  I think we're having

12   a little bit of problem on clarification here

13   as lived because I've lived my whole life as a

14   female.  How I, quote/unquote, presented myself

15   towards others would be how they would want me

16   to present myself as they perceived me to

17   present myself.  Does that give you a little

18   clarification between lived?  Because I've

19   lived my whole life as a female.

20        Q.    Sure.  So as an example, your

21   father, I think it's safe to assume, would have

22   wanted you or wanted to perceive you as a male;

23   is that accurate?

24        A.    I can't make a speculation on how

25   he wanted to perceive me.

CONFIDENTIAL

1      Q.    Is it your understanding that your

2  father would have wanted you to present or live

3  as a male?

4      A.    Again, I can't speculate towards

5  what his wants and desires are.

6      Q.    So I guess when you just said you

7  presented to others as they wanted to perceive

8  you, what does that mean?

9      A.    As I assumed that they wanted me

10 to --

11     Q.    So did you have any assumption

12 about your father wanted to perceive you as?

13     A.    Yes.

14     Q.    And what was that assumption?

15     A.    They wanted a hetero straight white

16 male.

17     Q.    All right.  And in 2017, the summer

18 of 2017, you informed your father that you were

19 not a hetero cisgendered male, right?

20     A.    No.

21     Q.    What did you inform your father?

22     A.    That I was not a hetero straight

23 white male.

24     Q.    That you were not a hetero straight

25 white male.

CONFIDENTIAL

                                                        Page 50

1              Okay.  What did you tell your

2    father you were?

3         A.    Me.

4         Q.    I could have predicted that.  And

5    so did you tell your father that you were

6    heterosexual?

7         A.    No.

8         Q.    Did you tell your father that you

9    were homosexual?

10        A.    No.

11        Q.    Did you tell your father that you

12   were cisgendered?

13        A.    No.

14        Q.    Did you tell your father that were

15   transgendered?

16        A.    No.

17        Q.    Did you tell your father that you

18   had a gender identity of a female?

19        A.    Yes.

20        Q.    Okay.  Did you explain to your

21   father what that meant?

22        A.    No.

23        Q.    Do you know whether he understood

24   what that meant?

25        A.    Seeing as he spit his beer all over

Page 51

1    the bar, yes.

2           Q.    Did he say anything else to you

3    other than spitting his beer on the bar?

4           A.    I do not recall what his exact

5    words were.

6           Q.    What was your impression?

7           A.    Unhappy.

8           Q.    Have you had any further contact

9    with him since then?

10          A.    Very minor.

11          Q.    And what have those contacts been

12   about?

13          A.    To see if he's still alive.

14          Q.    Have you guys had any further

15   conversations about your gender identity?

16          A.    No.

17          Q.    Your close friend, Erica, when did

18   you tell Erica about your gender identity?

19          A.    Technically, I never came out to

20   her.

21          Q.    What do you mean by that?

22          A.    I was introduced to her from Tegan.

23          Q.    So based on that introduction, like

24   Tegan's mother and Tegan's fiance, it's safe to

25   assume that Erica also understands that you're

Page 52

1    a transgendered person or --

2         A.    That is a good implication, yes.

3         Q.    What prompted you to tell Tanya

4    that you didn't identify as a male?

5         A.    Honesty in my relationship.

6         Q.    So before that time, did Tanya

7    believe that you were a male?

8         A.    We're -- you're stating that I

9    wasn't a male.  That I didn't identify as a

10   male would be the correct terminology, and I

11   don't know what her assumptions of me was.

12        Q.    Okay.

13        A.    I can't speak to that.

14        Q.    Sure.  You started dating her in

15   approximately 2002?

16        A.    Correct.

17        Q.    And at that time, you didn't know

18   what her notions were about your gender, your

19   gender identity or anything of that nature?

20        A.    Correct.  I did not know.

21        Q.    But then at some point, the

22   relationship progressed to the spot where you

23   felt it was appropriate to tell her, "I do not

24   identify as a male," or something like that; is

25   that fair?

Page 53

```
 1        A.     To some degree, vaguely, yes.

 2        Q.     I get it.  And, you know, I

 3   don't --

 4        A.     I know, you're not trying to trip

 5   me up.

 6        Q.     I'm not trying to trip you up.

 7               What was Tanya's reaction to the

 8   revelation that you did not identify as a male?

 9        A.     My perceived reaction of her

10   reaction would be shock and awe.

11        Q.     So at least up until that point in

12   the relationship, Tanya -- it's your perception

13   that Tanya believed your gender identity was

14   male?

15        A.     No, it is not my perception that

16   she believed that.

17        Q.     Okay.  What was your perception?

18        A.     I don't have a perception of what

19   she believed.

20        Q.     You remarked that she was shock and

21   awed when you told her that you did not

22   identify as a male, right?

23        A.     Correct.

24        Q.     Does that indicate to you that she

25   was surprised when you told her that you did
```

CONFIDENTIAL

1  not identify as a male?

2        A.    I think surprise would come along

3  with shock and awe, yes.

4        Q.    And if she was surprised that you

5  did not identify as a male, in your mind, is it

6  safe to assume that she perceived you as a male

7  prior to that conversation?

8        A.    No.

9        Q.    Okay.  What is your understanding,

10  if any, about that?

11        A.    I don't -- I do not make

12  assumptions of what's in other people's mind or

13  what they perceive.  It is impossible for me to

14  get inside someone's mind unless I'm a

15  telepath, which I don't know of anybody that is

16  a telepath.

17        Q.    So you don't know one way or the

18  other whether she perceived you or how she

19  perceived your gender identity prior to when

20  you told her that you did not identify as a

21  male?

22        A.    I do not know what she perceived me

23  as -- how she -- perception to my gender

24  identity.

25        Q.    Did she ever indicate to you one

Page 55

1  way or the other after that conversation what

2  her reaction was or what she had thought prior

3  to you telling her about your gender identity?

4       A.   No.  We never discussed it.

5       Q.   That was the first and only time

6  you discussed your gender identity?

7       A.   It's not the only time we discussed

8  my gender identity, but we never discussed what

9  brief -- what her thoughts were previous to

10  that.

11       Q.   Other than shock and awe, did she

12  have any other reactions?

13       A.   None that I'm going to discuss.

14       Q.   Okay.

15       A.   Intimate reactions would rather be

16  left off the record.

17       Q.   So other than sort of like

18  relationship, how this impacts the relationship

19  and, you know, you two as a couple, there

20  weren't any discussions about, you know, for

21  example, "Gee, this is surprising.  I really

22  thought you were a male?"  There wasn't

23  anything like that?

24       A.   No.  There was nothing to that

25  wording, no.

1      Q.    Well, I'm not asking you to that

2   wording, I'm saying similar to or like there

3   where she indicates what her belief was prior

4   to your disclosure and how that changed her

5   perception of you two as a couple afterwards.

6      A.    Not that I recall, no.

7      Q.    Okay.  We'd have to ask her about

8   that, I suppose, if we wanted more information,

9   right?

10      A.    I would say that would be the best

11   course of action, yes.

12      Q.    All right.  So setting aside the

13   folks that we just talked about, the people

14   that you've told, how many people have found

15   out that you're transgendered due to your birth

16   certificate --

17      A.    Oh.

18      Q.    -- approximately?

19      A.    Somewhere between ten and 20

20   people.  Maybe more.

21      Q.    Okay.  And we're going to get into

22   some of the incidents that you talked about in

23   the complaint and your response to discovery,

24   and if there are more people besides those

25   incidents, we can talk about them at that time,

Page 57

1   all right?  Is that okay with you?

2        A.    Okay.

3        Q.    Has your disclosure of your birth

4   certificate to any of these ten to 20 people

5   ever led to bodily harm?

6        A.    No.

7        Q.    You've never been assaulted

8   physically?

9        A.    Physically, no.

10        Q.    Verbally assaulted, perhaps?

11        A.    Yes.

12        Q.    Okay.  By a coworker, a colleague

13   at work or something like that?

14        A.    Colleague at work and a person in

15   the professional aspect.

16        Q.    All right.  We'll get into the

17   colleague at work, 'cause I think that is

18   discussed or mentioned in your complaint.  What

19   do you mean person in a professional context,

20   what does that mean?

21        A.    It's also the other incident in the

22   complaint.

23        Q.    Is that the TSA person?

24        A.    Correct.

25        Q.    Okay.  Other than those two times,

1  is there any other time that you've been

2  verbally assaulted?

3         A.    I mean, there's multiple at the one

4  facility where, you know, people were saying

5  things to me.

6         Q.    Right.  This is the colleague at

7  work?

8         A.    Correct.  It was the one colleague

9  that was brought up, but there was others also

10  in there that speak of how they would treat me,

11  so that's verbal assault.

12         Q.    Understood.  Was that at Zulily?

13         A.    That is correct.

14         Q.    So we have the Zulily, you know,

15  verbal assaults, and then we have the TSA

16  person that you -- we'll just call it verbal

17  assault.  Other than those two buckets of

18  assault, are there any other instances or

19  occurrences that you can think of related to

20  your birth certificate?

21         A.    Not to my knowledge.  Not that I

22  can recall.

23         Q.    Okay.  Are you familiar with the

24  Pride festival here in Columbus?

25         A.    Yes.

1       Q.    And have you attended the Pride

2  festival?

3       A.    Yes.

4       Q.    Do you participate?  Like, do you

5  go to parade or anything like that?

6       A.    Define participate.

7       Q.    Well, I mean, like, do you attend

8  the parade?  I attend the parade.  Have you

9  been to the parade?

10       A.    Yes, I have attended the parade.

11       Q.    Of course.  All right.  What about,

12  have you ever, like, marched in the parade or

13  been involved?

14       A.    No.

15       Q.    And the Pride festival, just so

16  it's clear, that's, right, a festival here in

17  Columbus and I suppose other places where they

18  celebrate all things that are LGBTQ related,

19  right?

20       A.    This is correct.

21       Q.    And, again, just so the record's

22  clear, part of the LGBTQ is the "T" stands for

23  transgendered, right, or transsexual; is that

24  right?

25       A.    No.

CONFIDENTIAL

Page 60

1        Q.    What does the "T" stand for, then?

2        A.    Transgender.

3        Q.    Transgender.  Thank you.  So just

4   to make sure the record's clear, part of the

5   LGBTQ is transgender, right?

6        A.    Correct, to my knowledge.

7        Q.    And you would consider yourself a

8   member of the transgender community, right?

9        A.    I do.

10       Q.    And you're not humiliated by your

11  status as a transgender person, right?

12             MS. BONHAM:  Objection.  Vague.

13             THE WITNESS:  Define what you mean

14  by humiliated.

15       Q.    Well, do you feel humiliation based

16  on your status as a transgender person?

17             MS. BONHAM:  Objection.  Vague.

18             THE WITNESS:  Again, I'm not

19  understanding what you mean by humiliated.  Do

20  you mean every day?  In what context are you

21  getting at humiliated because some people can

22  be humiliated by something that they wear one

23  day, but not another day.  You know, yes, I

24  know it's in reference to clothes and that's

25  kinds of like apples and oranges, but I'm

CONFIDENTIAL

Page 61

1    trying to understand what you mean by

2    humiliated.

3         Q.    Well, do you -- are you ashamed of

4    being a member of the transgender community?

5              MS. BONHAM:  Objection.  Relevance.

6              THE WITNESS:  No.

7         Q.    And so that's what I meant by a

8    feeling of humiliation.  If you are somehow,

9    you know, feel lesser or feel humiliated, just

10   as the common use of the word --

11             MS. BONHAM:  Objection.

12        Q.    -- with respect to a transgender

13   person?

14             MS. BONHAM:  Objection.

15             THE WITNESS:  I personally do not

16   correlate ashamed and humiliated in the same

17   sentence.

18        Q.    Okay.

19        A.    I know they are synonyms, but my

20   personal opinion and my experience is people

21   want me to feel ashamed or humiliated, the

22   terms that you were using, because I am part of

23   the transgender community, but I am proud of

24   who I am.

25        Q.    Right.  Okay.  And that was going

Page 62

1   to be my next question, right.  It's a point --

2   it's not something that you particularly feel

3   ashamed or humiliated about despite what other

4   people may try to project on you, but you

5   yourself feel proud, right?

6             MS. BONHAM:  Objection.  Compound.

7   Vague.  Misstates.

8             THE WITNESS:  I am proud of the

9   choices that I am currently making in my life

10  and who I am.

11      Q.   It's not something -- and by "it,"

12  your transgender status isn't something you try

13  to hide, right?

14            MS. BONHAM:  Objection.  Vague.

15  Misstates testimony.

16            THE WITNESS:  I don't know what you

17  mean by "hide," but I'm going to get to the

18  point of I live my life as Stacie Marie Ray.

19  Whether somebody knows that I'm transgender or

20  not is their assumptions and perspective, but I

21  don't wear it on my sleeve, as the saying goes.

22      Q.   Sure.  And you probably don't care

23  one way or the other what other people think

24  about your transgender --

25            MS. BONHAM:  Objection.

Page 63

1          Q.    -- status, right?

2                MS. BONHAM:  Objection.  Calls for

3    speculation.  Foundation.

4                THE WITNESS:  I don't know how to

5    answer that question, to be honest.

6          Q.    Well, do you care if somebody knows

7    about your transgendered status?

8          A.    Yes.

9          Q.    You do care?

10         A.    Yes.

11         Q.    In what way?

12         A.    Because they're making an automatic

13   assumption about me.

14         Q.    What's that assumption?

15         A.    That I'm transgender.

16         Q.    And do you consider yourself

17   transgender or not?

18                MS. BONHAM:  Objection.  Asked and

19   answered.

20                THE WITNESS:  I consider myself

21   transgender to the point of I don't agree with

22   what the doctors assigned my gender as a birth,

23   but yet I've always felt like a woman,

24   therefore, part of me always feels like I'm not

25   transgender, so there's two parts of that

Page 64

```
 1   question that I can't fully agree with your
 2   statement.  And I'm not trying to make it
 3   difficult for you, you're just -- I don't think
 4   you perceive how some of us are, and that's my
 5   perception from some of your wording.
 6        Q.   Well, it's fair to say you don't
 7   try to hide your gender identity as female from
 8   others, right?
 9             MS. BONHAM:  Objection.
10             THE WITNESS:  No.
11        Q.   And you present yourself to your
12   friends, your family, the public at large as a
13   female, right?
14             MS. BONHAM:  Objection.
15             THE WITNESS:  I present myself in
16   the identity that I am, which is female.
17        Q.   Are you familiar with the term
18   gender dysphoria or gender incongruence?
19        A.   I'm familiar with the term or the
20   wording of gender dysphoria, but not gender
21   incongruence.
22        Q.   Okay.  In my mind, those are
23   synonyms, but I'm happy to just use "gender
24   dysphoria" if that's the term you're familiar
25   with, okay?
```

Page 65

1          Is it your understanding that

2   gender dysphoria is a clinical diagnosis where

3   a person's biological sex does not match his or

4   her gender identity?

