# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| STACIE RAY, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:18-cv-00272 |
| v. | ) ) | |
| AMY ACTON, *et al.*, | ) ) ) | Judge Michael Watson |
| Defendants. | ) ) ) | Magistrate Judge Chelsey Vascura |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs file this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. Defendants' Policy prohibiting transgender people from obtaining birth certificates with a corrected sex marker violates Plaintiffs' rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution, and no state interest justifies these violations. As to all of Plaintiffs' claims, no material fact is in dispute and Plaintiffs are entitled to judgment as a matter of law. A Brief in Support is attached to this Motion.

Respectfully submitted,

*/s/ Elizabeth Bonham*

Elizabeth Bonham (0093733)
Freda Levenson (0045916)
Susan Becker (0010205)
ACLU of Ohio
4506 Chester Ave.
Cleveland, OH 44103
Phone: (614) 469-3200
Facsimile: (614) 469-3361
Email: flevenson@acluohio.org
Email: sbecker@acluohio.org
Email: ebonham@acluohio.org

David Carey (0088787)
ACLU of Ohio Foundation
1108 City Park Avenue, Suite 203
Columbus, OH 43206
Phone: 614-586-1969
Facsimile: 614-586-1974
Email: dcarey@acluohio.org

John Knight* (Illinois Bar No. 6201433)
American Civil Liberties Union of Illinois
180 N. Michigan Ave., Suite 2300
Chicago, IL 60601
Phone:   (312) 201-9740
Facsimile: (312) 288-5225
Email: jknight@aclu-il.org

Gabriel Arkles* (New York Bar No. 4391918)
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
Facsimile: (212) 549-2650
Email: garkles@aclu.org

Kara Ingelhart* (Illinois Bar No. 6321949)
Lambda Legal Defense and Education Fund
105 W. Adams St., 26th Fl.
Chicago, IL 60603
Phone: (312) 663-4413
Facsimile: (312) 663-4307
Email: kingelhart@lambdalegal.org

Peter C. Renn* (California Bar No. 247633)
Lambda Legal Defense and Education Fund
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
Phone: (213) 382-7600
Facsimile: (213) 351-6050
Email: prenn@lambdalegal.org

*Attorneys for Plaintiffs*

*Admitted Pro Hac Vice*

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| STACIE RAY, | ) | |
| *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:18-cv-00272 |
| | ) | |
| v. | ) | |
| | ) | |
| AMY ACTON, | ) | Judge Michael Watson |
| *et al.*, | ) | |
| | ) | Magistrate Judge Chelsey Vascura |
| Defendants. | ) | |
| | ) | |

---

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

Plaintiffs, four transgender people born in Ohio, brought this case against Defendants, Ohio Department of Health officials, to obtain birth certificates with sex markers that reflect their true sex. In approximately 2016, Defendants instituted a policy of refusing to correct sex markers on Ohio birth certificates whenever the basis for the requested correction is that the person is transgender (the "Policy"). This Policy, which is justified by no legitimate—much less compelling—government interest, violates Plaintiffs' constitutional rights to privacy, equal protection, and free speech.

**STATEMENT OF THE UNDISPUTED FACTS**

The Ohio Health Department, Vital Statistics Division (run by the Defendants) ("ODH") administers birth records, which includes the control of any change or correction. *See* Ohio Rev. Code § 3705.03. Under Defendants' Policy, Ohio is one of only two states in the country that still refuses to issue birth certificates with correct sex markers to transgender people.

**I.  ODH's Policy Has Harmed and Continues to Harm Plaintiffs**

Stacie Ray, Ashley Breda, and Jane Doe are transgender women born in Ohio, and Basil Argento is a transgender man born in Ohio. Ohio will not permit them to correct the sex marker

on their birth certificates to reflect their identities. Each of them has repeatedly had to disclose their birth certificate as a routine part of their lives—each time outing them as transgender, causing them fear and humiliation, forcing them to endorse a message with which they emphatically disagree, and putting them at grave risk of physical harm.

It took Mr. Argento three years to obtain an accurate passport because his birth certificate did not match his true sex or his other identity documents. Argento Dep. 97:3-98:24. He has had to present his inaccurate birth certificate to several public officials. *Id.* 115:17-123:9. He was even refused a marriage license as a result of his incorrect birth certificate. *Id* 120:3-12. Each time, "it was very uncomfortable . . . a lot of hassles and a lot of emotional suffering." *Id.* 122:7-10. Each time he must explain the discrepancy, people "treat [him] like a zoo specimen and then d[o] not update [his] information anyway." *Id.* 115:23-116:15. It is a similar story for each Plaintiff—and for every Ohio-born transgender person who cannot obtain an accurate birth certificate.

