## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| STACIE RAY, *et al*., | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:18-cv-00272 |
| LANCE HIMES, *et al*., | ) ) | |
| Defendants. | ) ) | Judge: Michael Watson |
| | ) ) | Magistrate Judge: Chelsey Vascura |
| | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

The parties agree that there are no disputed material facts in this case. But ODH mischaracterizes both fact and law. Once the Court rejects ODH's contortions of the undisputed record, Plaintiffs, not Defendants, prevail on the merits.

### I.      The Court Should Reject ODH's Characterization of this Dispute

### A.  Plaintiffs are challenging an ODH Policy, not Ohio's statutory scheme.

The Court must reject ODH's red herring that its hands are tied by Ohio's birth records statutes. The Ohio Revised Code is completely silent regarding changing birth certificate sex markers for transgender people. But even if Ohio law, rather than ODH's Policy, said outright: "the sex marker on a birth certificate shall not be changed if the basis for the change is being transgender," the legal standard, proper parties, and remedy in this lawsuit would all be the same.

This lawsuit is a facial and as applied constitutional challenge to an administrative agency's discriminatory Policy. Prior to 2016, ODH allowed transgender people to correct the sex marker on their birth certificates, and did so without any explicit authorization from the Ohio legislature. A subsequent ODH administration, without any new action from Ohio's legislature, reversed course. *Compare* ODH Dep. 138:14-139:13 *with* 99:9-100:21. That decision (the

Policy), to disallow transgender people to correct the sex marker on their Ohio birth certificate, is the basis for Plaintiffs' challenge. ODH admits it is the executive actor with the authority to give Plaintiffs the relief they seek, but it refuses to do so. *See* ODH Dep. 38:1-13.This Court need not address any Ohio statute to provide the relief Plaintiffs seek: to declare ODH's Policy unconstitutional, and to enjoin ODH from enforcing it.

Defendants concede, as they must, that the Ohio statutes governing birth records contain no "explicit[]" reference to changes of the sex marker. Def. Br., ECF No. 71 at 5. ODH also admits that, in general, it makes policy decisions for handling other vital statistics business where Ohio's statues are silent. For example, ODH changes sex markers originally marked U to M or F upon petition from the birth certificate holder. ODH Dep. 65:22-66:20. Because state agencies would be unable to carry out their duties if they lacked authority to make policy choices where statutes are silent, it is axiomatic that they may. *E.g.* Cass R. Sunstein, After the Rights Revolution: Reconceiving the Regulatory State 29-30 (1990). Moreover here, an Ohio statute specifically directs ODH to "adopt rules as necessary to insure that this state shall have a complete and accurate registration of vital statistics." Ohio Rev. Code § 3705.02.

To the extent that ODH wants this Court to read its Policy into Ohio law based on *Ladrach* or *Highland,* it attempts to import a pre-*Obergefell* state court marriage decision or footnote dicta (respectively), both non-binding. *In re Ladrach,* 513 N.E.2d 828 (Ohio Ct. Com. Pl 1987); *Bd. Of Educ. Of Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.,* 208 F. Supp. 3d 850, 866 n.3 (S.D. Ohio 2016); *Obergefell v. Hodges,* 135 S. Ct. 2584 (2015). Neither case interpreted Ohio's birth record statutes in the face of a constitutional challenge. Alternatively, if all ODH wants is for the Court to evaluate Plaintiffs' challenge under *Salerno*'s "no set of circumstances" standard, whether to use this standard also has nothing to do with Ohio's statutes. Def. Br., ECF No. 71 at 18 *citing United States v. Salerno,* 481 U.S. 739, 745 (1987). Plaintiffs agree, they are

2

making a facial and as applied challenge. A categorical refusal to provide transgender people with accurate birth certificates is unconstitutional in any application. *See, e.g., City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2451 (2015).

> **B.  Plaintiffs are seeking correct, useable identity documents and this Court has the power to order ODH to provide them.**

ODH argues that this Court cannot craft appropriate relief, and thus should rule that ODH has not violated the constitution. But Plaintiffs simply want ODH—like health departments in 48 other states, Puerto Rico, and the District of Columbia—to issue them accurate identity documents that they can use without risking their safety, privacy, health, or dignity. And Plaintiffs ask the Court to remedy the constitutional injury ODH's refusal causes. ODH may continue to maintain records documenting the appearance of Plaintiffs' genitals at birth, and may even cling to its counterfactual, anti-transgender view that a person's birth genitals should define them forever. What may *not* continue is ODH's requirement that Plaintiffs use identity documents conveying ODH's misguided view. The distinction between the words sex and gender on an identity document is not a meaningful one in the lives Plaintiffs live, nor is it relevant to the legal arguments they make in this case.

