# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Stacie Ray, *et al.*,

      Plaintiffs,

      v.

Stephanie McCloud, Director,
Ohio Department Health, *et al.*,

      Defendants.

Case No. 2:18-cv-272

Judge Michael H. Watson

Magistrate Judge Vascura

## OPINION AND ORDER

Ohio is one of only two states that does not allow a transgender person to change the sex marker on their birth certificate. Stacie Ray ("Ray"), Basil Argento ("Argento"), Jane Doe ("Doe"), and Ashley Breda ("Breda," collectively "Plaintiffs") sue Stephanie McCloud[1] ("McCloud"), in her capacity as Director of the Ohio Department of Health ("ODH"), Karen Sorrell ("Sorrell"), in her capacity as Chief of the Ohio Office of Vital Statistics, and Judith Nagy ("Nagy"), in her capacity as State Registrar of the Ohio Office of Vital Statistics (collectively "Defendants") and ask this Court to find such a prohibition unconstitutional. ECF No. 1. Plaintiffs and Defendants have both moved for summary judgment. ECF Nos. 69, 71.[2] For the following reasons, the Court **GRANTS** Plaintiffs' motion for summary judgment and **DENIES** Defendants' motion for summary judgment.

---

[1] Defendants substitute McCloud pursuant to Federal Rule of Civil Procedure 25(d).
[2] Defendants have filed a sealed version of their motion for summary judgment and a publicly available redacted version. ECF Nos. 70, 71. The Court has reviewed both

## I. BACKGROUND[3]

Plaintiffs are four transgender individuals born in Ohio who have been denied the ability to change the sex marker on their birth certificates to reflect their gender identities.

The Ohio Revised Code permits a person to correct a birth record that, among other things, "has not been properly or accurately recorded."  Ohio Rev. Code § 3705.15.  No portion of the Ohio Revised Code prohibits using § 3705.15 to change the sex marker on a birth certificate.  Other portions of Ohio's statutory scheme governing vital statistics permits changes to a birth certificate to reflect adoptions and legal name changes.  *See* Ohio Rev. Code §§ 3705.12, 3705.13.

Indeed, prior to 2016, Defendants permitted transgender individuals born in Ohio to change the sex marker on their birth certificates, if the transgender individuals obtained a court order, paid a processing fee, and completed an ODH-provided form.  *See* Nagy Dep. 138–39, 150–152, ECF No. 55.  At least ten transgender people born in Ohio successfully obtained sex-corrected birth certificates prior to 2016.  *Id.* at 138–39.

Sometime in 2015, after consultation with ODH in-house counsel and the Ohio Governor's office, ODH "re-reviewed" its birth certificate policy ("Policy")[4]

---

filings but will cite only to information contained in the public version located at ECF No. 71.

[3] The Court will discuss the parties' evidence in greater detail in its analysis.

[4] Defendants do not characterize it as a Policy; rather, they frame the issue as an interpretation of the Ohio statute.  *See* Defs.' Resp. in Opp. 4, ECF No. 73.  The Court

and decided to no longer permit changes to the sex marker on Ohio birth certificates when the basis for that change was that the person was transgender. *Id.* at 129–34. Ohio continues to permit other changes to birth certificates (such as for adoption and legal name) as well as alterations to the sex field if the basis for the request is a mistake or where the physician observed atypical genitalia and records the sex as "U" for "undetermined" at birth. *Id.* at 65–66, 73–74; *see also* Ohio Rev. Code §§ 3705.12, 3705.13.

Plaintiffs challenge Defendants' Policy and contend that it violates their substantive due process rights to informational privacy under the Fourteenth Amendment, discriminates against them in violation of the equal protection clause of the Fourteenth Amendment, and compels their speech in violation of the First Amendment. Compl., ECF No. 1. Defendants contend that there are no constitutional violations or that the state's justifications outweigh any violations. Defendants' justifications for prohibiting sex marker changes on the basis of being transgender are to maintain the historical accuracy of their birth records and prevent fraud.

The Court previously issued an Opinion and Order addressing Plaintiffs' substantive due process rights and denying Defendants' motion to dismiss. Op. and Order, ECF No. 47.