5          MS. BONHAM:  Objection.  Calls for

6   expert testimony.

7          THE WITNESS:  In my opinion, I am

8   not sure what the clinical definition of it is,

9   or not even in my opinion.  I am not sure what

10  the clinical definition of it is.

11      Q.   So you don't know one way or the

12  other whether being diagnosed with gender

13  dysphoria means that there's an incongruence

14  between a person's biological sex and his or

15  her gender identity; is that accurate?

16          MS. BONHAM:  Same objection.

17          THE WITNESS:  And same answer.  I'm

18  not sure what the medical definition of gender

19  dysphoria is.

20      Q.   But you acknowledge that you've

21  received a diagnosis of gender dysphoria,

22  right?

23      A.   I will acknowledge that I have

24  received a diagnosis of gender dysphoria, yes.

25      Q.   Would you agree that if two items

Page 66

```
 1   are incongruent with one another, they can't be
 2   the same logically?
 3              MS. BONHAM:  Objection.  Calls for
 4   speculation.  Vague.
 5              THE WITNESS:  It depends on what
 6   you're referring to.
 7        Q.    Well, I guess give me an example
 8   where two incongruent things can be the same.
 9              MS. BONHAM:  Same objection.
10              THE WITNESS:  Okay.  Pardon my
11   moving around.
12              You can have two identical tables
13   that look similar, appear to be similar, but
14   made of different things, therefore, they're
15   not the same, they're incongruent, but they
16   appear to be the same, so, therefore, they're
17   congruent.  Are you with me?
18        Q.    No, but...
19        A.    Okay.
20        Q.    I guess I don't -- so the tables
21   are -- and I don't want to beat this
22   hypothetical to death, but the tables are made
23   of different materials, but for all other
24   purposes, they look the same, so in your mind,
25   they're both congruent and incongruent?
```

CONFIDENTIAL

Page 67

1      A.     Correct.

2      Q.     Okay.

3      A.     Schroder's [sic] cat.

4      Q.     I got it.  The cat is dead, it's

5   not dead.  Sure.

6           MS. BONHAM:  So speaking of the

7   hypothetical, what's the point?

8           MR. BLAKE:  It's her hypothetical,

9   right?

10          MS. BONHAM:  Well, it's your

11  hypothetical.

12          MR. BLAKE:  Nope.

13          MS. BONHAM:  You're asking her to

14  provide, like, contextless, foundationless

15  testimony.

16          MR. BLAKE:  She disagreed with my

17  question which is that something that's

18  incongruent has to be different, right?  If two

19  things are incongruent, they cannot be the

20  same.  She disagreed with that.  I asked her to

21  provide an example.  She provided table

22  example.  Fine.

23          MS. BONHAM:  That's fine.

24          THE WITNESS:  The other example

25  that I would give is Schroder's cat.

CONFIDENTIAL

1     Q.    Sure.  Your claim or one of your

2   claims in the complaint is that the Department

3   of Health discriminates against transgender

4   people because they are not permitted to change

5   the sex identifier on their birth certificate;

6   is that accurate?

7         A.    I believe that's what it states in

8   the claim, yes.

9         Q.    And, again, that's not a direct

10  quote, it's -- but it's general understanding

11  of the claim, right?

12        A.    It is.  I believe it's what it

13  states, yes.

14              MS. BONHAM:  I'd just like to

15  remind us of the continuing objection and maybe

16  just get you to agree to it.

17              MR. BLAKE:  Noted.  Yeah.

18              MS. BONHAM:  We have an issue with

19  "biological sex."

20        Q.    Are you aware of any laws in Ohio

21  related to birth certificates that mention

22  transgender individuals?

23        A.    I am not an expert on Ohio law, no.

24        Q.    But it's fair to say that you're

25  not aware of if there are laws one way or the

CONFIDENTIAL

Page 69

1  other?

2        A.    Correct.

3        Q.    Same question with just a slight

4  deviation.  Are you aware of any laws in Ohio

5  related to birth certificates that make any

6  mention of gender?

7        A.    Again, I'm not an expert on Ohio

8  law.

9        Q.    Do you know whether Ohio laws

10 permit anyone, regardless of gender, to change

11 their sex marker on their birth certificate?

12        MS. BONHAM:  Objection.  Calls for

13 a legal conclusion.

14        THE WITNESS:  I will let you know

15 that I do not know of any laws like that, but

16 there was a young lady, which I do not recall

17 her name, at the Department of Health who told

18 me at one time they did allow and did do marker

19 changes on birth certificates.

20        Q.    Do you know if that was pursuant to

21 any law in Ohio or --

22        A.    I do not know.

23        Q.    Irrespective of what that person

24 you just mentioned told you about what

25 Department of Health's policy or procedures or

CONFIDENTIAL

Page 70

1    practice may have been previously, is it your

2    understanding that currently, the Department of

3    Health will not change a birth certificate

4    based on gender identity?

5        A.    She told me that they would never

6    change another birth certificate ever again,

7    her exact words.

8        Q.    Do you recall the -- the name of

9    that person?

10       A.    I do not.

11       Q.    Do you recall approximately when

12   that was told to you?

13       A.    It was the same day as the TSA

14   incident.

15       Q.    All right.  So is it your

16   understanding that ODH will not change a birth

17   certificate based on gender identity regardless

18   of whether the person is transgender or

19   cisgender or anything else?

20           MS. BONHAM:  Objection.

21   Foundation.

22           THE WITNESS:  I personally don't

23   know what their policy is or why they won't

24   change it.  She just told me they would never

25   change it ever again.

CONFIDENTIAL

1      Q.    But you don't know one way or the

2   other whether that's a rule that only applies

3   to transgendered people or whether it applied

4   to everyone?

5            MS. BONHAM:  Objection.  Calls for

6   a legal conclusion.  Foundation.

7            THE WITNESS:  Again, I don't know.

8      Q.    Do you understand that Ohio has

9   laws related to the birth certificates?

10     A.    No.

11     Q.    You don't know whether Ohio has any

12  laws what regarding how the records are created

13  or maintained or updated or anything like that?

14     A.    Again, I'm not an expert on law or

15  Ohio law, so, therefore, no.

16     Q.    Okay.  So you wouldn't know when,

17  if ever, Ohio's laws related to birth

18  certificates were enacted?

19            MS. BONHAM:  Objection.

20  Foundation.  Asked and answered.

21            THE WITNESS:  No.

22     Q.    And you don't know who sponsored

23  such a bill if any existed?

24            MS. BONHAM:  Same objection.

25            THE WITNESS:  Again, no.

Page 72

1      Q.    Whether it was started in the house

2   or the senate?

3      A.    Again, no.

4      Q.    Whether or how the bill was

5   received in a committee, if at all?

6      A.    Again, no.

7      Q.    Whether there was any testimony

8   regarding such a bill?

9      A.    No.

10     Q.    Whether there was any testimony or

11   evidence presented by the chamber regarding the

12   bill?

13          MS. BONHAM:  Continued objection to

14   this line of apparently irrelevant questions.

15          THE WITNESS:  No.

16     Q.    And you're not aware of any

17   legislative purpose related to Ohio's laws, if

18   any, regarding birth certificates?

19          MS. BONHAM:  Objection.  Calls for

20   a legal conclusion.

21          THE WITNESS:  Again, not an expert

22   on Ohio law.  I do not know of any laws.  I am

23   not aware of any laws on this matter.

24     Q.    Do you have any evidence at all

25   that Ohio's laws, if any, regarding the

CONFIDENTIAL

Page 73

1    amendment of its birth records are motivated by

2    any hatred or ill will towards transgendered

3    people?

4              MS. BONHAM:  Objection.

5    Foundation.  Calls for a legal conclusion.

6              THE WITNESS:  Again, I'm not an

7    expert on Ohio law.  No, will I speculate

8    whether a law was passed in malice or not, if

9    there is such a law.

10       Q.   But you don't have any evidence

11   about it at this point?

12             MS. BONHAM:  Objection.  Calls for

13   a legal conclusion.

14             THE WITNESS:  Again, I have -- I'm

15   not an expert on Ohio law, nor will I make any

16   speculations if there is any laws.  I do not

17   have any evidence towards any Ohio laws nor

18   have I studied any Ohio laws.

19       Q.   All right.  Let's take a look back

20   at your birth certificate, if you would,

21   Defendants' Exhibit 1.  Do you know what a

22   public record is?

23       A.   Yes.

24       Q.   What's your understanding of a

25   public record?

CONFIDENTIAL

Page 74

1      A.    Any record that's available to the

2   public.

3      Q.    Would you consider your birth

4   certificate a public record.

5            MS. BONHAM:  Objection.

6   Foundation.

7            THE WITNESS:  With cause.

8      Q.    What do you mean by "with cause"?

9      A.    You have to have cause to pull

10  somebody's birth certificate.

11     Q.    Okay.  Are you aware that anyone

12  can go to any county health department in Ohio

13  and as long as you know their name and

14  approximate birth year of an individual, you

15  can request the birth certificate with or

16  without any cause?

17     A.    No.  That is not my understanding.

18     Q.    Okay.  But like you said before,

19  you haven't looked into the law regarding birth

20  certificates, so...

21     A.    I'm not an expert on the laws.

22     Q.    Would it surprise if you that was

23  the law?

24     A.    Yes.

25     Q.    All right.  As we talked about

Page 75

1    before, your birth record reflects sex and

2    male.  Do you recall that?

3              MS. BONHAM:  Objection.  Misstates

4    testimony.

5              THE WITNESS:  I do recall some

6    mentioning of it, yes.

7         Q.   I mean, that's what your birth

8    certificate says, right?

9              MS. BONHAM:  Objection.

10             THE WITNESS:  That is what is

11   printed upon this record, yes.

12        Q.   Okay.  And that information was

13   recorded by the Department of Health based on

14   information provided by the medical provider at

15   or near the time of your birth, right?

16             MS. BONHAM:  Objection.

17   Foundation.

18             THE WITNESS:  To the best of my

19   understanding, that is the way it works.

20        Q.   And the medical provider determined

21   your sex as male at the time of birth, right?

22             MS. BONHAM:  Objection to the term

23   "sex."  Foundation.

24             THE WITNESS:  I can't speculate how

25   he determined it.

CONFIDENTIAL

1      Q.    All right.  So I didn't ask how the

2   medical provider, he or she, determined your

3   sex, I think I just asked whether the medical

4   provider determined your sex as male at the

5   time of birth.  We can agree on that, right?

6              MS. BONHAM:  Same objection.

7              THE WITNESS:  I would word it they

8   made an assumption upon my gender.

9      Q.    Okay.  They made an assumption

10   about your gender based on what?

11              MS. BONHAM:  Objection.

12   Foundation.

13              THE WITNESS:  I don't know what

14   their criteria is they use.

15      Q.    Okay.  Would you agree that it was

16   accurate for the medical provider to report

17   your sex as male as reflected on your birth

18   certificate at the time of birth?

19      A.    No.

20      Q.    All right.  Do you think -- do you

21   think it would have been accurate for the

22   medical provider to have reported your sex at

23   birth as female on the birth record?

24              MS. BONHAM:  Objection.

25              THE WITNESS:  No.

CONFIDENTIAL

Page 77

1          Q.    Okay.  So you don't believe male
2     would have been accurate, right?
3          A.    Correct.
4          Q.    And you don't believe female would
5     have been accurate?
6          A.    Correct.
7          Q.    What do you believe should have
8     been reported as your sex at birth?
9          A.    You're asking me to speculate what
10    they should put down in their mind, and I can't
11    do that.
12         Q.    No, I'm not asking you what they
13    should put down in their mind, I'm asking you:
14    What do you believe would have accurately
15    reflected your sex at birth?
16         A.    Female.
17         Q.    Okay.  Based on what criteria would
18    the medical provider have been able to
19    determine that your sex was female at the time
20    of birth?
21              MS. BONHAM:  Objection.  Calls for
22    expert testimony.
23              THE WITNESS:  Well, one, I'm not an
24    expert in the medical profession; two, I don't
25    know what criteria they did use nor should I

Page 78

1   speculate on what criteria they should use.

2        Q.    You don't have any idea what the

3   medical provider used to determine your sex as

4   male at the time of birth?

5   ██     ██

6   ██    ████  ████  ████  ████  ██████

7        ████  ████   ██████

8        ████  ████   █ █  ████  ████  ██

9   ████

10  ██    ████  ████   ████  ████

11  ██    ████ ██  ██████   ████  ██  ██

12  ██████  ██  ██  ████

13  ██    ████  ██  ████  █  ████  ██  ████  ████

14  ██████  ████

15        MS. BONHAM:  Objection.  Invasive.

16  Irrelevant.  Calls for expert testimony.

17        ████  ████  ██  ██  ██  ██  ██

18  ██████  ████

19  ██    ████  ████  ██  ████  ██

20  ██████  ████  ████  ████  ██  ████

21  you think it would have been accurate for the

22  medical provider to report to the Department of

23  Health that your sex was, in fact, female?

24        MS. BONHAM:  Objection.  Misstates

25  testimony.  Calls for expert testimony.

Page 79

1  Foundation.  Calls for legal conclusions.

2          THE WITNESS:  Again, not an expert.

3  Do not know the criteria that they use to

4  report, ███ ██████ █ █████ █ ████ █ ██████  that

5  does not determine in my mind what should be

6  reported on a birth certificate.

7      Q.    You say you don't know what

8  criteria go into a medical provider's

9  determination of sex at the time of birth,

10  right?

11      A.    That is correct.

12                  -  -  -  -  -

13          (Thereupon, Deposition Exhibit 2,

14           Complaint, was marked for purposes

15           of identification.)

16                  -  -  -  -  -

17      Q.    I've just handed you Defendants'

18  Exhibit No. 2, which is a copy of the complaint

19  that you, among others, filed in this matter.

20  The first named defendant is Stacie Ray.

21  That's you, right?

22      A.    That is correct.

23      Q.    I'm sorry.  The first named

24  plaintiff, Stacie Ray, that's you, right?

25      A.    That is correct.

CONFIDENTIAL

1      Q.    Did you review this complaint

2  before it was filed?