When Ms. Ray had to show her birth certificate at work, she was bullied and physically threatened. Ray Dep. 106:2-110:3, 112:7-115:16. When she tried to get a background check from the TSA for employment purposes, the TSA contractor verbally harassed her and denied her the background check. *Id.* 127:2-128:13. When she went to ODH to correct her birth certificate the same day, an ODH supervisor told her "they would never change another birth certificate ever again." *Id.* 70:5-7. For Ms. Ray, beyond the physical threats and "anxiety," "the harm was that I identified as female and I had to out myself to other people that [when] I was born . . . the doctors had categorized me as . . . something that I don't agree with." *Id.* 160:9-20.

Dr. Doe was denied a change to her Social Security information when she had to show her inaccurate birth certificate, and she "ran out of that place in tears . . . humiliated." Doe Dep.

124:4-125:25. Ms. Breda was mocked, harassed, and threatened at work after her birth certificate outed her as transgender. Breda Dep. 48:19-51:9. Her boss told her she would "always be a man in God's eyes." *Id.* Beyond that, "there's a lot of things that require a birth certificate, especially involving the government . . . for anything like disability or food stamps or anything like that, I do need to present it every time" in addition to presenting it at "every job I applied to." *Id.* 114:4-17, 117:9. In each of these instances, suffering harm is "always a fear." *Id.* 118:18-24.

## II.      ODH's Policy Is Aimed at Transgender People

People born in Ohio may petition ODH to change or update various birth certificate fields for a host of reasons. For example, an adoptive parent may change their child's birth certificate to replace the birth parent's name with the adoptive parent's name. Ohio Rev. Code § 3705.12; ODH Dep. 42:8-46:1, 60:7-61:11. If someone obtains a legal name change, they may change their birth certificate to reflect that. Ohio Rev. Code § 3705.13; ODH Dep. 60:7-61:11. Some of the reasons that ODH may change or correct a birth certificate are listed explicitly in Ohio's statutes. *E.g.*, Ohio Rev. Code § 3705.15 (allowing any changes "to correct errors"). Some reasons for changing a person's birth certificate are expressly *prohibited* by Ohio law. *E.g.*, Ohio Rev. Code § 3705.29 (prohibiting issuance of birth record information for purposes of "deception"). Still other reasons are neither explicitly provided for nor prohibited by statute. Defendants, however, are empowered under Ohio Rev. Code § 3705.03 to modify or correct birth certificates according to their own non-codified policies. *See e.g.*, ODH Dep. 65:22-66:20 (describing ODH practice of "updat[ing]" the sex field on birth certificates of prematurely-born children who were marked as having an "undetermined" sex at birth). As to changing the sex marker specifically, Ohio law is entirely silent. *Id.* 190:15-18.

3

Prior to 2016, ODH permitted Ohio-born transgender people to correct the sex marker on their birth certificates. *Id.* 138:25-139:13, 150:5-152:11; Ex. A (Defs.' Resp. Interrog. No. 3 and Supplemental Response). ODH required a probate court order authorizing the correction, a nominal processing fee, and a completed ODH-provided form. *See* ODH Dep. at 138:14-140:18, 150:5-155:11. In most cases, the applicant's former (incorrect) birth certificate was then locked in a vault, no longer accessible to the public. *Id.* 48:15-52:20; *see also* 62:15-65:21. At least ten transgender people born in Ohio successfully obtained sex-corrected birth certificates prior to 2016. *Id.* 138:25-139:13; Ex. A.

At some point in 2015, ODH received two orders from Ohio probate courts directing ODH to make simultaneous name and sex marker changes to the birth certificates of two transgender applicants. ODH Dep.108:18-112:3; 169:13-170:14. At that time, ODH decided to review its policy on granting such requests. *Id.* 112:5-114:16, 163:23-165:3. During this review, the ODH Director advised ODH staff to hold all pending requests for sex marker changes, causing a backlog. *Id.* 165:8-170:14. In consultation with ODH's in-house counsel and with the Ohio Governor's office, ODH decided to stop making changes to the sex field on Ohio birth certificates where the basis for the requested change was that the person was transgender. *Id.* 129:14-134:4, 175:10-19. ODH never articulated any reason why it implemented this new Policy, except to say that it reached a conclusion that state law did not authorize making these changes. Instead, ODH maintains that any reason and any evidence of any reason are privileged. *Id.* 102:11-108:23, 163:14-170:1, 178:21-181:6.

To carry out this reversal of its past practice, ODH adopted new internal guidance on how to respond to transgender people making these requests. *See id*. at 94:5-100:21, 113:17-114:16; Ex. B (ODH internal guidance documents). Now, under the Policy, when a transgender person

4

requests a change to the sex marker on their birth certificate, ODH explains it is not possible and rejects the application. ODH Dep. 31:17-38:13, 42:4-45:1, 46:14-52:20, 94:5-100:21; Ray Dep. 69:9-70:7; Ex. B.