The relief ODH is denying Plaintiffs is an accurate birth certificate that they can use—the public-facing document attached as Ex. 3 to the ODH Brief (birth certificate). Plaintiffs are not asking ODH to revise history itself, or to change the data that ODH records and deems important—that reflected in Ex. 2 to the ODH Brief (vital statistics document containing data on "over 300 topics" most of which do not appear on the birth certificate). Other courts considering similar claims have been able to craft appropriate relief, and most states' health departments provide this without a court order. *See, e.g., Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 335 (D.P.R. 2018); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1146 (D. Idaho 2018).

What Plaintiffs do need are identity documents they can use in their daily lives to express their sex when required by schools, driver's license bureaus, employers, and others. Towards that need, some of the Plaintiffs have already changed their birth certificates to reflect their names. *E.g.,* Ray Dep. 24:3-16; Breda Dep. 28:7-11. That correction did not change what Plaintiffs' parents named them at birth, any more than it changes their "mothers' smoking histor[ies]" or other data that ODH routinely collects, displays on birth certificates, or changes at a later time. Def. Br., ECF No. 71 at 6. ODH is not a mere "passive gatherer" of data, since it is also empowered to, and does routinely, change identity documents. Def. Br., ECF No. 71 at 6; *e.g.* ODH Dep. 34:12-18; 37:4-38:8. ODH can provide the relief Plaintiffs seek while fully maintaining its recordkeeping role. All Plaintiffs need, and what they have a right to, is a birth certificate they can use.

For the same reason, the distinction ODH makes between sex and gender is irrelevant. When Basil Argento shows his birth certificate to someone to prove his identity, it does not matter whether "F" for "female" is preceded by the word "sex," "gender," "gender identity," or "purple." What matters is that it is dangerous and humiliating for him, and confusing to others, for his paperwork to identify him as a woman. *See* Argento Dep. 106:25-110:4 (Q: Do you know if the Italian passport includes – is it a sex or gender word they use to track male or female do you know? A: … It makes no difference, 'cause that's the same word."). ODH itself recognizes that colloquially, the terms sex and gender are fungible. *E.g.* ODH Dep. 113:17-114:16. [1]

---

[1] As this Court has recognized, Ohio by its practices already complies with the common-sense recognition that the sex marker on state-issued identification documents may reflect a person's gender identity even where that differs from the person's assigned sex at birth. Ohio allows transgender people to change driver's license and state ID sex markers. ODH's argument that the sex marker *here* means something practically different from a gender marker is specious. *See* Order, ECF No. 47 at 30.

4

ODH here belabors a purported distinction based on mischaracterized science—a mischaracterization that even the state itself does not subscribe to. It is true that "[t]here is scientific consensus that biological sex is determined by numerous elements." Def. Br. ECF No. 71 at 6, *citing F.V. v. Barron,* 286 F. Supp. 3d at 1136-7 (requiring Idaho to provide sex-corrected birth certificates to transgender plaintiffs). One of these elements is gender identity. In other words, sex and gender identity are intrinsically related concepts with the latter being a component of the former—the determinative component when not all sex-related characteristics are typically male or typically female. Ettner Report, ECF No. 69-6 at 18-21; Gorton Report, ECF No. 69-7 at 22, 25-6. Transgender people have a gender identity different from the sex that a doctor had assigned them at birth based on a cursory examination of their external genitals. As a result, their true sex is different from that originally recorded on their birth certificate. This makes them the only class of persons that cannot obtain a birth certificate that reflects their sex accurately. The four Plaintiffs need corrections of that information based on their present-day realities. In fact, if ODH were to return to its prior view that for transgender people, their "'sex' was incorrectly recorded at birth," and therefore "Ohio law…permit[s] the birth certificate change that Plaintiffs seek," then this entire dispute could be resolved immediately and without judicial intervention. Def. Br., ECF No. 71 at 9.

Because the distinction ODH attempts to draw between sex and gender identity is immaterial to the claims and relief sought here, it can be important to ODH only as an ideological basis for the Policy. ODH's chosen expert, Dr. Van Meter, believes that "people don't go in and out of a sex." Def. Br., ECF No. 71 at 7-8. What ODH means by this is that, regardless of a person's gender identity, the state insists on identifying the person only by their sex recorded at birth based on external genitalia. *See* Van Meter Dep. 213:22-222:15. ODH

5

deposed each of the Plaintiffs extensively about their genital presentation. *E.g.* Argento Dep. 57:2-59:15; Ray Dep. 81:8-84:12; Breda Dep. 97:5-23; Doe Dep. 97:5-14.