---

recognizes the distinction Defendants make but will nonetheless refer to it as a Policy rather than their interpretation of Ohio's statutory framework for ease of reference.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence).  Furthermore, the existence of a

mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he or she is entitled to judgment as a matter of law. The fact that one party fails to satisfy that burden does not automatically indicate that the opposing party or parties has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. & Univs.)*, 757 F.2d 698, 705 (5th Cir. 1985)). The standard of review for cross-motions for

summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

## III.    ANALYSIS

Plaintiffs move for summary judgment and argue that Defendants' Policy violates their constitutional rights under 42 U.S.C. § 1983. Mot., ECF No. 69. Defendants likewise move for summary judgment contending that Ohio's statutory scheme is constitutional. Mot., ECF No. 71. The Court will analyze Plaintiffs' substantive due process right-to-privacy claim and equal protection claim before deciding the level of scrutiny to apply.

### A. As-Applied vs. Facial Challenge

As an initial matter, the Court must whether Plaintiffs' lawsuit is best classified as an as-applied or facial challenge. *See* Op. and Order 9–13, ECF No. 47.

Defendants characterize Plaintiffs' challenge as a facial challenge to Ohio's statutory scheme governing vital statistics. *See* Ohio Rev. Code § 3705.01 et seq. Plaintiffs, in turn, argue that they bring both as-applied and facial challenges. In other words, because the statute itself is silent as to whether a transgender person can change the sex marker on their birth certificate, Plaintiffs contend they challenge the statute only as it is applied to them, but because Defendants' Policy explicitly denies changing the sex marker for transgender persons, they challenge the Policy itself (*i.e.*, Defendants'

interpretation of the silent statute as it relates to all transgender people) as facially unconstitutional.

Facial challenges, at their core, contend that every use and application of a statute is unconstitutional as it is written. *See Reno v. Flores*, 507 U.S. 292, 301 (1993) ("To prevail in such a facial challenge, [plaintiffs] must establish that no set of circumstances exists under which the [statute] would be valid." (internal citations, quotation marks, and alterations omitted)). Because Plaintiffs do not challenge each and every application of Ohio's vital statistics statutory scheme, but do challenge each and every application of Defendants' Policy, the Court agrees that Plaintiffs bring either an as-applied challenge to the statute or a facial challenge to Defendants' Policy. *C.f. Winston v. City of Syracuse*, 887 F.3d 553, 559 (2d Cir. 2018) ("A facial challenge is an attack on a statute [*or policy*] itself as opposed to a particular application." (emphasis added) (internal citations omitted)). Indeed, because the Policy represents Defendants' interpretation of the statute in a particular context—which results in the statute being consistently applied the same way in that context—the challenges are two sides to the same coin.

## B. Substantive Due Process Right to Privacy

### 1. Review of this Court's Opinion and Order on Defendants' Motion to Dismiss

This Court previously found that forced disclosure of an individual's transgender status could subject them to risk of bodily harm under *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998). Specifically, that:

> "[W]here the release of private information places an individual at substantial risk of serious bodily harm, possibly even death, from *a perceived likely threat,* the 'magnitude of the liberty deprivation . . . strips the very essence of personhood.'" *Kallstrom*, 136 F.3d at 1064 (emphasis added) (quoting *Doe v. Claiborne*, 103 F.3d 495, 506–07 (6th Cir. 1996)).

Op. and Order 19, ECF No. 47.

Likewise, this Court found under *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998), that Defendants' Policy required Plaintiffs to disclose highly personal and private information that is entitled to remain confidential. As explained previously, *Bloch* found that:

> [S]uch disclosure [of highly personal and private information] violated the plaintiff's right to privacy because "sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood. Publicly revealing information regarding these interests exposes an aspect of our lives that we regard as highly personal and private." *Id.* at 685.

Op. and Order 21, ECF No. 47.

This Court went on to agree with the United States Court of Appeals for the Second Circuit's decision that found forced disclosure of a transgender individual's status as transgender was highly personal sexual information that

was protected by the due process clause's informational right to privacy. *See id.*;

*id.* at 23 ("the Court agrees with the Second Circuit that "[t]he excru[c]iatingly

private and intimate nature of [being transgender], for persons who wish to

preserve privacy in the matter, is really beyond debate" (internal citations

omitted)).