3      A.    I did.

4      Q.    Did you have input into its

5  preparation and so forth?

6      A.    Clarify "input."

7      Q.    Well, I mean, did you provide facts

8  and allegations and so forth?

9      A.    I provided facts and statements to

10  incidents that had happened to me, yes.

11      Q.    And before it was filed, did you

12  review it and approve it for filing?

13      A.    Before it was filed, yes, I

14  approved my portion of the complaint.

15      Q.    Did you review the facts that were

16  filed in support of your allegations?

17      A.    I believe I did, but I do not

18  recall what they were.

19      Q.    All right.  If you turn to Page 5

20  and look at Paragraph 20, it says:  A person's

21  gender marker on a birth certificate is usually

22  designated at birth based solely on the

23  appearance of external genitalia.

24            Do you see that?

25      A.    I do.

Page 81

1      Q.    Having read that or had that
2  paragraph read to you, does it refresh your
3  recollection as to what a medical provider uses
4  to designate an individual's sex at the time of
5  birth?
6              MS. BONHAM:  Objection.  Misstates
7  testimony.  Foundation.
8              THE WITNESS:  If this is the
9  criteria that they use, I did not know that
10  that was the actual, quote/unquote, medical
11  criteria that they use as stated.
12      Q.    All right.  Do you have any
13  evidence to support the allegation or your
14  statement, which you just made, ███  ██
15  ████  █████  ███  ███  ████  █████
16  █████  █████  ████  ███  █  ████  ███
17  ████  ███  █  █  █  ████  █  ████
18              MS. BONHAM:  Objection.  Misstates
19  testimony.  She literally did not say that.
20              THE WITNESS:  Again, I said that I
21  do not know what the medical criteria that they
22  use to determine.
23          █  ███  █  ██  ████  ███  █████  █
24  █████  ████  █  █  ███  ███  ███
25  █████  ████  ██  █  ███

Page 82

1          MS. BONHAM:  Objection.  Asked and

2     answered.  Foundation.  She's saying repeatedly

3     that she doesn't know.

4          THE WITNESS:  Not a medical expert.

5     I am not an medical expert, I should say.  I do

6     not know the criteria.  I have no evidence

7     towards what the criteria is or is not.

8          Q.   ████ ████ ███████ ██ ███ ████ █

9     █████ ███ ████████ ████████ you would agree

10    that it was accurate for the medical provider

11    to report your sex as male to the Department of

12    Health, correct?

13          MS. BONHAM:  Objection.

14    Argumentative.  Asked and answered.

15    Foundation.

16          THE WITNESS:  Again, I'm going to

17    go back to no.

18          Q.   No, you think it was inaccurate for

19    the doctor to report your sex as male to the

20    Department of Health ████ ██ ██ █████ █

21    ████ █████ ██████ █ █ █ █ █████

22          MS. BONHAM:  Vague.

23          THE WITNESS:  I answered no, that I

24    did not agree with the statement you had made.

25          MR. BLAKE:  Okay.  Could you read

Page 83

1    back my question that she answered "no" to?

2              (Question read back as requested.)

3         Q.    Upon what basis do you contend that

4    the medical provider's information provided to

5    the Ohio Department of Health on your birth

6    certificate was inaccurate?

7              MS. BONHAM:  Objection.  This

8    entire line of testimony calls for expert

9    testimony and misstates her testimony

10   completely.  She's answered to the best of her

11   personal knowledge already.

12             THE WITNESS:  Again, not an expert

13   on the law, not an expert on the criteria, not

14   an expert on what they should report and not

15   report, so I have no -- I can't help you with

16   that.

17        Q.    You don't have any -- you don't

18   have an answer to my question?

19             MS. BONHAM:  Objection.  Misstates

20   testimony.  Asked and answered.

21             THE WITNESS:  I had an answer.  I'm

22   not an expert on the law, I'm not an expert on

23   the criteria.  I cannot provide you on what

24   they should provide the Department of Health.

25        Q.    And so ███████ ███ ████ █████ ████

Page 84

1  ██████ ████ █████ ████ ████ ██████ ██ ██ ████

2  █████ ████ █ ████ █ ███ ████ ██████ you

3  disagree that your birth certificate accurately

4  reflects your sex as reported at the time of

5  birth?

6         MS. BONHAM:  Objection.  Vague.

7  Compound and calls for expert testimony.

8  Misstates testimony.  Continuing objection to

9  terms of art like "sex" and ██████ █████████

10 We've been at this for, like, ten minutes.

11        THE WITNESS:  I don't know what you

12 want from me on that question.  I really don't.

13        MR. BLAKE:  Can you read the

14 question again?  Let me know if there's a point

15 that's not clear, but can you read the question

16 again?

17        (Question read back as requested.)

18        THE WITNESS:  I do disagree.

19    Q.    You have your birth record there in

20 front of you, Defendants' Exhibit 1.  The birth

21 certificate doesn't include a gender marker,

22 correct?

23        MS. BONHAM:  Objection to the term

24 "gender marker."  Calls for a legal conclusion.

25        THE WITNESS:  No words that say

Page 85

1    "gender" or "marker" on the birth certificate,

2    no.

3         Q.    And your birth certificate does not

4    record a gender identity, right?

5                   MS. BONHAM:  Same objection.

6                   THE WITNESS:  Those words are not

7    present on the document in front of me.

8                   MS. BONHAM:  Is it okay to take a

9    break?  There's no question pending.

10                  MR. BLAKE:  There's no question

11   pending.  That's fine.

12                  MS. BONHAM:  Thanks.

13                      -  -  -  -  -

14                  (Thereupon, Deposition Exhibit 3,

15                  Ohio Department of Health Form, was

16                  marked for purposes of

17                  identification.)

18                      -  -  -  -  -

19                  (Recess taken.)

20        Q.    I have just handed you what

21   highways been marked as Defendants' Exhibit 3.

22   And I can tell you that this is a generic form

23   of all the data that the Ohio Department of

24   Health tracks when a person is born in Ohio.

25   Have you ever seen this document or any

Page 86

1    document like it before?

2         A.    No.

3         Q.    Okay.  You can -- well, I hate to

4    do this to you, but does this form record

5    gender or gender identity?

6              MS. BONHAM:  Objection.

7    Foundation.

8              THE WITNESS:  I've currently

9    skimmed to Page 6.  I mean, if we want to

10   continue to waste time, we can, but I don't

11   know.  I do not see it, but I don't know.

12        Q.    Are you aware of any form or

13   records maintained by the Department of Health

14   that track a person's gender or gender

15   identity?

16             MS. BONHAM:  Objection.

17   Foundation.

18             THE WITNESS:  I do not know ODH's

19   practices or policies.

20        Q.    So the answer to that question is

21   no?

22             MS. BONHAM:  Objection.

23        Q.    You're not aware?

24             MS. BONHAM:  Misstates testimony.

25             THE WITNESS:  Again, I'm not aware

CONFIDENTIAL

Page 87

1    of the -- ODH's practices or policies and what

2    they do or not do.

3         Q.    Are you familiar with the term

4    "karyotype"?

5         A.    No.

6         Q.    You've never heard that term?

7         A.    I think it was mentioned to me

8    yesterday.

9         Q.    Well, I don't want to hear about

10   any conversations you had yesterday 'cause

11   those were likely with counsel, but what about

12   chromosomes, generally, have you heard that

13   term used before?

14        A.    I have a very limited knowledge of

15   chromosomes.

16        Q.    Me too.  So if -- if someone had XX

17   chromosomes, would that indicate to you that

18   their sex was female?

19             MS. BONHAM:  Objection.

20   Foundation.  Calls for expert testimony.

21             THE WITNESS:  To be honest, I'm not

22   a medical expert.  I can't even tell you -- no.

23   I don't know.

24        Q.    Okay.

25        A.    And there's my limited knowledge.

Page 88

1      Q.    Are you aware that someone's

2  biological sex is determined by chromosomes?

3           MS. BONHAM:  Objection.  Calls for

4  a legal conclusion.  Calls for expert

5  testimony.  Argumentative.

6           THE WITNESS:  No.

7  ████     ███   ████████   ███  ██  ████

8  ████ █ ████████   ████  ██████  ██  ███████

9  ████  █████  ███████  ██ ██ █████  ██████

10 ███████   ███

11     ██    ███

12    ██   ████  ██ █   █████  █████  ████  ███

13 █████  ███  ████████  █████  ████  ████  ███

14 ████  ████  ███████  ██  █████  █ █████  ███

15 ███████  ████  ████

16           MS. BONHAM:  Objection.  Compound.

17 Foundation.  Calls for expert testimony.

18           THE WITNESS:  I don't believe I'm

19 able to answer that question ████ █ ███

20 ████  ████  ██  ██████  ██  ████

21    ██   ███  ███  █████  ██  ███  ██████

22 ███  ████  ███  █████  ████  ██  ██  ██████

23 ████  ████  █████████  █████  █████

24           MS. BONHAM:  Objection.  Asked and

25 answered.

CONFIDENTIAL

1           THE WITNESS:  Again, ███ █

2  ███████ █ ████ ████ █ ██████████ ████

3       Q.    Are you aware of any procedure by

4  which a person can change their chromosomes?

5           MS. BONHAM:  Objection.

6  Foundation.

7           THE WITNESS:  No.

8       Q.    Are you aware of any method by

9  which a person's gender identity can be

10  determined at the time of birth?

11           MS. BONHAM:  Objection.

12  Foundation.  Asked and answered.

13           THE WITNESS:  I am unaware -- I'm

14  not a medical expert and I'm not in any

15  position to speculate on how someone determines

16  gender identity.

17       Q.    When did you determine that your

18  gender identity did not match your biological

19  sex?

20           MS. BONHAM:  Objection.

21           THE WITNESS:  January 1982.

22       Q.    You were approximately nine years

23  old at that time?

24       A.    Correct.

25       Q.    Prior to that time, did your gender

Page 90

1    identity match the sex recorded on your birth
2    certificate?
3                MS. BONHAM:  Objection.
4                THE WITNESS:  Prior to that time, I
5    was ignorant to the subject.
6        Q.    So you didn't know one way or the
7    other?
8                MS. BONHAM:  Objection.  Misstates
9    testimony.
10                THE WITNESS:  I was ignorant to the
11   subject of gender identity, my gender identity.
12       Q.    Since that time, did you start
13   living your life -- and when I say "that time,"
14   since you were nine years old, did you start
15   living your life as a female?
16                MS. BONHAM:  Objection.  Asked and
17   answered.
18                THE WITNESS:  At nine years of age,
19   I knew something was very different about me.
20   I had discussions about it and I was told to
21   never talk that way again.
22       Q.    Who did you have discussions with?
23       A.    My mother.
24       Q.    I think earlier, there was some
25   testimony about living your life in a way that

1  you could present the identity to the person --

2  to the other person in the way that they wanted

3  to perceive you.  Is that accurately stating

4  what you testified to before?

5              MS. BONHAM:  Objection.

6              THE WITNESS:  It would be a very

7  offshoot way of twisting what I said, yes.

8       Q.   Yeah.  I mean, I don't want to

9  twist your words.  That was a confusing part of

10  your testimony for me, and I just -- my

11  recollection was that you -- you testified that

12  you presented yourself in a way that allowed

13  others to perceive sort of what they wanted to

14  perceive about your identity.

15             MS. BONHAM:  Same objection.

16      Q.   Is that right?

17      A.   I don't know if this is verbatim to

18  what I said earlier.

19      Q.   Sure.

20      A.   But -- okay.  Let's change this up

21  a little bit so we can understand each other a

22  little better.

23      Q.   Thank you.

24      A.   A little more clearly.

25             Until I was 18, I didn't have a

CONFIDENTIAL

Page 92

1   choice.  I had to wear what I was told to wear

2   and do what I was told to do, and I wasn't

3   brave enough to be myself for a little while

4   afterwards, so I still kept the façade up for a

5   while.  Is that understandable?

6          Q.    It makes sense to me.

7          A.    Thank you.

8          Q.    So nine years old, you realize

9   there was something different about you and you

10  started to understand that it had something to

11  do with your gender identity; is that accurate?

12         A.    To some degree, yes.

13         Q.    And I get it and I think it's

14  probably completely natural that these things

15  don't happen like an on-and-off switch, right?

16         A.    Correct.

17         Q.    You kind of come to -- as everyone

18  sort of comes to their identity over the course

19  of several months or years or even decades,

20  right?

21              MS. BONHAM:  Objection.

22              THE WITNESS:  I can't speculate on

23  others, I can only speculate on my account.

24         Q.    Is that consistent with your

25  experience?

CONFIDENTIAL

Page 93

```
 1        A.    My personal experience is what I
 2   felt -- at nine years of age, I seen a
 3   television show called Love Boat.
 4        Q.    Yeah.
 5        A.    I don't know if you're old enough
 6   to remember it or not.
 7        Q.    I don't know either.
 8        A.    Probably not.  At the time, I seen
 9   a female that had changed from male to female.
10        Q.    Correct.
11        A.    And this let me know that there was
12   hope for me that I could live my life the way I
13   feel, the way I believed that I was and am.  So
14   it was more of a conscious awareness that was
15   presented to me, and I can't state that
16   everybody has that revelation.  I knew
17   something was different even when I was younger
18   than that, but that's the point of when I knew
19   what it was exactly -- that I could pinpoint
20   exactly what it was.
21        Q.    Yeah.  So prior to that, and it's
22   not surprising as a young child, you didn't
23   necessarily have the vocabulary or the
24   experience to even say what it was, right?
25        A.    If the question you're asking is
```

CONFIDENTIAL

Page 94

1   did I understand before then, then yes, that
2   would be correct.
3       Q.   Okay.  And then for some period of
4   time because of societal pressures from your
5   parents or friends or whomever, your family
6   members, you conformed to an identity which you
7   did not necessarily agree with, right?
8           MS. BONHAM:  Objection.
9           THE WITNESS:  No.
10      Q.   No.  You were -- okay.  So I
11  thought what you had said that until you were
12  18 you didn't have a choice, you had to live
13  your life in a certain way, and then there was
14  a period of a few years after that where you
15  still were sort of coming out of that pressure
16  before you were finally able to start
17  expressing your gender identity in the form
18  that you are today.
19          MS. BONHAM:  Objection.
20          THE WITNESS:  But you're saying
21  that I lived that gender identity, no.  I still
22  had the gender identity of female.
23      Q.   Okay.  You presented on -- to
24  others on the outside as a gender identity you
25  didn't agree with; is that accurate?