ODH continues to make changes to birth certificates, including to sex markers, so long as the basis for the change is not that the person is transgender. For example, ODH will correct the sex marker if it considers the basis for the request to be mistake. ODH Dep. 44:19-46:1 (discussing corrections for twins born with different genitalia accidentally marked as the same sex). Where a physician observes atypical genitalia at birth and records a U for "undetermined" or unknown, ODH will later change the U to M or F upon request. *Id.* 65:12-66:25, 73:25-74:21; Ex. C (records of U-marked birth certificates). And in at least one instance, ODH changed a petitioner's birth certificate sex marker to "H" designating "hermaphrodite," upon that individual's request. ODH Dep. 66:21-68:21; Ex. D (records requesting H-marked birth certificate). Defendants do not deny that ODH *can* change sex markers, nor that it does so. *See e.g.* ODH Dep. 35:15-38:13, 138:14-140:23. Rather, ODH's Policy selectively prohibits changes on the basis that the requester is transgender. *Id.* ODH has never explained why the Policy is necessary or even rational, nor has it explained why it could not achieve any purported interest by less intrusive means. *See id.* at 181:7-183:14.

## LAW & ARGUMENT

Summary judgment is proper unless "a reasonable [factfinder] could return a verdict for [the non-moving] party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The uncontroverted evidence proves that Defendants' Policy violates Plaintiffs' constitutional rights of speech, privacy, and equal protection as a matter of law. Defendants have produced no evidence to create any genuine issue of material fact, nor to demonstrate how the Policy could

survive either the strict scrutiny applied to Plaintiffs' privacy and compelled speech claims, or the heightened scrutiny applied to their equal protection claim.

I.      **Defendants' Policy Violates Plaintiffs' Due Process Right to Privacy**

Defendants' Policy forces Plaintiffs to disclose that they are transgender every time they must produce their birth certificates. The undisputed evidence shows that these disclosures put Plaintiffs at risk of bodily harm and reveal highly sensitive, intimate information about them, in violation of their Fourteenth Amendment due process right to privacy.

A. **The Policy compromises transgender people's safety.**

Plaintiffs have a constitutional right to keep information private to preserve their "personal security and bodily integrity." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062 (6th Cir. 1998). In denying Defendants' motion to dismiss, this Court ruled that "Plaintiffs have alleged facts which, accepted as true, suggest that forced disclosure of Plaintiffs' transgender status upon presentation of their birth certificates place their 'personal safety and bodily integrity in jeopardy.'" ECF No. 47 at 19; *see also Arroyo Gonzalez v. Rossello Nevares,* 305 F. Supp. 3d 327, 333 (D.P.R. 2018); *Love v. Johnson*, 146 F. Supp. 3d 848, 855 (E.D. Mich. 2015). Plaintiffs have now produced undisputed evidence showing that the Policy has compromised their safety and will continue to endanger them.

"Courts across the United States have explicitly acknowledged the general hostility and violence affecting the transgender population for at least the last decade." Order, ECF No. 47 at 15. Based on a 2015 survey, 36% of transgender people in Ohio who showed an ID that did not match their sex presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted. National Center for Transgender Equality, 2015 U.S. Transgender Survey: Ohio State Report 3 (2017), https://bit.ly/2QyKNHF. Killings of transgender people, especially transgender

women of color, for being transgender remain high across the United States, including in Ohio. *See* National Coalition of Anti-Violence Programs, A Crisis of Hate: A Report on Lesbian, Gay, Bisexual, Transgender and Queer Hate Violence Homicides In 2017, https://bit.ly/2tOlhoQ; *see also, e.g.,* BJ Colangelo, *More than 15 Percent of this Year's Transgender Homicides Have Happened in Cleveland,* Cleveland Scene, June 27, 2018, https://bit.ly/2QIGWYJ.

Plaintiffs' experiences are representative examples of the harassment that transgender people routinely suffer when outed against their will. When Ms. Ray started a new job, she had to show her birth certificate to a human resources professional in a room with ten to fifteen new colleagues. Ray Dep. 119:11-120:9. As she began to realize how public the HR process would be, she became increasingly afraid for her safety. "[M]y anxiety level went through the roof of potential harm or fear for the documents I was holding, but I needed a job." *Id.* 119:21-24. The HR person asked—loudly enough for everyone else to hear—why the gender on her birth certificate and her driver's license did not match. *Id.* 112:14-113:5. Ms. Ray's co-workers overheard and began harassing her. They labeled her a "freak." *Id.* 114:1-19. One coworker threatened to "beat [her] ass" if she used a women's restroom. *Id*. These threats and harassment would not have happened if her birth certificate had not outed her. *Id.* 115:9-115:20.