Even more tellingly, ODH's chosen expert testified that he believes social affirmation of transgender identity, including use of correct gender pronouns, is "so scary," and "is the recruitment of a cult . . . it is almost a religious faith . . . it's an indoctrination, if you will, and that's what I mean by cult." Van Meter Dep. 282:2-283:10. In the state's view, providing transgender people with identity documents that reflect their true sex is wrong, because as Dr. Van Meter testified, "[a]ffirmation is not really anything other than trying to convert a male into a female or vice versa. Okay?" and "affirmation therapy, is actually converting. An attempt to convert one sex to the other. Which can't happen." *Id.* 108:8-110:15.[2] By selecting Dr. Van Meter as its expert, the state seeks to vindicate its Policy with the rationale—unsupported by credible science—that transgender people should *not* have congruent identity documents because their true sex should not be affirmed. While state officials may choose to embrace that ideological position, their decision to do so does not transform the purported difference between sex and gender into a material fact in this case. And it does not create a compelling interest that justifies the Policy.

The Court does not need to parse the terms "sex" and "gender"—like Ohio in other contexts does not, and the public does not—to decide that Plaintiffs have a right to corrected, public-facing identity documents that they can use without risk of harm.

---

[2] Jake Zuckerman, Conversion Therapy is a Discredited Practice. Ohio Hired its Advocate as an Expert Witness, *Ohio Capital Journal,* Feb. 5, 2020, https://ohiocapitaljournal.com/2020/02/05/conversion-therapy-is-a-discredited-practice-ohio-hired-its-advocate-as-an-expert-witness/.

### C. Plaintiffs can be both proud of, and harmed by unwanted disclosure of their transgender status.

The Court must reject ODH's strawman that Plaintiffs cannot be proud of their transgender identities while reasonably fearful that forced disclosure of their transgender status would put them at risk of physical harm and humiliation. The record in this case unequivocally demonstrates that both things are true.

Stacie Ray has felt "potential hatred and/or violence" from people during forced disclosure, has been "verbally assaulted" and threatened with physical attack, and has carried defensive weapons to "defend my own life." Ray Dep. 119:3-9; 57:7-11; 108:3-110:3. For Ashley Breda, physical harm is "always a fear." Breda Dep. 118:18-24. Even if the Plaintiffs themselves did not *fear* bodily harm at a particular given time, the threat of bodily harm undisputedly exists for each of them, based on knowledge of what sadly happens to transgender persons when forced to disclose incongruent documents. Mr. Argento has experienced instances of forced disclosure in the past during which he has not feared "bodily harm from government officials." Argento Dep. 122:21-123:9 ("[W]ho knows individually what anybody's capable of, but they are in a facility with cameras. They're not going to physically assault me when I come in."). But while he does not necessarily believe a DMV worker will jump the counter and assault him, "[t]here's a lot of anxiety about how I'll be treated . . . it's a lot of times dehumanizing." *Id.* 126:2-15. He is aware that "transgender people are marginalized and at risk and young trans people die of suicide…" *Id.* at 48:3-15. Similarly, Jane Doe cites humiliation and emotional distress from forced disclosure at a government office, as well as "fairly constant" workplace harassment on the basis of her identity. Doe Dep. 125:10-25; 116:21-117:19.

It is also true that Plaintiffs accept and express pride in who they are. Doe Dep. 90:1-12; Breda Dep. 83:20-84:14; Ray Dep. 60:7-61:24; Argento Dep. 40:4-41:6. But pride does not

negate the fear or harm they suffer. As Mr. Argento testified, "my status as transgender is very personal, and it does not humiliate me in itself, what's humiliating is how people have treated me, particularly these government officials once I've been forced to disclose." Argento Dep. 40:8-13.

ODH's mischaracterizations do not place any material fact into dispute, but only obfuscate how these facts apply to the law here. After Defendants' obfuscations are cleared, the undisputed facts prove Plaintiffs' Privacy, Equal Protection, and Compelled Speech claims.