> Thus, this Court concluded that:

> [U]nder both *Kallstrom* and *Bloch*, Plaintiffs have adequately alleged that Defendants' Policy of refusing to change birth certificates to reflect gender identity implicates a release of personal information that is of a "sexual, personal, and humiliating nature" and "could lead to bodily harm," resulting in a violation of Plaintiffs' informational right to privacy.

Op. and Order 19, 23–24, ECF No. 47 (footnote and internal citations omitted).

This Court further found that Defendants' Policy justifications had to

survive strict scrutiny to survive the substantive due process challenge, and

Defendants had failed to provide compelling state interests for the Policy that

were narrowly tailored in their motion to dismiss. *Id.* at 29–32.

Although Defendants attempt to re-argue the legal determinations

previously made by this Court, the Court will not revisit its legal analysis

highlighted above and discussed in greater detail in its previous Opinion and

Order, ECF No. 47. Instead, on summary judgment the Court will analyze only

whether Plaintiffs have provided sufficient evidence that Defendants' Policy

infringes on their informational right to privacy and weigh that evidence against

any evidence proffered by Defendants to support a compelling state interest that is narrowly tailored.

### 2. Plaintiffs' Evidence

On summary judgment, Plaintiffs have presented evidence that Defendants' Policy has compromised their safety, reveals their intimate personal information, and could lead to future bodily harm if continued to be enforced. Pls.' Mot. Summ. J. 6–9, ECF No. 69.

Ray's forced disclosure caused her to both experience threats and have her intimate personal information revealed.  Ray testified that when she started a new job, she had to show her birth certificate to a human resources ("HR") professional in a room with ten to fifteen new colleagues.  Ray Dep. 119–20, ECF No. 67.  HR then questioned her, loudly enough for everyone to hear, as to why the gender on her birth certificate and driver's license did not match.  *Id.* at 112–13.  Ray's co-workers harassed her as a result of this forced disclosure— they called her a "freak," and one co-worker threatened to "beat [her] ass" if she used a woman's restroom.  *Id.* at 114.

Similarly, Breda had to show her birth certificate to an employer and was verbally harassed as a result of the forced disclosure of her intimately personal information.  HR told her that she would "never be a woman" and that she would "always be a man in God's eyes."  Breda Dep. 50, ECF No. 65.  HR also disclosed that Breda was transgender to other employees and word quickly

spread from there. *Id.* at 53. After the forced disclosure to the loose-lipped HR person, Breda's supervisors misgendered her, made comments about her genitalia, and avoided working directly with her. *Id.* at 53–55.

Argento testified about the psychological toll of the forced disclosure of very private information. He explained that "it's a lot of times dehumanizing because I'm telling something very personal about myself that I don't want to be telling a stranger." Argento Dep. 125–26, ECF No. 64.

Doe faced public humiliation and scrutiny because of her forced disclosure. For example, she was publicly humiliated at the Social Security Administration when attempting to correct her sex with that agency. Doe Dep. 123–24, ECF No. 66. The Clerk loudly, and in front of many people, refused to permit her to change the sex, despite Doe showing the Clerk a copy of the Social Security Policy permitting her to do so. *Id.* at 124. Doe described that experience at the Social Security office as "awful" and that she "ran out of that place in tears" and "sat in the parking lot in [her] car for about forty-five minutes crying." *Id.* at 125.

Plaintiffs' expert also testified about how being forced to disclose documents with the wrong sex listed leads some transgender individuals to not pursue jobs, services, or opportunities because they are fearful of pushback and humiliation. Gordon Dep. 207–08, ECF No. 58 ("when people have non-matching documents, that can expose them to extra scrutiny").

Finally, it is not just Plaintiffs' own experiences that have caused them to

fear disclosing their status but also a broader reality that, unfortunately, many

transgender individuals do face a heightened risk of "discrimination, harassment,

and violence because of their gender identity."  *See e.g., Whitaker by Whitaker v.*

*Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir.

2017); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 720 (D. Md.