Page 95

1      A.    I would say that's not even

2  accurate, no.

3      Q.    Okay.  Tell me --

4      A.    My personal experience is, as I

5  stated earlier, I wore the clothes that I was

6  told to wear, I acted the way I was told to act

7  until I was 18.  Once I was 18, my actions

8  became a little different, little more me, but

9  I wasn't brave enough to -- to change the

10  clothes yet.

11      Q.    Okay.  So when did you become brave

12  enough to change the clothes?

13      A.    August 24th, 2016.

14      Q.    Why does that date stick in your

15  mind?

16      ████    █████  ████  ████ █  █████  ██████

17  ███████  █████  ██████  █████  ██  ███

18  █████ █████  ██████

19      Q.    That was about the same time that

20  you were attending these transgender support

21  groups, right?

22      A.    Actually, I started the transgender

23  support groups after, so maybe it was 2015.

24  I'm sorry.

25      Q.    So August 2015, ████  █████  █████

Page 96

1

2          A.      Correct.

3          Q.      And then the following year, you

4     start attending some transgender support

5     groups, but it was several years before that

6     that you had informed your now wife, then

7     partner, Tanya, that you didn't identify as a

8     male; is that accurate?

9          A.      That is accurate.  And I'm going to

10    ask you real fast.  You keep saying her name's

11    "Tanya" and I said "Tanya."

12         Q.      Oh, sorry.

13         A.      So I don't know what spelling you

14    have down, but if it's T-o-n-y-a, that is

15    incorrect.  It's T-a-n-y-a.

16         Q.      Thank you for --

17         A.      Just for the record.

18         Q.      Thank you for spelling that.  I had

19    it spelled properly, I just was pronouncing

20    a -- I guess goofy "A."  "Tanya."

21              So at least until

22    August 24th, 2015, you were still wearing men's

23    clothing, right?

24         A.      No.

25              MS. BONHAM:  Objection.

1    Q.    No.  All right.  So as you said

2  before, you weren't brave enough until

3  August 24th, 2015 ████  ███  ████████  ███████████

4  █████████  ███████████████  ████████████  correct?

5    A.    That is correct.

6    Q.    So I guess we need to sort of flesh

7  ow what you meant by "brave enough."  Prior to

8  that date, were you exclusively wearing men's

9  clothing?

10          MS. BONHAM:  Objection.

11          THE WITNESS:  No.

12    Q.    Okay.

13    A.    I -- on that date is when I

14  exclusively switched to women's clothing only.

15  There was a combination from the time I was 18

16  until then that I would wear either/or.

17    Q.    And would it depend in part of what

18  social setting you were in?

19    A.    Depended in part on what I wanted

20  to pick out of the closet that day.

21    Q.    Okay.  No other considerations than

22  just what was on top?

23          MS. BONHAM:  Objection.

24          THE WITNESS:  It would be the same

25  as how you picked that tie today.

CONFIDENTIAL

Page 98

1      Q.    Fair enough.

2            You have a driver's license, right?

3      A.    I do.

4      Q.    Do you know how often you update

5   the driver's license approximately?

6      A.    I believe Ohio regulations state

7   that it has to be every four years.

8      Q.    Yeah.  Give or take, right?

9      A.    I don't think that the law says

10  "give or take."  I think it's exclusively to a

11  set time frame.

12     Q.    Okay.  Do you ever change your hair

13  color?

14     A.    I probably should.

15     Q.    Do you know what the hair color is

16  on your driver's license?

17     A.    It says brown.

18     Q.    Okay.  Have you ever, when you go

19  in and update it, said it's, you know, blonde

20  or some other color?

21     A.    If it doesn't change, then no, I

22  didn't, but it kind of has.

23     Q.    Do you think the next time you go

24  in, you're going to change your hair color on

25  your driver's license?

Page 99

1        A.      Yeah, to say dirty blonde/gray.

2        Q.      I don't know if they have dirty

3   blonde.  Gray might be one.  Yeah, gray might

4   be one, but okay.

5                And what about weight, do you ever

6   update your weight when you update your

7   driver's license?

8        A.      I'll be honest, I lie about that.

9        Q.      Well, I think everybody lies about

10  it, but it has changed over time, correct?

11       A.      I would -- I would hope so, yes.

12  Unfortunately, I need it to change again, but

13  in the other direction.

14       Q.      And what about your address, you

15  update and change your address on your driver's

16  license?

17       A.      I let the Department -- Department

18  of Motor Vehicle know my address, but I don't

19  always get a new license because I hold a

20  commercial driver's license and it is quite

21  expensive to have a new printout down.

22       Q.      So the way that works, right, is

23  you send in an update form and they send you a

24  little card that you can keep with your

25  driver's license, right?

Page 100

1          A.    I just go in and tell them and they
2     just give me a card.
3          Q.    Okay.  I think I've done that once
4     before too because I was a year or something, I
5     didn't feel like paying the fee.
6               Have you ever been pulled over,
7     traffic stop?
8          A.    Yes.
9          Q.    And so you're familiar, you know,
10    the officer walks up to the window and says,
11    "Driver's license, registration, insurance,"
12    something like that, right?
13         A.    Something to that effect, yes.
14         Q.    You've never been asked to show
15    your birth certificate during a traffic stop,
16    right?
17         A.    To the best of my knowledge, no.  I
18    have personally never been asked, no.
19         Q.    Driver's license, at least as best
20    as we can, should be current documents so that
21    law enforcement can do his job, right?
22         A.    Yes.
23         Q.    You ever use your birth certificate
24    to buy beer?
25         A.    No.

CONFIDENTIAL

Page 101

1      Q.    Get into an R rated movie?

2      A.    No.

3      Q.    Get into a bar?

4      A.    No.

5      Q.    Verify a credit card purchase?

6            MS. BONHAM:  Objection.

7            THE WITNESS:  No.

8      Q.    Get on a plane?

9            MS. BONHAM:  Objection.

10           THE WITNESS:  Yes.

11     Q.    All right.  Tell me the time when

12   you used your birth certificate to get on a

13   plane.

14     A.    I had of my birth certificate sent

15   to me when I flew to Florida because I was

16   putting down female at the TSA agent ███ ████

17   ██████ ███ █████ ████ ██ ██ ████ ████

18     Q.    So they sent you a birth

19   certificate -- someone sent you a picture of

20   your birth certificate on your phone or

21   something?

22     A.    Correct.

23     Q.    And you used that picture of the

24   birth certificate to convince TSA what?

25     A.    That I was transgender.

CONFIDENTIAL

Page 102

1          Q.    Okay.

2          A.    So I didn't have to strip.

3          Q.    Okay.  All right.  What about to

4     rent a car?

5          A.    No.

6          Q.    And you don't carry your birth

7     certificate with you, do you?

8          A.    Not always, but sometimes.

9          Q.    Okay.  It's not on you right now,

10    is it?

11         A.    No.

12                MS. BONHAM:  Other than the

13    deposition exhibit.

14                THE WITNESS:  Oh, yes.

15                MR. BLAKE:  Noted.

16                THE WITNESS:  That's a good catch.

17         Q.    Yeah.  Other than the copy that I

18    provided to you earlier today, you didn't bring

19    a copy of your birth certificate with you,

20    right?

21         A.    I personally did not bring my own

22    copy with me, no.

23         Q.    And you would agree that a driver's

24    license is a much different document than a

25    birth certificate, right?

Page 103

1         MS. BONHAM:  Objection.  Calls for

2    a legal conclusion.  Foundation.  Calls for

3    speculation.

4         THE WITNESS:  Define.

5    Q.    Define different?

6    A.    You said it's -- am I -- I may be

7    misquoting you here, but you said that it is a

8    different legal document.

9    Q.    It is a much different document

10   than a birth certificate.

11        MS. BONHAM:  Same objection.

12        THE WITNESS:  Yes, it is a

13   different document.

14   Q.    All right.  If you can go back to

15   Exhibit 2, which is the complaint, Defendants'

16   Exhibit 2.  Let me know when you're done.

17   A.    You haven't given me a page number.

18   Q.    Oh, you have the exhibit in front

19   of you?

20   A.    I do.

21   Q.    Paragraph 52.

22   A.    Page?

23   Q.    Page 11.

24   A.    Thank you.  Okay.

25   Q.    It says:  Ms. Ray is aware of the

Page 104

1   high incidents of harassment, discrimination
2   and violence directed at transgender people.
3   In her work as a truck driver, she has been
4   harassed and menaced at truck stops and rest
5   stops.  As a result, she must take precautions
6   for her personal safety.  For example, Ms. Ray
7   uses highway rest stops designed for use by the
8   general population rather than designated truck
9   stops.  This is because lighting, security
10  cameras, quick accessibility to the highway and
11  the presence of police is better at rest stops
12  and truck stops.
13           Do you see that?
14      A.   I do.
15      Q.   You've never been required to show
16  your birth certificate to anyone at a truck
17  stop or rest stop, have you?
18      A.   Not in the current states I've been
19  driving, but I will make an addendum if I go to
20  North Carolina and they ask for it, I must
21  present it.
22      Q.   So if you go to North Carolina to a
23  truck stop, they can ask you for your birth
24  certificate?
25      A.   If I go to North Carolina and I am

1  subjected to DOT regulations which means I can

2  be pulled over any time I have to go into weigh

3  stations, their law down there states that I

4  must be able to present a birth certificate.

5      Q.    So is that why, when I asked you do

6  you carry it with you, you answered sometimes?

7      A.    That is not the only reason.

8      Q.    Okay.  But there are -- that's one

9  of the reasons why?

10     A.    That is one of reasons, if I travel

11  out of state.

12     Q.    Has that ever happened to you?

13  Have you ever been asked to present your birth

14  certificate at a DOT truck stop or weigh

15  station?

16     A.    Not yet.

17     Q.    At least in regards to Paragraph

18  No. 52, you don't contend that anything ODH has

19  done has resulted in the harassment at the

20  truck stops, right?

21         MS. BONHAM:  Objection.  Calls for

22  a legal conclusion.  Vague.

23         THE WITNESS:  I do not agree with

24  that assertation [sic].

25     Q.    Okay.  So in what ways do you

1  disagree?

2      A.   That if I have a birth certificate

3  that I could present, I wouldn't have to worry

4  about the harassment as much, a correct, legal

5  birth certificate to present.

6      Q.   You testified you haven't ever had

7  to produce your birth certificate.

8      A.   Correct.

9      Q.   So if you haven't had to produce

10 your birth certificate at a truck stop, how

11 would ODH's birth record have caused any

12 harassment that you've suffered at truck stops?

13          MS. BONHAM:  Objection.  Misstates

14 testimony.  Vague.

15          THE WITNESS:  In my personal

16 opinion, when people want to make assertations

17 as to my gender, I'd be able to show them what

18 my gender is.

19      Q.   So you think that having a birth

20 record that reflected sex as female would allow

21 you to prevent harassment at truck stops?

22          MS. BONHAM:  Objection.  Same

23 objection.

24      Q.   Is that accurate?

25      A.   For my particular case, I have been

CONFIDENTIAL

Page 107

1  pressured by people at truck stops to provide

2  such documents.  Now, these are not law

3  enforcement officials, so they're generally

4  ignored, but I would be able to have some kind

5  of back-up protection from the state.

6       Q.    So there are -- there are instances

7  at truck stops where another truck driver or

8  someone at a truck stop has said, "Show me your

9  birth certificate," or something like that?

10      A.    I have been asked by people to show

11 them my birth certificate upon exiting a female

12 bathroom, yes.

13      Q.    And you think if your birth

14 certificate reflected female, you would be able

15 to cut off or curtail whatever harassment that

16 followed?

17            MS. BONHAM:  Objection.

18            THE WITNESS:  I do.

19      Q.    If you didn't show these people who

20 were harassing you at the truck stop your birth

21 certificate, how did they know you were

22 transgender?

23            MS. BONHAM:  Objection.

24            THE WITNESS:  Who's to say that

25 that's what they said?

CONFIDENTIAL

Page 108

1      Q.    Well, what did they say?

2      A.    That I'm not a female.

3      Q.    Did you tell them you weren't a

4   female?

5      A.    No.

6      Q.    They just assumed that you weren't

7   a female?

8      A.    I'm guessing that's what it was by

9   their statement, yes.

10     Q.    Like you said before, they never

11  physically assaulted you or anything like that?

12     A.    Let's just put it this way:  I

13  normally carry a TASER and one big knife that I

14  don't have here today.

15     Q.    Thank you.  Neither of those are

16  permitted in the building, FYI.

17     A.    I was told -- and let's put it this

18  way:  I've had to get them out before.  Have I

19  had to use them, no.  Would I?  I will do what

20  it takes to defend my own life.

21     Q.    And you think if you had had an

22  accurate birth certificate that you could have

23  pulled out and showed somebody at the rest stop

24  or truck stop, you wouldn't have had to fend

25  off these would-be assailants or subject

Page 109

1    yourself to these verbal assaults; is that

2    accurate?

3         A.    I will agree with your statement,

4    if I would have had an accurate document, then,

5    yes, I would have been able to present it to

6    people to curtail potential violence, per your

7    statement.

8         Q.    And on what basis do you make that

9    statement?

10              MS. BONHAM:  Objection.  Vague.

11              THE WITNESS:  You had just said if

12   I had had an accurate document.

13        Q.    Oh, what I said was it's your

14   testimony, right?  So I'm trying to understand,

15   A, would you make that statement, and then the

16   follow-up is what's the basis for that?  How do

17   you know how they would have reacted to a birth

18   certificate that reflected sex as female?

19              MS. BONHAM:  Objection.  Vague.

20   Compound.

21              THE WITNESS:  I can't -- upon my

22   assumptions that in somebody see as female on a

23   birth certificate and I'm coming out of female

24   bathroom, which is their problem --

25        Q.    Sure.

1     A.    -- I'm going to guess they're going

2  to back down that they were just wrong and I'm

3  just one ugly woman.

4     Q.    Okay.  If you go to Page 12, it's

5  the same page that we were on, Paragraph 54.

6  I'm not going to read the whole paragraph, but

7  in that paragraph, you describe a situation

8  where someone at work harassed you based on

9  your status as a transgender person; is that

10  accurate?

11     A.    I believe what you said was

12  accurate, yes.

13     Q.    And then you go on to allege that

14  your employer did little to stop the

15  harassment, right?

16     A.    I go on to state that what I was

17  told with the -- my employer at the time was

18  going to do.

19     Q.    And what did your employer do?

20     A.    To the best of my knowledge, they

21  informed me that they were going to,

22  quote/unquote, have a conversation with the

23  person.