When Ms. Breda had to show her birth certificate to an employer, she too was outed, and mocked and threatened as a result. The employer's head of HR told her that she would "never be a woman. [She will] always be a man in God's eyes." Breda Dep. 50:15-20. Ms. Breda's supervisors started misgendering her, commenting on her genitalia, and steering work away from her. *Id.* 53:11-55:5. This mistreatment would not have happened if her birth certificate showed the correct sex. *Id.* 69:23-70:6.

Plaintiff's expert witness Dr. Randi Ettner testified that this kind of violence is routine. In one instance, someone revealed a document outing Dr. Ettner's patient as transgender at work. Ettner Dep. 228:17-229:19. The patient's co-workers began harassing her and her husband by circulating a petition to ban her from using the women's restroom, smearing feces on her desk, leaving sex toys in her husband's office, and threatening to kill them both. *Id*. Someone acted on those threats and cut their brake lines. *Id*. Although they survived the attempt on their lives, both the woman and her husband became disabled with complex post-traumatic stress syndrome as a result of the harassment. *Id*. They can no longer leave their homes. *Id*.

**B. The Policy reveals Plaintiffs' intimate personal information.**

The Policy also infringes on Plaintiffs' right to control the disclosure of information "of an intimate nature which define[s] significant portions of our personhood." *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998). Plaintiffs have produced undisputed evidence of the intimate, personal, and important nature of information about their transgender status, and how the exposure of this information, against their will and in a way that contradicts their core sense of self, has humiliated them.

The psychological toll of being both outed and misgendered by one's own birth certificate can be devastating. Routine daily events that most people take for granted are fraught with humiliation and repeated threats of serious bodily harm for transgender people with incorrect identity documents. Basil Argento, who has had multiple negative experiences showing his birth certificate, described feeling "a lot of anxiety about how [he'll] be treated" each time there is a forced disclosure. Argento Dep. 125:22-126:11. "[I]t's a lot of times dehumanizing because I'm telling something very personal about myself that I don't want to be telling a

stranger, especially one that I think is going to use it against me to make my life harder. So yeah, it's emotional. It takes an emotional toll." *Id*.

When Dr. Doe first tried to correct her sex with the Social Security Administration, a clerk refused to do so unless she produced a corrected birth certificate. Doe Dep. 123:24-124:13. The clerk's loud refusal outed Dr. Doe to about a hundred people nearby. *Id.* She remembers, "that experience in that Social Security Office was awful. I ran out of that place in tears. I sat in the parking lot in my car for about forty-five minutes crying. I still—when I have to think about that experience even currently I get emotionally distraught." *Id.* 125:10-16.

Dr. Ettner testified about a patient who died by suicide after having to show a document with the wrong sex listed. Ettner Dep. 228: 5-16. A 2015 study showed that having an identity document with the correct sex prevented more suicide attempts by transgender people than did treating patients with anti-depressants. *See* Ex. E (Expert Report of Dr. Randi Ettner) at ¶ 31; Ex. F. (Expert Report of Dr. Ryan Gorton) at ¶¶ 30-32. Dr. Gorton testified that some transgender people withdraw socially to avoid the fear and humiliation of using inaccurate identity documents: "[t]hey stay in a bad job that they don't like because it's too scary to try to apply for a better job, they don't go back to school, they don't register to vote, [and] they don't request services that they might be entitled to . . . ." Gorton Dep. 207:4-13.

These circumstances are precisely why such sensitive information is constitutionally protected from disclosure. *See Bloch*, 156 F.3d at 684; *Powell v. Schriver*, 175 F.3d 107, 111-12 (2d Cir. 1999). Privacy violations infringe on a fundamental right, and are subject to strict scrutiny. *Kallstrom*, 136 F.3d at 1064.

## II. Ohio's Policy Violates Plaintiffs' Right to Equal Protection Under the Law

State actions based on transgender status and based on sex receive heightened scrutiny under the Equal Protection clause. The Policy is based on transgender status and sex, and it violates Plaintiffs' rights to equal protection.

### A. The Policy is based on transgender status and sex.

The Policy discriminates against Plaintiffs on the basis of their transgender status and on the basis of sex. The Policy categorically denies sex marker corrections to transgender people, and it was adopted directly in response to such requests. ODH Dep. 163:14-170:14. Under the Policy, sex markers on Ohio birth certificates are assigned based on one thing: the appearance of external genitals at birth. *Id.* 57:21-58:20. For cisgender people, this is typically an accurate proxy for their true sex; for transgender people, it is not. Moreover, when a cisgender person requests to change the sex marker on their birth certificate, whether it is wrong because of a mistake or because of atypical genitalia at birth, ODH allows the change. *See id.* 65:22-68:15. But when a transgender person makes the same request, ODH denies it. *Id.* 102:11-105:18. As a result, all cisgender people born in Ohio may obtain a birth certificate that identifies their sex accurately and that they can use without sacrificing their safety or privacy. Transgender people born in Ohio are denied this on the basis of sex and transgender status.