## II.     The Undisputed Facts Prove Plaintiffs' Claims

### A.  The undisputed facts prove Plaintiffs' privacy claim.

ODH argues that it has not violated the Plaintiffs' privacy rights because birth certificates are public records; ODH itself does not directly demand that Plaintiffs produce their birth certificates to strangers; Plaintiffs do not always fear immediate physical harm when producing their birth certificates; and Plaintiffs do not feel personally ashamed of being transgender. These arguments rest on legal premises this Court already rejected, mischaracterizations of the facts, and misstatements of the law. The undisputed facts show that ODH's actions lead directly to the forced disclosure of information that endangers and humiliates the plaintiffs in ways tied to their fundamental rights.

The fact that Ohio birth certificates are public records under state law does not give ODH *carte blanche* to force Plaintiffs to disclose this information in contexts that will make it obvious they are transgender. Order, ECF No. 47 at 24-27. ODH attempts to disclaim any responsibility for the disclosure of Plaintiffs' transgender status, because in many situations it is a different government entity or a private actor that demands Plaintiffs produce their birth certificates. But "Defendants are the only ones who can create, issue, and correct" birth certificates. Def. Br., ECF No. 71 at 20. ODH has deliberately chosen to reveal Plaintiffs' external genital status at

8

birth on public-facing birth certificates, despite knowing this Policy forces Plaintiffs to choose between either (1) revealing against their will that they are transgender, knowing that negative consequences may follow, or (2) foregoing an application for crucial government benefits or private sector opportunities. *See* Def. Br., ECF No. 71 at 20, 33 (birth certificates serve a vital purpose as "a form of identification," and "are known as 'breeder documents' because …[they] are used to apply for and create other forms of state identification"); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (government may not condition receipt of government benefit on surrender of constitutional right). Every court to consider this question has rejected the argument ODH makes, as this Court did in denying ODH's motion to dismiss. Order, ECF No. 47 at 27-29.

To the extent ODH implies that government disclosure of sensitive information must both be about sex[3] *and* cause risk of harm, it is mistaken. To be constitutionally protected from unconsented disclosure, information must relate to another fundamental right, such as safety, healthcare, *or* sexuality. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998) (safety); *Nelson v. City of Madison Heights*, 845 F.3d 695, 701 (6th Cir. 2017) (safety); *In re Zuniga*, 714 F.2d 632, 641 (6th Cir. 1983) (healthcare); *Whalen v. Roe,* 429 U.S. 589, 599 (1977) (healthcare); *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998) (sexuality). The information disclosed in *Kallstrom* had nothing to do with sex. The information disclosed in *Bloch* did not put the plaintiff at risk of physical harm.

ODH also argues that because Plaintiffs do not feel ashamed of being transgender, and because being transgender does not dictate one's sexual behavior, one's transgender status is not the type of personal, intimate information protected from disclosure under *Bloch*. This argument

---

[3] An ironic disconnect exists between ODH's insistence that it lists only sex (as distinct from gender or gender identity), on its birth certificates, and its insistence that this birth certificate challenge is *not* about "sex" when it attempts to distance this case from *Bloch*.

misunderstands both the holding in *Bloch* and Plaintiffs' claims. In *Bloch,* the court did not rest its conclusion on whether the plaintiff felt personally ashamed of having been raped, or kept her identity as a survivor of sexual assault entirely secret. In fact, she had spoken about the rape to the media. *Bloch*, 156 F.3d at 686. Nonetheless, the way in which the defendant disclosed the information was painful and embarrassing, because it included details that the plaintiff had not chosen to share publicly. *Id.*

There is no comparison between Ms. Ray telling a few of her closest friends and family members that she is a woman, or even Ms. Breda stating that she is a trans woman on social media, with what ODH does. ODH forces Plaintiffs to make this disclosure—in person to strangers—in circumstances when they would never otherwise have disclosed. *See e.g.*, Argento Dep. 38:10-13 ("[T]hey're not people I've chose to disclose to, I was forced to."). Worse, the Policy does not permit Ms. Ray or Ms. Breda to simply state, with dignity, that they are transgender women. Instead, it humiliates them by forcing them to represent that they are *not* women. According to Dr. Ettner's undisputed testimony, these experiences cause shame, strip people of dignity and the ability to move freely in society, and lead to feelings of hopelessness and despair. Ettner Report, ECF No. 69-6 at 43. "An inaccurate birth certificate can transform a mundane interaction into a traumatic experience." Ettner Report, ECF No. 69-6 at 45. The effects are so extreme, one study found that if 1000 transgender people with suicidal thinking were allowed to change the sex marker on an identity document, it would prevent 230 suicide attempts. Ettner Report, ECF No. 69-6 at 31.