2018) (noting that transgender people suffer "very high rates of violence" due to

their status).[5]  A 2015 survey revealed that 36% of transgender people in Ohio

who showed identification that did not match their sex presentation were

harassed, denied benefits or services, asked to leave a place, or assaulted.  *See*

National Center for Transgender Equality, 2015 U.S. Transgender Survey: Ohio

State Report 3 (2017), https://bit.ly/2QyKNHF.[6]  Plaintiffs' expert testified to this

very real and heightened risk of harm as well.  *See* Ettner Dep. 228–29, ECF No.

56 (giving an example of how a forced disclosure of a mismatched birth

certificate at a workplace led to a couple having feces spread on their desk,

petitions circulated against one of them to prohibit use of the female restroom at

work, their brake lines cut, and death threats made against them).

---

[5] The Court notes that it incorrectly cited a statistic from this case in its previous Opinion
and Order, but that the overarching point is the same—transgender people experience
high rates of violence because of their transgender status.
[6] The complete 2015 U.S. Transgender Survey is available at
https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

In sum, Plaintiffs each testified that they have experienced threats of harm or have been humiliated and harassed when their highly personal transgender status was forcibly disclosed. And as this Court's previous Opinion and Order held, *either* a risk of bodily harm or forced revelation of highly personal information is sufficient evidence to implicate their substantive due process rights under *Kallstrom* and *Bloch*.

Defendants' arguments in response are unavailing. First, Defendants argue that Plaintiffs have not introduced evidence showing they have been harmed after forced disclosure of their birth certificates or that they were sufficiently fearful of harm. *See* Defs.' Mot. Summ. J. 9–14, ECF No. 71. Let the Court reiterate, requiring Plaintiffs to actually be harmed before having a cognizable claim would not only be legally incorrect, it would be an untenable proposition. *See* Op. and Order 19, ECF No. 47 ("*Kallstrom* does not require courts to wait until plaintiffs are actually assaulted, or worse, to recognize "a very real threat to [transgender individuals'] personal security and bodily integrity" upon disclosure of their status. *See Kallstrom*, 136 F.3d at 1063."). Moreover, the inquiry is not limited solely to whether past forced disclosure subjected Plaintiffs to a risk of bodily injury, it is also whether continued forced disclosure is *likely* to put them at risk of bodily harm in the future as well. Plaintiffs and their experts testified to that heightened risk of harm transgender people face when forced to disclose. *See* Ray Dep. 115, 119–20, ECF No. 67; Argento Dep. 125–

26, ECF No. 64; Breda Dep. 118–20, ECF No. 65; Doe Dep. 124–25, ECF No. 66; *see also* Ettner Dep. 151, 189–92, 205–206, ECF No. 56; Ettner Rep. 43–45, ECF No. 69-6; Gorton Dep. 206–07, ECF No. 58.

Second, Defendants argue that because Plaintiffs are proud of and have disclosed their transgender status to some people that Plaintiffs are therefore not humiliated by the forced disclosure of their birth certificates or that their information has no right to remain private.[7]  This argument likewise fails.  The fact that Plaintiffs are proud of their transgender status and have shared such information on their personal social media accounts or with friends and family in no way negates their right to not be forced to disclose such private and personal information except on their own terms and in environments they chose.  As Argento testified, even if he was not fearful of bodily harm from government officials at the Department of Motor Vehicles when he was forced to disclose his birth certificate, there is still "a lot of anxiety about how [he'll] be treated . . . it's a lot of times dehumanizing."  Argento Dep. 126:2–15, ECF No. 64.  Plaintiffs do not lose their informational right to privacy by choosing to share the private information at certain times with certain people.

Accordingly, the Court finds that Plaintiffs have submitted sufficient evidence to demonstrate that they have a substantive due process right to

---

[7] Defendants also resurrect their argument that a birth certificate is a public record in Ohio, and, thus, there is no privacy being violated.  This Court has already dispelled with this argument and will not revisit it again.  *See* Op. and Order 24–26, ECF No. 47.

informational privacy that protects against the forced disclosure of the unchanged sex marker on their birth certificates.  *See* Op. and Order 23–24, ECF No. 47.

The Court will proceed to discuss Plaintiffs' equal protection claim before discussing Defendants' justifications because their justifications are the same for both claims.