24     Q.    And did the harassment stop after

25  that?

Page 111

1      A.    No.  The verbal from her stopped.
2   Others, no.
3      Q.    Okay.  So there were multiple
4   people at this employer who are harassing you
5   verbally based on your status as a
6   transgendered individual, correct?
7      A.    That is correct, but only one
8   threat of violence.
9      Q.    All right.  And the threat of
10  violence you reported to your employer, your
11  employer spoke to that colleague, and at that
12  point, at least the threats of violence
13  stopped; is that accurate?
14     A.    There was no more threats of
15  violence from her.  Whether or not they spoke
16  to her, I cannot attest to.
17     Q.    Well, would you characterize what
18  your employer did as adequate or sufficient to
19  address your concerns as a transgender in their
20  workplace?
21     A.    My personal opinion, I would
22  suggest that what the employer did was
23  inadequate no matter who it was.
24     Q.    If anyone, transgender or
25  otherwise, is being threatened by another

Page 112

1    employee, you think the employer should take

2    some greater action than just merely talking to

3    someone; is that accurate?

4         A.    If someone threatens violence at a

5    workplace, they should be terminated

6    immediately.

7         Q.    Is it your testimony that the

8    harassment from that individual and others

9    began only after your status as a transgendered

10   person was disclosed?

11        A.    Well, seeing as that my status was

12   disclosed upon hiring, yeah, it was pretty much

13   thereafter.

14        Q.    And you mean upon hiring, that's

15   when your employer announced to a group of

16   people that the sex on your birth certificate

17   didn't match, right?

18        A.    She didn't blatantly, like, look at

19   the crowd and say it, she just said it loud

20   enough for the crowd to understand it, to hear

21   it.

22        Q.    Yeah.  I think what the allegation

23   is is the human resources person asked in a

24   voice loud enough for everyone in the room to

25   hear, "Why doesn't your gender match," right?

CONFIDENTIAL

Page 113

1    A.    Correct.  And your statement

2   earlier made it sound as though she actually

3   addressed the room as opposed to addressing me.

4   I wanted to make sure there was clarification

5   on that.

6    Q.    And there were enough people in

7   there that they overheard it and they reached

8   their own conclusions about what that meant?

9    A.    Yes.

10    Q.    The employer wasn't ODH or any of

11   the defendants in this case, right?

12    A.    No.

13    Q.    And was this Zulily?  Is that who

14   this was?

15    A.    That was who that was, yes.

16    Q.    Is it your conclusion based on the

17   harassment that you received that some of your

18   coworkers were prejudice against transgendered

19   people?

20         MS. BONHAM:  Objection.  Calls for

21   speculation.

22         THE WITNESS:  I cannot make an

23   assumption as to what -- how they felt towards

24   transgendered people.  I can only let you know

25   the facts of what happened.

1        Q.    Well, you state in Paragraph 54
2    that you had been labeled by your hostile
3    coworkers as the freak of the company.  Do you
4    see that?
5        A.    I do.
6        Q.    Does that indicate to you that they
7    were, in at least some way, shape or form
8    prejudice against transgendered people?
9              MS. BONHAM:  Same objection.
10             THE WITNESS:  I would indicate that
11   at least that I was the freak of the company,
12   which, therefore, they didn't like me for
13   whatever reason that they hold.
14       Q.    And the threat of violence, I
15   think, is in the next sentence where the female
16   coworker told you that if she ever encountered
17   you in the women's restroom, the woman would
18   beat your ass; is that right?
19       A.    That is correct.
20       Q.    The Department of Health didn't do
21   anything to cause those people to label you the
22   freak of the company or to cause them to want
23   to beat your ass for being in the women's
24   bathroom, did they?
25             MS. BONHAM:  Objection.  Calls for

CONFIDENTIAL

1    a legal conclusion.

2             THE WITNESS:  I'm not a legal

3    expert, but in my personal opinion, in my

4    personal experience, they indirectly did.

5         Q.    How?

6         A.    If I'd have had an accurate birth

7    certificate, we wouldn't be sitting here

8    talking.

9         Q.    You think if your sex identifier on

10   your birth certificate said female, you would

11   not have been labeled the freak of the company?

12        A.    Exactly.

13        Q.    And this other female coworker

14   wouldn't have threatened to beat your ass?

15        A.    There's no basis to suggest

16   otherwise.

17        Q.    Why did you show your birth

18   certificate to Zulily?

19        A.    It was requested for hiring.  It

20   was required upon hiring.

21        Q.    That was my next question.  Zulily

22   required that document as part of your hiring?

23        A.    I had a choice of one of two

24   documents -- or a few documents.  I had to

25   present a driver's license, I had to present my

Page 116

1  Social Security card, and I had to present my

2  birth certificate.  The only other option I

3  had, which was not an option to me, was my

4  green card.  I was born here, so...

5          Q.    So you get to -- at Zulily, you get

6  to provides -- you have to have three of the

7  four documents or is it you have to have --

8  explain to me again the policy 'cause I don't

9  quite understand.

10         A.    Driver's license.

11         Q.    Do you have the driver's license?

12         A.    Yes.

13         Q.    Okay.  Next one?

14         A.    Social Security card.

15         Q.    You have to have that one?

16         A.    Yes.

17         Q.    Birth certificate or --

18         A.    Green card.

19         Q.    Okay.  So only that third document

20  has an either/or?

21         A.    Okay.  And there was one other

22  thing.

23         Q.    Go ahead?

24         A.    High School diploma or GED had to

25  also be presented.

Page 117

1    Q.   Okay.  Okay.  Is that the first job
2   you've ever had?

3    A.   No.

4    Q.   At previous jobs, were you required
5   to present your birth certificate?

6    A.   I don't recall.

7    Q.   Did you consider Zulily to be
8   particularly dangerous when you showed them
9   your birth certificate?

10    MS. BONHAM:  Objection.  Vague.

11    THE WITNESS:  You're going -- yeah,
12   you're going to be a little more specific on
13   that question for me to answer.

14    Q.   Sure.  When you got hired at Zulily
15   and you they told you that you needed to
16   produce your birth certificate, were you
17   concerned for your safety?

18    A.   Yes.

19    Q.   Were you concerned for your safety
20   because you thought Zulily would try to do
21   something to harm you?

22    MS. BONHAM:  Same objection.

23    THE WITNESS:  My personal opinion
24   is I don't believe Zulily, the entity, no.

25    Q.   You didn't feel bodily harm from

CONFIDENTIAL

Page 118

1  Zulily when you showed them that your birth

2  certificate had male as the sex marker, right?

3          MS. BONHAM:  Objection.  Vague.

4  Mischaracterizes testimony.

5          THE WITNESS:  I'm a little confused

6  on your question there.  What -- what do you

7  mean?

8      Q.    You're in a room, right, as part of

9  your hiring process, right?

10     A.    Uh-huh.

11     Q.    And ahead of time, they've told

12 you, bring these set of documents, right?

13     A.    Correct.

14     Q.    Okay.  You show up that day, it's

15 you and a handful of other people in the room,

16 right?

17     A.    Approximately ten to 15 other

18 people.

19     Q.    Other prospective employees who are

20 going through the same hiring process you are,

21 right?

22     A.    Correct.

23     Q.    Okay.  You get called up?

24     A.    Correct.

25     Q.    All right.  You have your portfolio

Page 119

1  documents, right?

2       A.    Correct.

3       Q.    At the moment you handed that group

4  of documents over to the HR person who was

5  requesting those documents, did you feel harm,

6  bodily or otherwise, from that HR person?

7       A.    I started feeling potential hatred

8  and/or violence as soon as I seen how they were

9  doing it, doing the documentation.

10      Q.    What do you mean by that?

11      A.    Typical HR hiring process to my

12  experience is it's all kept quiet,

13  confidential, between you and the HR person,

14  not held in an open forum for everybody to

15  hear.  As soon as I noticed that they were

16  holding it in an open forum where everybody

17  could hear everything that's going on, I could

18  have sat there and literally wrote down

19  people's Social Security numbers and their

20  birth dates and everything else because she was

21  speaking so loud, my anxiety level went through

22  the roof of potential harm or fear for the

23  documents that I was holding, but I needed a

24  job.

25      Q.    What was the -- what was the

                                            Page 120

1    anxiety directed at?  Was it fear of harm from

2    your prospective colleagues or from the person

3    sitting behind the table, the HR person?

4           A.    Ten million and one thoughts I had

5    of who could potentially hold harm about the

6    situation.

7           Q.    So all of them?  Some of them?

8    What's the answer?

9           A.    Everybody.

10          Q.    So you were applying for a job at

11   Zulily and you got into the HR situation and

12   you immediately, based on the way the HR

13   situation was being handled, you immediately

14   started to fear harm from not only the other

15   people in the room, but the person across the

16   table requesting the documents?

17          A.    Correct.

18          Q.    So if it was a private setting,

19   would you have had that same fear?

20          A.    Yes, but not to the extreme extent.

21          Q.    Did Zulily ever do anything to harm

22   you?

23          A.    Yes.

24          Q.    What did they do?

25          A.    First off, let's just start at the

Page 121

1  beginning.  They pretty much said it loud

2  enough that everybody could hear, which they

3  did say it loud enough that everybody could

4  hear.

5      Q.    You think that the disclosure of

6  your private information to the group is harm?

7      A.    I don't think, I know it is.

8      Q.    Okay.  Is there anything that

9  you're aware of from the Department of Health

10  requiring you to disclose your birth

11  certificate to your employer?

12          MS. BONHAM:  Objection.

13  Foundation.

14          THE WITNESS:  Could you repeat the

15  question, please?

16      Q.    Sure.  I'll rephrase it.

17          ODH didn't require you to disclose

18  your birth certificate to Zulily, right?

19          MS. BONHAM:  Objection.

20  Foundation.  Calls for a legal conclusion.

21          THE WITNESS:  They're the ones who

22  provided me with the inaccurate document that I

23  had to present to obtain employment.

24      Q.    With Zulily?

25      A.    With Zulily.

Page 122

1          Q.    But it wasn't their rule that

2     required Zulily or that Zulily -- required

3     Zulily to ask for that document from you,

4     right?

5               MS. BONHAM:  Objection.

6     Foundation.

7               THE WITNESS:  I can't speculate

8     what their rules are.

9          Q.    So you don't know why Zulily asked

10    you for that document for your birth record?

11         A.    No.

12         Q.    But you're not aware of any

13    requirement from ODH that Zulily asked for that

14    document, right?

15         A.    I do not know anything of the sort.

16         Q.    And you don't contend that ODH

17    caused your employer to announce your sex

18    identifier to that roomful of people when you

19    were just starting out at the company, right?

20              MS. BONHAM:  Objection.  Calls for

21    a legal conclusion.  And to the extent it's

22    possible for her to testify about it, she's

23    answered that question.

24              THE WITNESS:  In my personal

25    experience on this situation, ODH didn't make

Page 123

1    that young lady say what she said that way, but

2    they are indirectly because had I had a correct

3    document, she wouldn't have said what she said

4    that way.

5         Q.    Let's move on to the next

6    paragraph.  It starts at the bottom of Page 12

7    and goes on to the next page, Page 13,

8    Paragraph 55, Defendants' Exhibit 2, and rather

9    than read the whole thing to you, in that

10   paragraph, you generally allege that you had

11   difficulty getting a hazmat endorsement from

12   the TSA; is that accurate?

13        A.    No.

14        Q.    Okay.

15             MS. BONHAM:  I'll just, you know,

16   object to the extent that it mischaracterizes

17   when opposing counsel's summarizing her

18   testimony, but the testimony is written down.

19   It speaks for itself.

20             MR. BLAKE:  Yeah.  I'm not trying

21   to be inaccurate, I'll trying to avoid the

22   various permutations of what the hazmat

23   endorsement is and what that allows you to do

24   and how that's part of your CDL.

25        Q.    So I'll try again to generalize

Page 124

1  what it is that you're alleging in that
2  paragraph so that we can move on to the next
3  question, but if I fail, then I'm going to let
4  you generally describe it, okay?
5           At some point in time, you left
6  Zulily, right?
7       A.    Correct.
8       Q.    And you got your commercial
9  driver's license, right?
10      A.    No.
11      Q.    You never received your commercial
12  driver's license?
13      A.    Still no.
14      Q.    Okay.  You had your commercial
15  driver's license beforehand?
16      A.    Correct.
17      Q.    Okay.  That's great.
18           And you decided that you were going
19  to be a truck driver for what company?
20      A.    Shall I just go ahead and describe
21  this?
22      Q.    No.  No.
23      A.    Because you --
24      Q.    Am I messing it all up?
25      A.    You are.

1      Q.    Okay.  Sure.  I don't think this is

2   particularly contentious, but go ahead.

3      A.    I already -- I've had my CDL since

4   2000.

5      Q.    Okay.

6      A.    I've been a truck driver before, so

7   for me to say I chose to be a truck driver then

8   would be an inaccurate statement.  That's the

9   reason I said no.  At the time that I was going

10  for my TSA background check, I was just -- I

11  needed it to apply to other positions.  I had

12  not picked an employer, but you must obtain

13  your hazmat before you can apply to these

14  companies or they will not even consider you.

15  So what the paragraph is saying is I went to

16  the TSA for a background check, not to

17  obtain -- not to get my hazmat from the TSA,

18  but to obtain a background check from the TSA.

19     Q.    Okay.  So that you could obtain

20  your hazmat endorsement?

21     A.    So I could take the background

22  check.  Once it's in the system, it shows so I

23  have to pass another test to obtain my hazmat.

24     Q.    Is that ultimately issued from the

25  TSA, though, the hazmat endorsement?

CONFIDENTIAL

Page 126

1    A.    No.

2    Q.    Okay.  That's a different entity

3  that gives you your hazmat endorsement?

4    A.    It is.

5    Q.    And that's, like, a little code or

6  identifier that goes on your CDL?

7    A.    It is.

8    Q.    Okay.  And the first step or one of

9  the initial steps is this background check from

10  the TSA?

11    A.    Correct.  You have no background

12  check, you will not get any further regardless

13  of what you do.

14    Q.    All right.  And there was a --

15  there was difficulty getting background check

16  because of a -- an incongruity between your

17  birth certificate and your CDL?

18    A.    There was difficulty getting a

19  background check because of the inaccuracy of

20  my birth certificate's marker.

21    Q.    And the inaccuracy you're referring

22  to is the sex designation on your birth

23  certificate said male, and what did that --

24  what did that not match with?