Defendants have relegated transgender people—and *only* transgender people—born in Ohio to two choices: forgo use of a birth certificate at all, which often means giving up employment, marriage, benefits, and other opportunities; or use a birth certificate that reveals their transgender status, contradicts their sense of self, humiliates them, compromises their health, and puts them in danger of bodily harm.

10

**B. The Policy is subject to heightened scrutiny.**

Heightened scrutiny is required where the state targets a class that (1) has been "historically subjected to discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," (3) has "obvious, immutable, or distinguishing characteristics," and (4) is "a minority or politically powerless." *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd on other grounds*, 133 S. Ct. 2675 (2013) (internal quotation marks omitted). All these indicia are present for transgender people.

First, "[t]here is no denying that transgender individuals face discrimination, harassment, and violence because of their transgender identity." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); Ex. E at ¶ 44 ("An abundance of research establishes that transgender people suffer from stigma and discrimination."); *see also* Ettner Dep. 23:22-24:21; 228:5-230; Ex. F at ¶ 31; Gorton Dep. 206:21-209:3. Plaintiffs' experiences illustrate that reality: they have all experienced some form of discrimination, harassment, or threat of violence because of their transgender identities. *E.g.* Ray Dep. 110:4-111:16, 112:4-21, 114:1-19, 117:7-121:7, 125:6-128:13; Breda Dep. 49:19-51:9, 52:19-55:25; Argento Dep. 45:1-9, 95:23-97:25, 125:22-126:15; Doe Dep. 117:5-118:14, 123:24-125:16.

Second, a transgender person is no less capable of contributing value to society than a cisgender person. *E.g. Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015). Third, as multiple courts have found, transgender people share common immutable characteristics. Their gender identities are core to their personhood and differ from the sex assigned based on their appearance at birth; these things cannot be changed. *E.g.*, *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 n.8 (N.D. Cal. 2015); *see also* Ex. E at ¶¶ 20, 22-25; Ex. F at ¶

11

37; Gorton Dep. at 167:13-20, 206:3-5. Finally, stigma and lack of representation have caused a status quo in which transgender people have very little political power. *See Adkins* at 140. As transgender people satisfy every criterion of a suspect or quasi-suspect class, discrimination against them is subject to heightened scrutiny.

Additionally, discrimination based on transgender identity is necessarily discrimination on the basis of sex, and thus receives heightened scrutiny for that additional reason. *E.g.*, *Equal Emp't Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc*., 884 F.3d 560, 575 (6th Cir. 2018), *cert. granted*; *Barnes v. City of Cincinnati*, 401 F.3d 729, 739 (6th Cir. 2005); *Smith v. City of Salem*, 378 F.3d 566, 573-75 (6th Cir. 2004); *Glenn v. Brumby*, 663 F.3d 1312, 1319-20 (11th Cir. 2011). "[A]ll gender-based classifications . . . warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (quotations omitted). Here, Defendants' Policy explicitly differentiates based on sex and inflicts harm on transgender people. Defendants have adduced no evidence demonstrating anything but a "vague, speculative, and unsubstantiated" interest supporting their Policy, and have not even attempted to demonstrate the Policy is appropriately tailored to achieve any state interest. Order, ECF No. 47 at 31-32.

### III.    Ohio's Policy Compels Speech in Violation of the First Amendment

Throughout their lifetime, every Ohio-born person must show their birth certificate at various times to prove the basic facts of who they are. ODH has taken the ideological position that transgender people should be forever designated the sex assigned to them based on stereotypes about their genital appearance at birth, rather than their actual sex.[1] ODH is perhaps

---

[1] This indeed is an ideological position. The state has disingenuously juxtaposed the term "sex," which it argues designates only the record of a child's perceived genitals at birth, with "gender," a purportedly different concept that the birth certificate does not reflect. ECF No. 18 PAGEID# 84-85; ODH Dep. 38:1-13. But in fact, in implementing the Policy, Defendants always used the terms "sex," "gender," and "gender identity" colloquially and interchangeably, understanding that as a practical matter, that field on an identity document indicates all three to the rest of the world. E.g., ODH Dep. at 95:19-96:21; 97:25-100:21; 113:17-114:16 and Ex. B. The state's attempt to distinguish these terms is a post hoc rationale that cannot help the Policy survive constitutional scrutiny.

entitled to its unfortunate point of view. *Walker v. Texas Div. Sons of Confederate Veterans,* 135 S. Ct. 2239, 2241 (2015). But ODH's Policy oversteps the First Amendment's boundary by forcing Plaintiffs to endorse this message. Every time Stacie Ray has to produce her birth certificate—to enroll in college, get a job, apply for professional licensure, or even to rent a car or drive in certain states—Ohio forces her not only to reveal that she is transgender, but to represent that she is really a man. Ray Dep. 101:11-102:2, 104:15-105:11, 110:4-123:4, 126:14-130:4, 144:10-145:19, 163:1-13. The compelled speech doctrine prohibits the state from forcing people to divulge facts they wish to keep private, and equally prohibits forced endorsement of a state message. Plaintiffs have proven these repeated speech compulsions, and the damage they inflict, with uncontroverted evidence.