The nature of the disclosure here violates several fundamental rights, including the liberty interest in sexual autonomy, for much the same reason as in *Bloch.* There, the court did not reason that the disclosure of what happened during the assault gave people actual information about the plaintiff's sexual choices. Instead, the court reasoned that "a historic social stigma has

attached to victims of sexual violence," which meant that disclosures will "often will subject a victim to criticism and scrutiny concerning her sexuality and personal choices regarding sex." *Bloch*, 156 F.3d at 685. The same thing is true for transgender people, which is what Dr. Ettner described in the statement ODH quotes. Def. Br., ECF No. 71 at 26 (Dr. Ettner: "lay people in particular confuse sexuality with gender leading to some serious negative connotations for people who are transgender."); *see also* Feona Attwood, Clare Bale, & Meg Barker, The Sexualization Report (2013), https://thesexualizationreport.wordpress.com/section-3-sex-gender-media/representations-of-trans-people/.

The disclosure here also risks the fundamental right to bodily integrity. The state may not disclose personal information that creates a "substantial risk of serious bodily harm, possibly even death, from a perceived likely threat." *Kallstrom*, 136 F.3d at 1064. The court found no privacy violation in *Barber* because the prisoners who threatened the correctional officers learned only information (social security numbers) that could, at some point down the line, lead to other information (addresses) that could present a physical risk to the officers. *Barber v. Overton*, 496 F.3d 449, 456 (6th Cir. 2007). The situation here is different. The information disclosed is the precise information that puts Plaintiffs at risk: the fact that they are transgender. Unlike in *Barber*, the people who learned Plaintiffs were transgender because of their birth certificates would not have learned the information another way.

The undisputed facts prove the risk of harm Plaintiffs face is very real. ODH omits from its discussion, for example, the time when one of Ms. Ray's co-workers threatened her with a beating because of the sex marker on her birth certificate. Ray Dep. 115:9-16. It omits the undisputed expert statements about the level of violence that transgender people face when they are outed. Gorton Dep. 206:21-207:4. Indeed, the American Medical Association has described anti-transgender violence as an epidemic. AMA Adopts New Policies on First Day of Voting at

2019 Annual Meeting (June 10, 2019), https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policies-first-day-voting-2019-annual-meeting ("Fatal attacks against transgender people have prompted the AMA to adopt a plan to help bring national attention to the epidemic of violence against the transgender community"). Dr. Ettner explained that "transgender women who fear disclosure are at 100% increased risk for hypertension, owing to the intersectionality of stress and cardiac reactivity." Ettner Report, ECF No. 69-6 at 43.

Regardless whether each Plaintiff personally feared bodily harm during each disclosure, the threat of bodily harm undisputedly exists for each of them, based on knowledge of what happens to transgender persons when forced to disclose incongruent documents. The risk to Plaintiffs *in the future* is also real—not only from the specific people they will have to show their birth certificates to directly, but from bystanders harboring anti-transgender bias—which is exactly what happened to Ms. Ray.

Finally, beyond sexuality and bodily integrity, the disclosure here also involves other fundamental rights. ODH's Policy forces Plaintiffs to share information about how an attending physician predicted Plaintiffs' sex based on their genital appearance at birth and strongly suggests that they experience gender dysphoria. It also interferes with the recommended course of treatment for dysphoria. These consequences of disclosure invade the fundamental right of health care decision-making and medical privacy. *See In re Zuniga*, 714 F.2d at 641; *Whalen v. Roe,* 429 U.S. at 599. They also violate the fundamental right to define one's own personhood. *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 851 (1992); *Arroyo Gonzalez*, 305 F. Supp. 3d at 333. Contrary to Defendants' suggestion, this Court need not find a new fundamental right at stake to resolve Plaintiffs' privacy claim.

**B.  The undisputed facts prove Plaintiffs' Equal Protection claim.**

The Policy is both unconstitutional on its face and as applied under the Equal Protection Clause. The Policy facially discriminates between transgender people and cisgender people, because by design it deprives only transgender people of birth certificates that accurately communicate who they are, and that they can use without compromising their privacy, dignity, and safety. Plaintiffs do not apply a disparate impact analysis as ODH suggests; they instead demonstrate that the Policy is not facially neutral. ODH decided to start denying transgender people the opportunity to obtain birth certificates that accurately reflect their sex, while allowing cisgender people to obtain birth certificates that accurately reflect theirs. This is precisely what facial discrimination in the Equal Protection context means. *See Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 285 (W.D. Pa. 2017).