## C. Equal Protection

The Court did not address Plaintiffs' equal protection claim in its Opinion and Order on Defendants' motion to dismiss.  However, the Court will address this claim on summary judgment as an alternative basis on which Plaintiffs' seek relief.

Plaintiffs argue that Defendants' Policy discriminates against Plaintiffs in violation of the equal protection clause of the Fourteenth Amendment by categorically denying transgender individuals the opportunity to have a birth certificate that reflects how they present to society but allowing others the same right.  Pls.' Mot. Summ. J. 10, ECF No. 69.  Plaintiffs also argue Defendants' Policy discriminates against transgendered people in that it allows other historical information—such as birth name or parents—to be changed but prohibits transgender individuals the ability to change the sex marker on their birth certificates.  *See* Ohio Rev. Code §§ 3705.12, 3705.13.

The equal protection clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection

of the laws." U.S. Const. amend. XIV, § 1. This protection extends to protection against "intentional and arbitrary discrimination" by the State. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curium). Put differently, "state action is unconstitutional when it creates 'arbitrary or irrational' distinctions between classes of people out of 'a bare . . . desire to harm a politically unpopular group.'" *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020) (internal citations omitted).

To prevail on their equal protection challenge, Plaintiffs must show that they were treated differently than other similarly situated individuals. *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1140 (D. Idaho 2018). Then, the Court must examine which level of scrutiny applies to review Defendants' justifications before examining the same. *See Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 285 (W.D. Pa. 2017) ("Where the state by its conduct intentionally treats one person differently from another, or one group of people differently from another group, when they are similarly-situated in all other material respects, the governmental classification must be justified by a standard related to its nature.").

Here, Defendants' Policy treats Plaintiffs differently than people who have changed their birth parents or name. Assuming for the sake of argument,[8] that

---

[8] The parties and their experts dispute whether sex and gender identity are the same thing or distinct categories. The Court need not decide this issue, however, because even assuming solely for the sake of argument that Defendants' position is right and the sex marker on a birth certificate identifies only biological sex at the time of birth, distinct from gender identity, and thus is "accurately recorded at birth" under the statute, Ohio

Plaintiffs' sex was correctly recorded at the time of birth, Plaintiffs are similarly situated to people who are allowed to change their accurately recorded birth parents or name in that those people, like Plaintiffs, had information accurately recorded at the time of their birth and have a court order with respect to the information they are trying to change. For example, adoptive parents can amend an adopted child's birth certificate to reflect the adopted parents' names, and individuals who have legally changed their names can have a birth certificate modified to reflect that change, but Plaintiffs are not afforded the same ability to change their birth certificates to align with their gender identities. *See Barron*, 286 F. Supp. 3d at 1141 (finding that Idaho's similar laws and policies violated the equal protection clause when it "g[a]ve certain people [such as adopted people] access to birth certificates that accurately reflect who they are, while denying transgender people, as a class, access to birth certificates that accurately reflect their gender identity"). Thus, the Court finds that Defendants' Policy treats transgendered people differently than similarly situated Ohioans.

### D. Levels of Scrutiny

The question for both the substantive due process and equal protection claims, now, is whether Defendants' justifications for the invasion of Plaintiffs' privacy interest and differential treatment between Plaintiffs and other persons

---

allows changes to other birth certificate information that was "accurately recorded at birth."

seeking to change birth certificate information, respectively, satisfies the applicable level of constitutional scrutiny.

There are three categories of scrutiny that apply to constitutional challenges of state law. The lowest level of scrutiny is rational basis review. That requires "[a]t a minimum, a statutory classification [to] be rationally related to a legitimate government purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). In the middle is intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex, and requires that the government's challenged action be "substantially related to an important government objective." *Id.* Last, at the other end of the spectrum is strict scrutiny. If the state action targets a race, national origin, or affects a fundamental right, it is subject to strict scrutiny and cannot be upheld absent a showing by the State that the law is narrowly tailored to further a compelling interest. *United States v. Brandon*, 158 F.3d 947, 959–60 (6th Cir. 1998).