25    A.    My driver's license that the State

www.veritext.com                                                888-391-3376

CONFIDENTIAL

Page 127

1   of Ohio had issued me.

2          Q.    So your driver's license said

3   female, right?

4          A.    Correct.

5          Q.    And the birth certificate said and

6   still says male, right?

7          A.    That's what it is printed on there,

8   yes.

9          Q.    And that resulted in the TSA saying

10  we can't go through with the background check

11  at this time?

12         A.    Not the TSA.

13         Q.    Who said that?

14         A.    The lady at the desk that was

15  checking me in.

16         Q.    I get it.  The employee at the TSA?

17         A.    She technically a contractor for

18  the TSA.  Was.  Was a contractor.

19         Q.    A contractor for the TSA said this

20  is a problem.  I can't essentially process this

21  or get you -- move you to the next step until

22  you clear up this -- this issue between the

23  driver's license and the birth certificate?

24         A.    I wish it was that nice.

25         Q.    I appreciate that.  I try to be

1    polite.  But that was her position, right, and

2    maybe she was rude, as you indicated?

3         A.    She wasn't just rude, she was

4    blatantly harassing.

5         Q.    Okay.  So this TSA agent was

6    terrible to you?

7         A.    And loud.

8         Q.    And loud.  And told you that this

9    inaccuracy was going to prohibit you from

10   taking the background or getting background

11   check complete, fair?

12        A.    At the present time, that was her

13   stance, yes.

14        Q.    Okay.  And you would agree that ODH

15   wasn't responsible for that TSA contractor's

16   behavior, right?

17               MS. BONHAM:  Objection.

18               THE WITNESS:  No.

19        Q.    You would agree or you wouldn't

20   agree?

21        A.    I would not agree to your

22   statement.

23        Q.    So you think that the Department of

24   Health was responsible for this woman's

25   behavior?

CONFIDENTIAL

Page 129

1          MS. BONHAM:  Objection.
2   Mischaracterizes.  Calls for a legal
3   conclusion.
4          THE WITNESS:  I would say that ODH
5   indirectly got her attitude the way it was.
6      Q.    So you think ODH indirectly caused
7   this woman to misapply TSA's rules on receiving
8   background check for the hazmat endorsement?
9          MS. BONHAM:  Same objection.
10         THE WITNESS:  And I'm going to let
11  you know that's not what I said.
12     Q.    Okay.
13     A.    I would say that ODH indirectly got
14  her attitude the way it was, not that she
15  misapplied TSA's rules, not that she was
16  mispresenting TSA, that ODH, because they
17  provided me with an inaccurate document to give
18  her, let her have a bad attitude.
19     Q.    So ODH --
20     A.    Gave her a reason to have a bad
21  attitude.
22     Q.    So ODH is the one who gave her the
23  bad attitude?  That's your testimony?
24         MS. BONHAM:  Same objection.
25  Mischaracterizes.

CONFIDENTIAL

Page 130

1          THE WITNESS:  If had ODH gave me a

2    correct document, she would have seen that both

3    markers had matched and we wouldn't be sitting

4    here talking today.

5          Q.    That woman -- that contractor's

6    attitude towards transgendered people, to your

7    knowledge, hasn't changed, has it?

8          MS. BONHAM:  Objection.  Calls for

9    speculation.

10          THE WITNESS:  I'm unable to

11    speculate on what her attitude is towards

12    others, one, because I don't know her

13    personally, and, two, she no longer is a

14    contractor for TSA.

15          Q.    But it's your testimony that had

16    your sex identifier on your birth certificate

17    matched your driver's license, this woman would

18    not have had this outburst or reaction to you

19    during your application?

20          MS. BONHAM:  Same objection.

21          THE WITNESS:  I cannot speculate if

22    she would have had a bad attitude in general,

23    but she wouldn't have been telling me you need

24    to change your marker back.

25          Q.    When you went to apply for the

1  background check, did you consider TSA

2  dangerous or potentially harmful when you had

3  to disclose this birth certificate information

4  to them?

5       A.    No, because I had called and spoken

6  to TSA agents about my particular situation.

7       Q.    So you didn't fear any bodily harm

8  from TSA when you went in to apply for the

9  background check that day?

10      A.    No.

11      Q.    All right.  In the next paragraph,

12  Paragraph 56, I'll try to generally summarize

13  it.  You testified that you went to the

14  Department of Health to request a corrected

15  birth certificate on that same day, right?

16      A.    That would be a very short

17  summation of the paragraph, yes.

18      Q.    And you state that a staff member

19  told you at that time we will never change it,

20  right?

21      A.    That was one of the ending remarks,

22  yes.

23      Q.    And I think as we -- you testified

24  before, you don't recall who that staff member

25  was, right?

1    A.    I do not.  They had said that a
2    supervisor would be with me and she came out,
3    and I, unfortunately, did not write down her
4    name.
5         Q.    Can you -- do you have any
6    recollection as to a physical description or
7    what they look like at all?
8         A.    White lady, possibly late 30s,
9    early 40s, brown hair, slender, approximately
10   five-eight, five-nine, somewhere in there, but
11   she was wearing heels, so that's hard to
12   determine if someone's wearing heels and I
13   didn't measure, so yeah.
14        Q.    Did you guys get that down?  White
15   lady, mid-30s, five-eight-ish.  No.  That's
16   fine.  It's my question.  I asked it and I got
17   what I asked for.  I got to -- I always
18   wondered how people recollected and drew those
19   sketches because I would have no idea.  I
20   wouldn't be able to go an hour from meeting any
21   of you people and describe, you know, tell me
22   the shape of the nose and all that stuff, but
23   nonetheless, people do it.  All right.  I guess
24   we're similarly situated when it comes to your
25   ability to describe folks.

Page 133

1          So it's your testimony that

2     someone, this woman told you we will never

3     change it, "it" being the birth certificate.

4     Are you aware of the legal process under which

5     a correction to a birth certificate can be

6     made?

7          A.     I am not an expert in the legal

8     laws, no.

9          Q.     Are you aware that a correction to

10    your birth certificate requires a court order?

11              MS. BONHAM:  Objection.

12    Foundation.

13              THE WITNESS:  Again, as stated in

14    the previous question, I'm not an expert in the

15    legal laws, so no.

16          Q.     Have you sought a court order to

17    have your sex identifier changed?

18          A.     I have not.

19                   -   -   -   -   -

20              (Thereupon, Deposition Exhibit 4,

21              August 12th, 2017 Communication;

22              Attachments, was marked for purposes

23              of identification.)

24                   -   -   -   -   -

25          Q.     I've handed you a group exhibit

CONFIDENTIAL

1   that consists of a series of communications

2   produced about your attorneys in this

3   litigation.  Do you recognize these documents?

4        A.    I do.

5        Q.    The first page appears to be a

6   request for assistance to the office of Senator

7   Sherrod Brown.  Do you see that?

8        A.    That is what it states up top, yes.

9        Q.    And that is dated

10  August 12th, 2017.  Do you see that at the

11  bottom?

12       A.    I do.

13       Q.    Was this about the time that you

14  attempted to get your background check from the

15  TSA, went to ODH, were told that they never

16  change it?

17       A.    As I recall, I believe that it was

18  literally the next day.

19       Q.    Okay.  And if you turn the page,

20  the next page is a letter from the office of

21  Sherrod Brown to Ms. Gibson at the TSA, and I

22  don't have a second page for this request for

23  assistance.  Do you -- and it looks like the

24  request sort of ends mid-sentence.  Is there

25  a --

Page 135

1    A.    It does.

2    Q.    Is there a back page or something?

3    A.    There is.  I've misplaced it.

4    Q.    Okay.  Okay.  Do you recall what

5    you said generally?

6    A.    Basically, as it's stated in the

7    complaint, went through and described my

8    interaction that I had at the TSA office, you

9    know, where I had an appointment time set, I

10   had even went into the context of I believe it

11   was 11:00 a.m. that I had the appointment time,

12   that I had showed up 15 minutes prior, signed

13   in.  I went through literally step by step.

14   Q.    So there's several pages that are

15   missing from there?

16   A.    There's really technically only one

17   because the writing was smaller and, you

18   know --

19   Q.    Okay.  Well, in any event, on the

20   26th, it looks like the office of Sherrod Brown

21   forwarded your request, your letter to the TSA,

22   right?

23   A.    To the best of my understanding,

24   that is what the document says, yes.

25   Q.    And then if you turn to the fifth

Page 136

1   page, it's a document that's dated

2   October 25th, 2017, or at least there's a

3   received stamp, it looks like on that date.  Do

4   you see there?

5             MS. BONHAM:  Sorry.  That's Bates

6   No. 5 rather than the fifth page of the --

7             MR. BLAKE:  Fair enough.

8             MS. BONHAM:  Sorry.

9        Q.    Bates No. 5.

10       A.    Thank you.

11       Q.    Yeah.  Do you see that, the

12   October 25th document?

13       A.    I do.

14       Q.    That's a few weeks later.  Looks

15   like September 18th.  In any event, sorry.  No.

16   It is the fifth page.  Sorry.  Strike all that.

17             This is Bates No. 6.  This is a

18   document that was received September 18th, 2017

19   from the TSA to the office of Sherrod Brown.

20   Do you see that document?

21       A.    I do.

22       Q.    Have you seen this document before?

23       A.    I have.

24       Q.    You were forwarded this letter by

25   Senator Brown's office?

1      A.      From someone in Senator Brown's

2   office.  It was mailed to me, yes.

3      Q.      All right.  So this letter from the

4   TSA generally describes certain requirements

5   necessary to receive a hazmat licensure, right?

6      A.      Correct.

7      Q.      And I've highlighted some text in

8   there for you.  If you look at the top of the

9   fourth paragraph down, it says:  It is still

10  possible for Ms. Ray to enroll for an HME STA

11  without a changed or admitted birth

12  certificate.

13          Do you see that?

14     A.      I do.

15     Q.      Is that consistent with the

16  information that the TSA had told you on the

17  phone prior to you going in?

18     A.      It is.

19     Q.      So this didn't tell you anything

20  new?

21     A.      Correct.

22     Q.      And then at the bottom paragraph of

23  that page, it says:  Ms. Ray -- it's also

24  highlighted.  Ms. Ray is concerned with how the

25  enrollment agent handled the situation at the

Page 138

1   enrollment center has been address with the TSA

2   contracted vendor, Morpho Trust USA, to ensure

3   that enrollment agents conduct themselves with

4   discretion, respect and sensitivity.

5              Do you see that?

6        A.    I do.

7        Q.    Do you know how they addressed the

8   issue with Morpho Trust USA?

9        A.    They terminated their contract.

10       Q.    So they did a better job than

11  Zulily did, at least, right?

12       A.    To my understanding, there was

13  multiple.  I wasn't just the only one, but

14  there was multiple incidents of disrespect and

15  not handling documentation sensitive.

16       Q.    With this particular contractor?

17       A.    With this particular contractor.

18       Q.    Okay.  All right.  You understand

19  that ODH has no authority over the issuance or

20  enforcement of federal regulations promulgated

21  by the TSA and other agencies, right?

22             MS. BONHAM:  Objection.  Calls for

23  a legal conclusion.  Foundation.  Calls for

24  speculation.

25             THE WITNESS:  I do not know what

Page 139

1    ODH and the TSA correspond with.

2          Q.    Did you ever follow the

3    recommendations set forth in this letter by the

4    TSA about how to get your -- your --

5          A.    Hazmat.

6          Q.    -- HME STA without the changed or

7    amended birth certificate?

8          A.    I did.

9          Q.    And did you receive the

10   certification eventually?

11         A.    Through a different contractor or

12   the TSA, yes.

13         Q.    And that was without incident?

14         A.    It was without incident, but she

15   had already known about my situation prior to

16   arriving.

17         Q.    Okay.  Next paragraph,

18   Paragraph 57.

19         A.    In Exhibit 2 we're talking about?

20         Q.    Yeah.  Back to Exhibit 2.

21         A.    That's Page 13, I take it?

22         Q.    Page 13.

23         A.    One second.  Go ahead.

24         Q.    You state that you've also been

25   required to present your birth certificate in

Page 140

1  other context.  That's gist of that paragraph,

2  right?

3          A.    It is.

4                    -  -  -  -  -

5                (Thereupon, Deposition Exhibit 5,

6                plaintiffs' Answers to Defendant

7                Lance Himes First Set of

8                Interrogatories, First Request for

9                Admissions, First Request for

10               Production of Documents, was marked

11               for purposes of identification.)

12                    -  -  -  -  -

13         Q.    I've just handed you a document

14  marked as Defendants' Exhibit 5, and it is a

15  copy of plaintiffs' answers to defendant Lance

16  Himes first set of interrogatories, first

17  request for admissions, first request for

18  production of documents.  Have you seen this

19  document before?

20         A.    I believe I have, yes.

21               MS. BONHAM:  Do you have a spare,

22  Jake?

23               MR. BLAKE:  Oh, yeah.  I'm sorry.

24  No, I do not.

25         Q.    And I understand that your

Page 141

1  attorneys were probably heavily involved in the

2  preparation of this document.  I don't want to

3  inquire about anything you discussed really

4  outside of the context of what you provided to

5  go into this document.  Do you understand?

6       A.    I believe I do.

7       Q.    Okay.  But you did provide

8  information which then was in some way, shape

9  or form, you know, included in this document

10  that we're looking at, right?

11       A.    I did.

12       Q.    Okay.  If you turn to Page 7 of the

13  document, and in the middle of the page,

14  there's bolded words Interrogatory No. 8.  We

15  sought, among other things, all the instances

16  when such plaintiff was required to disclose

17  provide his or her birth certificate.  Do you

18  see that, first sentence?

19       A.    I do.

20       Q.    And if you turn to the next page,

21  Page 8, it says:  Stacie Ray was obligated by

22  her employer, Zulily, in 2016, to present her

23  birth certificate along with other documents as

24  she was on-boarded for her new position.

25            Do you see that?

Page 142

1          A.     I do.

2          Q.     And then the next sentence is:  In

3    August 2017, Ms. Ray was required to present

4    her birth certificate to the Transportation

5    Security Administration, TSA, in order for the

6    TSA to perform a background check required for

7    a hazmat endorsement.

8               Do you see that?

9          A.     I do.

10         Q.     So I guess I'm a little confused

11   because those are the same instances that were

12   identified in the complaint, right?

13         A.     Correct.

14         Q.     And if you look back at Paragraph

15   57 in the complaint, it says:  Ms. Ray has also

16   been required to present and has presented her

17   birth certificate in other contexts, and she

18   will continue to be required to do so.