### A. Ohio may not force Plaintiffs to endorse its viewpoint that transgender people are not who they know themselves to be.

"[C]ompelling individuals to speak a particular message" by making them "provide [others] a government drafted script" contrary to their own beliefs is a content-based imposition on the freedom of speech. *Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2371 (2018) ("*NIFLA*"). Using strict scrutiny, the Supreme Court has repeatedly invalidated information disclosure requirements that force people to endorse a state message unwillingly. *E.g., id.; Agency for Int'l. Dev. v. All. for Open Soc'y Int'l., Inc.,* 570 U.S. 205, 212 (2013); *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.,* 487 U.S. 781, 797 (1988); *Wooley v. Maynard,* 430 U.S. 705, 714 (1977). ODH's Policy forces Plaintiffs to convey to others the state-mandated message that they are not the sex they know themselves to be. The Policy expresses an ideology that ODH holds: that a transgender person's sex should only be evaluated based on the sex typically associated with their external genitalia at birth, regardless of their gender identity. ODH Dep. 57:15-59:10; Van Meter Dep. 82:1-83:25, 95:4-17, 104:12-110:15, 153:17-24;

258:21-261:23. Plaintiffs, of course, hold the opposite view, central to their identities: that they are the sex they know themselves to be. Ray Dep. 63:20-64:16, 91:25-93:20; Breda Dep. 105:11-106:19; Doe Dep. 101:2-104:6; Argento Dep. 76:8-77:6, 78:17-80:14. This too is a protected message, *e.g., Doe v. Bell,* 754 N.Y.S.2d 846, 851 (Sup. Ct. N.Y. Co. 2003), but the state censors it on birth certificates.

It may be the state's prerogative, as a matter of First Amendment law, to express its position that transgender people should not be regarded according to their true sex. *Walker,* 135 S. Ct. at 2241. What the state may not do is force Plaintiffs to endorse that message by disclosing Ohio's opinion about their sex to others each time they produce their birth certificate. *Id.* at 2246; *see also NIFLA,* 138 S. Ct. 2361. "When speech is compelled … individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning . . . ." *Janus v. Am. Fed'n of State, Cty., and Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018). The coercion here forces Plaintiffs publicly to betray their most central convictions: their own identity.

**B. Ohio may not force the disclosure of Plaintiffs' transgender status.**

In addition to forcing Plaintiffs to endorse the state's viewpoint at the expense of expressing their own, Defendants' Policy forces unwanted disclosure of Plaintiffs' transgender status. Plaintiffs' experiences demonstrate the severe risk of harm that involuntary disclosure imposes on transgender people. *See supra* Section I; *see e.g.* Ray Dep. at 106:2-110:3, 112:7-115:16; Argento Dep. 89:14-19:2, 98:5-99:25, 115:16-119:16, 125:21-126:15; Breda Dep. 118:7-120:4; Doe Dep. 124:4-125:25; Ettner Dep. 205:20-206:7, 151:12-21, 189:16-192:10. Plaintiffs and their experts have amply demonstrated this, and Defendants have not contested it.

The First Amendment entitles Plaintiffs to keep their transgender status private because under compelled speech jurisprudence, "[t]he right to eschew association for expressive purposes

14

is likewise protected." *Janus*, 138 S. Ct. at 2463 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984)); *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 12 (1986). Defendants may not force Plaintiffs to disclose unwanted facts any more than unwanted viewpoints, *see Riley,* 487 U.S. at 797, especially when those facts put Plaintiffs at risk of harm upon disclosure. The First Amendment has long protected the need for people to keep their memberships in vulnerable groups anonymous because of fear of bodily harm. *NAACP v. State of Ala. ex rel. Patterson,* 357 U.S. 449, 462 (1958). And the harm caused by compelled speech "takes on an added dimension" where, as here, the privacy of *intimate* information is at stake— "[f]or also fundamental is the right to be free . . . from unwanted governmental intrusions into one's privacy." *Stanley v. Georgia,* 394 U.S. 557, 564 (1969). In Ms. Ray's words, "[t]he harm is that the State of Ohio shouldn't force me to out myself every time that I have to present a legal document and then I get the looks, the whispers, the generalized humiliation that I get after presenting [it]." Ray Dep. 161:5-10; *see also* 121:5-7 ("Q. You think that the disclosure of your private information to the group is harm? A. I don't think, I know it is"); 159:15-20.