ODH contends that the Policy is facially neutral because it supposedly deprives everybody (whether cisgender or transgender) of the ability to change their birth certificate's sex marker on the basis of being transgender. But this disregards the undisputed fact that transgender people are the *only* people whose birth-assigned sex conflicts with who they are. *E.g.* Ettner Report, ECF No. 69-6 at 34. It also ignores the undisputed fact that ODH deliberately chose to stop permitting transgender people to correct the sex markers on their birth certificates. *E.g.* ODH Dep. 129:14-134:4. A facially neutral policy could force all people, cis- and transgender, to have birth certificates with inaccurate sex markers. *See Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016) stay denied, *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016). But under this Policy, cisgender people born in Ohio are afforded access to an accurate birth certificate, while transgender people are not.

Forbidding "anyone" from changing their sex markers because they are transgender does not render a policy facially neutral as to sex or transgender status, any more than a policy denying benefits to both men and women in same-sex relationships would be facially neutral as

to sex or sexual orientation. According to ODH's logic, laws excluding same-sex couples from marriage would not have been discriminatory, because those laws provided gay men and lesbian women the same right as heterosexual people to marry different-sex spouses. But, of course, *Obergefell v. Hodges* concluded differently. *Obergefell v. Hodges* 135 S. Ct. 2584, 2589-90 (2015).

Accordingly, Defendants' contention that the Policy applies equally to cisgender and transgender people defies the most basic principles of Equal Protection, not to mention common sense. By ODH's logic, no state action discriminating against transgender people would ever be unconstitutional, because the state could always argue that it "neutrally" requires everyone to identify and live in a manner consistent with their birth-assigned sex—a requirement no transgender person could ever meet and every cisgender person could. Refusing to permit transgender people to obtain birth certificates indicating their true sex forecloses meaningful access to a government document every cisgender person born in Ohio may obtain and use. Requiring all people to have documents reflecting their birth-assigned sex does not cure this problem—it is the problem.

**C. The undisputed facts prove Plaintiffs' Speech claim.**

Defendants mischaracterize both what Plaintiffs are seeking, and what a birth certificate is, to arrive at the erroneous conclusion that an identity document is government speech. *See supra Sec. I.* The Supreme Court has repeatedly walked back the government speech doctrine, and it does not apply here. *E.g. Matal v. Tam,* 137 S. Ct. 1744, 1760 (2017)*; Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"). By forcing Plaintiffs to produce birth certificates containing both incorrect facts and ODH's objectionable ideology about their sex, Ohio unconstitutionally compels their speech.

14

ODH's reliance on *Walker*—the only speech case it cites— is misplaced. *Walker v. Texas Div. Sons of Confederate Veterans,* 135 S. Ct. 2239 (2015). ODH both ignores the Supreme Court's "caution" against the expansion of the government speech doctrine after *Walker* and misreads the Court's application of *Walker* in *Matal*. 137 S. Ct. at 1760. In *Matal*, the Court recognized the danger of misusing the government-speech doctrine, and warned against its extension, because the doctrine so risks stifling speech. *Id.* ("[I]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints."). Federal courts have consistently adhered to *Matal's* warning and refused to extend the doctrine. *E.g., Wandering Dago, Inc. v. Desito,* 879 F.3d 20, 35-6 (2d Cir. 2018); *Higher Society of Indiana v. Tippecanoe Cty, Indiana,* 858 F.3d 1113, 1117-18 (7th Cir. 2017); *Knight First Am. Inst. at Columbia University v. Trump,* 302 F. Supp. 3d 541, 572 (S.D.N.Y. 2018).

Here, even if *Walker* could still apply outside its own facts, ODH applies it too loosely— asserting that *any* piece of paper bearing a government seal is the state's own speech. To achieve this, ODH conveniently elides *Walker*'s historical use and public perception criteria, concluding that because the public-facing birth certificate bears the word "Ohio," it cannot be compelled speech. *See Walker*, 135 S. Ct. at 2249; *see also New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 593 (6th Cir. 2018) (quoting *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 565 n.8 (2005)) ("[T]he key analysis is whether the private parties 'are closely linked with the expression in a way that makes them appear to endorse the government message.'"). A birth certificate is an identification document that Plaintiffs show to other people to convey facts about themselves, not facts about Ohio. *E.g.* ODH Dep. 59:8-10; 43:24-44:1. ODH's reading is the kind of slippery-slope expansion of *Walker* that the Supreme Court has repeatedly cautioned against.