### 1. Level of Scrutiny for the Informational Right to Privacy Claim

As this Court has already found in its previous Opinion and Order, because Defendants' Policy infringes on Plaintiffs' fundamental right to privacy, it is subject to strict scrutiny. *See* Op. and Order 29, ECF No. 47; *Kallstrom*, 136 F.3d at 1064. Under this standard, it is Defendants' burden to demonstrate their Policy is narrowly tailored to achieve a compelling government interest and that

they have attempted to use less intrusive alternatives to achieve those interests.
*Johnson v. California*, 543 U.S. 499, 505 (2005).

### 2. Level of Scrutiny for the Equal Protection Claim

The level of scrutiny applicable to Plaintiffs' equal protection claim,
however, is not as straightforward.  Plaintiffs argue that this Court should find that
heightened, intermediate scrutiny applies because Defendants' Policy targets a
class that has historically been subjected to discrimination.  Defendants disagree.
There is no binding precedent from the United States Supreme Court[9] or the
Sixth Circuit regarding whether transgender people are a quasi-suspect class.

The Supreme Court applies the following four factors to determine whether
a new classification warrants heightened scrutiny:

> (1) whether the class has been historically "subjected to
> discrimination," *Lyng v. Castillo*, 477 U.S. 635, 638, 106 S. Ct. 2727,
> 91 L. Ed. 2d 527 (1986); (2) whether the class has a defining
> characteristic that "frequently bears no relation to ability to perform or
> contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473
> U.S. 432, 440-41, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985);
> (3) whether the class exhibits "obvious, immutable, or distinguishing
> characteristics that define them as a discrete group," *Lyng*, 477 U.S.
> at 638; and (4) whether the class is "a minority or politically
> powerless," *id*.

*Bd. of Educ.*, 208 F. Supp. 3d at 873.

---

[9] Although in a different context, the Supreme Court recently found that discrimination
against transgender individuals was discrimination on the basis of sex in violation of
Title VII of the Civil Rights Act of 1964.  *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731,
1743, 1754 (2020).

Upon review, the Court finds that transgender individuals are a quasi-suspect class entitled to heightened scrutiny. First, as a colleague within this district recently noted, "there is not much doubt that transgender people have historically been subject to discrimination including in education, employment, housing, and access to healthcare." *Bd. of Educ.*, 208 F. Supp. 3d at 874; *see also Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951–53 (W.D. Wis. 2018) (discussing the same history of discrimination and harassment transgender people face); *Grimm*, 972 F.3d at 611–12 (citing statistics that "transgender people frequently experience harassment in places such as schools (78%), medical settings (2%), and retail stores (37%)" and are "more likely to be the victim of violent crimes" such that in 2009 Congress extended the definition of hate crimes to include crimes based on gender identity (internal citations omitted)).

Second, transgender people are no less capable of contributing value to society than other people. *See M.A.B.*, 286 F. Supp. 3d at 720 ("The Court is not aware of any argument suggesting that a transgender person . . . is any less productive than any other member of society."); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) (finding the same).

Third, transgender people have common, immutable characteristics that "define them as a discrete group," *see Bd. of Educ.*, 208 F. Supp. 3d at 874,

primarily in that "their gender identity does not align with the gender they were assigned at birth." *M.A.B.*, 286 F. Supp. 3d at 721.

Fourth, transgender people constitute a minority lacking in political power. As the *Grimm* court noted, "approximately 0.6% of the adult population in the United States" are transgender and "transgender persons are underrepresented in every branch of government." *Grimm*, 972 F.3d at 613. The Court finds that all four factors support finding that transgender people are entitled to heightened protection under the Equal Protection Clause as a quasi-suspect class.

This Court is not alone in concluding that transgender people are part of a quasi-suspect class subject to intermediate scrutiny review under the equal protection clause. *See Bd. of Educ.*, 208 F. Supp. 3d at 872 (finding that "transgender individuals are a quasi-suspect class because discrimination against them is discrimination on the basis of sex"; and that "[t]he nature of [transgender] discrimination is the same; it may differ in degree but not in kind, and discrimination on that basis is a form of sex-based discrimination that is subject to heightened scrutiny under the Equal Protection Clause"); *M.A.B.*, 286 F. Supp. 3d at 721 ("classifications based on transgender status are per se entitled to heightened scrutiny because transgender status itself is at least a quasi-suspect class"); *Flack*, 328 F. Supp. 3d at 953 (discussing the challenges transgender people face and noting that "other than certain races, one would be hard-pressed to identify a class of people more discriminated against historically