19         A.     Okay.

20         Q.     So if the only two circumstances

21   that you identified in the complaint were

22   Zulily and the TSA and I asked you earlier in

23   the deposition for the circumstances under

24   which you identified or were required to

25   produce your birth certificate and you

Page 143

1    identified Zulily and the TSA and in response

2    to an interrogatory asking for those questions,

3    you identified Zulily and the TSA, I'm just

4    trying to figure out what are the other

5    circumstances you're referencing in

6    Paragraph 57?

7              MS. BONHAM:  Objection.

8    Mischaracterizes testimony and mischaracterizes

9    the record.  I just want to put it on the

10   record that earlier today in the deposition,

11   she has testified that there have been multiple

12   other instances and, obviously, on the face of

13   the interrogatory responses, it also says it is

14   unduly burdensome and impractical to list the

15   many instances within the plaintiffs' lives

16   when they have been required to disclose their

17   birth certificates.  They'll answer the

18   interrogatory to the best of their

19   recollection.

20             THE WITNESS:  So I answered the two

21   that I could recall the most.  I mean, the ones

22   that stick out the most.  It's like when you're

23   hit in the face, you remember that.

24        Q.    True.

25        A.    Okay.  So my personal instances

CONFIDENTIAL

Page 144

1  that come to memory right off the bat were

2  these two. As stated earlier in the

3  deposition, you know, I had to supply it to TSA

4  for boarding an airplane.

5       Q.    Yep.

6       A.    Which we discussed, which is not in

7  here, but I didn't recall that then. You don't

8  always recall things immediately if they're not

9  grossly negligent.

10       Q.    So other than the somewhere little

11  incident, TSA/hazmat incident and the

12  TSA/Florida incident, do you recall any other

13  incidents where you were required to disclose

14  your birth certificate?

15       A.    Yes.

16       Q.    What are those?

17       A.    The other one that I can remember

18  right off the bat was when I bought my most

19  recent car, they asked for my birth certificate

20  for some reason.

21       Q.    Car dealership asked for your birth

22  certificate?

23       A.    Correct.

24       Q.    When was that?

25       A.    October 2017, I believe. Roughly

Page 145

1   in that range.

2          Q.    Did they -- well, did you provide

3   it?

4          A.    I did.

5          Q.    Did anything happen?

6          A.    No.

7          Q.    Were you applying for a loan or

8   something?

9          A.    As stated, I purchased a vehicle.

10         Q.    Yeah.  So I guess my question is:

11  Were you getting financing to help purchase the

12  vehicle or were you just trying the vehicle

13  outright?

14         A.    I financed the vehicle, yes.

15         Q.    And did they request the birth

16  certificate in connection with the financing?

17         A.    I didn't ask them why they wanted a

18  birth certificate.  I wanted a car, they asked

19  for it and I provided it.

20         Q.    No idea why they wanted it, though?

21         A.    I did not know.

22         Q.    Did they ask for your driver's

23  license?

24         A.    Yes.

25         Q.    So they asked for your birth

CONFIDENTIAL

Page 146

1  certificate, driver's license.  Any other

2  documents?

3       A.    Social Security card, pay stubs.  I

4  mean, there was a list of stuff that I needed

5  to provide.  I don't recall every item.

6       Q.    But it was just a bunch of

7  documents?

8       A.    There was, yes.

9       Q.    What car dealership, do you

10  remember?

11       A.    That was Toyota West.

12       Q.    Is that here in town?

13       A.    It is.

14       Q.    But like you said, there was no

15  issue.  You provided the documents, they did

16  whatever they did, and you drove away with a

17  vehicle?

18            MS. BONHAM:  Objection.

19  Mischaracterizes.

20            THE WITNESS:  He looked at the

21  document, gave it back.

22       Q.    Any other incidents?

23       A.    Not that I recall at this present

24  time.

25       Q.    Okay.  In any of those context --

Page 147

1   well, let me put it this way:  With Toyota West

2   when you turned over your birth certificate,

3   did you fear bodily harm when you did that?

4        A.    No.

5        Q.    What about when you were at the TSA

6   checkpoint in Florida, did you fear bodily harm

7   when you showed them your birth certificate?

8        A.    That is mis-categorized.  I wasn't

9   in Florida.  I was going to Florida.

10        Q.    So at that TSA, at the airport TSA

11   incident were you required to show your birth

12   certificate so you didn't have to undergo a

13   strip search, essentially, did you fear bodily

14   harm?

15        A.    Yes.

16        Q.    Okay.  What -- what was the bodily

17   harm that you were fearful of at that time?

18        A.    TSA is not known to be the nicest

19   people on earth.  If you are trying to defend

20   your civil rights of privacy, and I did not

21   want to strip search and, to me, that's bodily

22   harm.  I had one of two things, provide a

23   document or get strip searched.

24        Q.    I think I know the answer to this

25   question, but was it ODH that required you to

CONFIDENTIAL

Page 148

1   show your birth certificate to the TSA agent at

2   the airport gate?

3            MS. BONHAM:  Objection.  Calls for

4   a legal conclusion.

5            THE WITNESS:  My personal opinion

6   about that matter would be, indirectly, yeah.

7        Q.   So you think, indirectly, ODH

8   caused the TSA to require you to show your

9   birth certificate?

10           MS. BONHAM:  Same objection.

11       Q.   Is that accurate?

12       A.   That is accurate.

13       Q.   So I guess what I don't understand

14  about that incident is you -- you hadn't shown

15  your birth certificate to TSA prior to going

16  through security, right?

17       A.   Correct.

18       Q.   You just showed up with your ticket

19  and your driver's license, right?

20       A.   Ticket, driver's license, purse.  I

21  mean, general travel essentials.

22       Q.   Right.  I'm not wrong when I say

23  generally when you go through TSA, you show up,

24  you got your driver's license, your ticket,

25  they look at both, right?

CONFIDENTIAL

Page 149

1       A.    Correct.

2       Q.    And then they check you through,

3   right?

4       A.    (Nods head.)

5       Q.    So what prompted them to say, "Hey,

6   we need to see your birth certificate"?

7       A.    The body scan showed an

8   abnormalities.

9       Q.    Okay.  And what do you mean by

10  abnormality?

11  ███    ███ ███ ████  █████

12  ███   ███ █ ███ ████ ████  ██████

13  ███ ████ ████ ████ ████ ████ ████ ████ ████

14  ███ ████ ████ ████ ████ ████ ████ █████

15  ███ ████ ██ ████ ████████ ████ ██ ████

16           MS.  BONHAM:   Objection.

17      Q.    Is that accurate?

18      A.    No.

19      Q.    Okay.

20      A.    The body scan showed an abnormality

21  within the system.

22       ███  ████ █ ████ █████  ████ ███

23  ███ ████ ████████ ██████ ████████  'Cause

24  the thing -- the body scan's designed to pick

25  up, what, x-ray, metal and stuff like that,

CONFIDENTIAL

Page 150

1    right?

2         A.    Correct.

3         Q.    Do you have a knee replacement?

4         A.    No.

5         Q.    Did you have a hip replacement?

6         A.    No.

7    ██   ████ ███ ███ █████████

8    ██   ███ ███ ████ █████ ██ ███ ████

9    ████

10        Q.    So based on the abnormality, did

11   the TSA challenge your sex designation on your

12   driver's license?

13        A.    No.

14        Q.    All right.  Well, then why did they

15   need your birth certificate?

16        A.    To prove why the abnormality was

17   there.

18   ██   ███ █ █ ███ █████ ██ ███

19   ████████ ███ ███ ██ ███ ████ ████

20   ██ ██ ███ █ █ ███ ████

21   █████

22             MS. BONHAM:  Objection.  Calls for

23   speculation.  Foundation.

24             THE WITNESS:  I can't say that

25   that's the same consistency between the two.

CONFIDENTIAL

Page 151

1          Q.     Is that your suspicion?

2                 MS. BONHAM:  Objection.  Same

3    objection.

4                 THE WITNESS:  No.

5          Q.     Okay.  What do you suspect?

6                 MS. BONHAM:  Objection.  Vague.

7    Foundation.

8                 THE WITNESS:  That they both had

9    their independent thoughts.

10         Q.     Okay.  Your driver's license said

11   female, right?

12         A.     Correct.

13         Q.     Okay.  Your ticket didn't say

14   anything one way or the other?

15         A.     Never does.

16         Q.     So at what point were you

17   questioned about your birth certificate?

18         A.     When they took me back to -- around

19   the corner, basically, sat me down and said,

20   "We have an abnormality.  We suspect what's

21   going on.  You can either be strip searched or

22   provide us with a birth certificate to prove

23   our suspicions."

24         Q.     Were you dressed as woman when you

25   went through the TSA -- this TSA issue?

Page 152

1          MS. BONHAM:  Objection.

2          THE WITNESS:  I was dressed in

3  street clothes.

4      Q.    Like, were they street clothes that

5  were feminine or masculine?

6          MS. BONHAM:  Objection.

7          THE WITNESS:  The clothes that I

8  was dressed in, I purchased out of a women's

9  department.

10      Q.    Okay.  I mean, look, we're not

11  playing games here.  You yourself said ███

12  ████ ████ ██████ you stopped wearing

13  men's clothes, you started wearing women's

14  clothing.  We know there's a difference.  So

15  you purchased them out of women's clothing,

16  they were women's clothing, right?

17          MS. BONHAM:  Objection.  We're not

18  playing games here.  You're independent

19  commentary about when women are, what men are

20  and what she's doing.  I think she's testifying

21  appropriately.

22          THE WITNESS:  To answer your

23  question, I never once -- I believe I did not

24  state that I stopped wearing men's clothing.  I

25  believe I stopped -- said I stopped wearing

CONFIDENTIAL

1  clothing that other perceived me that I should

2  wear.

3        Q.    Okay.  So these were clothes -- the

4  clothes you were wearing would be clothes that

5  would be perceived to be appropriate for a

6  female, right?

7        A.    That's a general characterization

8  that I believe I can agree with, yes.

9        Q.    And it was after you went through

10  the body scan that the TSA approached you and

11  said -- did they use the word "abnormality"?

12        A.    They did.

13  ████  ████ ████ ████ ████ ████ ████

14  ████████ ████ ████ ████ ██ ████ ██ ████

15  ████████ ██ ████████

16              MS. BONHAM:  Objection.

17  Mischaracterizes.  Asked and answered.

18           ████ ████ ████ ████ ████ ██ ██ ██

19  ██ ██ ████ ████

20      ██ ██ ████ ████ ████ ████████

21      ██ ████ ██ ██ ██ ████ ████ ████

22      ██ ████ ████ ████ ████

23  ████████ ████ ██ ████ ████ ████

24  ██ ████ ████████

25        A.    I do not assume, I go with the

CONFIDENTIAL

Page 154

1  facts that's given in front of me.

2  ██     ██  ██    ██  ██  ██  ██  ██

3  ████  ██  ██  ██  ██  ██  ████

4  ████  ██  ██  ██  ██  ██  ████ion

5  ████  ████  ████  ████  ██

6           MS. BONHAM:  Asked and answered.

7           THE WITNESS:  Again, I'm not going

8  to assume what someone else is thinking.  I

9  went with the facts that were presented in

10 front of me, ██  ██  ██  ██  ████  ████  ██

11 ██  ██  ██  ████  ██  ████

12      Q.    Right.  And then they asked for

13 your birth certificate, which you know states

14 male as the sex, right?

15      A.    They said I could present a birth

16 certificate to back up their suspicions of why

17 the abnormality was there.

18      Q.    Okay.  And at that time, did you

19 have any suspicions or hunches about what they

20 were referring to what they said "abnormality"?

21           MS. BONHAM:  Asked and answered.

22           THE WITNESS:  I went with -- again,

23 I went with the facts that were presented in

24 front of me, ██  ██  ██  ██  ████  ████  ██

25 ██  ████  ██  ██

Page 155

1      Q.    So then a picture of your birth

2   certificate was taken by someone who had access

3   to it sent to you on your phone, right?

4      A.    Correct.

5      Q.    And you showed that to the TSA?

6      A.    Correct.

7      Q.    And they identified that the sex

8   indicator said male, right?

9      A.    I showed them the birth certificate

10  and that the printing on it says male, yes.

11     Q.    And at that point, then, they let

12  you through?

13     A.    They did.

14     Q.    If the sex had said female, would

15  you have had to undergo a strip search?

16          MS. BONHAM:  Objection.  Calls for

17  speculation.  Hypothetical.

18          THE WITNESS:  I was going to say, I

19  don't know what their process would have been

20  after that.

21     Q.    ████████ ██ ███ ████████ ██ ██████

22  ███ ███ █████ ████ ███ ███████ █████████

23  ████████████ ███ ██████ █████ ████ █████ ███

24  ███ ███ ███ █████████ ██ a birth

25  certificate that said female wouldn't have

1    resolved that so-called abnormality, right?

2              MS. BONHAM:  Objection.  I don't

3    know the question.  That seems like your own

4    testimony.

5              THE WITNESS:  I don't know how to

6    answer --

7         Q.    You don't know?

8         A.    -- your statement.  I can't say

9    what their rules, their processes are.  I

10   cannot speak for the legal procedures that they

11   have, the rules that they have in place.  I

12   have no idea what would have happened had it

13   been a correct birth certificate that I

14   presented them.

15        Q.    So in what way did the sex

16   identifier of male cause you harm in this

17   instance?

18        A.    In this instance, humiliation in

19   general.

20        Q.    But it's the sex -- it's the sex

21   identified as male on the birth certificate

22   that allowed you to proceed through security,

23   correct?

24             MS. BONHAM:  Objection.

25   Mischaracterization.  Calls for speculation.

Page 157

1          THE WITNESS:  I would have to

2    speculate to give you an answer to that.  I

3    don't know what they looked at.  We never --

4    there was no point of anything said towards

5    that fact.  I, again, would have to speculate

6    towards the fact of what they were looking for.

7    I don't want to speculate.  I want to give you

8    facts.  The fact is they said I could present

9    them with a birth certificate or undergo a

10   strip search.

11        Q.    Right.  And you presented with your

12   birth certificate, right?

13        A.    Correct.

14        Q.    And it had the sex identified as

15   male on it, correct?

16        A.    There's printing on there that says

17   male, but there's other indicators on there

18   too.

19        Q.    And then you did not have to

20   undergo the strip search, right?

21        A.    That is correct.

22        Q.    So in this case, the birth

23   certificate from ODH helped you to avoid the

24   strip search, which you've characterized as the

25   harm, right?