This intrusion causes Plaintiffs harm at each disclosure, and chills their participation in public life. "Forcing disclosure of transgender identity chills speech and restrains engagement in the democratic process in order for transgender[] [people] to protect themselves from the real possibility of harm and humiliation…[this] also hurts society as a whole by depriving all from the voices of the transgender community." *Arroyo Gonzalez*, 305 F. Supp. 3d at 333.

Finally, the violation in forcing this particular speech is intensified here because the state subjects *only* transgender people to its compulsion, "le[aving] unburdened those speakers whose messages are in accord with its own views." *NIFLA*, 138 S. Ct. at 2378 (citing *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 580 (2011)). The state's speech compulsion does not touch those in

the majority—Ohio-born cisgender people who agree with and fit the sex on their identity

documents. The "curiously narrow subset of speakers" that the Policy targets makes it even more

suspect under the compelled speech doctrine. *NIFLA,* 138 S.Ct. at 2377. Defendants demonstrate

no compelling interest in, nor tailored approach to justify, this First Amendment intrusion.

### IV.    The Policy Fails Any Level of Scrutiny

Because the Policy infringes on Plaintiffs' fundamental right to privacy and freedom of

speech, it is subject to strict scrutiny. Because the Policy infringes on Plaintiffs' right to equal

protection, it is also subject to heightened (at least intermediate) scrutiny. But even if the Policy

were subject only to rational basis review, it would still fail.

#### A.    Defendants have offered no evidence of any compelling or important government interest for creating and maintaining the Policy.

Under heightened scrutiny, Defendants must demonstrate that their "classification []

substantially serve[s] an important governmental interest *today*.'" *Sessions v. Morales-Santana*,

137 S. Ct. 1678, 1690 (2017) (internal citations omitted) (emphasis in original). Post-hoc

rationalizations cannot survive. *See United States v. Virginia*, 518 U.S. 515, 533 (1996). And it is

ODH's burden to prove that it actually attempted to use less intrusive alternatives to meet its

goals. *McCullen v Coakley,* 573 U.S. 464, 494 (2014). Under strict scrutiny, ODH's Policy must

be narrowly tailored to achieve a compelling interest, and must not be over or under inclusive.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

Defendants have produced no evidence that the Policy was implemented to serve any

state interest. At best, ODH has articulated post-hoc rationales, with no evidence that it tailored

its Policy to achieve any of them. The sole reason ODH has offered for instituting its Policy is

that, in 2016, its legal department began construing Ohio law to prohibit the correction of sex

markers on transgender peoples' birth certificates. ODH Dep. 57:7-14; Ex. G (Defs.' Resp. to

Interrog., No. 2). ODH produced no evidence about why it reached that interpretation, whether it considered any alternatives, or why it rejected such alternatives. ODH Dep. 180:1-5. Instead, it maintains that any reason, and any evidence of any reason, are privileged, waiving any ability to rely on those reasons in this litigation. *New Phoenix Sunrise Corp. v. Comm'r*, 408 F. App'x 908, 919 (6th Cir. 2010), quoting *In re Lott*, 424 F.3d 446, 454 (6th Cir.2005) ("'[L]itigants cannot hide behind the privilege if they are relying upon privileged communications to make their case. The attorney-client privilege cannot at once be used as a shield and a sword'"); ODH Dep. 102:11-108:23, 163:14-170:1, 178:21-181:6. Even if, contrary to this Court's ruling that nothing in Ohio's statutes requires the Policy, ODH's reinterpretation of state law were accurate, compliance with state law is not a defense for violating rights protected by the U.S. Constitution.[2] *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011).

Besides its unexplained reinterpretation of state law, ODH has only alluded to post-hoc support for its Policy: preventing fraud, and keeping historical records or maintaining statistical information. ODH Dep. 193:20-24; 181:7-183:14. But ODH has produced no evidence that any of these considerations actually motivated its decision to prevent transgender people from obtaining birth certificates that accurately reflect their sex. *Id.* Nor has ODH produced any evidence showing the Policy actually serves these purposes, or that it is narrowly tailored to achieve them. *See* Order, ECF No.47 at 30.

**B. Defendants' Policy fails even rational basis review.**

Even under rational basis review, Defendants' justifications fall short. ODH has not identified and cannot identify any legitimate interest rationally related to the Policy. *See Romer*

---

[2] In fact, however, as this Court has already acknowledged, ECF No. 47 at 12, nothing in the relevant statutes actually precludes corrections to the sex field of a birth certificate because a person is transgender. Ohio Rev. Code §§ 3705.15; 3705.22; 3705.23.

17

*v. Evans*, 517 U.S. 620, 632-33 (1996). And ODH has not produced evidence that the Policy does anything but *undermine* any goal it may have. Courts in Alaska, Idaho, Michigan, and Puerto Rico have all held that policies barring transgender people from obtaining identity documents with the correct sex lack adequate justification. *See Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1142 (D. Idaho 2018); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015); *K.L. v. State, Dept. of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431 CI, 2012 WL 2685183, at *6-8 (Alaska Super. Ct. Mar. 12, 2012).