15

Moreover, *Walker* itself is clear that "our determination that Texas's specialty license plate designs are government speech does not mean that the designs do not also implicate the free speech rights of private persons…. [T]he First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees." 135 S. Ct. at 2252–53. Even if the sex marker on a birth certificate were government speech, it would still not be lawful for ODH to compel people to associate themselves with it—and that is exactly what it does. *See id.*; *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).

ODH repeatedly characterizes itself as a "passive" information gatherer, duty-bound to include certain historical data on every birth certificate it issues and maintains. Def. Br., ECF No. 71 at 8, 19; Nagy Aff., ECF No. 71-1 at ¶5. But this case is not about ODH's data collection. Def. Br. Ex. 2, ECF No. 71-2. It is about the agency's decision to freeze one piece of data on a critically important identity document for transgender people, while allowing other fields to be updated to accurately reflect key characteristics of the person the document identifies (and even allowing this "historical field" to be updated in certain other circumstances). Def. Br. Ex. 3, ECF No. 71-3. ODH may not force Plaintiffs to disclose sensitive and inaccurate information about themselves, nor to express ODH's viewpoint about their sex, each time they show their birth certificate. The Supreme Court has repeatedly invalidated laws that force people to disclose information about themselves or endorse viewpoints to which they object. *See Janus v. Am. Fed'n of State, Cty., and Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018).

ODH's Policy forces Plaintiffs to involuntarily disclose their transgender status by showing birth certificates with the wrong sex marker. The right to be free from compelled speech, like the right to privacy, protects Plaintiffs' transgender status from involuntary disclosure. *See Janus*, 138 S. Ct. at 2463 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984)); *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 12 (1986).

16

Defendants may not force Plaintiffs to disclose private facts, particularly when the disclosure puts them at risk of harm—whether because the information is so intimate, *Stanley v. Georgia,* 394 U.S. 557, 564 (1969), or because they belong to an at-risk group, *see NAACP v. State of Ala. ex rel. Patterson,* 357 U.S. 449, 462 (1958); *see also Riley v. Nat'l Fed. of the Blind of N.C.*, 487 U.S. 781, 797 (1988).

But it is not only disclosure of sensitive, private information that ODH forces with its Policy. It is also an ideological position inherent in its Policy: the viewpoint that transgender people either cannot, or should not be permitted to, live according to their true sex. ODH may not compel Plaintiffs to express that viewpoint. *E.g.,* Van Meter Dep. 108:8-110:15; Nagy Aff., ECF No. 71-1 at ¶5-8; *Janus* 138 S. Ct. 2448; *NIFLA*, 138 S. Ct. 2361.

The First Amendment may permit ODH to maintain its own point of view, however erroneous, regarding the proper sex designation on a transgender person's birth certificate. *Walker,* 135 S. Ct. 2239. But the constitution does not allow Ohio to force Plaintiffs to convey the state's erroneous message, or to out themselves, every time they must show their birth certificate to prove that they are who they say they are. *Wooley*, 430 U.S. at 715; *Walker,* 135 S. Ct. at 2246; *NIFLA,* 138 S. Ct. 2361.

### III. ODH Did Not Produce Any Evidence of Even a Legitimate Interest

ODH recycles the same arguments that this Court already dispensed with at the motion to dismiss stage—importantly, without presenting any evidence to support its arguments. ODH has not even attempted to meet its burden that the Policy is narrowly tailored to achieve a compelling government interest. Thus, ODH has conceded that if Plaintiffs have made their required showing that the Policy violates their privacy or free speech rights, the Policy fails strict scrutiny analysis. Plaintiffs have done so.

17

ODH does contend that the Policy survives intermediate or rational basis scrutiny. However, it has not pointed to any evidence that the interests it now offers to justify the Policy *ever* served as the basis for its 2016 decision to begin denying requests from transgender people to change the sex marker on their birth certificates. Nor has it offered a shred of evidence that any of these interests actually motivated the passage of the elusive statute it claims this Court would somehow need to strike down to provide Plaintiffs relief. The Supreme Court has foreclosed consideration of government interests that did not genuinely motivate the relevant government under any form of heightened scrutiny. *United States v. Virginia,* 518 U.S. 515, 533 (1996). Such interests may only be considered under rational basis review, which is not the standard that applies to sex-based or anti-transgender discrimination.