or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgendered people"); *Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 746–50 (E.D. Va. 2018) ("classifications based on transgender status are per se entitled to heightened scrutiny"), aff'd 972 F.3d 586 (4th Cir. 2020); *Barron*, 286 F. Supp. 3d at 1145 (same); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (same); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119–21 (N.D. Cal. 2015) (same); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139–40 (S.D.N.Y. 2015) (same); *see also Love v. Beshear*, 989 F. Supp. 2d 536, 545 (W.D. Ky. 2014) (rejecting the argument that sexual orientation discrimination is not entitled to heightened scrutiny because the Sixth Circuit caselaw relied upon used a line of cases overruled by the United States Supreme Court in *Lawrence v. Texas*, 539 U.S. 558 (2003)).

In arguing the contrary, Defendants state only that the Supreme Court and the Sixth Circuit have not found transgender people to constitute a quasi-suspect class and that the other out-of-circuit courts to have so found are not binding on this Court. *See* Defs.' Mot. Summ. J. 2–32, ECF No. 71. But the lack of binding precedent does not require this Court to only apply rational basis review, nor does it prevent this Court from relying on well-reasoned opinions of non-binding courts to inform its opinion here.

Accordingly, the Court finds that intermediate scrutiny applies.  Having concluded as such, it is Defendants' burden under intermediate scrutiny to demonstrate that their Policy "serves 'important governmental objectives and that the discriminatory means employ[ed]' are 'substantially related to the achievement of those objectives.'"  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  Moreover, those justifications must be genuine, not hypothesized or invented *post hoc* in response to litigation."  *Id.*

### E. Defendants' Justifications

The Court examines Defendants' justifications under strict scrutiny for the due process violation and intermediate scrutiny as it pertains to the equal protection violation.

Defendants first contend that "the accuracy of Ohio's birth certificate records is a substantial interest of the State."  Resp. 19, ECF No. 73.  They argue that Ohio's birth records confirm not only a person's birth but are also used to verify that person's death, and thus, the accuracy of the records are important.  Defs.' Mot. Summ. J. 30–31, ECF No. 71; *see also* Ohio Rev. Code § 3705.27.  The Court does not disagree that accurate records are important, but it would find this argument more persuasive if Defendants could explain why permitting someone who is adopted to change the names of their parents on their birth certificate to reflect people other than the individuals identified on the document

at birth does not affect the historical accuracy of the document and vital statistics, but changing a sex marker does.

Moreover, the idea that the State of Ohio has a true interest in maintaining historically accurate records is undermined by the fact that Ohio permitted transgender people to change the sex marker on their birth certificates until 2016. Defendants have offered no evidence to explain why "historical accuracy" has only recently become a State interest, or why it was necessary to change its Policy to further that interest. Given this, Defendants have failed to show that their Policy is substantially related to vital statistic preservation and certainly failed to show the Policy is the least restrictive means of achieving that purported goal.

Next, Defendants invoke fraud prevention as a justification for their Policy. They argue it is "well-known" that criminals routinely use Ohio birth certificates to perpetuate fraud," and "Defendants are in constant contact with other agencies to verify the accuracy of a birth record as part of a criminal investigation." Resp. 19, ECF No. 73. But the fact that criminals currently perpetuate fraud using birth certificates *generally* does not require the Court to therefore conclude that allowing transgender individuals to change their sex marker will lead to more fraud any more than allowing a person's legally changed name to be put on the birth certificate would. *See* Nagy Aff., ECF No. 71-1 (describing generally how fraud is perpetrated in Ohio using birth certificates). What Defendants fail to

connect is *how* criminals will use the change of a sex marker on a birth certificate to perpetuate fraud and why this change will result in fraud, let alone how this change will prevent Defendants from verifying the accuracy of birth records as part of a criminal investigation. Likewise, Defendants have not provided the Court with any evidence that the 2016 Policy about-face was made because there was an increase in fraudulent uses of birth certificates corresponding to someone's change of their sex marker.