Page 158

1          MS. BONHAM:  Objection.  Totally

2    mischaracterizes her testimony.  Asked and

3    answered.  We should really move on to

4    something more relevant.  At this point, it's

5    harassing the witness.

6          THE WITNESS:  Again, facts in the

7    face.  ██ ██  ██ ████████  ██ ███ ████████

8    ████████ asked to either present a birth

9    certificate or get strip searched.  Presented a

10   birth certificate, moved on.

11      Q.   And the harm in that circumstances

12   would have been the strip search, right?

13          MS. BONHAM:  Objection.  I don't

14   know what else to do here besides to take a

15   break.  I don't understand what you want from

16   her.  She's answered the question multiple

17   times.  Again, we've been at this.  It's a

18   personal, invasive, humiliating instance in her

19   life and you've been asking her to recall the

20   same testimony over and over again for many

21   minutes.

22      Q.   But it sounds like to me, and tell

23   me if I'm wrong here, that the harm occurred

24   long before you presented your birth

25   certificate and the harm either being detained

Page 159

1  by TSA or being humiliated by TSA or being

2  investigated by TSA stopped once you presented

3  the birth certificate, right?

4           MS. BONHAM:  Objection.  Calls for

5  legal conclusions.  Mischaracterizes testimony.

6  Argumentative.

7           THE WITNESS:  I'm not saying you're

8  wrong because I don't know what actually

9  stopped it.

10      Q.    Okay.

11      A.    What they were looking for on the

12  document, I can't attest to because no one

13  said, "Oh, this is the reason why we're going

14  to let you pass through."  No one said that.

15      Q.    But you understand one of your

16  claims in this case is that turning over this

17  information to people, disclosing this

18  information to people harms you, right?  That's

19  one of your claims?

20      A.    It is.

21      Q.    Okay.  Generally, right?  And so

22  I'm trying to understand all the instances in

23  which you've been harmed by disclosing this

24  information.  Do you understand that?

25      A.    I do.

CONFIDENTIAL

1      Q.    Okay.  And so this TSA incident

2   where they were not going to let you through

3   security unless you either underwent a strip

4   search or presented your birth certificate is

5   one of the instances where you've identified

6   you were harmed by this sex identifier as male

7   on your birth certificate, right?

8          A.    I did not state that.

9          Q.    Okay.  So do you believe that the

10  sex identifier as male on your birth

11  certificate caused you any harm in this

12  circumstance?

13         A.    Yes.

14         Q.    All right.  Please explain to me

15  how.

16         A.    Because I identified myself as

17  female and I had to out myself to other people

18  that I was born -- let me rephrase that.  That

19  the doctors had categorized me in something

20  that I don't agree with.

21         Q.    Okay.  So the harm isn't

22  necessarily this stuff by TSA that occurred

23  during the navigation of their security, it's

24  just the fact that you had to show them a birth

25  record which conflicted with your gender

Page 161

1   identity; is that right?

2               MS. BONHAM:  Objection.  Calls for

3   a legal conclusion.  Asked and answered.  You

4   can go ahead.

5               THE WITNESS:  The harm is that the

6   State of Ohio shouldn't force me to out myself

7   every time that I have to present a legal

8   document and then I get the looks, the

9   whispers, the generalized humiliation that I

10  get after presenting a document.  Whether or

11  not it helped or hindered is beside the point.

12  It's the offensive behavior that happens

13  personally from me.

14       Q.    Have you ever stopped to think

15  about what would have happened if your sex

16  identifier had said female?

17              MS. BONHAM:  Objection.  Asked and

18  answered.  Calls for speculation.  Incomplete

19  hypothetical.

20       Q.    Alls I'm asking is have you stopped

21  to think about it.  That can be, if she likes,

22  a "yes" or "no" question.

23              MS. BONHAM:  Objection.

24              THE WITNESS:  I will answer the

25  question in a "yes" or "no," but I'm going to

CONFIDENTIAL

                                          Page 162

1   put a timeout after I answer the question so we

2   can take a break.  Is that good?

3          Q.    Sure.

4          A.    Thank you.

5                No, I have not thought about that.

6   Thank you.

7                (Recess taken.)

8          Q.    Other than the circumstances you've

9   already described, are there other instances

10  where you've had to show your birth certificate

11  to people?

12         A.    Not that I recall right off the

13  bat, no.

14         Q.    School?

15         A.    I only needed to present them with

16  my updated driver's license and my legal name

17  change form because I had already been

18  registered there before.

19         Q.    So no birth certificate at any time

20  to any school, to your knowledge?

21         A.    I wouldn't say any time.  I mean,

22  is there a time frame we want to set down?

23         Q.    No.  What I want to know is whether

24  or not you've ever had to present your birth

25  certificate to a school.

Page 163

1      A.    I've had to present it to Columbus

2   State before, yes.

3      Q.    Okay.  When was that?

4      A.    When I first enrolled.

5      Q.    All right.  And what year was that

6   approximately?

7      A.    I don't remember when I originally

8   enrolled because I enrolled once and then I

9   went back.  In the '90s.

10      Q.    And in the '90s, at that time, were

11   you still presenting yourself -- or were you

12   presenting yourself as male?

13      A.    No.

14      Q.    Was there any issue associated with

15   presenting your birth certificate to CSU at

16   that time?

17      A.    No.

18      Q.    What about friends, have you, for

19   whatever reason, disclosed your birth

20   certificate to any friends?

21      A.    Not that I recall.

22      Q.    Medical professionals?

23      A.    Not that I recall.

24      Q.    What about to obtain insurance or

25   other benefits through work or otherwise?

CONFIDENTIAL

Page 164

1      A.    Not that I recall.

2      Q.    What about to obtain a passport?

3      A.    I've not applied for a passport.

4      Q.    And what about to obtain your

5  noncommercial driver's license?

6      A.    I don't have a noncommercial

7  driver's license.

8      Q.    You never had one?

9      A.    I did at one time.

10      Q.    Okay.  And when you did that, were

11  you required to present your birth certificate?

12      A.    Not that I recall.

13      Q.    Okay.  And then to obtain your CDL,

14  were you required to present a birth

15  certificate?

16      A.    I don't recall.

17      Q.    All right.  I just have one sort of

18  follow-up.  This is on Exhibit 4.  Sorry, 5,

19  which is the interrogatories.  If you go to

20  Interrogatory No. 17, which is on 12, Page 12,

21  and this is interrogatory that seeks

22  individuals with knowledge regarding any of the

23  claims.  It says:  Tanya ██████ and then in

24  parenthetically, wife to Stacie Ray, separated

25  spousal status.  What does that mean, separated

CONFIDENTIAL

1  spousal status?

2       A.    We've had an on-again/off-again

3  relationship.

4       Q.    Are you currently separated or

5  together?

6       A.    We are together.

7       Q.    And I think I --

8       A.    But I have to ask a question.

9  Could you define "together"?

10      Q.    I don't know.  Can you define

11 "separated"?

12      A.    Yes.

13      Q.    Okay.  What does separated mean?

14      A.    Not of spousal -- living in

15 different households.

16      Q.    Okay.  All right.  So then I guess

17 I would define together as the opposite of

18 that, so living together versus living

19 separately.  Let's put it that way.  Is that

20 fair?

21      A.    If that's the assessment you want

22 to take, yes.

23      Q.    And you say that that is just kind

24 of the nature of your relationship is sometimes

25 you're together, sometimes you're separated,

Page 166

1    right?

2         A.    It can be, yes.

3         Q.    Okay.  And I think we touched on

4    this briefly.  You were married in late

5    2007/2008-ish?

6         A.    I believe it was

7    January 22nd, 2008.

8         Q.    So early 2008?

9         A.    Correct.

10        Q.    And by then, you had already

11   disclosed your gender identity to Tanya?

12        A.    Correct.

13        Q.    And when you were married, Tanya

14   ███    was fully aware of your biological sex,

15   right?

16             MS. BONHAM:  Objection to the term

17   "biological sex."

18             THE WITNESS:  I don't know what you

19   mean by that statement.

20        Q.    She knew that your birth

21   certificate reflected sex as male, right?

22             MS. BONHAM:  Objection.

23             THE WITNESS:  She had -- I can

24   attest to that she had seen my birth

25   certificate because we had to present it to get

Page 167

1   married.

2          Q.    Okay.

3          A.    What she was aware of, I'm unsure.

4          Q.    Okay.  Whether that meant --

5   whether that meant anything to her or what that

6   meant to her, you don't know?

7          A.    Correct.

8          Q.    Okay.

9                MR. BLAKE:  All right.  That's all

10  my questions.

11               MS. BONHAM:  We'll just take a

12  second, I think, and we might have a few.

13               (Recess taken.)

14               EXAMINATION OF STACIE RAY

15  BY MS. BONHAM:

16         Q.    We talked about a series of terms

17  today including "biological sex," "sex,"

18  "gender," "gender identity" and other terms.

19  Are any of your personal claims in the lawsuit

20  contingent on your personal definition or

21  understanding of those terms?

22         A.    No.

23         Q.    Who do you look to to define those

24  terms?

25         A.    My experts.

Page 168

1          MS. BONHAM:  That's all for us.

2          MR. BLAKE:  No further questions.

3          (The deposition was concluded at

4          5:00 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 169

1  Whereupon, counsel was requested to give

2  instruction regarding the witness's review of

3  the transcript pursuant to the Civil Rules.

4

5                SIGNATURE:

6  Transcript review was requested pursuant to the

7  applicable Rules of Civil Procedure.

8

9             TRANSCRIPT DELIVERY:

10  Counsel was requested to give instruction

11  regarding delivery date of transcript.

12  Mr. Blake original regular.

13  Ms. Bonham copy regular.

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

1               REPORTER'S CERTIFICATE

2    The State of Ohio,    )

3                                    SS:

4    County of Fairfield. )

5

6               I, Kimberly A. Kaz, RPR, a Notary

7    Public within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, STACIE RAY, was

10   by me first duly sworn to testify the truth,

11   the whole truth and nothing but the truth in

12   the cause aforesaid; that the testimony then

13   given by the above-referenced witness was by me

14   reduced to stenotypy in the presence of said

15   witness; afterwards transcribed, and that the

16   foregoing is a true and correct transcription

17   of the testimony so given by the

18   above-referenced witness.

19               I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25

Page 171

1          I do further certify that I am not

2     a relative, counsel or attorney for either

3     party, or otherwise interested in the event of

4     this action.

5          IN WITNESS WHEREOF, I have hereunto

6     set my hand and affixed my seal of office at

7     Cleveland, Ohio, on this 10th day of

8     September, 2019.

9

10

11

12

13

14          Kimberly A. Kaz, RPR, Notary Public

15          within and for the State of Ohio

16

17     My commission expires March 31, 2023.

18

19

20

21

22

23

24

25

```
                                                      Page 172
 1                  Veritext Legal Solutions
                         1100 Superior Ave
 2                           Suite 1820
                       Cleveland, Ohio 44114
 3                    Phone: 216-523-1313
 4
     September 10, 2019
 5
     To: Ms. Bonham
 6
     Case Name: Ray, Stacie, et al. v. Director, Ohio Department Of Health,
 7   Et Al.
 8   Veritext Reference Number: 3493789
 9   Witness:  Stacie Ray        Deposition Date:  8/19/2019
10
     Dear Sir/Madam:
11
12   Enclosed please find a deposition transcript.  Please have the witness
13   review the transcript and note any changes or corrections on the
14   included errata sheet, indicating the page, line number, change, and
15   the reason for the change.  Have the witness' signature notarized and
16   forward the completed page(s) back to us at the Production address
     shown
17
     above, or email to production-midwest@veritext.com.
18
19   If the errata is not returned within thirty days of your receipt of
20   this letter, the reading and signing will be deemed waived.
21
     Sincerely,
22
     Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

```
1                  DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2

          ASSIGNMENT REFERENCE NO: 3493789
3         CASE NAME: Ray, Stacie, et al. v. Director, Ohio Department
     Of Health, Et Al.
          DATE OF DEPOSITION: 8/19/2019
4         WITNESS' NAME: Stacie Ray
5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7         I have made no changes to the testimony
     as transcribed by the court reporter.
8

     _____          _____
9    Date                     Stacie Ray
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
               Statement; and
14        Their execution of this Statement is of
               their free act and deed.
15
          I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25
```

Veritext Legal Solutions

CONFIDENTIAL

Page 174

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
          ASSIGNMENT REFERENCE NO: 3493789
 3        CASE NAME: Ray, Stacie, et al. v. Director, Ohio Department
   Of Health, Et Al.
          DATE OF DEPOSITION: 8/19/2019
 4        WITNESS' NAME: Stacie Ray
 5        In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7        I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9        I request that these changes be entered
   as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____       _____
   Date                     Stacie Ray
14
          Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18            in the appended Errata Sheet;
          They signed the foregoing Sworn
19            Statement; and
          Their execution of this Statement is of
20            their free act and deed.
21        I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Veritext Legal Solutions

CONFIDENTIAL

1                          ERRATA SHEET

                 VERITEXT LEGAL SOLUTIONS MIDWEST

2                     ASSIGNMENT NO: 3493789

3       PAGE/LINE(S) /          CHANGE          /REASON

4       7:6/ Replace "the" with "my" /Transcription error

5       11:3/ Insert "with" between "correspond"&"what" /Transcription error

6       25:22/ Replace "there's" with "there is" /Transcription error

7       33:22/ Replace "got" with "not" /Transcription error

8       38:9/ -- is "evident" /Transcription error

9       68:12/ "Replace "it's" with "that is" /Transcription error

10      72:21-23/ Should read:"Again, I am not an expert on Ohio law. I do not know
        of any laws nor am I aware of any laws on this matter." /Transcription error

11      73:7/ Replace "No" with "Nor" /Transcription error

12      115:15/ Replace "There's" with "There would be" /Transcription error

13      123:2/ Replace first "had" with "if" /Transcription error

14      126:11/ Insert "If" before "You" /Transcription error

15      130:1/ Transpose "had" and ODH /Transcription error

16      138:13/  Replace "wasn't" with "was" and omit "the" /Transcription error

17      158:7/ ██████████████████ / Transcription error

18      _____

19

        _10/1/2019_____          _Stacie M Ray_____
20      Date                      Stacie Ray

21      SUBSCRIBED AND SWORN TO BEFORE ME THIS 1st

22      DAY OF _October_____, 20_19___.

23      _____

                    Notary Public
                    THERESA SABO
24                  Notary Public, State of Ohio
                    My Commission Expires 11-28-2021
                                    11-28-2021
25                  Commission Expiration Date

CONFIDENTIAL

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.