First, Defendants suggest that birth certificates are "historical document[s]" with a "snapshot" of "statistical information," but they allow many kinds of amendments that render a birth certificate wholly useless to confirm facts at birth—including changes of paternity, parentage after adoptions, subjects' names, and even sex markers for certain people. ODH Dep. 59:8-10; 43:24-44:1. ODH also admits that the public policy reason to permit changes to this "historical document" is to let people use birth certificates for contemporaneous identity confirmation—a reason that would apply at least as strongly to transgender people. ODH Dep. 77:16-78:11. Defendants' argument is also belied by ODH's practice of granting sex marker changes for transgender people without any problem prior to 2016. ODH Dep. 138:25-139:13; 150:5-152:11; Ex. A. Compiling statistical information is simply not at issue in this case. ODH is free to compile statistical information however it wishes, using either an original or corrected sex marker. This case concerns only what sex marker appears on the public-facing birth certificate.

Second, ODH stretches credulity in arguing that an interest in fraud prevention or law enforcement justifies the Policy. ODH Dep. 181:7-183:14, 193:14-24. Because the Policy forces people to use Ohio birth certificates containing inaccurate information that conflicts with all

other available information about their sex, this undermines any purported state interest in using birth certificates to identify people—as well as undermining confidence in documents themselves. And by permitting transgender people to have accurate sex markers on some state-issued identity documents but not on others, Ohio is, if anything, *creating* a potential fraud problem—not solving one. *See* Order, ECF No. 47 at 30-31; *see also Love*, 146 F. Supp. 3d at 856; *K.L.*, 2012 WL 2685183, at *7. Forcing Plaintiffs to carry and produce mismatched, inaccurate identity documents also increases the likelihood that Plaintiffs will trigger false alarms of potential fraud, thereby exposing them to unnecessary, invasive scrutiny and potential discrimination, while wasting law enforcement resources. Finally, the Policy also undermines any interest in public safety by exposing Plaintiffs to violence. *See Arroyo Gonzalez,* 305 F. Supp. 3d at 333. Even if Defendants had met their burden of producing actual evidence supporting any of their purported rationales, these fail any level of constitutional scrutiny.

## CONCLUSION

Based on the foregoing, no material fact is in dispute and Plaintiffs are entitled to judgment as a matter of law. Plaintiffs ask this Court to strike down Defendants' Policy as unconstitutional, allowing them and other Ohio-born transgender people to obtain the accurate birth certificates that they need to live their lives.

19

Dated January 16, 2020                          Respectfully Submitted,

                                                */s/ Elizabeth Bonham*
Gabriel Arkles* (New York Bar No. 4391918)      Elizabeth Bonham (0093733)
American Civil Liberties Union Foundation        Freda Levenson (0045916)
125 Broad St.                                   Susan Becker (0010205)
New York, NY 10004                              ACLU of Ohio
Phone: (212) 549-2569                           4506 Chester Ave.
Facsimile: (212) 549-2650                       Cleveland, OH 44103
Email: garkles@aclu.org                         Phone: (614) 469-3200
                                                Facsimile: (614) 469-3361
Kara Ingelhart* (Illinois Bar No. 6321949)      Email: flevenson@acluohio.org
Lambda Legal Defense and Education Fund          Email: sbecker@acluohio.org
105 W. Adams St., 26th Fl.                       Email: ebonham@acluohio.org
Chicago, IL 60603
Phone: (312) 663-4413                           David Carey (0088787)
Facsimile: (312) 663-4307                       ACLU of Ohio Foundation
Email: kingelhart@lambdalegal.org                1108 City Park Avenue
                                                Columbus, OH 43206
Peter C. Renn* (California Bar No. 247633)       Phone: 614-586-1969
Lambda Legal Defense and Education Fund          Facsimile: 614-586-1974
4221 Wilshire Blvd., Suite 280                   Email: dcarey@acluohio.org
Los Angeles, CA 90010
Phone: (213) 382-7600                           John Knight* (Illinois Bar No. 6201433)
Facsimile: (213) 351-6050                       American Civil Liberties Union of Illinois
Email: prenn@lambdalegal.org                     180 N. Michigan Ave., Suite 2300
                                                Chicago, IL 60601
*Attorneys for Plaintiffs*                       Phone: (312) 201-9740
                                                Facsimile: (312) 288-5225
*Admitted Pro Hac Vice*                          Email: jknight@aclu-il.org


## CERTIFICATE OF SERVICE

I certify that on January 16, 2020, I filed the foregoing electronically. Notice of this filing

will be sent to all parties by operation of the Court's electronic filing system. Parties may access

this filing through the Court's system.

                                                */s/ Elizabeth Bonham*
                                                Elizabeth Bonham (0093733)
                                                Attorney for Plaintiffs