Moreover, 48 other states, as well as the District of Columbia and Puerto Rico, achieve their interests without forcing all transgender people to use birth certificates that endanger and humiliate them. The only rationale ODH has offered for how its interests differ from those other states is that Ohio is an open records state, permitting greater public access to birth certificates than most other states. If anything, such a difference would make it even more important that the birth certificate records at issue here do not endanger the lives of the people they describe when released to the public. And in fact, no other open records state has a policy similar to ODH's.

The interests ODH raises do not even satisfy rational basis review. The notion that permitting transgender people to correctly indicate their sex on their birth certificate would in any way interfere with ODH's work in verifying deaths is bizarre. According to ODH, information frequently does not match between birth and death certificates. ODH Dep. 184:14-185:7. If that lack of consistency were a problem—and ODH has not indicated that it is—it would be a problem made *worse*, not better, by the Policy, because it causes a mismatch between the sex listed on birth and death certificates for transgender people. The Policy also frustrates the

18

matching of birth records with Social Security records, because transgender people can and do update their sex markers with Social Security. ODH Dep. 183:19-184:13 (explaining matching process between vital records and Social Security upon death); Doe Dep. 125:3-10 (describing changing her sex marker with Social Security); Social Security Program Operations Manual System RM 10212.200, http://policy.ssa.gov/poms.nsf/lnx/0110212200 (Sept. 30, 2013) (providing for changes to the sex field of Social Security records on presentation of a doctor's letter).

And while accuracy of vital records and law enforcement may in some cases be legitimate interests, ODH has offered no explanation of how stopping Plaintiffs from correcting their sex markers interferes with those interests. Rational basis review requires ODH to point to *some* rational relationship between the interests it asserts and the action it has taken. It has not, and it cannot, because there are only inverse relationships between Ohio's outlier Policy and any legitimate governmental interest. The Policy undermines interests in public safety by increasing risk of violence. *Arroyo Gonzalez*, 305 F. Supp. 3d at 333. The Policy undermines interests in accurate record keeping, because it prevents ODH from receiving updated, accurate information about the sex of people born in the state. *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (2015); *K.L. v. State, Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183 at *7 (Alaska Super. Ct. Mar. 12, 2012). The Policy undermines interests in identifying holders of vital records, because people are not identified in daily life based on their genitalia at birth. *Id.* ODH has offered no plausible legitimate reason for continuing to jeopardize transgender lives. *F.V.*, 286 F. Supp. 3d at 1142. Even under the most deferential standard of review, ODH cannot justify its Policy, and this Court must strike it down.

## CONCLUSION

19

For the foregoing reasons, this Court should deny ODH's Motion for Summary

Judgments and grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

Kara Ingelhart* (Illinois Bar No. 6321949)
Lambda Legal Defense and Education Fund, Inc.
105 W. Adams St., 26th Fl.
Chicago, IL 60603
Telephone:     (312) 663-4413
Facsimile:     (312) 663-4307
Email: kingelhart@lambdalegal.org

Peter C. Renn* (California Bar No. 247633)
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
Telephone:     (213) 382-7600
Facsimile:     (213) 351-6050
Email: prenn@lambdalegal.org

David J. Carey (0088787)
Thompson Hine LLP
41 S. High St., Ste. 1700
Columbus, OH 43215
Telephone:     (614) 469-3200
Facsimile:     (614) 469-3361
Email: David.Carey@thompsonhine.com

*Admitted *pro hac vice*

*/s/ Elizabeth Bonham*
Elizabeth Bonham (0093733)
Freda Levenson (0045916)
Susan Becker (0010205)
ACLU of Ohio
4506 Chester Ave.
Cleveland, OH 44103
Phone: 216-472-2220
Facsimile: 216-472-2210
Email: flevenson@acluohio.org
Email: sbecker@acluohio.org
Email: ebonham@acluohio.org

John Knight* (Illinois Bar No. 6201433)
American Civil Liberties Union of Illinois
180 N. Michigan Ave., Suite 2300
Chicago, IL 60601
Telephone:     (312) 201-9740
Facsimile:     (312) 288-5225
Email: jknight@aclu-il.org

Gabriel Arkles* (New York Bar No. 4391918)
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
Telephone:     (212) 549-2569
Facsimile:     (212) 549-2650
Email: garkles@aclu.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2020, I electronically filed the foregoing with the Clerk of the Court for the for the U.S. District Court for the Southern District of Ohio using the CM/ECF system and a copy was made available electronically to all electronic filing participants.

Respectfully submitted,

*/s/ Elizabeth Bonham*
Attorney for Plaintiffs