Again, the Court does not doubt that fraud prevention is an important or even compelling government interest, but Defendants have failed to justify how their Policy's total prohibition on changing sex markers furthers this goal in the least restrictive means[10] possible, or even that this Policy is substantially related to this goal. Indeed, employing a similar process used prior to 2016 would seem to still achieve those goals. *See* Nagy Dep. 48–52, 62–65, 138–39, 150–52; ECF No. 55; Ex. A Defs.' Resp. Interrog. No. 3 and Supp'l Resp., ECF No. 69-2 (describing a process which entailed a court order authorizing the correction, a nominal processing fee, and a completed ODH-provided form, then locking the

---

[10] For example, Nagy's affidavit describes a notation put on a birth certificate with a legal name change and explains that Ohio is able to record and track that information with a corresponding file reference number. Nagy Aff. ¶¶ 21–26, ECF No. 71-1. But Defendants do not explain why a similar process is unavailable for tracking sex marker changes. Although the Court foresees a problem with an explicit "sex marker change" designation, including a file reference number on any changed birth certificate could perhaps be another narrowly tailored means of achieving the same goals.

Case No. 2:18-cv-272                                                    Page 25 of 28

transgender individual's birth certificate in a vault, no longer accessible to the public).

Finally, Defendants' argument that a judicial ruling on this issue will undermine the accuracy of vital statistics or fraud prevention is a red herring. *See* Defs.' Mot. Summ. J. 31–32, ECF No. 71.  Nothing in this Opinion prevents Defendants from creating and employing procedural systems and safeguards similar to the ones they have used previously to process sex marker changes, name changes, or adoptive parent changes.  All this Court is finding is that a blanket prohibition against transgender people changing their sex marker is unconstitutional.

At bottom, the Court finds that Defendants' proffered justifications are nothing more than thinly veiled post-hoc rationales to deflect from the discriminatory impact of the Policy.  And post hoc rationales do not suffice under either strict or intermediate scrutiny.

From the Court's estimation, however, Defendants' Policy justifications do not even survive rational basis review because there is no logical connection between the Policy and proffered justifications.  Instead, the testimony shows that after Defendants received a request to change a sex marker on a birth certificate sometime in 2015, the request "went up the chain," and upon "re-review" of the law they decided to no longer permit sex marker changes when the reason was because the requestor was transgender.  Nagy Dep. 108–10, ECF

No. 55.  This Policy resembles the sort of discrimination-based legislation struck down under the equal protection clause in *Romer v. Evans* as nothing more than a Policy "born of animosity toward the class of person affected" that has "no rational relation to a legitimate government purpose."  517 U.S. 620, 634 (1996). Indeed, when an almost identical policy (interpreting a similar neutral statute) in Idaho was challenged, the state defendants *conceded* that "no rational basis exist[ed] to support the categorical denial of requests to amend sex-assigned birth on the basis of correcting it to match one's gender identity."  *Barron*, 286 F. Supp. 3d at 1141 (the district court agreed there was no rational basis for the policy but ultimately found that intermediate scrutiny applied to the transgender plaintiffs' equal protection claim).  Although rational basis review is deferential, "it is not meant to be toothless."  *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981). "Equal protection of the laws is not achieved through indiscriminate imposition of inequalities."  *Romer*, 517 U.S. at 633 (citations and quotations omitted). Defendants' Policy prohibits transgender people the ability to change the sex on their birth certificate in an arbitrary and unequal manner.  Thus, although the Court finds that transgender people are a quasi-suspect class entitled to heightened scrutiny protections under the equal protection clause, even under rational basis review Defendants' Policy does not pass constitutional muster.

IV.    CONCLUSION[11]

For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for summary judgment, ECF No. 69, and **DENIES** Defendants' motion for summary judgment, ECF No. 70 (publicly available version at ECF No. 71).  The Court finds Defendants' Policy to be unconstitutional and hereby **PERMANENTLY ENJOINS** Defendants from enforcing their Policy.  The Clerk is **DIRECTED** to enter judgment in favor of Plaintiffs and **TERMINATE** this case.

IT IS SO ORDERED.

MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT

---

[11] Having addressed Plaintiffs' claims under the Fourteenth Amendment in their favor, the Court declines to analyze their compelled speech claim under the First Amendment.
Case No. 2:18-cv-272                                                      Page 28 of 28